**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CROSSINGBRIDGE ADVISORS LLC,

        Plaintiff,

    v.

CARGILL INTERNATIONAL TRADING
PTE LTD.,

        Defendant.

**Case No. 24-cv-9138 (RA)**

---

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**</u>

Tracey Salmon-Smith
Christian J. Clark
**FAEGRE DRINKER BIDDLE & REATH LLP**
1177 Avenue of the Americas, 41st Floor
New York, New York 10036
(212) 248-3140 (Telephone)
(212) 248-3141 (Fax)
tracey.salmonsmith@faegredrinker.com
christian.clark@faegredrinker.com

*Attorneys for Defendant Cargill International Trading
Pte Ltd.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS .................................................................................... 4

  I.      CITPL Enters into an Agreement to Purchase Iron Ore from Tacora. ................... 4

  II.     Tacora Experiences Financial Difficulties and Pursues Additional
          Financing..................................................................................... 5

  III.    Tacora Commences a Canadian Insolvency Proceeding and the Court
          Approves a Solicitation Process.............................................................. 6

  IV.     The Investors Agree to Invest New Capital Via a Subscription Agreement
          Implementing a Reverse Vesting Transaction. ....................................... 8

  V.      The Court Approves the Subscription Agreement and Reverse Vesting
          Transaction, Which Did Not Provide Any Recovery for Parties to the ICA. ....... 10

  VI.     The Court-Approved Restructuring Transaction Closed and the CCAA
          Proceeding Is Terminated. ................................................................ 11

  VII.    Procedural Background and Plaintiff's Allegations ............................. 12

LEGAL STANDARDS ....................................................................................... 14

  I.      Standard of Review....................................................................... 14

          A.      12(b)(6) Motion ............................................................ 14

          B.      12(c) Motion ............................................................... 15

  II.     Breach of Contract ....................................................................... 16

ARGUMENT..................................................................................................... 16

  I.      THE CANADIAN COURT APPROVED A TRANSACTION THAT DID
          NOT PROVIDE RECOVERY TO PRE-PETITION SECURED
          CREDITORS AND WHICH IS ENTITLED TO DEFERENCE........................ 16

          A.      The Cargill Consideration Payment and the $12.5 Million Setoff
                  were Issued to CITPL in Its Capacity as a Subsidiary to its Equity
                  Investor Parent Cargill, Incorporated, Not in its Capacity as a
                  Secured Creditor ........................................................... 18

          B.      Plaintiff's Attempts to Mis-Characterize and Re-Cast the Stated
                  Outcome of the Canadian Insolvency Proceeding Should be
                  Rejected....................................................................... 21

  II.     THE ICA IS NOT IMPLICATED HERE, AS ITS PLAIN TEXT EITHER
          DOES NOT SUPPORT OR CONTRADICTS PLAINTIFF'S THEORY
          OF RELIEF..................................................................................... 23

A.    The Cargill Consideration Payment and the $12.5 Million Setoff Are Not a Distribution or Payment Under Sections 2.01 and 2.03 of the ICA. ...................................................................................... 23

B.    Plaintiff Fails to Sufficiently Allege That Either the Cargill Consideration Payment or the $12.5 Million Setoff Implicate the ICA's Definition of Shared Collateral. ...................................................... 24

C.    Amendment would be Futile Because it is Logically and Factually Impossible that the Cargill Consideration Payment and the $12.5 Million Setoff Were Proceeds or Payments Made in Respect of Shared Collateral. ........................................................................................ 27

CONCLUSION.................................................................................................................. 29

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                              **Page(s)**

*1-800 Contacts, Inc. v. JAND, Inc.*,
   119 F.4th 234 (2d Cir. 2024) ..................................................................................................15

*Am. Soc'y for the Prevention of Cruelty to Animals v. Animal & Plant Health*
   *Inspection Serv.*,
   60 F.4th 16 (2d Cir. 2023) ......................................................................................................15

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
   671 F.3d 140 (2d Cir. 2011) ...............................................................................................4, 15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...............................................................................................................14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...............................................................................................................14

*Brenton v. Consol. Rail Corp.*,
   No. 00–CV–0742E(SR), 2003 WL 21383255 (W.D.N.Y. Feb. 4, 2003)................................22

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ..................................................................................................14

*Clarkson Co. v. Shaheen*,
   544 F. 2d 624 (2d Cir. 1976) .................................................................................................22

*Cornfeld v. Invs. Overseas Svcs., Ltd.*,
   471 F. Supp. 1255 (S.D.N.Y. 1979), *aff'd*, 614 F.2d 1286 (2d Cir. 1979) ............................22

*Crane Co. v. Coltec Indus., Inc.*,
   171 F.3d 733 (2d Cir. 1999)..................................................................................................16

*Dane v. UnitedHealthcare Ins. Co.*,
   974 F.3d 183 (2d Cir. 2020)............................................................................................14, 26

*In re Davis*,
   191 B.R. 577 (Bankr. S.D.N.Y. 1996).................................................................................22

*DeLuca v. AccessIT Grp., Inc.*,
   695 F. Supp. 2d 54 (S.D.N.Y. 2010)....................................................................................14

*In re Ditech Holding Corp.*,
   No. 19-10412 (JLG), 2021 WL 5225840 (Bankr. S.D.N.Y. Nov. 9, 2021) .............................3

*Edwards v. Sequoia Fund, Inc.*,
   938 F.3d 8 (2d Cir. 2019) ......................................................................................................16

*In re Energy Future Holdings Corp.*,
    546 B.R. 566 (Bankr. D. Del. 2016) ...................................................................26

*In re Energy Future Holdings Corp.*,
    773 F. App'x 89 (3d Cir. 2019) ...............................................................20, 28

*Finanz AG Zurich v. Banco Economico S.A.*,
    192 F.3d 240 (2d Cir. 1999)...........................................................................22

*Galli v. Metz*,
    973 F.2d 145 (2d Cir. 1992).............................................................................26

*L-7 Designs, Inc. v. Old Navy, LLC*,
    647 F.3d 419 (2d Cir. 2011).............................................................................15

*Labajo v. Best Buy Stores, L.P.*,
    478 F. Supp. 2d 523 (S.D.N.Y. 2007) ............................................................5, 15

*Lynch v. City of New York*,
    952 F.3d 67 (2d Cir. 2020)...........................................................................15, 20

*Mazzola v. Cnty. of Suffolk*,
    533 N.Y.S.2d 297 (2d Dep't 1988) ..................................................................16

*McCracken v. Verisma Sys., Inc.*,
    91 F.4th 600 (2d Cir. 2024) ............................................................................15

*In re MPM Silicones, LLC*,
    518 B.R. 740 (Bankr. S.D.N.Y. 2014)..........................................................5, 15, 21

*Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*,
    483 F. Supp. 3d 195 (S.D.N.Y. 2020) ..............................................................16

*Sira v. Morton*,
    380 F.3d 57 (2d Cir. 2004)...........................................................................14

*Torres v. Walker*,
    356 F.3d 238 (2d Cir. 2004)...........................................................................16

**Statutes, Rules & Regulations**

11 U.S.C. § 510.................................................................................................12

*Canadian Companies' Creditors Arrangements Act* ..................................................1

Fed. R. Civ. P. 12(b)(6)................................................................................ *passim*

Fed. R. Civ. P. 12(c) ................................................................................... *passim*

Defendant Cargill International Trading Pte Ltd. ("CITPL") respectfully submits this memorandum of law in support of its motion to dismiss the First Amended Complaint ("FAC") pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c).

