# EXHIBIT B

*Execution Version*

**THE ENTITIES LISTED ON EXHIBIT "A" HERETO**

**AS THE INVESTORS**

**- AND -**

**TACORA RESOURCES INC.**

**AS THE COMPANY**

---

**SUBSCRIPTION AGREEMENT**

---

**DATED July 21, 2024**

**TABLE OF CONTENTS**

**ARTICLE 1 INTERPRETATION**......................................................................................................2
   1.1    Definitions ....................................................................................................................2
   1.2    Actions on Non-Business Days ..................................................................................15
   1.3    Currency and Payment Obligations............................................................................16
   1.4    Calculation of Time ...................................................................................................16
   1.5    Additional Rules of Interpretation .............................................................................16
   1.6    Exhibits and Schedules ..............................................................................................17

**ARTICLE 2 SUBSCRIPTION FOR SUBSCRIBED SHARES; ASSUMPTION OF LIABILITIES**......18
   2.1    Deposit.......................................................................................................................18
   2.2    Total Transaction Value.............................................................................................18
   2.3    Cash Subscription Amounts .......................................................................................18
   2.4    Other New Equity Investors .......................................................................................19
   2.5    New Equity Offering Additional Cash Consideration .................................................19
   2.6    Unsecured Takeback Notes; New Warrants .................................................................20
   2.7    Administrative Expense Reserve.................................................................................21
   2.8    Cargill Designee ........................................................................................................22

**ARTICLE 3 TRANSFER OF EXCLUDED ASSETS, EXCLUDED CONTRACTS AND EXCLUDED LIABILITIES**.................................................................................................................................22
   3.1    Transfer of Excluded Assets, Excluded Contracts, Excluded Liabilities, Senior Priority Notes and Senior Secured Notes to ResidualCo ....................................................................................22

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES** ...............................................................23
   4.1    Representations and Warranties as to the Company ...................................................23
   4.2    Representations and Warranties as to the Investors ...................................................25
   4.3    As is, Where is ...........................................................................................................26

**ARTICLE 5 COVENANTS** ........................................................................................................27
   5.1    Target Closing Date...................................................................................................27
   5.2    Motion for Approval and Reverse Vesting Order .......................................................27
   5.3    Interim Period............................................................................................................28
   5.4    Company Support Obligations....................................................................................28
   5.5    Access During Interim Period ....................................................................................29
   5.6    Employees .................................................................................................................30
   5.7    Regulatory Approvals and Consents ..........................................................................30
   5.8    New Secured Priority Notes Offering.........................................................................31
   5.9    Release by the Investors .............................................................................................31
   5.10   Release by the Company ............................................................................................32
   5.11   Pre-Closing Reorganizations......................................................................................32

**ARTICLE 6 INSOLVENCY PROVISIONS** ..................................................................................33
   6.1    Court Orders and Related Matters .............................................................................33
   6.2    Form of Vesting Order ...............................................................................................34
   6.3    CCAA Plan................................................................................................................34
   6.4    DIP Credit Bid ..........................................................................................................34

**ARTICLE 7 CLOSING ARRANGEMENTS** ..................................................................................34
   7.1    Closing ......................................................................................................................34
   7.2    Closing Sequence.......................................................................................................35
   7.3    The Investors' Closing Deliverables ..........................................................................36

7.4     The Company's Closing Deliverables ................................................................37

**ARTICLE 8 CONDITIONS OF CLOSING** .................................................................**37**
8.1     Mutual Conditions ....................................................................................37
8.2     The Investors' Conditions ........................................................................38
8.3     The Company's Conditions ......................................................................39
8.4     Monitor's Certificate ...............................................................................40

**ARTICLE 9 TERMINATION** ....................................................................................**40**
9.1     Grounds for Termination .........................................................................40
9.2     Effect of Termination...............................................................................41

**ARTICLE 10 GENERAL**.........................................................................................**42**
10.1    Transaction Structure ..............................................................................42
10.2    Approval, Consent, Waiver, Amendment, Termination...........................42
10.3    Cost Reimbursement Amount ..................................................................43
10.4    Tax Returns .............................................................................................43
10.5    Survival ...................................................................................................43
10.6    Expenses ..................................................................................................43
10.7    Public Announcements ............................................................................43
10.8    Notices .....................................................................................................44
10.9    Time of Essence ......................................................................................45
10.10   Further Assurances ..................................................................................45
10.11   Entire Agreement ....................................................................................46
10.12   Waiver and Amendment ..........................................................................46
10.13   Severability .............................................................................................46
10.14   Remedies Cumulative ..............................................................................46
10.15   Governing Law ........................................................................................46
10.16   Dispute Resolution ..................................................................................46
10.17   Attornment ..............................................................................................46
10.18   Successors and Assigns............................................................................47
10.19   Assignment ..............................................................................................47
10.20   No Liability; Monitor Holding or Disposing Funds ................................47
10.21   Third Party Beneficiaries.........................................................................48
10.22   Counterparts ............................................................................................48

**EXHIBIT "A" INVESTOR ENTITIES AND ALLOCATIONS**

**EXHIBIT "B" NEW EQUITY OFFERING ADDITIONAL CASH CONSIDERATION**

**EXHIBIT "C" ADDITIONAL NEW EQUITY INVESTOR CONSIDERATION**

**SCHEDULE "A" DEBT OBLIGATIONS OWING TO INVESTORS**

**SCHEDULE "B" ASSUMED LIABILITIES**

**SCHEDULE "C" ENCUMBRANCES TO BE DISCHARGED**

**SCHEDULE "D" EXCLUDED ASSETS**

**SCHEDULE "E" EXCLUDED CONTRACTS**

**SCHEDULE "F" EXCLUDED LIABILITIES**

**SCHEDULE "G" MATERIAL PERMITS, LICENSES AND CONTRACTS**

**SCHEDULE "H" MINERAL TENURES**

**SCHEDULE "I" OWNED REAL PROPERTY**

**SCHEDULE "J" PERMITS AND LICENSES**

**SCHEDULE "K" PERMITTED ENCUMBRANCES**

**SCHEDULE "L" PRE-FILING TRADE AMOUNTS**

**SCHEDULE "M" RETAINED CONTRACTS**

**SUBSCRIPTION AGREEMENT**

This Subscription Agreement is executed on July 21, 2024, is made among:

**THE ENTITIES LISTED ON EXHIBIT "A" HERETO**

(hereinafter, collectively, the "**Investors**" and individually, an "**Investor**")

-and-

**TACORA RESOURCES INC.**, a corporation incorporated under the laws of Ontario

(hereinafter, the "**Company**")

**RECITALS:**

**WHEREAS** the Company is a private company, with a registered head office in Toronto, Ontario, and whose business mainly consists of operating an iron ore mine commonly known as the "Scully Mine", located near Wabush, Newfoundland and Labrador, Canada;

**WHEREAS** the Company commenced proceedings (the "**CCAA Proceedings**") under the Companies' Creditors Arrangement Act (Canada) (the "**CCAA**") and obtained an initial order from the Ontario Superior Court of Justice (Commercial List) (the "**Court**") on October 10, 2023 (which was amended and restated on October 30, 2023);

**WHEREAS** the Company obtained an order (the "**Sale Process Order**") from the Court on June 5, 2024, authorizing the Company to undertake a sale process (the "**Sale Process**") to solicit offers or proposals for a sale transaction in respect of the Company and authorizing and directing the Company and Greenhill & Co. Canada Ltd. (the "**Tacora Financial Advisor**") to implement the Sale Process pursuant to the terms thereof;

**WHEREAS** each of the Investors is an existing debtholder of the Company, with the outstanding amounts of obligations owing by the Company to each Investor as forth in Schedule "A";

**WHEREAS** in connection with the Sale Process, the Investors entered into a support agreement dated June 22, 2024 (as amended from time to time, and including all schedules thereto, the "**Restructuring Support Agreement**"), whereby such Investors have agreed to the principal aspects of a series of transactions involving the restructuring of the Company, as modified by this Agreement, under which it is contemplated that the Investors, among other things, shall acquire all the equity interests of the Company;

**WHEREAS** the Company has, in consultation with the Tacora Financial Advisor and the Monitor, designated the Qualified Bid (defined in the Sale Process) submitted by the Investors as the Successful Bid (defined in the Sale Process), and the Parties desire to consummate the Transactions on the terms and subject to the conditions contained in this Agreement;

**WHEREAS** the Investors have agreed to subscribe for and purchase from the Company, the Subscribed Shares, and the Company has agreed to issue the Unsecured Takeback Notes and the New Warrants to the Investors (excluding Cargill) who are also Existing Noteholders, in each case on the terms and conditions set out in this Agreement and in accordance with the Closing Sequence set out herein;

**NOW THEREFORE** in consideration of the covenants and mutual promises set forth in this Agreement (including the recitals hereof) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**ARTICLE 1**
**INTERPRETATION**

**1.1    Definitions**

In this Agreement.

"**Action**" means any claim, counterclaim, application, action, suit, cause of action, Order, charge, indictment, prosecution, demand, complaint, grievance, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at Law or in equity and by or before a Governmental Entity.

"**Administration Charge**" has the meaning given to it in the Initial Order.

"**Administrative Expense Costs**" means (i) the reasonable and documented fees and costs of the Monitor and its professional advisors and the professional advisors of ResidualCo in each case for services performed prior to and after the Closing Date, in each case, relating directly or indirectly to the CCAA Proceedings or this Agreement, including without limitation, costs required to wind down and/or dissolve and/or bankrupt ResidualCo and costs and expenses required to administer the Excluded Assets, Excluded Contracts, Excluded Liabilities and ResidualCo; (ii) amounts owing in respect of obligations secured by the CCAA Charges that rank ahead of the DIP Charge and are not paid or assumed on Closing, which shall be paid exclusively from the Administrative Expense Reserve; and (iii) costs related to a premium for a run-off policy on such terms (including, for certainty, the amount of the premium), as agreed to by the Investors and the Company, each acting reasonably.

"**Administrative Expense Reserve**" means such amount to be agreed to by the Investors, the Company and the Monitor on or before July 26, 2024 (or such other date as agreed to by the Investors, the Company and the Monitor), to be paid to the Monitor on the Closing Date out of the New Equity Offering Initial Cash Consideration and held in trust by the Monitor for the benefit of Persons entitled to be paid the Administrative Expense Costs.

"**Affiliate**" means, with respect to any Person, any other Person who directly or indirectly controls, is controlled by, or is under direct or indirect common control with, such Person, and includes any Person in like relation to an Affiliate. A Person shall be deemed to "**control**" another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise; and the term "**controlled**" shall have a similar meaning.

"**Agreement**" means this subscription agreement and all attachments, Schedules and Exhibits, in each case as the same may be supplemented, amended, restated or replaced from time to time.

"**APF**" means the Amended and Restated Advance Payment Facility dated May 29, 2023, entered into between the Company and Cargill, as amended and/or restated from time to time.

"**Applicable Law**" means, with respect to any Person, property, transaction, event or other matter, any transnational, foreign or domestic, federal, provincial, territorial, state, local or municipal (or any subdivision of them) law (including common law and civil law), constitution, treaty, law, statute, regulation, code, ordinance, principle of common law or equity, rule, by-law (zoning or otherwise),

Order (including any securities laws or requirements of stock exchanges and any consent decree or administrative Order) or other requirement having the force of law ("**Law**"), in each case relating or applicable to such Person, property, transaction, event or other matter and also includes, where appropriate, any interpretation of Law (or any part thereof) by any Person having jurisdiction over it, or charged with its administration or interpretation.

"**Approval and Reverse Vesting Order**" means an Order issued by the Court in the form and substance acceptable to the Investors, the Company and the Monitor, each acting reasonably:

    (a) approving this Agreement and the Transactions;

    (b) vesting out of the Company all Excluded Assets, Excluded Contracts, Excluded Liabilities and all Claims in respect of any Senior Priority Notes, Senior Secured Notes and the APF (other than those satisfied as contemplated pursuant to Section 7.2(c)), and discharging all Encumbrances to Be Discharged;

    (c) terminating and cancelling all Existing Equity as well as any agreement, contract, plan, indenture, deed, certificate, subscription rights, conversion rights, pre-emptive rights, options (including stock option or share purchase or equivalent plans), or other documents or instruments governing and/or having been created or granted in connection with the share capital of the Company, if any for no consideration (other than the rights of the Investors under this Agreement); and

    (d) authorizing and directing the Company to issue:

        (i) the Subscribed Shares to the Investors; and

        (ii) the Unsecured Takeback Notes and the New Warrants,

        in each case, free and clear of any Encumbrances;

    (e) authorizing and directing the Company to file the Articles of Reorganization; and

such additional and/or revised terms as may be agreed to by the Investors, the Company and the Monitor, each acting reasonably.

"**Articles of Reorganization**" means articles of reorganization to change the conditions in respect of the Company's authorized and issued share capital immediately prior to completion of the Transactions to provide for a redemption right in favour of the Company or such other provision acceptable to the Company and the Investors, acting reasonably, that would result in holders of Existing Common Shares ceasing to hold their Existing Common Shares at the time such articles are filed and effective in accordance with the Closing Sequence and receiving nil consideration, and, at the Investors discretion, effect a consolidation of the Existing Common Shares and/or New Common Shares at a ratio to be determined by the Investors, which shall be in form and substance satisfactory to the Investors, as confirmed in writing in advance of the filing thereof.

"**Assumed Liabilities**" means only those Liabilities specifically and expressly designated by the Investors as assumed Liabilities in Schedule "B", which includes certain Pre-Filing Trade Amounts, certain royalty obligations, Post-Filing Trade Amounts and Liabilities under Retained Contracts, in each case, as specifically set forth in Schedule "B" as such Schedule may be amended, supplemented or restated by the Investors from time to time up to two Business Days prior to the Closing Date.

"**Authorization**" means any authorization, approval, consent, concession, exemption, license, lease, grant, permit, franchise, right, privilege or no-action letter from any Governmental Entity having jurisdiction with respect to any specified Person, property, transaction or event, or with respect to any of such Person's property or business and affairs (including any zoning approval, mining permit, development permit or building permit) or from any Person in connection with any easements, contractual rights or other matters.

"**Backstop Commitment Fee**" means an amount payable by the Company to the Investors (other than Cargill) and the Other New Equity Investors that are, in each case, Existing Noteholders, in respect of their commitments hereunder and under the Other New Equity Subscription Agreements, equal to $25,000,000 plus the amount equal to the Warrant Cash Consideration payable to the Investors (other than Cargill) and the Other New Equity Investors that are, in each case, Existing Noteholders, to be satisfied in accordance with Section 2.6.

"**Books and Records**" means all books, records, files, papers, books of account and other financial data related to the Retained Assets and Assumed Liabilities in the possession, custody or control of the Company, including Tax Returns, sales and advertising materials, sales and purchase data, trade association files, research and development records, lists of present and former customers and suppliers, personnel, employment and other records, and all records, data and information stored electronically, digitally or on computer-related media.

"**Business**" means the business and operations carried on by the Company as at the date of this Agreement and as at the date of Closing.

"**Business Day**" means any day except Saturday, Sunday or any day on which banks are generally not open for business in each of the Province of Ontario, Canada, the State of New York and the Republic of Singapore.

"**Cargill**" means Cargill International Trading Pte. Ltd. and/or Cargill, Incorporated, as the context provides.

"**Cargill Designee**" has the meaning set out in Section 2.8.

"**Cargill Entity**" means any fund or Person associated with, related to or at the discretion or control of Cargill.

"**Cargill Existing Offtake Agreement**" means the offtake agreement between Cargill and the Company dated November 11, 2018, as amended and/or restated from time to time prior to the date hereof.

"**Cargill Margin Facility**" means the margin advances agreement to be entered into between Cargill and the Company effective on the Closing Date substantially on the terms set forth in the Restructuring Support Agreement and otherwise as agreeable to the Investors and the Company, each acting reasonably.

"**Cargill Offtake Agreement**" means the offtake agreement to be entered into between Cargill and the Company effective on the Closing Date substantially on the terms set forth in the Restructuring Support Agreement and otherwise as agreeable to the Investors and the Company, each acting reasonably.

"**Cargill OPA**" means the iron ore onshore purchase agreement to be entered into between Cargill and the Company effective on the Closing Date substantially on the terms set forth in the Restructuring Support Agreement and otherwise as agreeable to the Investors and the Company, each acting reasonably.

4

"**Cargill Pre-filing Payable**" means the amounts owing by Cargill to the Company under the Cargill Existing Offtake Agreement (approximately $12,500,000) prior to October 10, 2023.

"**Cargill Security Agreements**" means the security agreements to be entered into by the Company and any other grantors of security interests party thereto in favour of Cargill (or a collateral agent on its behalf) on the Closing Date, which will include the terms and conditions as agreed to by Cargill and the Company, each acting reasonably, and which (i) shall secure obligations under (x) the Cargill Offtake Agreement and the Cargill OPA in respect of the payment of the Termination Fee under the Cargill Offtake Agreement (collectively subject to a maximum amount of $25,000,000 plus legal costs); and (y) the Cargill Margin Facility; and (ii) shall not restrict or inhibit the Company from incurring additional senior indebtedness (including the New Secured Priority Notes) and related Encumbrances to fund operations and capital expenditures.

"**Cash Consideration**" means, collectively, the New Equity Offering Cash Consideration, the Takeback Note Cash Consideration and the Warrant Cash Consideration.

"**CCAA**" has the meaning set out in the Recitals.

"**CCAA Charges**" means the Administration Charge, the Directors' Charge, the KERP Charge and the Transaction Fee Charge.

"**CCAA Proceedings**" has the meaning set out in the Recitals.

"**Claims**" means all debts, obligations, expenses, costs, damages, losses, Actions, Liabilities, Encumbrances (other than Permitted Encumbrances), accounts payable, indebtedness, Contracts, leases, agreements, undertakings, claims, rights and entitlements of any kind or nature whatsoever (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, matured or unmatured or due or not yet due, in law or in equity and whether based in statute or otherwise).

"**Closing**" means the completion of the Transactions in accordance with the Closing Sequence and the other provisions of this Agreement.

"**Closing Date**" means the date on which Closing occurs.

"**Closing Deliverables**" means all contracts, agreements, certificates and instruments required by this Agreement to be delivered at or before the Closing in order to effect the Transactions.

"**Closing Sequence**" has the meaning set out in Section 7.2.

"**Closing Time**" means the time on the Closing Date at which Closing occurs, as evidenced by the Monitor's Certificate.

"**Company**" has the meaning set out in the Recitals.

"**Company Released Parties**" has the meaning set out in Section 5.9.

"**Conditions Certificates**" has the meaning set out in Section 8.4.

"**Contracts**" means all contracts, agreements, deeds, licenses, leases, obligations, commitments promises, undertakings, engagements, understandings and arrangements to which the Company is a party to or by which the Company is bound or under which the Company has, or will have at Closing, any right or liability or contingent right or liability (in each case, whether written or oral, express or

implied) relating to the Business, including any Personal Property Leases, any Real Property Leases and any Contracts in respect of Employees.

"**Cost Reimbursement Amount**" has the meaning set out in Section 10.3.

"**Court**" has the meaning set out in the Recitals.

"**Defaulting Investor**" has the meaning set out in Section 9.1(a)(ix).

"**Deposit**" means an amount equal to $16,000,000.

"**DIP Agreement**" means the Second Amended and Restated DIP Facility Term Sheet dated as of April 21, 2024 between the Company and the DIP Lender, as may be further amended, amended and restated, supplemented and otherwise modified from time to time.

"**DIP Charge**" has the meaning given to it in the Initial Order.

"**DIP Credit Bid Consideration**" has the meaning given to it in Section 6.4.

"**DIP Facility**" means the credit facility provided by the DIP Lender to the Company as part of the CCAA Proceedings, as described by the DIP Agreement.

"**DIP Lender**" means Cargill and/or any other lender under the DIP Facility from time to time.

"**DIP Obligations**" means (i) all Advances under the DIP Facility, (ii) all Excess Margin Amounts, (iii) all other principal, interest, fees (including the Exit Fees) due under the DIP Agreement, (iv) the DIP Lender Expenses, and (v) the Cargill Expenses (each as defined in the DIP Agreement).

"**DIP Participation Agreements**" means the DIP Facility Participation Agreements between each of the Initial Noteholder Investors and Cargill dated July 12, 2024 relating to the sale of a portion of the DIP Obligations from Cargill to the applicable Initial Noteholder Investor.

"**Directors' Charge**" has the meaning given to it in the Initial Order.

"**Discharged**" means, in relation to any Encumbrance against any Person or upon any asset, undertaking or property, including all proceeds thereof, the full, final, complete and permanent waiver, release, discharge, cancellation, termination and extinguishment of such Encumbrance against such Person or upon such asset, undertaking or property and all proceeds thereof.

"**Disclosure Letter**" means the confidential disclosure letter dated as of the date of this Agreement and delivered by the Company to the Investors with this Agreement, in form and substance acceptable to the Investors.

"**Eligible Equity Investor**" means (i) any Investor or an Other New Equity Investor that is an Existing Noteholder with New Equity Investor Commitment Amount equal to or greater than $50,000,000; and (ii) Cargill.

"**Employees**" means all individuals who, as of Closing Time, are employed by the Company, whether on a full-time or part-time basis, and whether union or non-union, and including all individuals who are on an approved and unexpired leave of absence and all individuals who have been placed on temporary lay-off which has not expired and "**Employee**" means any one of them.

"**Encumbrances**" means all claims, Liabilities (direct, indirect, absolute or contingent), obligations, prior claims, right of retention, liens, security interests, floating charges, mortgages, pledges, assignments, conditional sales, warrants, adverse claims, charges, hypothecs, trusts, deemed trusts (statutory or otherwise), judgments, writs of seizure or execution, notices of sale, contractual rights (including purchase options, rights of first refusal, rights of first offer or any other pre-emptive contractual rights), restrictive covenants, easements, servitudes, rights of way, licenses, leases, encroachments, and all other encumbrances, whether or not they have been registered, published or filed and whether secured, unsecured or otherwise.

"**Encumbrances to Be Discharged**" means all Encumbrances on the Retained Assets, including without limitation the Encumbrances listed in Schedule "C", as such Schedule may be amended, supplemented or restated by the Investors from time to time up to two Business Days prior to the hearing of the motion for the Approval and Reverse Vesting Order (or such other date agreed to by the Investors and the Company), the Administration Charge, the Directors' Charge, the KERP Charge, the Transaction Fee Charge, the DIP Charge, and any other charge granted by the Court in the CCAA Proceedings, excluding only the Permitted Encumbrances.

