# EXHIBIT C

# AMENDMENT TO SUBSCRIPTION AGREEMENT

This Amendment (this "**Amendment**") dated as of September 17, 2024, is made among :

A. Each of the entities listed on Exhibit A to the Subscription Agreement (as defined below) (collectively, the "**Investors**", and individually, an "**Investor**")

-and-

B. **TACORA RESOURCES INC.**, a corporation incorporated under the laws of Ontario (hereinafter, the "**Company**")

The Company and the Investors that are signatories to this Amendment are collectively referred to in this Amendment as the "**Parties**" and individually as a "**Party**".

**RECITALS**:

**WHEREAS** the Company and the Investors entered into the Subscription Agreement dated as of July 21, 2024 (the "**Subscription Agreement**"), pursuant to which the Investors have agreed to subscribe for and purchase from the Company, the Subscribed Shares, and the Company has agreed to issue the Unsecured Takeback Notes and the New Warrants to the Investors (excluding Cargill) who are also Existing Noteholders, in each case on the terms and conditions set out therein;

**AND WHEREAS** the Parties wish to make certain amendments to the Subscription Agreement in accordance with the terms thereof and the Monitor has provided its prior approval to the amendments;

**AND WHEREAS** capitalized terms used but not otherwise defined in this Amendment shall have the meanings ascribed to them in the Subscription Agreement;

**AND WHEREAS** all sections and paragraphs referenced herein are to the Subscription Agreement unless stated otherwise.

**NOW THEREFORE**, for good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby amend the Subscription Agreement as follows:

## ARTICLE I
## AMENDMENTS

1.1 Section 1.1 of the Subscription Agreement is hereby amended by adding the definitions of "Bridge Facility", "Bridge Facility Agreement", "Bridge Facility Security Agreements", and "Bridge Lenders" as follows:

""***Bridge Facility***" *means a senior secured first-lien (subject to the Intercreditor Agreement), interim, non-revolving credit facility up to a maximum principal amount of $100,000,000, which proceeds shall be used for the purposes described in the Bridge Facility Agreement.*"

""***Bridge Facility Agreement***" *means the Bridge Facility Financing Agreement to be entered into between the Company and the Bridge Lenders, as may be further amended, amended and restated, supplemented and otherwise modified from time to time.*"

"*"**Bridge Facility Security Agreements**" *means the security agreements to be entered into by the Company and any other grantors of security interests party thereto in favour of a collateral agent on behalf of the Bridge Lenders (and any other secured parties, if applicable) on the Closing Date, which will include the terms and conditions as agreed to by the Bridge Lenders and the Company, each acting reasonably.*"

"*"**Bridge Lenders**" *means Cargill, OSP, and Millstreet, each in their capacity as lender under the Bridge Facility Agreement.*"

1.2  Section 1.1 of the Subscription Agreement is hereby amended by deleting the definition of "New Equity Offering Initial Cash Consideration" and substituting it with the following:.

"*"**New Equity Offering Initial Cash Consideration**" *means an amount equal to (i) the DIP Obligations; (ii) the Cost Reimbursement Amount to the extent not waived hereunder; (iii) amounts necessary to fund the Administrative Expense Reserve; and (iv) all advisors' expenses of the Company and the Monitor (including advisor and legal counsel fees) that are secured by CCAA Charges that rank ahead of the DIP Charge, and advisors' fees and expenses of each Eligible Equity Investors pursuant to the terms of this Agreement, in each case payable on Closing in accordance with the Closing Sequence, which amounts are, for greater certainty, intended to be used for the payments set forth in the Closing Sequence and as set forth in Section 2.3(a).*"

1.3  Section 1.1 of the Subscription Agreement is hereby amended by deleting the definition of "Transaction" and substituting it with the following:.

"*"**Transactions**" *means all of the transactions contemplated by this Agreement and the Restructuring Support Agreement, including:*

  (a)  *the New Equity Offering;*

  (b)  *the New Secured Priority Notes Offering (as applicable);*

  (c)  *the Bridge Facility;*

  (d)  *repayment of the DIP Obligations and amounts owing under the APF (subject to set-off in accordance with the Closing Sequence);*

  (e)  *the cancellation of all Existing Equity;*

  (f)  *the assignment by the Company to ResidualCo of the Excluded Assets, Excluded Contracts and Excluded Liabilities and the Claims in respect of the Senior Priority Notes and the Senior Secured Notes and the APF (to the extent not otherwise satisfied as contemplated under Section 7.2(c));*

  (g)  *the issuances of any Unsecured Takeback Notes and the New Warrants;*

  (h)  *the entering into of the Unanimous Shareholder Agreement, each on and subject to the terms set forth herein, in the Approval and Reverse Vesting Order and Articles of Reorganization; and*

  (i)  *the entering into by the Company and Cargill Offtake Agreement and the Cargill OPA.*"

