# EXHIBIT D

**CITATION:** Tacora Resources Inc. (Re), 2023 ONSC 6126
**COURT FILE NO.:** CV-23-00707394-00CL
**DATE:** 20231030

## SUPERIOR COURT OF JUSTICE – ONTARIO (COMMERCIAL LIST)

**RE:**   **IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF TACORA RESOURCES INC.**

**BEFORE:**   KIMMEL J.

**COUNSEL:**   *Ashley Taylor, Eliot Kolers, Lee Nicholson, Natasha Rambaran and RJ Reid*, for the Applicant, Tacora Resources Inc.

*Alan Merskey, Jane Dietrich and Ryan Jacobs*, for the Monitor (FTI Consulting Canada Inc.)

*Robert Chadwick, Caroline Descours, Peter Kolla and Carlie Fox,* for Cargill, Incorporated and Cargill International Trading Pte Ltd.

*Richard Swan, Sean Zweig and Alexander Payne*, for the Ad Hoc Group of Senior Noteholders and the Indenture Trustee

*Natasha MacParland,* for Crossingbridge Advisors, LLC

*Joe Thorne,* for 1128349 B.C. Ltd.

**HEARD:**   October 24, 2023

### ENDORSEMENT – COME-BACK HEARING
### (ARIO AND SOLICITATION ORDER)

**The Come-Back Motion**

[1]     The court made an initial order under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("CCAA") in respect of Tacora Resources Inc. ("Tacora" or the "company") on October 10, 2023 (the "Initial Order").  The come-back hearing was originally scheduled for October 19, 2023, but was adjourned to October 24, 2023 by order dated October 13, 2023 to afford the company and the participating stakeholders additional time to address certain issues of disagreement among them, and in particular their disagreement over the terms and source of debtor in possession ("DIP") financing that the company needs to carry out its intended restructuring efforts.

[2]     The court's October 13, 2023 order adjourning the come-back hearing also extended the expiry of the stay of proceedings provided for in the Initial Order from October 20, 2023 to October 27, 2023 (the "Stay Period").   A further stay extension order was granted on October 27, 2023 while the court's decision on this motion was under reserve, extending the Stay Period to October

31, 2023 and increasing the permitted draws under the DIP financing approved under the Initial Order by $5 million to address the company's immediate cash needs, which the Monitor confirmed and recommended.

[3]     The company seeks the following relief on the come-back motion:

    a.  an amended and restated initial order (the "ARIO") to, among other things:

        i.  extend the Stay Period until and including February 9, 2024;

        ii.  authorize Tacora to borrow up to $75,000,000 under the Cargill DIP Facility;

        iii.  approve the Greenhill Engagement Letter and the Transaction Fee Charge;

        iv.  approve the company's proposed Key Employee Retention Plan (the "KERP"), and authorize Tacora to pay the KERP Funds to the Monitor and grant the KERP Charge;

        v.  grant a sealing order over a confidential schedule to the KERP; and

        vi.  grant an increase to the quantum of the Directors' Charge,

    b.  a solicitation order (the "Solicitation Order") to, among other things:

        i.  approve the proposed Solicitation Process; and

        ii.  authorize Tacora, Greenhill and the Monitor to immediately commence the Solicitation Process.

[4]     Capitalized terms not otherwise defined in this endorsement shall have the meanings ascribed to them in the Initial Order and the company's proposed ARIO.

[5]     The company owns and operates the Scully Mine (the "Scully Mine"), an iron ore concentrate producer located near Wabush, Newfoundland and Labrador, Canada with a production capacity of six (6) million tonnes per annum ("Mtpa").

**Stakeholder Positions**

*The Ad Hoc Group of Noteholders*

[6]     An *ad hoc* group of holders of senior secured priority notes ("Senior Priority Notes") and holders of senior secured notes ("Senior Notes") of Tacora (the "AHG") oppose the relief sought by the company on the come-back motion.  They comprise a substantial majority of the holders of

both series of Tacora notes[1]. The total amount of all of the secured notes under both series, including accrued interest, is estimated to be almost $270 million. The noteholders (including the AHG) are the most significant secured creditors of Tacora. They are the only stakeholders who oppose the relief sought by the company on the come-back motion.

[7]     The AHG's opposition to the ARIO is primarily in respect of the requested court approval and authorization of the Cargill DIP Facility.  By a cross-motion the AHG seek the court's approval of their competing DIP proposal made on October 8, 2023 (the "AHG DIP Proposal") that is provided for in their own proposed amended and restated initial order (the "AHG ARIO").  Their cross-motion also seeks various alternative relief if their request for approval of the AHG DIP Proposal and AHG ARIO is not successful (the "Alternative Relief"). The Alternative Relief would entail changes to the Cargill DIP Facility and changes to the proposed KERP and other proposed terms of the ARIO dealing with the priority of certain charges, as well as the appointment of a Chief Restructuring Officer ("CRO").

[8]     The AGH only opposes one aspect of the Solicitation Order, which is that it should not only provide for the court's authorization to immediately commence the Solicitation Process but it should also include a direction that the Solicitation Process be commenced immediately.

*Cargill*

[9]     The other significant secured creditor of Tacora is Cargill International Trading Pte Ltd. ("Cargill"), with first and second ranking secured debt of almost $35 million.

[10]     Cargill is party to various commercial arrangements and contracts with Tacora. Tacora sells 100% of the iron ore concentrate production at the Scully Mine to Cargill pursuant to an offtake agreement between Tacora, as seller, and Cargill, as buyer, dated April 5, 2017 and restated on November 9, 2018 (as amended from time to time, the "Offtake Agreement"). Pursuant to an amendment dated March 2, 2020, the term of the Offtake Agreement was extended to a life of mine contract such that Tacora is required to sell and Cargill is required to buy all iron ore concentrate produced at the Scully Mine while it remains operational.

[11]     The sale of the iron ore concentrate is also subject to a stockpile agreement between Tacora, as seller, and Cargill, as buyer, dated December 17, 2019 (the "Stockpile Agreement"), which works in conjunction with the Offtake Agreement.   The Offtake Agreement and other commercial arrangements between Cargill and Tacora have resulted in significant payments by Tacora to Cargill since 2019 despite Tacora's liquidity issues and financial challenges during this period.

[12]     In or around December 2022, Tacora required additional financing to fund operations through the liquidity challenges it was facing at that time. On January 3, 2023, Tacora, as seller, and Cargill, as buyer, entered into an advance payment facility agreement (as amended from time

---

[1] Although not in evidence, at the hearing counsel for the AHG represented the holdings of the AHG to account for approximately 86% of the total value of the Tacora senior secured notes.

to time, the "APF Agreement"). Pursuant to the APF Agreement, Cargill provided Tacora with an advance payment facility (the "Advance Payments Facility") under which Cargill made advance payments under the Offtake Agreement in the total principal amount of $30,000,000 (the "Initial Advances") to Tacora. Until termination of the APF Agreement, Cargill is required to continue paying Tacora for iron ore concentrate under the Offtake Agreement and may not credit such deliveries against the outstanding balance of the Advance Payments Facility.

[13]    Subsequently, on May 29, 2023, Tacora and Cargill entered into an Amended and Restated APF Agreement (the "Second APF Amendment") to provide Tacora with additional liquidity. The Second APF Amendment provided for a new facility under the Advance Payments Facility whereby Cargill would make margin advances ("Margin Advances") of up to $25,000,000 to Tacora. The Margin Advances were primarily made to finance margin payments payable to Cargill under the Offtake Agreement. The outstanding amount of Margin Advances fluctuate daily based on the Platts Index 62% price movement. The Margin Advances rank *pari passu* with the Senior Priority Note and senior to the Senior Notes and the Initial Advances. Pursuant to the Second APF Amendment, the maturity date of the Advance Payments Facility was extended to September 12, 2023.

[14]    On June 23, 2023, Tacora entered into a further amendment to the APF Agreement (the "Third APF Amendment") to provide greater flexibility to Tacora on utilizing the new margin facility provided by the Second APF Amendment. Under the Third APF Amendment, Cargill, in its sole discretion, could make additional prepay advances ("Additional Prepay Advances" and together with the Margin Advances, the "Senior Priority Advances") to Tacora utilizing any availability under the $25,000,000 facility created by the Second APF Amendment. On June 29, 2023, Cargill made an Additional Prepay Advance in the amount of $3,000,000. Additional Prepay Advances are repayable upon demand and rank *pari passu* with the Senior Priority Notes and the Margin Advances, and senior to the Senior Notes and the Initial Advances.  No further Additional Prepay Advances have been made by Cargill and the only Additional Prepay Advance  made to Tacora has been repaid.

[15]    To further enhance the company's liquidity position in the face of continued negative cash flow, Cargill and the company entered into a wet concentrate purchase and sale agreement (the "Wetcon Agreement") dated July 10, 2023, whereby Cargill agreed to purchase a stockpile of 172,000 tonnes of wet concentrate located at the Scully Mine from Tacora.

[16]    In connection with discussions and negotiations between Tacora's stakeholders regarding a potential consensual recapitalization transaction, Cargill agreed to extend the maturity date of the Advance Payments Facility from time to time, most recently to October 10, 2023. At the October 24, 2023 hearing, Cargill agreed to further extend the maturity date to allow the court time to render its decision on the come-back motion and the AHG's cross-motion.

[17]    Tacora's former co-founder, Chief Operating Officer, and Chief Commercial Officer, Matt Lehtinen, was hired by Cargill in 2023 and has responsibility for Cargill's relationship with Tacora.  There are Cargill employees on site on a day-to-day basis in connection with the management of the Scully Mine. Cargill has also had a representative on Tacora's board of directors ("Board") for many years. Mr. Leon Davies is a Cargill employee and was its Board

appointee when the Offtake Agreement was last amended and throughout the DIP Process (defined below).

[18]    Two Cargill entities are equity-holders in Tacora. Cargill is described as a "related party" under IFRS standards in Tacora's financial statements.

[19]    Cargill Incorporated, an affiliate of Cargill, is the counter-party to the Cargill DIP Facility for which approval is sought under the ARIO.

