# EXHIBIT F

**Court File No.  CV-23-00707394-00CL**

# Tacora Resources Inc.

**FOURTH REPORT OF FTI CONSULTING CANADA INC.,
IN ITS CAPACITY AS COURT-APPOINTED MONITOR**

**March 14, 2024**

# TABLE OF CONTENTS

**INTRODUCTION** ...................................................................................................................3

**PURPOSE** ...............................................................................................................................**5**

**TERMS OF REFERENCE** ....................................................................................................**6**

**THE SOLICITATION PROCESS** ........................................................................................**6**

**THE INVESTOR TRANSACTION** ....................................................................................**11**

      THE SUBSCRIPTION AGREEMENT ...........................................................12

**APPROVAL AND REVERSE VESTING ORDER** ..........................................................**15**

      OVERVIEW ....................................................................................................15

      RELEASES ......................................................................................................17

      SUMMARY .....................................................................................................18

**COMMENTS REGARDING CARGILL PRELIMINARY THRESHOLD MOTION AND
CARGILL RESPONDING MOTION**.................................................................................**20**

**SEALING**.................................................................................................................................**21**

**CONCLUSION**.......................................................................................................................**22**

**APPENDICES**

Appendix "A" - Solicitation Order dated October 30, 2023

Appendix "B" - Endorsement of Justice Kimmel dated February 9, 2024

Appendix "C" - Endorsement of Justice Kimmel dated October 30, 2023

Court File No. CV-23-00707394-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**TACORA RESOURCES INC.**

**(Applicant)**

**FOURTH REPORT TO THE COURT**
**SUBMITTED BY FTI CONSULTING CANADA INC.,**
**IN ITS CAPACITY AS MONITOR**

**INTRODUCTION**

1.      Pursuant to an Order (the "**Initial Order**") of the Ontario Superior Court of Justice (Commercial List) (the "**Court**") dated October 10, 2023, Tacora Resources Inc. ("**Tacora**" or the "**Applicant**") was granted protection under the *Companies' Creditors Arrangement Act,* R.S.C., c. C-36, as amended (the "**CCAA**" and in reference to the proceeding, the "**CCAA Proceeding**") and FTI Consulting Canada Inc. was appointed monitor of the Applicant (in such capacity (the "**Monitor**").

2.      Pursuant to an Order granted on October 30, 2023 (the "**Solicitation Order**"), the Court approved a sale, investment and services solicitation process (the "**Solicitation Process**") to solicit interest in a potential Transaction Opportunity and/or Offtake Opportunity. A copy of the Solicitation Order is attached as **Appendix "A"**.

3.      On February 2, 2024, the Applicant served and filed a motion (the "**Sale Approval Motion**") seeking *inter alia* approval of a subscription agreement dated January 29, 2024 (as amended as described below, the "**Subscription Agreement**") entered into between Tacora as issuer and a consortium consisting of the Ad Hoc Group[1], Resource Capital Fund VII L.P. and Javelin Global Commodities (SG) Pte Ltd. ("**Javelin**") (collectively, the "**Investors**") and the transaction contemplated therein (the "**Investor Transaction**") as the Successful Bid (as defined in the Solicitation Process).

---

[1] The "**Ad Hoc Group**" consists of Brigade Capital Management, L.P., Millstreet Capital Management LLC, MSD Partners, L.P., O'Brien-Staley Partners and Snowcat Capital Management.

- 4 -

4.  On February 5, 2024, Cargill, Incorporated and Cargill International Trading Pte Ltd. (collectively, "**Cargill**") filed a motion (the "**Preliminary Threshold Motion**") seeking an order *inter alia* prohibiting Tacora from obtaining relief set out in the Sale Approval Motion as it relates to the Cargill Offtake Agreement (as defined therein) absent a valid disclaimer of the Cargill Offtake Agreement.

5.  Cargill, the Investors and the Applicant were unable to consensually agree on a litigation schedule to address the Sale Approval Motion and Preliminary Threshold Motion and case conferences were held on February 6, 2024 and February 9, 2024 before Justice Kimmel.

6.  The Subscription Agreement was amended to extend the date for Court approval of such from April 1, 2024 to April 19, 2024 (the "**Court Approval Milestone**") and on February 9, 2024, the Court issued an endorsement (i) scheduling the hearing of the Sale Approval Motion including the matters raised in the Preliminary Threshold Motion on April 10, 11 and 12, 2024 for 2.5 days; (ii) noting the extended Court Approval Milestone; and (iii) setting a timetable for pre-hearing steps (the "**Litigation Schedule**"). A copy of the endorsement dated February 9, 2024, including the Litigation Schedule, is attached as **Appendix "B"**.

7.  On March 1, 2024, Cargill filed its Responding Motion Record and Motion Record for the Responding Cross-Motion dated March 1, 2024 (the "**Cargill Responding Motion**") seeking *inter alia*: (a) a meeting order, among other things, (i) authorizing Cargill to file with the Court a plan of compromise and arrangement (the "**Cargill Plan**") in respect of the Applicant; (ii) a meeting of the Affected Unsecured Creditors (as defined in the Cargill Responding Motion) to consider and vote upon the Cargill Plan filed; (b) a claims procedure; (c) in the alternative, a meeting order authorizing and directing the Applicant to file a plan and call a meeting of creditors; and (d) in the further alternative authorizing each of Cargill and the Ad Hoc Group to submit to the Applicant additional transaction proposals.

8.  As described below and in the Monitor's Third Report to Court filed March 13, 2024 (the "**Third Report**"), the Subscription Agreement is contemplated to be further amended in connection with a replacement DIP financing agreement entered into between the Applicant and the Investors or certain of their affiliates, on March 10, 2024 (the "**Replacement DIP Agreement**"). A hearing is scheduled for March 18, 2024 to seek an order *inter alia*, approving the Replacement DIP Agreement and thereby replacing the existing DIP agreement (the "**Cargill DIP Agreement**") with Cargill Inc. as lender and extending the stay of proceedings to May 19, 2024.

9.      In accordance with the Litigation Schedule, notices of examination have been issued and production of documents continues. Examinations are scheduled for the week of March 18, 2024. This Fourth Report to Court of the Monitor (the "**Fourth Report**") is filed by the Monitor pursuant to the Litigation Schedule. The Litigation Schedule also provides that the Monitor may file a supplement to the Fourth Report on or before March 26, 2024, following cross-examination of witnesses scheduled for the week of March 18, 2024.

10.     The background of the CCAA Proceeding is set out in the Pre-Filing Report to Court of the Monitor dated October 9, 2023, the First Report to Court of the Monitor dated October 20, 2023, the Second Report to Court of the Monitor dated January 18, 2024 and the Third Report (collectively, the "**Prior Reports**"). Copies of the Prior Reports, as well as other materials publicly filed and orders issued in the CCAA Proceeding, are available on the Monitor's website at http://cfcanada.fticonsulting.com/tacora/ (the "**Monitor's Website**").

11.     All references to monetary amounts herein are in United States dollars unless otherwise noted. Any capitalized terms not defined herein have the meanings given to them in the Affidavit of Joe Broking sworn February 2, 2024 (the "**February Broking Affidavit**"), the Affidavit of Michael Nessim sworn February 2, 2024 (the "**February Nessim Affidavit**").

**PURPOSE**

12.     The purpose of this, the Fourth Report of the Monitor (the "**Report**"), is to provide information to the Court in respect of the following:

(a)     the relief sought by the Applicant in the Sale Approval Motion, for, among other things, an order (the "**Approval and Reverse Vesting Order**"):

(i)      approving the Subscription Agreement and the Investor Transaction as well as authorizing and directing Tacora to take such additional steps and execute such additional documents as are necessary or desirable for the completion of the Investor Transaction;

(ii)     granting releases (the "**Releases**") in favour of the Released Parties (as defined below) in respect of the Released Claims (as defined below);

(iii)    sealing among other things the confidential exhibits related to the Bids received in the Solicitation Process, attached as Confidential Exhibit "C" to the February Nessim Affidavit; and

- 6 -

(b)    the relief sought by Cargill in the Preliminary Threshold Motion and the Cargill Responding Motion; and

(c)    the recommendation of the Monitor in respect of the above.

## TERMS OF REFERENCE

13.    In preparing this Report, the Monitor has relied upon unaudited financial information of the Applicant, the Applicant's books and records, certain financial information prepared by the Applicant and discussions with various parties (the "**Information**").

14.    Except as otherwise described in this Report:

(a)    the Monitor has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the Information in a manner that would comply with Generally Accepted Auditing Standards pursuant to the Chartered Professional Accountants of Canada Handbook; and

(b)    the Monitor has not examined or reviewed the financial forecasts or projections referred to in this Report in a manner that would comply with the procedures described in the *Chartered Professional Accountants of Canada Handbook*.

15.    The Monitor has prepared this Report to provide information to the Court in connection with the relief requested by the Applicant and Cargill as noted above. This Report should not be relied on for any other purpose.

16.    Future oriented financial information reported or relied on in preparing this Report is based on the assumptions of the management of the Applicant regarding future events; actual results may vary from forecast to forecast and such variations may be material.

## THE SOLICITATION PROCESS[2]

17.    The Monitor has reviewed the February Broking Affidavit and the February Nessim Affidavit and agrees with the description of the Pre-Filing Strategic Process and the conduct of the Solicitation Process set out therein.

### a)  **Establishment of the SISP**

---

[2] Capitalized terms used in this section not otherwise defined have the meaning ascribed to them in the Solicitation Process.

18.   As described in its Second Report, the Monitor was involved in the development of the Solicitation Process and views the Solicitation Process as a fair and transparent process to obtain proposals for the sale of the Property or the Business or an investment in, restructuring, recapitalization, refinancing or other form of reorganization of the Applicant or its Business as a going concern, or a combination thereof.

19.   The Solicitation Process was developed by Tacora in consultation with its counsel, Stikeman Elliott LLP ("**Stikeman**"), Greenhill and the Monitor. The Solicitation Process is consistent with sales investment and solicitation processes conducted in similar restructuring proceedings and was designed in a manner such that interested parties were provided with sufficient certainty and transparency regarding the Opportunity (as defined in the Solicitation Process) while simultaneously allowing the Applicant to identify a value maximizing transaction for its stakeholders and continue to operate in the interim.

20.   The Cargill DIP Agreement contemplated that the Applicant pursue a solicitation process of a certain nature with specific milestones. Specifically, the Cargill DIP Agreement required a solicitation process in respect of (a) a potential Restructuring Transaction (as defined therein); and (b) an offtake, service or other agreement in respect of the business. The Solicitation Process was consistent with the contemplated solicitation process set out in the Cargill DIP Agreement.

21.   The Service List in this CCAA Proceeding received general notice of the Applicant's request for approval of the Solicitation Order and the Applicant provided a draft of the proposed Solicitation Process to both the Ad Hoc Group and Cargill *in advance* of filing its Application Record for the Initial Order on October 9, 2023. The Solicitation Order was granted on October 30, 2023 and comments from both the Ad Hoc Group and Cargill were considered. Neither the Ad Hoc Group nor Cargill indicated to the Monitor at the time it was approved that the Solicitation Process did not provide sufficient time to canvass potential purchasers and investors.

22.   As set out in the Endorsement of Justice Kimmel approving the Solicitation Order dated October 30, 2024 (the "**October 30 Endorsement**"), the Ad Hoc Group was the only party to oppose any aspect of the Solicitation Order. In para 8 of the October 30 Endorsement the Court notes that the Ad Hoc Group "*...only opposes one aspect of the Solicitation Order, which is that it should not only provide for the court's authorization to immediately commence the Solicitation Process but it should also include a direction that the Solicitation Process be commenced immediately*". In para 170 of the October 30 Endorsement, Justice Kimmel agreed with the Ad Hoc Group in this regard

and found that in the circumstances it was appropriate *"... that the court not only authorizes but also direct the company and its advisors to immediately commence the Solicitation Process*."

23.    A copy of the October 30 Endorsement is attached as **Appendix "C"**.

**b)    Conduct of the SISP**

24.    The Monitor has reviewed the materials filed to date in connection with the Applicant's Sale Approval Motion, the Preliminary Threshold Motion and the Cargill Responding Motion.[3]

25.    The Monitor has been involved in supervising and monitoring all stages of the Solicitation Process, including:

(a)    reviewing Greenhill and Tacora's Solicitation Process outreach strategy and plan for implementation of the Solicitation Process generally;

(b)    reviewing the list of over 130 Potential Bidders, the Teaser, the NDA and other communication materials, each prepared by Greenhill in consultation with Tacora, Stikeman and the Monitor;

(c)    reviewing the contents of, and monitoring the activity in, the data room containing diligence information relating to the Solicitation Process prepared by Greenhill in consultation with Tacora and Stikeman;

(d)    posting a notice of the Solicitation Process on the Monitor's Website on November 4, 2023;

(e)    coordinating with Greenhill on diligence requests and requests regarding engagement with financing parties;

(f)    attending meetings, calls and site visits with, and being a party to email correspondence between, Tacora's management, Greenhill, Potential Bidders and interested parties;

(g)    attending discussions with both the Investors and Cargill and their legal and financial advisors;

(h)    attending calls and meetings with the Board, Greenhill, Stikeman and Tacora's management to assess the bids received; and

(i)    receiving and holding cash deposits received in trust in connection with the Phase 2 Bids.

---

[3] The Monitor is in the process of reviewing documents exchanged pursuant to the Litigation Schedule.

26.     As both Cargill and the Ad Hoc Group participated as bidders in the Solicitation Process neither of those parties were provided with consultation rights as contemplated by paragraph 7 of the Solicitation Process. Throughout the process, the Monitor participated in regular discussions with the Applicant, Greenhill and each of the Investors and Cargill. The Monitor also participated in calls with counsel to each of the Investors and Cargill throughout the process.

27.     The Monitor is of the view that the implementation of the Solicitation Process by the Applicant was conducted in accordance with the Solicitation Order.

28.     As described above, pursuant to the Litigation Schedule, the parties are still in the process of sharing productions and conducting cross examinations and, if the Monitor becomes aware of any information which changes its view in this regard, it will address such matters in a supplemental report as appropriate.

**c) Selection of Successful Bid**

29.     As noted in the February Broking Affidavit and the February Nessim Affidavit, Tacora received seven (7) non-binding term sheets on the Phase 1 Bid Deadline pursuant to the Solicitation Process. Five (5) of these bids were deemed "Phase 1 Qualified Bids" and, following a discussion with the Board and providing feedback to Phase 1 Bidders, three of the Phase 1 Bidders were permitted to proceed to Phase 2 of the Solicitation Process, with the remaining parties being introduced to Cargill (whose bid contemplated raising third-party financing) to form a consortium bid.

