[155] The main feature for which approval is required is the Cargill DIP Facility and DIP Charge. All creditors likely to be affected by the Cargill DIP Facility and DIP Charge were served with notice of the come-back hearing and only the AHG opposes this approval. That opposition is addressed in the preceding section of this endorsement.

[156] The requested approval and authorization sought for the company to draw up to the maximum amount of the Cargill DIP Facility of $75 million and to increase the DIP Charge accordingly, is supported by the company's Cash Flow Forecast demonstrating the need for the full amount to pay obligations as they come due, continue operations, and undertake the Solicitation Process during the proposed extended Stay Period. The Monitor supports the approval of the Cargill DIP Facility and authorization to draw up to the maximum available principal amount. The requested increase to the maximum principal amount of the DIP Facility is fair and reasonable and, for reasons previously indicated, satisfies the criteria under ss. 11.2(1) and 11.2(4) of the CCAA.

[157] As previously indicated, the court has independently determined that the Cargill DIP Facility and DIP Charge should be approved with regard to the relevant factors under s. 11.2(4) of the CCAA. The support and recommendations of the Monitor and Greenhill are relevant factors to take into account, as is the Board's approval of the Cargill DIP Facility and DIP Charge. The court "may consider, but not defer to, and is not fettered by, the recommendation of the Board." See *Crystallex* (Ont. C.A.), at para. 85.

[158] The other provisions of the ARIO for which the Court's approval are sought are reasonable and appropriate in the circumstances, because:

> a. The extension of the Stay Period from October 27, 2023 to February 9, 2024 is necessary and appropriate to allow the company's good faith pursuit of the Solicitation Process by which it hopes to identify a value maximization transaction for the benefit of Tacora stakeholders. The Solicitation Process contemplates a motion for court approval of a successful bid during the week of February 5, 2024 (subject to availability). The extension of the Stay Period to February 9, 2024 is supported by the Monitor and Cash Flow Forecasts that are, in turn, based on the Cargill DIP Facility.
>
> b. Section 11 of the CCAA provides the court with authority to allow debtor companies to enter into arrangements to facilitate a restructuring, which may include the retention of expert advisors like Greenhill where necessary to help with the restructuring efforts. See *Victorian Order of Nurses for Canada (Re)*, 2015 ONSC 7371, 32 C.B.R. (6th) 236, at para. 27. Courts have approved the appointment of advisors in restructuring proceedings, and corresponding charges to secure such advisors' professional fees, where such advisors' knowledge and experience is critical to assisting the debtor with a successful restructuring or is necessary to assist the debtor with a liquidation sale. See *Target Canada Co (Re)*, 2015 ONSC 303, at para. 72. Greenhill's prior experience with the company, including Greenhill's involvement running the Strategic Process starting in March of this year, along with its extensive experience in matters of this nature, makes it well-suited to this mandate. The Monitor recommends that the court approve the

      Greenhill Engagement Letter create of the Transaction Fee Charge, as it is of the view that the continued engagement of Greenhill to assist in the implementation of the Solicitation Process will be beneficial to the estate and its stakeholders generally and to the efficient completion of the CCAA Proceeding. The Monitor has considered the fees provided for in the Greenhill Engagement Letter and is satisfied that they are within market parameters. The court accepts the Monitor's recommendations in this regard and the approval of the Greenhill Engagement Letter is not challenged. The Monitor supports the granting of the Transaction Fee Charge, which the court has also found to be reasonable and appropriate in the previous section of this endorsement.

c. The initial amount of the Directors' Charge was found when the court granted the Initial Order to be appropriately "limited to projected potential uninsured obligations and to what [was] fair and reasonable for the initial 10 day period having regard to the requirements of s. 11.51 of the CCAA and the need for continuity and to keep the directors in place". In connection with the request for the grant of the ARIO, Tacora seeks to increase the quantum of the Directors' Charge to $5,200,000. The proposed increase has been determined in consultation with the Monitor to reflect the increased potential scope of liability during these CCAA Proceedings. This increase is justified on the same basis as the Directors' Charge was considered to be appropriate when the Court granted the Initial Order. The Monitor supports Tacora's request to increase the quantum of the Directors' Charge, which it believes is reasonable and justified in relation to the quantum of the Directors' estimated potential liability.

