# EXHIBIT H

CITATION: Tacora Resources Inc. (Re), 2024 ONSC 4436<br>
COURT FILE NO.: CV-23-00707394-00CL<br>
DATE: 20240812

**SUPERIOR COURT OF JUSTICE – ONTARIO (COMMERCIAL LIST)**

**RE:**     IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF TACORA RESOURCES INC.

**BEFORE:**    KIMMEL J.

**COUNSEL:** *Ashley Taylor/Lee Nicholson/Philip Yang/Natasha Rambaran*, for the Applicant, Tacora Resources Inc.

*Robert Chadwick/Caroline Descours/Peter Kolla/Sarah Stothart/Brittni Tee,* for Cargill, Incorporated and Cargill International Trading Pte Ltd.

*Marc Wasserman/Michael De Lellis*, for the Consortium Noteholders Group

*Alan Merskey/Jane Dietrich/Ryan Jacobs*, for the Monitor, FTI Consulting Canada Inc.

*Shaan Tolani*, for Computershare Trust Company

*Natasha MacParland/Derek Ricci*, for Crossing Bridge Advisors

*Joe Thorne*, for 1128349 BC Ltd.

*Gerry Apostolatos*, for Quebec North Shore and Labrador Railway Inc.

**HEARD:**    July 26, 2024

**ENDORSEMENT**
**(RVO AND INCLUDED THIRD PARTY RELEASES)**

[1]    Tacora Resources Inc. ("Tacora") brought a motion for an Approval and Reverse Vesting Order ("RVO") in respect of a July 21, 2024 Subscription Agreement and the transactions contemplated by it (the "Transactions"). The Subscription Agreement was entered into between Tacora and a group of investors comprised of certain noteholders represented by Millstreet Capital Management LLC, as investment manager ("Millstreet"), OSP, LLC, on behalf of certain managed funds ("OSP"), and Cargill, Incorporated ("Cargill") (collectively, the "Investors"). The RVO includes third party releases.

- Page 2 -

[2]     At the same time, Tacora sought an ancillary order dealing with an extension of the Stay and DIP Financing and approval of fees.  Both orders were signed on July 26, 2024 because time was of the essence.

[3]     In my July 26, 2024 endorsement, I indicated that I intended to issue further supplementary reasons on two aspects of the AVO.  I stated as follows at paragraph 11 of that endorsement:

> For the reasons set out in much greater detail in the factums filed by the Applicant and Cargill, I have determined that it is just and appropriate to grant the proposed Approval and Reverse Vesting Order.  Given the scrutiny that the court must apply to consideration of RVOs and third party releases, it is my intention to issue further supplementary reasons at a later date to explain the justification for the court's approval of these aspects of the order signed today.

**July 26, 2024 Endorsement Re: RVO and Third Party Releases**

[4]     For completeness, and given the brevity of my July 26, 2024 endorsement, I have reproduced below the first ten paragraphs of that endorsement in their entirety before providing my supplementary reasons about the approval of the RVO and the third party releases that it provides for.  The remainder of that earlier endorsement, dealing with an Ancillary Order and other matters, does not require any further elaboration or justification.

> [1] After a lengthy and sometimes acrimonious CCAA process that involved multiple attempts (pre-and post-filing) to achieve a going concern transaction that deleverages Tacora's capital structure and that amends an onerous offtake agreement with a Cargill affiliate, Tacora has entered into a subscription agreement with certain significant stakeholders (Millstreet Capital Management LLC, as investment manager on behalf of multiple noteholders ("Millstreet"), OSP, LLC, on behalf of certain managed funds ("OSP"), and Cargill, Incorporated, collectively, the "Investors") dated July 21, 2024 (the "Subscription Agreement").
>
> [2] Execution of the Subscription Agreement represents the culmination of extensive solicitation efforts on the part of Tacora which commenced in March 2023 and continued after the commencement of the CCAA proceedings in accordance with a court approved Solicitation Process[1] and court approved Sale Process.  Together, these three solicitation and sale processes resulted in a broad and robust canvassing of parties potentially interested in Tacora's business and assets.

---

[1] Capitalized terms not otherwise defined in this endorsement shall have the meanings ascribed to them in the applicant's factum filed in support of this motion.

- Page 3 -

[3] The transactions contemplated by the Subscription Agreement represent the best and only available going concern outcome for Tacora that has come out of these efforts. Among other things, they: (a) preserve Tacora as a going concern for the benefit of its employees, suppliers and other stakeholders; (b) deleverage Tacora and capitalize the Company with committed equity financing; (c) avoid the need to transfer the Company's permits and licenses; and (d) preserve the Company's tax attributes.

