Jeffrey Chubak
John W. Brewer
Amini LLC
130 West 35th Street
12th Floor
New York, NY 10001
(212) 490-4700
jchubak@aminillc.com
jbrewer@aminillc.com
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CROSSINGBRIDGE ADVISORS, LLC <br>                          Plaintiff <br> v. <br> CARGILL INTERNATIONAL TRADING PTE LTD. <br>                          Defendant | Case 1:24-cv-09138-RA <br><br> **MEMORANDUM OF LAW IN** <br> **OPPOSITION TO MOTION TO DISMISS** |

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENT .............................................................................................................................. 3

I. THE ONTARIO COURT EXPRESSLY PRESERVED THE RIGHT TO BRING THIS CLAIM IN AN APPROPRIATE FORUM ....................................................... 3

II. THE FAC ADEQUATELY PLEADS THAT THE INTERCREDITOR AGREEMENT APPLIES TO THE SUBJECT TRANSFERS ................................................................. 5

    A. The Cargill Consideration Payment under Subscription Agreement § 2.3(a) and the Setoff under Subscription Agreement § 7.2(c) are Payments and Distributions under Intercreditor Agreement § 2.01(a) & § 2.03(b) ........................................... 7

    B. The Cargill Consideration Payment under Subscription Agreement § 2.3(a) and the Setoff under Subscription Agreement § 7.2(c) are Payments and Distributins with respect to "Shared Collateral" under Intercreditor Agreement § 2.01(a), and Enabled CITPL to obtain possession of or realize any proceeds or payment in respect of "Shared Collateral" under § 2.03(b) ................................................... 11

    C. Subscription Agreement § 7.2(d) & § 3.1(c) Do Not Defeat CrossingBridge's Claims for Breach of the Intercreditor Agreement ............................................. 13

    D. The Supposed Reason for Value Given to CITPL under the Subscription Agreement is an Irrelevant Fact Question ........................................................... 14

CONCLUSION ........................................................................................................................ 15

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ackerberg v. Johnson*,
    892 F.2d 1328 (8th Cir. 1989) ............................................................................................... 10

*Empresa Cubana Exportadora De Azucar y Sus Derivados v. Lamborn & Co., Inc.*,
    652 F.2d 231, 236 (2d Cir. 1981) .......................................................................................... 5, 9

*Ex Parte Hubbard*,
    321 So.3d 70 (Sup. Ct. Ala. 2020) ......................................................................................... 8

*Kallai v. Jatola Homes, LLC*,
    2021 WL 5961626 (N.D. Ohio Dec. 16, 2021) ..................................................................... 9

*In re Lehman Bros. Holdings, Inc.*,
    433 B.R. 101 (Bankr. S.D.N.Y. 2010) .................................................................................. 10

*People v. Pinella*,
    137 Misc.2d 701 (Sup. Ct. N.Y. Co. 1987) ........................................................................... 10

*Scherling v. Hellman Elec. Corp. (In re Westchester Structures)*,
    181 B.R. 730 (Bankr. S.D.N.Y. 1995) .................................................................................. 10

*United States v. Harper*,
    756 Fed. App'x 656 (7th Cir. 2019) ....................................................................................... 10

**Statutes and Rules**

11 U.S.C. § 101 ............................................................................................................................ 10

11 U.S.C. § 550 ............................................................................................................................ 11

11 U.S.C. § 553 ............................................................................................................................ 11

Debtor and Creditor Law § 270 .................................................................................................... 10

**Other Authorities**

Black's Law Dictionary ............................................................................................................ 8, 10

60 Am. Jur. 2d Payment § 1 ....................................................................................................... 5, 9

70 C.J.S. Payment § 1 ................................................................................................................ 5, 9

70 C.J.S. Payment § 2 ............................................................................................................... 5, 10

Plaintiff CrossingBridge Advisors, LLC ("CrossingBridge") submits this memorandum of law in opposition to the motion to dismiss of defendant Cargill International Trading PTE Ltd. ("CITPL").

## INTRODUCTION

This is a breach of contract action, which CITPL removed based on diversity jurisdiction. It is undisputed that in May 2023, Tacora Resources, Inc. ("Tacora"), a Canadian mining company, incurred debt to (1) Senior Priority Noteholders, pursuant to a second supplemental indenture and (2) CITPL, under a facility established under an amendment to its advance payment facility agreement with Tacora ("APF Agreement"); and that in relation to said debt to Senior Priority Noteholders and CITPL, Tacora entered into a Collateral Agency and Intercreditor Agreement (ECF #21-1, "Intercreditor Agreement") governing the relationship among themselves. ("ECF #9, "FAC" ¶¶12, 14, 16, 20.)