## PRELIMINARY STATEMENT

This matter concerns an unhappy creditor plaintiff attempting to rewrite the outcome of a lawful, court-approved Canadian insolvency process in order to obtain funds which it is not entitled to under the applicable contractual arrangements. Following a year-long, court-supervised Canadian insolvency proceeding (the "CCAA Proceeding"),[1] the Ontario Superior Court of Justice (the "Ontario Court") approved a set of transactions pursuant to a Subscription Agreement that closed in September 2024 (the "Court-Approved Restructuring Transaction"), which the Ontario Court described as "the best and only available going concern outcome" for debtor Tacora Resources Inc. ("Tacora"), the operator of the Scully iron ore mine in Labrador, Canada.

At the start of the CCAA Proceeding, in order to maintain Tacora as a going concern, the Ontario Court had approved a super-priority debtor-in-possession loan facility (the "DIP Facility") provided by Cargill, Incorporated.[2] When the Court-Approved Restructuring Transaction finally closed a year later, it did not provide for any payments whatsoever on any pre-petition secured debt claims ranking junior to the DIP Facility. As a result, and which occurs from time to time in Canadian as well as U.S. bankruptcies, Tacora's pre-petition secured creditors—including Plaintiff CrossingBridge and Defendant CITPL—received no repayment on account of their pre-petition secured obligations.

---

[1] CCAA is the abbreviation for the *Canadian Companies' Creditors Arrangements Act*.
[2] As explained in Defendant's Rule 7.1 Statement to this Court, Cargill, Incorporated is the ultimate parent of Defendant Cargill International Trading Pte Ltd. *See* Rule 7.1 Statement, Dkt. No. 3.

Apparently disappointed by the outcome of the CCAA Proceeding, Plaintiff CrossingBridge—in a step not taken by any other secured or unsecured creditor of Tacora—now files suit in the United States against CITPL for allegedly breaching an intercreditor agreement ("ICA")[3] amongst the secured creditors to share proceeds from their shared collateral in Tacora. Based on the Court-Approved Restructuring Transaction, however, there were no such proceeds to share with any pre-petition secured creditors. Among other things, Plaintiff ignores the text of the court-approved Subscription Agreement, which does not contemplate distributions to any pre-petition secured creditors, but instead involves a sizeable new equity investment by Cargill, Incorporated and other investors, which was made in exchange for duly negotiated consideration and the "vesting out" of Tacora's liabilities (including the secured notes held by Plaintiff which are at issue here). As CITPL will demonstrate below, Plaintiff's attempt to bootstrap its way to some recovery on its secured notes via the ICA flies in the face of both the duly conducted CCAA Proceeding, which is entitled to deference, and the clear terms of the ICA itself.

The Subscription Agreement, which arose as the *only viable outcome* for Tacora after a series of failed attempts at a sale, contemplated Cargill, Incorporated and two other investors contributing $250 million in new equity to Tacora, which would ensure the Scully Mine could maintain operations and exit the CCAA Proceeding as a going concern. The Court-Approved Restructuring Transaction under the Subscription Agreement contemplated and was implemented pursuant to a "Reverse Vesting Transaction" overseen by a court-appointed Monitor (the "CCAA Monitor") and approved by the Ontario Court, which placed all Tacora's pre-petition secured debt (and other pre-petition liabilities) in a new entity known as ResidualCo. The Court-Approved

---

[3] Its full title is Collateral Agency and Intercreditor Agreement, dated as of May 11, 2023. *See* ICA, attached as Exhibit A to the Declaration of Tracey Salmon-Smith ("TSS Decl.").

Restructuring Transaction closed in September 2024. Tacora emerged from the CCAA Proceeding free of its obligations under the pre-petition secured debt at issue in this case and has continued operating at the Scully Mine.

Plaintiff's alleged claim arises because, in May 2023, before the CCAA Proceeding began, Computershare Trust Company, N.A. (the "Notes Trustee"), CITPL, and Tacora had entered into the ICA governing the relationship amongst Tacora's secured creditors. The ICA contained waterfall provisions outlining the priority of any payments or proceeds received "in respect of any Shared Collateral." The waterfall provisions, however, are only triggered under specific circumstances: the ICA does not purport to apply to any and all consideration, payment, or value received by CITPL or any other secured creditor, but rather only when such proceeds are received "in respect of any Shared Collateral." Nonetheless, Plaintiff takes the extreme position that if CITPL received *anything* of value in any way from Tacora or relating to the insolvency, the ICA requires CITPL to share that value among the noteholders. According to Plaintiff, despite not itself agreeing to make any new equity investment in Tacora[4] nor objecting to the transactions in the Ontario Court, Plaintiff should now be entitled to claim a portion of the duly negotiated and court-approved benefits of the Subscription Agreement for itself.

The key documents of the CCAA Proceeding[5] and the actual text of the ICA make clear that Plaintiff cannot allege any plausible claim for breach of that agreement, and this suit should

---

[4] CrossingBridge had the ability to put a binding proposal in the court-supervised sale process to bid over the value of the DIP Facility and create proceeds for all existing pre-petition secured creditors and elected not to do so. They cannot now complain that there is no value for pre-petition secured creditors after the Ontario Court overseeing the insolvency proceedings determined there are no proceeds available to such creditors.

[5] The Court can take judicial notice of legal proceedings in other courts if they are relevant to the case at hand. *See In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2021 WL 5225840, at *2 n.10 (Bankr. S.D.N.Y. Nov. 9, 2021) ("It is well settled that in resolving a Rule 12(b)(6) motion, the court may take notice of proceedings in other courts, both within and without the federal judicial

be dismissed under 12(b)(6) or 12(c). First, any alleged value that flowed to CITPL did so not in CITPL's capacity as a pre-petition secured creditor but rather because CITPL's parent, Cargill, Incorporated, provided a $129.8 million DIP Facility during the pendency of the CCAA Proceeding and agreed to invest $50 million in new equity, provide additional secured debt to Tacora and amend CITPL's existing offtake agreement. This is confirmed by the fact that no secured creditor that, like Plaintiff, did not participate in the transaction or make any new investment in Tacora, received any payments or distributions pursuant to the Subscription Agreement. Second, the actual terms of the ICA make clear that the ICA is not triggered by either the "Cargill Consideration Payment" or the $12.5 million Setoff between Tacora and CITPL because these transactions do not constitute payments with respect to Shared Collateral in Tacora.

For the reasons explained below, the documents of the CCAA Proceeding and the clear terms of the ICA necessitate dismissal of Plaintiff's breach of contract claim pursuant to Rule 12(b)(6) or 12(c).

## STATEMENT OF FACTS[6]

### I.    CITPL Enters into an Agreement to Purchase Iron Ore from Tacora.

Tacora is a private company that owns and operates the Scully Mine, which produces iron ore concentrate near Wabush, Newfoundland and Labrador, Canada. FAC ¶¶ 5–6. On April 5,

---

system, if those proceedings have a direct relation to matters at issue.") (internal quotations and citation omitted). The attached TSS Declaration attaches a selection of the most important documents from the CCAA Proceeding to ease the Court's review. As explained in the TSS Declaration, the full CCAA Proceeding docket is available through a website maintained by the court-appointed CCAA Monitor, available at http://cfcanada.fticonsulting.com/tacora/default.htm (last visited February 5, 2025).

[6] This Statement of Facts is drawn from allegations in the FAC and supplemented by documents that are incorporated by reference in the FAC or otherwise appropriate for judicial notice. For purposes of this motion to dismiss only, Defendant assumes, without conceding, that the factual allegations in the FAC are true. To the extent those factual allegations are contradicted by any incorporated documents or judicially noticed information, however, the latter should control. *See,*

2017, Tacora entered into an Offtake Agreement with Defendant CITPL, a Singaporean subsidiary of Cargill, Incorporated, which is a multinational corporation headquartered in Minnesota. *Id.* ¶¶ 4, 7. The Offtake Agreement (as amended) requires Tacora to sell 100% of the iron ore concentrate produced at Tacora's Scully Mine to CITPL. *Id.* ¶¶ 6–7.