"**Excluded Assets**" means: (i) all rights, covenants, obligations and benefits in favour of ResidualCo under this Agreement that survive Closing; and (ii) those assets listed in Schedule "D", as such Schedule may be amended, supplemented or restated by the Investors from time to time up to two Business Days prior to the Closing Date.

"**Excluded Contracts**" means all Contracts that are not Retained Contracts, including those Contracts listed in Schedule "E", an amended list of which may be delivered by the Investors no later than two Business Days before the Closing Date.

"**Excluded Liabilities**" means all Claims of or against the Company as of immediately prior to the implementation of the transactions contemplated under Section 7.2(b), other than Assumed Liabilities, including, *inter alia*, the non-exhaustive list of those certain Liabilities set forth in Schedule "F" (as such Schedule may be amended, supplemented or restated by the Investors from time to time up to two Business Days prior to the Closing Date), all pre-filing Claims, including without limitation, any amounts owing in respect of Taxes, any and all Claims relating to any change of control provision that may arise in connection with the change of control contemplated by the Transactions and to which the Company may be bound as of immediately prior to the implementation of the transactions contemplated under Section 7.2(b), all Claims relating to or under the Excluded Contracts and Excluded Assets, and Liabilities for Employees whose employment with the Company or its Affiliates is terminated on or before Closing and all Liabilities to or in respect of the Company's Affiliates. Without limiting the foregoing, Excluded Liabilities includes any Claims that are not Assumed Liabilities.

"**Existing Cargill Margin Facility**" means the facility consisting of Margin Advances (as defined in the APF) made available to the Company by Cargill from and after May 29, 2023 under the APF.

"**Existing Common Shares**" the issued and outstanding common shares in the capital of the Company immediately prior to the Transactions.

"**Existing Equity**" means any capital share (including the Existing Common Shares), capital stock, partnership, membership, joint venture, warrant, option or other ownership or equity interest, participation or securities (whether convertible, non-convertible, voting or nonvoting, whether preferred, common or otherwise, and including share appreciation, contingent interest or similar rights).

"**Existing Noteholder**" means a Senior Secured Noteholder and/or a Senior Priority Noteholder.

"**Final Order**" means, in respect of any Court Order, that such Court Order shall not have been vacated, set aside, or stayed, and that the time within which an appeal or request for leave to appeal must be initiated has passed with no appeal or leave to appeal having been initiated.

"**Governmental Entity**" means any government, regulatory authority, governmental department, agency, commission, bureau, official, minister, Crown corporation, court, board, tribunal or dispute settlement panel or other law, rule or regulation-making organization or entity: (i) having or purporting to have jurisdiction on behalf of any nation, province, territory or state or any other geographic or political subdivision of any of them, or (ii) exercising, or entitled or purporting to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power.

"**Initial Noteholder Investors**" means, collectively, Millstreet Capital Management LLC and its Affiliates and OSP, LLC on behalf of OSP Value Fund III, LP and OSP Value Fund IV, LP and its and their Affiliates.

"**Initial Order**" means the Initial Order granted by the Court on October 10, 2023 in the context of the CCAA Proceedings, as amended and restated on October 30, 2023, and as such Order may be further amended, restated or varied from time to time.

"**Intercreditor Agreement**" means an intercreditor agreement between Cargill, the Company and the trustee under the New Secured Priority Notes Indenture and, if applicable, any collateral agent under the Security Documents, entered into effective on the Closing Date on terms agreeable to the Investors and the Company, each acting reasonably.

"**Interim Period**" means the period from the date of this Agreement until the Closing Time.

"**Investment Canada Act**" means the *Investment Canada Act*, R.S.C., 1985, c. 28.

"**Investor**" and "**Investors**" have the respective meaning set out in the Recitals.

"**Investor Released Parties**" has the meaning set out in Section 5.10.

"**KERP Charge**" has the meaning given to it in the Initial Order.

"**Law**" has the meaning set out in the definition of "**Applicable Law**".

"**Liability**" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"**Management Incentive Plan**" means a management incentive plan on terms determined by the board of directors of the Company following the Closing and accepted by the Investors.

"**Material Adverse Effect**" means any change, effect, event, occurrence, state of facts or development that has or could reasonably be expected to have a material adverse effect on (i) the business, assets, liabilities, financial conditions or results of operations of the Company and its Affiliates, collectively, or (ii) prevents the ability of the Company to perform its obligations under, or to consummate the Transactions contemplated by, this Agreement, taken as a whole; in each case except to the extent that any such change, effect, event, occurrence, state of facts or development is attributable to: (a) general economic or business conditions; (b) Canada, the U.S. or foreign economies, or financial, banking or securities markets in general, or other general business, banking, financial or economic

conditions (including (i) any disruption in any of the foregoing markets, (ii) any change in the currency exchange rates or (iii) any decline or rise in the price of any security, commodity, contract or index); (c) acts of God or other calamities (including any earthquake, flood, forest fire, or other natural disaster), national or international political or social conditions, including the engagement and/or escalation by the U.S. or Canada in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the U.S. or Canada or any of their territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the U.S. or Canada; (d) conditions affecting generally the industry in which the Company or any of its subsidiaries participates; (e) the public announcement of, entry into or pendency of, actions required or contemplated by or performance of obligations under, this Agreement or the Transactions, or the identity of the Parties, including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any customers, suppliers, financing sources, licensors, licensees, distributors, partners, employees or others having relationships with the Company or any of its subsidiaries; (f) changes in Applicable Law or the interpretation thereof; (g) any change in applicable accounting standards or other accounting requirements or principles; (h) the failure of the Company to meet or achieve the results set forth in any internal projections (but not the underlying facts giving rise to such failure unless such facts are otherwise excluded pursuant to the clauses contained in this definition); or (i) any change resulting from compliance with the terms of, or any actions taken (or not taken) by any Party pursuant to or in accordance with, this Agreement; provided that the exceptions set forth in clauses (a), (b), (c), (d), (f), (g) or (h) shall not apply to the extent that such event is disproportionately adverse to the Company and its Affiliates, taken as a whole, as compared to other companies in the industries in which the Company and its Affiliates operate.

"**Material Permits, Mineral Tenures, Licenses and Contracts**" means those Permits and Licenses and Contracts listed in Schedule "G".

"**Mineral Tenures**" means the mining claims, leases and other property rights of the Company, all of which are listed in Schedule "H".

"**Minimum New Equity Allocation**" means, in respect of the New Equity Offering, a portion of the New Equity Investor Commitment Amount no less than:

      (a)      in respect of Millstreet and its Affiliates, $100,000,000; and

      (b)      in respect of OSP and its Affiliates, $60,000,000.

"**Mining Rights**" means all rights of the Company, whether contractual or otherwise, and whether in the Permits and Licenses, Mineral Tenures or Real Property Leases, appurtenant to the Owned Real Property, or otherwise, for the exploration for or exploitation of mineral resources and reserves together with surface rights, water rights, royalty interests, fee interests, joint venture interests and other leases, rights of way and enurements related to any such rights, and includes all rights vested in the Company under the Permits and Licenses, Mineral Tenures, the Real Property Leases and Owned Real Property.

"**Mining Rights Acknowledgement**" means an acknowledgement satisfactory to the Parties, acting reasonably, with approval as required by the Minister of Industry, Energy and Technology of Newfoundland and Labrador, acknowledging and confirming the Company's right, title and interest in and to the Mining Rights located in the Province of Newfoundland and Labrador and, to the extent the consent or approval of the Minister of Industry, Energy and Technology of Newfoundland and Labrador is required in connection with the Transactions, that the Mining Rights shall be unaffected by the Transactions contemplated by this Agreement.

"**Monitor**" means FTI Consulting Canada Inc. in its capacity as monitor of the Company in the CCAA Proceedings, and shall include, as the context so requires, FTI Consulting Canada Inc., in its capacity as monitor or trustee in bankruptcy of ResidualCo to the extent subsequently appointed as such.

"**Monitor's Certificate**" means the certificate, substantially in the form attached as Schedule "A" to the Approval and Reverse Vesting Order, to be delivered by the Monitor in accordance with Section 8.4, and thereafter filed by the Monitor with the Court.

"**New Common Shares**" means the common equity of the Company issued pursuant to the Transactions.

"**New Equity Investor Aggregate Commitment Amount**" means the maximum aggregate equity commitment by Investors other than Cargill and any Other New Equity Investors in connection with the New Equity Offering, being an aggregate of $200,000,000.

"**New Equity Investor Commitment Amount**" means in respect of the Investors other than Cargill, the amounts set forth on Exhibit "A" hereto, subject to adjustment in accordance with Section 2.4, and in respect of Other New Equity Investors, the amount committed under their respective Other New Equity Subscription Agreement.

"**New Equity Offering**" means the offering of an aggregate of $250,000,000 of New Common Shares by the Company to the Investors and any Other New Equity Investors pursuant to this Agreement and any Other New Equity Subscription Agreements (subject to dilution from any equity issued in connection with the Management Incentive Plan and the New Warrants).

"**New Equity Offering Additional Cash Consideration**" means an amount equal to $250,000,000 less the New Equity Offering Initial Cash Consideration and the New Equity Offering Retained Cash Consideration, subject to adjustment under Section 2.4(b).

"**New Equity Offering Cash Consideration**" means, collectively, the New Equity Offering Initial Cash Consideration, New Equity Offering Retained Cash Consideration and New Equity Offering Additional Cash Consideration.

"**New Equity Offering Initial Cash Consideration**" means an amount equal to (i) the DIP Obligations, (ii) amounts payable on closing under the Existing Cargill Margin Facility; (iii) the Cost Reimbursement Amount to the extent not waived hereunder; (iv) amounts necessary to fund the Administrative Expense Reserve; and (v) all advisors' expenses of the Company and the Monitor (including advisor and legal counsel fees) that are secured by CCAA Charges that rank ahead of the DIP Charge, and advisors' fees and expenses of each Eligible Equity Investors pursuant to the terms of this Agreement, in each case payable on Closing in accordance with the Closing Sequence, which amounts are, for greater certainty, intended to be used for the payments set forth in the Closing Sequence and as set forth in Section 2.3(a).

"**New Equity Offering Retained Cash Consideration**" means an amount equal to $175,000,000 (or if the Investors determine that additional cash is required on Closing, such higher amount as determined by the Investors but not to exceed $250,000,000) less the New Equity Offering Initial Cash Consideration, subject to adjustment under Section 2.4(b), which amount shall become a Retained Asset of the Company.

"**New Secured Priority Notes**" means the secured priority notes in the maximum aggregate principal amount of $100,000,000 issued pursuant to the New Secured Priority Notes Indenture and up to an additional $25,000,000 to be issued, if applicable, upon conversion of the Unsecured Takeback Notes in accordance with the terms of such Unsecured Takeback Notes.

"**New Secured Priority Notes Indenture**" means the indenture governing the New Secured Priority Notes, which shall include the terms and conditions as set forth in the Restructuring Support Agreement, and such other terms and conditions as agreed to by the Investors and the Company, each acting reasonably.

"**New Secured Priority Notes Offering**" means the offering of up to $100,000,000, in aggregate principal amount of New Secured Priority Notes by the Company.

"**New Secured Priority Notes Offering Subscription Agreement**" means a subscription agreement (or agreements) to be entered into by the Company and those Persons subscribing for New Secured Priority Notes in accordance with the New Secured Priority Notes Offering on terms and conditions acceptable to the Investors and the Company.

"**New Secured Priority Notes Security Agreements**" means the security agreements to be entered into by the Company and any other grantors of security interests party thereto in favour of a collateral agent on behalf of holders of the New Secured Priority Notes (and any other secured parties, if applicable) on the Closing Date, which will include the terms and conditions as agreed to by the Investors and the Company, each acting reasonably.

"**New Securities**" means the Subscribed Shares, New Warrants and Unsecured Takeback Notes.

"**New Warrants**" means the warrants to be issued to the Investors (other than Cargill) and Other New Equity Investors who are Existing Noteholders, as applicable, on Closing, pursuant to the terms hereof and the Approval and Reverse Vesting Order and pursuant to the New Warrant Certificates.

"**New Warrants Certificates**" means the certificates representing and governing the New Warrants, which will include the terms and conditions as set forth in the Restructuring Support Agreement, and such other terms and conditions as agreed to by the Investors and the Company, each acting reasonably.

"**Order**" means any order, directive, judgment, decree, injunction, decision, ruling, award or writ of any Governmental Entity.

"**Organizational Documents**" means any trust document, charter, certificate or articles of incorporation or amalgamation, articles of amendment, articles of association, articles of organization, articles of continuance, bylaws, as amended, partnership agreement or similar formation or governing documents of a Person (excluding individuals).

"**Other New Equity Investors**" means any Person, other than an Investor or any Cargill Designee, that enters into an Other New Equity Subscription Agreement and that is, in accordance with the terms of the Restructuring Support Agreement, acceptable to the Investors.

"**Other New Equity Subscription Agreement**" means a subscription agreement (or agreements) to be entered into by the Other New Equity Investors and the Company on terms and conditions acceptable to the Investors and the Company.

"**Outside Date**" means October 10, 2024, or such other date as the Company (with the consent of the Monitor) and the Investors may agree to in writing.

"**Owned Real Property**" means all real property owned by the Company, a complete list of which is set forth in Schedule "I".

"**Party**" means a party to this Agreement and any reference to a Party includes its successors and permitted assigns and "**Parties**" means more than one of them.

"**Permits and Licenses**" means the permits, licenses, Authorizations, approvals or other evidence of authority Related to the Business or issued to, granted to, conferred upon, or otherwise created for, the Company, or other evidence of authority issued to, granted to, conferred upon, or otherwise created for, the Company which relate to the ownership, maintenance, operation or reclamation of the Scully Mine, including, without limitation, as listed in Schedule "J".

"**Permitted Encumbrances**" means the Encumbrances related to the Retained Assets listed in Schedule "K", an amended list of which may be agreed to by the Investors, the Company and Monitor prior to the granting of the Approval and Reverse Vesting Order.

"**Person**" is to be broadly interpreted and includes an individual, a corporation, a partnership, a trust, an unincorporated organization, a Governmental Entity, and the executors, administrators or other legal representatives of an individual in such capacity.

"**Personal Property**" means any and all vehicles, equipment, parts, inventory of spare parts, parts and supplies, mine facilities (including maintenance shops, load out bins, crushers, mills, spirals, hydro-sizers, dryers, separation units), furniture and any other tangible personal property in which the Company has a beneficial right, title or interest (including those in possession of suppliers, customers and other third parties).

"**Personal Property Lease**" means a lease, equipment lease, financing lease, conditional sales contract and other similar agreement relating to Personal Property to which the Company is a party or under which it has rights to use Personal Property.

"**Post-Filing Trade Amounts**" means any accrued and unpaid amounts owing by the Company to third parties for leased or financed equipment and for goods and services provided to the Company by third parties Related to the Business relating to the period from and including October 10, 2023, that are unpaid as of the Closing (but excluding, for the avoidance of doubt, any amounts secured by any of the CCAA Charges or any Liabilities owing by the Company in respect of the DIP Facility (including the DIP Obligations), the Existing Cargill Margin Facility, the APF, the Senior Priority Notes and the Senior Secured Notes).

"**Pre-Closing Reorganization**" has the meaning set out in Section 5.11(a).

"**Pre-Filing Trade Amounts**" means the amounts identified on Schedule "L" as Pre-Filing Trade Amounts, as such Schedule may be amended, supplemented or restated by the Investors from time to time up to two Business Days prior to the Closing Date, provided that the aggregate amount of the Pre-Filing Trade Amounts shall not exceed a maximum amount to be agreed by the Investors, in consultation with the Company and the Monitor.

"**Rail Agreement**" means the Confidential Transportation Contract dated 3 November 2017 entered into between Quebec North Shore and Labrador Railway Company Inc. as carrier and Tacora Resources Inc. as shipper as amended, amended and restated, supplemented and modified from time to time.

"**Real Property Leases**" means all leases, subleases, licenses and other occupancy Contracts with respect to all real or immovable property (including subsurface mineral rights), and all plants, buildings, structures, improvements, appurtenances and fixtures (including fixed machinery and fixed equipment) thereon, forming part thereof or benefiting such real or immovable property Related to the Business, including those set out under "Real Property Leases" in Schedule "H".

"**Related to the Business**" means primarily (i) used in; (ii) arising from; or (iii) otherwise related to, the Business or any part thereof.

"**Released Claims**" means all Claims and Orders, contingent or otherwise, whether liquidated or unliquidated, matured or unmatured, disputed or undisputed, contractual, legal or equitable, including loss of value, professional fees, including "claims" as defined in the CCAA and including fees and disbursements of legal counsel on a full indemnity basis, and all costs incurred in investigating or pursuing any of the foregoing or any proceeding relating to any of the foregoing.

"**Representative**" when used with respect to a Person means each director, officer, employee, consultant, financial adviser, legal counsel, accountant and other agent, adviser or representative of that Person.

"**ResidualCo**" means a corporation to be incorporated by the Company in advance of Closing, to which the Excluded Assets, Excluded Contracts, Excluded Liabilities, Senior Priority Notes and Senior Secured Notes will be transferred to as part of the Closing Sequence, which shall have no issued and outstanding shares.

"**Restructuring Support Agreement**" has the meaning set out in the Recitals.

"**Retained Assets**" has the meaning set out in Section 3.1(d).

"**Retained Contracts**" means those Contracts listed in Schedule "M", as such Schedule may be amended, supplemented or restated by the Investors from time to time prior to the Closing.

"**RVO Outside Date**" has the meaning set out in Section 6.1(c).

"**Sale Process**" has the meaning set out in the Recitals.

"**Sale Process Order**" has the meaning set out in the Recitals.

"**Scully Mine**" has the meaning set out in the Recitals.

"**Second Tranche New Equity Payment**" has the meaning set out in Section 2.5(a).

"**Security Agreements**" means the Cargill Security Agreements and the New Secured Priority Notes Security Agreements, as applicable, it being understood and agreed that the Investors may, at their option, agree to shared security documentation in favour of a collateral agent to be held on behalf of Cargill, holders of the New Secured Priority Notes and any other secured parties from time to time, which will include the terms and conditions as agreed to by the Investors and the Company, each acting reasonably and which shall be subject to the Intercreditor Agreement.

"**Senior Priority Noteholders**" means the holders of the Senior Priority Notes.

"**Senior Priority Notes**" means the 9.00% Cash / 4.00% notes due 2023 issued by the Company pursuant to the Senior Priority Notes Indenture.

"**Senior Priority Notes Indenture**" means the second supplemental indenture dated May 11, 2023 between the Company and Trustee, as amended and/or restated from time to time.

"**Senior Secured Noteholders**" means the holders of the Senior Secured Notes.

"**Senior Secured Notes**" means the 8.250% notes due 2023 issued by the Company pursuant to the Senior Secured Notes Indenture.

"**Senior Secured Notes Indenture**" means the first supplemental indenture dated May 11, 2023 between the Company and the Trustee, as amended and/or restated from time to time.

"**Stay Period**" has the meaning given to it in the Initial Order.

"**Subscribed Shares**" means the New Common Shares, to be issued by the Company to the Investors, in accordance with the terms of this Agreement.

"**Tacora Financial Advisor**" has the meaning set out in the Recitals.

"**Takeback Note Cash Consideration**" means the cash consideration of $25,000,000 payable by the Investors (excluding Cargill) and Other New Equity Investors that are, in each case, also Existing Noteholders in consideration for the Unsecured Takeback Notes issued in accordance with Section 2.6(a).

"**Target Closing Date**" means August 30, 2024, or such other date as the Company (with the consent of the Monitor) and the Investors may agree to in writing.

"**Tax Act**" means the *Income Tax Act* (Canada).

"**Tax Returns**" means all returns, reports, declarations, designations, forms, elections, notices, filings, information returns, and statements in respect of Taxes that are filed or required to be filed with any applicable Governmental Entity, including all amendments, schedules, attachments or supplements thereto and whether in tangible or electronic form.

"**Taxes**" or "**Tax**" means, with respect to any Person, all supranational, national, federal, provincial, state, local or other taxes, including income taxes, global minimum taxes, mining taxes, branch taxes, profits taxes, capital gains taxes, gross receipts taxes, windfall profits taxes, value added taxes, severance taxes, ad valorem taxes, property taxes, property transfer taxes, capital taxes, net worth taxes, production taxes, sales taxes, goods and services taxes, harmonized sales taxes, use taxes, license taxes, excise taxes, franchise taxes, environmental taxes, transfer taxes, withholding or similar taxes, payroll taxes, employment taxes, employer health taxes, governmental pension plan premiums and contributions, social security premiums, workers' compensation premiums, employment/unemployment insurance or compensation premiums, stamp taxes, occupation taxes, premium taxes, alternative or add on minimum taxes, customs duties, import and export taxes, countervailing and anti-dumping duties or other taxes of any kind whatsoever imposed or charged by any Governmental Entity and any instalments in respect thereof including amounts or refunds owing in respect of any form of COVID-19 economic support, together with any interest, penalties, or additions with respect thereto and any interest in respect of such additions or penalties and any liability for the payment of any amounts of the type described in this paragraph as a result any express or implied obligation to indemnify any other Person or as a result of being a transferee or successor in interest to any Person, whether disputed or not.

"**Total Transaction Value**" shall be the aggregate value to the Company of all of the Transactions, as set forth in Section 2.2.

"**Transaction Fee Charge**" has the meaning given to it in the Initial Order.

"**Transaction Regulatory Approvals**" has the meaning given to it in Section 5.7.

119744559 v4

"**Transactions**" means all of the transactions contemplated by this Agreement and the Restructuring Support Agreement, including:

(a) the New Equity Offering;

(b) the New Secured Priority Notes Offering (as applicable);

(c) repayment of the DIP Obligations, the Existing Cargill Margin Facility and amounts owing under the APF (subject to set-off in accordance with the Closing Sequence);

(d) the cancellation of all Existing Equity;

(e) the assignment by the Company to ResidualCo of the Excluded Assets, Excluded Contracts and Excluded Liabilities and the Claims in respect of the Senior Priority Notes and the Senior Secured Notes and the APF (to the extent not otherwise satisfied as contemplated under Section 7.2(c));

(f) the issuances of any Unsecured Takeback Notes and the New Warrants;

(g) the entering into of the Unanimous Shareholder Agreement, each on and subject to the terms set forth herein, in the Approval and Reverse Vesting Order and Articles of Reorganization; and

(h) the entering into by the Company and Cargill Offtake Agreement and the Cargill OPA.