1.4 Section 2.3(a) of the Subscription Agreement is hereby deleted and substituted with the following:

"*(a) On the Closing Date, the New Equity Offering Initial Cash Consideration shall, in exchange for a number of Subscribed Shares that is equal to the dollar amount of New Equity Offering Initial Cash Consideration (or for such other number of Subscribed Shares based on a dollar amount per Subscribed Share to be agreed to among the Investors), be paid and satisfied by each Investor as follows: (i) by the release of its portion of the Deposit (together with any accrued interest thereon); and (ii) by wire transfer from each Investor (such obligation will be several for each Investor on their own behalf and not jointly nor jointly and severally) in immediately available funds to an account designated by the Monitor by no later than the Business Day prior to the Closing Date in the amount of its remaining New Equity Offering Initial Cash Consideration as set forth in Exhibit "A" hereto. The Monitor will be directed to pay on behalf of the Company all (i) amounts owing to the Monitor and its legal counsel; (ii) DIP Obligations; and (iii) the Company's applicable advisors' expenses, including financial advisor and legal counsel fees, solely to the extent that such expenses are subject to CCAA Charges that rank ahead of the DIP Charge, and expenses of the Investors, including the Investors' financial advisor and legal counsel fees, from the New Equity Offering Initial Cash Consideration and any other exit costs and charges as directed by the Investors, all in accordance with the Closing Sequence and the Approval and Reverse Vesting Order. Payment to Cargill of an amount equal to the amounts owing under the Existing Cargill Margin Facility (the "Cargill Consideration Payment") is being made in consideration for Cargill entering into this Agreement and its agreements, compromises and obligations hereunder. The Investors may and hereby have determined that the Cargill Consideration Payment shall be made to Cargill pursuant to a discount provided under the Cargill Offtake Agreement in connection with the Transactions and this Agreement, and, for certainty, is not being made in repayment of the Existing Cargill Margin Facility.*"

1.5 Section 7.2(g)(vi) of the Subscription Agreement is hereby deleted and substituted with the following:

"*(vi) the Monitor shall be directed to pay, on behalf of the Company, all DIP Obligations accruing up to the Closing Date (the calculation of such amount to be provided to the Monitor, the Company and the other Investors no later than two (2) Business Days prior to Closing) in full and from the New Equity Offering Initial Cash Consideration and all security in respect thereof will be fully Discharged and released;*"

## ARTICLE II
## FULL FORCE AND EFFECT

2.1 The Subscription Agreement shall not be amended or otherwise modified by this Amendment except as set forth in Article I of this Amendment. Except as amended by this Amendment, the Subscription Agreement shall continue to be and shall remain in full force and effect in accordance with its terms. All references to the "Agreement", "herein", "hereof", "hereunder" or words of similar import in the Subscription Agreement shall be deemed to include the Subscription Agreement as amended by this Amendment.

## ARTICLE III

**RESERVATION OF RIGHTS** Nothing contained in this Amendment constitutes a waiver of any default that may heretofore or hereafter occur or have occurred and be continuing under the Subscription Agreement.  Except as expressly provided herein, the execution and delivery of this Amendment does not: (i) extend the terms of the Subscription Agreement; (ii) give rise to any obligation on the part of any Party to extend, modify, alter, amend or waive any term or condition of Subscription Agreement or otherwise prejudice any rights or remedies which any Party now has or may have in the future; or (iii) give rise to any defences, setoffs, reductions or counterclaims to any Party right to enforce, exercise and enjoy the benefits of their respective rights and remedies under the Subscription Agreement.

## ARTICLE IV
## MISCELLANEOUS

4.1    The headings of the Sections of this Amendment have been inserted for convenience of reference only, are not to be considered a part hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

4.2    Unless the context otherwise requires, words importing the singular shall include the plural and vice versa and words importing any gender shall include all genders.

4.3    This Amendment shall stand automatically terminated if the Subscription Agreement is terminated in accordance with its terms.

4.4    The provisions of Sections 10.5 (Survival), 10.7 (Public Announcements), 10.8 (Notices), 10.9 (Time of Essence), 10.10 (Further Assurances), 10.11 (Entire Agreement), 10.12 (Waiver and Amendment), 10.13 (Severability), 10.14 (Remedies Cumulative), 10.15 (Governing Law), 10.16 (Dispute Resolution), 10.17 (Attornment), 10.18 (Successors and Assigns), 10.19 (Assignment), 10.22 (Counterparts) of the Subscription Agreement shall apply to this Amendment and are hereby incorporated by reference in their entirety herein, in each case, *mutatis mutandis*.

[*Remainder of this page intentionally left blank; signature pages follow*]

**IN WITNESS WHEREOF** the Parties have executed this Amendment as of the date first written above.

                                         **TACORA RESOURCES INC.**

Per: _____
         F46C01B3793E448...
Name: Heng Vuong
Title: Executive Vice President & Chief Financial Officer

*Signature page to the Amendment*

**CARGILL, INCORPORATED**

Per: _____

Name: Mitchell Marcus
Title:  VP, Corporate Development

[Signature page – Amendment to Subscription Agreement]

**OSP Value Fund III, LP**
By: OSP GP III, LLC, its general manager
By: OSP, LLC, its managing member

Per: _____

Name: Chuck Anderson
Title:   Chief Operating Officer


**OSP Value Fund IV, LP**
By: OSP GP IV, LLC, its general manager
By: OSP, LLC, its managing member

Per: _____

Name: Chuck Anderson
Title:   Chief Operating Officer

*Signature page to the Amendment*

**MILLSTREET CAPITAL MANAGEMENT LLC, as investment manager on behalf of multiple noteholders**

Per: _____/s/ Brian D. Connolly_____
Name: Brian D. Connolly
Title: Managing Member

*Signature page to the Amendment*