[20]    Cargill (in its various capacities as a stakeholder of Tacora) supports the ARIO and Solicitation Order sought by Tacora at this come-back hearing and opposes the relief sought by the AHG's cross-motion.

*The Monitor and Other Noteholders*

[21]    The court-appointed monitor under the Initial Order, FTI Consulting Canada Inc. (the "Monitor"), supports the ARIO and Solicitation Order sought by the company, as does one of the company's Senior Secured Priority Noteholders, Crossingbridge Advisors, LLC (under a reservation of its rights more generally). The remaining noteholders (not accounted for in the AHG) have taken no position on the come-back motion or the cross-motion.

*Other Stakeholders*

[22]    A number of other stakeholders were identified by Tacora in its initial CCAA filing.

[23]    Tacora employs approximately 450 employees. Some are salaried (36%) and some are hourly (64%) and more than half of the employees are unionized. The current collective bargaining agreement is in effect until December 31, 2027. Most employees are located at the Scully Mine. Only 13 employees are located at the company's head office in Grand Rapids, Minnesota.

[24]    Tacora also contracts with various local service providers that make available staff to assist Tacora with its operations on a regular basis. Certain of these contractors have staff at the Scully Mine during each shift worked by regular Tacora employees, performing either general labour or specialized tasks at the Scully Mine related to repair and maintenance.

[25]    In February 2023, Tacora engaged Partners in Performance ("PIP"), a global management consulting firm, to initiate an operational stabilization and turnaround program at the Scully Mine for a period of 20 weeks, commencing on February 27, 2023. The term of PIP's consultancy agreement was extended.  It has a team that are regularly on site at the Scully Mine to continue the operational stabilization and turnaround program and to assist Tacora develop and action a capital project plan to ramp up to 6 Mtpa capacity. Tacora anticipates enlisting PIP's continued support throughout its planned restructuring process.

[26]    Cargill also provides on-site consultancy support to Tacora, historically at no cost to Tacora.

[27]    Tacora is a critical customer for several businesses in Wabush who provide it goods and services and who in turn, provide employment to the local community. Tacora is also party to various equipment leases.

[28]    Tacora has contracts with the Wabush Lake Railway, owned by Tacora and operated by Western Labrador Rail Services Inc. ("WLRS"), and with the QNS&L Railway, owned and operated by Quebec North Shore and Labrador Railway Company, Inc ("QNS&L"). QNS&L is a wholly owned subsidiary of the Iron Ore Company of Canada, a competitor that operates another mine in the Labrador iron ore trough. WLRS and QNS&L are needed for the transportation of Tacora's iron ore concentrate from the Scully Mine to the Port.

[29]    Société Ferroviaire et Portuaire de Pointe Noire s.e.c. ("SFPPN") operates the Port used by Tacora (which is the multi-user port located in Sept-Îles, Quebec) that provides facilities to unload iron ore concentrate from trains delivered from the QNS&L Railway. The use of the Port and the provision of services by SFPPN is set out in a long-term operational agreement with an effective date of December 22, 2022.

[30]    On November 17, 2017, Tacora entered into an amendment and restatement of consolidation of mining leases (the "MFC Royalty") with 0778539 B.C. Ltd. (formerly MFC Bancorp Ltd.) ("MFC"), pursuant to which the parties agreed to amend and restate a lease which provided Tacora with tenure and mining rights to certain premises constituting the Scully Mine in exchange for an ongoing royalty payment based on production.

[31]    Tacora has various unsecured debt obligations to the Atlantic Canada Opportunities Agency in respect of financial assistance that has been provided to it through contribution agreements entered into as part of a national initiative to support regional recovery and stimulus. Tacora also has unsecured debt obligations to the Innu Nation pursuant to an impact and benefit agreement.

[32]    It is evident that there are a number of unsecured creditors and parties with whom Tacora does business who have a stake in the outcome of Tacora's restructuring efforts. None of these other stakeholders appeared or took any position in respect of the relief sought by Tacora under the proposed ARIO and Solicitation Order.

**Summary of Outcome**

[33]    The relief requested by Tacora under the proposed ARIO and Solicitation Order (with the one change requested by the AHG) is granted. Tacora has satisfied the court of the necessary requirements for these orders to be made and the requested relief to be granted. The AHG's Cross-Motion is dismissed.

[34]    As the court noted at the time of the approval of the Initial Order, this application was made by Tacora in the face of operational and liquidity challenges that it has been attempting to address since Q3 2022. It has not been able to do so to date, despite:

    a.    A strategic review process that was undertaken commencing in January 2023 in furtherance of which the applicant engaged Greenhill & Co. Canada Ltd. ("Greenhill") to assist it to, among other things, explore, review, and evaluate a

               broad range of alternatives including sale opportunities or additional investment into Tacora (the "Strategic Process").

    b.  Tacora's engagement of a mining operations consultant (PIP) to, among other things, implement operational initiatives to ramp up production at the Scully Mine in February 2023.

    c.  Various interim capital raises implemented to improve Tacora's liquidity position in collaboration with its primary secured creditors who agreed to defer various debt obligations over the preceding months.

    d.  Attempts since August 2023 to reach an agreement on a consensual restructuring and capitalization plan involving a third party, with the support and involvement of its primary secured creditors, the noteholders, and Cargill.

[35]    Tacora's liquidity and operational challenges and the confluence of factors that have led it to apply for protection under the CCAA transpired over the past few years since the Scully Mine first became operational in 2019 and are detailed in the supporting materials filed. No one has suggested that Tacora is not in need of urgent interim financing and court protection given its current circumstances.

[36]    The terms of the Cargill DIP Facility and its implications were considered by Tacora's Board, with the benefit of the advice and recommendations of the company's financial advisor and investment banker, Greehhill, and of the Monitor. The Cargill DIP Facility was determined to be the superior of the two options for DIP financing that were available to Tacora; the other alternative being the AHG DIP Proposal, the terms of which the company and its advisors determined were inferior, including and primarily from a financial and economic perspective.

[37]    Each of the Cargill DIP Facility and the AHG DIP Proposal contain terms that benefit the commercial interests of the counterparties and that could reduce the company's flexibility and/or options in the context of the company's planned Solicitation Process (the Cargill DIP Facility with respect to the preservation of the Offtake Agreement pending a transaction arising from, or the termination of, the Solicitation Process, and the AHG DIP Proposal with respect to the provisions for a topping credit bid option and stalking horse agreement). These were accounted for in the deliberations over the two options.

[38]    While the Cargill DIP Facility is not the preferred DIP financing option of the AHG, it does not materially prejudice their interests, nor were they treated unfairly or were their interests unduly disregarded in the DIP Process that led up to the company's acceptance of the Cargill DIP term sheet on October 8, 2023 and the execution of the Cargill DIP Facility.

[39]    For the reasons that follow, I have found the terms of the proposed ARIO and Solicitation Order to be fair and reasonably necessary for the continued operations of Tacora in the ordinary course of business to provide stability for the company and to allow it the breathing room that it needs to try to restructure its affairs so that it can continue as a going concern. These orders are approved.

**The Issues**

[40]    In general terms, what the court is concerned with on this come-back motion is whether the applicant has satisfied it of the requirements necessary to grant the ARIO (that includes the approval of the Cargill DIP Facility and DIP Charge) and the Solicitation Order.

[41]    The issues raised for the court's consideration by the AHG cross-motion are whether the court should decline to approve the Cargill DIP Facility and replace it with the AHG DIP Proposal (under the AHG ARIO); or, whether the Alternative Relief should be ordered with corresponding amendments to the ARIO as proposed by Tacora. The issues relating to the DIP financing to be approved will be addressed first since they were the primary focus of the written and oral submissions.

**Analysis**

*Should the Cargill DIP Financing be Approved?*

[42]    This *de novo* come-back hearing requires the court to consider whether the Cargill DIP Facility ought to be approved. Tacora bears the burden of the relief it seeks in this regard. Part of that burden involves dispelling the criticisms to the Cargill DIP Facility that the AHG has raised.

[43]    The AHG submits that: (a) the process leading to the company's approval of the Cargill DIP Facility was inherently flawed and unfair; (b) the Cargill DIP Facility does not meet the factors in s. 11.2(4) of the CCAA, in that it seriously prejudices the senior secured noteholders; (c) the Cargill DIP Facility is being used for an improper purpose, to further leverage Cargill's own commercial interests, rather than benefit Tacora; and, in these circumstances, (d) the AHG asks the court to approve its proposed form of ARIO that includes the approval of the AHG DIP Proposal *in lieu* of the Cargill DIP Facility.

[44]    These submissions will be addressed in turn.  The second submission of the AHG requires the court to consider more broadly whether the applicant has satisfied its onus to demonstrate that it is appropriate for the court to approve the Cargill DIP Facility and Charge, having regard to s. 11.2 of the CCAA, in the context of which any prejudice to the only other secured creditors is one of the relevant factors.

      a)  <u>The DIP Process</u>

            i. The Initiation of the DIP Process

[45]    Greenhill was engaged by Tacora in January 2023 to act as financial advisor and investment banker to Tacora. It initially sought interested purchasers for Tacora, but there were no offers or expressions of interest. One potential strategic purchaser that entered into a letter of intent with Tacora and conducted due diligence later withdrew from the potential acquisition, including due to concerns about the Offtake Agreement.

[46]    Greenhill turned its attention to efforts to obtain financing, and eventually directed its attention in or about late August and early September 2023 to the solicitation of DIP proposals (the "DIP Process"). Various milestones dates and other parameters were put in place for the

receipt of DIP proposals. Greenhill received four proposals for DIP financing. One such proposal was not actionable, including because it specified that the renegotiation or termination of the Offtake Agreement was a precondition to the delivery of a DIP offer.

[47]    Tacora and its advisors recognized that the Offtake Agreement presented some unique constraints and identified certain modifications to that agreement that would be desirable from Tacora's perspective, including: (a) changing the term of the Offtake Agreement from life of mine to renewal-based to provide Tacora "greater flexibility"; and (b) increasing Tacora's profit share under the Offtake Agreement. Cargill has not agreed to these or any other amendments to the Offtake Agreement.