30.     Three (3) bids were received on the Phase 2 Bid Deadline, from each of the Investors (the "**Investor Bid**"), Cargill and a third-party ("**Bidder #3**").

31.     It was determined that the bids submitted by Cargill and Bidder #3 were not Phase 2 Qualified Bids due to the uncertainty created by conditions contained within each respective bid. The Monitor was advised that Tacora's advisors contacted each of Bidder #3 and Cargill, advising them of the deficiencies and concerns with their respective bids.

32.     In particular, the Monitor notes that the Phase 2 Bid submitted by Cargill was contingent on raising significant new equity financing and contained a number of problematic features as described in the February Broking Affidavit and February Nessim Affidavit.

33.     Neither Cargill nor Bidder #3 submitted revised bids, and after careful consideration , it was determined that it was not in Tacora's interest to waive any requirements of the Solicitation Process to qualify the Phase 2 Bid of Cargill or Bidder #3.

34.    The Investor Bid contemplates a going concern transaction, meets all of the criteria to constitute a Phase 2 Qualified Bid and contains a number of attractive features as described in greater detail below. Additionally, the Investor Bid was the only viable and actionable going concern transaction available to Tacora. On January 29, 2023, the Board declared the Investor Bid the Successful Bid under the SISP. The Board did not declare a back-up Bid.

### d) Summary of the Solicitation Process

35.    The Solicitation Process occurred as part of a well-publicized CCAA Proceeding known by industry participants. Extensive solicitation efforts also predated these proceedings by way of the Pre-Filing Strategic Process, as described in the February Nessim Affidavit.

36.    In the Monitor's view, the Solicitation Process was thorough, transparent, far-reaching, and provided sufficient time and opportunity for interested third parties to be involved and carry out the necessary due diligence required to form a view on the opportunity and submit a bid. The Solicitation Process was sufficiently advertised.

37.    Material filed by Cargill has suggested that following the Phase 2 Bid Deadline, Tacora, Greenhill and the Monitor should have used the discretion provided to them under the Solicitation Process to waive the deadlines provided for thereunder and to encourage discussions between the Ad Hoc Group and Cargill to explore an alternative transaction.  In the Monitor's view, prior to the selection of a Successful Bid by the Applicant, encouraging communication between two bidders in that context would be antithetical to a properly run sale and investment solicitation process in a CCAA proceeding. As a general matter, collusion between two bidders is to be discouraged. Sale and investment solicitation processes are designed to prohibit collusion in order to maximize value for stakeholders through a fair and transparent process. The Monitor is also aware that the Ad Hoc Group and Cargill participated in extensive discussions prior to the CCAA Proceedings and were encouraged by Tacora to agree upon a consensual transaction. Failure to reach an agreement between the parties, as well as liquidity concerns, were the primary reasons Tacora commenced this CCAA Proceedings.

38.    Following selection of the Subscription Agreement as the Successful Bid, upon the request of counsel to Cargill, the Monitor understands that counsel to the Investors was asked if they would be open to a discussion with counsel to Cargill regarding a consensual transaction.  The Monitor understands that counsel to the Investors declined to participate in such discussions. The Monitor and Tacora have advised counsel to Cargill that they are free to request a discussion with counsel to the Investors, provided that the Monitor and its counsel are part of discussions related to the

Solicitation Process, so as to maintain the integrity of the Solicitation Process. To date Cargill's counsel has declined to meet or hold discussions with counsel to the Investors with the Monitor in attendance.

39.     The Monitor notes that the Applicant is vulnerable to fluctuations in the global price of iron ore, and that negative movements in such prices can and have materially impacted cashflow. The Monitor also notes that the Applicant is in need of substantial capital investment to enable it to achieve consistent, profitable operations. It is therefore imperative that the Applicant completes and emerges from this CCAA Proceeding at the earliest opportunity.

**THE INVESTOR TRANSACTION[4]**

40.     The effect of the Investor Transaction, if approved by the Court, is to allow the Investors to acquire Tacora's business and assets on a "free and clear basis". The Investor Transaction contemplated by the Subscription Agreement has been structured as a "reverse vesting" transaction whereby:

(a)     the Investors will subscribe for and purchase various securities of Tacora, who will, in turn, cancel and terminate all of its existing equity securities. As a result, the Investors and other holders of Senior Secured Notes that receive Takeback Shares will become the sole shareholders of Tacora; and

(b)     all Excluded Assets, Excluded Contracts, Excluded Liabilities, and Claims under any Excluded Senior Secured Notes will be transferred and "vested out" to corporations to be incorporated by Tacora in advance of the Closing Date ("**ResidualCo**" in relation to the Excluded Assets, Excluded Contracts, and Excluded Liabilities, and "**ResidualNoteCo**" in relation to the Excluded Senior Secured Notes), following which ResidualCo and ResidualNoteCo will become Applicants in this CCAA Proceeding. As set out in the Subscription Agreement:

(1)     such "Excluded Liabilities" include, among other things, pre-filing claims, any claim in respect of Taxes, amounts asserted against the Applicant in respect of ongoing litigation matters under Retained Contracts (the "**Disputed Litigation Costs**"), the APF, the Cargill Stockpile Agreement and the Cargill Offtake Agreement; and

---

[4] Capitalized terms used in this section not otherwise defined have the meaning ascribed to them in the Subscription Agreement.

> (2)   such "Excluded Assets" are expected to include (i) all rights, covenants, obligations and benefits in favour of ResidualCo and ResidualNoteCo under this Agreement that survive Closing; (ii) those Excluded Assets listed in the Disclosure Letter; and (iii) the Excluded Ore.[5]

### *The Subscription Agreement*

41.    As described above, the Subscription Agreement was previously amended to extend the Court Approval Milestone from April 1 to April 19, 2024.

42.    The Monitor has been advised that further amendments to the Subscription Agreement, which would be necessary to address the Replacement DIP Facility, and certain additional matters are currently being discussed between the Applicant and the Investors.

43.    The key commercial terms of the Subscription Agreement can be summarized as follows:

(a)   **Purchaser**: The "purchaser" under the Subscription Agreement or the "Investors" are comprised of the Ad Hoc Group, RCF and Javelin.

(b)   **Purchased Assets**: The New Securities (including Subscribed Shares, Backstopped Shares, Takeback Shares, Takeback SSN Warrants, Takeback SSNs, RCF Warrants, Excluded Takeback Shares, Excluded Takeback SSN Warrants and Excluded Takeback SSNs). The New Securities include all the issued outstanding equity interests in the Applicant on closing.

(c)   **Subscription Price**: The subscription price for the New Securities under the Subscription Agreement is comprised of (i) Cash Consideration in the amount of $268,650,000 ($225 million of equity through the New Equity Offering Cash Consideration, plus $45 million principal amount of debt through the $43,650,000 of New First Out SSN Offering Cash Consideration); (ii) an amount equivalent to all amounts and obligations owing by the Applicant to the Senior Secured Noteholders under the Senior Secured Notes and Senior Secured Notes Indenture (including principal, interest and reasonable and documented fees incurred by the Exchanging Senior Secured Noteholders, plus any other fees owing by the Applicant, which are not paid under the Closing Sequence (as defined below)); and (iii) an amount equivalent to the Assumed Liabilities which are retained on Closing.

---

[5] The "Excluded Ore" refers to certain iron ore which, as of the Closing Date, is owned by Cargill pursuant to the Cargill Offtake Agreement and for which Cargill has paid the Applicant the Stockpile Provisional Price (as defined in the Cargill Stockpile Agreement).

- 13 -

(d)     **Deposit**: Deposits totaling $26,865,000 were paid to the Monitor in trust on or about January 19, 2024 pursuant to the Solicitation Process.

(e)     **Employees**: All employees will continue to be employed by the Applicant on the same terms and conditions as they currently enjoy (except in respect of change of control payments for senior management, which amounts shall be waived or are Excluded Liabilities). The Applicant shall remain subject to any collective agreement and the Investors shall inherit all obligations and liabilities associated with any collective agreement which applies to the Continuing Employees.

(f)     **Assumed Liabilities**: Under the Subscription Agreement the Investors will cause the Applicant to retain (in accordance with the Closing Sequences): (i) All liabilities in respect of Continuing Employees; (ii) liabilities which relate to the Business under any Retained Contracts, Permits and Licenses (as defined below) or Permitted Encumbrances (in each case, to the extent forming part of the Retained Assets) arising out of events or circumstances that occur after the Closing and including Liabilities in respect of the Continuing Employees except change of control payments for senior management; (iii) Cure Costs in relation to Retained Contracts (up to a maximum aggregate amount of $27,900,000); (iv) Pre-Filing Trade Amounts and Post-Filing Trade Amounts; and (v) the Excluded Ore MTM Liabilities.

(g)     **Administrative Expense Reserve**: A $9 million administrative expense reserve will be paid to the Monitor on closing (the "**Administrative Expense Reserve**") for payment of (i) the reasonable and documented fees and costs of the Monitor and its professional advisors and the professional advisors of the Applicant, ResidualCo and ResidualNoteCo for services performed prior to and after the Closing Date, relating directly or indirectly to the CCAA Proceeding or the Subscription Agreement, including costs required to wind down and/or dissolve and/or bankrupt ResidualCo and ResidualNoteCo and costs and expenses required to administer the Excluded Assets, Excluded Contracts, Excluded Liabilities, ResidualCo and ResidualNoteCo; (ii) amounts owing in respect of obligations secured by the CCAA Charges; (iii) any liability that ranks in priority to the Senior Secured Notes; (iv) total Disputed Litigation Costs up to a maximum aggregate amount of C$6,176,809; and (v) costs related to a premium for a run-off policy of the Applicant's existing director and officer liability insurance policy. Any unused portion of the Administrative Expense Reserve will be returned to the Applicant.

- 14 -

(h)     **Releases**: As further described below the Subscription Agreement and Approval and Reverse Vesting Order provide for certain releases. Under the Subscription Agreement, other than in connection with any obligations under the Subscription Agreement or the Approval and Reverse Vesting Order: (i) the Investors provide releases in favour of the Applicant and the Monitor, and their respective affiliates, directors, officers and employees for any matter, circumstance, event, action, inaction, omission, cause or thing whatsoever arising prior to the Closing Time relating to its investments in the Applicant, including as a Senior Secured Noteholder, save and except for Released Claims arising out of fraud or willful misconduct.; and (ii) the Applicant provides releases in favour of the Monitor and each Investor, and their affiliates, directors, officers and employees for any matter, circumstance, event, action, inaction, omission, cause or thing whatsoever arising prior to the Closing Time, save and except for Released Claims arising out of fraud or willful misconduct. Broader releases are contemplated under the terms of the proposed Approval and Reverse Vesting Order and are discussed in more detail below.

(i)     **Replacement of the Cargill Offtake Agreement**: The Investor Transaction contemplates the replacement of the Cargill Offtake Agreement with a new offtake agreement to be provided by Javelin (the "**Javelin Agreements**"). The Javelin Agreements provide for (i) Javelin to act as marketer of the iron ore concentrate; (ii) the sale and purchase of the iron ore concentrate; and (iii) a secured working capital facility for Tacora up to $100 million. The Subscription Agreement also provides that the Cargill Offtake Agreement and the Cargill Stockpile Agreement are Excluded Liabilities which are to be transferred to ResidualCo in accordance with the Closing Sequence. Cargill's corresponding unsecured claim against ResidualCo will not be satisfied.

(j)     **Set off on Closing**: The Closing Sequence contemplates the payment in full in cash of the APF net of any set-off claims against Cargill. The Subscription Agreement currently provides that the Monitor will be directed to pay all amounts owing under the Existing DIP Facility and the APF from the New Equity Offering Initial Cash Consideration provided that any Claims by Tacora against Cargill as of the Closing Date, or any amounts Cargill sets off against Tacora shall be set-off against amounts owing under the APF and the Existing DIP Facility in lieu of payment from the New Equity Offering Initial Cash Consideration.[6] Under the Subscription Agreement, the Applicant and each Investor

---

[6] Certain amendments to the Subscription Agreement to address the Replacement DIP Agreement and the repayment of amounts owing under the Existing DIP Agreement are contemplated.

acknowledge and agree that if there is a dispute with Cargill in respect of the amount to be set-off, the Monitor will retain such disputed amount from the New Equity Offering Initial Cash Consideration and will not pay that amount to Cargill or the Applicant unless and until the Applicant, the Investors and Cargill jointly direct such payment or a Final Order of the Court directs the Monitor to release the amounts to Cargill or the Applicant.

(k)    **Unanimous Shareholder Agreement:** The Investor Transaction contemplates the entering into of the Unanimous Shareholder Agreement, set out in the Subscription Agreement and in the Approval and Reverse Vesting Order and Articles of Reorganization.

(l)    **Key Conditions to Closing**: The Closing of the Investor Transaction is conditional on, among other things: (i) Court approval of the Approval and Reverse Vesting Order which becomes a Final Order (the Subscription Agreement provides for an outside date of April 19, 2024 for the issuance and entering of the Approval and Reverse Vesting Order); (ii) the renegotiation of the Rail Agreement on terms and conditions acceptable to the Investors, acting reasonably, and (iii) the Net Debt immediately following the Closing Time not exceeding $150 million (the "**Net Debt Condition**").

44.    The Monitor notes that  as a result of the recent fall in iron ore prices and the delay in closing resulting from ongoing litigation, additional financing is necessary for Tacora to continue to operate in the ordinary course, Consequently, Tacora is currently not likely to satisfy the Net Debt Condition on closing of the Investor Transaction, as currently structured. The Monitor understands that Tacora and the Investors are in discussions to address same. The Monitor also understands that Tacora and the Investors are currently engaged in discussions around changes to the maximum aggregate Cure Cost Cap of $27.9 million on the Cure Costs in relation to Retained Contracts, as well as changes to Pre-Filing Trade Amounts to be assumed and Post-Filing Trade Amounts to be paid in ordinary course. If increases to the Cure Costs Cap and Pre-Filing Trade Amounts to be assumed are not agreed upon, the Monitor will report further to the Court.

45.    On the Closing Date, certain steps (collectively, the "**Closing Sequence**") are to be taken to permit the Investor Transaction to proceed in a tax-efficient manner.