d. The KERP was designed to incentivize Key Employees to continue their employment with Tacora in order to continue the business as a going concern and maximize value for all stakeholders through the proposed Solicitation Process. The KERP complies with the factors to be considered in the approval of such plans (*Just Energy Group Inc et al*, 2021 ONSC 7630, 95 C.B.R. (6th) 264), in that:

    i. It was developed by Tacora with significant input from the Monitor, and is comparable to other recent KERPs that have been approved in Canada. The Monitor supports approval of the KERP.

    ii. If the proposed KERP is not approved, the company's CEO believes that it is likely that the Key Employees would consider and pursue other employment opportunities.

    iii. The Key Employees have distinct and critical roles at Tacora and will allow the Company to continue operating in the ordinary course while also advancing the Solicitation Process. The company is concerned that finding qualified individuals to replace the Key Employees would be challenging, disruptive, costly, and time consuming.

    iv. The company believes that the KERP will facilitate and encourage the continued participation of Key Employees during these CCAA

      Proceedings. The KERP provides for the payment of up to $3,035,000 to 34 Key Employees (identified out of a work force of approximately 450 employees), including seven corporate personnel (the executive team and the corporate finance team) and 27 Scully Mine personnel.

  v. Individual bonuses for Key Employees range from 16% to 53% of their maximum potential annual compensation (with individual bonuses for Key Mine Employees ranging from 36% to 66% of their base salaries, and individual bonuses for Key Corporate Employees ranging between 49% and 107% of their base salaries), which will be forfeited if they resign or are terminated for just cause prior to the completion of a transaction pursuant to the Solicitation Process or the completion of the CCAA Proceedings.

  vi. The Board of Directors unanimously approved the KERP. As a proposed beneficiary of the KERP, Mr. Broking did not participate in the vote approving the KERP.

[159] The details of the KERP are set forth in Confidential Exhibit "C" to the Second Broking Affidavit. It contains sensitive personal and compensation information, which Tacora's CEO believes may cause harm to the Key Employees and could result in a distraction for employees if such information became public and generally accessible. Tacora requests a sealing order in relation to the confidential exhibit in order to protect the personal compensation information contained therein and avoid this distraction. To grant this relief, the court must be satisfied of the test in *Sierra Club of Canada v. Canada (Minister of Finance)*, 2002 SCC 41, [2002] 2 S.C.R. 522, at para. 53, as modified by *Sherman Estate v. Donovan*, 2021 SCC 25, 72 C.R. (7th) 223, at paras. 38 and 43, having regard to:

  a. The important public interest in the openness of courts and whether it poses a serious risk to some other important public interest;

  b. Whether the order sought is necessary to prevent the risk to the other identified public interest because alternative measures are not available; and

  c. As a matter of proportionality, the benefits of the sealing order outweigh its negative effects.

[160] Confidential Exhibit "C" contains individual compensation information and the amount of the proposed KERP payments for each eligible employee. Employees have a reasonable expectation that their names and salary information will be kept confidential. Conversely, disclosing this information could create a distraction for key employees who need to be focused right now on the company's restructuring efforts. Protecting the sensitive personal compensation information of the employees is an important public interest that should be protected. The sealing order is necessary in order to protect the privacy rights of Tacora's employees while permitting the court to consider the details of the KERP. As a matter of proportionality, the benefits of sealing Confidential Exhibit "C" outweigh its negative effects.

[161] Courts have applied the *Sierra Club* and *Sherman Estate* tests in the insolvency context and authorized sealing orders over confidential or commercially sensitive documents. See, for

example, *Ontario Securities Commission v. Bridging Finance Inc.*, 2021 ONSC 4347, 90 C.B.R. (6th) 102, at paras. 23–28; see also *Just Energy Corp, Re*, 2021 ONSC 1793 at paras. 123–24. Courts have previously granted sealing orders in respect of individual compensation arrangements relating to key employee retention plans. See *Bridging Finance*, at paras. 23–28; *Golf Town Canada Holdings Inc (Re)*, Initial Order issued September 14, 2016 [Court File No. CV-16-11527-00CL] at para. 64; *Acerus Pharmaceuticals Corporation et al (Re)*, Amended and Restated Initial Order issued February 3, 2023 [Court File No. CV-23-00693595-DDCL].