[4] No alternative transactions emerged from these processes that would provide full repayment to the Senior Notes or Senior Priority Notes. Despite the compromise of their indebtedness, parties collectively holding 71.5% of the obligations of Tacora's aggregate notes (being 55.3% of the Senior Priority Notes and 73.4% of the Senior Notes) support the approvals sought by Tacora in respect of the Subscription Agreement.

[5] In addition to the support of Cargill (in its various stakeholder capacities, as secured lender, unsecured lender, DIP lender, service provider, etc.) and of the majority of notes, the contemplated preferred transactions under the Subscription Agreement are recommended by the Monitor and not opposed by any of Tacora's remaining stakeholders. The proposed transactions are conditional upon the granting of an Approval and Reverse Vesting Order that includes the following relief:

   a. approval of the Subscription Agreement;
   b. approval of the Transactions contemplated in the Subscription Agreement, including, *inter alia*, execution of a new offtake agreement, new iron ore onshore purchase agreement, and new margin facility between the Company and Cargill to replace the Offtake Agreement, the Stockpile Agreement, and the Margin Advances available to the Company under the APF, and authorizing and directing Tacora to take such additional steps and execute such additional documents as are necessary or desirable for completion of the Transactions; and
   c. granting Releases in favour of the Released Parties from the Released Claims.

[6] An RVO transaction has various benefits, including the preservation of Tacora's permits and licenses and tax attributes, and timely completion to avoid consequences arising as a result of the volatile price of iron ore and the ongoing significant costs of these proceedings.

[7] As a result of the Transactions contemplated by the Subscription Agreement, Tacora will continue operating as a going concern as the second largest employer in the Labrador West region, preserving employment for its approximately 463 employees and providing the opportunity for ongoing business relationships for its suppliers of goods and services. The Transactions will also allow Tacora to execute on its long-term plan to upgrade and modernize the Scully Mine.

[8] The Subscription Agreement contemplates a target closing date of August 30, 2024.  It has an outside Closing Date of October 10, 2024.

[9] This court and other courts in Canada have been willing to grant reverse vesting orders ("RVOs") in appropriate circumstances, where certain requirements are satisfied.  RVOs remain the exception rather than the norm.  This is, however, a case in which the requirements for approval of an RVO are met, as prescribed in *Harte Gold (Re)*, 2022 ONSC 653 and s. 36(3) of the CCAA with regard to the factors prescribed in *Royal Bank of Canada v. Soundair Corp.*, 1991 CanLII 2727 (Ont CA). See also *Just Energy Group Inc et al v. Morgan Stanley Capital Group Inc et al*, 2022 ONSC 6354 at paras. 30-31.

[10] It has become more common in Canada for third party releases in favour of the parties to a restructuring, their professional advisors, their directors and officers, and the Monitor to be approved outside of a CCAA plan in the context of a transaction, including in the context of RVO transactions.  Court ordered third party releases, such as are contemplated in favour of certain of the Released Parties in this case, are carefully scrutinized by the court and not granted as a matter of course.  They must satisfy the requirements set out in *Lydian International Limited (Re)*, 2020 ONSC 4006 at para. 54.  See also *Harte Gold*, at paras. 78-86. Those requirements have been satisfied in this case.  Importantly, the record demonstrates that there is a reasonable connection between the claims being compromised and the restructuring achieved by the RVO.  The release language has been tailored to the particular circumstances of this case, including one further change that was made to the form of order after the appearance today.

**RVO Approval – Supplementary Reasons**

[5]     While RVOs remain the exception rather than the norm, I concluded that the requirements for approval of an RVO are met in this case.

[6]     The *Companies Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("CCAA") does not expressly provide for RVO transactions.  The jurisdiction to approve a transaction implemented through an RVO is found in section 11 of the CCAA, which gives the Court broad powers to make any order it thinks fit.  See *Harte Gold (Re)*, 2022 ONSC 653, 97 C.B.R. (6th) 202, at paras. 24 and 36-37.

[7]     Tacora points out that courts in Canada have applied this jurisdiction in granting RVOs in over 50 cases.  The reverse vesting orders sought in many of those cases (especially the early ones) were not opposed.  In appropriate cases, RVOs enable stakeholders to avoid the expense and delay that would be incurred under a plan of arrangement to achieve an equivalent result.  RVOs also avoid the expense, delay and uncertainty of an asset sale where there are valuable assets,  but some that might be difficult or impossible to transfer to a purchaser (such as licences and tax attributes) and there are unwanted liabilities (rendering a share sale undesirable for a purchaser).  See *Harte Gold* at para. 71.