In order to disincentivize the Senior Priority Noteholders and CITPL from each seeking to obtain preferential payment from Tacora to the other's detriment, they agreed in the Intercreditor Agreement that they would share with each other pro rata whatever amounts they received, thereby seeking to ensure that their financial interests would be in harmony rather than in competition if Tacora experienced financial difficulties.

The FAC alleges that CITPL has breached the Intercreditor Agreement by doing exactly what it promised not to do. Specifically, the FAC alleges that CrossingBridge is entitled to recover, pursuant to Sections 2.01(a) and 2.03(b), its pro rata share of amounts CITPL received from Tacora but has refused to share with CrossingBridge as required by the terms of the agreement.

The amounts CITPL has wrongfully refused to share were paid by Tacora in connection with its restructuring under Canadian insolvency law. CITPL first claims that this Court should

1

decline to examine the merits of CrossingBridge's claim and "defer" to the Ontario Superior Court of Justice (the "Ontario Court") which oversaw the insolvency proceeding. This is no basis for dismissal, because the Ontario Court did not adjudicate or purport to adjudicate CrossingBridge's claim against CITPL but to the contrary explicitly carved CrossingBridge's claim under the Intercreditor Agreement out of the release included (¶26) in the order approving the reverse vesting transaction (Chubak Decl. Exhibit 5, "RVO") so that this claim could be litigated on the merits in another court of competent jurisdiction, that contemplated by the forum selection clause in Intercreditor Agreement § 3.08(ii).

As to the merits, CITPL's defense is that it did not breach the Intercreditor Agreement because the transfers it received were not within the scope of those the agreement obligated it to share. This is at best a factual dispute, and CITPL has not substantiated its request for this Court to read a number of complex documents and agree that its self-serving interpretations of them are the only possible legally viable ones. Moreover, its arguments hinge heavily on a purported Amendment (ECF #21-3, "Amendment") to the Subscription Agreement dated September 17, 2024 (ECF #21-2, "Subscription Agreement") memorializing the terms of the reverse vesting transaction, which Amendment was hastily drafted immediately before the transaction closed in a transparent attempt to evade liability to Senior Priority Noteholders. The Amendment cynically tries to relabel the transfers CITPL received from Tacora under the Subscription Agreement without changing the economics of the transaction, and there are in any event unresolved fact questions about whether the Amendment was even validly adopted, as it was never approved by the Ontario Court and is not signed by the Monitor.

CITPL's obligation to share pro rata with Senior Priority Noteholders applies to "any distribution … in respect of any Shared Collateral in any Insolvency or Liquidation Proceeding

2

of any Grantor" (FAC ¶21, citing Intercreditor Agreement §2.01(a)) as well as "any proceeds or payment in respect of any such Shared Collateral" (FAC ¶25, citing §2.03(b)).

The FAC alleges that these provisions apply to the following transfers Tacora made to CITPL under the Subscription Agreement: (1) the payment of the approximately $6.2 million owing under the Existing Cargill Margin Facility, pursuant to Subscription Agreement § 2.3(a), defined as the "Cargill Consideration Payment" in the purported Amendment; and (2) the setoff of the approximately $12.5 million "Cargill Pre-Filing Payable" against the same amount owing by Tacora to CITPL under the APF Agreement, pursuant to Subscription Agreement § 7.2(c). (FAC ¶¶40-42.) As explained in detail below, CITPL's hyper-technical arguments about why these transactions did not trigger § 2.01(a) and/or § 2.03(b) are unconvincing, especially in the motion-to-dismiss context.