## II.    Tacora Experiences Financial Difficulties and Pursues Additional Financing.

Tacora issued $175 million in Senior Secured Notes pursuant to an indenture dated May 11, 2021. *Id.* ¶ 9. Tacora experienced strained liquidity in or around 2022[7] and implemented several mechanisms to raise additional financing *Id.* ¶¶ 8–19, including:

- In February 2022, Tacora issued an additional $50 million in Senior Secured Notes via a February 16, 2022 supplemental indenture. *Id.* ¶ 10. The Plaintiff CrossingBridge was a holder of the Senior Secured Notes. *Id.* ¶ 15. CITPL and parent, Cargill, Incorporated, did not hold any Senior Secured Notes. *Id.* ¶ 26.

- In January 2023, Tacora obtained additional funding from CITPL through an advance payment facility agreement (the "APF Agreement") with CITPL executed on January 3, 2023. *Id.* ¶ 12. Pursuant to the APF Agreement, CITPL agreed to advanced payments for future deliveries of iron ore ("the Advanced Payment Facility" or "APF," and collectively with the Senior Secured Notes, the "Senior Secured Claims") to be delivered pursuant to the Offtake Agreement. TSS Decl., Ex. D, October 30, 2023

---

*e.g.*, *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146–47 (2d Cir. 2011) ("where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true"); *In re MPM Silicones, LLC*, 518 B.R. 740, 744 (Bankr. S.D.N.Y. 2014); *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007).

[7] The FAC states that Tacora experienced these liquidity challenges "[s]ince at least 2021," *see* FAC ¶ 8, but the Ontario Court recognized "Q3 2022" as the start of the liquidity issues, *see* TSS Decl., Ex. D, October 30, 2023 Endorsement ¶ 34. As such, the date of the Ontario Court's Endorsement has been used.

Endorsement ¶ 12. The APF was secured by a lien, which ranked *pari passu* with the Senior Secured Notes, *see* FAC ¶ 23.

- In May 2023, Tacora sought additional financing from a group of Senior Noteholders by way of Senior Priority Notes, as well as CITPL by way of a margin advances facility under the APF Agreement (the "Cargill Margin Facility," and collectively with the Senior Priority Notes, the "Senior Priority Claims"). *Id.* ¶¶ 14–16. The Senior Priority Claims were secured by a lien on substantially all the real and personal property of Tacora and its subsidiaries, which lien ranked in priority to the liens securing the Senior Secured Claims. *Id.* ¶¶ 19, 24. Plaintiff CrossingBridge held $12,233,510 in principal, or forty-five percent (45%), of the Senior Priority Notes. *Id.* ¶ 18. CITPL and parent Cargill, Incorporated did not hold any Senior Priority Notes. *Id.* ¶ 26.

## III.    Tacora Commences a Canadian Insolvency Proceeding and the Court Approves a Solicitation Process.

Tacora's liquidity challenges continued throughout 2023, and Tacora initiated the CCAA Proceeding on October 10, 2023. *Id.* ¶ 28. That same day, the Ontario Court entered an Initial Order instituting a stay and permitting Tacora to retain possession and control of its assets and business operations while undergoing a restructuring. TSS Decl., Ex. E, October 10, 2023 Initial Order ("Initial Order") ¶ 29. Pursuant to the Initial Order, the Ontario Court also approved the DIP Facility from Cargill, Incorporated (in such capacity,[8] the "DIP Lender") in order to finance Tacora's working capital requirements. *Id.* The Ontario Court ordered a super-priority charge

---

[8] As the Ontario Court expressly acknowledged, CITPL and its corporate parent, Cargill, Incorporated, played a variety of roles in the Tacora insolvency transactions and were treated differently depending on the roles involved. *See* TSS Decl., Ex. D, G, July 26, 2024 Endorsement ("July Endorsement") ¶ 5 (noting Cargill "in its various stakeholder capacities, as secured lender, unsecured lender, DIP lender, service provider, etc.").

securing the DIP Facility and therefore the DIP Facility was entitled to repayment before any other creditors, including those holding Senior Secured Claims and Senior Priority Claims (including Plaintiff and Defendant in their relevant capacities). *See id.* ¶ 38 ("THIS COURT ORDERS that each of the [DIP] Charges shall constitute a charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, claims of secured creditors, statutory or otherwise.").

Following two failed attempts to solicit a viable transaction that would maximize value for Tacora's stakeholders, including through one prior sale process overseen by the CCAA Monitor, Tacora petitioned for and obtained a Sales Process Order on June 5, 2024, which "authorized and directed Tacora to undertake [a] Sale Process to identify the highest and/or best offer for the sale of: (a) all the shares of Tacora to be implemented pursuant to a subscription agreement; or (b) all or substantially all of Tacora's Property and Business pursuant to an asset purchase agreement." *Id.* ¶ 19. On July 12, 2024, the bid deadline under the Sales Process, Tacora received only one bid proposing the Subscription Agreement between Tacora and a group of investors: Cargill, Incorporated, Millstreet Capital Management LLC, and OSP, LLC (collectively, the "Investors"). *Id.* ¶¶ 5, 22. The Sale Process was open to any and all parties to participate. *See* TSS Decl., Ex. H, August 12, 2024 Endorsement ("August Endorsement") ¶ 14a (describing the sale process as "broad, open, fair and transparent"). The Plaintiff CrossingBridge could have submitted an offer for value above the DIP Facility to provide for recovery to secured creditors ranking below the DIP Facility, but it elected not to do so as evidenced by the fact that there was only one bid submitted under the Sale Process (*i.e.*, the Subscription Agreement submitted by the Investors).

**IV.    The Investors Agree to Invest New Capital Via a Subscription Agreement Implementing a Reverse Vesting Transaction.**

Tacora and the Investors entered into the Subscription Agreement on July 21, 2024. FAC ¶ 29. The Subscription Agreement contemplated a "Reverse Vesting Transaction" comprised of a series of steps. *Id.* As relevant to this case, these transactions included, inter alia: (a) a $250 million new equity investment from the Investors (including Cargill, Incorporated, not CITPL); (b) the cancellation of all Existing Equity; (c) repayment of the DIP Obligations, and the Cargill Margin Facility, (d) the set-off of a portion of the amounts owing by Tacora under the APF against the Cargill-Pre-Filing Payable; (e) the assignment of all claims related to the Senior Priority Notes, the Senior Secured Notes, and the obligations remaining under the APF to a new company called ResidualCo; and (f) the execution of a new Cargill Offtake Agreement between Tacora and CITPL. *See* TSS Decl., Ex. B, Subscription Agmt. § 1.3. With the cancellation of the Existing Equity and issuance of New Equity, the Investors would "become the sole shareholders of Tacora[,]" while "vesting out" liabilities related to the Senior Secured Notes, the Senior Priority Notes and the APF to ResidualCo "allow[ed] the Investors to acquire Tacora's business and assets on a 'free and clear basis.'" TSS Decl., Ex. F, Monitor's Fourth Report ¶¶ 40, 40(a).