"**Trustee**" means Computershare Trust Company, N.A., in its capacity as trustee under the Senior Secured Notes and Senior Priority Notes.

"**Unanimous Shareholder Agreement**" means the unanimous shareholder agreement to be entered into, or deemed to be entered into, by the Company, the Investors and any holders of New Common Shares at the Closing Time. The Unanimous Shareholder Agreement shall be on terms and conditions as agreed to by the Investors, each acting reasonably.

"**Unsecured Takeback Notes**" means the unsecured notes in the principal amount of up to $25,000,000 that may be issued to the Investors (excluding Cargill) and Other New Equity Investors that are, in each case, also Existing Noteholders on Closing, pursuant to the terms hereof and the Approval and Reverse Vesting Order. The Unsecured Takeback Notes shall be on substantially the same terms and conditions as set forth in the Restructuring Support Agreement, and such other terms and conditions as agreed to by the Investors and the Company, each acting reasonably.

"**Warrant Cash Consideration**" means the cash consideration, in an amount equal to the fair market value of the New Warrants determined by the Investors, acting reasonably, payable by Investors (excluding Cargill) and Other New Equity Investors that are, in each case, also Existing Noteholders in consideration for the New Warrants issued in accordance with Section 2.6(b).

## 1.2    Actions on Non-Business Days

If any payment is required to be made or other action (including the giving of notice) is required to be taken pursuant to this Agreement on a day which is not a Business Day, then such payment or action shall be considered to have been made or taken in compliance with this Agreement if made or taken on the next succeeding Business Day.

**1.3     Currency and Payment Obligations**

Except as otherwise expressly provided in this Agreement, all dollar amounts referred to in this Agreement are stated in the lawful currency of the United States.

**1.4     Calculation of Time**

In this Agreement, a period of days shall be deemed to begin on the first day after the event which began the period and to end at 5:00 p.m. Eastern time on the last day of the period. If any period of time is to expire hereunder on any day that is not a Business Day, the period shall be deemed to expire at 5:00 p.m. Eastern time on the next succeeding Business Day.

**1.5     Additional Rules of Interpretation**

(a)     *Consents, Agreements, Approval, Confirmations and Notice to be Written.* Any consent, agreement, approval or confirmations from, or notice to, any party permitted or required by this Agreement shall be written consent, agreement, approval, confirmation, or notice, and email shall be sufficient.

(b)     *Gender and Number.* In this Agreement, unless the context requires otherwise, words in one gender include all genders and words in the singular include the plural and vice versa.

(c)     *Headings and Table of Contents.* The inclusion in this Agreement of headings of Articles and Sections and the provision of a table of contents are for convenience of reference only and are not intended to be full or precise descriptions of the text to which they refer.

(d)     *Section References.* Unless the context requires otherwise, references in this Agreement to Articles, Sections or Schedules are to Articles or Sections of this Agreement, and Schedules to this Agreement.

(e)     *Words of Inclusion.* Wherever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation" and the words following "include", "includes" or "including" shall not be considered to set forth an exhaustive list.

(f)     *References to this Agreement.* The words "hereof", "herein", "hereto", "hereunder", "hereby" and similar expressions shall be construed as referring to this Agreement in its entirety and not to any particular Section or portion of it.

(g)     *Statute References.* Unless otherwise indicated, all references in this Agreement to any statute include the regulations thereunder, in each case as amended, re-enacted, consolidated or replaced from time to time and in the case of any such amendment, re-enactment, consolidation or replacement, reference herein to a particular provision shall be read as referring to such amended, re-enacted, consolidated or replaced provision and also include, unless the context otherwise requires, all applicable guidelines, bulletins or policies made in connection therewith.

(h)     *Document References.* All references herein to any agreement (including this Agreement), document or instrument mean such agreement, document or instrument as amended, supplemented, modified, varied, restated or replaced from time to time

in accordance with the terms thereof and, unless otherwise specified therein, includes all schedules attached thereto.

**1.6    Exhibits and Schedules**

(a)    The following are the Exhibits and Schedules attached to and incorporated in this Agreement by reference and deemed to be a part hereof, in each case, as such Exhibits and Schedules may be amended pursuant hereto:

<u>**SCHEDULES**</u>

| | |
|---|---|
| Exhibit "A" | Investor Entities and Allocations |
| Exhibit "B" | New Equity Offering Additional Cash Consideration |
| Exhibit "C" | Additional New Equity Investor Consideration |
| Schedule "A" | Debt Obligations Owing to Investors |
| Schedule "B" | Assumed Liabilities |
| Schedule "C" | Encumbrances to Be Discharged |
| Schedule "D" | Excluded Assets |
| Schedule "E" | Excluded Contracts |
| Schedule "F" | Excluded Liabilities |
| Schedule "G" | Material Permits, Licenses and Contracts |
| Schedule "H" | Mineral Tenures |
| Schedule "I" | Owned Real Property |
| Schedule "J" | Permits and Licenses |
| Schedule "K" | Permitted Encumbrances |
| Schedule "L" | Pre-Filing Trade Amounts |
| Schedule "M" | Retained Contracts |

(b)    Unless the context otherwise requires, words and expressions defined in this Agreement will have the same meanings in the Exhibits and Schedules and the interpretation provisions set out in this Agreement apply to the Exhibits and Schedules. Unless the context otherwise requires, or a contrary intention appears, references in the Exhibits and Schedules to a designated Article, Section, or other subdivision refer to the Article, Section, or other subdivision, respectively, of this Agreement.

(c)    The Disclosure Letter itself is confidential information and may not be disclosed unless: (i) it is required to be disclosed pursuant to Applicable Law, unless such Applicable Law permits the Parties to refrain from disclosing the information for confidentiality or other purposes; or (ii) a Party needs to disclose it in order to enforce or exercise its rights under this Agreement and, in that case, only to Persons to which such information must be disclosed in connection therewith.

**ARTICLE 2**
**SUBSCRIPTION FOR SUBSCRIBED SHARES; ASSUMPTION OF LIABILITIES**

**2.1    Deposit**

The Investors paid to the Monitor on or about July 12, 2024 in accordance with the Sale Process, by wire transfer of immediately available funds, their allocation of the Deposit as set forth on Exhibit "A" hereto. The Deposit shall be held in escrow by the Monitor in an interest-bearing account and applied in accordance with this Agreement. On or before the third Business Day prior to the Closing Date, the Monitor shall provide the Investors with the amount of interest that will be accrued on the Deposit as of the Closing Date.  Any interest accrued on the Deposit shall be held in escrow by the Monitor on behalf of and for the benefit of the Investors.

**2.2    Total Transaction Value**

The Total Transaction Value in respect of the Subscribed Shares shall be an amount equal to the aggregate of the following:

(a)    <u>Cash Consideration</u>: The New Equity Offering Initial Cash Consideration and New Equity Offering Retained Cash Consideration, which shall be paid and satisfied in consideration for the Subscribed Shares in accordance with Section 2.3; and

(b)    <u>Assumption of Assumed Liabilities</u>: An amount equivalent to the Assumed Liabilities which the Investors shall cause the Company to retain, on the Closing Date and in accordance with the Closing Sequence.

**2.3    Cash Subscription Amounts**

The Investors shall, severally and not jointly nor jointly and severally, cause the New Equity Offering Initial Cash Consideration and the New Equity Offering Retained Cash Consideration to be paid as follows:

(a)    On the Closing Date, the New Equity Offering Initial Cash Consideration shall, in exchange for a number of Subscribed Shares that is equal to the dollar amount of New Equity Offering Initial Cash Consideration (or for such other number of Subscribed Shares based on a dollar amount per Subscribed Share to be agreed to among the Investors), be paid and satisfied by each Investor as follows: (i) by the release of its portion of the Deposit (together with any accrued interest thereon); and (ii) by wire transfer from each Investor (such obligation will be several for each Investor on their own behalf and not jointly nor jointly and severally) in immediately available funds to an account designated by the Monitor by no later than the Business Day prior to the Closing Date in the amount of its remaining New Equity Offering Initial Cash Consideration as set forth in Exhibit "A" hereto. The Monitor will be directed to pay on behalf of the Company all (i) amounts owing to the Monitor and its legal counsel; (ii) DIP Obligations; (iii) amounts owing pursuant to the Existing Cargill Margin Facility and (iv) the Company's applicable advisors' expenses, including financial advisor and legal counsel fees, solely to the extent that such expenses are subject to CCAA Charges that rank ahead of the DIP Charge, and expenses of the Investors, including the Investors' financial advisor and legal counsel fees, from the New Equity Offering Initial Cash Consideration and any other exit costs and charges as directed by the Investors, all in accordance with the Closing Sequence and the Approval and Reverse Vesting Order. The payment to Cargill of the amounts owing under the Existing Cargill Margin Facility are being made in consideration for Cargill entering into this Agreement and

18

its agreements, compromises and obligations hereunder. The Investors may, in the alternative, determine that a payment in the same amount shall be made to Cargill not specifically in repayment of the Existing Cargill Margin Facility but otherwise as a payment to Cargill in connection with the Transactions and this Agreement.

(b)    The New Equity Offering Retained Cash Consideration shall, in exchange for a number of Subscribed Shares that is equal to the dollar amount of New Equity Offering Retained Cash Consideration  (or for such other number of Subscribed Shares based on a dollar amount per Subscribed Share to be agreed to among the Investors), be paid and satisfied by each Investor by wire transfer from each Investor (such obligation will be several for each Investor on their own behalf and not jointly nor jointly and severally) in immediately available funds to an account designated by the Monitor by no later than the Business Day prior to the Closing Date in the amount of its New Equity Offering Retained Cash Consideration as set forth in Exhibit "A" hereto, subject to adjustment under Section 2.4(b). The New Equity Offering Retained Cash Consideration shall be retained by the Company as a Retained Asset and will not form part of the Excluded Assets.

Upon payment and satisfaction of the New Equity Offering Initial Cash Consideration and the New Equity Offering Retained Cash Consideration in accordance with this Section 2.3, the Subscribed Shares shall be issued to the Investors in accordance with their allocations set forth on Exhibit "A". The actions to take place as contemplated by this Section 2.3 are interdependent and are deemed to take place as nearly as possible, simultaneously.

## 2.4    Other New Equity Investors

(a)    From the date hereof until the date that is five Business Days prior to the anticipated Closing Date, Other New Equity Investors who are acceptable to the Initial Noteholder Investors and Cargill may enter into Other New Equity Investor Subscription Agreements and subscribe for New Common Shares in accordance with the terms and conditions of the Other New Equity Investor Subscription Agreements.

(b)    In the event that any Other New Equity Investors subscribe for New Common Shares in accordance with Section 2.4(a) and fund the amounts under their Other New Equity Investor Subscription Agreements by the second Business Day prior to Closing, the Subscribed Shares, the New Equity Offering Initial Cash Consideration, the New Equity Offering Retained Cash Consideration and the New Equity Offering Additional Cash Consideration attributable to each Initial Noteholder Investor shall be reduced *pro rata* (based on the Initial Noteholder Investors' New Equity Investor Commitment Amounts in respect of the Subscribed Shares, New Equity Offering Initial Cash Consideration, New Equity Offering Retained Cash Consideration and New Equity Offering Additional Cash Consideration) by the amount of such Other New Equity Investor's subscription for New Common Shares; provided that, the New Equity Offering Initial Cash Consideration, New Equity Offering Retained Cash Consideration and the New Equity Offering Additional Cash Consideration shall not, in the aggregate, be adjusted pursuant to this Section 2.4(b) below the Minimum New Equity Allocation for each Initial Noteholder Investor.

## 2.5    New Equity Offering Additional Cash Consideration

(a)    Following Closing an amount of the aggregate New Equity Offering Additional Cash Consideration shall, in exchange for a number of additional Subscribed Shares to be issued at such time that is equal to the dollar amount of New Equity Offering Additional

Cash Consideration (or for such other number of Subscribed Shares based on a dollar amount per Subscribed Share to be agreed to among the Investors), be paid by each Investor from time to time in the amount set forth in Exhibit "B" hereto and on the dates set forth in the Unanimous Shareholder Agreement (each such payment, a "**Second Tranche New Equity Payment**"); provided that the amounts of all such Second Tranche New Equity Payments do not exceed the aggregate amount of each Investor's New Equity Offering Additional Cash Consideration as set forth in Exhibit "A" hereto as adjusted in accordance with Section 2.4(b).

(b)     Each Second Tranche New Equity Payment, representing a portion of the aggregate New Equity Offering Additional Cash Consideration, shall, in exchange for additional Subscribed Shares to be issued upon receipt of such Second Tranche New Equity Payment, be paid and satisfied by wire transfer from each Investor (such obligation will be several for each Investor on their own behalf and not jointly nor jointly and severally) in immediately available funds to an account designated by the Company on the date set forth for such payment in the Unanimous Shareholder Agreement in the amount equal to such Second Tranche New Equity Payment. The right of the Company to receive the New Equity Offering Additional Cash Consideration, and the Second Tranche New Equity Payments, will be retained by the Company as Retained Assets and shall survive Closing.

Upon payment and satisfaction of the New Equity Offering Additional Cash Consideration, in the form of Second Tranche New Equity Payments, in accordance with this Section 2.5, the additional Subscribed Shares shall be issued to the Investors in accordance with their allocations set forth on Exhibit "B".

### 2.6    Unsecured Takeback Notes; New Warrants

(a)     On the Closing Date, in consideration for the Takeback Note Cash Consideration, the Company shall issue to the Investors (excluding Cargill) and the Other New Equity Investors that are, in each case, also Existing Noteholders, the Unsecured Takeback Notes, in the following allocations:

(i)     to the Initial Noteholder Investors, $5,000,000 in principal amount of the Unsecured Takeback Notes in the allocations set forth in Exhibit "C" hereto; and

(ii)     to the Initial Noteholder Investors and the Other New Equity Investors that are, in each case, Existing Noteholders, $20,000,000 in principal amount of the Unsecured Takeback Notes in accordance with such Initial Noteholder Investors and Other New Equity Investors' *pro rata* share of their New Equity Investor Commitment Amount in an amount not to exceed the New Equity Investor Aggregate Commitment Amount.

(b)     On the Closing Date, in consideration for the Warrant Cash Consideration, the Company shall issue to the Investors (excluding Cargill) and the Other New Equity Investors that are, in each case, also Existing Noteholders, the New Warrants, in the following allocations:

(i)     to the Initial Noteholder Investors, 40% of such New Warrants in the allocation set forth in Exhibit "C" hereto; and

     (ii)      to the Initial Noteholders Investors and the Other New Equity Investors that are, in each case, Existing Noteholders, the remaining 60% of such New Warrants in accordance with such Initial Noteholder Investors and Other New Equity Investors' *pro rata* share of their New Equity Investor Commitment Amount in an amount not to exceed the New Equity Investor Aggregate Commitment Amount.

(c)     The obligation of each Investor (excluding Cargill) and Other New Equity Investors that are, in each case, also Existing Noteholders to pay their respective Takeback Note Cash Consideration and the Warrant Cash Consideration in consideration for the issuance of the applicable Unsecured Takeback Notes and New Warrants, respectively, in accordance with Section 2.6(a) and Section 2.6(b), shall, in accordance with the Closing Sequence, be set-off and satisfied in full against the Company's obligation to satisfy such amounts of the Backstop Commitment Fee to such Investors (the "**Set-off**").

(d)     The Investors (excluding Cargill) and Other New Equity Investors that are, in each case, also Existing Noteholders may elect among such Investors and Other New Equity Investors to share as between them a combination of Unsecured Takeback Note and New Warrants, such that the allocations as set forth in Section 2.6(a)(ii) and 2.6(b)(ii), as applicable, may be individually (as between Unsecured Takeback Notes and New Warrants) greater than their *pro rata* share of the New Equity Investor Commitment Amount bears to the New Equity Investor Aggregate Commitment Amount (excluding Cargill's New Equity Investor Commitment Amount), provided that, no such Investor or Other New Equity Investor may elect to hold greater than their *pro rata* share of the New Equity Investor Aggregate Commitment Amount in both Unsecured Takeback Notes and New Warrants combined.

(e)     Any amount paid or credited by the Company under this Section 2.6 shall be made free and clear of and without deduction or withholding for any amounts under the *Income Tax Act* (Canada) or any other provision of Applicable Law except as required by Applicable Law. If the Company is required under Applicable Law to deduct or withhold any such amount under this Section 2.6, then (i) the sum shall be increased as necessary so that, after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section 2.6(e)), the recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made, (ii) the Company shall make such required deduction or withholding, and (iii) the Company shall pay to the relevant Governmental Entity the full amount deducted or withheld in accordance with, and within the time limits prescribed by, Applicable Law. Each of the Company and the recipient shall use commercially reasonable efforts to cooperate with each other in accordance with Applicable Law to minimize Tax withholding in respect of a payment under this Section 2.6 including the recipient providing, at the request of the Company, tax forms (including Canada Revenue Agency forms in the NR series) that may be reasonably necessary in order for the Company to withhold Tax at a reduced rate under Applicable Law because of a tax treaty.

**2.7    Administrative Expense Reserve**

On the Closing Date, the Monitor shall be directed by the Company to retain a portion of the New Equity Offering Initial Cash Consideration equal to the Administrative Expense Reserve, which the Monitor shall hold in trust for the benefit of Persons entitled to be paid the Administrative Expense Costs, and which amounts are received by ResidualCo in consideration of the assumption by

ResidualCo of the Excluded Liabilities. Any unused portion of the Administrative Expense Reserve after payment or reservation for all Administrative Expense Costs, as determined by the Monitor, shall be transferred by the Monitor to the Company.

**2.8    Cargill Designee**

Notwithstanding any other provision of this Agreement, Cargill (a) shall have the right to designate one or more of the Cargill Entities (each, a "**Cargill Designee**") to perform all or any part of the obligations of Cargill under this Agreement (including paying the New Equity Offering Cash Consideration agreed to be paid, and subscribing for the Subscribed Shares agreed to be subscribed for, by Cargill hereunder), and (b) shall cause such Cargill Designee to perform such obligations in accordance with the terms of this Agreement.  All references to Cargill in this Agreement shall include such Cargill Designee (as applicable).

**ARTICLE 3**
**TRANSFER OF EXCLUDED ASSETS, EXCLUDED CONTRACTS AND EXCLUDED LIABILITIES**

**3.1    Transfer of Excluded Assets, Excluded Contracts, Excluded Liabilities, Senior Priority Notes and Senior Secured Notes to ResidualCo**

(a)    On the Closing Date, in accordance with the Closing Sequence and pursuant to the Approval and Reverse Vesting Order, the Excluded Assets, the Excluded Contracts and Excluded Liabilities shall be transferred to and assumed by ResidualCo, and the same shall be vested in ResidualCo pursuant to the Approval and Reverse Vesting Order. For greater certainty, as consideration for the transfer of the Excluded Assets and the Administrative Expense Reserve and Excluded Contracts, ResidualCo shall assume an amount of the Excluded Liabilities equal to the fair market value of the Excluded Assets and the Administrative Expense Reserve, and any additional Excluded Liabilities that are assumed by ResidualCo shall be assumed for no consideration.

(b)    On the Closing Date and in accordance with the Closing Sequence and pursuant to the Approval and Reverse Vesting Order, any Claims in respect of any Senior Priority Notes and Senior Secured Notes and any Claims remaining under the APF that are not otherwise satisfied as contemplated under Section 7.2(c), shall be transferred and assumed by ResidualCo, for no consideration, and the same shall be vested in ResidualCo pursuant to the Approval and Reverse Vesting Order, which transfer shall constitute a novation of the Senior Priority Notes and Senior Secured Notes to ResidualCo.

(c)    Notwithstanding any other provision of this Agreement, neither the Investors nor the Company shall assume or have any Liability for any of the Senior Priority Notes, Senior Secured Notes, any Claims remaining under the APF that are not otherwise satisfied as contemplated under Section 7.2(c), Excluded Liabilities or any Liability related to the Excluded Contracts and the Company and its assets, undertaking, business and properties shall be fully and finally Discharged from all Senior Priority Notes, Senior Secured Notes, and any Claims remaining under the APF that are not otherwise satisfied as contemplated under Section 7.2(c), Excluded Liabilities and any Liabilities related to the Excluded Contracts as at and from and after the Closing Time, pursuant to the Approval and Reverse Vesting Order. For greater certainty, the Company shall be solely liable for all Tax liabilities (including any transfer Taxes), if any, arising in connection with or as a result of the transfer of the Excluded Liabilities to ResidualCo and the assumption of the Excluded Liabilities by ResidualCo.

(d)    On the Closing Date, the Company shall retain, free and clear of any and all Encumbrances other than Permitted Encumbrances, all of the assets owned by it on the date of this Agreement and any assets acquired by it up to and including Closing, including the Mining Rights, Mineral Tenures, Owned Real Property, Retained Contracts, Permits and Licenses and Books and Records (the "**Retained Assets**"), except, however, any assets sold in the ordinary course of business during the Interim Period in accordance with the terms of this Agreement. For greater certainty, the Retained Assets shall not include the Excluded Liabilities, Excluded Assets or the Excluded Contracts, which the Company shall transfer to ResidualCo in accordance with Section 3.1(a) or the Claims in respect of the Senior Priority Notes or Senior Secured Notes, which the Company shall transfer to ResidualCo in accordance with Section 3.1(b). For greater certainty, the Company shall be solely liable for all Tax liabilities (including any transfer Taxes), if any, arising in connection with or as a result of the transfer of the Excluded Assets, Excluded Liabilities, Excluded Contracts, Senior Priority Notes and Senior Secured Notes to ResidualCo.

### ARTICLE 4
### REPRESENTATIONS AND WARRANTIES

**4.1    Representations and Warranties as to the Company**

Subject to the issuance of the Approval and Reverse Vesting Order, the Company represents and warrants to the Investors on the date hereof and at Closing as follows and acknowledges and agrees that the Investors are relying upon such representations and warranties in connection with the Transactions:

(a)    <u>Incorporation and Status</u>. The Company is a corporation continued, validly existing and in good standing under the laws of the Province of Ontario and has all necessary corporate power, authority and capacity to enter into, deliver and perform its obligations under this Agreement.

(b)    <u>Corporate Authorization</u>. The execution, delivery and performance by the Company of this Agreement and the consummation of the Transactions has been authorized by all necessary corporate action on the part of the Company.