[48]    In the early part of the DIP Process Cargill submitted a non-binding DIP proposal, which expressly prevented the disclaimer of the Offtake Agreement. Cargill ultimately decided not to submit a bid capable of acceptance by the original proposal deadline that had been specified.

## ii. The AHG DIP

[49]    The AHG first submitted a non-binding DIP proposal on August 21, 2023 followed by a draft definitive DIP agreement on August 28, 2023.  By this time, Tacora had no other actionable DIP proposals. The Board considered what the AHG was proposing, the advice and endorsement of the company's advisors, and the recommendation of the (at that time proposed) Monitor and determined that this was the best (and also the only) option available to the company at the time.

[50]    In anticipation of Tacora's planned filing for CCAA protection on September 12, 2023, Tacora executed the AHG DIP on September 11, 2023 (the "AHG DIP") with the unanimous approval of the Board. The AHG DIP was sent to the court on September 11, 2023 with supporting affidavits sworn by Tacora's CEO and the managing director of Greenhill. It was provided to other key stakeholders late that evening in anticipation of the company's planned CCAA filing the following day. In that context, Cargill received a copy of the AHG DIP.

## iii. The Suspension and Resumption of the CCAA Filing and Request for Further DIP financing proposals

[51]    Just prior to the company formally making its CCAA filing, it was advised that the noteholders, Cargill, and a third party had reached an agreement in principle regarding a consensual restructuring of Tacora that obviated the need for a CCAA filing, so the filing did not proceed on September 12, 2023. To alleviate immediate cash flow concerns while those parties worked towards a binding agreement, Cargill agreed to make certain contractual payments that it had been withholding to protect what it described as its pre-filing contractual set-off rights (which the company disputed).

[52]    Negotiations regarding a consensual restructuring ensued for a number of weeks.  In the intervening time period, the company's funding needs changed, certain deadlines contemplated under the AHG DIP lapsed and there was a change in the composition of the members of the AHG that were prepared to provide the funding for the AHG DIP. Accordingly, while still holding out the prospect of a consensual restructuring deal, the AHG, of its own accord, sent to Tacora on September 28, 2023 a revised AHG DIP proposal to address these changed circumstances in the event of a CCAA filing.

[53]    Having received a new DIP proposal from the AHG, Greenhill decided to reach out to Cargill on September 29, 2023 to see if it was willing to make a DIP proposal as well. Cargill was not told about the revised AHG DIP proposal. The AHG was not told about the reach out to Cargill.

[54]    Initially, Cargill remained focused on achieving a definitive restructuring agreement. When that fell apart, Tacora was informed on October 4, 2023 that no binding agreement had been reached. In anticipation of this possibility, a hearing date had been scheduled for the initial CCAA application on October 6, 2023.

[55]    Cargill[2] submitted a non-binding DIP proposal on October 5, 2023.  At the request of the company, Cargill agreed that it would pay certain further outstanding invoices that it had been withholding to protect what it described as its pre-filing contractual set-off rights (which the company disputed) to provide cash flow to the company on the condition that the company agree not to make a CCAA filing prior to October 10, 2023.  The company agreed to this.

[56]    The company had been communicating with the AHG since receiving its September 28, 2023 proposed revised AHG DIP terms. On the evening of October 5, 2023, Greenhill asked both the AHG and Cargill to submit their respective best and final DIP offers by 5 p.m. on October 7, 2023. They were each made aware that the other had provided non-binding proposals.

[57]    Cargill submitted a binding DIP proposal on October 7, 2023. Tacora asked for a higher amount of DIP financing, which Cargill agreed to on October 8, 2023.

[58]    The AHG continued to communicate with the company about the changes that it was proposing to make to the AHG DIP.  It was also asked to consider making changes requested by the company.  There was an exchange of emails that eventually resulted in the final revised draft AGH DIP Proposal being transmitted on Sunday October 8, 2023, which was accompanied by a redline version showing the changes to the September 11, 2023 AHG DIP.  The AHG made it clear that they were prepared to stand behind the September 11, 2023 AHG DIP (that was never implemented) with necessary amendments to account for the delay in the CCAA filing etc. That continued to be their position at the hearing.

### iv. The Decision to Execute the Cargill DIP Facility

[59]    The October 7, 2023 Cargill DIP term sheet (with the increased funding amount that Cargill International agreed to on October 8, 2023) and the October 8, 2023 AHG DIP Proposal were compared and considered side by side at the Tacora October 8, 2023 Board meeting with the benefit of a detailed review and analysis prepared by Greenhill.

---

[2] The formal contracting party is an affiliate of Cargill, Cargill International.  References in this endorsement to "Cargill" in the context of the DIP Process and ultimately the execution of the Cargill DIP Facility do not attempt to distinguish between the two Cargill entities.  They are both called "Cargill" but shall be read as referring to the specific entity that was involved in accordance with the context of the events described.

[60]    Below is a summary of the comparison of costs, expenses and key terms and conditions of the AHG DIP Proposal to the Cargill DIP term sheet (ultimately accepted by the company and reflected in the Cargill DIP Facility). As a matter of convenience, this summary has been extracted from the Monitor's Pre-Filing Report dated October 9, 2023, which concluded that the Cargill DIP term sheet:

a. requires a significantly smaller DIP amount and DIP Charge, thereby reducing the potential prejudice to existing creditors;

b. has significantly lower costs, including lower aggregate interest, lower DIP fees and lower DIP Expenses.  Greenhill's comparison indicated the cost of the Cargill DIP to be less than half the cost of the AHG DIP Proposal and that it represented an overall estimated $7 million in cost savings;

c. has significantly more favourable Permitted Variance parameters and similar tests under its terms, conditions and covenants;

d. provides for significantly less potential operational disruption through the continuation of the various existing Cargill arrangements, including the margin and hedging arrangements which would likely not be available under the AHG DIP; and

e. provides certainty in respect of the KERP.

[61]    In addition to the comparison of the two DIP financing proposals that were available to the company on October 8, 2023, the Monitor compared the cost of the Cargill DIP Facility to that of other court approved interim financings, and concluded that: The cost of the Cargill DIP Facility appears to be within the range of costs, in terms of annualized interest and fees, for interim financings of similar size approved in other CCAA proceedings. The Monitor also expressed the view that the terms of the Cargill DIP Facility are within market parameters in respect of interest and fees.

[62]    Even the AHG concedes that there are elements of the Cargill DIP Facility that are more favourable to the AHG DIP Proposal.  The primary "flaws" that the AHG identifies stem from the treatment and implications of the Offtake Agreement and the fact that the noteholders' debt will be "primed" to the extent of the Cargill DIP Facility (which will be at least $75 million and possibly as much as $100 million).  This latter consideration will be discussed in more detail in the sections of this endorsement that follow, dealing with the CCAA requirements and the claimed prejudice to the AHG. The AHG's concerns about the Offtake Agreement also tie into the third area of criticism regarding the ulterior purpose of Cargill's DIP Facility, which the AHG says is to protect that Offtake Agreement, and will also be discussed later in this endorsement.

[63]    After going through the various features that rendered the Cargill DIP Facility superior to the AHG DIP Proposal, Mr. Bandhari of Greenhill testified in his second affidavit that it was for these reasons that the Board determined, following the advice and recommendations of the company's advisors, that the company should proceed with the Cargill DIP Facility. All of the Board members and both Greenhill and the Monitor concluded that the terms of the Cargill DIP

term sheet were superior to the revised AHG DIP Proposal. This conclusion is not seriously challenged. As noted above, the AHG's challenges to the Cargill DIP Facility are on other grounds.

[64]    It was for these reasons that on October 9, 2023 following the Board's approval, Tacora executed the Cargill DIP Facility.

### v. The Board Process and Governance Concerns

[65]    The Monitor expressed the view that "there is no better alternative to the [Cargill] DIP Financing Agreement at this time".  The Monitor did not recommend the approval of the AHG DIP Proposal. The clear recommendations in both reports from the Monitor is a strong indicator of the fairness of both the process by which DIP financing was solicited, analyzed, and selected, and the terms of the Cargill DIP Agreement itself.

[66]    The AHG suggests that the "*Soundair*" principles for approval of a sale (or sale process) should be applied by analogy to the court's consideration of the DIP Process and whether it was fair and reasonable in the circumstances. No authority or precedent was offered for this suggestion and the specific factors do not directly correlate.  I find that analogy to be strained and unhelpful.

[67]    However, I agree with the more general suggestion that, as part of the court's exercise of its discretion in approving the Cargill DIP Financing under the ARIO, the court can and should consider whether the DIP Process that the company and its advisors engaged in to solicit possible DIP financing options was fair and reasonable.  The company also suggests that the court can and should consider whether the Board exercised its reasonable business judgment in its decision to accept the Cargill DIP agreement.

[68]    The AHG points to what it describes as several serious process, governance, and substantive problems underlying the request by Tacora for the approval of the Cargill DIP Facility. The AHG says that the DIP Process was not fair and reasonable to them because of certain timing and mechanical aspects (discussed in the next section) but also because their interests were not given due consideration by the Board and the Board was tainted by the presence of the Cargill Board nominee, Mr. Davies, such that the Board cannot be said to have exercised objective, reasonable business judgment.

[69]    The AHG selectively focusses on the specific questions put to two of the witnesses who were cross-examined for this motion, divorced from the broader context of the rest of the evidence about the DIP Process and the factors considered by the Board and the company's advisors in the decision to move forward with the Cargill DIP Facility (summarized earlier in this endorsement). The AHG focusses on the evidence of:

   a.   Mr. Bandhari of Greenhill, that he did not give any advice to the Board in respect of the fact that the Cargill DIP would prime the senior secured noteholders to the tune of $75 million or more; and

   b.   Mr. Davies, who acknowledged that, while he understood that the AHG would be primed by the Cargill DIP, that [priming] was not something that he and the other directors spent a great deal of time talking about.

[70]    From this, the AHG asks the court to infer that when the Board was exercising its business judgement due consideration was not given to the senior noteholders' interests, and in particular that their security would be "primed" by the Cargill DIP Facility by up to $75 million or more.