## APPROVAL AND REVERSE VESTING ORDER

*Overview*

46.    As noted above, the Subscription Agreement contemplates implementation through a reverse vesting structure in accordance with the requested Approval and Reverse Vesting Order.

47.     The Monitor understands that the request for the Approval and Reverse Vesting Order in the circumstances follows from the regulated nature of Tacora's mining operation and Tacora's tax attributes.

48.     The value of Tacora's business is entirely dependent on Tacora maintaining eight (8) material permits and licenses, six (6) mining claims, leases and other property rights, and other forest resource licenses and fire permits that are required to maintain its mining operations and allow Tacora to perform exploration work on various parts of the Scully Mine (collectively, the "**Permits and Licenses**"). The Permits and Licenses are issued by various government authorities over multiple provincial and federal jurisdictions and the Monitor understands that each of the Permits and Licenses would need to be in place for any prospective purchaser to continue operations at the Scully Mine.

49.     The Monitor understands that, while certain regulators that issued the Permits and Licenses may permit the transfer of such Permits and Licenses, this regulatory approval is not certain and would require advance discussions between a purchaser and the relevant government authority or lessor. The Monitor further understands that seeking such approval would likely cause significant delay, increased costs and risk and may imperil the Investor Transaction, as the Investor Transaction deals with a going concern business.

50.     Furthermore, the Monitor understands that absent the granting of the Approval and Reverse Vesting Order, Tacora's tax attributes in the approximate amount of $665.1 million would likely be lost.

51.     The Subscription Agreement provides that, to the extent the proposed Approval and Reverse Vesting Order is not granted, another structure could be agreed to by the parties but requires that, if the tax attributes are adversely impacted by a new structure, the consideration payable would be revised to reflect the decrease in value solely arising from the adverse impact to the tax attributes or as a result of additional costs that may need to be incurred in connection with assigning any Permits and Licenses or applying for and obtaining any replacement Permits and Licenses.

52.     As described above, the Monitor has considered the potential impact on stakeholders, including Cargill, that the Approval and Reverse Vesting Order structure may have. In this respect, the Monitor acknowledges that the effect of the Investor Transaction is to leave Cargill with a substantial damage claim under the Cargill Offtake Agreement. The Monitor has not undertaken an independent valuation of the potential damages claim at this time, but assumes for this purpose that the damages claim may be significant.  In this regard, the Monitor observes that (i) despite the potential of such claim and despite Cargill's participation in the Solicitation Process, Cargill did

not submit an actionable alternative transaction. As noted previously, the Phase 2 Bid submitted by Cargill was problematic in that, among other things, it was conditional upon financing (as is the Cargill Plan discussed below); and (ii) Cargill would suffer the same prejudice should the Investor Transaction be completed by way of traditional asset sale.

53.     In the circumstances, the Monitor's view is that any potential prejudice to Cargill is outweighed by the benefits of the Investor Transaction to stakeholders as a whole. These stakeholders include Senior Priority Noteholders, the Senior Secured Noteholders, the Continuing Employees, counterparties to Retained Contracts, holders of Pre-Filing Trade Amounts and holders of Post-Filing Trade Amounts.

*Releases*

54.     The proposed Approval and Reverse Vesting Order includes releases in favour of the "Released Parties", which is defined to include: (a) Tacora, ResidualCo and ResidualNoteCo and their respective present and former directors, officers, employees, legal counsel and advisors; (b) the Monitor, its legal counsel, and their respective present and former directors, officers, partners, employees and advisors; (c) the Notes Trustee (as defined in the Subscription Agreement) and its respective present and former directors, officers, partners, employees and advisors; and (d) the Investors and their respective present and former directors, officers, employees, legal counsel and advisors.

55.     The proposed Releases contemplate that the Released Parties are to be released from any and all present and future claims of any nature or kind whatsoever based in whole or in part on any act or omission, transaction or dealing or other occurrence existing or taking place on or prior to delivery of the Monitor's Certificate in connection with the Approval and Reverse Vesting Order, the CCAA Proceeding, the Subscription Agreement, the closing documents and/or the consummation of the Investor Transaction (provided that in respect of any release by the Investors in favour of the Released Parties, such release is limited to matters directly relating to its investments in the Applicant, including as a Senior Secured Noteholder) (the "**Released Claims**"). Released Claims under the proposed Approval and Reverse Vesting Order do not include (i) any claim that is not permitted to be released pursuant to section 5.1(2) of the CCAA, or (ii) any claim resulting from fraud or willful misconduct.

56.     The Monitor understands that the proposed Release provisions are essential to the Investor Transaction and the Subscription Agreement. The Monitor also understands that the proposed

Releases in favour of the Directors and Officers is necessary to allow for the release of the Directors' Charge, which in turn is necessary to allow the Investor Transaction to close.

57.     In the view of the Monitor, having considered the facts of the situation, each of the Released Parties contributed meaningfully and was necessary to Tacora's efforts to address its financial difficulties, the Pre-Filing Strategic Process, the Solicitation Process, the CCAA Proceeding, and the Investor Transactions and each of the Released Parties was a necessary part of the successful restructuring.

58.     Accordingly, the Monitor is of the view that the proposed Releases are reasonable and not overly broad in the circumstances, and supports the relief requested by Tacora.

*Summary*

59.     In considering the Applicant's request for approval of the Subscription Agreement and the Investor Transaction and the terms of the requested Approval and Reverse Vesting Order, the Monitor has considered the factors set out in section 36(3) of the CCAA:

   (a)   **The process leading to the Investor Transaction was reasonable in the circumstances**: As described in the First Report, the Monitor is of the view that the Solicitation Process is consistent with the principles of section 36 of the CCAA and provided for a broad, open, fair and transparent process with an appropriate level of independent oversight, that it encouraged and facilitated bidding by interested parties and was reasonable in the circumstances. The Monitor has been involved in the carrying out the Solicitation Process as contemplated by the Solicitation Order and to date, nothing has come to the Monitor's attention that causes the Monitor concern with the way Tacora conducted the Solicitation Process.

   (b)   **The Court and Monitor approved the Solicitation Process**: As described above, the Investor Transaction is the culmination of the solicitation efforts by Tacora and Greenhill since March 2023 as part of the Pre-Filing Strategic Process and the Solicitation Process. The Solicitation Process was approved by the Court and no party, including Cargill, opposed the granting of the Solicitation Order or the substance of the Solicitation Process, including the Milestones established for Phase 1 and Phase 2 Bid Deadlines set forth therein.

   (c)   **The Investor Transaction is, in the view of the Monitor, more beneficial to the creditors than a sale or disposition under a bankruptcy**: The Investor Transaction, if approved and closed, will, among other things, provide for full recovery to secured

creditors (other than the Senior Noteholders), preserve the ongoing employment of all of Tacora's approximately 460 employees, and maintain critical relationships with regulators, suppliers, trade creditors, and other contract counterparties. The Investor Transaction provides for the assumption of all of Tacora's equipment capital leases, including the payment of all amounts outstanding under the leases, as well as assumption of all outstanding Pre-Filing Trade Amounts and Post-Filing Trade Amounts. The Investor Transaction also provides for a new capital facility of up to $100 million for ongoing operational costs, deferred maintenance costs and capital expenditures to allow Tacora to exit the CCAA Proceeding and continue to operate as a going concern. A bankruptcy of Tacora would lead to significantly increased claims by, among others, employees, suppliers, regulators and contract counterparties. In this respect, the Monitor notes that the damage claim asserted by Cargill under the Cargill Offtake Agreement would be equally as applicable in a bankruptcy of Tacora. Along with substantially increased claims, the loss of value associated with a cessation of Tacora's business as a going concern would, in the Monitor's view result in a significant reduction in recovery for secured creditors.

(d)     **The creditors were consulted**: As described above, stakeholders (including Cargill) were consulted in the development of the Solicitation Process. No substantive objections to the terms of the Solicitation Process were raised prior to its approval by the Court. Given the terms of the Solicitation Process and the participation as bidders by the Ad Hoc Group and Cargill (the Applicant's two largest creditors), further consultation with creditors during the conduct of the Solicitation Process was inappropriate in the circumstances.

(e)     **The effects of the Investor Transaction on the creditors and other interested parties**: As noted above, the Monitor acknowledges that the proposed Investor Transaction creates a significant claim under the Cargill Offtake Agreement. However, there are also significant benefits to the Applicant and the vast majority of its stakeholders.

(f)     **The consideration is reasonable and fair, taking into account the Applicant's market value**: No superior bid in compliance with the Solicitation Process was received. The Monitor has no evidence to suggest that the value provided under the Subscription Agreement is not fair and reasonable. Rather, it is the best and highest bid received as a result of the Solicitation Process. As noted, the Phase 2 Bid submitted by Cargill and Bidder #3 were not compliant with the Solicitation Process, because, among other things, they were subject to significant financing conditions.

60.  Accordingly, at this time and based on current information available to the Monitor, the Monitor supports the relief requested by the Applicant in approving the Subscription Agreement and the Investor Transaction contemplated thereby as requested in the Approval and Reverse Vesting Order.

## COMMENTS REGARDING CARGILL PRELIMINARY THRESHOLD MOTION AND CARGILL RESPONDING MOTION

61.  The Monitor has reviewed Cargill's materials in connection with the Preliminary Threshold Motion and the Cargill Responding Motion, including the various affidavits and expert reports.

62.  Many of the issues raised in these materials have been addressed above in this Report. For example, the Preliminary Threshold Motion and the Cargill Responding Motion raise issues with the conduct of the Solicitation Process. As described above, the Monitor notes that the Solicitation Process followed processes typically used in restructuring sales processes where there is an operating company which is required to exit CCAA proceedings quickly. These processes typically include clear deadlines, a fixed final date and refrain from putting bidders together to ensure certainty, transparency, and competitive tension.

63.  As noted above, it would be highly unusual and potentially value damaging to allow bidders to collude during the Solicitation Process or to re-open the bidding process following a final bid deadline in a situation where at least one qualified bid has been submitted. A broad, open, fair and transparent process with an appropriate level of independent oversight is required to encourage and facilitate bidding by interested parties in order to maximize value for all stakeholders.

64.  The Monitor also notes that the Preliminary Threshold Motion seeks to prohibit the approval of the Subscription Agreement and the related Investor Transaction as it relates to the Cargill Offtake Agreement absent a valid disclaimer under section 32 of the CCAA. The Monitor has reviewed these materials. The Subscription Agreement as structured does not require a disclaimer of the Cargill Offtake Agreement and whether the Applicant should be required to comply with section 32 of the CCAA is a legal issue.

65.  Cargill in its cross-motion also requests a meeting order in respect of the Cargill Plan. The Monitor notes that although the Solicitation Process permitted interested parties to submit a plan by the Phase 2 Bid Deadline, the Cargill Plan was not submitted in accordance with the Solicitation Process. Further, the Cargill Plan is not actionable as it remains conditional on raising new equity financing.

66.    Cargill also requests a claims procedure order to, among other things, identify and quantify claims against the Applicant. In the absence of a meeting order, which is not appropriate for the reasons noted above, a claims procedure order is not necessary at this time.

67.    In the alternative, if Cargill is not granted the relief described above it is requesting an order for Cargill and the Investors to submit revised bids or new proposed transactions. The Monitor is of the view that a delay of this nature, to effectively re-do a sales process which was approved by the Court, robust and fulsome and allowed parties to submit a compliant bid, is unnecessary and would be detrimental to the Applicant's Business. If the relief sought by the Applicant is not approved, the appropriate next steps would be for the Tacora Board to consider next steps and the Applicant to return to Court in due course.

68.    Tacora is a commodity-based business which is highly susceptible and vulnerable to market pricing changes. This vulnerability is illustrated by the recent need to increase the DIP financing due to fluctuations in the price of iron ore. Put simply, Tacora cannot afford to remain in CCAA Proceedings indefinitely and should emerge as soon as possible.

**SEALING**

69.    The Monitor recommends that the confidential exhibits to the February Nessim Affidavit (the "**Bid Analysis**") be filed with the Court on a confidential basis and remain sealed until the earlier of (i) the closing of the Investor Transaction, or (ii) a further order of the Court.

70.    The Bid Analysis contains sensitive information, including the identity of the bidders and the value of competing bids received in the Solicitation Process. Public disclosure of the Bid Analysis could impact efforts to remarket the Applicant if the Investor Transaction is not capable of closing. Sealing the Bid Analysis is necessary to maximize stakeholder value in this proceeding and maintain the integrity and confidentiality of key information in the Solicitation Process.

71.    The salutary effects of sealing such information from the public record greatly outweigh the deleterious effects of doing so under the circumstances. The Monitor is not aware of any party that will be prejudiced if the information is sealed or any public interest that will be served if such details are disclosed in full. The Monitor is of the view that the sealing of the Bid Analysis and the Cargill Agreements is consistent with the decision in *Sherman Estate v Donovan*, 2021 SCC 25.

72.    Accordingly, the Monitor believes the proposed sealing of the Bid Analysis is appropriate in the circumstances.

**CONCLUSION**

73.    The Monitor delivers this Fourth Report in compliance with the Litigation Schedule to provide its initial views and recommendations on the issues raised in the Sale Approval Motion, Preliminary Threshold Motion and Cargill Responding Motion.

74.    At this time and based on current information available to the Monitor and for the reasons discussed above, the Monitor is of the view that the relief requested by the Applicant is reasonable and justified in the circumstances and accordingly the Monitor respectfully supports the requested relief and recommends that the Approval and Reverse Vesting Order be granted.

75.    As contemplated by the Litigation Schedule the Monitor may provide the Supplemental Report following delivery of further materials and the conduct of cross-examinations in connection with the Litigation Schedule if it determines it is necessary.

The Monitor respectfully submits this Fourth Report to the Court dated this 14ᵀᴴ day of March, 2024.

**FTI Consulting Canada Inc**
in its capacity as Court-appointed Monitor of
Tacora Resources Inc. and not in its personal or
corporate capacity

By:  _____          _____
     Paul Bishop                                Jodi Porepa
     Senior Managing Director                   Senior Managing Director

# Appendix "A"

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00707394-00CL



Court File No. CV-23-00707394-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

| | | |
|---|---|---|
| THE HONOURABLE MADAM | ) | MONDAY, THE 30TH |
| | ) | |
| JUSTICE KIMMEL | ) | DAY OF OCTOBER, 2023 |
| | ) | |

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
TACORA RESOURCES INC.**

**(Applicant)**

**ORDER
(Solicitation Order)**

**THIS MOTION**, made by Tacora Resources Inc. (the "**Applicant**"), for an Order approving, the procedures for a sale, investment, and services solicitation process in respect of the Applicant attached hereto as Schedule "A" (the "**Solicitation Process**") was heard on October 24, 2023 at 330 University Avenue, Toronto, Ontario with reasons released this day.