[162]  Certain documents were agreed as between the parties to be designated as confidential for purposes of the examinations. Some of the documents were referred to during the examinations and a very few of them were referred to in the factums filed on these motions. This is real time litigation and the 3 C's of the Commercial List encourage parties to find practical solutions to allow cases to move forward expeditiously, as was done here through the agreement to a confidentiality protocol. The court was advised that, with the possible exception of one profit figure, none of the information from the confidential exhibits is relevant to the issues before the court. The confidentiality designations are primarily in respect of personal information.

[163]  Thus, the practical solution that was adopted by the parties, of redacting the references to these exhibits in the materials filed with the court, was appropriate. Leave is granted for those filed materials to remain in redacted form. I do not believe that I have made reference in this endorsement to any of the redacted confidential information, but I invite counsel to alert the court immediately if there are any concerns in that regard.

*Should the Court Approve the Solicitation Order?*

[164]  The remedial nature of the CCAA confers broad powers to facilitate restructurings, including the power to approve a solicitation process prior to or in the absence of a plan of compromise and arrangement. See *Nortel Networks Corporation (Re)*, 55 CBR (5th) 229, at paras. 47–48.

[165]  Section 36 of the CCAA sets out certain factors to be considered by the Court in approving a sale. Section 36 does not directly address the factors a court should consider when determining whether to approve a solicitation process; however, such criteria can be evaluated in light of the considerations that will ultimately apply when seeking approval of a sale transaction, including whether the process is reasonable in the circumstances, whether the Monitor approved the process, and the extent to which the creditors were consulted. See *Brainhunter Inc (Re)*, 2009 CanLII 72333 at paras. 16–17.

[166]  In *Walter Energy Canada Holdings, Inc.*, 2016 BCSC 107, 33 C.B.R. (6th) 60, at paras. 20–21, the court considered the following additional factors in approving a CCAA SISP:

     a. the fairness, transparency and integrity of the proposed process;

     b. the commercial efficacy of the proposed process in light of the specific circumstances; and

     c. whether the sales process will, in the circumstances, optimize the chances of securing the best possible price for the assets for sale.

[167]   The *Walter Energy* factors have been cited with approval in subsequent decisions, including the recent CCAA proceedings of *Nordstrom Canada Retail, Inc.*, 2023 ONSC 1631 at para. 9 and *Bron Media Corp (Re)*, 2023 BCSC 1563 at para. 41.

[168]   The Solicitation Process was developed by Greenhill in consultation with the Monitor, and provided to the company's secured creditors for feedback. The Solicitation Process will be run by Greenhill with assistance from the company's counsel and with the oversight of the Monitor.

[169]   The Monitor has recommended that this court approve the Solicitation Process, as it believes the Solicitation Process: (a) provides for a broad, open, fair and transparent process; (b) provides for an appropriate level of independent oversight; (c) should encourage and facilitate bidding by interested parties; (d) is reasonable in the circumstances; and (e) should not discourage parties from submitting offers.

[170]   In these circumstances, it is appropriate for the court to approve the Solicitation Process and grant the Solicitation Order, with the change requested by the AHG that the court not only authorizes but also direct the company and its advisors to immediately commence the Solicitation Process.

**Final Disposition**

[171]   For the foregoing reasons, the ARIO and Solicitation Order shall issue in the forms signed by me today.

*[signature]*

Kimmel J.

**Date:** October 30, 2023

Court File No. CV-23-00707394-00CL

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF TACORA RESOURCES INC.

|  |  |
|---|---|
|  | *ONTARIO* <br> **SUPERIOR COURT OF JUSTICE** <br> **(COMMERCIAL LIST)** <br><br> PROCEEDING COMMENCED AT <br> TORONTO |
|  | **FOURTH REPORT OF THE MONITOR** |
|  | **Cassels Brock & Blackwell LLP** <br> Suite 3200, Bay Adelaide Centre – North Tower <br> 40 Temperance St. <br> Toronto, ON M5H 0B4 <br><br> **Ryan Jacobs LSO#59510J** <br> Tel:   416.860.6465 <br> rjacobs@cassels.com <br><br> **Jane Dietrich LSO#49302U** <br> Tel:   416.860.5223 <br> jdietrich@cassels.com <br><br> **Alan Merskey LSO#413771** <br> Tel:   416.860. 2948 <br> amerskey@cassels.com <br><br> **Monique Sassi LSO# 63638L** <br> Tel:  416.860.6886 <br> msassi@cassels.com <br><br> *Lawyers for the Monitor, FTI Consulting Canada Inc.* |