[8]     While Cargill opposed an RVO structure contemplated by an uncompleted earlier transaction in this case, the RVO approved on July 26, 2024 was not opposed by any of the stakeholders.  The lack of opposition is a relevant consideration in the court's exercise of its discretion under s. 11 and s. 36(3) of the CCAA.

[9]     Here, a significant majority of Tacora's secured creditors (including Cargill) have achieved common ground through extensive negotiation to arrive at the Transactions that they and the Monitor consider will achieve the best possible outcome in the circumstances.  The Transactions are supported by potentially the largest unsecured creditor, Cargill, and secured creditors who would hold deficiency unsecured claims. A significant amount of other unsecured claims are being paid or assumed as part of the Transactions.

[10]    However, even when (as in this case) an RVO is not opposed, the court must still be satisfied that it is an appropriate mechanism to implement the proposed Transactions.  The jurisprudence establishes certain circumstances in which RVOs may be appropriate, at least two of which apply to Tacora:

- a. Tacora operates in the highly regulated mining environment in which its existing eight material permits and licences, six mining claims, leases, and other property rights that are required to maintain its mining operations and allow Tacora to perform exploration work on various parts of the Scully Mine, as well as other forest resource licences and fire permits (the "Licences and Permits") would be difficult or impossible to assign to a purchaser.

- b. Maintaining the existing legal entity would preserve $650 million in tax attributes (the "Tax Attributes") that would otherwise be lost in a traditional asset sale.

[11]    In *Harte Gold*, Penny J. held (at para. 38) that scrutiny of a proposed reverse vesting transaction may be informed by certain delineated enquiries:

- a. Why is the RVO necessary in this case?

- b. Does the RVO structure produce an economic result at least as favourable as any other viable alternative?

- c. Is any stakeholder worse off under the RVO structure than they would have been under any other viable alternative? and

- d. Does the consideration being paid for the debtor's business reflect the importance and value of the licences and permits (or other intangible assets) being preserved under the RVO structure?

[12]    Those enquiries support the granting of the RVO to implement the Transactions contemplated by the Subscription Agreement in this case:

- a. The RVO is necessary:

- Page 6 -

    i. to preserve Tacora's Permits and Licences so that any prospective purchaser can continue operations at the Scully Mine. The RVO avoids the risks and costs associated with potential delays in attempting to transfer Permits and Licences and seeking associated governmental approvals. This is of heightened importance because the volatile price of iron ore can significantly impact Tacora's liquidity. In fact, an earlier proposed transaction in these CCAA proceedings fell victim to these external market forces.

    ii. to preserve Tacora's Tax Attributes for the prospective purchaser, which have been factored into the purchase price under the Subscription Agreement. Without the RVO, the Tax Attributes would have to be accounted for (at the expense of Tacora and its stakeholders) under the possible (but less economically advantageous) alternative transaction structures.[2]

b. The RVO structure produces an economic result at least as favourable as any other viable alternative. The Subscription Agreement and the Transactions (a) were the best and only actionable transaction available to Tacora, as determined by a broad market canvass conducted through the Pre-Filing Solicitation Process, the Solicitation Process and the Sale Process; and (b) result in significant benefits for the "economic community" consisting of Tacora and its stakeholders. They present a going concern solution that preserves the Company and its business and provides for the ongoing employment of all Tacora's employees. These economics have been thoroughly analyzed by Tacora, its financial advisor and the Monitor, all of whom recommended the approval of the Subscription Agreement and the Transactions under an RVO structure to maximize value for the stakeholders.

c. No stakeholder is worse off under the reverse vesting transaction structure than they would have been under any other viable alternative. The RVO structure does not result in material prejudice or impairment to any of Tacora's creditors' rights that they would not otherwise suffer under a traditional asset sale structure. This is, in part, confirmed by the fact that there was no opposition to the requested RVO. The Subscription Agreement provides that, to the extent the RVO is not granted and the structure of the Transaction is converted into an asset sale, the parties shall amend the structure of the Transactions to ensure the transfer of mining rights and to account for the decrease in value arising from the adverse impact to the Tax Attributes and other increased costs associated with transferring Permits and Licences etc. The stakeholders would receive less value, and be worse off, under that alternative structure.

---

[2] The court's approval of a reverse vesting structure is not to be construed as an endorsement of the use or efficacy of that structure for tax purposes. That is a matter for CRA and the parties. However, the prospect of preserving those attributes can nonetheless be ascribed value in a transaction, as it was in this case.

    d. On the flip side, the consideration being paid under the RVO structure reflects the importance and value of the Licenses and Permits (or other intangible assets) being preserved under the RVO transaction structure.