## **ARGUMENT**

**I.      THE ONTARIO COURT EXPRESSLY PRESERVED THE RIGHT TO BRING THIS CLAIM IN AN APPROPRIATE FORUM**

After the reverse vesting transaction was proposed in Tacora's Canadian insolvency proceeding, CrossingBridge raised concerns about the scope of release in the form of approval order initially proposed, so as to ensure that it did not did not interfere with CrossingBridge's claims and rights under the Intercreditor Agreement. In response, a redlined form of RVO (Chubak Decl. Exhibit 4) was submitted for approval, which expressly carved out these claims in ¶26, excluding from the scope of the release "(iv) any present or future claim of CrossingBridge Advisors, LLC, including any of its affiliates or agents, arising out of or relating to" the Intercreditor Agreement. This carveout is reflected in the RVO that was subsequently entered. CrossingBridge's participation is noted in the July 26, 2024 endorsement (ECF #21-9) that CITPL filed. CITPL's suggestion that CrossingBridge made no objection in the Canadian

3

insolvency proceeding is disingenuous, because, as CITPL knows full well, the Ontario Court at Tacora's request accommodated CrossingBridge's concerns without CrossingBridge needing to file a formal objection.

Thus, CITPL's claim that the Canadian insolvency proceeding is "entitled to deference" (Moving Br. at 13) makes no sense at all, since, if anything, this Court should "defer" to the carveout and the Ontario Court's expressed preference to do nothing that would impede CrossingBridge from pursuing its rights in an appropriate forum.

Nor does CITPL substantiate its claim this action "is a veiled attempt to side-step the reality of the outcome of the duly supervised CCAA Proceeding." (Moving Br. at 18)   There is no dispute that the Ontario Court found that the transactions contemplated by the Subscription Agreement were in the best interests of Tacora and its creditor constituencies, but CrossingBridge does not seek to challenge that finding in this Court, nor does it seek to enforce any claim against Tacora.  The Ontario Court simply expressed no view as to whether or not CITPL might have a contractual obligation to share part of the value in received from those transactions with Senior Priority Noteholders including CrossingBridge under a separate contract to which Tacora itself was not a party and under which Tacora had no rights and no duties.  This should not be surprising.  Neither CITPL nor CrossingBridge are Canadian companies, and neither is insolvent, so there was no need or motivation for the Ontario Court to consider this dispute between them in overseeing and resolving Tacora's insolvency.

Significantly, while the Ontario Court did approve the Subscription Agreement, there is no claim that its approval was either sought or received with respect to the Amendment on which CITPL now seeks to rely in its attempt to defeat CrossingBridge's claim.

4

II. **THE FAC ADEQUATELY PLEADS THAT THE INTERCREDITOR AGREEMENT APPLIES TO THE SUBJECT TRANSFERS**

CITPL does not dispute that on its face the FAC alleges all the elements of a breach of contract, but claims only that if a variety of other documents are interpreted the way CITPL argues they could be, the transfers it received did not trigger its obligations under the Intercreditor Agreement.

CITPL's various defenses are either not properly considered on a FRCP 12(b)(6) motion or simply wrong as a matter of law. To summarize its technical arguments and the responses given at greater length below: First, CITPL argues the value it received (assuming the validity of the Amendment, which is in dispute) does not count as "distribution" or "payment" under the Intercreditor Agreement. This argument, which relies only on Oxford English Dictionary ("OED") definitions, fails: the "Cargill Consideration Payment" is clearly a distribution or payment, even if under the Amendment it takes the form of a "discount" under a new offtake agreement with CITPL, because the term "payment" is not limited to payment in money and includes "the discharge in money <u>or its equivalent</u> of an obligation or debt owing by one person to another". 70 C.J.S. Payment § 1. *See also* 60 Am. Jur. 2d Payment § 1 (similar); *Empresa Cubana Exportadora De Azucar y Sus Derivados v. Lamborn & Co., Inc.*, 652 F.2d 231, 236 (2d Cir. 1981) (citing 70 C.J.S. Payment § 1 and 60 Am. Jur. 2d Payment § 1 approvingly). The term "distribution" is even broader, as it is generally construed as synonymous with "transfer". Under these definitions, not only is a discount considered a payment or distribution, so is the mutual setoff under Subscription Agreement § 7.2 which is considered "in the nature of a payment." 70 C.J.S. Payment § 2. All the Amendment does is try to relabel each dollar of loan repayment to CITPL as a dollar of discount enjoyed by CITPL on its future purchases of iron ore from Tacora: rather than Tacora paying CITPL $X for the prior debt and then selling CITPL

5

iron ore for $Y it is purporting to sell the ore for $(Y-X). This transparent attempt to evade CITPL's contractual obligations to CrossingBridge does not change the economic substance of the transaction, and still defines the discount as a "[p]ayment … made to" CITPL which is further defined as the "Cargill Consideration Payment."  Thus, not only is the economic substance unchanged, the "payment" label is also unchanged. Under this standard, the setoff under Subscription Agreement § 7.2(c) likewise qualifies as a payment or distribution.