Cargill, Incorporated, not the Defendant CITPL, was the relevant "Investor" that entered into the Subscription Agreement. *See* TSS Decl., Ex. B, Subscription Agmt., Ex. A. The Subscription Agreement outlines a seven-step Closing Sequence implementing the Reverse Vesting Transaction, pursuant to which, as is common in this transaction structure under Canadian insolvency law, unpaid liabilities were excluded from the restructured Tacora and "vested" in a newly formed entity called ResidualCo. *Id.* § 7.2. In relevant part, the Subscription Agreement stated:

(a) the Company shall . . transfer to ResidualCo . . . the **Excluded Liabilities;**

(b) "Cargill shall set-off a portion of the amount owing by the Company under the APF (equal to the amount of the Cargill Pre-filing Payable) against the Cargill Pre-filing Payable";[9]

(c) **the Company shall . . .  transfer to ResidualCo all Claims in respect of the Senior Secured Notes and the Senior Priority Notes and any Claims remaining under the APF**; and

(d) the Monitor shall be directed to **pay, on behalf of the Company, all DIP Obligations** accruing up to the Closing Date . . . and the Existing Cargill Margin Facility."

*Id.* § 7.2 (emphasis added). Section 3.1(c) further stated with respect to the Excluded Liabilities that:

> the Company and its assets, undertaking, business and properties shall be fully and finally Discharged from all Senior Priority Notes, Senior Secured Notes, and any Claims remaining under the APF that are not otherwise satisfied as contemplated under Section 7.2(c)."

*Id.* § 3.1(c).

On September 17, 2024, the parties executed an Amendment to the Subscription Agreement (the "Subscription Agreement Amendment"), which reflected revised terms agreed to by the parties and approved by the CCAA Monitor. *See* TSS Decl., Ex. C, Subscription Agmt. Amend., "Recitals." The Subscription Agreement Amendment, among other amendments, explicitly provided that "the 'Cargill Consideration Payment'[] is being made in consideration for Cargill entering into this Agreement and its agreements, compromises and obligations hereunder." *See id.* § 1.4. This was consistent with the express provisions of the Subscription Agreement that were approved by the Ontario Court, which specifically noted that:

> "[t]he payment to Cargill of the amounts owing under the Existing Cargill Margin Facility are being made in consideration for Cargill entering into this Agreement and its agreements, compromises and obligations hereunder. The Investors may, in

---

[9] As for 7.2(c), the Subscription Agreement defines Cargill Pre-filing Payable as "the amounts owing by Cargill to the Company under the Cargill Existing Offtake Agreement (approximately $12,500,000) prior to October 10, 2023." TSS Decl., Ex. B § 1.1.

the alternative, determine that a payment in the same amount shall be made to Cargill not specifically in repayment of the Existing Cargill Margin Facility but otherwise as a payment to Cargill in connection with the Transactions and this Agreement." *See* TSS Decl., Ex. B § 2.3(a).

V.  **The Court Approves the Subscription Agreement and Reverse Vesting Transaction, Which Did Not Provide Any Recovery for Parties to the ICA.**

On July 26, 2024, the Ontario Court granted an Approval and Reverse Vesting Order. FAC ⁋ 29. Justice Kimmel also entered an Endorsement on that same day, which provided an additional explanation for her approval. *See* TSS Decl., Ex. G, July 26, 2024 Endorsement ("July Endorsement"). The Endorsement noted that the Subscription Agreement was "the culmination of extensive solicitation efforts on the part of Tacora" involving "three solicitation and sale processes [that] resulted in a broad and robust canvassing of parties potentially interested in Tacora's business and assets." *Id.* ⁋ 2. Moreover, it described the CCAA proceeding as a "lengthy and sometimes acrimonious . . . process that involved multiple attempts . . . to achieve a going concern transaction." *Id.* ⁋ 1.

Significantly, Justice Kimmel identified the Reverse Vesting Transaction as "**the best and only available going concern outcome for Tacora**" and stated that "**[n]o alternative transactions emerged from these processes that would provide full repayment to the Senior Notes or Senior Priority Notes**." *Id.* ⁋⁋ 3–4 (emphasis added). In a further Endorsement issued on August 12, 2024, Justice Kimmel again emphasized that "**[t]he Subscription Agreement and the Transactions . . . were the best and only actionable transaction available to Tacora**, as determined by a broad market canvass conducted through the Pre-Filing Solicitation Process, the Solicitation Process and the Sale Process." TSS Decl., Ex. H, August Endorsement ⁋ 12b (emphasis added). The Endorsement further described the sale process as "broad, open, fair and transparent." *Id.* ⁋ 14a. Justice Kimmel found that "[n]o stakeholder is worse off under the reverse

vesting transaction structure than they would have been under any other viable alternative" and that **"[t]he RVO structure does not result in material prejudice or impairment to any of Tacora's creditors' rights** that they would not otherwise suffer under a traditional asset sale structure." *Id.* ¶ 12c (emphasis added). Finally, Justice Kimmel noted that "Tacora's major secured creditor groups, Cargill and holders of the Senior Notes and Senior Priority Notes, were involved in the Sale Process and are supportive of the relief sought on this motion" and "[n]o substantive objections to the terms of the Sale Process have been raised." *Id.* ¶ 14d. The result of the Subscription Agreement and the court-approved sale process was that the Ontario Court concluded that there was no recovery for any of the pre-petition secured claims, including the claims held by the Plaintiff or CITPL. TSS Decl., Ex. H, August Endorsement ¶ 12b (noting "significant compromises were made by the secured creditors (whose pre-filing debt and annual debt service was eliminated in exchange for equity and future funding commitments by some) . . . ."); TSS Decl., Ex. I, Monitor's Certificate ¶ B (certifying that "all Claims in respect of any Senior Priority Notes, Senior Secured Notes and the APF" were "vested out of [Tacora]"). In sum, value for Tacora "broke" at the level of the DIP Facility, that is, there were no proceeds available for any payments to secured creditors ranking behind the DIP Facility.

## VI.    The Court-Approved Restructuring Transaction Closed and the CCAA Proceeding Is Terminated.

The Court-Approved Restructuring Transaction closed on September 19, 2024, thereby effectuating, among other things, the vesting of the liabilities related to the Senior Secured Notes, the Senior Priority Notes, the remaining obligations under the APF Agreement (including the remaining APF obligations and the Cargill Margin Facility), and the Cargill Offtake Agreement and certain other obligations to ResidualCo. *See* TSS Decl., Ex. I, Monitor's Certificate ¶¶ B, C4. On October 7, 2024, the Ontario Court entered a CCAA Termination Order recognizing that the

transaction was completed. *See* TSS Decl., Ex. J, CCAA Termination Order ¶ 15. Justice Kimmel entered an Endorsement along with the CCAA Termination Order, which noted that "[n]o one on the service list has raised any concerns and no one appeared at the hearing to raise any objections."[10] TSS Decl., Ex. K, October 7, 2024 Endorsement ¶ 5.

## VII.    Procedural Background and Plaintiff's Allegations

Following the closing of the Court-Approved Restructuring Transaction, Plaintiff brought this suit on October 23, 2024, in New York Supreme Court on a single claim of breach of contract alleging that any value received by CITPL as a result of the CCAA Proceeding violated the ICA that governs the priorities as between holders of the Senior Secured Claims and the Senior Priority Claims. Plaintiff then filed the FAC directly with this Court on December 30, 2024, following removal from New York Supreme Court on November 27, 2024.