(c)    <u>No Conflict</u>. Subject to receipt of applicable Transaction Regulatory Approvals, the execution, delivery and performance by the Company of this Agreement does not or would not with the giving of notice, the lapse of time, or both, or the happening of any other event or condition result in a breach or a violation of, or conflict with, or allow any other Person to exercise any rights under, any terms or provisions of the Organizational Documents of the Company or Applicable Law.

(d)    <u>Execution and Binding Obligation</u>. This Agreement has been duly executed and delivered by the Company and constitutes a legal, valid and binding obligation of the Company, enforceable against it in accordance with its terms subject only to the Approval and Reverse Vesting Order.

(e)    <u>Proceedings</u>. As of the date hereof, other than as disclosed in Schedule 4.1(e) of the Disclosure Letter, there are no Actions pending against the Company with respect to, or in any manner affecting, title to the Retained Assets, the operation of the Business or which would reasonably be expected to enjoin, delay, restrict or prohibit the Closing of the Transactions, as contemplated by this Agreement, or which would reasonably

be expected to delay, restrict or prevent or the Company from fulfilling any of its obligations set forth in this Agreement.

(f)    <u>Ownership of Retained Assets</u>. Subject to the Court issuing the Approval and Reverse Vesting Order, the Company will be the sole holder of record of, and will be the sole registered and beneficial owner of, and have good and valid title to its interests in the Retained Assets free and clear of all Encumbrances other than Permitted Encumbrances.  The Retained Assets are sufficient to operate the Business as it is currently conducted.  All of the mining claims comprising Mining Rights have been properly located and recorded in compliance with Applicable Law in all material respects and are comprised of valid and subsisting mineral claims.  Except as set out in the Schedule 4.1(f), no Person other than the Company has any material interest in the Mining Rights or the production or profits therefrom or any royalty or streaming or similar interest in respect thereof or any right to acquire any such interest from the Company.

(g)    <u>Material Permits, Mineral Tenures, Licenses and Contracts</u>. The Material Permits, Mineral Tenures, Licenses and Contracts are in full force and effect. The Company is not in default or breach of any Material Permit, Mineral Tenure, License or Contract that would reasonably be expected to create a Material Adverse Effect, other than defaults arising from: (i) the non-payment of liabilities relating to the period prior to the commencement of the CCAA Proceedings; and (ii) the Company's commencement of the CCAA Proceedings.

(h)    <u>Compliance with Laws</u>. Except as would not, individually or in the aggregate, have a Material Adverse Effect as of the date hereof, the Company is in compliance with all Applicable Law. To the Company's knowledge upon due inquiry, no facts, circumstances or conditions exist that would reasonably be expected to prevent the expansion of the Tailings Impoundment Area at the Scully Mine as described in the Environmental Assessment Registration for Scully Mine Tailings Impoundment Area Expansion Project, July 9, 2021.

(i)    <u>Employee Matters.</u> Except as would not, individually or in the aggregate, have a Material Adverse Effect as of the date hereof,

(i)    the Company is and has been operated in all material respects in compliance with all applicable legislation relating to employees, including but not limited to employment standards, labour relations, wages and hours of work, human rights, occupational health and safety and workers' compensation;

(ii)    other than as disclosed in Schedule 4.1(i) of the Disclosure Letter, there is no proceeding, action, suit or claim pending or threatened involving any employee of the Company;

(iii)    there are no existing or, to the Company's knowledge, threatened strikes, labour disputes, work slow-downs or stoppages, grievances, controversies or other labour relations difficulties affecting the Company, and no such event has occurred within the last five (5) years; and

(iv)    all amounts due and payable by the Company to its former or current employees, consultants and contractors have been paid in full and all amounts accruing due to same have been reflected in the financial records of the Company.

Additionally, the Company has provided the Investors with copies of all employment Contracts that have change of control provisions and all amendments thereto.

**4.2    Representations and Warranties as to the Investors**

Each Investor severally, on its own behalf only, and not jointly or jointly and severally, represents and warrants to and in favour of the Company as follows and acknowledges and agrees that the Company is relying upon such representations and warranties in connection with the Transactions.

(a)    <u>Incorporation and Status</u>. Each Investor is duly incorporated, organized or formed (as applicable), validly existing and in good standing under the Laws of the jurisdiction of its incorporation, organization or formation and has full power and authority to enter into, deliver and perform its obligations under, this Agreement.

(b)    <u>Corporate Authorization</u>. The execution, delivery and performance by each Investor (or its general partners or equivalent, as the case may be) of this Agreement and the consummation of the Transactions has been authorized by all necessary corporate action on the part of the applicable Investor.

(c)    <u>No Conflict</u>. Subject to receipt of the Transaction Regulatory Approvals, the execution, delivery and performance by each Investor (or its general partner or equivalent, as the case may be) of this Agreement and the completion of the Transactions does not (or would not with the giving of notice, the lapse of time, or both, or the happening of any other event or condition) result in a breach or a violation of, or conflict with, or allow any other Person to exercise any rights under, any terms or provisions of the Organizational Documents of such Investor, or Applicable Law.

(d)    <u>Execution and Binding Obligation</u>. This Agreement has been duly executed and delivered by each Investor (or its general partner or equivalent, as the case may be), and constitutes a legal, valid and binding obligation of such Investor, enforceable against it in accordance with its terms except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity and subject only to the Approval and Reverse Vesting Order.

(e)    <u>No Commissions</u>. Except as contemplated by the Restructuring Support Agreement, there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the Transactions based on any arrangement or agreement which would result in Liability for the Company.

(f)    <u>Proceedings</u>. As of the date hereof, there are no Actions pending, or to the knowledge of each Investor, threatened against such Investor before any Governmental Entity, which would: (i) prevent such Investor from paying the Cash Consideration to the Monitor; (ii) prohibit or seek to enjoin, restrict or prohibit the Transactions or (iii) which would reasonably be expected to materially delay such Investor from fulfilling any of its obligations set forth in this Agreement.

(g)    <u>Investment Canada Act</u>. Each Investor is a "Canadian" or a "WTO Investor" or a "Trade Agreement Investor" within the meaning of the Investment Canada Act.

(h)    <u>Consents</u>. Except for: (i) the issuance of the Approval and Reverse Vesting Order; and (ii) the Transaction Regulatory Approvals, no Authorization, consent or approval of, or filing with or notice to, any Governmental Entity, court or other Person is required in

25

connection with the Investor's execution, delivery or performance of this Agreement and each of the agreements to be executed and delivered by the Investor hereunder, including the subscription of the Subscribed Shares hereunder.

(i)    <u>Financial Ability</u>. The Investor has cash on hand and/or firm financing commitments in amounts sufficient to allow them to pay the balance of the Cash Consideration and all other costs and expenses in connection with the consummation of the Transactions.

(j)    <u>Securities Law Matters</u>.

    (i)    Each Investor is:

        (x) an "accredited investor", as such term is defined in National Instrument 45-106 – Prospectus Exemptions of the Canadian Securities Administrators and it was not created or used solely to purchase or hold securities and acknowledges that the Subscribed Shares will be subject to resale restrictions under applicable securities laws, which may be indefinite under applicable Canadian securities laws; and

        (y) it is an "accredited investor" or "qualified institutional buyer" within the meaning of the rules of the United States Securities and Exchange Commission under the Securities Act of 1933, as amended, and the regulations promulgated thereunder, as modified by The Dodd-Frank Wall Street Reform and Consumer Protection Act.

    (ii)    Each Investor understands and acknowledges that no prospectus or offering memorandum has been or will be filed by the Company with any securities commission or similar regulatory authority in any jurisdiction in connection with the issuance of the Subscribed Shares and that the New Common Shares are being offered for sale only on a "private placement" basis and that the sale of the New Common Shares is conditional upon such sale being exempt from registration requirements and requirements to file and obtain a receipt for a prospectus, and the requirement to sell securities through a registered dealer, or upon the issuance of such orders, consents or approvals as may be required to enable such sale to be made without complying with such requirements, and that as a consequence of acquiring the Subscribed Shares pursuant to such exemptions: (A) the Investors are restricted from using most of the civil remedies otherwise available under applicable securities laws; (B) the Investors will not receive information that would otherwise be required to be provided to it under applicable securities laws; and (C) the Company is relieved from certain obligations that would otherwise apply under applicable securities laws.

## 4.3    As is, Where is

Each Investor acknowledges and agrees that they have conducted to their satisfaction an independent investigation and verification of the Company, the Business, the New Securities and the Retained Assets, and, based solely thereon and the advice of their financial, legal and other advisors, have determined to proceed with the Transactions. Each Investor has relied solely on the results of their own independent investigation and verification and, except for the representations and warranties of the Company expressly set forth in Section 4.1, each Investor understands, acknowledges and agrees that all other representations, warranties, guarantees, conditions and statements of any kind or nature, expressed or implied (including any relating to the future or historical financial condition, results of

operations, prospects, assets or liabilities of the Company or the Business) are specifically disclaimed by the Company and its financial and legal advisors and the Monitor and its legal counsel. EACH INVESTOR SPECIFICALLY ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF THE COMPANY EXPRESSLY AND SPECIFICALLY SET FORTH IN SECTION 4.1: (A) THE INVESTORS ARE ACQUIRING THE NEW SECURITIES ON AN "AS IS, WHERE IS" BASIS; AND (B) NONE OF THE COMPANY, THE MONITOR OR ANY OTHER PERSON (INCLUDING ANY REPRESENTATIVE OF THE COMPANY OR THE MONITOR WHETHER IN ANY INDIVIDUAL, CORPORATE OR ANY OTHER CAPACITY) IS MAKING, AND THE INVESTORS ARE NOT RELYING ON, ANY REPRESENTATIONS, WARRANTIES, GUARANTEES, CONDITIONS OR OTHER STATEMENTS OF ANY KIND WHATSOEVER, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, AS TO ANY MATTER CONCERNING THE COMPANY, THE BUSINESS, THE NEW SECURITIES, THE RETAINED LIABILITIES, THE EXCLUDED ASSETS, THE EXCLUDED LIABILITIES, THIS AGREEMENT OR THE TRANSACTIONS, OR THE ACCURACY OR COMPLETENESS OF ANY INFORMATION PROVIDED TO (OR OTHERWISE ACQUIRED BY) THE INVESTORS OR ANY OF THEIR RESPECTIVE REPRESENTATIVES, INCLUDING WITH RESPECT TO MERCHANTABILITY, PHYSICAL OR FINANCIAL CONDITION, DESCRIPTION, FITNESS FOR A PARTICULAR PURPOSE, OR IN RESPECT OF ANY OTHER MATTER OR THING WHATSOEVER, INCLUDING ANY AND ALL CONDITIONS, GUARANTEES, STATEMENTS, WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, PURSUANT TO ANY APPLICABLE LAWS IN ANY JURISDICTION, WHICH THE INVESTORS CONFIRM DO NOT APPLY TO THIS AGREEMENT, AND ARE HEREBY WAIVED IN THEIR ENTIRETY BY EACH INVESTOR.

## ARTICLE 5
## COVENANTS

### 5.1    Target Closing Date

The Parties shall cooperate with each other and shall use their commercially reasonable efforts to effect the Closing by the Target Closing Date.

### 5.2    Motion for Approval and Reverse Vesting Order

As soon as practicable after the date hereof, the Company shall serve and file a motion seeking the issuance of the Approval and Reverse Vesting Order.

The Company shall diligently use its commercially reasonable efforts to seek the issuance and entry of the Approval and Reverse Vesting Order and each Investor shall cooperate with the Company in its efforts to obtain the issuance and entry of such Order. The Company's motion materials for the Approval and Reverse Vesting Order shall be in form and substance satisfactory to counsel to the Investors, acting reasonably. The Company will provide counsel to the Investors a reasonable opportunity to review a draft of the motion materials to be served and filed with the Court, it being acknowledged that such motion materials should be served as promptly as reasonably possible following the execution of this Agreement, and will serve such materials on the service list prepared by the Company and reviewed by the Monitor, and on such other interested parties, and in such manner, as counsel to the Investors may reasonably require. Both the Company and the Investors will each promptly notify counsel for the other party of any and all threatened or actual objections to the motion for the issuance of the Approval and Reverse Vesting Order, of which it becomes aware, and will promptly provide to counsel for the other party, a copy of all written objections received.

**5.3    Interim Period**

(a)    During the Interim Period, except: (i) as contemplated or permitted by this Agreement (ii) as necessary in connection with the CCAA Proceedings; (iii) as otherwise provided in the Initial Order and any other Court Orders; or (iv) as consented to by the Investors and the Company:

    (i)    the Company shall continue to maintain its Business and operations in substantially the same manner as conducted on the date of this Agreement, including preserving, renewing and keeping in full force its corporate existence as well as the Material Permits, Mineral Tenures, Licenses and Contracts;

    (ii)    the Company shall not transport, remove or dispose of, any of its assets out of its current locations outside of its ordinary course of Business;

    (iii)    the Company shall use commercially reasonable efforts to keep in full force and effect all of its existing insurance policies and give any notice or present any claim under any such insurance policies consistent with past practices of the Company in the ordinary course of business; and

    (iv)    Post-Filing Trade Amounts shall continue to be paid in the ordinary course of business.

(b)    During the Interim Period, the Company, in consultation with the Investors and the Monitor, shall attempt to reach agreements with trade suppliers, equipment lessors, real property lessors and other Persons owed Pre-Filing Trade Amounts in respect of (i) terms on which such Person's Pre-Filing Trade Amounts may be assumed in accordance with this Agreement; and (ii) credit terms in respect of ongoing supply to the Business following the Closing Date.

(c)    During the Interim Period, except as contemplated or permitted by this Agreement or any Court Order, the Company shall not enter into any non-arms' length transactions involving the Company or its assets or the Business without the prior approval of the Investors.

(d)    During the Interim Period, the Company shall comply with the DIP Budget (as defined in the DIP Agreement) in all material respects subject to Permitted Variances (as defined in the DIP Agreement), and for certainty, as such DIP Budget may be amended from time to time pursuant to the DIP Agreement.

**5.4    Company Support Obligations**

(a)    During the Interim Period:

    (i)    the Company will cooperate with the Investors with respect to all material steps required in connection with the Transactions;

    (ii)    the Company will negotiate in good faith all documentation necessary to consummate the New Equity Offering and New Secured Priority Notes Offering and entry into the Cargill Offtake Agreement, the Cargill OPA and the Cargill Margin Facility with the Investors on terms consistent with the Restructuring Support Agreement and will take any and all commercially reasonable and appropriate actions in furtherance of the New Equity Offering and New

Secured Priority Notes Offering and as agreed to with the Investors, including sending such documentation necessary to consummate the New Equity Offering and New Secured Priority Notes Offering (to the extent finalized) and entry into the Cargill Offtake Agreement, the Cargill OPA and the Cargill Margin Facility at least five Business Days in advance of Closing (or such later date as agreed to between the Company, the Monitor and the Investors, each acting reasonably);

(iii)      the Company will promptly notify the Investors, in writing, of receipt of any notice, demand, request or inquiry by any Governmental Entity concerning the Transactions or the issuance by any Governmental Entity of any cease trading or similar Order or ruling relating to any securities of the Company and its Affiliates;

(iv)      the Company will take all action as may be necessary so that the Transactions will be effected in accordance with Applicable Law;

(v)      the Company will execute any and all documents and perform (or cause its agents and advisors to perform) any and all commercially reasonable acts required in connection with this Agreement;

(vi)      the Company and the Investors will use commercially reasonable efforts to timely prepare and file all documentation and pursue all steps reasonably necessary to obtain all required Transaction Regulatory Approvals, and material third-party consents and approvals as may be required in connection with the Transactions;

(vii)      the Company and the Investors will use commercially reasonable efforts to prepare and finalize the Management Incentive Plan in advance of the Closing Time;

(viii)      the Company and the Investors will use commercially reasonable efforts to agree on new individuals to comprise the board of directors of the Company post-Closing; and

(ix)      the Company will promptly notify the Investors of any Material Adverse Effect occurring from and after the date hereof.

## 5.5     Access During Interim Period

During the Interim Period, the Company shall give, or cause to be given, to the Investors, and their Representatives, reasonable access during normal business hours to the Retained Assets and Assumed Liabilities, including the Company's Scully Mine site, Books and Records, personnel, properties, Permits and Licenses, and Contracts, to conduct such investigations of the financial and legal condition of the Business and the Retained Assets as the Investors may deem reasonably necessary or desirable to further familiarize themselves with the Business and the Retained Assets, provided that the Investors shall not be entitled to any confidential, privileged or otherwise sensitive information, as determined by the Company and the Monitor, each acting reasonably. Without limiting the generality of the foregoing: (i) the Investors and their Representatives shall be permitted reasonable access during normal business hours to all documents relating to information scheduled or required to be disclosed under this Agreement and to the Employees; (ii) subject to the ongoing reasonable oversight and participation of the Company and the Monitor, and with prior notice to the Company and consent of the Monitor, the Investors and their Representatives shall be permitted to

29

contact and discuss the Transactions with Governmental Entities and the Company's customers and contractual counterparties; and (iii) the Company shall instruct its executive officers and senior business managers, employees, counsel, auditors and finance advisors of the Company to reasonably cooperate with the Investors and their Representatives regarding the same. Such investigations shall be carried out at the Investors' sole and exclusive risk and cost, during normal business hours, and the Company shall co-operate reasonably in facilitating such investigations and shall furnish copies of all such documents and materials relating to such matters as may be reasonably requested by or on behalf of the Investors, provided, that: (A) such investigations will not unreasonably interfere with the Company's operations; (B) the Investors shall not conduct invasive or intrusive investigations, inspections, tests or audits in respect of the Retained Assets or Excluded Assets, without the prior written consent of the Company, which consent shall not be unreasonably withheld, and the Investors having given the Company at least two (2) Business Days' prior written notice; (C) the Investors shall provide the Company with evidence of appropriate liability insurance coverage for the Investors and their Representatives and the Company will be entitled to have a Representative present during all such tests, inspections and investigations; (D) any damage to the Retained Assets or Excluded Assets caused by such tests, land surveys, inspections and investigations will be promptly repaired by the Investors and the Investors will indemnify and save the Company harmless from all Claims imposed upon or asserted against it as a result of, in respect of or arising out of such tests, inspections and investigations, such indemnity to survive Closing or in the event this Agreement is terminated in accordance with its terms. No investigation made pursuant to this Section 5.5 by the Investors or their Representatives at any time prior to or following the date of this Agreement shall affect or be deemed to modify any representation or warranty made by the Company herein.

## 5.6 Employees

Following the Closing Date, except in respect of change of control payments for senior management, which amounts shall be waived or are Excluded Liabilities, the Investors agree that the Company will continue to employ the Employees on the same terms and conditions as they currently enjoy provided such terms and conditions (and any written agreement related to same) are as set forth in the virtual data room of the Company for the Transactions as of July 11, 2024. The Investors acknowledge and agree that that the Company shall remain subject to any collective agreement of the Company and shall inherit all obligations and liabilities associated with any collective agreement which applies to the Employees.

## 5.7 Regulatory Approvals and Consents

(a)     The Company and the Investors shall, from and after the date hereof, work together to determine whether any material Permits and Licenses required from any Governmental Entity or under any Applicable Law relating to the business and operations of the Company and its Affiliates and the Mining Rights would be required to be obtained in order to permit the Company and the Investors to complete the Transactions, including to permit the Company and the Investors to perform their obligations hereunder and the issuance, acquisition and holding of the New Securities (the "**Transaction Regulatory Approvals**").  In the event any such determination is made, the Company and the Investors shall use commercially reasonable efforts to apply for and obtain any such Transaction Regulatory Approvals as soon as reasonably practicable, in accordance with Section 5.7(b), in each case at the sole cost and expense of the Company.

(b)     The Company and the Investors shall use commercially reasonable efforts to apply for and obtain the Transaction Regulatory Approvals and shall co-operate with one another in connection with obtaining such approvals.  Without limiting the generality of the foregoing, the Company and the Investors shall: (i) give each other reasonable

advance notice of all meetings or other oral communications with any Governmental Entity relating to the Transaction Regulatory Approvals, as applicable, and provide as soon as practicable but in any case, if any, within the required time, any additional submissions, information and/or documents requested by any Governmental Entity necessary, proper or advisable to obtain the Transaction Regulatory Approvals; (ii) not participate independently in any such meeting or other oral communication without first giving the Company or the Investors, as applicable (or their outside counsel) an opportunity to attend and participate in such meeting or other oral communication, unless otherwise required or requested by such Governmental Entity; (iii) if any Governmental Entity initiates an oral communication regarding the Transaction Regulatory Approvals as applicable, promptly notify the Company or the Investors, as applicable, of the substance of such communication; (iv) subject to Applicable Law relating to the exchange of information, provide each other with a reasonable advance opportunity to review and comment upon and consider in good faith the views of the other in connection with all written communications (including any filings, notifications, submissions, analyses, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of the Company or an Investor, as applicable) with a Governmental Entity regarding the Transaction Regulatory Approvals as applicable; and (v) promptly provide each other with copies of all written communications to or from any Governmental Entity relating to the Transaction Regulatory Approvals as applicable.

(c)     Each of the Company, its Affiliates and the Investors may, as advisable and necessary, reasonably designate any competitively or commercially sensitive material provided to the other under this Section 5.6 as "Outside Counsel Only Material". Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and, subject to any additional agreements between the Company, its Affiliates and the Investors, will not be disclosed by such outside legal counsel to employees, officers or directors of the recipient unless express written permission is obtained in advance from the source of the materials or its legal counsel.

(d)     The obligation of the Company, its Affiliates or an Investor to use its commercially reasonable efforts to obtain the Transaction Regulatory Approvals does not require the Company or the Investors (or any Affiliate thereof) to undertake any divestiture of any business or business segment of the Company or the Investors, to agree to any material operating restrictions related thereto or to incur any material expenditure(s) related therewith, unless agreed to by the Investors and the Company.  In connection with obtaining the Transaction Regulatory Approvals, the Company shall not agree to any of the foregoing items without the prior written consent of Investors.

(e)     To the extent that any of the Investors' consent in respect of the Transactions is required, each Investor agrees to provide such consent (on such terms and conditions acceptable to it, acting reasonably).

## 5.8     New Secured Priority Notes Offering

The Company hereby covenants and agrees that it shall use its commercially reasonable efforts to complete the New Secured Priority Notes Offering.