[71]    This is not a reasonable inference to draw from the totality of the evidence.  First, these specific statements do not support the suggested inference since the combination of the two statements is that at least one director (Mr. Davies) was aware of the "priming" implications and did not need to be told about that by Greenhill; and his evidence goes only so far as to say that a great deal of time was not spent on this topic; he does not say that it was not considered at all. Further, these specific statements are consistent with the general statements in the affidavits of Mr. Bandhari and the Monitor's Pre-Filing Report in which it is stated that the potential prejudice to existing creditors (the noteholders being the largest such group) was considered.

[72]    The AHG also challenges the Board's process as inherently unfair and flawed from a governance perspective because of the role played by Mr. Davies who was the Cargill Board nominee and remained a Cargill employee throughout. He recused himself and did not vote on the approval of the Cargill DIP Facility when all of the other Board members unanimously voted in favour of it.

[73]    Section 132(5) of the Ontario *Business Corporations Act*, R.S.O. 1990, c. B-16 ("OBCA") addresses circumstances where directors are required to recuse themselves. None of the circumstances are present in this situation. Thus, Mr. Davies was not required to recuse himself. He was also not required to abstain from voting on the approval of the Cargill DIP Facility, but he did. The AHG suggests that because he abstained from voting, this is a concession of a conflict of interest that should have led him not only to abstain from voting but also to recuse himself from any discussions at the Board about the Cargill DIP Facility.

[74]    Merely abstaining from voting does not create a legal conflict, especially one that the OBCA does not recognize.  There is no evidence that Mr. Davies' presence at the Board meetings at which the Cargill DIP Facility was discussed tainted the views of the other Board members in any way.  His presence at the earlier Board meeting at which the AHG DIP was approved did not result in any dissention over the earlier approval of that financing.  There is no basis on which the court can or should infer that his presence at the Board meeting(s), in these circumstances, tainted the Board process so as to undermine the Board's business judgment to proceed with the objectively superior Cargill DIP Facility.

[75]    The Board, having regard to relevant factors (including the potential prejudice to other stakeholders such as the senior secured noteholders) and acting on the advice of professional advisors, exercised its reasonable business judgment in good faith and without any reasonable inference of improper involvement of the Cargill Board nominee, in deciding to approve the Cargill DIP Facility on October 8, 2023.  While the Board's independent decision to approve the Cargill DIP Facility is not determinative of the ultimate decision of the court about whether to approve the Cargill DIP Facility, it is a relevant consideration. See *Crystallex International Corp, Re,* 2012 ONCA 404, 293 O.A.C. 102, at para. 85, aff'g *Crystallex International Corp, Re*, 2012 ONSC 2125, 91 C.B.R. (5th) 169, at para. 35.

### vi. Other Fairness Concerns

[76]    The AHG complains that there was an uneven playing field from a process perspective because Mr. Davies and others at Tacora were favouring Cargill in the DIP Process by passing on information to Cargill that gave it an unfair advantage.  For this, the AGH relies upon inferences it asks the court to draw from certain exchanges between Tacora and Cargill representatives.

[77]    The first exchange of text messages is between Tacora's CEO Mr. Broking and Mr. Davies, Cargill's Board nominee, on September 12, 2023 about a request for Cargill to make certain interim payments.  In this text message exchange, Mr. Broking states "I love Cargill". The AGH relies upon these texts to suggest that there was an ongoing dialogue between Tacora and Cargill about the DIP proposals and a bias in favour of Cargill.

[78]    Mr. Davies denies that he was involved in any discussions about the DIP financing proposals with any Cargill representatives aside from one specific conversation that he had on October 5, 2023 to see whether Cargill would consider making a DIP proposal and the direct follow up to that regarding the timing of Cargill's internal approval process for making and increasing its proposal.  There is nothing in the record to indicate otherwise.

[79]    Aside from the identified text message exchange, Mr. Davies' evidence, which was uncontroverted, was that: (i) he took his fiduciary duties as a Tacora director seriously; (ii) he had no involvement in Cargill's DIP proposal or its negotiation other than to encourage Cargill on behalf of Tacora to consider putting forward a DIP proposal; (iii) he shared no confidential Tacora information with Cargill; and (iv) he did not learn of the substance of Cargill's DIP proposal or the AHG's until they were both presented to Tacora's board on October 8, 2023.

[80]    Next, the AHG points to the acknowledgment of Tacora's CEO Mr. Broking that he spoke to Cargill representatives between October 5 and 10, 2023.  However, his testimony was that these discussions were only about operational matters and he similarly denies having been involved in any direct communications with individuals at Cargill (or the AHG) about the DIP Process or proposed terms. Mr. Broking testified that he was not involved in negotiations of the DIP proposals, and did not see the DIP term sheets until they were provided to Tacora's board on October 8. The AHG seeks to have the court infer that he must be lying about this because of his practice of deleting his text messages, even though he was examined on texts produced by others and the documents produced by the company, none of which contradict his denial of any discussions with Cargill about the DIP.

[81]    Mr. Bhandari testified more generally, that although Tacora and its advisors were in discussions with the AHG after September 11 about DIP matters, he provided no details of those discussions to Cargill, and he is not aware of Tacora or any of its advisors doing so either.

[82]    The evidence obtained through the r. 39.03 examinations and cross-examinations undertaken by the AHG did not reveal any improper or inappropriate contact between the company's management or Board and Cargill, nor any favoritism in relation to having a Cargill DIP Facility. The conversations taking place with Cargill in this time period were no different in substance than the conversations taking place with the AHG. There is no evidence of any sharing of information with one about what the other was proposing or considering.

[83]    The AGH also complains about the fairness of the timing of the request for their final and best DIP proposal over the Canadian Thanksgiving and American Columbus Day holiday weekend.  Their position at the hearing is that they were unable to finalize an amended definitive DIP Proposal in that time frame. This is notwithstanding that the company continued to offer to make their advisors available on October 6 and 7, 2023 "to discuss any remaining issues in order for the Ad Hoc Group to make an informed decision on whether to make any revisions to their proposal".

[84]    The inconvenience of the timing of this is not something that the company was in a position to control. It was a function of the timing of the breakdown in the negotiations towards a consensual restructuring on October 4, 2023. Both Cargill and the AHG were given the same amount of time to finalize and submit a definitive DIP financing proposal on October 7, 2023.  The AHG had been working on theirs since September 28, 2023.

[85]    The AHG further complains that the DIP Process was flawed and unfair because Cargill had seen their first AHG DIP Agreement and knew the terms it needed to beat in the October round, after having declined to submit a binding proposal back in September. However, that ignores the reality of the situation which is that there had to be a further round of DIP negotiations because the AHG DIP Agreement had lapsed. In fact, it was the AHG that initiated those discussions and initiated further negotiations at the end of September.

[86]    The AHG knew what they had offered and knew what the company was asking for in terms of possible improvements. They were given the same time and opportunity to make a new DIP proposal as Cargill was on October 5, 2023.  There was nothing unfair about the notice that AHG was given relative to the notice that Cargill was given for providing their DIP financing proposals. The company had to act quickly given the ongoing liquidity crisis it was facing. Absent a restructuring, it was clearly understood that the company would need to file for CCAA protection.

[87]    The company put no constraints or restrictions on the AHG in terms of any further DIP proposal that they might wish to make. The company accepted, and put before the Board for consideration, the AHG DIP Proposal that was submitted on the morning of October 8, 2023 even though it was received after the deadline that had been imposed of 5 p.m. on October 7, 2023 and even though it did not come in the form of an offer that the company could accept.

[88]    The AHG says that, on principle, they were not prepared to re-engage with the company on any terms other than what it considered to be "updates" to the AHG DIP. That was its explanation for not putting forward an "improved" DIP proposal over the Thanksgiving weekend or at any time prior to the October 24, 2023 come-back hearing. The need for updates implicitly recognizes that the AHG DIP had lapsed; yet, the AHG continued to assert in materials filed in advance of the come-back hearing that the AHG DIP signed on September 11, 2023 remained a binding and executable agreement on October 8, 2023.

[89]    This position is untenable. The AHG itself proposed a new agreement that included not only new (updated) financial terms but also a new party (one noteholder departing and another added).  The company and the AHG recognized by the end of September 2023 that the AHG DIP Agreement was no longer actionable or viable as a result of the time that had elapsed while both Cargill and the AHG were engaged in good faith efforts to try to reach a consensual restructuring.

[90]    At the hearing, greater emphasis was placed by the AHG on a variation to the assertion of the continued existence of a binding AHG DIP, namely that they believed that they had an agreement that no further DIP proposals would be considered by the company from anyone else after their AHG DIP had been approved and accepted in September 2023.  In other words, that the AHG had the exclusive right to be the DIP lender in any CCAA filing by the company. However, this belief is not said to be based on anything that the AHG was told by the company or its advisors or by the proposed Monitor.  The AHG submitted no direct evidence on this point. The AHG DIP did not contain exclusivity for any future DIPs in a CCAA proceeding, nor did it provide a tail period.

[91]    There is no objectively reasonable evidentiary basis for the asserted belief that the company would not consider any other DIP financing proposals. It appears to be based on the assertion that the September AHG DIP remained a binding agreement, an assertion that is untenable (as noted above) given that the AHG DIP was no longer capable of execution in October 2023 and the AHG had themselves acknowledged that a new agreement with amended terms was required.

[92]    Tacora had the right (in fact, the obligation) to resume the DIP Process when the circumstances and timing had changed and it was planning for its CCAA filing in October 2023. It needed a binding DIP agreement to present to the court for that filing.

### vii. The AHG's Proposed Run-Off DIP Process

[93]    Up until the come-back hearing, the AHG did not make any attempt after the Thanksgiving weekend, when they claim to have been under undue time pressure (and under the erroneous belief that Tacora had to negotiate solely with the AHG regarding the DIP financing), to make any new or different proposal with any materially new or improved terms, ostensibly because they did not want to lend credibility to what they considered to be a flawed DIP Process.