**ON READING** the Application Record of the Applicant dated October 9, 2023 (the "**Application Record**"), the Affidavit of Joe Broking sworn October 9, 2023, the Affidavit of Chetan Bhandari sworn October 9, 2023, the Supplementary Application Record of the Applicant dated October 15, 2023 (the "**Supplementary Application Record**"), the Affidavit of Joe Broking sworn October 15, 2023 (the "**Second Broking Affidavit**"), the Affidavit of Chetan Bhandari sworn October 15, 2023, the Affidavit of Philip Yang sworn October 15, 2023, the consent of FTI Consulting Canada Inc. ("**FTI**") to act as Court-appointed monitor of the Applicant (in such capacity, the "**Monitor**"), the Pre-Filing Report of the Proposed Monitor dated October 10, 2023, the First Report of the Monitor dated October 20, 2023, the Motion Record of the Ad Hoc Group of Noteholders (the "**Ad Hoc Group**") dated October 16, 2023, the Affidavit of Thomas Gray sworn October 16, 2023, the Brief of Transcripts and Exhibits, including the transcripts from the Examinations of Leon Davies held October 18, 2023, Chetan Bhandari held October 18, 2023, Paul Carrelo held October 19, 2023 and Joe Broking held October 19, 2023, and on hearing the submissions of counsel for the Applicant, counsel for the Monitor, counsel for Cargill, Incorporated

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00707394-00CL

and Cargill International Trading Pte Ltd., and counsel for the Ad Hoc Group, and such other counsel and parties as listed on the Counsel Slip, with no one else appearing although duly served as appears from the affidavits of service of Natasha Rambaran and the affidavit of service of Philip Yang, filed,

## SERVICE AND DEFINITIONS

1.     **THIS COURT ORDERS** that the time for service and filing of the Notice of Application, the Application Record and the Supplementary Application Record is hereby abridged and validated so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.     **THIS COURT ORDERS** that capitalized terms used in this Order and not otherwise defined herein shall have the meanings ascribed to them in the Solicitation Process.

## APPROVAL OF THE SOLICITATION PROCESS

3.     **THIS COURT ORDERS** that the Solicitation Process attached hereto as Schedule "A" is hereby approved and the Applicant, Financial Advisor, and Monitor are hereby authorized and directed to implement the Solicitation Process pursuant to the terms thereof. The Financial Advisor, Applicant, and Monitor are hereby authorized and directed to take any and all actions as may be necessary or desirable to implement and carry out the Solicitation Process in accordance with its terms and this Order.

4.     **THIS COURT ORDERS** that the Financial Advisor, Applicant, and the Monitor are hereby authorized and directed to immediately commence the Solicitation Process.

5.     **THIS COURT ORDERS** that each of the Financial Advisor, Applicant, Monitor and their respective affiliates, partners, directors, employees, agents and controlling persons shall have no liability with respect to any and all losses, claims, damages or liabilities, of any nature or kind, to any person in connection with or as a result of the Solicitation Process, except to the extent such losses, claims, damages or liabilities result from the gross negligence or wilful misconduct of the Financial Advisor, Applicant, or Monitor, as applicable, in performing their obligations under the Solicitation Process, as determined by this Court.

6.     **THIS COURT ORDERS** that, pursuant to section 3(c) of the Electronic Commerce Protection Regulations, Reg. 81000-2-175 (SOR/DORS), the Financial Advisor, Applicant, and Monitor are authorized and permitted to send, or cause or permit to be sent, commercial electronic

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00707394-00CL

messages to an electronic address of prospective bidders or offerors and to their advisors, but only to the extent required to provide information with respect to the Solicitation Process in these proceedings.

7.    **THIS COURT ORDERS** that notwithstanding anything contained herein or in the Solicitation Process, the Financial Advisor and Monitor shall not take possession of the Property or be deemed to take possession of the Property.

**PROTECTION OF PERSONAL INFORMATION**

8.    **THIS COURT ORDERS** that, pursuant to clause 7(3)(c) of the *Personal Information Protection and Electronic Documents Act*, S.C. 2000, c. 5, the Financial Advisor, Applicant, Monitor, and their respective advisors are hereby authorized and permitted to disclose and transfer to prospective Solicitation Process participants (each, a "**Solicitation Process Participant**") and their advisors personal information of identifiable individuals ("**Personal Information**"), records pertaining to the Applicant's past and current employees, and information on specific customers, but only to the extent desirable or required to negotiate or attempt to complete a transaction under the Solicitation Process (a "**Transaction**"). Each Solicitation Process Participant to whom any Personal Information is disclosed shall maintain and protect the privacy of such Personal Information and limit the use of such Personal Information to its evaluation of a Transaction, and if it does not complete a Transaction, shall return all such information to the Financial Advisor, Applicant, or Monitor, or in the alternative destroy all such information and provide confirmation of its destruction if required by the Financial Advisor, Applicant, or Monitor. The Successful Transaction Bidder shall maintain and protect the privacy of such information and, upon closing of the Transaction contemplated in the Successful Transaction Bid, shall be entitled to use the personal information provided to it that is related to the Business and/or Property acquired pursuant to the Solicitation Process in a manner that is in all material respects identical to the prior use of such information by the Applicant, and shall return all other personal information to the Financial Advisor, Applicant, or Monitor, or ensure that all other personal information is destroyed and provide confirmation of its destruction if requested by the Financial Advisor, Applicant, or Monitor.

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00707394-00CL

**GENERAL**

9.      **THIS COURT ORDERS** that the Applicant or the Monitor or any interested party may from time to time apply to this Court to amend, vary or supplement this Order or for advice and directions in the discharge of their powers and duties under the Solicitation Process.

10.     **THIS COURT ORDERS** that this Order shall have full force and effect in all provinces and territories in Canada.

11.     **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States of America, or in any other foreign jurisdiction, to give effect to this Order and to assist the Applicant, Monitor, and their respective agents in carrying out the terms of this Order. All courts, tribunals, and regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Financial Advisor, Applicant, and Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Financial advisor, Applicant, Monitor, and their respective agents in carrying out the terms of this Order.

12.     **THIS COURT ORDERS** that the Applicant and Monitor be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

13.     **THIS COURT ORDERS** that this Order and all of its provisions are effective as of 12:01 a.m. on the date of this Order.

Digitally signed
by Jessica Kimmel
Date: 2023.10.31
11:07:08 -04'00'

[Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice
*INGEMENT ACT*, R.S.C. 1985 Court File No./N° du dossier du greffe : CV-23-00707394-00CL
~~C. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR~~
ARRANGEMENT OF TACORA RESOURCES INC.

(Applicant)

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

PROCEEDINGS COMMENCED AT TORONTO

ORDER
(Solicitation Order)

STIKEMAN ELLIOTT LLP
5300 Commerce Court West
199 Bay Street
Toronto, ON  M5L 1B9

**Ashley Taylor (LSO #39932E)**
Tel: 416-869-5236
Email: ataylor@stikeman.com

**Lee Nicholson (LSO #66412I)**
Tel: 416-869-5604
Email: leenicholson@stikeman.com

**Natasha Rambaran (LSO #80200N)**
Tel: 416-869-5504
Email: nrambaran@stikeman.com

**Philip Yang (LSO #82084O)**
Tel: 416-869-5593
Email: pyang@stikeman.com

Counsel to Tacora Resources Inc.

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00707394-00CL

Schedule "A"

**Procedures for the Sale, Investment and Services Solicitation Process**

Tacora Resources Inc. ("**Tacora**") is a private company that is focused on the production and sale of high-grade and quality iron ore products that improve the efficiency and environmental performance of steel making. Tacora currently sells 100% of the iron ore concentrate production of the Scully Mine, an iron ore concentrate mine located near Wabush, Newfoundland and Labrador, Canada (the "**Scully Mine**"), pursuant to the Offtake Agreement with Cargill.

On October 10, 2023, Tacora commenced proceedings (the "**CCAA Proceedings**") under the *Companies' Creditors Arrangement Act* (Canada) (the "**CCAA**") before the Ontario Superior Court of Justice (Commercial List) in the City of Toronto (the "**Court**") pursuant to an order granted by the Court on the same day (as may be amended or amended and restated from time to time, the "**Initial Order**").

Pursuant to the Initial Order, FTI Consulting Canada Inc., a licensed insolvency trustee, was appointed as monitor in the CCAA Proceedings (in such capacity, the "**Monitor**"). Greenhill & Co. Canada Ltd. (the "**Financial Advisor**") is acting as Tacora's financial advisor and investment banker.

On October 30, 2023, the Court granted an order (the "**Solicitation Order**"), authorizing Tacora to undertake a sale, investment and services solicitation process (the "**Solicitation Process**") to solicit offers or proposals for a sale, restructuring or recapitalization transaction in respect of Tacora's assets (the "**Property**") and business operations (the "**Business**"). The Solicitation Process will be conducted by the Financial Advisor with the Monitor in the manner set forth in these procedures (the "**Solicitation Procedures**").

<u>**Defined Terms**</u>

1. Capitalized terms used in these Solicitation Procedures and not otherwise defined herein have the meanings given to them in Appendix "A".

<u>**Solicitation Procedures**</u>

*Opportunity*

2. The Solicitation Process is intended to solicit interest in, and opportunities for: (a) a sale of all, substantially all, or certain portions of the Property or the Business; or (b) an investment in, restructuring, recapitalization, refinancing or other form of reorganization of Tacora or its Business as a going concern, or a combination thereof (the "**Transaction Opportunity**").

3. The Solicitation Process will also provide the ability for interested parties to investigate and conduct due diligence regarding an opportunity to arrange an offtake, service or other agreement in respect of the Business (the "**Offtake Opportunity**" and together with the Transaction Opportunity, the "**Opportunity**")).

*General*

4. The Solicitation Procedures describe the manner in which prospective bidders may

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

gain access to due diligence materials concerning Tacora, the Business and the Property, the manner in which interested parties may participate in the Solicitation Process, the requirements of and the receipt and negotiation of Bids received, the ultimate selection of a Successful Bidder and the requisite approvals to be sought from the Court in connection therewith.

5.   Tacora, in consultation with the Monitor and the Financial Advisor, may at any time and from time to time, modify, amend, vary or supplement the Solicitation Procedures, without the need for obtaining an order of the Court or providing notice to Phase 1 Bidders, Phase 2 Bidders, the Successful Bidder and the Back-Up Bidder, provided that the Financial Advisor and the Monitor determine that such modification, amendment, variation or supplement is expressly limited to changes that do not materially alter, amend or prejudice the rights of such bidders and that are necessary or useful in order to give effect to the substance of the Solicitation, the Solicitation Procedures and the Solicitation Order.

6.   Except as set forth in these Solicitation Procedures, nothing in this Solicitation Process shall prohibit a secured creditor of Tacora (a) from participating as a bidder in the Solicitation Process, or (b) committing to Bid its secured debt, including a credit bid of some or all of its outstanding indebtedness under any loan facility (inclusive of interest and other amounts payable under any loan agreement to and including the date of closing of a definitive transaction) owing to such party in the Solicitation Process.

7.   Tacora, in consultation with the Financial Advisor and the Monitor, shall have complete discretion with respect to the provision of any information to any party or any consultation rights in connection with the Solicitation Process, provided that, no information regarding any Bids received shall be provided to any stakeholder of Tacora or their respective advisors, provided further that, the Monitor may (but is not required to) share Bids with advisors to the Ad Hoc Group and/or Cargill following the Phase 2 Bid Deadline on such terms and conditions they may deem appropriate, if (a) in the case of the Ad Hoc Group, each member of the Ad Hoc Group, other noteholders and the trustee on behalf of noteholders and their affiliates and related parties have not participated in any Bid, including as a Financing Party; and (b) in the case of Cargill, Cargill and its affiliates and related parties have not participated in any Bid, including as a Financing Party.

8.   Notwithstanding anything to the contrary in these Solicitation Procedures, Tacora and the Financial Advisor, in consultation with the Monitor, may attempt to negotiate a stalking horse bid (a "**Stalking Horse Bid**") prior to the Phase 1 Bid Deadline to provide certainty for Tacora and the Property/Business during the Solicitation Process. If Tacora, with the approval of the Monitor, determines that it is appropriate to utilize a Stalking Horse Bid, such Stalking Horse Bid shall be subject to approval by the Court and Tacora shall bring a motion before the Court on notice to the service list in these CCAA Proceedings seeking approval to use the Stalking Horse Bid as a "stalking horse" in the Solicitation Process, together with approval of any necessary consequential amendments to these Solicitation Procedures. All interested parties that have executed an NDA in connection with this Solicitation Process shall be promptly informed of any such motion, Court approval for the use of the Stalking Horse Bid and any related amendments to these Solicitation Procedures. The terms of any Stalking Horse Bid must, at a minimum, meet all requirements under these Solicitation Procedures, including, for greater certainty, the criteria applicable to a Phase 2

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00707394-00CL

Qualified Bid (which must provide for payment in cash of all obligations (unless the DIP Lender agrees otherwise) owing under the DIP Agreement in full).