[13] Section 36(3) of the CCAA is also relevant in providing guidance to the court on the factors to be considered in exercising its discretion to approve a transaction (such as those set out in *Royal Bank of Canada v. Soundair Corp.* (1991), 4 O.R. (3d) 1 (C.A.)) and in granting the court jurisdiction to vest off "other restrictions".  See *Just Energy Group Inc et al v. Morgan Stanley Capital Group Inc. et al*, 2022 ONSC 6354, at paras. 30-31.

[14] The following additional factors support this Court's approval of the Subscription Agreement and the Transactions and the granting of the Approval and Reverse Vesting Order:

    a. The process leading to the proposed Transactions, beginning with the Pre-Filing Strategic Process and including the Solicitation Process, was reasonable in the circumstances.  It was broad, open, fair and transparent with an appropriate level of independent oversight.

    b. The Sale Process was recommended by the Monitor and approved by the Court.

    c. The Monitor considers the Transactions to be more beneficial to Tacora's creditors than a sale or disposition under a bankruptcy. The Monitor has expressed its support for the court's approval of the Subscription Agreement and the Transactions as requested in the Approval and Reverse Vesting Order.

    d. Tacora's major secured creditor groups, Cargill and holders of the Senior Notes and Senior Priority Notes, were involved in the Sale Process and are supportive of the relief sought on this motion.  No substantive objections to the terms of the Sale Process have been raised.

    e. As described above, the Transactions are of significant benefit to the Applicant and the vast majority of its stakeholders. The Transactions will result in a going concern solution for Tacora's business and represent the best available outcome for Tacora, its creditors, and other stakeholders in the circumstances.

    f. The Monitor is of the view that the consideration is reasonable and fair, taking into account Tacora's market value.  The results of the Pre-Filing Strategic Process, the Solicitation Process and the Sale Process did not produce a better executable transaction lending further support to this conclusion that the consideration is fair and reasonable.

[15] This is a situation equally as compelling as in *Harte Gold* (at para. 57) where the court remarked that "it is hard to see how anything would change under a creditor class vote scenario." In that case, all creditors, both secured and unsecured, were expected to be paid in full and none opposed the RVO structure that was approved.  Here, under the Subscription Agreement and Transactions not all secured or unsecured creditors will be paid in full, yet none oppose the RVO structure.  There is no suggestion that the RVO structure is being used to do an end-run around the creditor class voting that is provided for under a CCAA plan of arrangement.  There is no creditor

whose vote under a CCAA plan might have impacted its approval that has lost its right to have its vote count by the proposed RVO structure. The interesting legal questions surrounding the limits on the use of RVOs in the face of opposition need not be decided at this time.

[16]    It is for these more detailed reasons that the RVO was approved and signed on July 26, 2024.

**Approval of Third Party Releases – Supplementary Reasons**

[17]    Third party releases are carefully scrutinized by the court. As I stated in paragraph 10 of my July 26, 2024 endorsement:

> They must satisfy the requirements set out in *Lydian International Limited (Re)*, 2020 ONSC 4006 at para. 54.  See also *Harte Gold*, at paras. 78-86. Those requirements have been satisfied in this case.  Importantly, the record demonstrates that there is a reasonable connection between the claims being compromised and the restructuring achieved by the RVO.  The release language has been tailored to the particular circumstances of this case, including one further change that was made to the form of order after the appearance today.

[18]    The test for third-party releases in CCAA proceedings is well established.  The Court must ask: (i) whether the parties being released were necessary and essential to the restructuring of the debtor; (ii) whether the claims to be released are rationally connected to the purpose of the restructuring and necessary for it; (iii) whether the restructuring could succeed without the releases; (iv) whether the parties being released contributed to the restructuring; and (v) whether the releases benefit the debtors as well as the creditors generally: *Lydian*, at para. 54.

[19]    The releases granted in this case are not unprecedented in their breadth, but they are broad.

   a. They include Released Parties that extend beyond the Company, ResidualCo, and the Monitor (including their respective present and former officers, directors, employees, legal counsel and advisors) to the Notes Trustee, the Investors, and Other New Equity Investors (and their respective present and former officers, directors, employees, legal counsel and advisors).

   b. The Released Claims include any and all present and future claims of any nature or kind whatsoever based in whole or in part on any act or omission, transaction or dealing or other occurrence existing or taking place on or prior to delivery of the Monitor's Certificate or undertaken or completed in connection with or pursuant to the terms of the Approval and Reverse Vesting Order or these CCAA Proceedings, or arising in connection with or relating to the Subscription Agreement, the closing documents, the Applicant's assets, business or affairs, prior dealings with the Applicant, or any agreement, document, instrument, matter or transaction involving the Applicant arising in connection with or pursuant to any of the foregoing, and/or the consummation of the Transactions, with certain standard exclusions (for claims that are not permitted to be released under s. 5.1(2) of the CCAA or any claim resulting from fraud or wilful misconduct) and certain exceptions tailored to this RVO and the Transactions,

        including the liabilities that are intended to remain in ResidualCo (and are not being released).

c. They effectively include releases between certain of the Released Parties, including (with one express exception for Crossing Bridge) as between the noteholders and the Note Trustee.