       Second, CITPL argues the payments it is receiving do not relate to "Shared Collateral." But CrossingBridge adequately pleaded (FAC ¶17) that under the indenture documents, "[t]he Senior Priority Notes are secured by a lien on substantially all the real and personal property of Tacora and its subsidiaries" such that value given to CITPL was from Shared Collateral. CITPL's position is that this construction is nonsensical, because if all property were Shared Collateral, that would render "in respect of Shared Collateral" in the Intercreditor Agreement superfluous.  This argument fails as the term is needed to import the concept of "Excluded Assets" into the Intercreditor Agreement.

       Finally, CITPL argues the "Discharge" and novation under Subscription Agreement § 7.2(d) & § 3.1(c) defeat the contract claim, as Intercreditor Agreement § 2.03(b) only applies to distributions or possession of Shared Collateral "prior to the Discharge."  But this ignores that the two agreements define discharge differently: The former defines the term as encompassing elimination of claims and liens, whereas the latter defines it as referring only to lien elimination. In any event, this line of argument only applies to the branch of the claim under § 2.03(b), not that under § 2.01(a) which does not refer to Discharge.

### A. The Cargill Consideration Payment under Subscription Agreement § 2.3(a) and the Setoff under Subscription Agreement § 7.2(c) are Payments and Distributions under Intercreditor Agreement § 2.01(a) & § 2.03(b)

CITPL argues that the "payment" under Subscription Agreement § 2.3(a) is not a payment or distribution under Intercreditor Agreement § 2.01(a) or § 2.03(b) because under the Amendment, signed immediately before closing, it "was made as a 'discount' to the new Cargill Offtake Agreement that took effect following the implementation of the Court-Approved Restructuring Transaction"; and the OED definition of "discount" does not fit neatly within the OED definition of "distribution." (Moving Br. at 23-24.)

At the outset, there is a fact dispute that cannot be resolved in this motion whether the Amendment is of any force and effect. Subscription Agreement § 10.12 provides that "no amendment or waiver of this Agreement shall be binding unless … (b) the Monitor shall have provided its prior consent" to the same. CITPL's motion papers are devoid of evidence that the Monitor consented to the Amendment, and the Monitor's Certificate dated September 19, 2024 (ECF #21-11) does not reference the Amendment. The sole reference to Monitor approval is in the second recital to the Amendment ("WHEREAS … the Monitor has provided its prior approval to the amendments"), which is not signed by the Monitor, rendering that statement inadmissible hearsay. CITPL does not appear to dispute that absent the Amendment, the payment to CITPL of the approximately $6.2 million owing under the Existing Cargill Margin Facility, pursuant to Subscription Agreement § 2.3(a), is a "distribution or payment" under Intercreditor Agreement § 2.01(a) and § 2.03(b).

Even if the Amendment were treated as valid, it expressly states that the subject transfer is a "Payment to Cargill of an amount equal to the amounts owing under the Existing Cargill Margin Facility" and defines it as the "Cargill Consideration Payment" (emphasis added) such

7

that it necessarily qualifies as a "distribution or payment."[1] That the last sentence of Subscription Agreement § 2.3(a) (as purportedly amended) provides "[t]he Investors may and hereby have determined that the Cargill Consideration Payment shall be made to Cargill pursuant to a discount provided under the Cargill Offtake Agreement in connection with the Transactions and this Agreement, and, for certainty, is not being made in repayment of the Existing Cargill Margin Facility" does not move the needle. The Investors' "determination" that the Cargill Consideration Payment shall take the form of a discount is not dispositive of what form the payment actually took, as CITPL is not an Investor.[2] At a minimum, labeling the Cargill Consideration Payment as a "Payment" presents fact issues as to how this obligation under Subscription Agreement § 2.3(a) was satisfied.