For context, in May 2023, Tacora, the Notes Trustee, and CITPL (the latter two in their roles as "Authorized Representatives" for secured holders of Senior Secured Notes and Senior Priority Notes, and the APF Agreement, respectively) entered into the ICA in connection with the issuance of the Senior Priority Notes and provision of the Cargill Margin Facility under the APF. FAC ⁋ 20. Intercreditor agreements, which can be similar conceptually to "subordination agreements," *see* Bankruptcy Code, 11 U.S.C. § 510, establish the priority of debt repayment amongst creditors, among other things. Specifically, Section 2.01(a) of the ICA provided a ranked set of priorities amongst the secured creditors and also required CITPL or the Notes Trustee to distribute certain proceeds they received in respect of Shared Collateral to the other creditors. TSS Decl., Ex. A, ICA § 2.01(a). Crucially, this waterfall provision in Section 2.01(a) is only triggered

---

[10] The cited Service List was included at the top of the document and identified all participants, including Plaintiff's insolvency counsel, who evidently did not object.

in transactions where a distribution was "made in respect of any Shared Collateral." *Id.* Section 2.03(b), the other provision that the FAC is based on, similarly contained language limiting its reach to "possession of any Shared Collateral . . . at any time prior to the Discharge." *Id.* § 2.03(b). The ICA defined "Collateral" as "all assets and properties of [Tacora] or any Grantor now or hereafter subject to Liens created . . . to secure Senior Priority Obligations or Pari Passu Obligations," while "Shared Collateral" is defined as "Collateral in which the holders of any Series of Senior Priority Obligations and/or any Series of Pari Passu Obligations . . . hold a valid and perfected security interest at such time." *Id.* § 1.01(c).

In the FAC, Plaintiff alleges that a "payment to CITPL of the around $6.2 million owing under the Existing Cargill Margin Facility (defined as the 'Cargill Consideration Payment' in the [Subscription Agreement] amendment)" and a "setoff of the approximately $12.5 million Cargill Pre-Filing Payable against the same amount owing by Tacora to CITPL under the APF Agreement, violated the ICA." FAC ¶ 40. According to Plaintiff, by failing to distribute such amounts "on a pari passu basis to each Series of Senior Priority Obligations," CITPL violated §§ 2.01 and 2.03(b) of the ICA. *Id.* ¶¶ 41–42. Whether these were cash payments, or "discounts" is irrelevant, according to Plaintiff, because these were instances of "payment/distribution triggering application of the ICA." *Id.* ¶ 44.

Defendant CITPL now moves this Court for an order dismissing Plaintiff's breach of contract claim because Plaintiff's theory of relief is utterly inconsistent with the duly conducted CCAA Proceeding, which is entitled to deference, as well as clear terms of the ICA, because there was no distribution "made in respect of Shared Collateral" that would have triggered the ICA's waterfall provision.

## LEGAL STANDARDS

### I.    Standard of Review

#### A.  12(b)(6) Motion

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court will "accept as true all factual allegations and draw from them all reasonable inferences" but will not "credit conclusory allegations or legal conclusions couched as factual . . . allegations." *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188–89 (2d Cir. 2020). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

When analyzing a Rule 12(b)(6) motion, courts can consider "any written instrument attached to [the complaint] as an exhibit, materials incorporated in [the complaint] by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (citations omitted); *see also DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) ("To be incorporated by reference, the complaint must make 'a clear, definite and substantial reference to the documents.'"); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (a document is integral to the complaint "where the complaint 'relies heavily upon its terms and effect'").[11]

---

[11] The FAC explicitly incorporates the "Subscription Agreement" (FAC ¶¶ 27, 29–31, 33, 35–36) and the "Subscription Agreement Amendment" (FAC ¶¶ 32, 40, 44), as well as the January 9, 2023 "Pari Passu Intercreditor Agreement" (FAC ¶ 13), the May 11, 2023 "Collateral Agency and Intercreditor Agreement" dated May 1, 2023 (FAC ¶¶ 1, 2, 20–25, 34–36, 38–39), and the October 7, 2024 "CCAA Termination Order" (FAC ¶ 32).

Yet, "where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146–47 (2d Cir. 2011); *see also In re MPM Silicones, LLC*, 518 B.R. 740, 744 (Bankr. S.D.N.Y. 2014) ("[A] Court need not accept a complaint's allegations that are clearly contradicted by documents incorporated into the pleadings.") (citing *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007) ("Where a plaintiff's conclusory allegations are clearly contradicted by documentary evidence incorporated into the pleadings by reference, however, the court is not required to accept them.")).

**B. 12(c) Motion**

A Rule 12(c) motion for judgment on the pleadings is reviewed "*de novo* 'under the same standard as the grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).'" *McCracken v. Verisma Sys., Inc.*, 91 F.4th 600, 606 (2d Cir. 2024) (quoting *Am. Soc'y for the Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Serv.*, 60 F.4th 16, 21 (2d Cir. 2023)); *see, e.g.*, *1-800 Contacts, Inc. v. JAND, Inc.*, 119 F.4th 234, 246 (2d Cir. 2024) ("The legal standard for granting a Rule 12(c) motion is identical to that for granting a Rule 12(b)(6) motion to dismiss for failure to state a claim."). As such, courts will also consider "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case" on a Rule 12(c) motion. *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011). And, just like a 12(b)(6) motion, courts will "not to give effect to a complaint's assertions of law or legal conclusions couched as factual allegations." *Lynch v. City of New York*, 952 F.3d 67, 75–76 (2d Cir. 2020).

## II.    Breach of Contract

"Under New York law[12], a breach of contract claim requires (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd*., 483 F. Supp. 3d 195, 209 (S.D.N.Y. 2020). "[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found therein, and the words and phrases used in an agreement must be given their plain meaning so as to define the rights of the parties." *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12–13 (2d Cir. 2019) (cleaned up) (quoting *Mazzola v. Cnty. of Suffolk*, 533 N.Y.S.2d 297, 297 (2d Dep't 1988). "Where the parties' intent is unambiguously conveyed by the plain meaning of the agreements, interpretation is a matter of law." *Id.* (cleaned up) (quoting *Crane Co. v. Coltec Indus., Inc*., 171 F.3d 733, 737 (2d Cir. 1999)). "If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." *Torres v. Walker*, 356 F.3d 238, 245 (2d Cir. 2004). "At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Edwards*, 938 F.3d 8 at 13.

## ARGUMENT

## I.    THE CANADIAN COURT APPROVED A TRANSACTION THAT DID NOT PROVIDE RECOVERY TO PRE-PETITION SECURED CREDITORS AND WHICH IS ENTITLED TO DEFERENCE

Through this suit, Plaintiff seeks to obtain preferential treatment by rewriting the outcome of a court-supervised and approved insolvency proceeding in Canada that resulted in Tacora's pre-

---

[12] The Intercreditor Agreement's governing law provision recognizes New York law. TSS Decl., Ex. A, IAC § 3.07.

petition secured creditors (including both Plaintiff and Defendant) receiving zero proceeds on account of their pre-petition secured claims and having their claims discharged and transferred to a separate entity so that Tacora could emerge from the CCAA Proceedings "free and clear" of liabilities. TSS Decl., Ex. F, Monitor's Fourth Report ¶ 40.

At the start of the CCAA Proceedings in the fall of 2023, the Ontario Court granted the Initial Order granting a super-priority charge to secure the DIP Facility. *Id.*, Ex. E ¶¶ 29, 38. This order gave the DIP Facility super-priority status in the CCAA Proceedings such that it had priority over all pre-petition secured claims, including those of the holders of the Senior Secured Claims and the Senior Priority Claims. *Id.* ¶ 38. When the Court-Approved Restructuring Transaction closed a year later, Cargill, Incorporated received consideration for its role as a new equity funder, advancing new secured debt and entering into a new offtake agreement. Still, no secured claims ranking junior to the DIP Facility in the capital structure received a recovery on account of those claims. *See* TSS Decl., Ex. H, ¶ 12b (noting "significant compromises were made by the secured creditors (whose pre-filing debt and annual debt service was eliminated in exchange for equity and future funding commitments by some), and by some unsecured creditors (Cargill in particular, whose offtake agreement is being replaced)"). This state of affairs, of course, is an entirely typical and permissible result in court-approved restructuring transactions in both Canada and the United States.