## 5.9     Release by the Investors

Except in connection with any obligations of the Company contained in this Agreement, any Closing Deliverables or the Approval and Reverse Vesting Order, effective as of the Closing Time, each

Investor and Other New Equity Investor hereby releases and forever discharges the Company, the Monitor and their respective Affiliates, and each of their respective successors and assigns, and all current and former officers, directors, partners, employees, agents, financial and legal advisors of each of them (the "**Company Released Parties**"), whether in this jurisdiction or any other, whether or not presently known to them or to the law, and whether in law or equity, of and from, and hereby unconditionally and irrevocably waives, any and all Released Claims that each Investor and Other New Equity Investor ever had, now has or ever may have or claim to have against any of the Company Released Parties in their capacity as such, for or by reason of any matter, circumstance, event, action, inaction, omission, cause or thing whatsoever arising prior to the Closing Time, save and except for Released Claims arising out of fraud or willful misconduct and any Released Claims against ResidualCo in respect of the Investors' Senior Secured Notes and/or Senior Priority Notes.

## 5.10    Release by the Company

Except in connection with any obligations of each Investor contained in this Agreement, any Closing Deliverables or the Approval and Reverse Vesting Order, effective as of the Closing Time, the Company and its respective Affiliates (including ResidualCo) hereby release and forever discharge each Investor, Other New Equity Investor, the Monitor and their respective Affiliates, and each of their respective successors and assigns, and all current and former officers, directors, partners, members, shareholders, limited partners, employees, agents, financial and legal advisors of each of them (the "**Investor Released Parties**"), whether in this jurisdiction or any other, whether or not presently known to them or to the law, and whether in law or equity, of and from, and hereby unconditionally and irrevocably waives, any and all Released Claims that the Company ever had, now has or ever may have or claim to have against any of the Investor Released Parties in their capacity as such, for or by reason of any matter, circumstance, event, action, inaction, omission, cause or thing whatsoever arising prior to the Closing Time, save and except for Released Claims arising out of fraud or willful misconduct.

## 5.11    Pre-Closing Reorganizations

(a)    Subject to Section 5.11(b), the Company agrees to, as close as reasonably practicable to the Closing Date and upon request of the Investors, and with the consent of the Company, not to be unreasonably withheld, conditioned or delayed, and consent of the Monitor, (i) amend the Senior Secured Notes and Senior Priority Notes to include a right for Senior Secured Noteholders and Senior Secured Priority Noteholders to convert their Senior Secured Notes and Senior Priority Notes into Existing Common Shares (at a conversion price to be agreed to between the Company and the Investors); and (ii) perform such reorganizations of its corporate structure, capital structure, business, operations and assets or such other transactions as the Investors may reasonably request (each such action in paragraphs (i) and/or (ii), a "**Pre-Closing Reorganization**"). The Company agrees to use commercially reasonable efforts to cooperate with the Investors and their advisors to determine the nature of any Pre-Closing Reorganizations that might be undertaken and the manner in which they would most effectively be undertaken, including filing or causing the Company to file elections, designations or other forms reasonably required to effect the Pre-Closing Reorganizations if such filing is reasonably proposed to be made at or prior to Closing, and to cooperate with the Investors and their respective advisors to seek to obtain consents or waivers which might be required under any Retained Contracts or any approvals, authorizations, Orders or consents from any Governmental Entity required in respect of any Pre-Closing Reorganization.

(b)    Notwithstanding the foregoing, the Company will not be obligated to participate in any Pre-Closing Reorganization if the Company determines, acting reasonably, that such

Pre-Closing Reorganization would (i) materially impair, impede, delay or prevent the satisfaction of any conditions set forth in article 8, or the ability of the Investors or the Company to consummate the Transactions, (ii) in respect of Section 5.11(a)(i), it not be permitted pursuant to the terms of the Senior Priority Note Indenture or Senior Secured Note Indenture; or (iii) (A) materially alter or impact the consideration which the Company and/or their applicable stakeholders will benefit from as part of the Transactions, or (B) have adverse Tax consequences, or impose any Liability on, the Monitor or any director of the Company in each case that is materially greater than the amount of such Tax consequences or Liability in the absence of such action (taking into account Sections 5.9 and 5.10 hereof) taking into account any reasonable mitigation measures including, for greater certainty, disclosure under subsection 237.3(2) of the Tax Act.

(c)     This Agreement (including the Closing Sequence) will be amended and restated as required to give effect to a Pre-Closing Reorganization.

## ARTICLE 6
## INSOLVENCY PROVISIONS

**6.1     Court Orders and Related Matters**

(a)     From and after the date of this Agreement and until the Closing Date, the Company shall deliver to applicable legal counsel for each Investor drafts of any and all pleadings, motions, notices, statements, applications, schedules, reports, and other papers to be filed or submitted by the Company in connection with or related to this Agreement, for the Investors' prior review at least two (2) Business Days in advance of service and filing of such materials (or where circumstances make it impracticable to allow for two (2) Business Days' review, with as much opportunity for review and comment as is practically possible in the circumstances). The Company acknowledges and agrees (i) that any such pleadings, motions, notices, statements, applications, schedules, reports, or other papers in respect of Approval and Reverse Vesting Order shall be in form and substance satisfactory to the Investors, acting reasonably, and (ii) to consult and cooperate with the Investors regarding any discovery, examinations and hearing in respect of any of the foregoing, including the submission of any evidence, including witnesses testimony, in connection with such hearing.

(b)     Notice of the motion seeking the issuance of the Approval and Reverse Vesting Order shall be served by the Company on all Persons required to receive notice under Applicable Law and the requirements of the CCAA and the Court, and any other Person determined necessary by the Company or the Investors, acting reasonably.

(c)     In the event that the Approval and Reverse Vesting Order has not been issued and entered by the Court by August 8, 2024 (the "**RVO Outside Date**") or such later date agreed to in writing by the each of the Investors, in their sole discretion, the Investors may terminate this Agreement, provided that if all other conditions (including receipt of Transaction Regulatory Approvals) are satisfied, the Company shall be entitled to extend the RVO Outside Date to the Outside Date.

(d)     If the Approval and Reverse Vesting Order is appealed or a motion for leave to appeal, rehearing, reargument or reconsideration is filed with respect thereto, the Company agrees to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion.

**6.2    Form of Vesting Order**

The Investors agree that if the Court does not grant the Approval and Reverse Vesting Order prior to the Outside Date, the structure of the Transactions shall be converted to contemplate an asset purchase agreement and approval and vesting Order, and the Parties shall amend the structure of the Transactions accordingly, so long as the material terms contained herein are continued into the amended structure of the Transactions (including, without limitation, the Cargill Offtake Agreement), and provided that (a) the transfer and assignment of the Mining Rights (or replacements thereof) effective as of the Closing shall be a condition to the implementation of the Transactions pursuant to such asset purchase agreement, and (b) the Investors and Company shall negotiate, in good faith, a reduction in the amount of the Pre-Filing Trade Amounts that form part of the Assumed Liabilities as reduced consideration under the Transactions to reflect any decrease in value arising from the adverse impact to the tax attributes that would be acquired pursuant to the amended structure of the Transaction or as a result of additional costs that may need to be incurred in connection with an asset purchase, including assigning any Mining Rights or applying for and obtaining any replacement Mining Rights.

**6.3    CCAA Plan**

The Investors and the Company shall have the option, in their reasonable discretion and subject to consultation with the Monitor, to proceed with implementing the Transactions pursuant to a CCAA plan of compromise and arrangement, instead of pursuant to an Approval and Reverse Vesting Order, in which case the Parties shall work in good faith to amend this Agreement and negotiate such related agreements, documents and instruments to reflect such alternative implementation process (and, for greater certainty, the economic terms of the Transactions (including, without limitation, the Cargill Offtake Agreement) shall not be amended as a result of such alternative implementation process); provided that such alternative implementation process shall not, in the view of the Investors and the Company, acting reasonably and in consultation with the Monitor, be likely to result in an inability, solely as a result of such alternative implementation process, for the Parties to complete the Transactions prior to the Outside Date. Further, nothing in this Agreement shall be construed to restrict the Investors from advancing an alternative CCAA plan of compromise and arrangement.

**6.4    DIP Credit Bid**

If the conditions to Closing set forth in article 8 hereof are not (or cannot reasonably be) satisfied by the Outside Date, in accordance with and subject to the DIP Participation Agreements, the DIP Lender agrees that it will subscribe for and purchase the Subscribed Shares in exchange for an amount equivalent to all of the outstanding DIP Obligations owing by the Company to the DIP Lender at the applicable time (the "**DIP Credit Bid Consideration**"), which shall be satisfied by the DIP Lender credit bidding the DIP Credit Bid Consideration as consideration for the Subscribed Shares. The DIP Lender, parties to the DIP Participation Agreements and the Company shall work in good faith to amend the Transactions contemplated hereby to reflect the foregoing.

**ARTICLE 7**
**CLOSING ARRANGEMENTS**

**7.1    Closing**

The Closing shall take place virtually by exchange of documents in PDF format on the Closing Date, in accordance with the Closing Sequence (as defined below), and shall be subject to such escrow document release arrangements as the Parties may agree.

**7.2     Closing Sequence**

On the Closing Date, subject to the terms of the Approval and Reverse Vesting Order, Closing shall take place in the following sequence (the "**Closing Sequence**"):

(a)     First, each Investor shall pay their respective unpaid balance of the New Equity Offering Initial Cash Consideration and New Equity Offering Retained Cash Consideration, each as set forth in Exhibit "A" hereto (and which amounts will, for greater certainty, not include any amount of the Deposit and interest accrued thereon), to be held in escrow by the Monitor on behalf of the Investors;

(b)     Second, the Company shall be deemed to transfer to ResidualCo the Excluded Assets, the Excluded Contracts and the Excluded Liabilities, pursuant to the Approval and Reverse Vesting Order;

(c)     Third, Cargill shall set-off a portion of the amount owing by the Company under the APF (equal to the amount of the Cargill Pre-filing Payable) against the Cargill Pre-filing Payable;

(d)     Fourth, the Company shall be deemed to transfer to ResidualCo all Claims in respect of the Senior Secured Notes and the Senior Priority Notes and any Claims remaining under the APF, pursuant to the Approval and Reverse Vesting Order, and the deemed transfer of the Senior Priority Notes and the Senior Secured Notes to ResidualCo will constitute a novation of such Senior Priority Notes and Senior Secured Notes to ResidualCo;

(e)     Fifth, the Retained Assets will be retained by the Company, in each case free and clear of and from any and all Claims and, for greater certainty, all of the Encumbrances, other than Permitted Encumbrances, affecting or relating to the Retained Assets are hereby expunged and discharged as against the Retained Assets;

(f)     Sixth, all Existing Equity (other than the Existing Common Shares which will be cancelled in accordance with the Articles of Reorganization) as well as any agreement, Contract, plan, indenture, deed, certificate, subscription rights, conversion rights, pre-emptive rights, options (including stock option or share purchase or equivalent plans), or other documents or instruments governing and/or having been created or granted in connection with the share capital of the Company (other than any New Secured Priority Notes Offering Subscription Agreements or Other New Equity Subscription Agreements) shall be deemed terminated and cancelled for no consideration;

(g)     Seventh, the following shall occur concurrently:

(i)     the Company shall issue the Subscribed Shares in respect of the New Equity Offering Initial Cash Consideration and the New Equity Offering Retained Cash Consideration to the applicable Investors in accordance with their allocations set forth in Exhibit "A" hereto;

(ii)     the Unsecured Takeback Notes and the New Warrants shall be issued to the applicable Investors, and the Set-Off shall be effective;

(iii)     the Monitor shall release the New Equity Offering Retained Cash Consideration to the Company;

(iv)      the Monitor shall be directed to pay on behalf of the Company: (A) all advisors' expenses of the Company and the Monitor (including financial advisor and legal counsel fees) related to the CCAA Proceedings and the Transactions solely to the extent that such expenses are subject to CCAA Charges that rank ahead of the DIP Charge; (B) to each Eligible Equity Investor, an amount no greater than $650,000 as a reimbursement for advisors' fees and expenses incurred in connection with the Transactions by each applicable Eligible Equity Investor; provided that each such Eligible Equity Investor has provided to the Monitor applicable invoices setting out in reasonable detail such professional fees and expenses; and (C) to the Investors, unless waived by the Investors, the Cost Reimbursement Amount, in each case, from the New Equity Offering Initial Cash Consideration;

(v)      the Monitor shall retain the Administrative Expense Reserve to a separate interest-bearing account from the New Equity Offering Initial Cash Consideration; and

(vi)      the Monitor shall be directed to pay, on behalf of the Company, all DIP Obligations accruing up to the Closing Date (the calculation of such amount to be provided to the Monitor, the Company and the other Investors no later than two (2) Business Days prior to Closing) and the Existing Cargill Margin Facility, each in full and from the New Equity Offering Initial Cash Consideration and all security in respect thereof will be fully Discharged and released;

(h)      <u>Eighth</u>, the Articles of Reorganization will be filed and be effective; and

(i)      <u>Ninth</u>, the Unanimous Shareholder Agreement shall be effective.

The Investors, in consultation with the Company and Monitor, may change the order of the Closing Sequence or amend the Closing Sequence provided that such amendment to the Closing Sequence does not materially negatively alter or impact the Transactions or the consideration which the Company and/or its applicable stakeholders will benefit from as part of the Transactions.

## 7.3    The Investors' Closing Deliverables

At or before the Closing (as applicable), the Investors shall deliver or cause to be delivered to the Company (or to the Monitor, if so indicated below), the following:

(a)      the aggregate of the New Equity Offering Initial Cash Consideration, less the Deposit and any accrued interest on the Deposit, in accordance with Section 7.2(a), and the New Equity Offering Retained Cash Consideration;

(b)      with respect to Cargill only, the Cargill Offtake Agreement, the Intercreditor Agreement, the Cargill OPA and, if applicable, the Security Agreements to which Cargill is a party, in each case, duly executed by Cargill;

(c)      counterpart signature of each applicable Investor with respect to the Unsecured Takeback Notes, if applicable;

(d)      counterpart signatures from each Investor with respect to the Unanimous Shareholder Agreement;

(e)     in the event that the New Secured Priority Notes Offering closes concurrently with Closing, a counterpart signature of the Intercreditor Agreement, New Secured Priority Notes Indenture and the applicable Security Agreements from the trustee and/or collateral agent therefor; and

(f)     such other agreements, documents and instruments as may be reasonably required by the Company to complete the Transactions provided for in this Agreement, all of which shall be in form and substance satisfactory to the Parties, acting reasonably.

## 7.4    The Company's Closing Deliverables

At or before the Closing (as applicable), the Company shall deliver or cause to be delivered to the Investors, the following:

(a)     a certificate dated as of the Closing Date and executed by an executive officer of the Company confirming and certifying that each the conditions in Sections 8.2(b), 8.2(d) and 8.2(e) have been satisfied;

(b)     counterpart signature from the Company with respect to the Unanimous Shareholder Agreement;

(c)     counterpart signature from the Company with respect to the Cargill Offtake Agreement, the Cargill OPA, if applicable, the Security Agreements to which Cargill is a party and all related ancillary documents applicable thereunder;

(d)     evidence satisfactory to the Investors, acting reasonably, of the filing of the Articles of Reorganization;

(e)     share certificates representing the Subscribed Shares (or other acceptable evidence of ownership of the Subscribed Shares);

(f)     counterpart signature from the Company with respect to the Unsecured Takeback Notes; and

(g)     in the event that the New Secured Priority Notes Offering closes concurrently with Closing, counterpart signature from the Company with respect to the New Secured Priority Notes Indenture, the Intercreditor Agreement and the applicable Security Agreements and all related ancillary documents.

## ARTICLE 8
## CONDITIONS OF CLOSING

## 8.1    Mutual Conditions

The respective obligations of each Investor and the Company to consummate the Transactions are subject to the satisfaction of, or compliance with, at or prior to the Closing Time, each of the conditions listed below:

(a)     <u>No Violation of Orders or Law</u>. During the Interim Period, no Governmental Entity shall have enacted, issued or promulgated any final or non-appealable Order or Law which has: (i) the effect of making any of the Transactions illegal, or (ii) the effect of otherwise prohibiting, preventing or restraining the consummation of any of the Transactions.

    (b)    <u>Court Approval</u>. The following conditions shall have been met: (i) the Approval and Reverse Vesting Order shall have been issued by the Court and become a Final Order; and (ii) the Initial Order, the Sale Process Order and the Approval and Reverse Vesting Order shall not have been vacated, set aside or stayed.

    (c)    <u>Transaction Regulatory Approvals</u>. Each of the Transaction Regulatory Approvals shall have been obtained and shall be in force and effect and shall have not been rescinded or modified.

The Parties acknowledge that the foregoing conditions are for the mutual benefit of the Company and each Investor. Any condition in this Section 8.1 may be waived by the Company and by the Investors, in whole or in part, without prejudice to any of their respective rights of termination in the event of non-fulfillment of any other condition in whole or in part. Any such waiver will be binding on the Company or the Investors, as applicable, only if made in writing. Notwithstanding anything to the contrary contained herein, the Company and each Investor shall, subject to Section 5.7, take all such commercially reasonable actions, steps and proceedings as are reasonably within its control to ensure that the conditions listed in this Section 8.1 are fulfilled at or before the commencement of the first step in the Closing Sequence.

## 8.2    The Investors' Conditions

The Investors shall not be obligated to complete the Transactions, unless each of the conditions listed below in this Section 8.2 have been satisfied, it being understood that the said conditions are included for the exclusive benefit of the Investors, and may be waived by the Investors in whole or in part, without prejudice to any of its rights of termination in the event of non- fulfillment of any other condition in whole or in part. Any such waiver shall be binding on the Investors only if made in writing, provided that if the Investors do not waive a condition(s) and complete the Closing, such condition(s) shall be deemed to have been waived by the Investors. The Company shall take all such commercially reasonable actions, steps and proceedings as are reasonably within its control to ensure that the conditions listed below in this Section 8.2 are fulfilled at or before the commencement of the first step in the Closing Sequence.

    (a)    <u>The Company's Deliverables</u>. The Company shall have executed and delivered or caused to have been executed and delivered to the Investors at the Closing all the documents contemplated in Section 7.4.

    (b)    <u>Material Adverse Effect</u>. There shall not have been any Material Adverse Effect since the date hereof.

    (c)    <u>No New Equity Issuances</u>. The Company shall not have issued any New Common Shares or other securities of the Company, or incurred any new debt obligations, except in each case as provided for in the Approval and Reverse Vesting Order and this Agreement.

    (d)    <u>No Breach of Representations and Warranties</u>. Except as such representations and warranties may be affected by the occurrence of events or transactions specifically contemplated by this Agreement (including the Approval and Reverse Vesting Order), each of the representations and warranties contained in Section 4.1 shall be true and correct in all material respects (unless qualified by materiality, in which case the foregoing qualification shall not apply): (i) as of the Closing Date as if made on and as of such date; or (ii) if made as of a date specified therein, as of such date.

(e)     <u>No Breach of Covenants</u>.  The Company shall have performed in all material respects (unless qualified by materiality, in which case the foregoing qualification shall not apply) all covenants, obligations and agreements contained in this Agreement required to be performed by the Company on or before the Closing.

(f)     <u>Rail Agreement</u>. The Rail Agreement shall have been renegotiated on terms and conditions acceptable to the Investors, acting reasonably.

(g)     <u>Mining Rights Acknowledgment</u>. The Mining Rights Acknowledgement shall have been delivered by the Minister of Industry, Energy and Technology of Newfoundland and Labrador.

Each Investor acknowledges and agrees that (i) its obligations to consummate the Transactions are not conditioned or contingent in any way upon receipt of financing from a third party, and (ii) failure to consummate the Transactions as a result of the failure to obtain financing shall constitute a breach of this Agreement by the Investor which will give rise, *inter alia*, to the Company's recourses for breach.

## 8.3     **The Company's Conditions**

The Company shall not be obligated to complete the Transactions unless each of the conditions listed below in this Section 8.3 have been satisfied, it being understood that the said conditions are included for the exclusive benefit of the Company, and may be waived by the Company in whole or in part, without prejudice to any of their rights of termination in the event of nonfulfillment of any other condition in whole or in part. Any such waiver shall be binding on the Company only if made in writing, provided that if the Company does not waive a condition(s) and completes the Closing, such condition(s) shall be deemed to have been waived by the Company. Each Investor shall take all such actions, steps and proceedings as are reasonably within the Investor's control as may be necessary to ensure that the conditions listed below in this Section 8.3 are fulfilled at or before the commencement of the first step in the Closing Sequence.

(a)     <u>Investor's Deliverables</u>. Each Investor shall have executed and delivered or caused to have been executed and delivered to the Company (with a copy to the Monitor) at the Closing all applicable documents and payments required of such Investor contemplated in Section 7.3.

(b)     <u>No Breach of Representations and Warranties</u>. Except as such representations and warranties may be affected by the occurrence of events or transactions specifically contemplated by this Agreement (including the Approval and Reverse Vesting Order), each of the representations and warranties contained in Section 4.2 shall be true and correct in all material respects: (i) as of the Closing Date as if made on and as of such date; or (ii) if made as of a date specified therein, as of such date.

(c)     <u>No Breach of Covenants</u>. The Investors shall have performed in all material respects all covenants, obligations and agreements contained in this Agreement required to be performed by the Investor on or before the Closing.

(d)     <u>Administrative Expense Reserve</u>. The Investors shall have agreed to an amount for the Administrative Expense Reserve on or before July 26, 2024 (or such other date as agreed to by the Investors, the Company and the Monitor) that is satisfactory to the Company, the Investors and the Monitor, each acting reasonably.

**8.4     Monitor's Certificate**

When the conditions to Closing set out in Section 8.1, 8.2 and 8.3 have been satisfied and/or waived by the Company or the Investors, as applicable, the Company, the Investors or their respective counsel will each deliver to the Monitor confirmation in writing that such conditions of Closing, as applicable, have been satisfied and/or waived and that the Parties are prepared for the Closing Sequence to commence (the "**Conditions Certificates**"). Upon receipt of the Conditions Certificates and the receipt of the entire Cash Consideration, the Monitor shall: (i) issue forthwith its Monitor's Certificate concurrently to the Company and counsel to the Investors, at which time the Closing Sequence will be deemed to commence and be completed in the order set out in the Closing Sequence, and Closing will be deemed to have occurred; and (ii) file as soon as practicable a copy of the Monitor's Certificate with the Court (and shall provide a true copy of such filed certificate to the Company and counsel to the Investors). In the case of: (i) and (ii) above, the Monitor will be relying exclusively on the Conditions Certificates without any obligation whatsoever to verify or inquire into the satisfaction or waiver of the applicable conditions, and the Monitor will have no liability to the Company or the Investors as a result of filing the Monitor's Certificate.