[94]    At the come-back hearing, the AHG suggested a further alternative, that the court direct a short further run-off DIP process by which the company could solicit last and best DIP financing proposals from Cargill International, the AHG and any other interested party, for the Board to consider and make a final decision about (the "Run-Off DIP Process").  A precedent for this proposed further Run-Off DIP Process, in which each party would be given a further opportunity to submit (on a double blind basis) the best DIP proposal for the company's consideration, is said to be found in *Cystallex* in the context of the consideration of a DIP extension.  While there is no reported decision containing this direction, it is said to be the process that is referenced by Newbould J. in *Crystallex International Corporation (Re)*, 2012 ONSC 2125, 91 C.B.R. (5th) 169, at para. 21. However, there was not a similar immediacy to the company's cash concerns when the court directed the "run off" DIP process in that case.

[95]    The company and the Monitor both raised concerns about stability and delay for the company and the need to finalize the ARIO, the DIP financing, the KERP and to begin the Solicitation Process.  They are concerned that the company cannot tolerate the inevitable further uncertainty and instability that the suggested Run-Off DIP Process would entail.  The opportunity to make a best and last DIP financing proposal was afforded on October 5, 2023 and has passed.

[96]    These concerns are valid and were left largely unanswered.  The proposed Run-Off DIP Process is not a realistic option for the company in its present circumstances and could interfere with the company's restructuring process.

[97]    After the hearing, in an effort to address a concern raised by the court about there being no binding offer from the AHG that the company could accept if the court were to be inclined to grant the cross-motion and deny the request for approval of the Cargill DIP Facility, the AHG sent a new DIP proposal to the company on the morning of October 26, 2023 and asked that a case conference be convened on October 27, 2023 before the court released its decision.   At the case conference, the AHG made the court aware of this offer and of an accompanying alternative to the Offtake Agreement with a new purchaser of the ore produced at the Scully Mine (the "New AHG DIP Proposal").  According to the submissions of counsel to the AHG, the New AHG DIP Proposal is similar to, but an improvement upon, the September AHG DIP.  The members of the AHG behind the New AHG DIP Proposal are not the same as those behind either of the AHG DIP or the AHG DIP Proposal.  The alternative offtake agreement that accompanied it is an entirely new feature.

[98]    The company and the Monitor (and Cargill, although given its commercial self-interest, its concerns carry less weight on this issue) raised concerns about this New AHG DIP Proposal, which the AHG is asking the court to require the company and its Board to consider while the court's decision regarding the approval of the Cargill DIP Facility remains under reserve. The AHG did this without tendering any proposed evidence about this proposal and without a motion for the court to consider whether to receive any proposed "fresh" evidence.  The company and the Monitor did not have sufficient time to properly consider and assess the new terms and undertake the complex comparative analysis that would be needed to understand the economic implications of the alternative offtake agreement that accompanied the New AHG Proposal. To do all of this would mean further uncertainty and delay for the company.

[99]    Both the company and the Monitor indicated that the company would take the time to consider the New AHG Proposal but strenuously reiterated the earlier arguments, that the company needs the certainty of the approval now of the ARIO (including the DIP financing, and the KERP) and needs the court's approval of the Solicitation Order so that the Solicitation Process can get underway.  The company no longer has the luxury of time. Its Stay Period is expiring. It has already gone below the minimum floor of cash that it is comfortable operating with and it is forecasted to run out of during the week after the hearing.  The stability of the company's ongoing operations is dependent upon the certainty of the requested court orders and their implementation.

[100]    To alleviate the concerns about delay and the company's immediate funding needs, the AHG suggested that they would make funds available to the company under the New AHG DIP Proposal without any exit or back stop fee, if Cargill was not willing to continue funding under the Cargill DIP Facility on an interim basis while the New AHG DIP Proposal (and any further proposal from Cargill) is considered.

[101]    The court is concerned that this invites an open-ended process and will lead to delay and instability that could be prejudicial to the company's restructuring efforts. The AHG had the opportunity to submit the New AHG DIP Proposal before the come-back hearing. The presentation of this proposal after the hearing was explained to be with a view to addressing the court's concern

about the lack of any binding offer that the company could accept if the court was otherwise inclined to grant the primary relief on the cross-motion. However, presenting this New AHG DIP Proposal and accompanying alternative offtake agreement while the court's decision was under reserve and without a proper record or any formal request for the introduction of this evidence falls outside of any recognized evidentiary or procedural mechanism. In these circumstances, consideration of the New AHG DIP Proposal could only be accommodated if the court were prepared to delay the release of its decision on the come-back motion and order the Run-Off DIP Process that the court has found (above) to be unrealistic for the company and potentially detrimental to its restructuring efforts.

[102]   The company needs stability and needs to move into its Solicitation Process. The AHG already had its chance to put in its best DIP proposal and it submitted the AHG DIP Proposal which was considered and determined to be inferior to the Cargill DIP in a variety of respects. As the Monitor submitted, it is time to put a pin in the process and move forward. That is what the company did at the beginning of October when it completed its DIP Process in which each of Cargill International and the AHG had an opportunity to participate. The court is not prepared to order a re-do of that now through a further Run-Off DIP Process that will take at least a week if not longer. The company has been in a state of limbo for long enough.

[103]   That said, the court is encouraged by the prospect that there could be a better DIP proposal for the company. If so, the repayment and replacement or disclaimer of the Cargill DIP Facility remain open for consideration by the company in the future. As the company, the Monitor and Cargill have pointed out, the question of whether the Offtake Agreement can be disclaimed or replaced remains an issue for another day. But at the very least, it is acknowledged that there is the possibility for this to happen in the context of a transaction or restructuring arising out of the Solicitation Process (including a credit bid from the AHG submitted in that process) or in the context of the repayment and replacement of the Cargill DIP Facility. The cost of Cargill's exit fee under the Cargill DIP Facility is the cost of the stability and the timely implementation that the company requires now.

      b)   The CCAA Requirements For Approval of the Cargill DIP Facility and DIP Charge

[104]   The court's authority to grant the requested priority DIP charge for the Cargill DIP Facility is found in s. 11.2 of the CCAA, and must be considered in light of the factors in s. 11.2(4) of the CCAA, which provide as follows:

> (4) In deciding whether to make an order, the court is to consider, among other things,
> (a) the period during which the company is expected to be subject to proceedings under this Act;
> (b) how the company's business and financial affairs are to be managed during the proceedings;
> (c) whether the company's management has the confidence of its major creditors;
> (d) whether the loan would enhance the prospects of a viable compromise or arrangement being made in respect of the company;

(e) the nature and value of the company's property;
(f) whether any creditor would be materially prejudiced as a result of
the security or charge; and
(g) the monitor's report referred to in paragraph 23(1)(b), if any.

[105]   These factors may be equally applicable in deciding who shall be the DIP lender and on what terms DIP financing ought to be provided. See *Great Basin Gold Ltd., Re*, 2012 BCSC 1459, 94 C.B.R. (5th) 228, at para. 14. These factors and how they are satisfied in this case are reviewed in the Monitor's Pre-Filing report and the company's affidavits and they need not each be reviewed in this endorsement.

[106]   The AHG's challenges to the s. 11.2(4) criteria regarding the need for governance changes during the CCAA process and the AHG's loss of confidence in existing management, flow from the criticisms of the DIP Process previously discussed. They are not borne out on the record. This section of the endorsement focuses on the primary challenge of the AHG, namely its contention that it will be materially prejudiced as a result of the proposed Cargill DIP Facility and priming Charge.

[107]   The Cargill DIP Financing is conditional on the DIP Charge being granted. The only alternative funding option that would be available to the company would also require a DIP charge. Under the AHG DIP proposal, the DIP facility would have been substantially larger; the increased amount being necessary as the Advanced Payments Facility and other financing available from Cargill would no longer be available under the AHG DIP Proposal. Any prejudice to the secured creditors that may result from the granting of a DIP charge is therefore reduced under the DIP Financing Agreement as compared to the alternative AHG DIP Proposal.

[108]   Material prejudice in the context of s. 11.2(4) requires consideration of how much the creditors are being primed by a priority DIP charge, not who is the priming creditor. On an objective test it is clear that the Cargill DIP Facility is far less prejudicial to creditors generally than the AHG DIP, including because the company will require significantly less financing due to the operational agreements already in place with Cargill.

[109]   By letter dated October 6, 2023, the AHG communicated, amongst other things, certain concerns regarding the Applicant accepting DIP financing from the DIP Lender. Those stated concerns included potential prejudice to the AHG from such financing. The proposed Monitor took note of the concerns expressed, noting that: "[u]nder the Ad Hoc Group DIP proposal, the DIP facility would have been substantially larger" and, as a result, "[a]ny prejudice to the secured creditors that may result from the granting of a DIP charge is therefore reduced under the [Cargill] DIP Financing Agreement as compared to the alternative Ad Hoc Group DIP Proposal."

[110]   The AHG complaint that the Senior Noteholders are being "primed" ignores the fact that the AHG DIP Proposal would prime the Senior Noteholders by a larger margin than the Cargill DIP Facility.

[111]   Additionally, the AHG's argument ignores Tacora's other creditors, including Senior Noteholders who are not part of the AHG, trade creditors, employees, lessors and other unsecured creditors. Under the AHG DIP Proposal, the company will need to realize approximately $30

million more in connection with a restructuring transaction for these creditors to have the same recovery as under the Cargill DIP Facility due to the additional financing that will be required with the AHG DIP Proposal. Accordingly, it is clear that creditors broadly will be less prejudiced with the Cargill DIP Facility.

[112]   A further instance of prejudice that the AHG identifies arises from the implications of the Offtake Agreement and the impediments that it could present to the restructuring process if interested third party purchasers or investors are dissuaded by its "life of mine" and other terms (as some already have expressed concerns about in the Solicitation Process and the earlier Strategic Process also undertaken by Greenhill prior to that). Consideration of this must begin with an acknowledgment that, while the AGH asserts that the Offtake Agreement is not commercially reasonable and that it unduly restricts the company's restructuring efforts, that agreement was in place prior to the issuance of the notes.