*Timeline*

9.      The following table sets out the key milestones under this Solicitation Process, which may be extended from time to time by Tacora, in consultation with the Financial Advisor and with the consent of the Monitor, in accordance with the Solicitation Process:

| Event | Timing |
|---|---|
| **Phase 1** | |
| **1.  Notice**<br><br>Monitor to publish a notice of the Solicitation Process on the Monitor's Website<br><br>Financial Advisor / Tacora to publish notice of the Solicitation Process in industry trade publications, as determined appropriate<br><br>Financial Advisor to distribute Teaser Letter and NDA (if requested) to potentially interested parties | No later than five (5) days following issuance of the Solicitation Order. |
| **2.  Phase 1 - Access to VDR**<br><br>Phase 1 Bidders provided access to the VDR, subject to execution of appropriate NDAs | October 30, 2023 to December 1, 2023 |
| **3.  Phase 1 Bid Deadline**<br><br>Deadline for Phase 1 Bidders to submit non-binding LOIs in accordance with the requirements of section 23 | By no later than December 1, 2023 at 12:00 p.m. (Eastern Time) |
| **4.  Notification of Phase 1 Qualified Bid**<br><br>Deadline to notify a Phase 1 Bidder whether it has been designated as a Phase 2 Bidder invited to participate in Phase 2 | By no later than December 6, 2023, at 12:00 p.m. (Eastern Time) |
| **Phase 2** | |
| **5.  Phase 2 Bid Deadline**<br><br>Phase 2 Bid Deadline (for delivery of definitive offers by Phase 2 Qualified Bidders in accordance with the requirements of section 34) | By no later than January 19, 2024, at 12:00 p.m. (Eastern Time) |

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00707394-00CL
.

| 6. Definitive Documentation<br><br>Deadline for completion of definitive documentation in respect of a Successful Bid and filing of the Approval Motion | By no later than February 2, 2024 |
|---|---|
| 7. Approval Motion<br><br>Hearing of Approval Motion in respect of Successful Bid (subject to Court availability) | Week of February 5, 2024 |
| 8. Outside Date – Closing<br><br>Outside Date by which the Successful Bid must close | February 23, 2024 (subject to customary conditions related to necessary and required regulatory approvals acceptable to Tacora, in consultation with the Financial Advisor and the Monitor, in their sole discretion) |

***Solicitation of Interest***

10. As soon as reasonably practicable, but, in any event, by no later than five (5) days after the granting of the Solicitation Order:

   (a) the Financial Advisor, in consultation with the Monitor and Tacora, will prepare a list of potential bidders, including (i) parties that have approached Tacora, the Financial Advisor, or the Monitor indicating an interest in the Opportunity, (ii) parties suggested by Tacora's secured creditors or their advisors, (iii) local and international strategic and financial parties, including offtakers and streamers, who the Financial Advisor, in consultation with Tacora and the Monitor, believes may be interested in the Opportunity; (iv) Cargill and the Ad Hoc Group; and (v) parties that showed an interest in Tacora and/or its assets prior to the date of the Solicitation Order including by way of the previous, out-of-court strategic review process, in each case whether or not such party has submitted a letter of intent or similar document (collectively, the "**Potential Bidders**");

   (b) a notice of the Solicitation and any other relevant information that the Monitor considers appropriate regarding the Solicitation Process, in consultation with Tacora and the Financial Advisor, will be published by the Monitor on the Monitor's Website;

   (c) a notice of the Solicitation Process and any other relevant information that the Financial Advisor, in consultation with Tacora and the Monitor, considers appropriate may be published by the Financial Advisor in one or more trade industry and/or insolvency-related publications as may be considered appropriate by the Financial Advisor; and

   (d) the Financial Advisor, in consultation with Tacora and the Monitor, will prepare (i) a process summary (the "**Teaser Letter**") describing the Opportunity, outlining the process under the Solicitation Process and inviting recipients of the Teaser Letter to express their interest pursuant to the Solicitation Process;

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

and (ii) a form of non-disclosure agreement in form and substance satisfactory to the Financial Advisor, Tacora, the Monitor, and their respective counsel (an "**NDA**").

11.     The Financial Advisor will cause the Teaser Letter to be sent to each Potential Bidder by no later than five (5) days after the Solicitation Order and to any other party who requests a copy of the Teaser Letter  or who is identified to the Financial Advisor or the Monitor as a potential bidder as soon as reasonably practicable after such request or identification, as applicable. A copy of the NDA will be provided to any  Potential Bidder that requests a copy of same.

**Phase 1: Non-Binding LOIs**

*Phase 1 Due Diligence*

12.     In order to participate in the Solicitation Process, and prior to the distribution of any confidential information, a Potential Bidder (each Potential Bidder interested in the Transaction Opportunity who has executed an NDA with Tacora, a "**Phase 1 Bidder**") must deliver to the Financial Advisor an executed NDA (with a copy to the Monitor).

13.     Notwithstanding any other provision of this Solicitation Process, prior to Tacora executing an NDA with any Potential Bidder, Tacora, in consultation with the Financial Advisor and the Monitor, may require evidence reasonably satisfactory to Tacora, in consultation with the Financial Advisor and the Monitor, of the financial wherewithal of the Potential Bidder to complete on a timely basis a transaction in respect of the Opportunity (either with existing capital or with capital reasonably anticipated to be raised prior to closing) and/or to disclose details of their ownership and/or investors.

14.     A confidential virtual data room (the "**VDR**") in relation to the Opportunity will be made available by Tacora to Phase 1 Bidders and Financing Parties (including those interested in the Offtake Opportunity) that have executed the NDA in accordance with Section 12 as soon as practicable. Following the completion of "Phase 1", but prior to the completion of "Phase 2", additional information may be added to the VDR to enable Phase 2 Qualified Bidders to complete any confirmatory due diligence in respect of Tacora and the Opportunity. The Financial Advisor, in consultation with Tacora and the Monitor, may establish or cause Tacora to establish separate VDRs (including "clean rooms"), if Tacora reasonably determines that doing so would further Tacora's and any Phase 1 Bidder's compliance with applicable antitrust and competition laws, would prevent the distribution of commercially sensitive competitive information, or to protect the integrity of the Solicitation Process and Tacora's restructuring process generally. Tacora may also, in consultation with the Financial Advisor and the Monitor, limit the access of any Phase 1 Bidder to any confidential information in the VDR where Tacora may also, in consultation with the Financial Advisor and the Monitor, reasonably determine that such access could negatively impact the Solicitation Process, the ability to maintain the confidentiality of the information, the Business or its value.

15.     Tacora, in consultation with the Financial Advisor and the Monitor, may (but is not required to) provide management presentations to Phase 1 Bidders. Any communications between Phase 1 Bidders and management of Tacora shall be supervised by representatives of the Financial Advisor and the Monitor, provided that such discussions shall remain confidential and shall not be disclosed without the

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

consent of the parties to the discussion. In connection with the foregoing, the Financial Advisor and the Monitor shall continue to have duties to the Court to ensure that the Solicitation Process proceeds in a manner that complies with the CCAA and the terms of the Solicitation Process. The provisions of this section are subject to further order of the Court.

16.     The Financial Advisor, Tacora, the Monitor, and their respective employees, officers, directors, agents, other representatives and their respective advisors make no representation, warranty, condition or guarantee of any kind, nature or description as to the information contained in the VDR or made available in connection with the Solicitation Process. All Phase 1 Bidders (and Financing Parties) must rely solely on their own independent review, investigation and/or inspection of all information and of the Property and Business in connection with their participation in the Solicitation Process.

***Communication Protocol***

17.     Each Phase 1 Bidder and Financing Party is prohibited from communicating with any Potential Bidder or another Phase 1 Bidder or Financing Party and their respective affiliates and their legal and financial advisors regarding the Opportunity during the term of the Solicitation Process, without the consent of the Financial Advisor and the Monitor, except as provided in these Solicitation Procedures. Notwithstanding the terms of any NDA entered into by a Phase 1 Bidder or Financing Party, all Phase 1 Bidders and Financing Parties shall comply with these Solicitation Procedures.

18.     Any party interested in providing debt financing (a "**Debt Financing Party**"), equity financing (an "**Equity Financing Party**") or financing through an offtake or similar agreement (including a stream or royalty agreement) in respect of the Offtake Opportunity (an "**Offtake Financing Party**" and together with Debt Financing Parties, Equity Financing Parties, the "**Financing Parties**" and each, a "**Financing Party**") shall execute a NDA with Tacora or a joinder to a NDA with the Phase 1 Bidder which the Financing Party is interested in providing financing to, prior to receiving distribution of any confidential information.

19.     Each Debt Financing Party must indicate to the Financial Advisor and the Monitor whether such Debt Financing Party is acting exclusively with a Phase 1 Bidder or conducting due diligence with the expectation of providing potential debt financing to potentially multiple Phase 1 Bidders. If a Debt Financing Party is acting exclusively with a Phase 1 Bidder, the Debt Financing Party may communicate with such Phase 1 Bidder but shall not communicate with another Phase 1 Bidder and their respective affiliates and their legal and financial advisors regarding the Opportunity during the term of the Solicitation Process. If the Debt Financing Party is not acting exclusively with a Phase 1 Bidder, the Debt Financing Party may communicate with multiple Phase 1 Bidders, provided that Debt Financing Party confirms in writing to the Financial Advisor and the Monitor that the Debt Financing Party has appropriate internal controls and processes to ensure information related to Bids or potential Bids (including the identity of Potential Bidders and/or Phase 1 Bidders) is not shared with multiple Phase 1 Bidders.

20.     Each Offtake Financing Party must indicate to the Financial Advisor and the Monitor whether such Offtake Financing Party is acting exclusively with a Phase 1 Bidder or

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

Court File No./N° du dossier du greffe : CV-23-00707394-00CL
.

conducting due diligence with the expectation of providing potential financing through an offtake or similar agreement (including a stream or royalty agreement) to potentially multiple Phase 1 Bidders. If an Offtake Financing Party is acting exclusively with a Phase 1 Bidder, the Offtake Financing Party may communicate with such Phase 1 Bidder but shall not communicate with another Phase 1 Bidder and their respective affiliates and their legal and financial advisors regarding the Opportunity during the term of the Solicitation Process. If an Offtake Financing Party is not acting exclusively with a Phase 1 Bidder, the Offtake Financing Party shall submit an Offtake IOI and may communicate with Phase 1 Bidders with the consent of the Financial Advisor and the Monitor on such terms and conditions as the Financial Advisor and the Monitor deem appropriate.

21.    Each Equity Financing Party must indicate to the Financial Advisor and the Monitor whether such Equity Financing Party is acting exclusively with a Phase 1 Bidder or conducting due diligence with the expectation of providing potential equity financing to potentially multiple Phase 1 Bidders. If an Equity Financing Party is acting exclusively with a Phase 1 Bidder, the Equity Financing Party may communicate with such Phase 1 Bidder but shall not communicate with another Phase 1 Bidder and their respective affiliates and their legal and financial advisors regarding the Opportunity during the term of the Solicitation Process. If an Equity Financing Party is not acting exclusively with a Phase 1 Bidder, the Equity Financing Party shall submit an Equity Financing IOI and may communicate with Phase 1 Bidders with the consent of the Financial Advisor and the Monitor on such terms and conditions as the Financial Advisor and the Monitor deem appropriate.

### Phase 1 Bids

22.    If a Phase 1 Bidder wishes to submit a bid in respect of the Transaction Opportunity (a "**Bid**"), it must deliver a non-binding letter of intent (an "**LOI**") (each such LOI, in accordance with section 23 below, a "**Phase 1 Qualified Bid**") to the Financial Advisor (including by email) with a copy to the Monitor (including by email) so as to be received by the Financial Advisor not later than 12:00 p.m. (Eastern Time) on December 1, 2023, or such other date or time as may be agreed by Tacora, in consultation with the Financial Advisor, and with the consent of the Monitor (the "**Phase 1 Bid Deadline**").

23.    An LOI submitted by a Phase 1 Bidder will only be considered a Phase 1 Qualified Bid if the LOI complies at a minimum with the following:

(a)    it has been duly executed by all required parties;

(b)    it is received by the Phase 1 Bid Deadline;

(c)    it clearly indicates that:

(i)    the Phase 1 Bidder is (A) seeking to acquire all or substantially all of the Property or Business, whether through an asset purchase, a share purchase or a combination thereof (either one, a "**Sale Proposal**"); or (B) offering to make an investment in, restructure, recapitalize or refinance Tacora or the Business (a "**Recapitalization Proposal**").

(d)    in the case of a Sale Proposal, the Bid includes:

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00707394-00CL

(i) the purchase price or price range and key assumptions supporting the valuation and the anticipated amount of cash payable on closing of the proposed transaction;

(ii) details regarding any consideration which is not cash;

(iii) any contemplated purchase price adjustment;

(iv) a specific indication of the expected structure and financing of the transaction (including, but not limited to the sources of financing to fund the acquisition);

(v) a description of the Property that is subject to the transaction and any of the Property expected to be excluded;

(vi) a description of those liabilities and obligations (including operating liabilities and obligations to employees) which the Phase 1 Bidder intends to assume and those liabilities and obligations it does not intend to assume and are to be excluded as part of the transaction, and shall specifically identify whether the Phase 1 Bidder intends to assume or maintain the existing Offtake Agreement on its existing terms or any proposed amendments, and if not, whether the Phase 1 Bidder anticipates requiring to be paired with a Financing Party interested in the Offtake Opportunity in connection with their proposed Bid;

(vii) information sufficient for Tacora, in consultation with the Financial Advisor and the Monitor, to determine that the Phase 1 Bidder has sufficient financial ability to complete the transaction contemplated by the Sale Proposal;

(viii) a description of the Phase 1 Bidder's intentions for the Business, including any plans or conditions related to Tacora's management and employees;

(ix) an outline of any additional due diligence required to be conducted in order to submit a final and binding offer; and

(x) any other terms or conditions of the Sale Proposal that the Phase 1 Bidder believes are material to the transaction.

(e) in the case of a Recapitalization Proposal, the Bid includes:

(i) a description of how the Phase 1 Bidder proposes to structure and finance the proposed investment, restructuring, recapitalization or refinancing (including, but not limited to the sources of financing to fund the transaction);

(ii) the aggregate amount of the equity and/or debt investment to be made in Tacora or its Business;

(iii) details on the permitted use of proceeds;

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00707394-00CL

(iv)     a description of those liabilities and obligations (including operating liabilities and obligations to employees) which the Phase 1 Bidder intends to assume and those liabilities and obligations it does not intend to assume and are to be excluded as part of the transaction, and shall specifically identify whether the Phase 1 Bidder intends to assume or maintain the existing Offtake Agreement on its existing terms or any proposed amendments and if not, whether the Phase 1 Bidder anticipates requiring to be paired with a Financing Party interested in the Offtake Opportunity in connection with their proposed Bid;

(v)      information sufficient for Tacora, in consultation with the Financial Advisor and the Monitor, to determine that the Phase 1 Bidder has sufficient ability to complete the transaction contemplated by the Recapitalization Proposal;

(vi)     the underlying assumptions regarding the pro forma capital structure;

(vii)    a description of the Phase 1 Bidder's intentions for the Business, including any plans or conditions related to Tacora's management and employees;

(viii)   the equity, if any, to be allocated to the secured creditors, unsecured creditors, shareholders and/or any other stakeholder of Tacora;

(ix)     an outline of any additional due diligence required to be conducted in order to submit a final and binding offer; and

(x)      any other terms or conditions of the Recapitalization Proposal which the Phase 1 Bidder believes are material to the transaction.