[20]    To satisfy the court that this breadth of release language was not unprecedented, the Company provided examples of the release language from the *Just Energy* and *Harte Gold* cases which contained comparably broad release language. I will begin by stating that just because release language has been approved in the past by this court does not mean that it necessarily will be approved in every case that follows.

[21]    While it is helpful to consider whether any given release language falls on the spectrum of what has been approved in earlier cases, the third party releases in each case must be individually scrutinized and the circumstances and context in which the approval was provided must be understood. That is in part why I consider it to be important to explain the reason for my approval of the third party releases contained in the Approval and Reverse Vesting Order that was signed on July 26, 2024 in this case. Releases of this breadth would not necessarily be appropriate in every case.

[22]    The releases in this case are described by the Company to be "an integral component of the Transactions contemplated by the Subscription Agreement and an important feature allowing Tacora to emerge from these proceedings as a "cleaned company" and a going-concern business". This is a function, in part, of the long history of these proceedings and dealings between the parties, that have been described by some as "exhaustive and exhausting". The first of the three sales processes began months before the CCAA filing. The parties have been negotiating over an extended period of time during which their alliances have shifted. Once litigation commenced, there was no shortage of finger pointing and blame laying. Ultimately, significant compromises were made by the secured creditors (whose pre-filing debt and annual debt service was eliminated in exchange for equity and future funding commitments by some), and by some unsecured creditors (Cargill in particular, whose offtake agreement is being replaced).

[23]    When cases are hard fought and the parties emerge with an agreement and compromise that includes releases so that all can move forward with a clean slate, that is a circumstance in which broader releases of the nature provided for in this case may be appropriate.

[24]    There is precedent for the application of the *Lydian* factors to the approval of third party releases in favour of the parties to a restructuring, their professional advisors, and their directors and officers in the context of an RVO or other transaction outside of a plan of arrangement: see *Harte Gold*, at para. 79, and *Green Relief Inc. (Re)*, 2020 ONSC 6837, at para. 76.

[25]    In this case, the *Lydian* factors can be readily established for the release in favour of not only the traditional categories of third parties but also the Investors, the New Investors (some of whom are also unsecured creditors) and the Note Trustee, all of whom have come to the table during this lengthy and difficult reorganization process and were integrally involved in the

restructuring process. Some of the relevant factors to consider in approving the releases in this case include that:

    a. the Released Parties played a role in some or all of the Pre-Filing Strategic Process, the Solicitation Process, the Sale Process, the CCAA Proceedings, and negotiation of the Subscription Agreement and the contemplated Transactions, which provide for a going concern solution for Tacora's business and represents the best outcome available to Tacora;

    b. many of the Released Parties will also be involved in the implementation of the Transactions;

    c. the Monitor is of the view that each of the Released Parties contributed meaningfully and was necessary to Tacora's efforts to address its financial difficulties;

    d. the Released Parties are a necessary part in the successful restructuring of the Company and, in the case of Tacora's directors and officers, continued in their roles or joined Tacora notwithstanding the increase in risk and scrutiny due to these proceedings;

    e. some of the released parties, if sued, would have indemnification claims by the Released Parties against the Administration Charge and the Directors' Charge, the elimination of which would help achieve the purpose of maximizing creditor recovery;

    f. the releases are a condition of the Subscription Agreement; while that alone would not be a sufficient reason to approve them, they have been demonstrated for reasons outlined earlier to be fair, reasonable and not unreasonably broad (having regard to the exclusions and exceptions noted); and

    g. no one opposed the requested releases; a specific carve out was negotiated for one aspect of the release for Crossing Bridge in respect of certain claims it wishes to preserve under the inter-creditor agreement.

[26]    It is for these more detailed reasons that the court was prepared to approve and sign the Approval and Reverse Vesting Order on July 26, 2024, which contains the proposed release language that was determined to be reasonably connected to the restructuring to be achieved through the RVO and approved Transactions therein.

                                                                                                 Justice Kimmel

**Date:** August 12, 2024