More significantly, the argument that a "discount" cannot be a "distribution or payment" is wrong. In *Ex Parte Hubbard*, 321 So.3d 70, 79-80 (Sup. Ct. Ala. 2020), the Alabama Supreme Court held "standard references" "suggest that the meaning of 'pays' is not limited to payment in money" and encompasses reduction in payment obligations citing the following:

> Black's Law Dictionary defines "payment" as: "1. Performance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation. 2. The money or other valuable thing so delivered in discharge of an obligation." The term is similarly defined in Corpus Juris Secundum:

---

[1] Cargill is defined as CITPL "and/or Cargill, Incorporated, as the context provides." The context requires that Cargill be interpreted as CITPL, as only it (not Cargill, Inc.) is a party to the Existing Cargill Margin Facility, defined as "the facility consisting of Margin Advances (as defined in the APF) made available to the Company by Cargill from and after May 29, 2023 under the APF." (Subscription Agreement § 1.1.) The FAC alleges only CITPL is the buyer under said APF Agreement (¶12), and "[p]ursuant to an amendment to the APF Agreement dated May 29, 2023, CITPL agreed to provide Tacora with a new facility whereby CITPL would make margin advances of up to $25 million to Tacora primarily to finance payments due to CITPL under the Offtake Agreement ('Margin Advances')."

[2] Unlike the definition of "Cargill" which includes both Cargill, Inc. and CITPL, Exhibit "A" only identifies Cargill, Inc. as an "Investor" and makes no reference to CITPL.

8

> "Payment is the discharge in money of a sum due or the performance or satisfaction of a pecuniary obligation in whole or in part, by compliance with the terms of the obligation, or by the actual or constructive delivery of money <u>or its equivalent</u>, by the obligor or someone for him or her to the obligee for the purpose of extinguishing the obligation in whole or in part and the acceptance as such by the obligee.  Payment has also been defined as the full or partial discharge of a pecuniary obligation by money <u>or what is accepted as the equivalent of a specific sum of money</u>; delivery and acceptance of money <u>or its equivalent</u> in discharge of an obligation; and the discharge in money <u>or its equivalent</u> of an obligation or debt owing by one person to another…."
>
> "Payment requires a tender, or the actual or constructive delivery by a debtor or someone for the debtor to the debtor's creditor, or some other person authorized to receive it, of money <u>or something accepted by the creditor as the equivalent of money</u>, with the intention or purpose on the part of the payor or transferor to extinguish a debt or obligation in whole or in part and its acceptance by the creditor for the same purpose…."
>
> "Generally, nothing is to be considered as payment in fact <u>unless the creditor expressly agrees to receive something else in its place</u>, but <u>what the parties to the contract agree be accepted as payment is, in fact, payment</u>."

70 C.J.S. Payment § 1 (2018) (footnotes omitted; emphasis added) …

*See also* 60 Am. Jur. 2d Payment § 1) ("'Payment' is defined as the discharge of a pecuniary obligation by money or what is accepted as the equivalent of a specific sum of money.  It is a discharge of a debt by compliance with the terms of the obligation.  Stated more fully, payment is the discharge of an obligation by the actual or constructive delivery of money or its equivalent by an obligor or by someone for the obligor for the purpose of extinguishing an obligation, wholly or partially, and the acceptance of it by the obligee."); *Empresa Cubana*, 652 F.2d at 236 (citing these definitions approvingly); *Kallai v. Jatola Homes, LLC*, 2021 WL 5961626, at *8 (N.D. Ohio Dec. 16, 2021) ("the term 'payment' is 'synonymous with the giving or receiving of any 'thing of value' and does not require transfer of money").

If "payment" encompasses a discount, then a priori "distribution" does as well as the term is understood as generally being synonymous with "transfer". *E.g. Ackerberg v. Johnson*, 892

9

F.2d 1328, 1335 (8th Cir. 1989) ("The congressional intent in defining 'underwriter' was to cover all persons who might operate as conduits for the transfer of securities to the public … Thus, 'underwriter' is generally defined in close connection with the definition and meaning of 'distribution'") (emphasis added); *United States v. Harper*, 756 Fed. App'x 656, 658 (7th Cir. 2019) ("'Transfer' is just another word for distribute"); *People v. Pinella*, 137 Misc.2d 701, 702 (Sup. Ct. N.Y. Co. 1987) ("The term 'distribute' employed in the Federal statute (21 U.S.C. § 802[11]) means actual, constructive or attempted transfer").

The term "transfer" in turn is at least as broad as "payment". Black's Law Dictionary defines "transfer" (verb) as "1. To convey or remove from one place or one person to another; to pass or hand over from one to another, esp. to change over the possession or control of. 2. To sell or give." As a noun, it is commonly understood to mean (Debtor and Creditor Law § 270(p), 11 U.S.C. § 101(54)(D), Black's Law Dictionary) each and every "mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset", which is certainly broad enough to encompass satisfaction of an obligation via discount. CITPL cites no authority, beyond one of several (paywalled) OED definitions, for the proposition that a discount is not a distribution.