Disappointed with this result, however, Plaintiff CrossingBridge has taken the extraordinary step of bringing this suit against CITPL despite not objecting to the Court-Approved Restructuring Transaction when it had the chance. TSS Decl., Ex. H, August Endorsement ¶ 14d (explaining that "[n]o substantive objections to the terms of the Sale Process have been raised"); *see also id.*, Ex. K, October 7, 2024 Endorsement ¶ 5 (noting in support of termination order that

"[n]o one on the service list," which explicitly listed insolvency counsel for Plaintiff CrossingBridge "has raised any concerns and no one appeared at the hearing to raise any objections."). At bottom, Plaintiff's breach of contract action in this Court is a veiled attempt to side-step the reality of the outcome of the duly supervised CCAA Proceeding and must be dismissed for this reason.

### A. The Cargill Consideration Payment and the $12.5 Million Setoff were Issued to CITPL in Its Capacity as a Subsidiary to its Equity Investor Parent Cargill, Incorporated, Not in its Capacity as a Secured Creditor

No secured claims ranking junior to the DIP Facility received any recovery as part of the Court-Approved Restructuring Transaction. Because no distributions in respect of Shared Collateral were ever paid out to the Senior Priority Claims or Senior Secured Claims (which are subject to the ICA), the ICA, by its own terms, quite appropriately never came into play. That alone is sufficient grounds to dismiss this suit.

The Cargill Consideration Payment and the $12.5 million Setoff were <u>not</u> made in connection with CITPL's rights as a secured creditor in respect of the Shared Collateral but instead were issued in consideration for Cargill, Incorporated's participation as an investor in the Court-Approved Restructuring Transaction and the entering into of a new offtake agreement. Cargill, Incorporated, along with Millstreet Capital LLC and OSP, LLC, executed the Subscription Agreement and Subscription Agreement Amendment as "Investors" and participated in the Court-Approved Restructuring Transaction as such. *See* TSS Decl. Ex. B, Subscription Agmt., "Recitals." The benefits CITPL ultimately received—the Cargill Consideration Payment, in the form of "a discount provided under the Cargill Offtake Agreement," and the $12.5 million Setoff, as detailed in the Subscription Agreement's Closing Sequence—were provided pursuant to the Subscription Agreement as consideration for its corporate parent's—Cargill, Incorporated—

participation in the Court-Approved Restructuring Transaction, including providing a $50 million equity investment and new secured debt to Tacora, as well as for CITPL's agreement to enter into a new offtake agreement with reorganized Tacora. *See* TSS Decl., Ex. C, Subscription Agmt. Amend. §§ 1.3, 1.4.

The Subscription Agreement, approved by the Ontario Court, expressly provided that the Cargill Consideration Payment was being made "in consideration for Cargill entering into [the Subscription Agreement] and its agreements, compromises and obligations hereunder" and that the Investors may "determine that a payment in the same amount shall be made to Cargill not specifically in repayment of the Existing Cargill Margin Facility but otherwise as a payment to Cargill in connection with the Transactions and this Agreement." *See* TSS Decl., Ex. B, Subscription Agmt. § 2.3(a). The Subscription Agreement Amendment documented such determination by the Investors, as contemplated by the Court-Approved Subscription Agreement, providing expressly that "[t]he Investors may and hereby have determined that the Cargill Consideration Payment shall be made to Cargill pursuant to a discount provided under the Cargill Offtake Agreement in connection with the Transactions and this Agreement, and, **for certainty, is not being made in repayment of the Existing Cargill Margin Facility**." *See* TSS Decl., Ex. C, Subscription Agmt. Amend. § 1.4 (emphasis added). In other words, when the Ontario Court approved the Subscription Agreement, it was approving value being attributed to the overall transaction and not to any pre-petition secured obligations and approved the parties allocating consideration to Cargill's participation in the transaction and not to the Cargill Margin Facility. *Id.* Plaintiff at no time objected to such court-approved provisions of the Subscription Agreement. TSS Decl., Ex. H, August Endorsement ¶ 14d; *see also Id.*, Ex. K, October 7, 2024 Endorsement ¶ 5.

The other two Investors in the Subscription Agreement (Millstreet Capital and OSP) were also existing pre-petition secured creditors but only received consideration in the transaction because they contributed new equity and debt. *See* TSS Decl., Ex. B, Subscription Agmt., Exs. A ("Investor Entities and Allocations"), B ("New Equity Offering Additional Cash Consideration"). Contrary to the theory of the FAC, the Court-Approved Restructuring Transaction did not involve distributions to pre-petition secured creditors. No pre-petition secured creditor received any distribution for their pre-petition secured obligation. Again, the only parties that received any distributions were those participating as *new* equity investors and *new* secured lenders (or, in the case of CITPL, investment by its corporate parent, as well as its entry into a new offtake agreement). *See id.; see also In re Energy Future Holdings Corp.*, 773 F. App'x 89, 93 (3d Cir. 2019) (holding under New York law that an intercreditor agreement did not apply and acknowledging that "assets acquired after bankruptcy generally are 'not subject to any lien resulting from' a prior agreement"). The FAC's theory of breach would impermissibly require that Cargill's role as equity investor, new secured lender, and CITPL's role as offtake provider be collapsed into CITPL's distinct capacity as a pre-petition secured creditor. *See* TSS Decl., Ex. G, July Endorsement ⁋ 5 (noting Cargill "in its various stakeholder capacities, as secured lender, unsecured lender, DIP lender, service provider, etc.").

The parties to the ICA, on the other hand, are creditors, including CITPL and Plaintiff, who provided pre-petition secured financing to Tacora. None received distributions, and all emerged from the Court-Approved Restructuring Transaction in the equivalent creditor position. As such, any benefits CITPL may have received in its capacity as the subsidiary to an equity investor, new secured lender, or in its capacity as a new offtake provider, have no bearing on and certainly do not result in a breach of its obligations as a secured creditor under the ICA. Therefore, Plaintiff

cannot allege a viable claim against CITPL in connection with the ICA. *See In re MPM Silicones, LLC*, 518 B.R. 740, 753 (Bankr. S.D.N.Y. 2014) (holding intercreditor agreement governed by New York law not breached where defendant accepted a payment constituting "a separate, unsecured obligation undertaken by the debtors to the defendants" and thereby "would not be exercising remedies as secured creditors against the Common Collateral for purposes of triggering [the Intercreditor Agreement]").

As noted, the FAC's theory of breach requires that these multiple, distinct roles of Cargill, Incorporated as new equity investor and provider of new secured debt (which it did not share with Plaintiff), CITPL as new offtake provider (which it did not share with Plaintiff and other pre-petition secured creditors), and CITPL as creditor (which it did share with Plaintiff) be ignored and collapsed into a monolith. When taken to its logical conclusion, Plaintiff's theory reduces to absurdity. Plaintiff is not entitled under the ICA to share in the consideration CITPL may have received in a separate legal capacity in connection with its corporate parent's role as the DIP Lender, new equity investor, and provider of new secured debt, or its entry into a new offtake agreement with reorganized Tacora. Contrary to Plaintiff's theory, the ICA is not a magic wand that entitles Plaintiff to any type of value or benefit potentially received by CITPL, no matter the source and no matter the circumstances.

## B. Plaintiff's Attempts to Mis-Characterize and Re-Cast the Stated Outcome of the Canadian Insolvency Proceeding Should be Rejected.

Plaintiff's flawed allegations are also directly at odds with the Ontario Court's Order approving the Court-Approved Restructuring Transaction, as effectuated by the Subscription Agreement and the Subscription Agreement Amendment. Allowing Plaintiff's suit to proceed would undermine a court-approved solution that followed a year of extensive and fraught negotiations among all interested parties and, therefore, should be dismissed. This lawsuit is

nothing more than CrossingBridge's attempt to circumvent this duly constituted and supervised CCAA Proceeding and obtain recovery it was not, and would never have, received in the insolvency (along with all other creditors not participating in any new investment or new contractual arrangements).