**ARTICLE 9**
**TERMINATION**

**9.1     Grounds for Termination**

(a)     Subject to Section 9.1(b), this Agreement may be terminated on or prior to the Closing Date:

(i)     by the mutual agreement of the Company and the Investors;

(ii)    by either the Company or the Investors, upon the termination, dismissal or conversion of the CCAA Proceedings, provided that neither Party may terminate this Agreement pursuant to this Section 9.1(a)(ii) if the termination, dismissal or conversion of the CCAA Proceedings was caused by a breach of this Agreement by such Party;

(iii)   by either the Company or the Investors if the Court grants relief terminating the Stay Period with regard to any material assets or business of the Company and any appeal periods relating thereto shall have expired;

(iv)    by the Investors, if the Approval and Reverse Vesting Order has not been issued and entered by the Court by the RVO Outside Date, or such later date agreed to in writing by each of the Investors;

(v)     by either the Company or the Investors, if a Governmental Entity issues a final, non-appealable Order permanently restraining, enjoining or otherwise prohibiting consummation of the Transactions where such Order was not requested, encouraged or supported by the terminating Party, provided that the right to terminate this Agreement under this Section 9.1(a)(v) shall not apply if an Investor or Investors have assumed another Investor's obligations hereunder in a manner that the restraint, enjoinment or other prohibition on the consummation of the Transactions would no longer apply;

(vi)    by either the Company or the Investors, at any time following the Outside Date, if Closing has not occurred on or prior to 11:59 p.m. (Eastern time) on the Outside Date, provided that the reason for the Closing not having occurred is

40

not due to any act or omission, or breach of this Agreement, by the Party proposing to terminate this Agreement;

(vii)    by the Company, if there has been a material violation or breach by an Investor of any agreement, covenant, representation or warranty of the Investor in this Agreement which would prevent the satisfaction of, or compliance with, any condition set forth in Section 8.3, as applicable, by the Outside Date and such violation or breach has not been waived by the Company or cured by the Investor, or some or all of the non-breaching Investors have not assumed such Investor's obligations to acquire New Common Shares under this Agreement within fifteen (15) Business Days of the Company providing notice to the Investor of such breach, unless the Company is itself in material breach of its own obligations under this Agreement at such time;

(viii)    by the Investors, if there has been a material violation or breach by the Company of any agreement, covenant, representation or warranty of the Company in this Agreement which would prevent the satisfaction of, or compliance with, any conditions set forth in Section 8.2, as applicable, by the Outside Date and such violation or breach has not been waived by the Investors or cured by the Company within ten (10) Business Days of the Investors providing written notice to the Company of such breach, unless the Investors are themselves in material breach of their own obligations under this Agreement at such time; or

(ix)    if an Investor fails or Investors fail to fund its or their Cash Consideration on or prior to the date on which Closing would have otherwise occurred (each a "**Defaulting Investor**"), by the other Investors if some or all of the non-Defaulting Investors have not assumed such Defaulting Investor's obligations to acquire New Common Shares under this Agreement within five (5) Business Days of the date on which Closing would otherwise have occurred.

(b)    Prior to the Company agreeing or electing to any termination pursuant to Section 9.1(a), the Company shall first obtain the prior written consent of the Monitor.

(c)    The Party desiring to terminate this Agreement pursuant to this Section 9.1 (other than pursuant to Section 9.1(a)(i)) shall give written notice of such termination to the other Party or Parties, as applicable, specifying in reasonable detail the basis for such Party's exercise of its termination rights.

**9.2    Effect of Termination**

(a)    If this Agreement is terminated pursuant to Section 9.1, all further obligations of the Parties under this Agreement will terminate and no Party will have any Liability or further obligations to any other Party hereunder, except, subject to Section 9.2(b), as contemplated in Sections 2.1 (*Deposit*), 10.6 (*Expenses*), 10.7 (*Public Announcements*), 10.8 (*Notices*), 10.12 (*Waiver and Amendment*), 10.15 (*Governing Law*), 10.16 (*Dispute Resolution*), 10.17 (*Attornment*), 10.18 (*Successors and Assigns*), 10.19 (*Assignment*), 10.20 (*No Liability; Monitor Holding or Disposing Funds*), and 10.21 (*Third Party Beneficiaries*), which shall survive such termination.

(b)    If the Agreement is terminated pursuant to Section 9.1(a)(vii) or 9.1(a)(ix), the Deposit shall become the property of, and shall be transferred to, the Company as liquidated damages (and not as a penalty) to compensate the Company for the expenses

incurred and opportunities foregone as a result of the failure to close the Transactions. The Company agrees that, notwithstanding any other provision herein, the Deposit shall be the exclusive remedy as against the non-Defaulting Investors if any event described in Section 9.1(a)(vii) or 9.1(a)(ix) occurs giving rise to a termination right to the Company under this Agreement. If this Agreement is terminated pursuant 9.1(a)(ix), the Company may pursue any Claims of the Company as against each Defaulting Investor related to the termination of this Agreement and such Claims are fully reserved, provided that the aggregate liability for a Defaulting Investor to the Company will not exceed an amount equal to the amount of the Deposit.  Any and all accrued interest in respect of such Deposit shall continue to belong to the Investors.

(c)     If the Closing does not occur for any reason and the Agreement is terminated other than the Agreement having been terminated pursuant to Section 9.1(a)(vii) or 9.1(a)(ix), the Deposit (together with any accrued interest, and without offset or deduction) will be forthwith refunded in full to each Investor in accordance with their allocations set forth on Exhibit "A".

## ARTICLE 10
## GENERAL

### 10.1    Transaction Structure

The Investors, with the prior consent of the Company and the Monitor, acting reasonably, may amend the structure of the Transactions, including with respect to optimizing tax structures, provided that such amendment to the Closing Sequence does not materially alter or impact the Transactions or the consideration which the Company and/or its applicable stakeholders will benefit from as part of the Transactions.

### 10.2    Approval, Consent, Waiver, Amendment, Termination

(a)     Except as may be otherwise specifically provided for under this Agreement, where this Agreement provides that a matter shall have been approved, agreed to, consented to, waived, amended or terminated by the Investors, or that a matter must be satisfactory or acceptable to the Investors, such approval, agreement, consent, waiver, amendment, termination, satisfaction, acceptance or other action shall be effective or shall have been obtained or satisfied, as the case may be, for the purposes of this Agreement only where each Initial Noteholder Investor and Cargill shall have confirmed their approval, consent, waiver, amendment, termination, satisfaction or acceptance, as the case may be, to the Parties, which confirmation may be delivered by email, provided, further, that any amendment to this Agreement (including any attachment hereto) that would materially and adversely affect any Investor compared to any other Investor shall require the prior written consent of the adversely affected Investor.

(b)     Counsel to each Investor shall be able to communicate any required approval, agreement, consent, waiver, amendment, termination, satisfaction, acceptance or other action hereunder on behalf of such Investor, provided such Investor has provided the approval, agreement, consent, waiver, amendment, termination, satisfaction, acceptance or other action hereunder to its counsel. The Investors may be able to rely on such confirmation of approval, agreement, consent, waiver, amendment, termination, satisfaction, acceptance or other action without any obligation to inquire into such counsel's authority to do so on behalf of their respective clients and such communication shall be effective for all purposes of this Agreement.

42

**10.3    Cost Reimbursement Amount**

In consideration for the Investors having expended considerable time and expense in connection with this Agreement and the negotiation thereof, the Company shall reimburse the Investors, in accordance with the terms of this Agreement and the Approval and Reverse Vesting Order, documented out-of-pocket third party expenses incurred by the Investors up to a maximum aggregate amount of CAD$3,000,000 (the "**Cost Reimbursement Amount**") on the earlier of the termination of this Agreement, and the Closing. The Investors may agree to waive such Cost Reimbursement Amount. Each of the Parties acknowledges and agrees that the agreements contained in this Section 10.3 are an integral part of the Transactions and this Agreement and that the Cost Reimbursement Amount is not a penalty.  Upon the granting and in accordance with the terms of the Approval and Reverse Vesting Order, the Investors will be entitled to the Cost Reimbursement Amount which shall be subject to a Court-ordered charge granted pursuant to the Approval and Reverse Vesting Order against the assets and property of the Company which shall rank immediately behind the DIP Charge and in priority to all other security interests, trusts, liens, charges and Encumbrances, Claims of secured creditors, statutory or otherwise in favour of any Person. The Company does not intend to withhold or deduct any amounts under the *Income Tax Act* (Canada) or any other provision of Applicable Law from any amount paid or credited by the Company under this Section 10.3 and the Company shall immediately notify the Investors of any change in the Company's intention.

**10.4    Tax Returns**

The Investors shall: (a) prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Company for all Tax periods ending on or prior to the Closing Date and for which Tax Returns have not been filed as of such date; and (b) cause the Company to duly and timely make or prepare all Tax Returns required to be made or prepared by them to duly and timely file all Tax Returns required to be filed by them for periods beginning before and ending after the Closing Date.

**10.5    Survival**

All representations, warranties, covenants and agreements of the Company or each Investor made in this Agreement or any other agreement, certificate or instrument delivered pursuant to this Agreement shall not survive the Closing except where, and only to the extent that, the terms of any such covenant or agreement expressly provide for rights, duties or obligations extending after the Closing, or as otherwise expressly provided in this Agreement.

**10.6    Expenses**

Except as set forth in Section 7.2, or as otherwise set forth herein or agreed in writing upon amongst the Parties, each Party shall be responsible for its own costs and expenses (including any Taxes imposed on such expenses) incurred in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the Transactions (including the fees and disbursements of legal counsel, bankers, agents, investment bankers, accountants, brokers and other advisers).

**10.7    Public Announcements**

(a)    All public announcements made in respect of the Transactions shall be made solely by the Company, provided that such public announcements shall be in form and substance acceptable to the Investors, acting reasonably. Notwithstanding the foregoing, nothing herein shall prevent a Party from making public disclosure in respect of the Transactions to the extent required by Applicable Law, provided that if any disclosure is to reference a Party hereto, such Party will be provided notice of such

requirement so that such Party may seek a protective order or other appropriate remedy.

(b)    Subject to the above, the Investors will agree to the existence and factual details of this Agreement and the Transactions generally being set out in any public disclosure made by the Company or an Investor, including, without limitation, press releases and court materials, and to the filing of this Agreement and the Restructuring Support Agreement with the Court in connection with the CCAA Proceedings, provided that the Restructuring Support Agreement shall be subject to redactions as may be necessary to protect the commercial interests of the applicable Parties.

(c)    Except as required by Applicable Law, the Company shall not without the prior written consent of an Investor (not to be unreasonably withheld, conditioned or delayed), specifically name the Investor in any press release or other public announcement or statement or commentary or make any representation in relation thereto.

**10.8    Notices**

(a)    Any notice, direction, certificate, consent, determination or other communication required or permitted to be given or made under this Agreement shall be in writing and shall be effectively given and made if: (i) delivered personally; (ii) sent by prepaid courier service; or (iii) sent by e-mail, in each case, to the applicable address set out below:

if to the Company to:

**Tacora Resources Inc.**
102 NE 3rd Street Suite 120
Grand Rapids, Minnesota
55744 USA

Attention:      Heng Vuong
E-mail:          Heng.Vuong@tacoraresources.com

*with a copy to:*

**Stikeman Elliott LLP**
5300 Commerce Court West,
199 Bay St.,
Toronto, ON M5L 1B9

Attention:      Ashley Taylor / Lee Nicholson
E-mail:          ataylor@stikeman.com / leenicholson@stikeman.com

If to the Monitor to:

**FTI Consulting Canada Inc.**
79 Wellington Street West
Toronto Dominion Centre, Suite 2010, P.O. Box 104
Toronto, ON M5K 1G8

Attention:      Paul Bishop / Jodi Porepa
E-mail:          Paul.Bishop@fticonsulting.com / Jodi.Porepa@fticonsulting.com

*with a copy to:*

**Cassels, Brock & Blackwell LLP**
Bay Adelaide Centre
40 Temperance St. #3200,
Toronto, ON M5H 2S7

Attention:      Ryan Jacobs / Jane Dietrich
E-mail:         rjacobs@cassels.com / jdierich@cassels.com

If to Investors or any Investors other than Cargill:

**Osler, Hoskin & Harcourt LLP**
First Canadian Place
100 King St. W Suite 6200
Toronto, ON M5X 1B8

Attention:      Marc Wasserman / Michael De Lellis / Justin Sherman
E-mail:         mwasserman@osler.com        /        mdelellis@osler.com        /
jsherman@osler.com

If to Cargill:

**Goodmans LLP**
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7

Attention:      Robert J. Chadwick / Caroline Descours / Emily Ting
E-mail:         rchadwick@goodmans.ca        /        cdescours@goodmans.ca        /
eting@goodmans.ca

(b)    Any such communication so given or made shall be deemed to have been given or made and to have been received on the day of delivery if delivered, or on the day of e-mailing, provided that such day in either event is a Business Day and the communication is so delivered, e-mailed or sent before 5:00 p.m. Eastern time on such day. Otherwise, such communication shall be deemed to have been given and made and to have been received on the next following Business Day.

(c)    Any Party may from time to time change its address under this Section 10.8 by notice to the other Parties given in the manner provided by this Section 10.8.

## 10.9    Time of Essence

Time shall be of the essence of this Agreement in all respects.

## 10.10    Further Assurances

The Company on the one hand, and the Investors on the other hand, shall, at the sole expense of the requesting Party, from time to time promptly execute and deliver or cause to be executed and delivered all such further documents and instruments and shall do or cause to be done all such further acts and things in connection with this Agreement that the other Parties may reasonably require as being

119744559 v4

necessary or desirable in order to effectively carry out or better evidence or perfect the full intent and meaning of this Agreement or any provision hereof.

## 10.11   Entire Agreement

This Agreement and the deliverables delivered by the Parties in connection with the Transactions constitute the entire agreement between the Parties or any of them pertaining to the subject matter of this Agreement and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, with respect to the subject matter herein. There are no conditions, representations, warranties, obligations or other agreements between the Parties with respect to the subject matter of this Agreement (whether oral or written, express or implied, statutory or otherwise) except as explicitly set out in this Agreement.

## 10.12   Waiver and Amendment

Except as expressly provided in this Agreement, no amendment or waiver of this Agreement shall be binding unless: (a) executed in writing by the Company and each of the Investors (including by way of email); and (b) the Monitor shall have provided its prior consent. No waiver of any provision of this Agreement shall constitute a waiver of any other provision nor shall any waiver of any provision of this Agreement constitute a continuing waiver unless otherwise expressly provided.

## 10.13   Severability

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and will be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

## 10.14   Remedies Cumulative

The rights, remedies, powers and privileges herein provided to a Party are cumulative and in addition to and not exclusive of or in substitution for any rights, remedies, powers and privileges otherwise available to that Party.

## 10.15   Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

## 10.16   Dispute Resolution

If any dispute arises with respect to the interpretation or enforcement of this Agreement, including as to what constitutes a breach or material breach of this Agreement for the purposes of article 8 hereof, such dispute shall be determined by the Court within the CCAA Proceedings, or by such other Person or in such other manner as the Court may direct. The Parties irrevocably submit and attorn to the exclusive jurisdiction of the Court.

## 10.17   Attornment

Each Party agrees: (a) that any Action relating to this Agreement shall be brought in the Court, and for that purpose now irrevocably and unconditionally attorns and submits to the jurisdiction of the Court; (b) that it irrevocably waives any right to, and shall not, oppose any such Action in the Court on any jurisdictional basis, including *forum non conveniens*; and (c) not to oppose the enforcement

against it in any other jurisdiction of any Order duly obtained from the Court as contemplated by this Section 10.17. Each Party agrees that service of process on such Party as provided in this Section 10.17 shall be deemed effective service of process on such Party.

### 10.18   Successors and Assigns

This Agreement shall enure to the benefit of, and be binding on, the Parties and their respective successors and permitted assigns.

### 10.19   Assignment

The Company may not assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Parties. Prior to Closing, each Investor may assign, upon written notice to the Company, all or any portion of its rights and obligations under this Agreement (including its right to subscribe for New Securities hereunder) to another Investor or an Affiliate provided that such Affiliate is capable of making the same representations and warranties herein and completing the Transactions by the Outside Date. Any purported assignment or delegation in violation of this Section 10.19 is null and void. No assignment or delegation shall relieve the assigning or delegating party of any of its obligations hereunder.  For certainty, this Section 10.19 shall not restrict or apply to the provisions of Section 2.8.

### 10.20   No Liability; Monitor Holding or Disposing Funds

Any obligation of or direction to the Monitor to disburse or hold funds or take any action shall be subject to the Approval and Reverse Vesting Order or other order of the Court in all respects. The Investors and the Company acknowledge and agree that the Monitor, acting in its capacity as the Monitor of the Company in the CCAA Proceedings, and the Monitor's Affiliates and their respective former and current directors, officers, employees, agents, advisors, lawyers and successors and assigns will have no Liability under or in connection with this Agreement, the Approval and Reverse Vesting Order or any other related Court orders whatsoever (including, without limitation, in connection with the receipt, holding or distribution of the Cash Consideration (including the Deposit and interest accrued thereon)), whether in its capacity as Monitor, in its personal capacity or otherwise. If, at any time, there shall exist, in the sole and absolute discretion of the Monitor, any dispute between the Company on the one hand, and the Investors on the other hand, with respect to the holding or disposition of any portion of the Cash Consideration (including the Deposit and interest accrued thereon), or any other obligation of the Monitor hereunder in respect of the Cash Consideration (including the Deposit and interest accrued thereon), or if at any time the Monitor is unable to determine the proper disposition of any portion of the Cash Consideration (including the Deposit and interest accrued thereon), or its proper actions with respect to its obligations hereunder in respect of the Cash Consideration (including the Deposit and interest accrued thereon), then the Monitor may (i) make a motion to the Court for direction with respect to such dispute or uncertainty and, to the extent required by law or otherwise at the sole and absolute discretion of the Monitor, pay the Cash Consideration (including the Deposit and interest accrued thereon) or any portion of thereof into the Court for holding and disposition in accordance with the instructions of the Court, or (ii) hold the Cash Consideration (including the Deposit and interest accrued thereon)or any portion thereof and not make any disbursement thereof until: (a) the Monitor receives a written direction signed by both the Company and the Investors directing the Monitor to disburse, as the case may be, the Cash Consideration (including the Deposit and interest accrued thereon) or any portion thereof in the manner provided for in such direction, or (b) the Monitor receives an Order from the Court, which is not stayed or subject to appeal and for which the applicable appeal period has expired, instructing it to disburse, as the case may be, the Cash Consideration (including the Deposit and interest accrued thereon) or any portion thereof in the manner provided for in the Order. For the avoidance of doubt, all references to the Deposit in this Section shall be deemed to include any accrued interest thereon.

**10.21   Third Party Beneficiaries**

Except with respect to: (i) the Monitor as expressly set forth in this Agreement (including Section 10.20) or ResidualCo as it relates to all rights, covenants, obligations and benefits in favour of the Company under this Agreement that survive Closing and are transferred to ResidualCo as an Excluded Liability at the Closing; and (ii) ResidualCo as it relates to all rights, covenants, obligations and benefits in favour of the Company under this Agreement that survive Closing and are transferred to ResidualCo as an Excluded Asset at the Closing, this Agreement is for the sole benefit of the Parties, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**10.22   Counterparts**

This Agreement may be executed in counterparts, each of which shall be deemed to be an original and both of which taken together shall be deemed to constitute one and the same instrument. To evidence its execution of an original counterpart of this Agreement, a Party may send a copy of its original signature on the execution page hereof to the other Parties by e-mail in pdf format or by other electronic transmission and such transmission shall constitute delivery of an executed copy of this Agreement to the receiving Party.

[*Remainder of page intentionally left blank. Signature page follows.*]

**IN WITNESS WHEREOF** the Parties have executed this Agreement as of the date first above written.

**CARGILL, INCORPORATED**

By: _Mitchell Marcus_

Name: MITCHELL MARCUS

Title: VP. Corporate Development

**OSP, LLC (on behalf of certain managed funds)**

By: _____

    Name:   Chuck Anderson

    Title:    COO

**MILLSTREET CAPITAL MANAGEMENT LLC,**
**as investment manager on behalf of multiple**
**noteholders**

By: _____

    Name:  Craig M. Kelleher

    Title:  Managing Member

**IN WITNESS WHEREOF** the Parties have executed this Agreement as of the date first above written.

**TACORA RESOURCES INC.**

By: _____

Name:  Heng Vuong
Title:     Executive Vice President &
             Chief Financial Officer

*Signature page to Subscription Agreement*

Exhibit "A"
Investors Entities and Allocations

| Investor | Deposit | New Equity Offering Initial Cash Consideration | New Equity Offering Initial Cash Consideration (less Deposit) | New Equity Offering Retained Cash Consideration | Total Cash Consideration on Closing (less Deposit) | Total Cash Consideration on Closing |
|---|---|---|---|---|---|---|
| **Millstreet**[1] | $8,000,000.00 | Allocation of subscription amounts amongst New Equity Offering Initial Cash Consideration and New Equity Offering Retained Cash Consideration to be determined prior to Closing. | | | $79,500,000.00 | $87,500,000.00 |
| **OSP**[1] | $4,800,000.00 | | | | $47,700,000.00 | $52,500,000.00 |
| **Cargill, Incorporated** | $3,200,000.00 | | | | $31,800,000.00 | $35,000,000.00 |
| **Total** | **16,000,000** | | | | **159,000,000** | **175,000,000** |

Note:

1: Subject to adjustment in accordance with Section 2.4 of the Subscription Agreement to the extent any Other New Equity Investors, who are also Existing Noteholders, enter into the Other New Equity Investor Subscription Agreements.

Exhibit "B"
New Equity Offering Additional Cash Consideration

| | **Millstreet**[1] | **OSP**[1] | **Cargill** | **Total** |
|---|---|---|---|---|
| **Aggregate New Equity Offering Additional Cash Consideration:** | $37,500,000 | $22,500,000 | $15,000,000 | **75,000,000** |

Note:

1: Subject to adjustment in accordance with Section 2.4 of the Subscription Agreement to the extent any Other New Equity Investors, who are also Existing Noteholders, enter into the Other New Equity Investor Subscription Agreements.