[113]   This motion must proceed on the basis that the Offtake Agreement is, as of the date of the hearing of this motion, a valid and enforceable agreement to which the company is a party. It is not an entirely one-sided agreement, in that it provides a guaranteed customer and revenue stream for all of the output at the Scully Mine.

[114]   The AHG has taken issue, in particular, with an event of default provision in the Cargill DIP Facility involving any termination, suspension or disclaimer of the Offtake Agreement (the "Offtake EOD"). Section 23(d) defines the Offtake EOD to be: The termination, suspension or disclaimer of the Existing Arrangements [including the Offtake Agreement], or the taking of any steps to terminate, suspend or disclaim (if permitted under the CCAA) any of the Existing Arrangements.

[115]   However, this same Offtake EOD goes on to expressly indicate that an event of default shall NOT include: (i) the commencement and prosecution of the SISP (defined below), including the solicitation of an Alternative Offtake or Service Agreement, or (ii) taking any step or related action pursuant to a binding agreement entered into in respect of a Restructuring Transaction at or after the Bid Deadline, including executing such agreement, seeking court approval of such binding agreement or taking any steps in connection with consummating the Restructuring Transaction pursuant to such binding agreement in each case at or after the Bid Deadline, without prejudice to any rights that [Cargill] may have pursuant to section 32 (including subsection 32(9)(c)) of the CCAA or otherwise.

[116]   Further, s. 29 of the Cargill DIP Facility requires that: The Borrower … (in consultation with the Monitor) shall pursue a sales and investment solicitation process (the "SISP") approved pursuant to a Court Order in respect of (a) potential Restructuring Transactions that may be available to the Borrower; and (b) offtake, service or other agreements in respect of the business of the Borrower ("Alternative Offtake and Service Agreements") that may be available to the Borrower. In fact, the solicitation process agreed to in the Cargill DIP Facility expressly contemplates that the company shall solicit "Alternative Offtake or Services Agreements" as part of the Solicitation Process and the Solicitation Process put forward by the company for court approval contemplates soliciting interest in the "Offtake Opportunity" as part of binding bids.

[117]   Reading these provisions of the Cargill DIP Facility together, the Offtake EOD does not limit the company's ability to explore all value-maximizing alternatives, including restructuring transactions that involve either a new offtake agreement or no offtake agreement.

[118]   While the company considered it to be of critical importance to its evaluation of the DIP proposals it received for it to be able to fully explore all alternatives available to it during the CCAA Proceedings, it also recognized that it would not be practical to terminate, suspend or disclaim the Offtake Agreement before the company had the means to sell its iron ore concentrate to one or more alternative customers.

[119]   The practical restriction created by the Offtake EOD is that the company will not be able to enter a stalking horse agreement that contemplates the termination, suspension or disclaimer of the Offtake Agreement without either refinancing the Cargill DIP Facility or obtaining the Cargill DIP Lender's consent. The company understood this risk when evaluating the Cargill DIP Facility.

[120]   This is a thorn in the AHG's side because they made it known to the company that they intend to make a credit bid and might be interested in acting as a stalking horse bidder. While not in the original AHG DIP, the redline version of the AHG DIP Proposal submitted on October 8, 2023 indicates a new provision expressly allowing the AHG to make a stalking horse bid in the Solicitation Process. However, from the company's perspective and the perspective of the creditors as a whole (not the interests of a creditor who might also wish to be a potential purchaser), at the time that the Cargill DIP Facility was considered and approved, there had not been any advanced discussions regarding a stalking horse agreement. Under the Cargill DIP Facility, all parties will be able to participate fully in the solicitation process. In the meantime, should a stalking horse agreement be determined to be favourable, the company maintains the flexibility to refinance (repay and replace) the Cargill DIP Facility at any time.

[121]   The terms of the Cargill DIP Financing do not materially prejudice the AHG in their capacity as creditors, either from the perspective of the priming of their existing security (which is less than it would be under their own AHG Financing Proposal) or from the perspective of the overall implications of the Offtake EOD and its practical implications for the restructuring process. The restriction on stalking horse agreements may be prejudicial to the AHG in their capacity as a prospective "credit bidder," but that is not of paramount concern to the interests of the stakeholders generally and is not a material prejudice to the AHG in their capacity as creditors of Tacora arising as a result of the Cargill DIP Facility and DIP Charge within the meaning of s. 11.2(4)(f) of the CCAA.

[122]   In *Great Basin* (at para. 15), the court noted that when approving DIP financing it "must determine which proposal is most appropriate and most importantly, which will best serve the interests of the stakeholders of the [Applicants] as a whole by enhancing the prospects of a successful restructuring". The company notes that certain provisions of the AHG DIP Proposal were considered and identified by the company to be restrictive and to provide advantages to the AHG, such as their ability to submit a "topping credit bid" (up to the amount of their total debt) after the completion of the Solicitation Process if the successful bid does not result in full payment of the AHG's pre-filing secured debt. In other words, the AHG would have a "last look" following the final bid deadline even if the AHG did not participate in the Solicitation Process.

[123]   The company had a concern that this "last look" could have a chilling effect on prospective purchasers who would be put to the time and expense of the due diligence to make a bid. Another concern identified was that such a clause could cause any interested bidder to have discussions with the AHG regarding a transaction rather than the company, its advisors, and the Monitor, which could result in a loss of control and fairness in the process.

[124]   Further, the AHG DIP Proposal would require the company to appoint two (2) new directors from a slate of five (5) directors put forward by the AHG, if requested. In *Quest University, (Re),* 2020 BCSC 318, 77 C.B.R. (6th) 117 the court recognized that a creditor's attempt to seek control through board appointments in connection with DIP financing was "unreasonable and inappropriate in the circumstances and it may significantly disadvantage other interests in this proceeding". Like the present situation, the creditor in *Quest University* had indicated an interest in purchasing the debtor's property.

[125]   On balance, I find the reasons and conclusions of the company, the Monitor and Greenhill that the Cargill DIP Facility is more favourable to the company and will better serve its stakeholders than the AGH DIP Proposal would, to be well founded.

[126]   In terms of some of the other factors under s. 11.2(4) of the CCAA, the Cargill DIP Facility amount lines up with the company's cash flow forecasts for the Stay Period and provides the funding for the company's anticipated business and financial affairs that are to be managed during the CCAA proceedings. The company needs the Cargill DIP Facility to commence its Solicitation Process which is intended to enhance the prospects of a viable compromise or arrangement being made in respect of the company. The Monitor recommends the approval of the Cargill DIP Facility. I am satisfied, having considered the relevant factors, that the  requirements under the CCAA for the court to approve the Cargill DIP Facility and DIP Charge have been satisfied.

### c)   Alleged Ulterior Objectives of Cargill

[127]   Courts are required to carefully and closely scrutinize financing proposals that may advance the interests of one particular stakeholder (see *Quest University*, at paras. 97–99) and "be constantly vigilant against such strategies" (see *Great Basin*, at paras. 179–81).

[128]   Both Cargill and the AHG have their own commercial interests that will inevitably influence their conduct in these CCAA Proceedings.

[129]   A proposed extension of DIP financing was not approved in *Essar Steel Algoma Inc. et al, Re*, 2017 ONSC 3331, 48 C.B.R. (6th) 264, because of concerns that the DIP lenders were "imposing terms to assist their position as Term Lenders" who were party to a restructuring agreement, and that "their interests are now too closely aligned with what has been proposed and that the provision of DIP lending is now being too negatively affected" (see paras. 19–24).  A DIP lender wearing various hats can give rise to concerns about the potential for mischief in the management and operation of the business for its own interest with less than due regard for the interests of the other secured creditors. See *Conexus Credit Union 2006 v. Voyager Retirement II Genpar Inc.*, 2021 SKQB 273, 94 C.B.R. (6th) 190.

[130]   Cargill does wear various hats in this case but none of its activities to date have given rise to any foundation for the suggestion that it will (or will have the ability under the Cargill DIP

Facility to) exert control over the business of the company or the Solicitation Process in a way that will give less regard to the interests of the other secured creditors.

[131]   The AHG accuses Cargill of manipulating the process to "stave off" the CCAA filing on September 12, 2023 (that would have sought approval of the AHG DIP) and appears to be suggesting that the negotiations for a consensual restructuring were a ruse to give Cargill time to put in a DIP proposal of its own to protect its Offtake Agreement. There is no evidentiary foundation for this theory.

[132]   It is further alleged by the AHG that the Cargill DIP Facility is being used for the improper purpose of protecting the Offtake Agreement.  It is suggested that this conclusion can be reasonably inferred, as the court did in *Quest University* (at paras. 99–100).

[133]   The real concern that is expressed in the AHG's factum is that the current terms of the Offtake Agreement are not commercially reasonable, are considered to be prejudicial to Tacora, and are considered by the AHG to be prohibitive to an effective restructuring. The AHG does not like this agreement and would like Tacora to be able to rid itself of it. As a prospective purchaser, the AHG would no doubt prefer to be rid of the Offtake Agreement. This position exposes that the AHG is also commercially motivated, to try to get rid of a contractual burden of the company to advance its interests as a prospective purchaser.

[134]   All participating stakeholders agree that the question of whether the Offtake Agreement is a commercially unreasonable contract and/or whether it can be disclaimed at all is not a question that is before the court to decide on this motion.  The validity or enforceability of the Offtake Agreement is not properly before the court on this motion.  If Cargill has arguments that the Offtake Agreement cannot be disclaimed those would be available to it irrespective of the DIP Facility terms.

[135]   In the meantime, the AHG is concerned that Cargill is bootstrapping its position by building in the Offtake EOD that prevents its disclaimer except as part of the Solicitation Process.  From the company's perspective, this may be realistically the most likely circumstance in the context of its restructuring in which it would want to disclaim the Offtake Agreement.  But even if not so, the Offtake EOD can be eliminated if the Cargill DIP Facility is repaid. The inclusion of the Offtake EOD does not lead to the conclusion that the Cargill DIP Facility is being used for an improper purpose just because it recognizes the commercial realities of the company's existing contractual arrangements with Cargill.