(f)      it provides written evidence, satisfactory to Tacora, in consultation with the Financial Advisor and the Monitor, of its ability to consummate the transaction within the timeframe contemplated by these Solicitation Procedures and to satisfy any obligations or liabilities to be assumed on closing of the transaction, including, without limitation, a specific indication of the sources of capital and, to the extent that the Phase 1 Bidder expects to finance any portion of the purchase price, the identity of the financing source and the steps necessary and associated timing to obtain the capital;

(g)      it provides any relevant details of the previous investments or acquisitions, or any other experience a Phase 1 Bidder in the mining industry, including the date, nature of the investment, amount invested, geography and any other relevant information related to such investment;

(h)      it identifies all proposed material conditions to closing including, without limitation, any internal, regulatory or other approvals and any form of consent, agreement or other document required from a government body, stakeholder or other third party, and an estimate of the anticipated timeframe and any anticipated impediments for obtaining such conditions, along with information sufficient for Tacora, in consultation with the Financial Advisor, and the Monitor, to determine that these conditions are reasonable in relation to the Phase 1

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

Bidder;

(i)     it includes a statement disclosing any connections or agreements between the Phase 1 Bidder, on the one hand, and Tacora, its shareholders, creditors and affiliates and all of their respective directors and officers and/or any other known Phase 1 Bidder, on the other hand;

(j)     it includes an acknowledgement that any Sale Proposal and/or Recapitalization Proposal is made on an "as-is, where-is" basis; and

(k)     it contains such other information as may be reasonably requested by Tacora, in consultation with the Financial Advisor and the Monitor.

*Assessment of Phase 1 Bids*

24.    Following the Phase 1 Bid Deadline, Tacora, in consultation with the Financial Advisor and the Monitor, will assess the LOIs received by the Phase 1 Bid Deadline and determine whether such LOIs constitute Phase 1 Qualified Bids.

25.    Tacora, in consultation with the Financial Advisor and the Monitor, may following the receipt of any LOI, seek clarification with respect to any of the terms or conditions of such LOI and/or request and negotiate one or more amendments to such LOI prior to determining if the LOI should be considered a Phase 1 Qualified Bid.

26.    Tacora, in consultation with the Financial Advisor, and with the consent of the Monitor, may (a) waive compliance with any one or more of the requirements specified above and deem such non-compliant bid to be a Phase 1 Qualified Bid; or (b) reject any LOI if it is determined that such Bid does not constitute a Phase 1 Qualified Bid, is otherwise inadequate or insufficient, or is otherwise contrary to the best interests of Tacora and its creditors and other stakeholders.

*Financing Opportunity*

27.    To assist the Financial Advisor and the Monitor in making a determination of whether to introduce any Offtake Financing Party interested in the Offtake Opportunity to any Phase 1 Bidders, such parties may provide the Financial Advisor and the Monitor, prior to the Phase 1 Bid Deadline, an indication of interest in respect of the Offtake Opportunity (an "**Offtake IOI**"), which includes:

(a)     the product to be purchased from Tacora and any required specifications;

(b)     the term of the contract, including all options to extend;

(c)     the committed volume of product to be purchased, including market price and hedged price (if applicable);

(d)     product pricing terms, including price indices to be used, premiums, hedging terms (if any);

(e)     delivery and payment terms, including delivery point for product;

(f)     other services that the Phase 1 Bidder anticipates providing to Tacora, including

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

any working capital financing;

(g)     any proposed capital investment by the bidder and the form of such investment, including the criteria set forth in Sections 23(e)(ii), (iii) and (ix); and

(h)     an outline of any additional due diligence required to be conducted in order to submit a final and binding offer.

28.     To assist the Financial Advisor and the Monitor in making a determination of whether to introduce any Equity Financing Party interested in the Opportunity to any Phase 1 Bidders, such parties may provide the Financial Advisor and the Monitor, prior to the Phase 1 Bid Deadline, an indication of interest in respect of the Opportunity (an "**Equity Financing IOI**"), which includes:

(a)     a description of how the Equity Financing Party proposes to structure and finance the proposed investment (including, but not limited to the sources of financing to fund the transaction);

(b)     the aggregate amount of the equity investment to be made in Tacora or its Business;

(c)     details on the permitted use of proceeds;

(d)     the underlying assumptions regarding the pro forma capital structure; and

(e)     an outline of any additional due diligence required to be conducted in order to commit to providing financing.

### *Selection of Phase 2 Bidders*

29.     The Financial Advisor shall notify each Phase 1 Bidder in writing as to whether the Phase 1 Bidder has been determined to be permitted to proceed to Phase 2 (each a "**Phase 2 Bidder**") by no later than December 6, 2023, at 12:00 p.m. (Eastern Time) or such other date or time as may be agreed by Tacora, in consultation with the Financial Advisor, and with the consent of the Monitor.

### <u>Phase 2 – Formal Binding Offers</u>

### *Phase 2 Due Diligence*

30.     Each Phase 2 Bidder shall be invited to participate in on-site tours and inspections at the Scully Mine (within reason and not at the expense of Tacora maintaining "business as usual" operations, and at the sole cost and expense of such bidder).

31.     Tacora, in consultation with the Financial Advisor and the Monitor, shall allow each Phase 2 Bidder such further access to due diligence materials and information relating to the Property and Business as they deem appropriate in their reasonable business judgment and subject to competitive and other business considerations.

32.     Phase 2 Bidders shall have the opportunity (if requested by such party) to meet with management of Tacora. Any communications or meetings between Phase 2 Bidders and management of Tacora shall be supervised by representatives of the Financial

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

Advisor and the Monitor, provided that the discussions shall remain confidential and shall not be disclosed without the consent of the parties to the discussion. In connection with the foregoing, the Financial Advisor and the Monitor shall continue to have duties to the Court to ensure that the Solicitation Process proceeds in a manner that complies with the CCAA and the terms of these Solicitation Procedures. The provisions of this section are subject to further order of the Court.

33.    Each Phase 2 Bidder will be prohibited from communicating with any other Phase 2 Bidder and their respective affiliates and their legal and financial advisors regarding the Transaction Opportunity during the term of the Solicitation Process, without the consent of Tacora and the Monitor, in consultation with the Financial Advisor. Such communications shall only occur on such terms as Tacora, the Financial Advisor and the Monitor may determine.

***Phase 2 Bids***

34.    A Phase 2 Bidder that wishes to make a definitive transaction proposal (a "**Phase 2 Bid**") shall submit a binding offer that complies with all of the following requirements to the Financial Advisor (including by email) with a copy to the Monitor (including by email) so as to be received by the Financial Advisor not later than 12:00 p.m. (Eastern Time) on January 19, 2024, or such later date determined by Tacora, in consultation with the Financial Advisor and with the consent of the Monitor (the "**Phase 2 Bid Deadline**"). Such Phase 2 Bid shall be a "**Phase 2 Qualified Bid**" if it meets all of the following criteria:

(a)    it is received by the Phase 2 Bid Deadline;

(b)    the Bid complies with all of the requirements set forth in respect of Phase 1 Qualified Bids other than the requirements set out in Sections 23(b) and 23(d)(ix) herein;

(c)    the Bid is binding and includes a letter confirming that the Phase 2 Bid is irrevocable until the selection of the Successful Bidder and the Back-Up Bidder, if any, provided that if such Phase 2 Bidder is selected as the Successful Bidder or the Back-Up Bidder, its offer shall remain irrevocable until the earlier of (a) completion of the transaction with the Successful Bidder, and (b) February 23, 2024, subject to further extensions as may be agreed to under the applicable transaction agreement(s), with the consent of the Monitor;

(d)    the Bid is in the form of duly authorized and executed transaction agreements, and in the case of:

(i)    a Sale Proposal, the Bid includes an executed share or asset purchase agreement, including all exhibits and schedules contemplated thereby (other than exhibits and schedules that by their nature must be prepared by Tacora), together with a blackline to any model documents provided by Tacora during the Solicitation Process; and

(ii)    a Recapitalization Proposal, the Bid includes the draft transaction documents contemplated to effect the Recapitalization Proposal, including all exhibits and schedules contemplated thereby (other than

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

exhibits and schedules that by their nature must be prepared by Tacora), together with a blackline to any model documents provided by Tacora during the Solicitation Process;.

(e)     the Bid includes written evidence of a firm commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to Tacora, in consultation with the Financial Advisor and the Monitor;

(f)     the Bid is not subject to the outcome of unperformed due diligence, internal approval(s) or contingency financing;

(g)     any conditions to closing or required approvals, including any agreements or approvals with unions, regulators or other stakeholders, the anticipated time frame and any anticipated impediments for obtaining such approvals are set forth in detail, such that Tacora, the Financial Advisor and the Monitor, can assess the risk to closing associated with any such conditions or approvals;

(h)     the Bid fully discloses the identity of each entity that will be entering into the transaction or the financing (including through the issuance of equity and/or debt in connection with such Bid and whether such party is assuming the Offtake Agreement on its existing terms, assuming the Offtake Agreement with amendments agreed to by Cargill or entering into an offtake or similar agreement with another party in connection with the Bid), or that is sponsoring, participating or benefiting from such Bid, and such disclosure shall include, without limitation: (i) in the case of a Phase 2 Bidder formed for the purposes of entering into the proposed transaction, the identity of each of the actual or proposed direct or indirect equity holders of such Phase 2 Bidder and the terms and participation percentage of such equity holder's interest in such Bid; and (ii) the identity of each entity that has or will receive a benefit from such Bid from or through the Phase 2 Bidder or any of its equity holders and the terms of such benefit;

(i)     the Bid provides a detailed timeline to closing with critical milestones;

(j)     the Bid is accompanied by a non-refundable good faith cash deposit (the "**Deposit**"), equal to 10% of the total cash component of the purchase price or investment contemplated under the Phase 2 Bid which shall be paid to the Monitor and held in trust pursuant to Section 44 hereof until the earlier of (i) closing of the Successful Bid or Back-Up Bid, as applicable; and (ii) rejection of the Phase 2 Bid pursuant to Section 43;  and

(k)     The Bid includes acknowledgements and representations of the Phase 2 Bidder that: (i) it had an opportunity to conduct any and all due diligence desired regarding the Property, Business and Tacora prior to making its offer; (ii) it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Property in making its Bid; and (iii) it did not rely upon any written or oral statements, representations, warranties, or guarantees whatsoever, whether express, implied, statutory or otherwise, regarding the Business, Property or Tacora or the completeness of any information provided in connection therewith, except to the extent otherwise provided under any definitive transaction agreement executed by Tacora.

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice
**Court File No./N° du dossier du greffe :** CV-23-00707394-00CL

*Assessment of Phase 2 Bids*

35.    Following the Phase 2 Bid Deadline, Tacora in consultation with the Financial Advisor and the Monitor, will assess the Phase 2 Bids received by the Phase 2 Bid Deadline and determine whether such Bids constitute Phase 2 Qualified Bids.

36.    Tacora, in consultation with the Financial Advisor, and with the consent of the Monitor, may waive strict compliance with any one or more of the requirements specified above and deem such non-compliant Bid to be a Phase 2 Qualified Bid.

37.    Phase 2 Bids may not be modified, amended, or withdrawn after the Phase 2 Bid Deadline without the written consent of Tacora, in consultation with the Financial Advisor and with the consent of the Monitor, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Phase 2 Bid for Tacora, its creditors and other stakeholders.

38.    Tacora, in consultation with the Financial Advisor and with the consent of the Monitor, may reject any Phase 2 Bid if it is determined that such Bid does not constitute a Phase 2 Qualified Bid, is otherwise inadequate or insufficient, or is otherwise contrary to the best interest of Tacora and its creditors and other stakeholders.

## Evaluation of Qualified Bids and Subsequent Actions

39.    Following the Phase 2 Bid Deadline, Tacora, the Financial Advisor and the Monitor will review the Phase 2 Qualified Bids. In performing such review and assessment, the Financial Advisor, Tacora, and the Monitor may evaluate the following non-exhaustive list of considerations: (a) the purchase price and net value (including assumed liabilities and other obligations to be performed by the Phase 2 Bidder); (b) the firm, irrevocable commitment for financing of the transaction; (c) the claims likely to be created by such Bid in relation to other Bids; (d) the counterparties to the transaction; (e) the terms of transaction documents; (f) the closing conditions and other factors affecting the speed, certainty and value of the transaction; (g) planned treatment of stakeholders, including employees; (h) the assets included or excluded from the Bid; (i) any restructuring costs that would arise from the Bid; (j) the likelihood and timing of consummating the transaction; (k) the capital sufficient to implement post-closing measures and transactions; and (l) any other factors that the Financial Advisor, Tacora, and Monitor may deem relevant in their sole discretion.

40.    Following evaluation of the Phase 2 Qualified Bids, Tacora may, in consultation with the Financial Advisor and the Monitor, undertake one or more of the following steps:

(a)    accept one of the Phase 2 Qualified Bids (the "**Successful Bid**" and the offeror making such Successful Bid the "**Successful Bidder**") and take such steps as may be necessary to finalize definitive transaction documents for the Successful Bid with Successful Bidder;

(b)    continue negotiations with Phase 2 Bidders who have submitted a Phase 2 Qualified Bids with a view to finalizing acceptable terms with one or more of Bidders that submitted Phase 2 Qualified Bids; or

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

(c)      schedule an auction with all Bidders that submitted Phase 2 Qualified Bids to determine the Successful Bid in accordance with auction procedures determined by the Financial Advisor and the Monitor, in consultation with Cargill and the Ad Hoc Group, provided they or any of their members are not Bidders that submitted Phase 2 Qualified Bids, which procedures shall be provided to all Bidders that submitted Phase 2 Qualified Bids at least four (4) Business Days prior to an auction.

41.      Tacora, in consultation with the Financial Advisor and the Monitor, may select the next highest or otherwise best Phase 2 Qualified Bid which is a Sale Proposal or Recapitalization Proposal to be a back-up bid (the "**Back-Up Bid**" and such bidder, the "**Back-Up Bidder**"). For greater certainty, Tacora shall not be required to select a Back-Up Bid.

42.      If a Successful Bidder fails to consummate the Successful Bid for any reason, then the Back-Up Bid will be deemed to be the Successful Bid and Tacora will proceed with the transaction pursuant to the terms of the Back-Up Transaction Bid. Any Back-Up Bid shall remain open for acceptance until the completion of the transaction with the Successful Bidder.