With regard to the setoff under Subscription Agreement § 7.2(c), CITPL likewise cites only the OED definition to explain why a setoff "is not a distribution or payment in the ordinary meaning." (Moving Br. at 24.) However, it does qualify as "it has been said that where there are mutual debts, a set-off is in the nature of a payment." 70 C.J.S. Payment § 2. "'Mutuality' … exists when 'the debts and credits are in the same right and are between the same parties, standing in the same capacity.'" *In re Lehman Bros. Holdings, Inc.*, 433 B.R. 101, 107 (Bankr. S.D.N.Y. 2010) (quoting *Scherling v. Hellman Elec. Corp. (In re Westchester Structures)*, 181 B.R. 730, 739 (Bankr. S.D.N.Y. 1995)). Here, any mutuality requirement is satisfied in that the

setoff is between the same two parties of "a portion of the amount owing by the Company under the APF (equal to the amount of the Cargill Pre-filing Payable) against the Cargill Pre-filing Payable." If a "setoff" qualifies as a "payment", then a priori it must be considered a distribution for reasons discussed above. Indeed, the Bankruptcy Code treats "setoff" as a category of avoidable transfer (11 U.S.C. § 553(b) & § 550(a)), which term as noted above is synonymous with distribution.

> **B.  The Cargill Consideration Payment under Subscription Agreement § 2.3(a) and the Setoff under Subscription Agreement § 7.2(c) are Payments and Distributions with respect to "Shared Collateral" under Intercreditor Agreement § 2.01(a), and Enabled CITPL to obtain possession of or realize any proceeds or payment in respect of "Shared Collateral" under § 2.03(b)**

CITPL argues that "Plaintiff does not adequately allege that the Cargill Consideration Payment or the $12.5 million Setoff were made in respect of Shared Collateral, which is a prerequisite for application of the ICA." (Moving Br. at 24.)

This argument fails. Intercreditor Agreement § 2.01(a) establishes a payment waterfall in the event "any distribution is made in respect of any Shared Collateral in any Insolvency or Liquidation Proceeding" or if "any Senior Priority Secured Party [defined to include CITPL] receives any payment pursuant to any intercreditor agreement (other than this Agreement) with respect to any Shared Collateral."

§ 2.03(b) provides that if an "Authorized Representative [defined to include CITPL] shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any Shared Collateral (other than from a distribution in accordance with the [waterfall] provisions of Section 2.01) … then it shall hold such Shared Collateral, proceeds or payment in trust for the other Secured Parties and promptly transfer such Shared Collateral, proceeds or payment, as the case may be, to the Authorized Representatives for the Senior Priority Secured

11

Parties [defined to include CrossingBridge] to be distributed in accordance with the provisions of Section 2.01."

"Shared Collateral" in turn includes "Collateral in which the holders of any Series of Senior Priority Obligations … hold[s] a valid and perfected security interest", with "Collateral" defined to include "all assets and properties of the Company or any Grantor now or hereafter subject to Liens created pursuant to any Senior Priority Security Document … to secure the Senior Priority Obligations." "Senior Priority Secured Document" is defined by reference to the indentures (see definition of "Noteholder Collateral Documents"). CrossingBridge has alleged (FAC ¶17) that under the indenture documents, "[t]he Senior Priority Notes are secured by a lien on substantially all the real and personal property of Tacora and its subsidiaries". Despite having access to the indenture documents, CITPL has offered no documentary evidence to the contrary. Thus, the subject transactions trigger application of the Intercreditor Agreement.

CITPL argues that this construction renders "in respect of Shared Collateral" in the Intercreditor Agreement superfluous, in that it means "*any* payment made to CITPL necessarily is made from the payment or proceeds in respect of Shared Collateral." (Moving Br. at 26.) That is wrong. The second supplemental indenture under which the Senior Priority Notes were issued (Chubak Decl. Exhibit 3) excludes "Excluded Assets" from the definition of "Collateral", which otherwise includes "all of the assets and property of the Company or any Guarantor, whether real, personal or mixed securing or purported to secure any Senior Priority Obligations or Notes Priority Obligations". Including "in respect of Shared Collateral" in the Intercreditor Agreement serves to exclude from the scope of said agreement payments made from Excluded Assets or proceeds thereof, such as a payment to CITPL made from an "Excluded Account", or proceeds from the sale of "Excluded Equity Interests" or real property other than "Material Real

12

Property Assets." That this limitation does not apply here does not render CrossingBridge's construction nonsensical.