*First*, the Court of Appeals and courts within this Circuit have consistently recognized and deferred to foreign insolvency proceedings. *See*, *e.g.*, *Brenton v. Consol. Rail Corp.*, No. 00–CV–0742E(SR), 2003 WL 21383255, at *4 (W.D.N.Y. Feb. 4, 2003) ("The Second Circuit has consistently recognized the appropriateness of extending comity to foreign bankruptcy proceedings."); *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999) ("We have repeatedly noted the importance of extending comity to foreign bankruptcy proceedings."). Canada, in particular, has been deemed a "sister common law jurisdiction with procedures akin to our own." *Clarkson Co. v. Shaheen*, 544 F. 2d 624, 629–30 (2d Cir. 1976); *see also Cornfeld v. Invs. Overseas Svcs., Ltd.*, 471 F. Supp. 1255, 1259 (S.D.N.Y. 1979) (recognizing a Canadian liquidation proceeding given the deference afforded Canadian judgments by New York courts as well as the similarities with Canada's judicial procedures*), aff'd*, 614 F.2d 1286 (2d Cir. 1979); *In re Davis*, 191 B.R. 577, 587 (Bankr. S.D.N.Y. 1996) (courts "uniformly grant comity to Canadian proceedings"). Thus, this Court's acceptance of and deferral to Justice Kimmel's findings and expression of the nature of the relief ordered is required here.

*Second*, deference to the Ontario Court's decision is also appropriate because the Court-Approved Restructuring Transaction was "the best **and only** available going concern outcome for Tacora that" emerged from "extensive solicitation efforts on the part of Tacora" both before and during the insolvency proceedings. *See* TSS Decl., Ex. G, July Endorsement ¶¶ 2–3 (emphasis added). These solicitation efforts were far from selective or unfair as "the[] three solicitation and

sale processes resulted in a broad and robust canvassing of parties potentially interested in Tacora's business and assets," *see id.* ¶ 2, and were "broad, open, fair and transparent with an appropriate level of independent oversight," *see* TSS Decl., Ex. H, August Endorsement ¶ 14a. Additionally, even though "the RVO approved on July 26, 2024 was not opposed by any of the stakeholders," including Plaintiff, *see id.* ¶ 8, Justice Kimmel thoroughly analyzed various factors related to the Court-Approved Restructuring Transaction to be sure that "it [was] an appropriate mechanism to implement," *see id.* ¶¶ 10–12.

*Third*, Plaintiff and the other noteholders would not be better off under an alternative to the Court-Approved Restructuring Transaction. Again, "[n]o alternative transactions emerged from these processes that would provide full repayment to the Senior Notes or Senior Priority Notes." TSS Decl., Ex. G, July Endorsement ¶ 4. Further, Justice Kimmel concluded that "[t]he RVO structure [did] not result in material prejudice or impairment to any of Tacora's creditors' rights that they would not otherwise suffer under a traditional asset sale structure." TSS Decl., Ex. H, August Endorsement ¶ 12c. In fact, Justice Kimmel explicitly stated that "[t]he stakeholders would receive less value, and be worse off" under an asset sale. *Id.* Justice Kimmel's findings on this point are, of course, a total refutation of Plaintiff's theory of relief and are entitled to deference.

## II.   THE ICA IS NOT IMPLICATED HERE, AS ITS PLAIN TEXT EITHER DOES NOT SUPPORT OR CONTRADICTS PLAINTIFF'S THEORY OF RELIEF.

### A.   The Cargill Consideration Payment and the $12.5 Million Setoff Are Not a Distribution or Payment Under Sections 2.01 and 2.03 of the ICA.

The relevant portions of Sections 2.01 and 2.03 of the ICA both refer to a "distribution or payment," which are also identified as "proceeds," in connection with any "Shared Collateral." *See* TSS Decl., Ex. A, ICA §§ 2.01(a), 2.03(b). The Cargill Consideration Payment, however, was made as a "discount" to the new Cargill Offtake Agreement that took effect following the

implementation of the Court-Approved Restructuring Transaction. FAC ¶ 32. A "discount" is "[a] reduction in, or deduction from, the amount or gross value of something; the amount by which something is reduced."[13] On the other hand, a "distribution" is "[t]he action of dividing and dealing out or bestowing in portions among a number of recipients; apportionment, allotment" and a payment is "[a] sum of money (or equivalent) paid or payable, esp[ecially] in return for goods or services or in discharge of a debt; wages, pay."[14] While Plaintiff alleges that the labeling of the "Cargill Consideration Payment" as a "Payment" necessarily means the ICA applies, *see* FAC ¶ 44, this impermissibly ignores the actual form of the value being exchanged.

Similarly, the $12.5 million Setoff also cannot be described as a distribution or payment. Setoff is defined as "[a]n act of 'setting off' one item of account against another, i.e. of reckoning the former as a counterbalance to or a deduction from the latter."[15] Such a "counterbalance" or "deduction" is precisely what occurred: the $12.5 million CITPL owed Tacora under the Offtake Agreement, otherwise known as the "Cargill Pre-filing Payable," *see* FAC ¶ 35, was credited against the $12.5 million "owed by Tacora to CITPL under the APF Agreement," *see id.* ¶ 36. This "canceling-out" is not a distribution or payment in the ordinary meaning because neither CITPL nor Tacora were "deal[t]," "bestow[ed]," or "paid" anything.

### B. Plaintiff Fails to Sufficiently Allege That Either the Cargill Consideration Payment or the $12.5 Million Setoff Implicate the ICA's Definition of Shared Collateral.

Even if the Cargill Consideration Payment or the $12.5 million Setoff could properly be considered a "distribution" or "payment" (which they are not), it is undeniable that not all

---

[13] *See* https://www.oed.com/dictionary/discount_n?tab=meaning_and_use#6709341.
[14] *See* https://www.oed.com/dictionary/distribution_n?tab=meaning_and_use#6516880O, and https://www.oed.com/dictionary/payment_n1?tab=meaning_and_use#31306965.
[15] *See* https://www.oed.com/dictionary/set-off_n?tab=meaning_and_use#23438052 (3.a. "Commerce and Law" definition).

payments CITPL receives from any source implicate the ICA. Put another way, no reasonable person would deny that the ICA, like any contract, has definitional triggers for its application to a given situation. Specifically, here, the ICA only applies to distributions "with respect to Shared Collateral," but the FAC lacks sufficient allegations as to how the Cargill Consideration Payment or the $12.5 million Setoff meets that definition. By failing to articulate any particularized allegations connecting the alleged payments to Shared Collateral, the FAC ends up espousing an overbroad and implausible theory that any money or consideration flowing to CITPL in connection with the Tacora insolvency—no matter the context—must also be shared with CrossingBridge.

Sections 2.01 and 2.03 of the ICA apply to any payments or proceeds realized in connection with "Shared Collateral." *See* TSS Decl., Ex. A, ICA § 2.01(a) ("[I]f . . . any such distribution or payment received by . . . the Initial Additional Authorized Representative . . . pursuant to any such Insolvency or Liquidation Proceeding . . . *with respect to such Shared Collateral* (all proceeds of any sale, collection or other liquidation *of any Shared Collateral* and all such distributions or payments being collectively referred to as 'Proceeds') . . . shall be applied . . .") (emphasis added); *id.* § 2.03(b) ("Each Authorized Representative . . . agrees that if it . . . shall realize any proceeds or payment *in respect of any such Shared Collateral* . . . in any Insolvency or Liquidation Proceeding . . . at any time prior to the Discharge of each of the Senior Priority Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other Secured Parties . . ."). Shared Collateral is defined as "Collateral in which the holders of any Series of Senior Priority Obligations and/or any Series of Pari Passu Obligations (or their respective Authorized Representatives) hold a valid and perfected security interest at such time," and Collateral refers to "all assets and properties of [Tacora] or any Grantor now or hereafter subject

to Liens created pursuant to any Senior Priority Security Document or Pari Passu Security Documents to secure Senior Priority Obligations or Pari Passu Obligations." *Id.* § 1.01.