Exhibit "C"
Takeback Notes; New Warrants

| Investor | Unsecured Takeback Notes for Initial Noteholder Investors | Principal Amount of Unsecured Takeback Notes for Investors (who are also Existing Noteholders)[1] | Takeback Note Cash Consideration[1] | Allocation of 40% of New Warrants | Allocation of 60% of New Warrants [1] |
|---|---|---|---|---|---|
| **Millstreet** | $3,125,000 | $12,500,000 | $15,625,000 | 62.50% | 62.50% |
| **OSP** | $1,875,000 | $7,500,000 | $9,375,000 | 37.50% | 37.50% |
| **Total** | **$5,000,000** | **$20,000,000** | **$25,000,000** | | |

Note:

1: Subject to adjustment in accordance with Section 2.6 of the Subscription Agreement to the extent any Other New Equity Investors, who are also Existing Noteholders, enter into the Other New Equity Investor Subscription Agreements.

Schedule "A"
Investor Debtholders[1]

| Investor | Outstanding Obligations |
|---|---|
| Millstreet | $79.5 million |
| OSP | $47.0 million |
| Cargill | DIP Facility: approximately $129.8 million

(comprised of $125m of principal amount drawn and $4.8m of Post-Filing Credit Extensions) |
| | Senior Secured Marging Facility: approximately $6.2 million |
| | APF: $30 million |

---

[1] As at July 7, 2024, principal amounts outstanding only, not including accrued interest, fees, expense or any other applicable amounts.

Schedule "B"
Assumed Liabilities

- Grievances of the Union under the collective agreement between the Company and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (United Steel Workers) executed on January 11, 2023, including:

    1. Grievance filed on February 20, 2023, regarding Daniel Critch (Termination date: February 16, 2023; Seniority date: June 24, 2019)

    2. Grievance filed on December 16, 2022, regarding Mark Dandy (Termination date: December 12, 2022; Seniority date: September of 2019)

    3. Grievance filed on October 13, 2023, regarding Stan Hill (Termination date: October 12, 2023; Seniority date: May of 2019)

    4. 4. Grievance filed on October 27, 2023, regarding Anna March (Termination date: October 18, 2023; Seniority date: 2021 or 2022)

- Substantially all Pre-Filing Trade Amounts and royalty obligations of the Company on terms and amounts to be agreed by the Company and the Investors

- Post-Filing Trade Amounts on terms and amounts to be agreed by the Company and the Investors

- Liabilities under Retained Contracts on terms and amounts to be agreed by the Company, the Investors and the counterparty of the Retained Contracts

- All Liabilities of the Company relating to the Retained Assets arising from and after the Closing Time

- All Liabilities of the Company under the Retained Contracts and Permits and Licenses arising from and after the Closing Time

<u>Schedule "C"</u>
Encumbrances to Be Discharged

All Encumbrances concerning, with regard to, arising from, or which otherwise related to:

- Any of the Excluded Contracts or the Excluded Liabilities

- The Senior Priority Notes

- The Senior Secured Notes

- The DIP Agreement

- The APF

- Lien Claims made by JSM Electrical Ltd. subject to proceedings before the Supreme Court of Newfoundland and Labrador (Court File No. 2023 01G 5933)

- Lien Claims made by MacGregors Industrial Group subject to proceedings before the Supreme Court of Newfoundland and Labrador (Court File No. 2024 01G 1503)

- Lien Claims made by 13859380 Canada Inc. subject to proceedings before the Supreme Court of Newfoundland and Labrador (Court File No. 2023 01G 6075)

- Mechanics Lien No. 20544 registered by Energy Lock Inc. on May 16, 2024

- Mechanics Lien No. 20446 registered by Newfound Roofing Ltd. on November 10, 2023

<u>Schedule "D"</u>
Excluded Assets

- Unless otherwise agreed by the Investors, the Existing Equity of the subsidiaries and affiliates of the Company

Schedule "E"
Excluded Contracts

All contracts that are not Retained Contracts as listed in Schedule "M", including but not limited to:

- Amended and Restated Advance Payments Facility Agreement between the Company and Cargill dated May 29, 2023, as amended by the Amendment dated June 23, 2023

- DIP Facility Term Sheet between the Company and Cargill dated October 9, 2023

- Debenture between the Company and Cargill dated January 9, 2023

- General Security Agreement between the Company and Cargill dated January 9, 2023

- Assignment of Material Contracts between the Company and Cargill dated January 9, 2023

- Assignment of Insurance between the Company and Cargill dated January 9, 2023

- Hypothec on Movables between the Company and Cargill dated January 9, 2023

- Share Pledge Agreement between the Company and Cargill dated January 9, 2023

- Blocked Account Agreement between the Company, Bank of Montreal, in its capacity as the provider of banking services, Computershare Trust Company, N.A., in its capacity as notes collateral agent under the Indenture (as defined thereunder) and Cargill dated January 9, 2023

- Collateral and Intercreditor Agreement between the Company, the other Grantors thereto from time to time, Computershare Trust Company, N.S., in its capacity as the Notes Collateral Agent, as the Authorized Representative for the Indenture Secured Parties, Cargill and each Additional Authorized Representative from time to time party thereto dated May 11, 2023

- Pari Passu Intercreditor Agreement between the Company, the other Grantors thereto from time to time, Computershare Trust Company, N.S., in its capacity as the Notes Collateral Agent, as the Authorized Representative for the Indenture Secured Parties, Cargill and each Additional Authorized Representative from time to time party thereto dated January 9, 2023

- Second Amended and Restated Shareholders' Agreement between the Company, Proterra M&M MGCA B.V., Magglobal, Proterra M&M Co-Invest LLC, OMF Fund II (Be) Ltd., Cargill and Titlis Mining AS dated January 9, 2023

- Letter Agreement between the Company, Cargill and certain holders of the Company's (a) 9.00% Cash / 4.00% PIK Senior Secured Priority Notes Due 2023 and (b) 8.250% Senior Secured Notes due May 15, 2026 listed in Schedule "A" thereto dated May 29, 2023

- Sublease Offer between the Company and 12893118 Canada Inc. dated January 31, 2023

- Offer to Lease between the Company and 9356-0563 Quebec Inc. dated February 12, 2021

- Assignment of Insurance by the Company in favour of Wells Fargo Bank, National Association, in its capacity as Notes Collateral Agent dated May 11, 2021

- Assignment of Material Contracts by the Company in favour of Wells Fargo Bank, National Association, in its capacity as Notes Collateral Agent dated May 11, 2021

- Debenture between the Company and Wells Fargo Bank, National Association, in its capacity as Notes Collateral Agent

- Debenture Amendment Agreement between the Company and Computershare Trust Company, N.A., in its capacity as Notes Collateral Agent dated February 16, 2022

- Debenture Second Amendment between the Company and Computershare Trust Company, N.A., in its capacity as Notes Collateral Agent dated May 11, 2023

- General Security Agreement between the Company and Wells Fargo Bank, National Association, in its capacity as Notes Collateral Agent dated May 11, 2021

- Deed of Hypothec between the Company and Wells Fargo Bank, National Association, in its capacity as Notes Collateral Agent dated August 3, 2021

- Share Pledge Agreement between the Company and Wells Fargo Bank, National Association, in its capacity as Notes Collateral Agent

- Note No. A-2 between the Company and Computershare Trust Company, N.S. as Trustee dated February 16, 2022

- Note No. S-1 between the Company and Computershare Trust Company, N.S. as Trustee dated February 16, 2022

- Indenture between the Company and Wells Fargo, National Association as Trustee and Notes Collateral Agent dated May 11, 2021

- First Supplemental Indenture between the Company and Computershare Trust Company, N.A. as Trustee and Notes Collateral Agent dated February 15, 2022

- Second Supplemental Indenture between the Company and Computershare Trust Company, N.A. as Trustee and Notes Collateral Agent dated February 16, 2022

- Purchase Agreement between the Company and Jefferies LLC, in its capacity as representative dated February 8, 2022

- Purchase Agreement between the Company and Jefferies LLC, in its capacity as representative dated May 5, 2021

- Jarvis Hedge Intercreditor Agreement between the Company, Wells Fargo Bank, National Association, as the First Lien Representative and the Indenture Collateral Agent and SAF Jarvis 2 LP dated May 11, 2021

- Amended and Restated Base Indenture between the Company and Computershare Trust Company, N.A., as Trustee dated May 11, 2023

- First Supplemental Indenture between the Company and Computershare Trust Company, N.A. dated May 11, 2023

- Second Supplemental Indenture between the Company and Computershare Trust Company, N.A. dated May 11, 2023

- Third Supplemental Indenture between the Company and Computershare Trust Company, N.A. dated June 23, 2023

- Fourth Supplemental Indenture between the Company and Computershare Trust Company, N.A. dated September 8, 2023

- Sydvaranger Offtake Conditions Precedent Agreement between the Company, Cargill and Sydvaranger Mining AS dated July 21, 2022

- Agreement between the Company, Sydvaranger Mining AS, Tacora Norway AS and OMF Fund II H Ltd dated February 15, 2023

- Royalty Agreement between, inter alios, the Company, Sydvaranger Mining AS, Sydvaranger Eiendom AS, Sydvaranger Drift AS, Sydvaranger Malmtransport AS, Tacora Norway AS and OMF Fund II H Ltd dated January 13, 2021

- Amendment Agreement to Royalty Agreement between the Company, Sydvaranger Mining AS, Sydvaranger Eiendom AS, Sydvaranger Drift AS, Sydvaranger Malmtransport AS, Tacora Norway AS and OMF Fund II H Ltd dated February 15, 2023

- Funding Letter between the Company and OMF Fund II Be Ltd., OMF Fund II Be Ltd., Sydvaranger Mining AS and Tacora Norway AS dated February 8, 2023

- Funding Letter between the Company and OMF Fund II H Ltd., Tacroa Norway and Sydvaranger Mining AS dated February 15, 2023

- Side Letter Agreement between the Company, OMF Fund II (BE) Ltd., OMF Fund II H Ltd., Tacora Norway AS and Sydvaranger Mining AS dated January 3, 2023

- Offtake Agreement between the Company and Cargill dated November 11, 2018

- Iron Ore Stockpile Purchase Agreement between the Company and Cargill dated December 17, 2019

- Iron Ore Sale and Purchase Contract between the Company and Cargill dated April 5, 2017

- First Restatement of Iron Ore Sale and Purchase Contract between the Company and Cargill dated November 9, 2018

- Consent between the Company and Cargill dated May 11, 2023

- Side Letter Agreement between the Company and Cargill dated March 20, 2020

- Side Letter Agreement between the Company and Cargill dated March 2, 2021

- Side Letter Agreement between the Company and Cargill dated March 9, 2022

- Side Letter Agreement between the Company and Cargill dated September 8, 2022

- Side Letter Agreement between the Company and Cargill dated January 25, 2023

- Amendment Letter between the Company and Cargill dated January 9, 2023

- Side Letter Agreement between the Company and Cargill dated January 31, 2023

- Side Letter Agreement between the Company and Cargill dated June 30, 2022

- Side Letter Agreement between the Company and Cargill dated March 28, 2022

- Side Letter Agreement between the Company and Cargill dated July 11, 2022

- Side Letter Agreement between the Company and Cargill dated July 15, 2022

- Side Letter Agreement between the Company and Cargill dated June 27, 2022

- Side Letter Agreement between the Company and Cargill dated May 27, 2022

- Side Letter Agreement between the Company and Cargill dated June 13, 2022

- Side Letter Agreement between the Company and Cargill dated June 16, 2022

- Side Letter Agreement between the Company and Cargill dated April 29, 2022

- Side Letter Agreement between the Company and Cargill dated March 10, 2022

- Side Letter Agreement between the Company and Cargill dated May 15, 2023

- Side Letter Agreement between the Company and Cargill dated May 13, 2022

- Amendment between the Company and Cargill dated July 22, 2022, pursuant to the Side Letter Agreement between the Company and Cargill dated March 10, 2022

- Side Letter Agreement between the Company and Cargill dated February 24,2022

- Amendment between the Company and Cargill dated March 10, 2022, pursuant to the Side Letter Agreement between the Company and Cargill dated February 24, 2022

- Wetcon Purchase and Sale Agreement between the Company and Cargill dated July 10, 2023

- all indemnity agreements with all current and former directors of the Company or any third party that is not an employee of the Company at the time of Closing

- all engagement letters, retainer agreements, fee reimbursement agreements and any similar agreements between the Company and any legal, financial or other advisors to the Company or any other party

- Contribution Agreement between the Company and Atlantic Canada Opportunities Agency dated February 1, 2023

- Contribution Agreement between the Company and Atlantic Canada Opportunities Agency dated October 20, 2020

- Contribution Agreement between the Company and Atlantic Canada Opportunities Agency dated March 9, 2022

and in each case including all amendments, restatements, addendums, modifications, work orders, revisions, statements of work and other documentation or supplements issued thereunder

Schedule "F"
Excluded Liabilities

- Any and all Claims and Liabilities relating to the Senior Priority Notes and the Senior Secured Notes

- Any and all claims under the APF that are not otherwise satisfied pursuant to the Agreement

- Any and all Liabilities with regard to any litigation or other legal proceedings brought or initiated, or which could be brought or initiated, against the Company relating to or arising from any act, occurrence or circumstance existing at or before the Closing Date, including in connection with:

    1. Claims made by JSM Electrical Ltd. subject to proceedings before the Supreme Court of Newfoundland and Labrador (Court File No. 2023 01G 5933);

    2. Claims made by 13859380 Canada Inc. subject to proceedings before the Supreme Court of Newfoundland and Labrador (Court File No. 2023 01G 6075);

    3. Claims made by Quebec Iron Ore Inc. subject to proceedings before the Supreme Court of Newfoundland and Labrador (Court File No. 2023 01G 4195);

    4. Claims made pursuant to letters dated April 27, 2023 and August 25, 2023 from 1128349 B.C. Ltd. and subject to arbitration proceedings in Newfoundland and Labrador; and

    5. Claims made by Construction & Expertise PG Inc. subject to proceedings before the Supreme Court of Newfoundland and Labrador (Court File No. 2022 01G 3243).

- Any and all Liabilities relating directly or indirectly, at Law, under contract or otherwise, to or arising from the Excluded Contracts

- Any and all Liabilities relating directly or indirectly, at Law, under contract or otherwise, to or arising from the Excluded Assets

- Any and all Liabilities under the engagement letter between Greenhill & Co. Canada Ltd. and Tacora Resources Inc., dated as of January 23, 2023 (including all amendments, restatements, addendums, modifications, work orders, revisions, statements of work and other documentation or supplements issued thereunder) that are not secured by a CCAA Charge ranking in priority to the DIP Charge

Schedule "G"
Material Permits, Licenses and Contracts

- See Schedule "J"

- See Schedule "H"

- Insurance Policies

| No. | Policy Type | Policy Number | Date | Insurer | Coverage Allowance | Expiration | Annual Premium |
|-----|-------------|---------------|------|---------|--------------------|------------|----------------|
| 1. | Automobile Insurance | 43-CAO-150292-04 | 01-Mar-23 | National Liability & Fire Insurance Company | C$2,000,000 | 01-Mar-24 | C$100,680 |
| 2. | Commercial General Liability Occurrence | 43-GLO-303996-06 | 01-Mar-23 | National Liability & Fire Insurance Company | Each Occurrence Limit(CAD): $2,000,000<br><br>Medical Expenses Limit: $25,000 – any one person<br><br>Tenant's Legal Liability Limit: $2,000,000 – any one premises<br><br>Personal and Advertising Injury Limit: $2,000,000 – any one person or organization<br><br>General Aggregate Limit: $10,000,000<br><br>Products-Completed Operations | 01-Mar-24 | C$196,000 |

| No. | Policy Type | Policy Number | Date | Insurer | Coverage Allowance | Expiration | Annual Premium |
|---|---|---|---|---|---|---|---|
| | | | | | Limit: $2,000,000 | | |
| 3. | Commercial Umbrella Liability Occurrence | 43-UMO-310361-04 | 01-Mar-23 | National Liability & Fire Insurance Company | Each Occurrence Limit(CAD): $8,000,000<br><br>General Aggregate Limit: $8,000,000<br><br>Products-Completed Operations Aggregate Limit: $8,000,000 | 01-Mar-24 | C$164,640 |
| 4. | Excess Liability Policy | 1000399279-04 | 01-Mar-23 | Liberty Mutual Insurance Company | Each Occurrence (CAD): $15,000,000<br><br>Products and Completed Operations Aggregate: $15,000,000<br><br>Other Aggregate: $15,000,000 | 01-Mar-24 | C$171,645 |
| 5. | Directors and Officers Liability | 02-778-37-62 | 01-Mar-23 | AIG Insurance Company of Canada | Limit of Liability (CAD):<br><br>$10,000,000 Policy Aggregate<br><br>$10,000,000 Employment Practices Liability (shared limit)<br><br>$10,000,000 Fiduciary | 01-Mar-24 | C$32,800 |

| No. | Policy Type | Policy Number | Date | Insurer | Coverage Allowance | Expiration | Annual Premium |
|-----|-------------|---------------|------|---------|--------------------|-----------|----------------|
| | | | | | Liability (shared Limit) $1,000,000 Excell Limit for Insured Persons $25,000 Crisis Fund | | |
| 6. | Marine Cargo (Iron Ore) | OCTOABW7KX023 | 20-Dec-23 | Liberty Mutual Insurance Company & Great American Insurance Company | Limits(USD): $10,000 any one rail car in respect to iron ore only $1,680,000 any one train in respect to iron ore $2,500,000 limit in storage in mine site, prior to loading in rail cars $2,500,000 any and/or location and in the annual aggregate for earthquake | 20-Dec-24 | US$56,900 |
| 7. | Railcars and Locomotive Liability | RRP1805-03 | 10-Mar-23 | Evanston Insurance Company | Limit of Liability(USD): $20,000,000 per occurrence $500,000 additionally acquired property $100,000 Debris Removal, | 10-Mar-24 | US$211,508 |

| No. | Policy Type | Policy Number | Date | Insurer | Coverage Allowance | Expiration | Annual Premium |
|---|---|---|---|---|---|---|---|
| | | | | | Rerail and Rerouting Expense<br><br>$50,000 Pollutant Clean-Up and Removal<br><br>$25,000 Rental Reimbursement Expense | | |

Schedule "H"
Mineral Tenures

All mining claims, leases and other property rights and Mining Rights of the Company appurtenant to the Owned Real Property and pursuant to the Real Property Leases described below:

"**Real Property Leases**"

All of the real property leased, subleased, licensed and/or otherwise used or occupied (whether as tenant, subtenant, licensee or pursuant to any other occupancy arrangement) (including subsurface mineral rights) in connection with the operation of the Business as it is now being conducted, including (without limitation):

1. Offer to Lease effective March 11, 2021 between 9356-0563 Quebec Inc., as landlord, and the Vendor, as tenant, in respect of certain premises on the sixth floor of the building in "Solar Uniquartier" with a municipal address of 3400, De L'Éclipse, Brossard, QC (the "Brossard Head Lease").

2. Offer de Sous-Location dated January 31, 2023 between the Vendor, as sublandlord, and 12893118 Canada Inc., as subtenant, being a sublease of the Brossard Head Lease.

3. Commercial Lease dated December 31, 2017 between Northbank Professional Building, Inc., as landlord, and the Vendor, as tenant, in respect of certain premises constituting suites 120, 130, 140, and 260A located at the building with a municipal address of 102-04 3rd Street NE, Grand Rapids, MN.

And, for greater certainty, also including all leasehold properties acquired by the Vendor pursuant to the Wabush Iron Purchase Agreement, including the following:

**Lot 1:**

1. Indenture dated May 26, 1956 made by and between the Lieutenant-Governor of the Province of Newfoundland in Council, as lessor, and to Newfoundland and Labrador Corporation Limited ("NALCO"), as lessee, registered at the Registry of Transfers of the Department of Industry, Energy and Technology for the Province of Newfoundland and Labrador as item No. 1 in the Minerals Volume entitled "Volume 1-NALCO and Associates" as assigned by an indenture dated May 26, 1956 between NALCO, as lessor, and Canadian Javelin Limited ("Javelin"), as lessee, registered in the Registry of Deeds for the Province of Newfoundland and Labrador at Volume 349 Folio 333-350 and as Item No. 2 in the Minerals Volume entitled "Volume 1 -NALCO and Associates" as amended and consolidated by an Amendment and Consolidation of Mining Leases dated September 2, 1959 initially made between Javelin, as lessor, and Wabush Iron, as lessee, as the same has been amended and assigned from time to time, including by Deed of Assignment from Wabush Iron and Wabush Resources to the Vendor dated July 18 2017 registered at the Registry of Deeds for Newfoundland and Labrador on November 24, 2017 as registration no. 841257, and by Amendment and Restatement of Consolidation of Mining Leases among 0778539 B.C. Ltd., as Javelin was then known, and the Vendor, as same as been assigned from 0778539 B.C. Ltd., as assignor, to 1128349 B.C. Ltd., as assignee, pursuant to which the Vendor has been granted rights to explore and conduct mining operations at the Scully Mine.

**Lots 2, 3, 4:**

2. The Crown Lease made by and between the Lieutenant-Governor of the Province of Newfoundland in Council, as lessor, and NALCO, as lessee, dated May 15, 1962 and

registered in the Registry of Deeds at Volume 578, Folios 001-043, as assigned by an indenture dated May 16, 1962, between NALCO, as lessor, and Javelin, as lessee, and registered in the Registry of Deeds at Volume 579, Folios 362-392 (the "NALCO-Javelin Indenture"), as conveyed by Javelin, as lessor, to Wabush, as lessee, pursuant to an indenture dated May 17, 1962, and registered in the Registry of Deeds at Volume 579, Folios 396-426 (the "Javelin-Wabush Indenture"), as assigned to the Vendor, as lessee, by Deed of Assignment from Wabush Iron and Wabush Resources dated July 18 2017 registered at the Registry of Deeds for Newfoundland and Labrador on November 24, 2017 as registration no. 841257, respecting mining rights to areas referred to as Lots 2, 3, and 4, excepting all portions of that real property that have been sold, assigned or conveyed by the Vendor or their predecessors in title to any third parties in deeds of sale, assignment or conveyance registered in the Registry of Deeds for Newfoundland and Labrador, copies of all of which have been provided to the Purchaser.