[136]   Various assertions are made by the AHG about the refusal by Cargill representatives to produce documents requested in r. 39.03 notices of examination. Even if the Cargill representatives who were examined are treated as "party" as opposed to non-party witnesses and subject to the usual rules of cross-examination (see *Magnotta Winery Corp. v. Ontario (Alcohol and Gaming Commission)*, 2016 ONSC 3174, at para. 11), the timing, scope and breadth of the document requests that accompanied their notices of examination were not proportionate. Further, many of the requests were for historic documents that relate to the Offtake Agreement, the very existence of which is what the AHG alleges is problematic.

[137]   Based on the refusal to produce the requested documents in response to the broad requests, the AHG is asking the court to draw adverse inferences that they would have disclosed Cargill's true motives behind the Cargill DIP Facility to be to gain some advantage for itself under the Offtake Agreement.  These witnesses were not obligated to produce all records responsive to the overly broad, discovery-like document requests set out in the notices of examination only delivered late in the evening on Monday, October 16, 2023 in advance of examinations scheduled for October 18 and 19, 2023. For such inferences to be drawn from a refusal to produce documents in these circumstances, there would first need to be some factual basis to which to tether the suggested inference, which there is not.

[138]   The fact that Cargill has other commercial interests and contractual rights vis-à-vis Tacora does not mean that it is acting improperly for its own interest with less than due regard for the interests of the other secured creditors when it introduces a term into its proposed DIP that recognizes those other contractual interests but also acknowledges circumstances in which they might be compromised.

[139]   While it is true that it is less "messy" to have a truly independent DIP lender in a CCAA restructuring, that is not always realistic or possible. It is often the parties who are already entrenched with the debtor who have the most incentive to see its restructuring efforts succeed.  It is a balance. The court does need to be vigilant to ensure that a creditor wearing more than one hat does not take advantage of its position, but for the court to make a finding that a DIP facility from that party is tainted there would need to be something more than the type of speculation and innuendo that has been suggested here.

[140]   The Offtake Agreement (among other agreements with Cargill) is the sole source of revenue for Tacora. Cargill has committed to purchasing 100% of the output of the Scully Mine under the Offtake Agreement. This is why Tacora has argued that it is unlikely that it would seek to disclaim, terminate, suspend, etc. that agreement, other than in the context of a transaction arising out of the Solicitation Process, which would be exempt from the restriction in the Cargill DIP Facility on such actions.

[141]   In my view, the contractual terms that have been incorporated into the Cargill DIP Facility strike the right balance to counter what is otherwise just a speculative theory of the AHG regarding improper motivations.

#### d) Should the Court Approve the AHG ARIO that Includes the AHG DIP Proposal

[142]   In light of all of the criticisms that it has raised to the Cargill DIP Facility, the AHG also asks the court to consider whether there is a more appropriate DIP financing option available to the company through the AHG DIP Proposal[3] that the court should approve (as requested by the

---

[3] For reasons indicated earlier, the company and its advisors have not had the opportunity to consider the New AHG DIP Proposal and it is not properly for the court for consideration at this time.

primary relief on the cross-motion), with an invitation to the company to agree to the AHG DIP Proposal if it wants the CCAA protection to continue.

[143]   However, this requested relief is dependent upon a finding that the AHG DIP Proposal is more favourable to Tacora and its stakeholders than the Cargill DIP Facility; whereas, for the reasons outlined earlier in this endorsement, the company and its advisors, and now the court, have found the opposite to be true:  the Cargill DIP Facility is more favourable to Tacora and its stakeholders than the AHG DIP Proposal. Thus, there is no basis for granting this alternative relief. Accordingly, this aspect of the cross-motion (for the approval of the AHG ARIO) is dismissed.

[144]   In the context of the discussion about the request for the court to approve the AHG ARIO, which includes the AHG DIP Proposal, the court raised the question of its jurisdiction to make the order sought on the cross-motion, which is for an amended and restated initial order that approves alternative DIP financing to be provided by the AHG that the company would have to agree to. Similarly, the Alternative Relief sought by the AHG in respect of the Tacora proposed ARIO includes directions that would require changes to be made to the Cargill DIP Facility to remove the Offtake EOD. This relief appears to be asking the court to become involved in the contractual negotiations between parties and to impose contractual terms upon them. No authority was identified that addresses this jurisdictional question.

[145]   The AHG suggested that the court has, in the past, and could in this case, simply indicate that approvals would be granted if these contractual arrangements are made and then leave it to the parties to decide whether those contractual terms will or will not be agreed to.  The court was referred to *Nortel Networks Corp. (Re)*, 2010 ONSC 1708, 63 C.B.R. (5th) 44 for this proposition. That may be a tool available to the court in appropriate cases, but since I have concluded that the Cargill DIP Financing should be approved it does not arise in this case.

*Should the Court Order any of the Alternative Relief Sought by the AHG on the Cross-Motion?*

[146]   That leaves the question of whether the court should order any of the Alternative Relief sought by the AHG. The various elements of that Alternative Relief are addressed in turn, with the conclusion that it is not necessary or appropriate to grant any of the Alternative Relief.

[147]   The request for a CRO is not warranted or justified. There is precedent for appointing a CRO in a CCAA proceeding. See, for example, *Payless ShoeSource Canada Inc and Payless ShoeSource Canada GP Inc (Re)*, 2019 ONSC 1215, 68 C.B.R. (6th) 269, at paras. 30–32. However, this is not typically done over the objection of the company. Further, in this case, this request is predicated on the assertion that the AHG was unfairly treated by management and the Board in the DIP Process, and that either Tacora's management or its Board is unreasonably impairing, or are likely to unreasonably impair, the possibility of a viable compromise or arrangement. These assertions have not been made out, for reasons outlined earlier in this endorsement.

[148]   The AHG's complaint about "how management and the Board have run the restructuring thus far" is unparticularized (aside from the complaints about the DIP Process addressed earlier in this endorsement that have not been substantiated) and premature given that the CCAA proceedings were commenced less than a month ago. There is no reason to appoint a CRO at this

time. Further, no CRO has been identified and no proposed mandate been formulated. At the hearing the AHG suggested that this request be deferred for further consideration after an appropriate person and mandate had been identified. If the court had been persuaded that there was a reason to consider appointing a CRO, that approach might have been appropriate, but since no justification for doing so has been identified, there is no reason to defer the request.

[149]   The KERP should not require the AHG's approval. The AHG does not dispute that a KERP is necessary. The only concern noted by the AHG with respect to the proposed KERP is that "a significant portion of the KERP to be proposed by Tacora will go to executive management resident in Grand Rapids, Minnesota, rather than the non-executive and operation employees (primarily located in Wabush, Newfoundland) whose contributions will be crucial to keeping Tacora operating during the CCAA process." Tacora counters this concern by pointing out that approximately 80% of the Key Employees (27 of 34) covered by the KERP work directly at the Scully Mine in Wabush, Newfoundland, and senior management frequently travels to be on site at the Scully Mine.

[150]   No specific counter-proposal for the KERP, or this aspect of it, has been advanced by the AHG. The company and its advisors are best situated to determine who the key employees are that it is at risk of losing during the CCAA process and the appropriate parameters for calculating the KERP payments that they will receive.

[151]   The ancillary Post-Filing Credit Extension should not require the AHG's approval or Court approval. The current terms require the Monitor's approval for credit extensions that are built into the Cargill DIP Facility. If the Monitor has concerns then the court would expect those to be brought before the court and for consideration under the court's inherent and supervisory jurisdiction over the CCAA proceedings. But if the Monitor does not have concerns, requiring the company to come back to court for specific extensions would be an added and unnecessary expense.

[152]   The Greenhill Priority Transaction Fee Charge should not be subordinated. Greenhill's fees, if earned, are entitled to a super priority. That is typically the basis on which financial advisors are incentivized to continue to work for companies involved in restructuring. Greenhill is already agreeing to defer much of its fees to coincide with the completion of a successful transaction, and to risk not receiving the deferred fees if there is no successful transaction. In the interim, while its success fee is deferred, it has agreed to be paid only a much smaller guaranteed monthly amount. It should not be put at further risk of not receiving its earned fees if there is a successful transaction by having its charge subordinated to the Senior Secured Priority Notes and ranked *pari passu* with the remaining Senior Secured Notes.

[153]   The reasons for not granting the Alternative Relief are further elaborated upon as the corollary to the reasons for granting the corresponding provisions in the company's proposed ARIO, discussed in the next section of this endorsement.

*Should the Court Approve the ARIO?*

[154]   I will now turn to address certain aspects of the ARIO that warrant specific consideration.

[155]   The main feature for which approval is required is the Cargill DIP Facility and DIP Charge. All creditors likely to be affected by the Cargill DIP Facility and DIP Charge were served with notice of the come-back hearing and only the AHG opposes this approval. That opposition is addressed in the preceding section of this endorsement.

[156]   The requested approval and authorization sought for the company to draw up to the maximum amount of the Cargill DIP Facility of $75 million and to increase the DIP Charge accordingly, is supported by the company's Cash Flow Forecast demonstrating the need for the full amount to pay obligations as they come due, continue operations, and undertake the Solicitation Process during the proposed extended Stay Period. The Monitor supports the approval of the Cargill DIP Facility and authorization to draw up to the maximum available principal amount. The requested increase to the maximum principal amount of the DIP Facility is fair and reasonable and, for reasons previously indicated, satisfies the criteria under ss. 11.2(1) and 11.2(4) of the CCAA.

[157]   As previously indicated, the court has independently determined that the Cargill DIP Facility and DIP Charge should be approved with regard to the relevant factors under s. 11.2(4) of the CCAA.  The support and recommendations of the Monitor and Greenhill are relevant factors to take into account, as is the Board's approval of the Cargill DIP Facility and DIP Charge.  The court "may consider, but not defer to, and is not fettered by, the recommendation of the Board." See *Crystallex* (Ont. C.A.), at para. 85.