43.      All Phase 2 Qualified Bids (other than the Successful Bid and the Back-Up Bid, if applicable) shall be deemed rejected by Tacora on and as of the date of the execution of the definitive documents contemplated by the Successful Bid by Tacora.

44.      All Deposits will be retained by the Monitor and deposited in a trust account. The Deposit (without interest thereon) paid by the Successful Bidder and Back-Up Bidder whose bid(s) is/are approved at the Approval Motion will be applied to the purchase price to be paid or investment amount to be made by the Successful Bidder and/or Back-Up Bidder, as applicable upon closing of the approved transaction and will be non-refundable, other than in the circumstances set out in the Successful Bid or the Back-Up Bid, as applicable. The Deposits (without interest) of Qualified Bidders not selected as the Successful Bidder and Back-Up Bidder will be returned to such bidders within five (5) Business Days after the selection of the Successful Bidder and Back-Up Bidder or any earlier date as may be determined by the Monitor, in consultation with the Financial Advisor and Tacora. The Deposit of the Back-Up Bidder, if any, shall be returned to such Back-Up Bidder no later than five (5) Business Days after closing of the transaction contemplated by the Successful Bid .

45.      If a Successful Bidder or Back-Up Bidder breaches its obligations under the terms of the Solicitation Process, its Deposit shall be forfeited as liquidated damages and not as a penalty, without limiting any other claims or actions that Tacora may have against such Successful Bidder or Back-Up Bidder and/or their affiliates.

46.      If no Phase 2 Qualified Bids are received by the Phase 2 Bid Deadline, the Solicitation Process shall automatically terminate.

**Approval Motion**

47.      Prior to the Approval Motion, the Monitor shall provide a report to the Court providing information on the process and including its recommendation in connection with the relief sought at the Approval Motion. At the Approval Motion, Tacora shall seek the Approval Order.

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

48.   The consummation of the transaction contemplated by the Successful Bid, or the Back-Up Bid if the Successful Bid does not close, will not occur unless and until the Approval Order is granted.

**"As Is, Where Is"**

49.   Any sale of the Business and/or Property or any investment in Tacora or its Business will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Financial Advisor, Tacora, or Monitor, or their advisors or agents, except to the extent otherwise provided under any definitive sale or investment agreement with the Successful Bidder executed by Tacora. None of the Financial Advisor, Tacora, or Monitor, or their advisors or agents, including the Financial Advisor, make any representation or warranty as to the information contained in the Teaser Letter, any management presentation or the VDR, except to the extent otherwise provided under any definitive sale or investment agreement with the Successful Bidder executed by Tacora. Each Phase 2 Bidder is deemed to acknowledge and represent that: (a) it has had an opportunity to conduct any and all due diligence regarding the Business and Property prior to making its Phase 2 Bid; (b) it has relied solely on its own independent review, investigation, and/or inspection of any documents and/or the Business and Property in making its Bid; and (c) it did not rely on any written or oral statements, representations, promises, warranties, conditions or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Business and Property, or the completeness of any information provided in connection therewith, except to the extent otherwise provided under any definitive sale or investment agreement executed by Tacora.

**No Entitlement to Expense Reimbursement or Other Amounts**

50.   Phase 1 Bidders and Phase 2 Bidders shall not be entitled to any breakup fee, termination fee, expense reimbursement, or similar type of payment or reimbursement.

**Jurisdiction**

51.   Upon submitting an LOI or a Phase 2 Bid, the Phase 1 Bidder or the Phase 2 Bidder, as applicable, shall be deemed to have submitted to the exclusive jurisdiction of the Court with respect to all matters relating to the Solicitation Process and the terms and conditions of these Solicitation Procedures, any Sale Proposal or Recapitalization Proposal.

52.   For the avoidance of doubt, the approvals required pursuant to the terms hereof are in addition to, and not in substitution for, any other approvals required by the CCAA or any other statute or as otherwise required at law in order to implement a Successful Bid.

53.   Neither Tacora, the Financial Advisor nor the Monitor shall be liable for any claim for a brokerage commission, finder's fee or like payment in respect of the consummation of any of the transactions contemplated under the Solicitation Process arising out of any agreement or arrangement entered into by the parties that submitted the Successful Bid and Back-Up Bid.

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00707394-00CL

54.   The Monitor shall supervise the Solicitation Process as outlined herein. In the event that there is disagreement or clarification is required as to the interpretation or application of this Solicitation Process the responsibilities of the Monitor, the Financial Advisor or Tacora hereunder, the Court will have jurisdiction to hear such matter and provide advice and directions, upon application of the Monitor or Tacora or any other interested party with a hearing which shall be scheduled on not less than three (3) Business Days' notice.

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

## APPENDIX A

## DEFINED TERMS

(a)     "**Ad Hoc Group**" means the ad hoc group of holders of the Senior Notes and Senior Priority Notes issued by Tacora.

(b)     "**Approval Motion**" means the motion seeking approval by the Court of the Successful Bid with the Successful Bidder, and if applicable, any Back-Up Bid if the Successful Bid is not consummated.

(c)     "**Approval Order**" means an order of the Court approving, among other things, if applicable the Successful Bid and the consummation thereof, and if applicable, any Back-Up Bid if the Successful Bid is not consummated;

(d)     "**Back-Up Bid**" shall have the meaning attributed to it in Section 41;

(e)     "**Back-Up Bidder**" shall have the meaning attributed to it in Section 41;

(f)     "**Bid**" shall have the meaning attributed to it in Section 22

(g)     "**Business**" shall have the meaning attributed to it in the preamble;

(h)     "**Business Day**" means a day, other than a Saturday, Sunday or a statutory holiday, on which banks are generally open for business in Toronto, Ontario;

(i)     "**Cargill**" means Cargill International Trading PTE Ltd. and its affiliates.

(j)     "**CCAA**" shall have the meaning attributed to it in the preamble;

(k)     "**Court**" shall have the meaning attributed to it in the preamble;

(l)     "**Debt Financing Party** s**hall have the meaning attributed to it in Section 18;

(m)     "**DIP Agreement**" means the DIP Loan Agreement between Tacora and Cargill, Incorporated, dated October 9, 2023, as may be amended from time to time;

(n)     "**Equity Financing IOI**" s**hall have the meaning attributed to it in Section 28;

(o)     "**Equity Financing Party**" s**hall have the meaning attributed to it in Section 18;

(p)     "**Financial Advisor"** shall have the meaning attributed to it in the preamble;

(q)     "**Financing Party** s**hall have the meaning attributed to it in Section 18;

(r)     "**Initial Order**" shall have the meaning attributed to it in the preamble;

(s)     "**LOI" s**hall have the meaning attributed to it in Section 22;

(t)     "**Monitor**" shall have the meaning attributed to it in the preamble;

(u)     "**Monitor's Website**" means http://cfcanada.fticonsulting.com/Tacora;

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

(v)      "**NDA"** shall have the meaning attributed to it in Section 10(d);

(w)      "**Offtake Agreement**" means the Restatement of the Iron Ore Sale and Purchase Agreement dated November 11, 2018, as amended;

(x)      "**Offtake Financing Party**" **s**hall have the meaning attributed to it in Section 18;

(y)      "**Offtake IOI**" **s**hall have the meaning attributed to it in Section 27;

(z)      "**Offtake Opportunity**" shall have the meaning attributed to it in Section 3;

(aa)     "**Opportunity**" shall have the meaning attributed to it in Section 3;

(bb)     "**Phase 1 Bid Deadline**" shall have the meaning attributed to it in Section 22;

(cc)     "**Phase 1 Bidder**" shall have the meaning attributed to it in Section 12;

(dd)     "**Phase 1 Qualified Bid**" shall have the meaning attributed to it in Section 22;

(ee)     "**Phase 2 Bid**" shall have the meaning attributed to it in Section 34;

(ff)     "**Phase 2 Bid Deadline**" shall have the meaning attributed to it in Section 34;

(gg)     "**Phase 2 Bidder**" shall have the meaning attributed to it in Section 29;

(hh)     "**Phase 2 Qualified Bid**" shall have the meaning attributed to it in Section 34;

(ii)     "**Potential Bidder"** shall have the meaning attributed to it in Section 10(a);

(jj)     "**Property**" shall have the meaning attributed to it in the preamble;

(kk)     "**Recapitalization Proposal**" shall have the meaning attributed to it in Section 23(c)(i);

(ll)     "**Sale Proposal**" shall have the meaning attributed to it in Section 23(c)(i);

(mm)     "**Scully Mine**" shall have the meaning attributed to it in the preamble;

(nn)     "**Solicitation Order**" shall have the meaning attributed to it in the preamble;

(oo)     "**Solicitation Process**" shall have the meaning attributed to it in the preamble;

(pp)     "**Solicitation Procedures**" shall have the meaning attributed to it in the preamble;

(qq)     "**Stalking Horse Bid**" shall have the meaning attributed to it in Section ;

(rr)     "**Successful Bid**" shall have the meaning attributed to it in Section 40; and

(ss)     "**Successful Bidder**" shall have the meaning attributed to it in Section 40**.**

(tt)     "**Teaser Letter**" shall have the meaning attributed to it in Section 10(d);

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

(uu)        "**Transaction Opportunity**" shall have the meaning attributed to it in Section 2.

Electronically issued / Délivré par voie électronique : 31-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice
C. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF TACORA RESOURCES INC.

*INGEMENT ACT*, R.S.C. 1985 Court File No./N° du dossier du greffe : CV-23-00707394-00CL

(Applicant)

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

PROCEEDINGS COMMENCED AT TORONTO

**ORDER**
**(Solicitation Order)**

**STIKEMAN ELLIOTT LLP**
5300 Commerce Court West
199 Bay Street
Toronto, ON  M5L 1B9

**Ashley Taylor (LSO #39932E)**
Tel: 416-869-5236
Email: ataylor@stikeman.com

**Lee Nicholson (LSO #66412I)**
Tel: 416-869-5604
Email: leenicholson@stikeman.com

**Natasha Rambaran (LSO #80200N)**
Tel: 416-869-5504
Email: nrambaran@stikeman.com

**Philip Yang (LSO #82084O)**
Tel: 416-869-5593
Email: pyang@stikeman.com

Counsel to Tacora Resources Inc.

# Appendix "B"



ONTARIO SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

## COUNSEL SLIP/ENDORSEMENT

**COURT FILE NO.:**    **CV-23-00707394-00CL**    **DATE:**  **6 February 2024 and 9 February 2024**

**NO. ON LIST:**    **3**

**TITLE OF PROCEEDING:**    **TACORA RESOURCES INC.**

**BEFORE JUSTICE:**    **KIMMEL**

---

### PARTICIPANT INFORMATION

**For Plaintiff, Applicant, Moving Party, Crown:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Ashley Taylor | Stikeman Elliott LLP, counsel for the Applicant, Tacora Resources Inc. | ataylor@stikeman.com |
| Eliot N. Kolers | | ekolers@stikeman.com |
| Lee Nicholson | | leenicholson@stikeman.com |
| Natasha Rambaran | | nrambaran@stikeman.com |
| Philip Yang | | pyang@stikeman.com |

**For Defendant, Respondent, Responding Party, Defence:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| | | |

**For Proposed Monitor:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Jane Dietrich | Cassels Brock & Blackwell LLP, counsel for the Proposed Monitor | jdietrich@cassels.com |
| Ryan Jacobs | | rjacobs@cassels.com |
| Alan Merskey | | amerskey@cassels.com |
| Paul Bishop | FTI Consulting Canada Inc. in its capacity as Monitor | Paul.Bishop@fticonsulting.com |
| Jodi Porepa | | Jodi.Porepa@fticonsulting.com |

**For Other, Self-Represented:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Andrew Winton | Lax O'Sullivan Lisus Gottlieb LLP, counsel for the Board of Directors | awinton@lolg.ca |
| Marc Wasserman | Osler, Hoskin & Harcourt LLP, counsel for the Consortium | mwasserman@osler.com |
| Michael De Lellis | | mdelellis@osler.com |
| Jeremy Dacks | | jdacks@osler.com |
| Robert Chadwick | Goodmans LLP, counsel for Cargill, Incorporated and Cargill International Trading Pte Ltd. | rchadwick@goodmans.ca |
| Peter Kolla | | pkolla@goodmans.ca |
| Caroline Descours | | cdescours@goodmans.ca |
| Alan Mark | | amark@goodmans.ca |
| Brennan Caldwell | | bcaldwell@goodmans.ca |
| Brittni Tee | | btee@goodmans.ca |
| Richard Swan | Bennett Jones LLP, counsel for the Ad Hoc Group of Senior Noteholders | SwanR@bennettjones.com |
| Sean Zweig | | ZweigS@bennettjones.com |
| Natasha MacParland | Davies Ward Phillips & Vineberg LLP, counsel for Crossingbridge Advisors, LLC | nmacparland@dwpv.com |
| Natalie Renner | | nrenner@dwpv.com |
| Joe Thorne | Stewart McKelvey, counsel for 1128349 B.C. Ltd. | joethorne@stewartmckelvey.com |
| David Seifer | Dickinson Wright LLP, counsel for | DSeifer@dickinsonwright.com |
| Corinne Godbout | Department of Justice, counsel for Atlantic Canada Opportunities Agency Legal Services | Corinne.Godbout@acoa-apeca.gc.ca |
| Gerry Apostolatos | Langlois Lawyers LLP, counsel for Quebec North Shore and Labrador Railway Inc. | gerry.apostolatos@langlois.ca |
| Jean Leclerc | S.E.N.C.R.L, counsel for Société Ferroviaire et Portuaire de Pointe-Noire | jean.leclerc@cainlamarre.ca |
| Usman Masood | Greenhill & Co Canada Ltd. Relation to Tacora: Financial Advisor | usman.masood@greenhill.com |
| Peter Rubin | Resource Capital Fund VII L.P. | peter.rubin@blakes.com |
| Mark F. Hebbeln | Foley & Lardner Llp, Counsel for Computershare Trust Company | mhebbeln@foley.com |
| Ben Muller | Consortium Noteholder Group | bmuller@osler.com |

**ENDORSEMENT OF JUSTICE KIMMEL:**

1. The applicant's sale approval motion sought by Notice of Motion dated February 2, 204 (that requests, among other things, a reverse vesting order) and the non-scheduling aspects of the motion brought by Cargill International Trading Pte Ltd. (together, "Cargill") by its Notice of Motion dated February 5, 2024 (referred to in the agreed timetable as the "Preliminary Threshold Motion") have now been scheduled to be heard together commencing on April 10, 2024 at 10:00 a.m. for 2.5 days.