   C. **Subscription Agreement § 7.2(d) & § 3.1(c) Do Not Defeat CrossingBridge's Claims for Breach of the Intercreditor Agreement**

CITPL argues Subscription Agreement § 7.2(d) & § 3.1(c) are "fatal to Plaintiff's theory that Section 2.03(b) of the ICA was violated here because, by its clear terms, Section 2.03(b) only applies to distributions or possessions of Shared Collateral 'at any time prior to the Discharge'". (Moving Br. at 27-28.)

This argument fails. At the outset, on its face this argument only applies to the branch of the contract claim under Intercreditor Agreement § 2.03(b), not the branch under § 2.01(a) which does not include the word "Discharge."

As to Intercreditor Agreement § 2.03(b), CITPL's argument ignores that "Discharge" is defined differently in the Subscription Agreement and the Intercreditor Agreement. Whereas the Subscription Agreement defines "Discharge" as encompassing elimination of a claim and lien ("release, discharge, cancellation … of [an] Encumbrance", which in turn is defined to include claims and liens), the Intercreditor Agreement defines it as referring only to elimination of a <u>lien</u> and only if the lien is satisfied pursuant to the loan documents ("'Discharge' means, with respect to any Shared Collateral and any Senior Priority Obligations … the date on which such Senior Priority Obligations … are no longer secured by such Shared Collateral pursuant to the terms of the documentation governing such Senior Priority Obligations"). Subscription Agreement § 7.2(d) & § 3.1(c) do not provide for lien satisfaction pursuant to the terms of the indenture documents governing the Senior Priority Obligations. CITPL's argument that "Discharge" as used in Intercreditor Agreement § 2.03(b) refers to novation under Subscription Agreement § 7.2(d) or claim discharge under § 3.1(c) is therefore wrong.

13

### D.   The Supposed Reason for Value Given to CITPL under the Subscription Agreement is an Irrelevant Fact Question

CITPL argues "[t]he Cargill Consideration Payment and the $12.5 million Setoff were <u>not</u> made in connection with CITPL's rights as a secured creditor in respect of the Shared Collateral but instead were issued in consideration for Cargill, Incorporated's participation as an investor in the Court-Approved Restructuring Transaction and the entering into the new offtake agreement". (Moving Br. at 18.)

This is not a basis for dismissal.  No evidence is provided in support save CITPL's self-serving incorrect recitation of what transpired in the Canadian insolvency proceeding, covering matters outside the FAC and not proven by documentary evidence filed in support of the motion, and the self-serving Amendment as to which no evidence of Monitor approval is provided.

And whether value transferred to CITPL under the Subscription Agreement was given on account of its claims, or because it is a subsidiary of the DIP lender or otherwise is a fact question not properly determined on this motion.  CITPL acknowledges the "variety of roles" it and its parent played in the Canadian insolvency proceeding (Moving Br. at 6) which also militates against dismissal.

Moreover, this fact question is irrelevant as under the Intercreditor Agreement it does not matter why CITPL received value under the Subscription Agreement.  As CITPL acknowledges, what matters is whether the value given is a payment or distribution in respect of Shared Collateral under § 2.01(a) or § 2.03(b).  No ambiguity is pointed to, that would serve to warrant consideration of parol evidence as to the supposed purpose of any transaction document.[3]

---

[3] CITPL claims "when the Ontario Court approved the Subscription Agreement, it was approving value being attributed to the overall transaction and not to any pre-petition secured obligations and approved the parties allocating consideration to Cargill's participation in the transaction and not the Cargill Margin Facility", citing only the Amendment.  (Moving Br. at 19.)  This falsely implies Ontario Court approval of the Amendment, which never happened.

**CONCLUSION**

The motion should be denied.

| | |
|---|---|
| Dated: New York, NY<br>March 7, 2025 | Amini LLC<br><br>/s/ Jeffrey Chubak<br>Jeffrey Chubak<br>John W. Brewer<br>130 West 35th Street<br>12th Floor<br>New York, NY 10001<br>(212) 490-4700<br>jchubak@aminillc.com<br>jbrewer@aminillc.com<br>Attorneys for Plaintiff |