Plaintiff does not adequately allege that the Cargill Consideration Payment or the $12.5 million Setoff were made in respect of Shared Collateral, which is a prerequisite for application of the ICA. *In re Energy Future Holdings Corp.*, 546 B.R. 566, 578 (Bankr. D. Del. 2016) (explaining that "if any of these initial requirements are not met, then the Adequate Protection Payments and the Plan Distributions would be distributed outside of the Intercreditor Agreement"). Specifically, the FAC states that the ICA applies because the "[Subscription Agreement] amendment characterizes the Cargill Consideration Payment as a 'Payment to Cargill' and the referenced discount is itself a payment/distribution triggering application of the [ICA]." *See* FAC ¶ 44. This statement, which is the FAC's main articulation of how the Tacora restructuring transactions implicate the ICA, is conclusory. *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188–89 (2d Cir. 2020) (explaining that courts do not "credit conclusory allegations or legal conclusions couched as factual allegations") (cleaned up).

Plaintiff's barebones allegation here relies on the circular logic that *any* payment made to CITPL necessarily is made from the payment or proceeds in respect of Shared Collateral. In this way, Plaintiff's theory renders the phrase "in respect of Shared Collateral" in the ICA "superfluous or meaningless" and thus fails under New York law. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("[U]nder New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible."). Because the FAC fails to connect the Cargill Consideration Payment and the $12.5 million Setoff to payments or proceeds derived from Shared Collateral as defined by the ICA, Plaintiff's claim for breach of contract must be dismissed. *See In re Energy Future Holdings Corp.*, 546 B.R. at

580 ("To argue that any of the Plan Distributions, including any Cash Distribution, are included in the definition of 'Proceeds' ignores the beginning part of the paragraph that limits 'Proceeds' to (i) any consideration received from the sale/disposition of assets, (ii) value received as a consequence of possessing the Collateral[.]").

### C. Amendment would be Futile Because it is Logically and Factually Impossible that the Cargill Consideration Payment and the $12.5 Million Setoff Were Proceeds or Payments Made in Respect of Shared Collateral.

The above arguments make plain Plaintiff's failure to sufficiently allege that the Cargill Consideration Payment or $12.5 million Setoff violated the ICA. For its part, this section demonstrates additionally that Plaintiff *cannot* make out such claims and thus further amendment of the complaint would be futile. Pursuant to the Closing Sequence detailed in the Subscription Agreement:

> [Tacora] shall be deemed to transfer to ResidualCo all Claims in respect of the Senior Secured Notes and the Senior Priority Notes and any Claims remaining under the APF, pursuant to the Approval and Reverse Vesting Order, and the deemed transfer of the Senior Priority Notes and the Senior Secured Notes to ResidualCo will constitute a novation of such Senior Priority Notes and Senior Secured Notes to ResidualCo[.]

*See* TSS Decl., Ex. B, Subscription Agmt. § 7.2(d). In connection with this transfer, "*[Tacora] and its assets, undertaking, business and properties shall be fully and finally Discharged* from all Senior Priority Notes, Senior Secured Notes, and any Claims remaining under the APF that are not otherwise satisfied as contemplated under Section 7.2(c)." *See id.* § 3.1(c) (emphasis added). Thus, as part of the Court-Approved Restructuring Transaction, the Senior Secured Claims, and the Senior Priority Claims, as well as their underlying Liens, were shifted and discharged from Tacora to ResidualCo. *See id.*, Schedule C (listing "The Senior Priority Notes" and "The Senior Secured Notes" as "Encumbrances to Be Discharged"). This is fatal to Plaintiff's theory that Section 2.03(b) of the ICA was violated here because, by its clear terms, Section 2.03(b) only applies to

distributions or possessions of Shared Collateral "at any time prior to the Discharge." TSS Decl., Ex. A, ICA § 2.03(b).

In addition, the Cargill Consideration Payment, which was made as a discount on the Cargill Offtake Agreement, a completely new contractual obligation between CITPL and reorganized Tacora has no connection to the pre-petition Shared Collateral under the ICA, as Plaintiff and the other secured creditors possess no relevant liens, which were instead transferred to ResidualCo. To be sure, the discount applies only on a post-closing basis after the security was released from Tacora. *See In re Energy Future Holdings Corp.*, 773 F. App'x at 93 (holding under New York law that an intercreditor agreement did not apply where "plan distributions are made from assets on which the creditors had no liens. . . . And bankruptcy law confirms that assets acquired after bankruptcy generally are not subject to any lien resulting from a prior agreement"); TSS Decl., Ex. A, ICA § 1.01 (defining "Shared Collateral" as "Collateral" in which the parties "hold a valid and perfected security interest at such time").

By the same token, the $12.5 million Setoff involved an outstanding debt under the APF Agreement between reorganized Tacora and CITPL. *See* FAC ¶ 36. Again, pursuant to the Court-Approved Restructuring Transaction, APF-related claims were transferred to ResidualCo and thereby were no longer connected to any arguable distributions emanating from reorganized Tacora. *See* TSS Decl., Ex. A, ICA § 7.2(d). Furthermore, the Setoff is demonstrably irrelevant to Plaintiff's theory of relief because if no set-off had occurred, Tacora would have simply retained the CITPL receivable of $12.5 million as an asset following completion of the Court-Approved Restructuring Transaction, which also would not constitute "Shared Collateral." Thus, under no circumstances would that asset of Tacora be available for recovery to any pre-petition secured creditors.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the FAC pursuant to the Federal Rules of Civil Procedure 12(b)(6) or 12(c). Additionally, the dismissal should be granted with prejudice as Plaintiff has already taken an opportunity to amend its pleadings and there is no reason to expect that a further amended pleading will overcome the fundamental flaws discussed above.

Respectfully submitted,

Dated:  February 5, 2025

*/s/ Tracey Salmon-Smith*

Tracey Salmon-Smith
Christian J. Clark
Faegre Drinker Biddle & Reath LLP
1177 Avenue of the Americas, 41st Floor
New York, New York
(212) 248-3140 (Telephone)
(212) 248-3141 (Fax)
tracey.salmonsmith@faegredrinker.com
christian.clark@faegredrinker.com

*Attorneys for Defendant Cargill International Trading Pte. Ltd.*

## **WORD COUNT CERTIFICATION**

I, TRACEY SALMON-SMITH, in accordance with Rule 7.1(c) of the Joint Local Rules for S.D.N.Y. and E.D.N.Y., Rule 4.A of the Honorable Ronnie Abrams's Individual Rules, and the Honorable Ronnie Abrams's February 3, 2025 Order (Dkt. 18), certify that the foregoing Memorandum of Law contains 9,130 words, as counted by Microsoft Word's word-processing system, excluding the caption, tables of contents and authorities, and signature block, and is in compliance with the aforementioned Rules and Orders.


Dated: February 5, 2025                               */s/ Tracey Salmon-Smith*
                                                      TRACEY SALMON-SMITH

## CERTIFICATE OF SERVICE

I certify that, on the date set forth below, I caused a true and correct copy of the foregoing Notice of Motion to Dismiss, Memorandum of Law in Support of Motion to Dismiss, and all accompanying declarations and exhibits to be served via the Court's electronic filing system on counsel for Plaintiff CrossingBridge Advisors LLC. Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: February 5, 2025                              /s/ *Tracey Salmon-Smith*
                                                     TRACEY SALMON-SMITH