**Wabush Mountain:**

3.  The Crown Lease made between the Lieutenant-Governor of the Province of Newfoundland in Council, as lessor, and NALCO, as lessee, dated May 15, 1962, and registered in the Registry of Deeds at Volume 577, Folios 522-543, as assigned by NALCO, as lessor, to Javelin, as assignee, pursuant to the NALCO-Javelin Indenture, and registered in the Registry of Deeds at Volume 579, Folios 393-395 as conveyed by Javelin, as lessor, to Wabush, as lessee, pursuant to the Javelin-Wabush Indenture, and registered in the Registry of Deeds at Volume 579, Folios 427-431,as assigned to the Vendor, as lessee, by Deed of Assignment from Wabush Iron and Wabush Resources dated July 18 2017 registered at the Registry of Deeds for Newfoundland and Labrador on November 24, 2017 as registration no. 841257.

**Other:**

4.  Indenture made between the Lieutenant-Governor in and for the Province of Newfoundland in Council, as lessor, and Knoll Lake, as lessee, dated 12 April 1965, as assigned to Wabush Iron and Wabush Resources pursuant to an indenture dated January 1, 1969 between, inter alia, Knoll Lake, as assignor, and Wabush Iron, as assignee, and subsequently assigned to the Vendor by Deed of Assignment from Wabush Iron and Wabush Resources dated July 18 2017 and registered at the Registry of Deeds for Newfoundland and Labrador on November 24, 2017, as registration no. 841250 respecting an area consisting of 8.678 acres of land for installing, maintaining and repairing a pumping facility.

5.  Indenture made between the Lieutenant-Governor in and for the Province of Newfoundland in Council, as licensor, and NALCO, as licensee, dated 15 May 1962 and registered in the Registry of Deeds for Newfoundland and Labrador at Volume 577, Folios 544-563, which was assigned from NALCO to Javelin on May 16, 1962, registered in the Registry of Deeds at Volume 579 Folios 393-395  and further  assigned to Wabush Iron and Wabush Resources from Javelin on May 17, 1962 registered in the Registry of Deeds in Volume 579, Folios 427-431, and subsequently assigned to the Vendor by Deed of Assignment from Wabush Iron and Wabush Resources dated July 18 2017 and registered at the Registry of Deeds for Newfoundland and Labrador as registration no. 841250, respecting the deposit and recovery of tailings in Flora Lake.

6.  Indenture dated January 14, 1983, between Wabush Iron, Stelco Inc., Dofasco Inc. and the Newfoundland and Labrador Ministry of Transportation for proposed Route 530, registered in the Registry of Deeds for Newfoundland and Labrador at Volume 3732, pages 250-257 and Roll 95, Frame 2376, as assigned to the Vendor by Deed of Assignment from Wabush Iron and Wabush Resources dated July 18 2017 and registered at the Registry of Deeds for Newfoundland and Labrador as registration no. 841250.

Schedule "I"
Owned Real Property

All real property interests owned by the Company, including those acquired pursuant to an Asset Purchase Agreement (the "**Wabush Iron Purchase Agreement**") among Wabush Iron Co. Limited ("**Wabush Iron**"), Wabush Resources Inc. ("**Wabush Resources**"), and Wabush Lake Railway Company Limited ("**Wabush Lake**") (collectively as vendors pursuant thereto) and Tacora Resources Inc. (as purchaser pursuant thereto) and Magglobal LLC (as Parent), including the following:

- 1.      The Crown Grant of surface and mining rights made by the Lieutenant Governor in Council to NALCO, dated May 26, 1956 and registered in the Registry of Transfers as Item No. 3 in the Land Titles (Concessions) Volume entitled "Volume 1 – NALCO and Associates", as assigned by NALCO, as assignor, to Javelin, as assignee, dated May 26, 1956, and registered in the Registry of Deeds for Newfoundland at Volume 349, Folios 351-365, as amended by agreement from the Lieutenant Governor in Council in favour of Javelin dated June 28, 1957,  registered in the Registry of Deeds for Newfoundland and Labrador at Volume 389, Folios 465 to 479, as assigned from Javelin to Wabush Iron Co. Limited and Wabush Resources Inc. in an Amendment and Consolidation of Mining leases dated September 2, 1959 and subsequently assigned to the Company by Deed of Assignment from Wabush Iron and Wabush Resources dated July 18 2017 and registered at the Registry of Deeds for Newfoundland and Labrador as registration no. 841250, respecting the surface rights to areas referred to as Lots 2, 3, and 4, excepting all portions of that real property that have been sold, assigned or conveyed by the Company or their predecessors in title to any third parties in deeds of sale, assignment or conveyance registered in the Registry of Deeds for Newfoundland and Labrador, copies of all of which have been provided to the Investors.

- All right, title and interest of the Company in the Jean River (Railway) Bridge acquired pursuant to indentures of conveyance from Wabush Resources, Wabush Iron and Wabush Lake dated July 18, 2017 registered in the Registry of Deeds for Newfoundland and Labrador as registration nos. 841249 and 841247, including that parcel of land referred to as "Parcel 14-2" in the Indenture made as of February 23, 2018 between Quebec Iron Ore Inc. and the Company, registered in the Registry of Deeds as registration number 852093.

- All buildings, infrastructure, fixtures and other immovable assets, if any, located on the on the property set out at item 1 above, or any properties described in the Real Property Leases.

- All real property described in the indenture dated 31 October 1961 between Wabush Iron and Wabush Lake and registered in the Registry of Deeds for Newfoundland and Labrador at Volume 559, Folios 383 to 389, as conveyed to the Company by indenture of conveyance dated July 18 2017 registered in the Registry of Deeds for Newfoundland and Labrador as registration no. 841247, excepting all portions of that real property that have been sold, assigned by conveyed by the Company or its predecessors to any third parties in deeds of sale, assignment or conveyance registered in the Registry of Deeds for Newfoundland and Labrador, copies of all of which have been provided to the Investors.

- All real property described in the indenture dated 30 September 1981 made between Newfoundland and Labrador Housing Corporation, as vendor, and Wabush Lake, as purchaser, registered in the Registry of Deeds for Newfoundland and Labrador at Roll 8858,

Frame 664, as conveyed to the Company by indenture of conveyance dated July 18 2017 registered in the Registry of Deeds for Newfoundland and Labrador as registration no. 841247.

Schedule "J"
Permits and Licenses

- Nuclear Substance and Radiation Device License No. 17061-1-25.2 dated September 23, 2021, issued by the Canadian Nuclear Safety Commission to the Company

- Certificate of Approval dated March 27, 2023, issued by the Government of Newfoundland and Labrador for the operation of an iron ore mine and mill at Wabush, including: pit dewatering; processing ore to concentrate; and disposal of tailings at Flora Lake. (Approval No. AA23-035696)

- Certificate of Approval dated March 27, 2023, issued by the Government of Newfoundland and Labrador (Department of Municipal Affairs and Environment) to the Company for the operation of an iron ore mine and mill at Wabush (Approval No. AA23-035696) and all related permits and licences

- Certificate of Approval dated March 27, 2023, issued by the Government of Newfoundland and Labrador (Department of Environment and Climate Change) to the Company for the operation of an iron ore mine and mill at Wabush (Approval No. AA23-035696) and all related permits and licences

- Certificate of Approval dated November 30, 2023, issued by the Government of Newfoundland and Labrador (Department of Digital Government and Service NL) to the Company for the continued maintenance and operation of a waste management system (Approval No. LB-WMS23-01023N)

- Mill License No. ML-TRI-02 dated November 22, 2023, issued by the Government of Newfoundland and Labrador (Department of Natural Resources) to the Company (for the processing of 18 million tonnes of ore per year; issued November 22, 2023 and valid for 5 years)

- Water Use License – Industrial (General Purpose) – No. WUL-21-12126 dated October 1, 2021, issued by the Government of Newfoundland and Labrador (Department of Environment and Climate Change Water Resources Management Division) to the Company to withdraw water from a groundwater well within the Town of Wabush

- Water Use License – Industrial (Mining) – No. WUL-23-12921 dated January 18, 2023, issued by the Government of Newfoundland and Labrador (Department of Environment and Climate Change Water Resources Management Division) to the Company to withdraw and use water from Little Wabush Lake

- Water Use License – Industrial (Mining) – No. WUL-23-12922 dated January 18, 2023, issued by the Government of Newfoundland and Labrador (Department of Environment and Climate Change Water Resources Management Division) to the Company for the dewatering of certain pits

- Written confirmation from the Minister of Environment and Climate Change,  Newfoundland and Labrador that the Scully Mine Tailings Impoundment Area Expansion Project is released from further provincial environmental assessment requirements and that the Company may

proceed with the Project pursuant to section 56 of the Newfoundland Environmental Protection Act, SNL 2002 c.E-14.2

Schedule "K"
Permitted Encumbrances

- Reservations, limitations, proviso and conditions, if any, expressed in any original grant from the Crown provided that they do not materially adversely affect value, use or exploration or exploitation rights

- Title defects or irregularities which are of minor nature, encroachments, easements, rights-of-way, rights to use, servitudes or similar interests provided that same does not materially adversely affect value, use or exploration or exploitation rights

- Rights-of-way for or reservations or rights of others for, sewers, drains, water lines, gas lines, electric lines, railways, telegraph, telecommunications and telephone lines, or cable conduits, poles, wires and cables, and other similar utilities, or zoning by-laws, ordinances or other restrictions as to the use of the Company's real property, that arise in the ordinary course of business and which do not individually or in the aggregate materially adversely affect value, use or exploration or exploitation rights

- The Mineral Tenures

- Encumbrances permitted in writing by the Investors

- Encumbrances in respect of any Retained Contracts

Schedule "L"
Pre-Filing Trade Amounts

- Substantially all Pre-Filing Trade Amounts on terms and amounts to be agreed by the Company and the Investors

Schedule "M"
Retained Contracts

- Mine Rehabilitation and Closure Performance Bond between the Company and Intact Insurance Company dated March 14, 2019

- Impact and Benefit Agreement between the Company and Innu Nation Inc. dated March 21, 2018

- Agreement between the Company and Her Majesty of Newfoundland and Labrador, as represented by the Minister of Natural Resources, dated April 14, 2019

- Agreement between the Company and Town Council of the Town of Wabush, on behalf of the Town of Wabush, dated January 1, 2023

- Limited Liability Company Agreement between the Company and Tacora Resources LLC dated July 20, 2017

- Commercial Lease between the Company and Northbank Professional Building, Inc. dated December 31, 2017

- Direct Debit Agreements between the Company and Sandvik Canada, Inc. dated August 19, 2022

- Direct Debit Agreement between the Company and Sandvik Canada, Inc. dated October 7, 2022

- Extension Agreements between the Company and Komatsu Financial dated March 29, 2023

- All Security Agreements – Conditional Sales Contracts among the Vendor and Equipement SMS Inc., as assigned to Komatsu International (Canada) Inc. dba Komatsu Financial, including:

  o Security Agreements – Conditional Sales Contracts between the Company and Komatsu Financial dated May 21, 2019

  o Security Agreements – Conditional Sales Contracts between the Company and Komatsu Financial dated May 28, 2019

  o Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated May 31, 2019

  o Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated May 26, 2021

  o Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated June 24, 2019

- o Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated July 5, 2019

- o Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated July 15, 2019

- o Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated August 30, 2019

- o Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated August 6, 2019

- o Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated September 6, 2019

- o Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated June 14, 2019

- o Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated May 10, 2019

- o Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated January 22, 2020

- o Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated September 2, 2019

- o Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated September 24, 2021

- o Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated May 14, 2019

- o Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated May 10, 2019

- Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated August 6, 2021

- Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated July 6, 2022

- Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated June 1, 2021

- Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated May 26, 2021

- Security Agreement – Conditional Sales Contract between the Company and Komatsu Financial dated April 15, 2021

- Security Agreements – Conditional Sales Contracts between the Company and Komatsu Financial dated July 7, 2022

- Lease Contract between the Company and Caterpillar Financial Services Limited dated August 31, 2022

- Lease Contracts between the Company and Caterpillar Financial Services Limited dated April 25, 2019

- Lease Contracts between the Company and Caterpillar Financial Services Limited dated July 15, 2019

- Lease Contract between the Company and Caterpillar Financial Services Limited dated December 18, 2019

- Master Equipment Lease Agreement between the Company and Sandvik Canada, Inc. dated August 18, 2022

- Amended and Restated Master Lease Agreement between the Company and Caterpillar Financial Services Limited dated August 3, 2022

- Equipment Purchase Offer, Order, and Sale Agreement between the Company and SMS Equipment Inc. dated June 21, 2022

- Specific Security Agreement made by the Company in favour of Caterpillar Financial Services Limited dated April 15, 2019

- Lease Agreement between the Company and JSM Properties Inc. dated December 5, 2023

- Operational Agreement between the Company and Société Ferroviaire et Portuaire de Pointe-Noire, S.E.C. dated December 24, 2022

- Joinder Agreement between the Company, Société Ferroviaire et Portuaire de Pointe-Noire, S.E.C., Société du Plan Nord, Quebec Iron Ore Inc. and Tata Steel Minerals Canada Limited dated February 5, 2019

- Contract between the Company and Set-îles Port Authority

- Contract (for users of the Port's multi-user berth) dated July 13, 2012 between Sept-Iles Port Authority and New Millennium Iron Corp. (now operating as Abaxx Technologies Inc.), as since assigned to the Company by the Assignment of Contractual Rights dated April 19, 2018 between New Millennium Iron Corp. (now operating as Abaxx Technologies Inc.) and the Company, as amended by the Amending Agreement dated August 24, 2018

- Agreement between the Company, Set-îles Port Authority and New Millenium Iron Corp. (now operating at Abaxx Technologies Inc.) dated April 19, 2018

- Locomotive Rental Agreement between the Company and Quebec North Shore & Labrador Railway Company Inc. dated November 8, 2017

- Confidential Transportation Contract between the Company and Quebec North Shore & Labrador Railway Company Inc. dated November 3, 2017 subject to Section 5.3(d) of the Agreement

- Agreement to Amend the Confidential Transportation Contract between the Company and Quebec North Shore & Labrador Railway Company Inc. dated February 13, 2019

- Second Agreement to Amend the Confidential Transportation Contract between the Company and Quebec North Shore & Labrador Railway Company Inc. dated May 20, 2019

- Third Agreement to Amend the Confidential Transportation Contract and the Locomotive Rental Agreement between the Company and Quebec North Shore & Labrador Railway Company Inc. dated July 1, 2019

- Fourth Agreement to Amend the Confidential Transportation Contract between the Company and Quebec North Shore & Labrador Railway Company Inc. dated April 24, 2020

- Sixth Agreement to Amend the Confidential Transportation Contract between the Company and Quebec North Shore & Labrador Railway Company Inc. dated November 30, 2021

- Seventh Agreement to Amend the Confidential Transportation Contract between the Company and Quebec North Shore & Labrador Railway Company Inc.

- Eighth Agreement to Amend the Confidential Transportation Agreement between the Company and Quebec North Shore & Labrador Railway Company Inc. dated January 9, 2023

- Contract Pertaining to the Purchase of Assets between the Company and Société Ferroviaire et Portuaire de Pointe-Noire S.E.C. dated June 1, 2018

- Indenture between the Company and Quebec Iron Ore Inc. dated February 23, 2018 in respect of their co-ownership of certain railway lands benefitting the Scully Mine and the Bloom Lake Mine, as registered in the Registry on March 1, 2018 as Registration Number 852093

- Amended and Restated Agreement for Right-of-Way and Easement between the Company and Quebec Iron Ore Inc. dated February 23, 2018

- Amendment and Restatement of Consolidation of Mining Leases between the Company and 0778539 B.C. Ltd. dated November 17, 2017

- Settlement Agreement between the Company and Construction & Expertise PG Inc. dated October 7, 2023

- Agreement for Consulting Services between the Company and Partners in Performance dated March 2, 2023

- Offer for the Supply of Explosives Products and Services between the Company and Orica Canada Inc. dated March 30, 2023

- Lease Order Agreement between the Company and Xerox Canada Ltd. dated May 30, 2019

- Services Agreement between the Company and Ascencia Group dated July 15, 2022

- Consulting Agreement between the Company and Kelly Rivers dated October 17, 2022

- Service Agreement between the Company and Newfoundland and Labrador Hydro dated May 16, 2018

- Petroleum Products Supply Agreement between the Company and Harnois Energies

- Railroad Operation and Maintenance Services Agreement between the Company and Western Labrador Rail Services Inc. dated March 12, 2019

- Bunker Resale Agreement between the Company, Iron Ore Company of Canada and Quebec North Shore & Labrador Railway Company Inc. dated May 20, 2019

- First Amendment to the Bunker Resale Agreement between the Company, Iron Ore Company of Canada and Quebec North Shore & Labrador Railway Company Inc. dated August 17, 2019

- Second Amendment to the Bunker Resale Agreement between the Company, Iron Ore Company of Canada and Quebec North Shore & Labrador Railway Company Inc. dated June 16, 2020

- Third Amendment to the Bunker Resale Agreement between the Company, Iron Ore Company of Canada and Quebec North Shore & Labrador Railway Company Inc. dated June 16, 2021

- Fourth Amendment to the Bunker Resale Agreement between the Company, Iron Ore Company of Canada and Quebec North Shore & Labrador Railway Company Inc. dated July 6, 2023

- Planned Maintenance Service Agreement between the Company and Maritime Pressure Works Ltd. dated February 18, 2023

- Staged Labor Agreement between the Company and Wabush SMS dated February 6, 2023

- Agreement between the company and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (United Steel Workers) dated December 2022

- Settlement Agreement among the Company, MagGlobal LLC, and 0778539 B.C. LTD. (formerly, MFC BANCORP LTD) dated October 30, 2017

- Vendor Deposit Letter between the Company and SMS Equipment Inc. dated October 12, 2023

- Vendor Deposit Letter between the Company and Sikumiut Environmental Management Ltd. dated October 13, 2023

- Vendor Deposit Letter between the Company and Industrial Rubber Labrador dated October 16, 2023

- Vendor Deposit Letter between the Company and Modern Pumps & Metals Inc. dated October 16, 2023

- Vendor Deposit Letter between the Company and Graybar Canada dated October 19, 2023

- Vendor Deposit Letter between the Company and Industrial Sales Ltd. dated October 19, 2023

- Vendor Deposit Letter between the Company and North Star Associates Inc. dated October 19, 2023

- Vendor Deposit Letter between the Company and Pneus Ratté (Pneus Colosse) dated October 20, 2023

- Vendor Deposit Letter between the Company and Toromont Cat dated October 23, 2023

- Vendor Deposit Letter between the Company and Labrador Rewinding dated October 24, 2023

- Vendor Deposit Letter between the Company and Source Atlantic Limited dated October 24, 2023

- Vendor Deposit Letter between the Company and Air Liquide Canada Inc. dated October 27, 2023

- Vendor Deposit Letter between the Company and BBA Hagerty Penashue Limited Partnership dated October 27, 2023

- Vendor Deposit Letter between the Company and Nuera Industrial Inc. dated October 27, 2023

- Vendor Deposit Letter between the Company and JECANAKA INVESTMENTS INC. O/A Canadian Tire Labrador City #901 dated October 30, 2023

- Vendor Deposit Letter between the Company and TransferEase Relocation Inc. dated October 31, 2023

- Vendor Deposit Letter between the Company and Centre de Mecanique du Golfe Inc. dated November 2, 2023

- Vendor Deposit Letter between the Company and Manitoulin Transport Inc. dated November 3, 2023

- Vendor Deposit Letter between the Company and JSM Electrical Ltd. dated November 6, 2023

- Vendor Deposit Letter between the Company and Wajax Limited dated November 6, 2023

- Vendor Deposit Letter between the Company and Rogers Electric & Machine dated November 7, 2023

- Vendor Deposit Letter between the Company and Energy Lock Inc. dated November 8, 2023

- Vendor Deposit Letter between the Company and GFL Environmental Services Inc. dated November 10, 2023

- Vendor Deposit Letter between the Company and Les Services JAG Inc. dated November 13, 2023

- Vendor Deposit Letter between the Company and Tyco Integrated Fire & Security O/A Johnson Controls dated November 16, 2023

- Vendor Deposit Letter between the Company and FCowen Engineering Inc. dated November 21, 2023

- Vendor Deposit Letter between the Company and Metalium Inc. dated November 22, 2023

- Vendor Deposit Letter between the Company and The Fluid Life Corporation dated November 27, 2023

- Vendor Deposit Letter between the Company and Bureau Veritas dated November 29, 2023

- Vendor Deposit Letter between the Company and Stagg & Templeman dated November 29, 2023

- Vendor Deposit Letter between the Company and Pumpaction Inc. dated January 12, 2024

- Letter Agreement between the Company, Tacora Norway AS and OMF Fund II H Ltd. dated February 15, 2023

- Voya 401k Retirement Plan for Tacora Resources employees

- Lincoln Life and Accidental Death and Dismemberment Insurance for Tacora Resources employees

- Lincoln Short-Term Disability Insurance for Tacora Resources employees

- Lincoln Long-Term Disability Insurance for Tacora Resources employees

- Delta Dental Plan for Tacora Resources employees

- Tacora Staff Overtime Policy dated January 1, 2022

- Tacora Staff Vacation Policy dated January 1, 2023

- 2023 Safe Quality Tonnes Bonus

- Lumino Health Virtual Care Employee Assistance Program, powered by Dialogue

- Relocation Assistance Policy for Tacora Resources

- Group Benefits Plan for management and office employees of Tacora Resources Inc. provided by Sun Life Financial effective March 1, 2023 (contract no. 184598)

- Group Benefits Plan for hourly employees of Tacora Resources Inc. provided by Sun Life Financial effective March 1, 2023 (contract no. 184598)

- 2023 Allowances (travel allowance, northern living allowance, hydro allowance, housing/rental allowance, healthy living allowance, safety clothing allowance)

- Blue Cross and Blue Shield of Minnesota Group Health Care Coverage Contract with Tacora Resources

- Blue Cross and Blue Shield of Minnesota Group Vision Care Coverage Contract with Tacora Resources

- Group Retirement Savings Plan of Tacora Resources Inc. (contract no. G700058) with Desjardins Financial Security Life Assurance Company

- Supplemental Unemployment Benefit Top-Up Program for apprentices actively attending approved block training pursuant to Section 8:10 of the Collective Bargaining Agreement dated January 11, 2023

and in each case including all amendments, restatements, addendums, modifications, work orders, revisions, statements of work and other documentation or supplements issued thereunder