[158]   The other provisions of the ARIO for which the Court's approval are sought are reasonable and appropriate in the circumstances, because:

   a.   The extension of the Stay Period from October 27, 2023 to February 9, 2024 is necessary and appropriate to allow the company's good faith pursuit of the Solicitation Process by which it hopes to identify a value maximization transaction for the benefit of Tacora stakeholders. The Solicitation Process contemplates a motion for court approval of a successful bid during the week of February 5, 2024 (subject to availability). The extension of the Stay Period to February 9, 2024 is supported by the Monitor and Cash Flow Forecasts that are, in turn, based on the Cargill DIP Facility.

   b.   Section 11 of the CCAA provides the court with authority to allow debtor companies to enter into arrangements to facilitate a restructuring, which may include the retention of expert advisors like Greenhill where necessary to help with the restructuring efforts. See *Victorian Order of Nurses for Canada (Re)*, 2015 ONSC 7371, 32 C.B.R. (6th) 236, at para. 27. Courts have approved the appointment of advisors in restructuring proceedings, and corresponding charges to secure such advisors' professional fees, where such advisors' knowledge and experience is critical to assisting the debtor with a successful restructuring or is necessary to assist the debtor with a liquidation sale. See *Target Canada Co (Re)*, 2015 ONSC 303, at para. 72. Greenhill's prior experience with the company, including Greenhill's involvement running the Strategic Process starting in March of this year, along with its extensive experience in matters of this nature, makes it well-suited to this mandate. The Monitor recommends that the court approve the

Greenhill Engagement Letter create of the Transaction Fee Charge, as it is of the view that the continued engagement of Greenhill to assist in the implementation of the Solicitation Process will be beneficial to the estate and its stakeholders generally and to the efficient completion of the CCAA Proceeding. The Monitor has considered the fees provided for in the Greenhill Engagement Letter and is satisfied that they are within market parameters. The court accepts the Monitor's recommendations in this regard and the approval of the Greenhill Engagement Letter is not challenged. The Monitor supports the granting of the Transaction Fee Charge, which the court has also found to be reasonable and appropriate in the previous section of this endorsement.

c.  The initial amount of the Directors' Charge was found when the court granted the Initial Order to be appropriately "limited to projected potential uninsured obligations and to what [was] fair and reasonable for the initial 10 day period having regard to the requirements of s. 11.51 of the CCAA and the need for continuity and to keep the directors in place". In connection with the request for the grant of the ARIO, Tacora seeks to increase the quantum of the Directors' Charge to $5,200,000. The proposed increase has been determined in consultation with the Monitor to reflect the increased potential scope of liability during these CCAA Proceedings. This increase is justified on the same basis as the Directors' Charge was considered to be appropriate when the Court granted the Initial Order. The Monitor supports Tacora's request to increase the quantum of the Directors' Charge, which it believes is reasonable and justified in relation to the quantum of the Directors' estimated potential liability.

d.  The KERP was designed to incentivize Key Employees to continue their employment with Tacora in order to continue the business as a going concern and maximize value for all stakeholders through the proposed Solicitation Process. The KERP complies with the factors to be considered in the approval of such plans (*Just Energy Group Inc et al*, 2021 ONSC 7630, 95 C.B.R. (6th) 264), in that:

    i.   It was developed by Tacora with significant input from the Monitor, and is comparable to other recent KERPs that have been approved in Canada. The Monitor supports approval of the KERP.

    ii.  If the proposed KERP is not approved, the company's CEO believes that it is likely that the Key Employees would consider and pursue other employment opportunities.

    iii. The Key Employees have distinct and critical roles at Tacora and will allow the Company to continue operating in the ordinary course while also advancing the Solicitation Process. The company is concerned that finding qualified individuals to replace the Key Employees would be challenging, disruptive, costly, and time consuming.

    iv.  The company believes that the KERP will facilitate and encourage the continued participation of Key Employees during these CCAA

Proceedings. The KERP provides for the payment of up to $3,035,000 to 34 Key Employees (identified out of a work force of approximately 450 employees), including seven corporate personnel (the executive team and the corporate finance team) and 27 Scully Mine personnel.

v. Individual bonuses for Key Employees range from 16% to 53% of their maximum potential annual compensation (with individual bonuses for Key Mine Employees ranging from 36% to 66% of their base salaries, and individual bonuses for Key Corporate Employees ranging between 49% and 107% of their base salaries), which will be forfeited if they resign or are terminated for just cause prior to the completion of a transaction pursuant to the Solicitation Process or the completion of the CCAA Proceedings.

vi. The Board of Directors unanimously approved the KERP. As a proposed beneficiary of the KERP, Mr. Broking did not participate in the vote approving the KERP.

[159]   The details of the KERP are set forth in Confidential Exhibit "C" to the Second Broking Affidavit. It contains sensitive personal and compensation information, which Tacora's CEO believes may cause harm to the Key Employees and could result in a distraction for employees if such information became public and generally accessible. Tacora requests a sealing order in relation to the confidential exhibit in order to protect the personal compensation information contained therein and avoid this distraction. To grant this relief, the court must be satisfied of the test in *Sierra Club of Canada v. Canada (Minister of Finance)*, 2002 SCC 41, [2002] 2 S.C.R. 522, at para. 53, as modified by *Sherman Estate v. Donovan*, 2021 SCC 25, 72 C.R. (7th) 223, at paras. 38 and 43, having regard to:

a. The important public interest in the openness of courts and whether it poses a serious risk to some other important public interest;

b. Whether the order sought is necessary to prevent the risk to the other identified public interest because alternative measures are not available; and

c. As a matter of proportionality, the benefits of the sealing order outweigh its negative effects.

[160]   Confidential Exhibit "C" contains individual compensation information and the amount of the proposed KERP payments for each eligible employee. Employees have a reasonable expectation that their names and salary information will be kept confidential. Conversely, disclosing this information could create a distraction for key employees who need to be focused right now on the company's restructuring efforts. Protecting the sensitive personal compensation information of the employees is an important public interest that should be protected. The sealing order is necessary in order to protect the privacy rights of Tacora's employees while permitting the court to consider the details of the KERP. As a matter of proportionality, the benefits of sealing Confidential Exhibit "C" outweigh its negative effects.

[161]   Courts have applied the *Sierra Club* and *Sherman Estate* tests in the insolvency context and authorized sealing orders over confidential or commercially sensitive documents. See, for

example, *Ontario Securities Commission v. Bridging Finance Inc.*, 2021 ONSC 4347, 90 C.B.R. (6th) 102, at paras. 23–28; see also *Just Energy Corp, Re*, 2021 ONSC 1793 at paras. 123–24. Courts have previously granted sealing orders in respect of individual compensation arrangements relating to key employee retention plans. See *Bridging Finance*, at paras. 23–28; *Golf Town Canada Holdings Inc (Re)*, Initial Order issued September 14, 2016 [Court File No. CV-16-11527-00CL] at para. 64; *Acerus Pharmaceuticals Corporation et al (Re)*, Amended and Restated Initial Order issued February 3, 2023 [Court File No. CV-23-00693595-DDCL].

[162]   Certain documents were agreed as between the parties to be designated as confidential for purposes of the examinations. Some of the documents were referred to during the examinations and a very few of them were referred to in the factums filed on these motions. This is real time litigation and the 3 C's of the Commercial List encourage parties to find practical solutions to allow cases to move forward expeditiously, as was done here through the agreement to a confidentiality protocol. The court was advised that, with the possible exception of one profit figure, none of the information from the confidential exhibits is relevant to the issues before the court. The confidentiality designations are primarily in respect of personal information.

[163]   Thus, the practical solution that was adopted by the parties, of redacting the references to these exhibits in the materials filed with the court, was appropriate. Leave is granted for those filed materials to remain in redacted form. I do not believe that I have made reference in this endorsement to any of the redacted confidential information, but I invite counsel to alert the court immediately if there are any concerns in that regard.

*Should the Court Approve the Solicitation Order?*

[164]   The remedial nature of the CCAA confers broad powers to facilitate restructurings, including the power to approve a solicitation process prior to or in the absence of a plan of compromise and arrangement. See *Nortel Networks Corporation (Re)*, 55 CBR (5th) 229, at paras. 47–48.

[165]   Section 36 of the CCAA sets out certain factors to be considered by the Court in approving a sale. Section 36 does not directly address the factors a court should consider when determining whether to approve a solicitation process; however, such criteria can be evaluated in light of the considerations that will ultimately apply when seeking approval of a sale transaction, including whether the process is reasonable in the circumstances, whether the Monitor approved the process, and the extent to which the creditors were consulted. See *Brainhunter Inc (Re)*, 2009 CanLII 72333 at paras. 16–17.

[166]   In *Walter Energy Canada Holdings, Inc.*, 2016 BCSC 107, 33 C.B.R. (6th) 60, at paras. 20–21, the court considered the following additional factors in approving a CCAA SISP:

    a.  the fairness, transparency and integrity of the proposed process;

    b.  the commercial efficacy of the proposed process in light of the specific circumstances; and

    c.  whether the sales process will, in the circumstances, optimize the chances of securing the best possible price for the assets for sale.

[167]   The *Walter Energy* factors have been cited with approval in subsequent decisions, including the recent CCAA proceedings of *Nordstrom Canada Retail, Inc.*, 2023 ONSC 1631 at para. 9 and *Bron Media Corp (Re)*, 2023 BCSC 1563 at para. 41.

[168]   The Solicitation Process was developed by Greenhill in consultation with the Monitor, and provided to the company's secured creditors for feedback. The Solicitation Process will be run by Greenhill with assistance from the company's counsel and with the oversight of the Monitor.

[169]   The Monitor has recommended that this court approve the Solicitation Process, as it believes the Solicitation Process: (a) provides for a broad, open, fair and transparent process; (b) provides for an appropriate level of independent oversight; (c) should encourage and facilitate bidding by interested parties; (d) is reasonable in the circumstances; and (e) should not discourage parties from submitting offers.

[170]   In these circumstances, it is appropriate for the court to approve the Solicitation Process and grant the Solicitation Order, with the change requested by the AHG that the court not only authorizes but also direct the company and its advisors to immediately commence the Solicitation Process.

**Final Disposition**

[171]   For the foregoing reasons, the ARIO and Solicitation Order shall issue in the forms signed by me today.

Kimmel J.

**Date:** October 30, 2023