2. The schedule has been accommodated by Cargill's agreement to extend the DIP Facility and by the negotiated extension of the court approval deadline contained in the Subscription Agreement for the Investors' bid from April 1, 2024 to April 19, 2024 (the "Court Approval Milestone"). While the court will endeavour to render its decision, one way or the other, within the one week period that this extension allows for before the expiry of the extended deadline, that cannot be guaranteed. This will be a matter for the parties to address, if it becomes an issue after the hearing.

3. The parties shall adhere to the following timetable for the remaining pre-hearings steps, such that all materials shall have been served, filed and uploaded into CaseLines by no later than 2:30 p.m. on April 9, 2024 (with the exception of the reply factum(s) due that day and which may be served, filed and uploaded into CaseLines by no later than 5 p.m. that day):

| Event | Dates |
|---|---|
| Notices of Examination from all parties | Wednesday, February 14 |
| Production in response to notices of examination | Friday, February 23 |
| Cargill Responding Record and any Tacora responding record on preliminary threshold motion | Friday, March 1 |
| Additional Notices of Examination from Tacora and any supporting parties | Tuesday, March 5 |
| Production in response to additional notices of examination | Tuesday, March 12 |
| Fourth Report of the Monitor | Thursday, March 14 |
| Reply | Thursday, March 14 |
| Cross-examinations on all motions | Week of March 18 |
| Answers to undertakings from cross-examinations | Tuesday, March 26 |
| Supplement to the Fourth Report | Tuesday, March 26 |
| Factums of Tacora and any supporting parties and factum of Cargill and any supporting parties on preliminary threshold motion | Wednesday, March 27 |

| Event | Dates |
|---|---|
| Responding factums of Cargill and any supporting parties and responding factums of Tacora and any supporting parties to preliminary threshold motion | Saturday, April 6 at noon |
| Reply factums | Tuesday, April 9 |
| Hearing (including of Cargill preliminary threshold motion) | April 10, 11 and 12 (morning) |

4. The current stay of proceedings expires on March 18, 2024.  A stay extension motion has been scheduled commencing at 9:30 a.m. on March 18, 2024.  Cargill has indicated that it would like to see the cash flows and the Monitor's report supporting the stay extension.  The applicant is encouraged to serve this motion as far in advance as it is able to with a view to minimizing the matters in dispute, if any, on the stay extension motion.

KIMMEL J.

# Appendix "C"

**CITATION:** Tacora Resources Inc. (Re), 2023 ONSC 6126
**COURT FILE NO.:** CV-23-00707394-00CL
**DATE:** 20231030

## SUPERIOR COURT OF JUSTICE – ONTARIO (COMMERCIAL LIST)

**RE:**        **IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF TACORA RESOURCES INC.**

**BEFORE:**    KIMMEL J.

**COUNSEL:**   *Ashley Taylor, Eliot Kolers, Lee Nicholson, Natasha Rambaran and RJ Reid*, for the Applicant, Tacora Resources Inc.

*Alan Merskey, Jane Dietrich and Ryan Jacobs*, for the Monitor (FTI Consulting Canada Inc.)

*Robert Chadwick, Caroline Descours, Peter Kolla and Carlie Fox,* for Cargill, Incorporated and Cargill International Trading Pte Ltd.

*Richard Swan, Sean Zweig and Alexander Payne*, for the Ad Hoc Group of Senior Noteholders and the Indenture Trustee

*Natasha MacParland,* for Crossingbridge Advisors, LLC

*Joe Thorne,* for 1128349 B.C. Ltd.

**HEARD:**     October 24, 2023

## <u>ENDORSEMENT – COME-BACK HEARING</u><br><u>(ARIO AND SOLICITATION ORDER)</u>

**The Come-Back Motion**

[1]     The court made an initial order under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("CCAA") in respect of Tacora Resources Inc. ("Tacora" or the "company") on October 10, 2023 (the "Initial Order"). The come-back hearing was originally scheduled for October 19, 2023, but was adjourned to October 24, 2023 by order dated October 13, 2023 to afford the company and the participating stakeholders additional time to address certain issues of disagreement among them, and in particular their disagreement over the terms and source of debtor in possession ("DIP") financing that the company needs to carry out its intended restructuring efforts.

[2]     The court's October 13, 2023 order adjourning the come-back hearing also extended the expiry of the stay of proceedings provided for in the Initial Order from October 20, 2023 to October 27, 2023 (the "Stay Period"). A further stay extension order was granted on October 27, 2023 while the court's decision on this motion was under reserve, extending the Stay Period to October

31, 2023 and increasing the permitted draws under the DIP financing approved under the Initial Order by $5 million to address the company's immediate cash needs, which the Monitor confirmed and recommended.

[3]     The company seeks the following relief on the come-back motion:

    a.  an amended and restated initial order (the "ARIO") to, among other things:

        i.  extend the Stay Period until and including February 9, 2024;

        ii.  authorize Tacora to borrow up to $75,000,000 under the Cargill DIP Facility;

        iii.  approve the Greenhill Engagement Letter and the Transaction Fee Charge;

        iv.  approve the company's proposed Key Employee Retention Plan (the "KERP"), and authorize Tacora to pay the KERP Funds to the Monitor and grant the KERP Charge;

        v.  grant a sealing order over a confidential schedule to the KERP; and

        vi.  grant an increase to the quantum of the Directors' Charge,

    b.  a solicitation order (the "Solicitation Order") to, among other things:

        i.  approve the proposed Solicitation Process; and

        ii.  authorize Tacora, Greenhill and the Monitor to immediately commence the Solicitation Process.

[4]     Capitalized terms not otherwise defined in this endorsement shall have the meanings ascribed to them in the Initial Order and the company's proposed ARIO.

[5]     The company owns and operates the Scully Mine (the "Scully Mine"), an iron ore concentrate producer located near Wabush, Newfoundland and Labrador, Canada with a production capacity of six (6) million tonnes per annum ("Mtpa").

**Stakeholder Positions**

*The Ad Hoc Group of Noteholders*

[6]     An *ad hoc* group of holders of senior secured priority notes ("Senior Priority Notes") and holders of senior secured notes ("Senior Notes") of Tacora (the "AHG") oppose the relief sought by the company on the come-back motion.  They comprise a substantial majority of the holders of

both series of Tacora notes[1]. The total amount of all of the secured notes under both series, including accrued interest, is estimated to be almost $270 million. The noteholders (including the AHG) are the most significant secured creditors of Tacora. They are the only stakeholders who oppose the relief sought by the company on the come-back motion.

[7]    The AHG's opposition to the ARIO is primarily in respect of the requested court approval and authorization of the Cargill DIP Facility.  By a cross-motion the AHG seek the court's approval of their competing DIP proposal made on October 8, 2023 (the "AHG DIP Proposal") that is provided for in their own proposed amended and restated initial order (the "AHG ARIO").  Their cross-motion also seeks various alternative relief if their request for approval of the AHG DIP Proposal and AHG ARIO is not successful (the "Alternative Relief"). The Alternative Relief would entail changes to the Cargill DIP Facility and changes to the proposed KERP and other proposed terms of the ARIO dealing with the priority of certain charges, as well as the appointment of a Chief Restructuring Officer ("CRO").

[8]    The AGH only opposes one aspect of the Solicitation Order, which is that it should not only provide for the court's authorization to immediately commence the Solicitation Process but it should also include a direction that the Solicitation Process be commenced immediately.

*Cargill*

[9]    The other significant secured creditor of Tacora is Cargill International Trading Pte Ltd. ("Cargill"), with first and second ranking secured debt of almost $35 million.

[10]    Cargill is party to various commercial arrangements and contracts with Tacora. Tacora sells 100% of the iron ore concentrate production at the Scully Mine to Cargill pursuant to an offtake agreement between Tacora, as seller, and Cargill, as buyer, dated April 5, 2017 and restated on November 9, 2018 (as amended from time to time, the "Offtake Agreement"). Pursuant to an amendment dated March 2, 2020, the term of the Offtake Agreement was extended to a life of mine contract such that Tacora is required to sell and Cargill is required to buy all iron ore concentrate produced at the Scully Mine while it remains operational.

[11]    The sale of the iron ore concentrate is also subject to a stockpile agreement between Tacora, as seller, and Cargill, as buyer, dated December 17, 2019 (the "Stockpile Agreement"), which works in conjunction with the Offtake Agreement.  The Offtake Agreement and other commercial arrangements between Cargill and Tacora have resulted in significant payments by Tacora to Cargill since 2019 despite Tacora's liquidity issues and financial challenges during this period.

[12]    In or around December 2022, Tacora required additional financing to fund operations through the liquidity challenges it was facing at that time. On January 3, 2023, Tacora, as seller, and Cargill, as buyer, entered into an advance payment facility agreement (as amended from time

---

[1] Although not in evidence, at the hearing counsel for the AHG represented the holdings of the AHG to account for approximately 86% of the total value of the Tacora senior secured notes.

- Page 4 -

to time, the "APF Agreement"). Pursuant to the APF Agreement, Cargill provided Tacora with an advance payment facility (the "Advance Payments Facility") under which Cargill made advance payments under the Offtake Agreement in the total principal amount of $30,000,000 (the "Initial Advances") to Tacora. Until termination of the APF Agreement, Cargill is required to continue paying Tacora for iron ore concentrate under the Offtake Agreement and may not credit such deliveries against the outstanding balance of the Advance Payments Facility.

[13]    Subsequently, on May 29, 2023, Tacora and Cargill entered into an Amended and Restated APF Agreement (the "Second APF Amendment") to provide Tacora with additional liquidity. The Second APF Amendment provided for a new facility under the Advance Payments Facility whereby Cargill would make margin advances ("Margin Advances") of up to $25,000,000 to Tacora. The Margin Advances were primarily made to finance margin payments payable to Cargill under the Offtake Agreement. The outstanding amount of Margin Advances fluctuate daily based on the Platts Index 62% price movement. The Margin Advances rank *pari passu* with the Senior Priority Note and senior to the Senior Notes and the Initial Advances. Pursuant to the Second APF Amendment, the maturity date of the Advance Payments Facility was extended to September 12, 2023.

[14]    On June 23, 2023, Tacora entered into a further amendment to the APF Agreement (the "Third APF Amendment") to provide greater flexibility to Tacora on utilizing the new margin facility provided by the Second APF Amendment. Under the Third APF Amendment, Cargill, in its sole discretion, could make additional prepay advances ("Additional Prepay Advances" and together with the Margin Advances, the "Senior Priority Advances") to Tacora utilizing any availability under the $25,000,000 facility created by the Second APF Amendment. On June 29, 2023, Cargill made an Additional Prepay Advance in the amount of $3,000,000. Additional Prepay Advances are repayable upon demand and rank *pari passu* with the Senior Priority Notes and the Margin Advances, and senior to the Senior Notes and the Initial Advances. No further Additional Prepay Advances have been made by Cargill and the only Additional Prepay Advance made to Tacora has been repaid.

[15]    To further enhance the company's liquidity position in the face of continued negative cash flow, Cargill and the company entered into a wet concentrate purchase and sale agreement (the "Wetcon Agreement") dated July 10, 2023, whereby Cargill agreed to purchase a stockpile of 172,000 tonnes of wet concentrate located at the Scully Mine from Tacora.

[16]    In connection with discussions and negotiations between Tacora's stakeholders regarding a potential consensual recapitalization transaction, Cargill agreed to extend the maturity date of the Advance Payments Facility from time to time, most recently to October 10, 2023. At the October 24, 2023 hearing, Cargill agreed to further extend the maturity date to allow the court time to render its decision on the come-back motion and the AHG's cross-motion.

[17]    Tacora's former co-founder, Chief Operating Officer, and Chief Commercial Officer, Matt Lehtinen, was hired by Cargill in 2023 and has responsibility for Cargill's relationship with Tacora. There are Cargill employees on site on a day-to-day basis in connection with the management of the Scully Mine. Cargill has also had a representative on Tacora's board of directors ("Board") for many years. Mr. Leon Davies is a Cargill employee and was its Board

appointee when the Offtake Agreement was last amended and throughout the DIP Process (defined below).

[18]    Two Cargill entities are equity-holders in Tacora. Cargill is described as a "related party" under IFRS standards in Tacora's financial statements.

[19]    Cargill Incorporated, an affiliate of Cargill, is the counter-party to the Cargill DIP Facility for which approval is sought under the ARIO.

[20]    Cargill (in its various capacities as a stakeholder of Tacora) supports the ARIO and Solicitation Order sought by Tacora at this come-back hearing and opposes the relief sought by the AHG's cross-motion.

*The Monitor and Other Noteholders*

[21]    The court-appointed monitor under the Initial Order, FTI Consulting Canada Inc. (the "Monitor"), supports the ARIO and Solicitation Order sought by the company, as does one of the company's Senior Secured Priority Noteholders, Crossingbridge Advisors, LLC (under a reservation of its rights more generally). The remaining noteholders (not accounted for in the AHG) have taken no position on the come-back motion or the cross-motion.

*Other Stakeholders*

[22]    A number of other stakeholders were identified by Tacora in its initial CCAA filing.

[23]    Tacora employs approximately 450 employees. Some are salaried (36%) and some are hourly (64%) and more than half of the employees are unionized. The current collective bargaining agreement is in effect until December 31, 2027. Most employees are located at the Scully Mine. Only 13 employees are located at the company's head office in Grand Rapids, Minnesota.

[24]    Tacora also contracts with various local service providers that make available staff to assist Tacora with its operations on a regular basis. Certain of these contractors have staff at the Scully Mine during each shift worked by regular Tacora employees, performing either general labour or specialized tasks at the Scully Mine related to repair and maintenance.

[25]    In February 2023, Tacora engaged Partners in Performance ("PIP"), a global management consulting firm, to initiate an operational stabilization and turnaround program at the Scully Mine for a period of 20 weeks, commencing on February 27, 2023. The term of PIP's consultancy agreement was extended.  It has a team that are regularly on site at the Scully Mine to continue the operational stabilization and turnaround program and to assist Tacora develop and action a capital project plan to ramp up to 6 Mtpa capacity. Tacora anticipates enlisting PIP's continued support throughout its planned restructuring process.

[26]    Cargill also provides on-site consultancy support to Tacora, historically at no cost to Tacora.