**Execution Copy**

TACORA RESOURCES INC.

AND EACH OF THE GUARANTORS PARTY HERETO

9.00% CASH / 4.00% PIK SENIOR SECURED PRIORITY NOTES DUE 2023

———————————————

SECOND SUPPLEMENTAL INDENTURE

Dated as of May 11, 2023

———————————————

COMPUTERSHARE TRUST COMPANY, N.A.,

as Trustee and Notes Collateral Agent,

# TABLE OF CONTENTS

*Page*

## ARTICLE 1
## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01   *Definitions*.................................................................................................7

Section 1.02   *Other Definitions.*.......................................................................................38

Section 1.03   *Rules of Construction*.................................................................................39

Section 1.04   *Conflicts with Base Indenture*...................................................................39

## ARTICLE 2
## THE NOTES

Section 2.01   *Form and Dating.*........................................................................................40

Section 2.02   *Execution and Authentication.*...................................................................40

Section 2.03   *Registrar and Paying Agent*........................................................................41

Section 2.04   *Paying Agent to Hold Money in Trust.*......................................................41

Section 2.05   *Holder Lists*................................................................................................41

Section 2.06   *Transfer and Exchange.*..............................................................................41

Section 2.07   *Replacement Notes*.....................................................................................49

Section 2.08   *Outstanding Notes*......................................................................................49

Section 2.09   *Treasury Notes*............................................................................................49

Section 2.10   *Temporary Notes*........................................................................................49

Section 2.11   *Cancellation.*...............................................................................................50

Section 2.12   *Defaulted Interest.*......................................................................................50

Section 2.13   *Persons Deemed Owners.*...........................................................................50

Section 2.14   *Interest Payment Date; Record Date.*........................................................50

Section 2.15   *Tax Treatment.*...........................................................................................51

## ARTICLE 3
## REDEMPTION AND PURCHASE

Section 3.01   *[Reserved]*...................................................................................................51

Section 3.02   *Selection of Notes to Be Purchased.*..........................................................51

Section 3.03   *[Reserved]*...................................................................................................52

Section 3.04   *[Reserved]*...................................................................................................52

Section 3.05   *Deposit of Redemption or Purchase Price*.................................................52

Section 3.06   *Notes Redeemed or Purchased in Part.*......................................................52

Section 3.07   *No Optional Redemption*............................................................................53

Section 3.08    *No Mandatory Redemption.* ........................................................................53

Section 3.09    *[Reserved].* ...........................................................................................53

Section 3.10    *Offer to Purchase by Application of Excess Proceeds.* ..................................53

Section 3.11    *Offer to Purchaser by Application of Excess Cash Flow* ...............................55

Section 3.12    *Certificate and Opinion as to Conditions Precedent.* ....................................56

ARTICLE 4
COVENANTS

Section 4.01    *Payment of Notes.* .................................................................................57

Section 4.02    *Maintenance of Office or Agency.* ............................................................57

Section 4.03    *Corporate Existence; Insurance; Maintenance of Properties.* .......................57

Section 4.04    *Compliance Certificate.* .........................................................................58

Section 4.05    *Taxes.* ................................................................................................58

Section 4.06    *Stay, Extension and Usury Laws* .............................................................58

Section 4.07    *Restricted Payments.* .............................................................................58

Section 4.08    *Incurrence of Indebtedness and Issuance of Preferred Stock.* ......................62

Section 4.09    *Liens.* .................................................................................................66

Section 4.10    *Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries.* ..............66

Section 4.11    *Transactions with Affiliates.* ....................................................................68

Section 4.12    *Business Activities* ...............................................................................69

Section 4.13    *Additional Guarantees.* ..........................................................................69

Section 4.14    *Designation of Restricted and Unrestricted Subsidiaries.* ...........................69

Section 4.15    *Reports.* ..............................................................................................70

Section 4.16    *Offer to Repurchase Upon Change of Control.* ..........................................71

Section 4.17    *Asset Sales* ..........................................................................................73

Section 4.18    *Additional Amounts* ..............................................................................75

Section 4.19    *Excess Cash Flow.* ................................................................................78

Section 4.20    *Grant of Security Interests.* .....................................................................79

Section 4.21    *Further Assurances; After-Acquired Collateral.* ........................................80

Section 4.22    *Impairment of Security Interest.* ...............................................................80

Section 4.23    *Additional Notes Collateral.* ....................................................................80

Section 4.24    *Suspension of Certain Covenants on Achievement of Investment Grade Status.* ...........81

Section 4.25    *Minimum Liquidity* ...............................................................................82

Section 4.26    *Canadian Defined Benefit Pension Plans.* ..................................................82

ARTICLE 5
SUCCESSORS

Section 5.01    *Merger, Amalgamation, Consolidation, or Sale of Assets.*............................................82

Section 5.02    *Successor Corporation Substituted*................................................................................83

ARTICLE 6
DEFAULTS AND REMEDIES

Section 6.01    *Events of Default.*..........................................................................................................84

Section 6.02    *Acceleration.*...................................................................................................................86

Section 6.03    *Other Remedies.*.............................................................................................................86

Section 6.04    *Waiver of Past Defaults.*.................................................................................................86

Section 6.05    *Control by Majority.*.......................................................................................................87

Section 6.06    *Limitation on Suits.*........................................................................................................87

Section 6.07    *Rights of Holders of Notes to Receive Payment*.............................................................88

Section 6.08    *Collection Suit by Trustee or Notes Collateral Agent*....................................................88

Section 6.09    *Trustee and Notes Collateral Agent May File Proofs of Claim.*.....................................88

Section 6.10    *Priorities.*........................................................................................................................89

Section 6.11    *Undertaking for Costs*....................................................................................................89

ARTICLE 7
TRUSTEE

Section 7.01    *Duties of Trustee.*...........................................................................................................90

Section 7.02    *Rights of Trustee.*...........................................................................................................91

Section 7.03    *Individual Rights of Trustee.*..........................................................................................93

Section 7.04    *Trustee's Disclaimer.*......................................................................................................93

Section 7.05    *Notice of Defaults.*..........................................................................................................93

Section 7.06    *Compensation and Indemnity.*........................................................................................93

Section 7.07    *Replacement of Trustee and Notes Collateral Agent.*.....................................................94

Section 7.08    *Successor Trustee or Successor Notes Collateral Agent by Merger, etc.*......................95

Section 7.09    *Eligibility; Disqualification.*...........................................................................................95

Section 7.10    *Additional Rights of Trustee.*.........................................................................................95

Section 7.11    *Third Party Interests.*.....................................................................................................96

Section 7.12    *Appointment of Additional Co-Trustees*........................................................................96

Section 7.13    *USA PATRIOT Act Compliance*.....................................................................................97

ARTICLE 8
LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01 *Option to Effect Legal Defeasance or Covenant Defeasance.* .................................. 98

Section 8.02 *Legal Defeasance and Discharge.* ................................................................... 98

Section 8.03 *Covenant Defeasance.* ................................................................................. 98

Section 8.04 *Conditions to Legal or Covenant Defeasance.* ................................................... 99

Section 8.05 *Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions.* ....................................................................................... 100

Section 8.06 *Repayment to Company.* ............................................................................. 101

Section 8.07 *Reinstatement.* ......................................................................................... 101

ARTICLE 9
AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01 *Without Consent of Holders of Notes* ............................................................. 101

Section 9.02 *With Consent of Holders of Notes* ................................................................. 103

Section 9.03 *Revocation and Effect of Consents.* ............................................................... 104

Section 9.04 *Notation on or Exchange of Notes.* ............................................................... 104

Section 9.05 *Trustee to Sign Amendments, etc.* ................................................................ 104

ARTICLE 10
SATISFACTION AND DISCHARGE

Section 10.01 *Satisfaction and Discharge.* ....................................................................... 105

Section 10.02 *Application of Trust Money.* ....................................................................... 105

ARTICLE 11
GUARANTEES

Section 11.01 *Guarantee.* ............................................................................................ 106

Section 11.02 *Limitation on Guarantor Liability.* ............................................................... 107

Section 11.03 *Execution and Delivery of Guarantee* ........................................................... 107

Section 11.04 *Guarantors May Consolidate, etc., on Certain Terms* ....................................... 108

Section 11.05 *Releases.* .............................................................................................. 108

ARTICLE 12
SECURITY

Section 12.01 *Grant of Security Interests; ABL Intercreditor Agreement* .................................. 109

Section 12.02 *Recording and Filings.* ............................................................................. 110

Section 12.03 *Release of Collateral.* .............................................................................. 111

Section 12.04 *Form and Sufficiency of Release* ................................................................. 112

Section 12.05 *Actions to be Taken by the Notes Collateral Agent Under the Collateral Documents.* 112

Section 12.06 *Authorization of Receipt of Funds by the Notes Collateral Agent Under the Collateral Documents.* 112

ARTICLE 13
MISCELLANEOUS

Section 13.01 *Notices.* 113

Section 13.02 *Certificate and Opinion as to Conditions Precedent.* 114

Section 13.03 *Statements Required in Certificate or Opinion.* 114

Section 13.04 *Rules by Trustee and Agents.* 114

Section 13.05 *No Personal Liability of Directors, Officers, Employees and Stockholders.* 115

Section 13.06 *Governing Law.* 115

Section 13.07 *Additional Information.* 115

Section 13.08 *Payment Date Other than a Business Day.* 115

Section 13.09 *Currency Indemnity.* 115

Section 13.10 *Agent for Service; Submission to Jurisdiction; Waiver of Immunities.* 116

Section 13.11 *No Adverse Interpretation of Other Agreements.* 116

Section 13.12 *Force Majeure.* 116

Section 13.13 *Successors.* 117

Section 13.14 *Severability.* 117

Section 13.15 *Waiver of Jury Trial.* 117

Section 13.16 *Counterpart Originals.* 117

Section 13.17 *Table of Contents, Headings, etc.* 117

Section 13.18 *Intercreditor Agreements.* 117

<u>EXHIBITS</u>

Exhibit A    FORM OF NOTE
Exhibit B    FORM OF CERTIFICATE OF TRANSFER
Exhibit C    FORM OF CERTIFICATE OF EXCHANGE
Exhibit D    FORM OF SUPPLEMENTAL INDENTURE
Exhibit E    FORM OF ABL INTERCREDITOR AGREEMENT
Exhibit F    FORM OF PARI PASSU INTERCREDITOR AGREEMENT

<u>SCHEDULES</u>

Schedule A    POST-CLOSING COLLATERAL REQUIREMENTS

NOTE: This Table of Contents shall not, for any purpose, be deemed to be part of this Indenture.

SECOND SUPPLEMENTAL INDENTURE (this "*Second Supplemental Indenture*"), dated as of May 11, 2023, among Tacora Resources Inc., a corporation incorporated under the laws of the Province of Ontario, Canada (the "*Company*"), the Guarantors (as defined herein) and Computershare Trust Company, N.A., as trustee (in such capacity, the "*Trustee*") and Notes Collateral Agent (in such capacity, the "*Notes Collateral Agent*") and any and all successors thereto.

## W I T N E S S E T H :

WHEREAS, the Company, the guarantors from time to time party thereto, and Wells Fargo Bank, National Association, in its capacity as the trustee and notes collateral agent (in such capacities, the "*Prior Trustee*" and "*Prior Notes Collateral Agent*," respectively) entered into that certain indenture dated as of May 11, 2021 (the "*Original Indenture*"), to which Computershare Trust Company, N.A.(hereinafter referred to as the "*Trustee* and *Notes Collateral Agent*"), succeeded in interest following its acquisition of substantially all of the Prior Trustee's and Prior Notes Collateral Agent's Corporate Trust Services business, as supplemented by that certain first supplemental indenture (the "*Original First Supplemental Indenture*") dated as of February 15, 2022, by and among the Company, the guarantors party thereto from time to time, and the Trustee and Notes Collateral Agent, and as further supplemented by that second supplemental indenture dated as of February 16, 2022 (the "*Original Second Supplemental Indenture*" and, together with the Original Indenture as initially supplemented by the Original First Supplemental Indenture, the "*Prior Indenture*"), by and among the Company, the guarantors party thereto from time to time, and the Trustee and Notes Collateral Agent;

WHEREAS, the Prior Indenture was amended and restated by the Company, the guarantors party thereto, and the Trustee and Notes Collateral Agent, with the consent of the holders of more than two-thirds in aggregate principal amount of the $225,000,000 aggregate principal amount of 8.250% senior secured notes due 2026 (the "*Existing Notes*"), guaranteed by the guarantors from time to time party to the Prior Indenture (the "*Existing Note Guarantees*"), outstanding under the Prior Indenture (such holders, the "*Required Holders*"), in the form of the Base Indenture (as defined below) and the First Supplemental Indenture (as defined below);

WHEREAS, after having obtained the consent of the Required Holders, the Company, the guarantors from time to time party hereto, and the Trustee and Notes Collateral Agent have immdtiately heretofore executed and delivered an Amended and Restated Base Indenture, dated as of May 11, 2023 (the "*Base Indenture*") and the First Supplemental Indenture, dated as of May 11, 2023 (the "*First Supplemental Indenture*"), which sets forth the amended terms of the Existing Notes and Existing Note Guarantees, including to permit the issuance of the Notes (as defined below);

WHEREAS, Section 2.02 of the Base Indenture provides that various matters with respect to any series of Securities issued under the Base Indenture may be established in a supplemental indenture to the Base Indenture;

WHEREAS, pursuant to the terms of the Base Indenture, the Company desires to provide for the establishment of a series of Securities to be designated as the "9.00% Cash / 4.00% PIK Senior Secured Priority Notes due 2023" which are guaranteed by the Guarantors (as defined below) (the "*Note Guarantees*"), the form and substance of such notes and the terms, provisions and conditions thereof to be set forth as provided in the Base Indenture, as amended and supplemented by this Second Supplemental Indenture (together with the Base Indenture, the "*Indenture*");

WHEREAS, the Company has duly authorized the execution and delivery of this Second Supplemental Indenture to provide for the issuance of (i) the 9.00% Cash / 4.00% PIK Senior Secured Priority Notes due 2023 in an initial aggregate principal amount of $27,000,000 (the "*Initial Notes*") and

(ii) any additional 9.00% Cash / 4.00% PIK Senior Secured Priority Notes due 2023 (the "Additional Notes," together with the Initial Notes, the "*Notes*") that may be issued after the Issue Date.

WHEREAS, the Company desires and has requested the Trustee and the Notes Collateral Agent to join in the execution and delivery of this Second Supplemental Indenture in order to govern the Notes;

WHEREAS, the conditions set forth in the Base Indenture for the execution and delivery of this Second Supplemental Indenture have been complied with; and

WHEREAS, all acts and things necessary to make this Second Supplemental Indenture, when duly executed and delivered, a valid, binding and legal instrument in accordance with its terms and for the purposes herein expressed, have been done and performed; and the execution and delivery of this Supplemental Indenture have been in all respects duly authorized;

**NOW, THEREFORE,** in consideration of the premises and mutual covenants herein contained and intending to be legally bound, the Company, the Guarantors (as defined below), the Trustee and the Notes Collateral Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (as defined below) of the Notes:

ARTICLE 1
DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01    *Definitions*.

"*ABL Administrative Agent*" means any agent under any ABL Facility.

"*ABL Facility*" means a new Credit Facility with the financial institutions party thereto as lenders and the agent of such lenders, as amended, restated, modified, renewed, refunded, replaced (whether upon or after termination or otherwise) or refinanced in whole or in part from time to time.

"*ABL Facility Documents*" means the collective reference to any ABL Facility and the guarantees thereof, and the collateral documents relating thereto, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified, in whole or in part, from time to time and any other any collateral documents evidencing or governing any ABL Priority Obligations.

"*ABL Intercreditor Agreement*" means an intercreditor agreement in substantially the form attached as Exhibit E hereto, among, *inter alia*, the ABL Agent, on behalf of itself and the ABL Secured Parties and the Notes Collateral Agent, on behalf of itself, the Trustee and the other Notes Secured Parties, that shall govern, among other things, the relative lien priorities of the ABL Priority Liens on the Collateral securing the ABL Priority Obligations and the Notes Priority Liens on the Collateral securing the Existing Notes Priority Obligations.

"*ABL Priority Collateral*" means all Collateral consisting of the following (including for the avoidance of doubt, any such assets that, but for the application of Section 552 of the Bankruptcy Code (or any similar provision of any foreign Debtor Relief Laws), would be ABL Priority Collateral):

(1)    all Accounts, other than Accounts which constitute identifiable proceeds of Notes Priority Collateral;

(2)    cash, Money and cash equivalents;

(3)    all (x) Deposit Accounts (other than Notes Priority Accounts) and Money and all cash, checks, other negotiable instruments, funds and other evidences of payments properly held therein, including intercompany indebtedness between or among the Credit Parties or their Affiliates, to the extent owing in respect of ABL Priority Collateral, (y) Securities Accounts (other than Notes Priority Accounts), Security Entitlements and Securities credited to such a Securities Account (other than Capital Stocks) and (z) Commodity Accounts (other than Notes Priority Accounts) and Commodity Contracts credited thereto, and, in each case, all cash, Money, cash equivalents, checks and other property properly held therein or credited thereto (other than Capital Stock); provided, however, that to the extent that identifiable proceeds of Notes Priority Collateral are deposited in any such Deposit Accounts or Securities Accounts, such identifiable proceeds shall be treated as Notes Priority Collateral;

(4)    all Inventory;

(5)    to the extent relating to, evidencing or governing any of the items referred to in the preceding clauses (1) through (4) constituting ABL Priority Collateral, all Documents, General Intangibles (including all rights under contracts), Instruments (including Promissory Notes), Chattel Paper (including Tangible Chattel Paper and Electronic Chattel Paper), Intellectual Property and Commercial Tort Claims; provided that to the extent any of the foregoing also relates to Notes Priority Collateral, only that portion related to the items referred to in the preceding clauses (1) through (4) shall be included in the ABL Priority Collateral;

(6)    to the extent relating to any of the items referred to in the preceding clauses (1) through (5) constituting ABL Priority Collateral, all Supporting Obligations and Letter-of-Credit Rights; provided that to the extent any of the foregoing also relates to Notes Priority Collateral only that portion related to the items referred to in the preceding clauses (1) through (5) shall be included in the ABL Priority Collateral;

(7)    all books and Records relating to the items referred to in the preceding clauses (1) through (6) constituting ABL Priority Collateral (including all books, databases, customer lists, engineer drawings, and Records, whether tangible or electronic, which contain any information relating to any of the items referred to in the preceding clauses (1) through (6) constituting ABL Priority Collateral); and

(8)    all collateral security and guarantees, products or Proceeds of or with respect to any of the foregoing items referred to in the preceding clauses (1) through (7) constituting ABL Priority Collateral and all cash, Money, cash equivalents, insurance proceeds, Instruments, Securities and Financial Assets received as Proceeds of any of the foregoing items referred to in the preceding clauses (1) through (7) and this clause (8) constituting ABL Priority Collateral ("*ABL Priority Proceeds*").

"*ABL Priority Liens*" means the Liens on the Collateral securing the ABL Priority Obligations.

"*ABL Priority Obligations*" means the "Obligations" or any term of similar import as defined in the ABL Facility Documents.

"*ABL Secured Parties*" means the applicable ABL Administrative Agent, on behalf of itself and the other holders of the related ABL Priority Obligations (together with any other ABL Administrative Agent and the holders of any other ABL Priority Obligations)

"*Acquired Debt*" means, with respect to any specified Person:

(1)      Indebtedness of any other Person existing at the time such other Person is amalgamated or merged with or into or became a Subsidiary of such specified Person, whether or not such Indebtedness is incurred in connection with, or in contemplation of, such other Person merging with or into, or becoming a Restricted Subsidiary of, such specified Person; and

(2)      Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"*Additional Notes*" means Notes (other than the Initial Notes) issued after the Issue Date under this Indenture in accordance with Sections 2.02, 4.08 and 4.09 hereof, as part of the same class as the Initial Notes.

"*Additional Notes Collateral*" means any Collateral acquired after the Issue Date or any other assets of the Company and its Subsidiaries not constituting Collateral as of the Issue Date that subsequently become subject to a Notes Priority Lien or an ABL Priority Lien.

"*Ad Hoc Group*" means, collectively, Snowcat Capital Management LP, Brigade Capital Management, LP, and funds managed by CrossingBridge Advisors, LLC and Cohanzick Management, LLC.

"*Ad Hoc Group Representative*" means GLC Advisors & Co., LLC.

"*Advance Payments Facility Agreement*" means the Advance Payments Facility Agreement by and among the Company and Cargill International Trading Pte. Ltd., dated as of January 3, 2023, as amended, modified, restated or supplemented from time to time.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "*control*," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided*, that beneficial ownership of 10% or more of the Voting Stock of a Person will be deemed to be control. For purposes of this definition, the terms "*controlling*," "*controlled by*" and "*under common control with*" have correlative meanings.

"*Agent*" means any Registrar, co-registrar, Paying Agent or additional paying agent.

"*Applicable Procedures*" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary, Euroclear or Clearstream that apply to such transfer or exchange.

"*Asset Sale*" means:

(1)      the sale, lease, conveyance or other disposition of any property or assets by the Company or any of the Company's Restricted Subsidiaries; *provided*, that the sale, lease, conveyance or other disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries taken as a whole will be governed by Section 4.16 and/or Section 5.01 of this Indenture and not by Section 4.17 of this Indenture; and

(2)    the issuance of Equity Interests by any of the Company's Restricted Subsidiaries or the sale by the Company or any of the Company's Restricted Subsidiaries of Equity Interests in any of the Company's Subsidiaries (other than statutory or directors' qualifying shares).

Notwithstanding the preceding, each of the following items will be deemed not to be an Asset Sale:

(1)    any single transaction or series of related transactions that involves assets having a Fair Market Value of less than US$5.0 million;

(2)    a transfer of assets between or among the Company and its Restricted Subsidiaries, including to a Person which becomes a Restricted Subsidiary in connection with such transfer;

(3)    an issuance of Equity Interests by a Restricted Subsidiary of the Company to the Company or to a Restricted Subsidiary of the Company;

(4)    the issuance or disposition of the Equity Interests of an Unrestricted Subsidiary;

(5)    the sale, lease or other transfer of products (including, but not limited to minerals, ores, concentrates and refined metals), services or accounts receivable in the ordinary course of business, including the sale of the Company's or one of its Restricted Subsidiaries' products pursuant to agreements for customary royalty arrangements entered into in the ordinary course of business;

(6)    the sale or other disposition of cash or Cash Equivalents;

(7)    licenses and sublicenses by the Company or any of its Restricted Subsidiaries of software or intellectual property in the ordinary course of business;

(8)    any sale, abandonment or other disposition of damaged, worn-out, redundant or obsolete assets in the ordinary course of business (including the abandonment or other disposition of mineral interests or intellectual property that is, in the reasonable judgment of the Company, no longer economically practicable to maintain or useful in the conduct of the business of the Company and its Restricted Subsidiaries taken as whole), any sale or other disposition of surplus or redundant real property in the ordinary course of business;

(9)    any surrender or waiver of contract rights or settlement, release, recovery on or surrender of contract, tort or other claims in the ordinary course of business and foreclosure or any similar action with respect to any property or other asset of the Company or any of its Restricted Subsidiaries;

(10)    the granting of Liens not prohibited by Section 4.09;

(11)    a Restricted Payment that does not violate Section 4.07 or a Permitted Investment;

(12)    a sale, lease, transfer, issuance or other disposition, or a series of related sales, leases, transfers, issuances or dispositions in connection with any Permitted Tax Reorganization; and

(13) any exchange (other than with a Person that is an Affiliate of the Company) of assets (including a combination of assets and Cash Equivalents) for assets or services related to a Permitted Business of comparable or greater market value or usefulness to the business of the Company and its Subsidiaries taken as a whole, which in the event of an exchange of assets with a Fair Market Value in excess of US$10.0 million shall be set forth in a resolution of the Board of Directors of the Company, *provided*, that the Company shall apply any cash or Cash Equivalents received in any such exchange of assets as described in Section 4.17(b).

"*Attributable Debt*" means, in respect of a sale and leaseback transaction, at the time of determination, the present value of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction including any period for which such lease has been extended or may, at the option of the lessor, be extended. Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with GAAP; *provided*, that if such sale and leaseback transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligation."

"*Bankruptcy Code*" means Title 11 of the United States Code, as amended or any similar federal, state, provincial or foreign law for the relief of debtors.

"*Bankruptcy or Insolvency Laws*" means the Bankruptcy Code, the Bankruptcy and Insolvency Act (Canada), the Companies' Creditors Arrangement Act (Canada), the Winding up and Restructuring Act (Canada) and any Canadian corporate statute where such statute is used to propose an arrangement involving the compromise of claims of creditors, each as amended from time to time, and any similar federal, provincial, state or foreign law for the relief of debtors, including any other bankruptcy, insolvency or analogous laws applicable to the Company or any of the Guarantors or any of their respective properties or liabilities.

"*Base Indenture*" has the meaning set forth in the recitals hereto.

"*Beneficial Owner*" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "*Beneficially Owns*" and "*Beneficially Owned*" have a corresponding meaning.

"*Board of Directors*" means:

(1) with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2) with respect to a partnership, the board of directors of the general partner of the partnership;

(3) with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(4) with respect to any other Person, the board or committee of such Person serving a similar function.

"*Business Day*" means any day other than a Saturday, Sunday, or any day on which banks in New York, New York are authorized or required by law to close.

"*Canadian Defined Benefit Pension Plan*" means any plan that is a "registered pension plan" as defined in subsection 248(1) of the Income Tax Act (Canada) which contains a "defined benefit provision" as defined in subsection 147.1(1) of the Income Tax Act (Canada), that is sponsored, maintained, or contributed to by the Partnership or any of its Subsidiaries, or pursuant to which the Partnership or any of its Subsidiaries has any liability or contingent liability.

"*Canadian Securities Legislation*" means all applicable securities laws in each of the provinces and territories of Canada, including, without limitation, the Provinces of Ontario and British Columbia, and the respective regulations and rules under such laws together with applicable published rules, policy statements, blanket orders, instruments, rulings and notices of the regulatory authorities in such provinces or territories.

"*Capital Lease Obligation*" means, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet prepared in accordance with GAAP (except as provided in the provisos to this definition), and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty, *provided*, that obligations of the Company or its Subsidiaries (a) either existing on the Issue Date or created thereafter that initially were not included on the consolidated balance sheet of the Company as capital lease obligations and were subsequently re-characterized as capital lease obligations due to a change in accounting treatment, or (b) that did not exist on the Issue Date and were required to be characterized as capital lease obligations, but would not have been required to be treated as capital lease obligations on the Issue Date had they existed at that time (due to a change in accounting treatment between the Issue Date and the time of incurrence of such obligations), shall for all purposes not be treated as Capital Lease Obligations.

"*Capital Stock*" means:

(1)     in the case of a corporation, common or preferred shares in its share capital;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"*Cash Equivalents*" means:

(1)     United States dollars or Canadian dollars;

(2)     securities issued or directly and fully guaranteed or insured by the United States, Canada or any province of Canada or any agency or instrumentality thereof (*provided*, that the full faith and credit of the United States, Canada or such province of Canada, as the case may be, is pledged in support of those securities) having maturities of not more than twelve months from the date of acquisition;

(3)     certificates of deposit and eurodollar time deposits with maturities of twelve months or less from the date of acquisition, bankers' acceptances with maturities not exceeding 365 days and overnight bank deposits, in each case, with any bank referred to in Schedule I or Schedule II of the Bank Act (Canada) or rated at least A-1 or the equivalent thereof by S&P, at least P-1 or the equivalent thereof by Moody's or at least R-1 or the equivalent thereof by DBRS;

(4)     repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (2) and (3) of this definition entered into with any financial institution meeting the qualifications specified in clause (3) of this definition;

(5)     commercial paper having one of the two highest ratings obtainable from Moody's or S&P, or with respect to Canadian commercial paper, having one of the two highest ratings obtainable from DBRS and, in each case, maturing within one year after the date of acquisition; and

(6)     money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (1) through (5) of this definition.

"*Change of Control*" means the occurrence of any of the following:

(1)     the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger, amalgamation or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Company and its Subsidiaries taken as a whole to any Person (including any "person" (as that term is used in Section 13(d)(3) of the Exchange Act));

(2)     the adoption of a plan relating to the liquidation or dissolution of the Company; or

(3)     the consummation of any transaction (including, without limitation, any merger, amalgamation or consolidation), the result of which is that any Person (including any "person" (as that term is used in Section 13(d)(3) of the Exchange Act)), other than one or more Permitted Holders, becomes the Beneficial Owner, directly or indirectly, of more than 50% of the Voting Stock of the Company, measured by voting power rather than number of shares.

For the avoidance of doubt, a reverse takeover shall not trigger a "Change of Control" unless such reverse takeover independently triggers one of the foregoing clauses (1), (2) or (3)

"*Clearstream*" means Clearstream Banking, S.A.

"*Collateral*" means all of the assets and property of the Company or any Guarantor, whether real, personal or mixed securing or purported to secure any Senior Priority Obligations or Notes Priority Obligations, other than Excluded Assets. Unless otherwise defined herein, all terms defined in the UCC or the PPSA and used but not defined herein have the meanings specified therein (notwithstanding that such terms may be defined in lowercase in the UCC or PPSA, as applicable).

"*Collateral Documents*" means the security agreement, to be entered into by and among the Company, the Notes Collateral Agent and the other Grantors party thereto with respect to the Collateral, the Mortgages, the Quebec deed of hypothec among the Company, the Notes Collateral Agent and the other Grantors party thereto with respect to the Collateral, and other security agreements, pledge agreements,

mortgages, debentures, deeds of hypothec, assignments of material contracts, assignments of insurance, collateral assignments, control agreements and related agreements (including, without limitation, financing statements under the UCC or the PPSA) with respect to any Collateral or Additional Notes Collateral, the Jarvis Hedge Facility Intercreditor Agreement, any Pari Passu Intercreditor Agreement, any Senior Priority Intercreditor Agreement or the ABL Intercreditor Agreement, if any, each as amended, supplemented, restated, renewed, replaced or otherwise modified from time to time, to secure any Obligations under the Indenture Documents or under which rights or remedies with respect to any such Lien are governed.

"*Company*" means Tacora Resources Inc., a corporation incorporated under the laws of the Province of Ontario, Canada, and any and all successors thereto.

"*Consolidated EBITDA*" means, with respect to any specified Person for any period, the Consolidated Net Income of such Person for such period plus, without duplication:

(1)     an amount equal to any net loss realized by such Person or any of its Restricted Subsidiaries in connection with an Asset Sale, to the extent such losses were deducted in computing such Consolidated Net Income; *plus*

(2)     provision for taxes based on income or profits of such Person and its Restricted Subsidiaries for such period, to the extent that such provision for taxes was deducted in computing such Consolidated Net Income; *plus*

(3)     the Fixed Charges of such Person and its Restricted Subsidiaries for such period, to the extent that such Fixed Charges were deducted in computing such Consolidated Net Income; *plus*

(4)     any foreign currency translation losses of such Person and its Restricted Subsidiaries for such period, to the extent that such losses were taken into account in computing such Consolidated Net Income; *plus*

(5)     depreciation, amortization (including amortization of intangibles but excluding amortization of prepaid cash expenses that were paid in a prior period) and other non-cash charges and expenses (excluding any such non-cash charge or expense to the extent that it represents an accrual of or reserve for cash charges or expenses in any future period or amortization of a prepaid cash charge or expense that was paid in a prior period) of such Person and its Restricted Subsidiaries for such period to the extent that such depreciation, amortization and other non-cash charges or expenses were deducted in computing such Consolidated Net Income; *minus*

(6)     any foreign currency translation gains of such Person and its Restricted Subsidiaries for such period, to the extent that such gains were taken into account in computing such Consolidated Net Income;

in each case, on a consolidated basis and determined in accordance with GAAP.

"*Consolidated Net Income*" means, with respect to any specified Person for any period, the aggregate of the net income (loss) of such Person and its Restricted Subsidiaries for such period, on a consolidated basis (excluding the net income (loss) of any Unrestricted Subsidiary of such Person), determined in accordance with GAAP and without any reduction in respect of preferred stock dividends; *provided*, that:

(1)      all gains (and losses) realized in connection with any Asset Sale or the disposition of securities or the early extinguishment of Indebtedness, together with any related provision for taxes on any such gain, will be excluded;

(2)      the net income (and loss) of any Person that is accounted for by the equity method of accounting will be included only to the extent of the amount of dividends or similar distributions paid in cash to the specified Person or a Restricted Subsidiary of the Person;

(3)      the net income (but not loss) of any Unrestricted Subsidiary will be excluded, whether or not distributed to such Person or one of its Subsidiaries;

(4)      the net income (but not loss) of any Restricted Subsidiary will be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that net income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders;

(5)      the cumulative effect of a change in accounting principles will be excluded;

(6)      non-cash gains and losses attributable to movement in the mark-to-market valuation of Hedging Obligations as required by GAAP will be excluded; and

(7)      any non-cash expense resulting from grants of stock appreciation or similar rights, stock options or restricted stock to officers, directors and employees will be excluded.

"*Consolidated Secured Net Leverage Ratio*" means, as of any date of determination, the ratio determined on a consolidated basis for the Company and its Restricted Subsidiaries of (a) the aggregate principal amount of Consolidated Total Indebtedness that is secured by a Lien as of such date (calculated, without duplication, net of the aggregate amount of cash or Cash Equivalents included in the consolidated balance sheet of the Company and its Restricted Subsidiaries and which is not (i) subject to any Lien (other than Liens in favor of the Notes Collateral Agent) or (ii) noted as "restricted" on such consolidated balance sheet) to (b) Consolidated EBITDA for the most recent four consecutive fiscal quarters for which internal financial statements are available ending on or prior to the date of determination; provided, that Consolidated EBITDA will be calculated in the manner contemplated by, and subject to the adjustments provided in, the definition of the term "Fixed Charge Coverage Ratio."

"*Consolidated Tangible Assets*" means as of any date the total assets of the Company and its Restricted Subsidiaries as of the most recent fiscal quarter end for which a consolidated balance sheet of the Company and its Restricted Subsidiaries is available, minus all current liabilities of the Company and its Restricted Subsidiaries reflected on such balance sheet and minus total goodwill and other intangible assets of the Company and its Restricted Subsidiaries reflected on such balance sheet, all calculated on a consolidated basis in accordance with GAAP.

"*Consolidated Total Indebtedness*" means, as of any date of determination, the aggregate principal amount of Indebtedness for borrowed money and Capital Lease Obligations (other than letters of credit and bankers' acceptances, except to the extent of unreimbursed amounts thereunder, Hedging Obligations entered into in the ordinary course of business and not for speculative purposes and intercompany indebtedness) of the Company and its Restricted Subsidiaries outstanding on such date.

"*Consolidated Total Leverage Ratio*" means the ratio determined on a consolidated basis for the Company and its Restricted Subsidiaries of (a) Consolidated Total Indebtedness to (b) Consolidated EBITDA for the most recent four consecutive fiscal quarters for which internal financial statements are available ending on or prior to the date of determination; *provided*, that Consolidated EBITDA will be calculated in the manner contemplated by, and subject to the adjustments provided in, the definition of the term "Fixed Charge Coverage Ratio."

"*continuing*" means, with respect to any Default or Event of Default, that such Default or Event of Default has not been cured or waived.

"*Corporate Trust Office of the Trustee*" will be at the address of the Trustee specified in Section 4.02 hereof or such other address as to which the Trustee, or any successor Trustee, may give notice to the Company.

"*Credit Facility*" means, one or more debt facilities with banks (or other institutional lenders that provide revolving credit loans in the ordinary course of business) providing for revolving credit loans (including, without limitation, an ABL Facility), in each case, as amended, restated, modified, renewed, refunded, replaced in any manner (whether upon or after termination or otherwise) or refinanced in whole or in part from time to time.

"*Custodian*" means the Trustee, as custodian on behalf of the Depositary with respect to the Notes in global form, or any successor entity thereto.

"*DBRS*" means DBRS Limited, a corporation governed by the Business Corporations Act (Ontario).

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Definitive Note*" means a Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of Exhibit A hereto, except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"*Depositary*" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 hereof as the Depositary with respect to the Notes, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"*Disqualified Stock*" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Capital Stock), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is 91 days after the earlier of (1) the date on which the Notes mature and (2) the date on which the Notes are no longer outstanding. Notwithstanding the preceding sentence, only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock. Any Capital Stock that would constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the Company to repurchase such Capital Stock upon the occurrence of a change of control or an asset sale will not constitute Disqualified Stock if the terms of such Capital Stock provide that the Company may not repurchase or redeem any such Capital Stock

pursuant to such provisions unless such repurchase or redemption complies with Section 4.07 of this Indenture. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Indenture will be the maximum amount that the Company and its Restricted Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.

"*EDGAR*" means the SEC's Electronic Data Gathering, Analysis, and Retrieval system.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*Equity Offering*" means a public or private sale either (1) of Equity Interests of the Company by the Company (other than Disqualified Stock and other than to a Subsidiary of the Company) or (2) of Equity Interests of a direct or indirect parent entity of the Company (other than to the Company or a Subsidiary of the Company) to the extent that the net proceeds therefrom are contributed to the common equity capital of the Company.

"*Excess Cash Flow*" means, with respect to any Person for any period, (i) net change in cash for such Person for such period minus (ii) net cash (used in) provided by financing activities for such Person for such period (other than any amounts used to reduce the principal amount of the Notes or any Indebtedness that is subordinated to the Notes or any Note Guarantee) (*provided*, that for any amounts used to reduce the principal amount of Indebtedness (1) such Indebtedness has been incurred in accordance with this Indenture and (2) to the extent such Indebtedness is revolving in nature, such payment shall have been accompanied by a concurrent corresponding permanent reduction in the revolving commitment relating thereto), in each case, as such amounts would be shown on a consolidated statement of cash flows prepared in accordance with IFRS.

"*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended.

"*Excluded Assets*" means (A) any "intent to use" trademark application or intent-to-use service mark application, solely during the period in which the grant of a security interest therein would impair the validity or enforceability of, or render void or voidable or result in the cancellation of the Company or the applicable Guarantor's right, title or interest in, such intent-to-use trademark application or intent-to-use service mark application or any trademark issued as a result of such use trademark application or intent-to-use service mark application under applicable federal law, after which period such application shall be automatically subject to the security interest described herein and deemed to be included in the Collateral; (B) the Excluded Equity Interests; (C) any asset or property with respect to which the Company has determined in good faith that the cost, difficulty, burden or consequences (including adverse tax consequences) of obtaining a security interest therein are excessive in relation to the benefit to the holders of the security to be afforded thereby; (D) any asset or property securing a purchase money obligation or Capital Lease Obligation permitted to be incurred under the Indenture, to the extent that the terms of the agreements relating to such Lien would violate or invalidate such purchase money obligation or Capital Lease Obligation or create a right of termination in favor of, or require the consent of, any other party thereto (other than the Company or any Guarantor), except to the extent such prohibition or restriction is deemed ineffective under the UCC, PPSA or other applicable law or principle of equity (except that proceeds thereof, as and to the extent the assignment of which is expressly deemed effective under the UCC or PPSA, as applicable, notwithstanding such prohibition shall constitute Collateral); (E) any asset or property, if a security interest therein is prohibited by applicable law, rule or regulation (including any requirement to obtain the consent of any governmental authority) other than to the extent such prohibition is rendered ineffective under the UCC, PPSA or other applicable law notwithstanding such prohibition; (F) any rights of the Company or a Guarantor arising under or evidenced by any contract, lease, instrument,

license or agreement (other than the shareholders agreement) to the extent the security interest therein is prohibited or restricted by, or would violate or invalidate such contract, lease, instrument, license or other agreement, or create a right of termination in favor of, or require the consent of, any other party thereto (other than the Company or any Guarantor), except to the extent such prohibition or restriction is deemed ineffective under the UCC, PPSA or other applicable law or principle of equity (except that proceeds thereof, as and to the extent the assignment of which is expressly deemed effective under the UCC or PPSA, as applicable, notwithstanding such prohibition shall constitute Collateral) and provided that such contract, lease, instrument, license or other agreement shall cease to be an Excluded Asset if and when any such required consent is obtained to the granting of a security interest therein; (G) any governmental license or state, federal, provincial, territorial or local franchise, charter or authorization, to the extent a security interest therein is prohibited or restricted thereby, except to the extent such prohibition or restriction is deemed ineffective under the UCC, PPSA or other applicable law or principle of equity (except that proceeds thereof, as and to the extent the assignment of which is expressly deemed effective under the UCC or PPSA, as applicable, notwithstanding such prohibition shall constitute Collateral) and provided that such governmental license or state, federal, provincial, territorial or local franchise, charter or authorization shall cease to be an Excluded Asset if and when any required consent is obtained to the granting of a security interest therein; (H)(1) payroll and other employee wage and benefit accounts, (2) tax accounts, including, without limitation, sales tax accounts, (3) escrow accounts, (4) fiduciary or trust accounts and (5) any account containing an average daily balance less than $2,500,000 over three consecutive business days (all such bank accounts not to contain an average daily balance greater than $5,000,000 over five consecutive business days), and, in the case of clauses (1) through (5), the funds or other property held in or maintained in any such account (each such accounts described in this clause (H), (an "*Excluded Account*"); (I) motor vehicles subject to certificates of title and other assets subject to certificates of title; (J) any commercial tort claim with a value not in excess of $1,000,000; and (K) any real property other than Material Real Property Assets; provided that any property of the Company or any Guarantor that is subject to a Lien for the benefit of the agent under any Pari Passu Indebtedness  shall be deemed not to be an "Excluded Asset".

"*Excluded Contributions*" means the net cash proceeds and Fair Market Value of other property received by the Company after the Issue Date from:

(1)     contributions to its Capital Stock; and

(2)     the sale (other than to a Subsidiary or any employees, director, consultant or Affiliate of the Company or to an employee stock ownership plan, option plan or similar trust to the extent such sale to an employee stock ownership plan or similar trust is financed by loans from or guaranteed by the Company or any Restricted Subsidiary, unless such loans have been repaid with cash on or prior to the date of determination) of Capital Stock (other than Disqualified Stock) of the Company, in each case designated as Excluded Contributions pursuant to an Officers' Certificate, the proceeds of which are excluded from the calculation set forth in clause (3)(b) of the second paragraph of 4.07(a).

"*Excluded Equity Interests*" means (A) any Capital Stock of any person (other than a Wholly-Owned Subsidiary that is directly owned by the Company or any Guarantor, excluding any Capital Stock of any Unrestricted Subsidiary), to the extent restricted or not permitted by the terms of such person's organizational documents or other agreements (other than the shareholders agreement) with holders of such Capital Stock (so long as such prohibition did not arise as part of the acquisition or formation of such person and other than to the extent that any such prohibition would be rendered ineffective pursuant to the UCC or any other applicable law); provided that such Capital Stock shall cease to be an Excluded Equity Interest at such time as such prohibition ceases to be in effect, (B) any Capital Stock if, to the extent and for so long as the pledge of such Capital Stock hereunder is prohibited by any applicable law (other than to the extent such prohibition would be rendered ineffective under the UCC or any other applicable law); provided that

18

such Capital Stock shall cease to be an Excluded Equity Interest at such time as such prohibition ceases to be in effect, (C) any Capital Stock in (1) any Subsidiary that is not a Wholly-Owned Subsidiary of the Company or a Guarantor, other than Knoll Lake Minerals Limited, (2) Immaterial Subsidiaries or (3) any Subsidiary that is prohibited or restricted by applicable law or contractual obligation existing on the Issue Date or on the date any such Subsidiary is acquired or organized (so long as, in the case of an acquisition of a Subsidiary, such prohibition did not arise as part of such acquisition) from providing a Guarantee or if such Guarantee would require governmental (including regulatory) consent, approval, license or authorization and (4) each Unrestricted Subsidiary, other than Tacora Norway AS.

"*Existing Indebtedness*" means all Indebtedness of the Company and its Subsidiaries in existence on the Issue Date, until such amounts are repaid.

"*Existing Note Guarantees*" has the meaning specified in the preamble hereto.

"*Existing Notes*" has the meaning specified in the preamble hereto.

"*Fair Market Value*" means the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by an executive officer of the Company if the transaction involves aggregate payments or consideration of less than US$15.0 million and by the Board of Directors of the Company otherwise.

"*February 2022 Notes Offering*" means the offering, sale and issuance in February 2022 of $50.0 million in aggregate principal amount of Notes issued pursuant to the Original First Supplemental Indenture.

"*FF&E*" means furniture, fixtures and equipment used in the ordinary course of business of the Company and its Restricted Subsidiaries.

"*Fixed Charge Coverage Ratio*" means with respect to any specified Person for any period, the ratio of the Consolidated EBITDA of such Person for such period to the Fixed Charges of such Person for such period. In the event that the specified Person or any of its Restricted Subsidiaries incurs, assumes, guarantees, repays, repurchases, redeems, defeases or otherwise retires or discharges any Indebtedness (other than ordinary working capital borrowings) or issues, repurchases or redeems preferred stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated and on or prior to the date on which the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "*Calculation Date*"), then the Fixed Charge Coverage Ratio will be calculated giving pro forma effect (in accordance with Regulation S-X under the Securities Act) to such incurrence, assumption, Guarantee, repayment, repurchase, redemption, defeasance or other retirement or discharge of Indebtedness, or such issuance, repurchase or redemption of preferred stock, and the use of the proceeds therefrom, as if the same had occurred at the beginning of the applicable four-quarter reference period.

For purposes of calculating the Fixed Charge Coverage Ratio:

(1)     acquisitions or dispositions that have been made by the specified Person or any of its Restricted Subsidiaries, including through mergers, consolidations or amalgamations, or any Person or any of its Restricted Subsidiaries acquired by the specified Person or any of its Restricted Subsidiaries, and including all related financing transactions and including increases in ownership of Restricted Subsidiaries, during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date, or that are to be made on the Calculation Date, will be given pro forma effect (determined in

accordance with Regulation S-X under the Securities Act) as if they had occurred on the first day of the four-quarter reference period;

(2)    the Consolidated EBITDA attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded;

(3)    the Fixed Charges attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded, but only to the extent that the obligations giving rise to such Fixed Charges will not be obligations of the specified Person or any of its Restricted Subsidiaries following the Calculation Date;

(4)    any Person that is a Restricted Subsidiary on the Calculation Date will be deemed to have been a Restricted Subsidiary at all times during such four-quarter period;

(5)    any Person that is not a Restricted Subsidiary on the Calculation Date will be deemed not to have been a Restricted Subsidiary at any time during such four-quarter period; and

(6)    if any Indebtedness bears a floating rate of interest, the interest expense on such Indebtedness will be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligation applicable to such Indebtedness if such Hedging Obligation has a remaining term as at the Calculation Date in excess of 12 months).

"*Fixed Charges*" means, with respect to any specified Person for any period, the sum, without duplication, of:

(1)    the consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, including, without limitation, original issue discount, non- cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, imputed interest with respect to Attributable Debt, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings, and net of the effect of all payments made or received pursuant to Hedging Obligations in respect of interest rates; *plus*

(2)    the consolidated interest expense of such Person and its Restricted Subsidiaries that was capitalized during such period; *plus*

(3)    any interest on Indebtedness of another Person that is guaranteed by such Person or one of its Restricted Subsidiaries or secured by a Lien on assets of such Person or one of its Restricted Subsidiaries, whether or not such Guarantee or Lien is called upon; *plus*

(4)    the product of (a) all dividends, whether paid or accrued and whether or not in cash, on any series of preferred stock of such Person or any of its Restricted Subsidiaries, other than dividends on Equity Interests payable solely in Equity Interests of the Company (other than Disqualified Stock) or to the Company or a Restricted Subsidiary of the Company, times (b) a fraction, the numerator of which is one and the denominator of which is one minus the then current combined federal, state and local statutory tax rate of

such Person, expressed to three decimals, in each case, determined on a consolidated basis in accordance with GAAP.

"*GAAP*" means, as of any date of determination and for any Person, the International Financing Reporting Standards issued by the International Accounting Standards Board ("*IFRS*"), as in effect on such date, unless such Person's most recent audited or quarterly financial statements are not prepared in accordance with IFRS, as applicable, in which case GAAP shall mean generally accepted accounting principles in effect in the United States on such date.

"*Global Note Legend*" means the legend set forth in Section 2.06(f)(2) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"*Global Notes*" means, individually and collectively, each of the Restricted Global Notes deposited with or on behalf of and registered in the name of the Depositary or its nominee, substantially in the form of Exhibit A hereto and that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Sections 2.01 and 2.06(b)(3) hereof.

"*Governmental Authority*" means the government of the United States, Canada or any other nation, or of any political subdivision thereof, whether state, provincial, territorial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Government Securities*" means direct obligations of, or obligations guaranteed by, the United States of America for the full and timely payment of which the United States of America pledges its full faith and credit.

"*Guarantee*" means a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

"*Guarantors*" means any Subsidiary of the Company that executes a Note Guarantee in accordance with the provisions of this Indenture, and their respective successors and assigns, in each case, until the Note Guarantee of such Person has been released in accordance with the provisions of this Indenture.

"*Hedging Obligations*" means, with respect to any specified Person, the obligations of such Person under:

(1)    interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate cap agreements and interest rate collar agreements;

(2)    other agreements or arrangements designed to manage interest rates or interest rate risk; and

(3)    other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates or commodity prices.

"*Hedge Termination Value*" means, in respect of any one or more Hedging Obligations, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Obligations, (a) for any date on or after the date such Hedging Obligations have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Obligations, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Obligations.

"*Holder*" means a Person in whose name a Note is registered.

"*Immaterial Subsidiary*" means, as of any date, any Restricted Subsidiary whose total assets, as of that date, are less than 5.0% of the Company's total assets and whose total revenues for the most recent 12-month period are less than 5.0% of the Company's total revenues for such period, in each case, on a consolidated basis (and as of the Issue Date, the only Immaterial Subsidiary will be Tacora Resources, LLC); *provided*, that a Restricted Subsidiary will not be considered to be an Immaterial Subsidiary if it, directly or indirectly, guarantees or otherwise provides direct credit support for any Indebtedness of the Company or any Guarantor; *provided*, *further*, that total assets of all Immaterial Subsidiaries, as of that date, may not exceed 10.0% of the Company's total assets and total revenues for the most recent 12-month period of all Immaterial Subsidiaries may not exceed 10.0% of the Company's total revenues for such period, in each case, on a consolidated basis.

"*Indebtedness*" means, with respect to any specified Person,

(a)        any indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent:

        (1)        in respect of borrowed money;

        (2)        evidenced by bonds, notes, debentures or similar instruments;

        (3)        in respect of letters of credit (or reimbursement agreements in respect thereof) or bankers' acceptances;

        (4)        representing Capital Lease Obligations or Attributable Debt in respect of sale and leaseback transactions;

        (5)        representing the balance deferred and unpaid of the purchase price of any property or services due more than six months after such property is acquired or such services are completed; or

        (6)        representing any Hedging Obligations,

if and to the extent any of the preceding items (other than letters of credit, Attributable Debt and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP, except as hereinafter provided; and

(b)        any principal amount raised under any transaction entered into after the Issue Date having the economic or commercial effect of a borrowing, including streaming transaction payments, royalty financing payments, customer deposits and advance payments (including pursuant to any factoring arrangements) (the amount of which as determined in accordance with GAAP).

In addition, the term "Indebtedness" includes all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) and, to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person. Indebtedness shall be calculated without giving effect to the effects of applicable accounting standards and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness.

For the avoidance of doubt, amounts shown on the consolidated balance sheet of the Company as the current portion of deferred revenue, current portion of future income taxes, income taxes, deferred revenue, site closure and reclamation costs or future income taxes will not be Indebtedness.

"*Indenture*" means the Base Indenture Indenture, as amended and supplemented by this Second Supplemental Indenture, pursuant to which the Notes will be issued among the Company, the Guarantors, the Trustee and the Notes Collateral Agent, as amended, supplemented or modified.

"*Indenture Documents*" means, collectively, the Indenture, the Existing Notes, the Notes (including any Additional Notes) issued pursuant hereto, the Existing Note Guarantees, the Note Guarantees and the Collateral Documents, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified, in whole or in part, from time to time; *provided* that, for purposes of any Collateral Documents that refer to the Indenture for the definition of "Indenture Documents," such term shall have the meaning ascribed to it in the Base Indenture.

"*Indirect Participant*" means a Person who holds a beneficial interest in a Global Note through a Participant.

"*Initial Notes*" has the meaning specified in the preamble hereto.

"*Insolvency Event*" means:

(a)     any dissolution, winding up, total or partial liquidation, adjustment or readjustment of debt, reorganization, recapitalization, judicial reorganization, extrajudicial reorganization, compromise, arrangement with creditors, plan of arrangement, proposal or similar proceedings under any Bankruptcy or Insolvency Laws of or with respect to the Company or any of the Restricted Subsidiaries or their respective property or liabilities, in each case under any Bankruptcy or Insolvency Laws;

(b)     any dissolution, winding up, total or partial liquidation, adjustment or readjustment of debt, reorganization, recapitalization, compromise, arrangement with creditors, plan of arrangement or similar proceedings under the arrangement provisions of any applicable corporate law (in any case which involves the alteration, amendment, conversion, compromise, satisfaction or discharge of debts owing to any or all creditors) of or with respect to the Company or any of the Restricted Subsidiaries or their respective property or liabilities;

(c)     any bankruptcy, insolvency, receivership, petition or assignment in bankruptcy, assignment for the benefit of creditors or any similar case or proceeding is commenced under any Bankruptcy or Insolvency Laws or otherwise of or with respect to the Company or any of the Restricted Subsidiaries;

(d)     any marshalling of assets or liabilities of the Company or any of the Restricted Subsidiaries under any Bankruptcy or Insolvency Laws;

(e)    any bulk sale of assets by the Company or any of the Restricted Subsidiaries including any sale of all or substantially all of the assets of the Company or any of the Restricted Subsidiaries, in each case, to the extent not permitted by the terms of the Indenture Documents or ABL Facility Documents, if any;

(f)    any proceeding seeking the appointment of any trustee, monitor, receiver, receiver and manager, liquidator, custodian or other insolvency official with similar powers with respect to all or substantially all of the assets of the Company or any of the Restricted Subsidiaries, or with respect to any of their respective assets, to the extent not permitted under the Indenture Documents or ABL Facility Documents, if any;

(g)    any proceedings in relation to any of the foregoing or otherwise involving the compromise of claims of creditors or in which substantially all claims of creditors of the Company or any Restricted Subsidiary are determined and any payment or distribution is or may be made on account of such claims, whether any of the foregoing is voluntary or involuntary, partial or complete, and includes any such proceedings initiated or consented to by the Company or any of the Restricted Subsidiaries, as applicable; or

(h)    any other event which, under the laws of any applicable jurisdiction, has an effect equivalent to any of the events referred to in clauses (a) through (g) above.

"*Institutional Accredited Investor*" means an institution that is an "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"*Intercreditor Agreement*" means the Jarvis Hedge Facility Intercreditor Agreement, any Pari Passu Intercreditor Agreement, the ABL Intercreditor Agreement and Senior Priority Intercreditor Agreement, as applicable.

"*Investment Grade Status*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) S&P, or, if either Moody's or S&P no longer rates the Notes, any equivalent rating by another Rating Agency, in each case, with a stable or better outlook.

"*Investments*" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. If the Company or any Restricted Subsidiary of the Company sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary of the Company such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary of the Company, the Company will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Company's Investments in such Subsidiary that were not sold or disposed of in an amount determined as provided in Section 4.07(c) of this Indenture. The acquisition by the Company or any Restricted Subsidiary of the Company of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Company or such Restricted Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investments held by the acquired Person in such third Person in an amount determined as provided in Section 4.07(c) of this Indenture. Except as otherwise provided in this Indenture, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

"*Issue Date*" means May 11 2023 or, if later, the first date on which the Notes are issued under this Indenture.

"*Jarvis Hedge Agreements*" means the definitive agreements governing the Jarvis Hedge Facility. "*Jarvis Hedge Facility*" means those certain new credit arrangements entered into on the Issue Date in the form of a commodity derivatives facility to support existing commodity derivatives contracts of the Company (as assigned by SAF Jarvis 1 LP to the Jarvis Hedge Provider) which are scheduled to mature from time to time on or before December 31, 2021, and potential new commodity derivatives contracts.

"*Jarvis Hedge Facility Cash Collateral*" means cash or cash equivalents deposited with the Jarvis Hedge Provider as cash collateral to secure amounts under the Jarvis Hedge Facility in excess of the Jarvis Pari Passu Cap Amount, which such cash collateral will not constitute Shared Collateral.

"*Jarvis Hedge Facility Intercreditor Agreement*" means that certain intercreditor agreement, dated as of the Issue Date, among the Notes Collateral Agent (on behalf of itself, the Trustee, and the Holders of the Existing Notes) and the Jarvis Hedge Provider with respect to the Shared Collateral.

"*Jarvis Hedge Obligations*" means any Hedging Obligations incurred under the Jarvis Hedge Facility.

"*Jarvis Pari Passu Cap Amount*" means obligations under the Jarvis Hedge Facility secured by the Shared Collateral on a pari passu basis with the Notes Obligations to exceed $50.0 million at any time outstanding.

"*Jarvis Hedge Provider*" means SAF Jarvis 2 LP and any of its successors and assigns.

"*Jarvis Secured Hedge Obligations*" means any Jarvis Hedge Obligations secured by a Lien on a pari passu basis with the Liens securing the Notes Obligations.

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, hypothec, debenture, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the UCC or the PPSA (or equivalent statutes) of any jurisdiction.

"*Material Real Property Asset*" means any Real Property located in the United States or Canada (i) owned or operated by the Company or any Guarantor as of the Issue Date having a fair market value (as determined by the Company in good faith after taking into account any liabilities with respect thereto that impact such fair market value) in excess of $5,000,000 as of the Issue Date; (ii) acquired by the Company or any Guarantor after the Issue Date (it being understood and agreed that any fee-owned Real Property owned by a Person who becomes a Guarantor after the Issue Date shall be deemed to have been acquired as of the time such Guarantor became a Guarantor for purposes of this definition) having a fair market value (as determined by the Company in good faith after taking into account any liabilities with respect thereto that impact such fair market value) in excess of $5,000,000 as of the date of acquisition thereof; or (iii) used or occupied by the Company in relation to the Scully Mine Project.

"*Moody's*" means Moody's Investors Service, Inc.

"*Mortgages*" means individually and collectively, one or more mortgages, debentures, deeds of trust, or deeds to secure debt, executed and delivered by the Company or any of the Guarantors in favor of

the Notes Collateral Agent for its benefit, the benefit of the Trustee and the benefit of holders, in form and substance reasonably acceptable to the Notes Collateral Agent, that encumber the Material Real Property Assets.

"*Net Proceeds*" means the aggregate cash proceeds and Cash Equivalents received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash or Cash Equivalents received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of (i) the direct costs relating to such Asset Sale, including, without limitation, brokerage commissions, legal, accounting and investment banking fees, and sales commissions, and any relocation expenses incurred as a result of the Asset Sale, (ii) taxes paid or payable as a result of the Asset Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, secured by a Lien on the asset or assets that were the subject of such Asset Sale and (iii) any reserve for adjustment or indemnification obligations in respect of the sale price of such asset or assets established in accordance with GAAP.

"*Non-Recourse Debt*" means Indebtedness:

(1)     as to which neither the Company nor any of its Restricted Subsidiaries (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness) or (b) is directly or indirectly liable as a guarantor or otherwise; and

(2)     as to which the lenders have been notified in writing that they will not have any recourse to the Capital Stock or assets of the Company or any of its Restricted Subsidiaries (other than the Equity Interests of an Unrestricted Subsidiary).

"*Non-U.S. Person*" means a Person who is not a U.S. Person as defined under Regulation S of the Securities Act.

"*Notes*" has the meaning assigned to it in the preamble to this Indenture. The Initial Notes and the Additional Notes, if any, shall be treated as a single class for all purposes under this Indenture and the Collateral Documents, including without limitation, waivers, amendments, redemptions and offers to purchase. Any Additional Notes that are issued will be secured by the Collateral, equally and ratably, with the Initial Notes. Unless the context otherwise requires, all references to the "Notes" shall include the Initial Notes and any Additional Notes, but do not include any Existing Notes.

"*Note Guarantee*" means the Guarantee by each Guarantor of the Company's obligations under this Indenture and the Notes, executed pursuant to the provisions of this Indenture.

"*Notes Collateral Agent*" means Computershare Trust Company, N.A.

"*Notes Obligations*" means the Notes Priority Obligations.

"*Notes Priority Accounts*" means any Deposit Accounts or Securities Accounts, in each case that are intended to contain Notes Priority Collateral or identifiable proceeds of the Notes Priority Collateral (it being understood that any property in such Deposit Accounts or Securities Accounts which is not Notes Priority Collateral or identifiable proceeds of Notes Priority Collateral shall not be Notes Priority Collateral solely by virtue of being on deposit in any such Deposit Account or Securities Account).

"*Notes Priority Collateral*" means all Collateral consisting of the following (including for the avoidance of doubt, any such assets that, but for the application of Section 552 of the Bankruptcy Code (or any similar provision of any foreign Debtor Relief Laws) would be Notes Priority Collateral):

1.  all Equipment, Fixtures, Real Property, intercompany indebtedness between or among the Company and the Restricted Subsidiaries or their Affiliates, except to the extent constituting ABL Priority Collateral, and Investment Property (other than any Investment Property described in clauses 3(y) and 8 of the definition of ABL Priority Collateral);

2.  except to the extent constituting ABL Priority Collateral, all Instruments, Intellectual Property, Commercial Tort Claims, Documents and General Intangibles;

3.  Notes Priority Accounts; provided, however, that to the extent that identifiable proceeds of ABL Priority Collateral are deposited in any such Notes Priority Accounts, such identifiable proceeds shall be treated as ABL Priority Collateral;

4.  all other Collateral, other than the ABL Priority Collateral (including ABL Priority Proceeds); and

5.  all collateral security and guarantees, products or Proceeds of or with respect to any of the foregoing items referred to in the preceding clauses (1) though (4) constituting Notes Priority Collateral and all cash, Money, cash equivalents, insurance proceeds, Instruments, Securities and Financial Assets received as Proceeds of any of the foregoing items referred to in the preceding clauses (1) through (4) and this clause (5) constituting Notes Priority Collateral, other than the ABL Priority Collateral.

"*Notes Priority Liens*" means the Liens securing the Obligations under the Existing Notes and the Notes, together with any Additional Notes Priority Liens and the Liens securing the Jarvis Secured Hedge Obligations.

"*Notes Priority Obligations*" means the Obligations under the Existing Notes and the Indenture Documents, together with the Jarvis Secured Hedge Obligations and any other Pari Passu Indebtedness secured by Notes Priority Liens.

"*Notes Secured Parties*" means the Notes Collateral Agent on behalf of itself, the Trustee and the Holders of the Existing Notes and the Notes.

"*Obligations*" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"*Offering Memorandum*" means the Company's final offering memorandum, dated May 5, 2021, regarding the issuance and sale of the Existing Notes initially issued pursuant thereto.

"*Officer*" means, with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, the Senior Vice President Operations, any Assistant Treasurer, the Controller, the Secretary or any Vice-President of such Person.

"*Officers' Certificate*" means a certificate signed on behalf of the Company by two Officers of the Company that meets the requirements of Section 13.03 hereof.

"*Opinion of Counsel*" means an opinion from legal counsel who is reasonably acceptable to the Trustee, that meets the requirements of Section 13.03 hereof. The counsel may be an employee of or counsel to the Company, any Subsidiary of the Company or the Trustee.

"*Pari Passu Indebtedness*" means Indebtedness, including any Jarvis Hedge Obligations and Obligations under the Advance Payments Facility Agreement incurred prior to the Issue Date, of the Company (other than Senior Priority Obligations, which rank senior in right of payment to Pari Passu Indebtedness), which ranks equally in right of payment to the Existing Notes or of any Guarantor of the Existing Notes if such Indebtedness ranks equally in right of payment to the Existing Note Guarantees.

"*Pari Passu Intercreditor Agreement*" means an intercreditor agreement in substantially the form attached as Exhibit F hereto.

"*Pari Passu Lien Priority*" means, relative to specified Indebtedness, having equal Lien priority on specified Collateral and subject to the Pari Passu Intercreditor Agreement.

"*Participant*" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"*Permitted Business*" means:

(1)    the acquisition, exploration, development, operation and disposition of mining and mineral processing properties and assets; and

(2)    any other business that is the same as, incidental to, or reasonably related, ancillary or complementary to, or a reasonable extension of (as determined in good faith by the Board of Directors of the Company), the business described in clause (1), or to any of the businesses in which the Company and its Restricted Subsidiaries are engaged on the Issue Date.

"*Permitted Holders*" means each of Proterra M&M MGCA B.V., OMF Fund II (Be) Ltd., MagGlobal LLC, Titlis Mining AS, Cargill International Trading Pte. Ltd. and Cargill, Incorporated, in each case together with their respective controlled Affiliates. Any Person or group whose acquisition of beneficial ownership constitutes a Change of Control in respect of which a Change of Control Offer is made in accordance with the requirements of the Indenture (or would result in a Change of Control Offer in the absence of the waiver of such requirement by holders of the Notes in accordance with the Indenture) will thereafter constitute additional Permitted Holders.

"*Permitted Investments*" means:

(1)    any Investment in the Company or in a Restricted Subsidiary of the Company that is a Guarantor;

(2)    any Investment in cash or Cash Equivalents;

(3)    any Investment by the Company or any Restricted Subsidiary of the Company in a Person, if as a result of such Investment:

a.    such Person becomes a Restricted Subsidiary of the Company and a Guarantor; or

     b.     such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company that is a Guarantor;

(4)     any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 4.17 of this Indenture;

(5)     any acquisition of assets or Capital Stock solely in exchange for the issuance of Equity Interests (other than Disqualified Stock) of the Company;

(6)     any Investments received in compromise or resolution of (a) obligations of trade creditors or customers that were incurred in the ordinary course of business of the Company or any of its Restricted Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (b) litigation, arbitration or other disputes with Persons who are not Affiliates;

(7)     Investments represented by Hedging Obligations;

(8)     loans or advances to employees made in the ordinary course of business of the Company or any Restricted Subsidiary of the Company in an aggregate principal amount not to exceed US$2.5 million at any one time outstanding;

(9)     repurchases of the Notes;

(10)     any guarantee of Indebtedness permitted to be incurred pursuant to Section 4.08 of this Indenture other than a guarantee of Indebtedness of an Affiliate of the Company that is not a Restricted Subsidiary of the Company;

(11)     any Investment existing on, or made pursuant to binding commitments existing on, the Issue Date and any Investment consisting of an extension, modification or renewal of any Investment existing on, or made pursuant to a binding commitment existing on, the Issue Date; *provided*, that the amount of any such Investment may be increased (a) as required by the terms of such Investment as in existence on the Issue Date or (b) as otherwise permitted under this Indenture;

(12)     Investments acquired after the Issue Date as a result of the acquisition by the Company or any Restricted Subsidiary of the Company of another Person, including by way of a consolidation, arrangement, merger or amalgamation with or into the Company or any of its Restricted Subsidiaries in a transaction that is not prohibited by Section 5.01 of this Indenture after the Issue Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(13)     any Investment acquired by the Company in exchange for any other Investment (that was permitted under this Indenture) or accounts receivable held by the Company or any of its Subsidiaries in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable;

(14)     Investments made to effect, or otherwise made in connection with, any Permitted Tax Reorganization; and

(15)    other Investments having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (15) that are at the time outstanding not to exceed the greater of US$25.0 million and 8.5% of Consolidated Tangible Assets.

"*Permitted Liens*" means:

(1)    Liens on the Collateral securing Indebtedness that was permitted by the terms of this Indenture to be incurred pursuant to Section 4.08(b)(1) of this Indenture; provided, that, in each case, the authorized representative of any such Obligations or Indebtedness has become a party to the ABL Intercreditor Agreement, Pari Passu Intercreditor Agreement or Senior Priority Intercreditor Agreement, as applicable;

(2)    Liens in favor of the Company or its Restricted Subsidiaries;

(3)    Liens on property (including Capital Stock) existing at the time of acquisition of the property by the Company or any Subsidiary of the Company (including by means of consolidation, arrangement, merger or amalgamation by another Person into the Company or any such Subsidiary or pursuant to which such Person becomes a Subsidiary of the Company); *provided*, that such Liens were in existence prior to such acquisition and not incurred in contemplation of, such acquisition;

(4)    Liens to secure the performance of statutory obligations, insurance, surety or appeal bonds, workers compensation obligations, unemployment insurance laws, performance bonds or other obligations of a like nature incurred in the ordinary course of business (including Liens to secure letters of credit issued to assure payment of such obligations);

(5)    Liens to secure Indebtedness (including Capital Lease Obligations) permitted by Section 4.08(b)(4) of this Indenture covering only the assets acquired with or financed by such Indebtedness;

(6)    Liens existing on the Issue Date;

(7)    Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; *provided*, that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(8)    Liens imposed by law, such as carriers', warehousemen's, landlord's, mechanics' and builders' Liens, in each case, incurred in the ordinary course of business;

(9)    survey exceptions, minor encumbrances, minor title deficiencies, rights of way, easements, reservations, licenses and other rights for services, utilities, sewers, electric lines, telegraph and telephone lines, oil and gas pipelines and other similar purposes, zoning or other restrictions as to the use of real property that were not incurred in connection with Indebtedness, and that do not in the aggregate materially adversely affect the value of the properties encumbered or affected or materially impair their use in the operation of the business of the Company or any of its Restricted Subsidiaries;

(10)    Liens created for the benefit of (or to secure) the Existing Notes and the Notes and the Existing Note Guarantees and Note Guarantees related thereto;

(11)    Liens to secure any Permitted Refinancing Indebtedness permitted to be incurred under this Indenture; *provided*, that;

    (a)    the new Lien is limited to all or part of the same assets that secured or, under the written agreements pursuant to which the original Lien arose, could secure the original Lien (plus improvements and accessions to, such property or proceeds or distributions thereof);

    (b)    the Indebtedness secured by the new Lien is not increased to any amount greater than the sum of (x) the outstanding principal amount, or, if greater, committed amount, of the Indebtedness renewed, refunded, refinanced, replaced, defeased or discharged with such Permitted Refinancing Indebtedness and (y) an amount necessary to pay any fees and expenses, including premiums, related to such renewal, refunding, refinancing, replacement, defeasance or discharge; and

    (c)    in the case of any Lien securing any Permitted Refinancing Indebtedness that renews, refunds, refinances, replaces, defeases or discharges, in whole or in part, any Indebtedness secured by any Lien referred to in clause (1) of this definition of "*Permitted Liens*" (or any Permitted Refinancing Indebtedness that originally renewed, refunded, refinanced, replaced, defeased or discharged, in whole or in part, any Indebtedness secured by any Lien referred to in clause (1) of this definition of "*Permitted Liens*"), the authorized representative of any such Indebtedness has become a party to the ABL Intercreditor Agreement;

(12)    Liens on insurance policies and proceeds thereof, or other deposits, to secure insurance premium financings;

(13)    filing of UCC or PPSA financing statements as a precautionary measure in connection with operating leases, joint venture agreements, transfers of accounts or transfers of chattel paper;

(14)    bankers' Liens, rights of setoff, Liens arising out of judgments or awards not constituting an Event of Default and notices of lis pendens, certificates of pending litigation and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(15)    Liens on cash, Cash Equivalents or other property arising in connection with the defeasance, discharge or redemption of Indebtedness;

(16)    Liens on specific items of inventory or other goods (and the proceeds thereof) of any Person securing such Person's obligations in respect of bankers' acceptances issued or created in the ordinary course of business for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods (other than in connection with the types of arrangements described in Section 4.08(b)(1));

(17)    grants of software and other technology licenses in the ordinary course of business;

(18)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business (other than in connection with the types of arrangements described in Section 4.08(b)(1));

(19)    Liens in favor of any Governmental Authority securing reclamation obligations or in connection with the provision of any service or product and Liens arising out of or resulting from any right reserved to or vested in any Governmental Authority by the terms of any agreement, lease, license, franchise, grant, permit or claim with or from any such Governmental Authority (including, without limitation, any agreement or grant under which the Company or any of the Restricted Subsidiaries holds any mineral title or interest) or by any applicable law, statutory provision, regulation or bylaw (whether express or implied) related thereto, or any other limitations, provisos or conditions contained therein; (b) exploration, development and operating permit and bonding requirements imposed by any Governmental Authority in the ordinary course business; and (c) subdivision agreements, development agreements, servicing agreements, utility agreements and other similar agreements with any Governmental Authority or public utility entered into in the ordinary course of business affecting the development, servicing or use of real property;

(20)    Liens arising by reason of a judgment or order that does not give rise to an Event of Default so long as such Liens are adequately reserved or bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(21)    Liens arising under (a) customary farm-in agreements, farm-out agreements, contracts for the sale, purchase, exchange, transportation, gathering or processing of minerals or ore (including Liens incurred under the Advance Payments Facility Agreement), (b) declarations, orders and agreements, partnership agreements, operating agreements, working interests, carried working interests, net profit interests, joint interest billing arrangements, participation agreements and (c) licenses, sublicenses and other agreements, in each case entered into in the ordinary course of business (in each case, other than in connection with the types of arrangements described in clause (1)(b) of the definition of "Permitted Debt");

(22)    Liens on assets of the Company or any of its Restricted Subsidiaries (in each case other than assets constituting Collateral) securing Hedging Obligations that are permitted by the terms of this Indenture to be incurred pursuant to Section 4.08(b)(8) of this Indenture, the counterparty of which is not a lender under a Credit Facility (or an Affiliate thereof) or at the time of the incurrence thereof was not a lender under a Credit Facility (or an Affiliate thereof);

(23)    Liens arising in connection with any Permitted Tax Reorganization;

(24)    Liens on the Collateral incurred in the ordinary course of business of the Company or any Restricted Subsidiary of the Company with respect to Indebtedness that does not exceed, at any one time outstanding, the greater of US$10.0 million and 3.5% of Consolidated Tangible Assets;

(25)    to the extent that the same may constitute a Lien, any reserve or in-trust account arrangement described in paragraph (17) of the definition herein of Permitted Debt,

provided that any such arrangement adheres to the terms set out in the SFPPN Agreement;

(26)    any Lien resulting from the deposit of cash or securities in connection with contracts, tenders or expropriation proceedings in the ordinary course of business;

(27)    [reserved];

(28)    Liens (i) on the Shared Collateral (ranking junior in priority to Liens on the Shared Collateral securing the Existing Notes and the Notes) securing Jarvis Hedge Obligations in excess of US$50.0 million, so long as such Liens are subject to the Jarvis Hedge Facility Intercreditor Agreement and (ii) on the Jarvis Hedge Facility Cash Collateral securing Jarvis Hedge Obligations in excess of US$50.0 million; and

(29)    Liens on the Collateral incurred with respect to Indebtedness under any Senior Priority Notes, including the Notes, and any Senior Secured Hedging Facility that does not exceed, at any one time outstanding, in the aggregate, US$77.0 million.

"*Permitted Refinancing Indebtedness*" means any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge other Indebtedness of the Company or any of its Restricted Subsidiaries (other than intercompany Indebtedness); *provided*, that:

(1)    the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness renewed, refunded, refinanced, replaced, defeased or discharged (plus all accrued interest on the Indebtedness and the amount of all fees and expenses, including premiums, incurred in connection therewith);

(2)    such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and has a Weighted Average Life to Maturity that is (a) equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged or (b) more than 90 days after the final maturity date of the Notes;

(3)    if the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged is subordinated in right of payment to the Notes, such Permitted Refinancing Indebtedness is subordinated in right of payment to the Existing Notes and the Notes on terms at least as favorable to the Holders of such Existing Notes or Notes as those contained in the documentation governing the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged; and

(4)    such Indebtedness is incurred either by the Company or by the Restricted Subsidiary of the Company that was the obligor on the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged and is guaranteed only by Persons who were obligors on the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged.

"*Permitted Tax Reorganization*" means any reorganizations and other activities related to tax planning and tax reorganization, so long as, (i) after giving effect thereto, the enforceability of the Notes

and the Note Guarantees, taken as a whole, are not materially impaired and (ii) such reorganizations or other activities are otherwise not materially adverse to the holders of the Notes.

"*Person*" means any individual, corporation, partnership, limited partnership, limited liability partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company, unlimited liability company or government or other entity.

"*PIK Interest*" means the portion of interest payable on the Notes in kind, either by increasing the principal amount of the outstanding Notes or by issuing Additional Notes in an aggregate principal amount equal to the amount of such interest for the applicable interest period (rounded up to the nearest whole dollar).

"*PPSA*" means the Personal Property Security Act in effect from time to time in the Province of British Columbia; provided that, at any time, if perfection or the effect of perfection or non-perfection or the priority of the Notes Collateral Agent's security interest in any item or portion of the Collateral is governed by the *Personal Property Security Act* as in effect in a Canadian jurisdiction other than the Province of Ontario, including the *Civil Code of Québec*, the term "PPSA" shall mean the *Personal Property Security Act* or the *Civil Code of Québec* (as applicable) as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or the effect of perfection or non-perfection or priority and for purposes of definitions relating to such provisions.

"*Private Placement Legend*" means the legend set forth in Section 2.06(f)(1) hereof to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"*QIB*" means a "qualified institutional buyer" as defined in Rule 144A.

"*QIB Global Note*" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that will be initially issued in a denomination equal to the outstanding principal amount of the Notes sold to QIBs.

"*Rating Agency*" means each of S&P and Moody's or, if S&P or Moody's or both shall not make a rating on the Notes publicly available, a nationally recognized statistical rating agency or agencies (as defined pursuant to Section 3(62) of the Exchange Act), as the case may be, selected by the Company (as certified by a resolution of the Board of Directors) which shall be substituted for S&P or Moody's or both, as the case may be.

"*Real Property*" means, collectively, all right, title and interest (including any leasehold or mineral estate) in and to any and all parcels of real property owned or operated by the Company or any Guarantor, whether by lease, license or other use agreement, including but not limited to, mining leases, surface leases, licence to occupy, and mineral licences, together with, in each case, all improvements and appurtenant fixtures (including all plant and equipment), easements, rights-of-way, and other property and rights incidental to the ownership, lease or operation thereof, including but not limited to, access rights, water rights and extraction rights for minerals.

"*Restructuring or Recapitalization Transaction*" means the consummation of any restructuring, reorganization or recapitalization of the Existing Notes, the Notes and other Indebtedness of the Company pursuant to a plan of arrangement, plan of compromise or similar restructuring plan pursuant to the Canada Business Corporations Act, the Business Corporations Act (Ontario), the Companies' Creditors Arrangement Act or other Bankruptcy or Insolvency Laws.

"*Regulation S*" means Regulation S promulgated under the Securities Act.

"*Regulation S Global Note*" means a permanent Global Note in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Notes initially sold in reliance on Rule 903 of Regulation S.

"*Responsible Officer*" when used with respect to the Trustee, means any officer within the Corporate Trust Administration of the Trustee (or any successor group of the Trustee) or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"*Restricted Definitive Note*" means a Definitive Note bearing the Private Placement Legend. "*Restricted Global Note*" means a Global Note bearing the Private Placement Legend.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Period*" means the 40-day distribution compliance period as defined in Regulation S.

"*Restricted Subsidiary*" of a Person means any Subsidiary of the referent Person that is not an Unrestricted Subsidiary.

"*Rule 144*" means Rule 144 promulgated under the Securities Act.

"*Rule 144A*" means Rule 144A promulgated under the Securities Act.

"*Rule 903*" means Rule 903 promulgated under the Securities Act.

"*Rule 904*" means Rule 904 promulgated under the Securities Act.

"*S&P*" means S&P Global Ratings.

"*Scully Mine Project*" means the iron ore mine and related infrastructure operated by the Company located north of the town of Wabush, Newfoundland and Labrador.

"*SEC*" means the U.S. Securities and Exchange Commission. "*Securities Act*" means the U.S. Securities Act of 1933, as amended.

"*Security Deadline*" means 90 days after the Issue Date.

"*SEDAR*" means the Canadian Securities Administrators' System for Electronic Document Analysis and Retrieval.

"*Senior Priority Intercreditor Agreement*" means that certain Collateral Agency and Intercreditor Agreement, dated as of May 11, 2023, by and among Cargill International Trading Pte Ltd, the Company and the Trustee and Notes Collateral Agent, in form and substance reasonably satisfactory to the Trustee or the Notes Collateral Agent.

"*Senior Priority Notes*" means up to US$77,000,000 aggregate principal amount of (i) debt securities, including the Notes, that may be issued in one or more series under the Indenture which may be secured by a Notes Priority Lien on the Collateral and be senior in priority in payment to the Notes

Obligations and (ii) any Senior Secured Hedging Facility or Indebtedness under the Advance Payments Facility Agreement incurred on or after the date of the First Supplemental Indenture, in each case issued in the form of a debt security.

"*Senior Priority Obligations*" means the Obligations under the Senior Priority Notes, including the Notes, and any Senior Secured Hedging Facility.

"*Senior Secured Hedging Facility*" means any Indebtedness incurred by the Company used to finance amounts payable to counterparties under the Company's current hedging and offtake arrangements, which may be issued in the form of debt securities or Indebtedness under the Advance Payments Facility Agreement incurred on or after the date of the First Supplemental Indenture and such Obligations under which would rank pari passu with the Senior Priority Notes, including the Notes, and the form and substance of which shall be subject to the approval of the Ad Hoc Group (such approval not to be unreasonably withheld).

"*Series*" means (i) the Existing Notes, (ii) the Notes and (iii) the Jarvis Secured Hedge Obligations.

"*SFPPN*" means Société ferroviaire et portuaire de Pointe-Noire s.e.c.

"*SFPPN Agreement*" means the arrangements between SFPPN and the Company in respect of the use and long term access by the Company of the rail and port facilities located at Pointe-Noire, Quebec and managed by SFPPN, and as of the Issue Date is comprised of the agreement in principle dated May 4, 2018 (as amended by an amending agreement dated August 15, 2018) between such parties, and immediately following the Issue Date includes all definitive agreements entered into by the Company and SFPPN, including the services and access agreement agreed between such parties and any schedules or exhibits related to all such agreements, each as may be amended, confirmed, replaced or restated from time to time.

"*Shared Collateral*" means, at any time, Collateral in which the Notes Collateral Agent (on behalf of the holders of the Existing Notes and the Notes) and the Jarvis Hedge Provider hold a valid and perfected security interest at such time.

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such Regulation is in effect on the Issue Date.

"*Stated Maturity*" means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the documentation governing such Indebtedness as of the Issue Date, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"*Subsidiary*" means, with respect to any specified Person:

(1)     any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or

controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2) any partnership or limited liability company of which (a) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (b) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*Tax*" means any tax, duty, levy, impost, assessment or other governmental charge (including penalties, interest and any other liabilities related thereto, and, for the avoidance of doubt, including any withholding or deduction for or on account of any of the foregoing). "*Taxes*" shall be construed to have a corresponding meaning.

"*Trustee*" means Computershare Trust Company, N.A., until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

"*UCC*" means the Uniform Commercial Code (or equivalent statute) as in effect from time to time in the State of New York; provided, however, that at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of a Notes Collateral Agent's security interest in any item or portion of the collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"*Unrestricted Subsidiary*" means any Subsidiary of the Company that is designated by the Board of Directors of the Company as an Unrestricted Subsidiary pursuant to a resolution of the Board of Directors (which, on the Issue Date, shall include Tacora Norway AS and its subsidiaries), but only if such Subsidiary:

(1) has no Indebtedness other than Non-Recourse Debt;

(2) except as permitted by Section 4.11 of this Indenture, is not party to any agreement, contract, arrangement or understanding with the Company or any Restricted Act. Subsidiary of the Company unless the terms of any such agreement, contract, arrangement or understanding are no less favorable to the Company or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Company;

(3) is a Person with respect to which neither the Company nor any of its Restricted Subsidiaries has any direct or indirect obligation (a) to subscribe for additional Equity Interests or

(4) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results; and

(5) has not guaranteed or otherwise directly or indirectly provided credit support for any Indebtedness of the Company or any of its Restricted Subsidiaries.

For the avoidance of doubt, Tacora Norway AS and its Subsidiaries will be designated as Unrestricted Subsidiaries as of the Issue Date.

"*U.S. Person*" means a U.S. Person as defined in Rule 902(k) promulgated under the Securities "*Voting Stock*" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1)     the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect of the Indebtedness, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; *by*

(2)     the then outstanding principal amount of such Indebtedness.

Section 1.02     *Other Definitions*.

| Term | Defined in Section |
|---|---|
| "*Additional Amounts*" | 4.18 |
| "*Additional Notes Collateral*" | 4.23 |
| "*Affiliate Transaction*" | 4.11 |
| "*Asset Sale Offer*" | 4.17 |
| "*Asset Sale Offer Period*" | 3.10 |
| "*Asset Sale Purchase Amount*" | 3.10 |
| "*Asset Sale Purchase Date*" | 3.10 |
| "*Authentication Order*" | 2.02 |
| "*Calculation Date*" | 1.01 |
| "*Canadian Restricted Legend*" | 2.06 |
| "*Cash Interest Rate*" | 2.14 |
| "*Change of Control Offer*" | 4.16 |
| "*Change of Control Payment*" | 4.16 |
| "*Change of Control Payment Date*" | 4.16 |
| "*Covenant Defeasance*" | 8.03 |
| "*DTC*" | 2.03 |
| "*Event of Default*" | 6.01 |
| "*Excess Cash Flow Offer*" | 4.19 |
| "*Excess Cash Flow Offer Amount*" | 4.19 |
| "*Excess Cash Flow Offer Period*" | 3.11 |
| "*Excess Cash Flow Purchase Date*" | 3.11 |
| "*Excess Proceeds*" | 4.17 |
| "*Excluded Taxes*" | 4.18 |
| "*FATCA*" | 4.18 |
| "*IFRS*" | 1.01 |
| "*incur*" | 4.08 |
| "*Indemnified Party*" | 7.06 |
| "*Interest Payment Date*" | 2.14 |

"*Legal Defeasance*" ............................................................. .........8.02
"*MD&A*" ............................................................................. .........4.15
"*Paying Agent*" .................................................................. .........2.03
"*Payment Default*" ............................................................ .........6.01
"*Permitted Debt*" ...............................................................4.08
"*PIK Interest Rate*" ...........................................................2.14
"*PIK Notes*" .......................................................................2.14
"*Record Date*" ....................................................................2.14
"*Registrar*" ........................................................................2.03
"*Restricted Payments*" ...................................................... .........4.07
"*Reversion Date*" ...............................................................4.24
"*Suspended Covenants*" .....................................................4.24
"*Suspension Period*" .......................................................... .........4.24
"*Tax Jurisdiction*" ............................................................. .........4.18

Section 1.03    *Rules of Construction*.

Unless the context otherwise requires:

(1)    a term has the meaning assigned to it;

(2)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)    words (including definitions) in the singular include the plural, and in the plural include the singular;

(4)    "will" shall be interpreted to express a command;

(5)    provisions apply to successive events and transactions;

(6)    references to sections of or rules under the Securities Act will be deemed to include substitute, replacement of successor sections or rules adopted by the SEC from time to time;

(7)    "including" is not limiting; and

(8)    "or" is not exclusive.

Section 1.04    *Conflicts with Base Indenture*.

In the event that any provision of this Second Supplemental Indenture limits, qualifies or conflicts with a provision of the Base Indenture, such provision of this Second Supplemental Indenture shall control.  With respect to the Notes (but not with respect to other Securities), the provisions of Articles 3, 4, 5, 6, 9, 10, 11, 12 and 13 of this Second Supplemental Indenture replace the provisions of those sections of the Base Indenture in their entirety.  Capitalized terms used but not defined in this Second Supplemental Indenture have the meanings given such terms in the Base Indenture.  Capitalized terms defined in both this Second Supplemental Indenture and in the Base Indenture have the meanings given such terms in this Second Supplemental Indenture.

ARTICLE 2
THE NOTES

Section 2.01    *Form and Dating*.

(a)    *General*. The Notes and the Trustee's certificate of authentication will be substantially in the form of Exhibit A hereto. The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage. Each Note will be dated the date of its authentication. The Notes shall be in minimum denominations of US$2,000 and integral multiples of US$1,000 in excess thereof.

The terms and provisions contained in the Notes will constitute, and are hereby expressly made, a part of this Indenture and the Company, the Guarantors, the Trustee and the Notes Collateral Agent, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b)    *Global Notes*. Notes issued in global form will be substantially in the form of Exhibit A hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto).  Notes issued in definitive form will be substantially in the form of Exhibit A hereto (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note will represent such of the outstanding Notes as will be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby will be made by either the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof or in accordance with instructions given by the Company to the Trustee to reflect any redemptions or repurchases hereunder.

(c)    *Euroclear and Clearstream Procedures Applicable.* The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream will be applicable to transfers of beneficial interests in the Regulation S Global Note that are held by Participants through Euroclear or Clearstream.

Section 2.02    *Execution and Authentication*.

(a)    At least one Officer must sign the Notes for the Company by manual or facsimile signature. If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note will nevertheless be valid.

(b)    The Trustee will, upon receipt of a written order of the Company signed by two Officers (an "*Authentication Order*"), authenticate Notes for original issue that may be validly issued under this Indenture, including any Additional Notes. The aggregate principal amount of Notes outstanding at any time may not exceed the aggregate principal amount of Notes authorized for issuance by the Company pursuant to one or more Authentication Orders, except as provided in Section 2.07 hereof.

The Trustee may appoint an authenticating agent acceptable to the Company to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this

Indenture to authentication by the Trustee includes authentication by any such authenticating agent. An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Company.

(c)      A Note will not be valid until authenticated by the manual signature of the Trustee. The signature will be conclusive evidence that the Note has been authenticated under this Indenture.

Section 2.03     *Registrar and Paying Agent*.

The Company will maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("*Registrar*") and an office or agency where Notes may be presented for payment ("*Paying Agent*"). The Registrar will keep a register of the Notes and of their transfer and exchange, including the names and addresses of the Holders and the principal amounts and interest on the Notes. The Company may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent. The Company may change any Paying Agent or Registrar without notice to any Holder. The Company will notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Company fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such. The Company or any of its Subsidiaries may act as Paying Agent or Registrar.

The Company initially appoints The Depository Trust Company ("*DTC*") to act as Depositary with respect to the Global Notes.

The Company initially appoints the Trustee to act as the Registrar and Paying Agent and to act as Custodian with respect to the Global Notes.

Section 2.04     *Paying Agent to Hold Money in Trust*.

The Company will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium, if any, or interest on the Notes, and will notify the Trustee of any default by the Company in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Company or a Subsidiary) will have no further liability for such money. If the Company or a Subsidiary acts as Paying Agent, it will segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Company, the Trustee will serve as Paying Agent for the Notes.

Section 2.05     *Holder Lists*.

The Trustee will preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders. If the Trustee is not the Registrar, the Company will furnish to the Trustee at least seven Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders.

*Section 2.06     Transfer and Exchange.*

(a)      *Transfer and Exchange of Global Notes*. A Global Note may not be transferred except as a whole by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor

Depositary or a nominee of such successor Depositary. All Global Notes will be exchanged by the Company for Definitive Notes if:

> (1)    the Company delivers to the Trustee notice from the Depositary that it is unwilling or unable to continue to act as Depositary or that it is no longer a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Company within 90 days after the date of such notice from the Depositary;

> (2)    the Company in its sole discretion determines that the Global Notes (in whole but not in part) should be exchanged for Definitive Notes and delivers a written notice to such effect to the Trustee; *provided*, that in no event shall the Regulation S Global Note be exchanged by the Company for Definitive Notes prior to the expiration of the Restricted Period; or

> (3)    there has occurred and is continuing an Event of Default with respect to the Notes and holders representing 25% in aggregate principal amount or more of the then outstanding Notes request that such Global Notes be exchanged for Definitive Notes.

Upon the occurrence of either of the preceding events in clause (1) or (2) of this Section 2.06(a), Definitive Notes shall be issued in such names as the Depositary shall instruct the Trustee. Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof. Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06, Section 2.07 or 2.10 hereof, shall be authenticated and delivered in the form of, and shall be, a Global Note. A Global Note may not be exchanged for another Note other than as provided in this Section 2.06(a), however, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06(b) or (c) hereof.

(b)    *Transfer and Exchange of Beneficial Interests in the Global Notes*. The transfer and exchange of beneficial interests in the Global Notes will be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures. Beneficial interests in the Restricted Global Notes will be subject to restrictions on transfer set forth in this Indenture to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also will require compliance with either subparagraph (1) or (2) of this Section 2.06(b), as applicable, as well as one or more of the other following subparagraphs, as applicable:

> (1)    *Transfer of Beneficial Interests in the Same Global Note*. Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend; *provided*, that prior to the expiration of the Restricted Period, transfers of beneficial interests in the Regulation S Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(1).

> (2)    *All Other Transfers and Exchanges of Beneficial Interests in Global Notes.* In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(1), the transferor of such beneficial interest must deliver to the Registrar both:

>> (A)    a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(B)    instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase.

Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.06(h) hereof.

(3)    *Transfer of Beneficial Interests to Another Restricted Global Note.* A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.06(b)(2) of this Indenture and the Registrar receives the following:

(A)    If the transferee will take delivery in the form of a beneficial interest in the QIB Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof; and

(B)    if the transferee will take delivery in the form of a beneficial interest in the Regulation S Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof.

(c)    Transfer or Exchange of Beneficial Interests for Definitive Notes.

(1)    *Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes.* If in accordance with Section 2.06(a) a beneficial interest in a Restricted Global Note is to be exchanged for a Restricted Definitive Note or transferred to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon receipt by the Registrar of the following documentation:

(A)    if the Holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(a) thereof;

(B)    if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C)    if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(D)    if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E)    if such beneficial interest is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) or (C) of this Section 2.06(c), a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable;

(F)      if such beneficial interest is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(G)      if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(h) hereof, and the Company shall execute and the Trustee shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c) shall be registered in such name or names and in such authorized denomination or denominations as the Holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c)(1) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(2)      *Beneficial Interests in Regulation S Global Note to Definitive Notes.* Notwithstanding Sections 2.06(c)(1)(A) and (C) hereof, a beneficial interest in the Regulation S Global Note may not be exchanged for a Definitive Note or transferred to a Person who takes delivery thereof in the form of a Definitive Note prior to the expiration of the Restricted Period, except in the case of a transfer pursuant to an exemption from the registration requirements of the Securities Act other than Rule 903 or Rule 904.

(d)      Transfer and Exchange of Definitive Notes for Beneficial Interests.

(1)      *Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes.* If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A)      if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(b) thereof;

(B)      if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C)      if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(D)      if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E)    if such Restricted Definitive Note is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) of this Section 2.06(d)(1), a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, applicable;

(F)    if such Restricted Definitive Note is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(G)    if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof, the Trustee will cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) of this Section 2.06(d)(1), the appropriate Restricted Global Note, in the case of clause (B) of this Section 2.06(d)(1), the QIB Global Note and in the case of clause (C) of this Section 2.06(d)(1), the Regulation S Global Note.

(e)    *Transfer and Exchange of Definitive Notes for Definitive Notes.* Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(e), the Registrar will register the transfer or exchange of Definitive Notes.  Prior to such registration of transfer or exchange, the requesting Holder must present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing. In addition, the requesting Holder must provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(e).

(1)    *Restricted Definitive Notes to Restricted Definitive Notes.* Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(A)    If the transfer will be made pursuant to Rule 144A, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(B)    if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof; and

(C)    if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable.

(f)    *Legends.* The following legends will appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

(1)    Private Placement Legend.

(A)     Except as permitted by subparagraph (B) of this Section 2.06(f)(1), each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THE NOTE EVIDENCED HEREBY HAS NOT BEEN AND IS NOT EXPECTED TO BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND, ACCORDINGLY, AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (A) (1) TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (2) IN AN OFFSHORE TRANSACTION COMPLYING WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (3) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE AND PROVIDED THAT PRIOR TO SUCH TRANSFER, THE TRUSTEE IS FURNISHED WITH AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT), (4) TO AN INSTITUTIONAL ACCREDITED INVESTOR IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, (5) TO THE ISSUER OR ITS SUBSIDIARIES OR (6) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS.

In the case of Notes issued in reliance upon an exemption from the prospectus requirements of Canadian Securities Legislation, the Notes shall bear a legend in substantially the following form (the "*Canadian Restricted Legend*"):

UNDER CANADIAN SECURITIES LAWS, UNLESS PERMITTED UNDER APPLICABLE SECURITIES LEGISLATION, THE HOLDER OF THIS NOTE MUST NOT TRADE THE NOTE BEFORE THE DATE THAT IS FOUR MONTHS PLUS ONE DAY AFTER THE LATER OF (I) THE ISSUE DATE AND (II) THE DATE THE COMPANY BECOMES A REPORTING ISSUER IN ANY PROVINCE OR TERRITORY."

In the case of the Notes sold pursuant to Regulation S, the Notes will bear an additional legend substantially to the following effect unless otherwise agreed by us and the holder thereof:

BY ITS ACQUISITION HEREOF, THE HOLDER HEREOF REPRESENTS THAT IT IS NOT A U.S. PERSON, NOR IS IT PURCHASING FOR THE ACCOUNT OF A U.S. PERSON, AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT

(B)     The Private Placement Legend on any Restricted Global Note or Restricted Definitive Note may be removed by the Company (i) after the applicable Resale

Restriction Termination Date and (ii) subject to compliance with the requirements of applicable securities laws. Subject to clauses (i) and (ii) of the preceding sentence, the Company shall use its best efforts to remove any such Private Placement Legend on any Restricted Global Note or Restricted Definitive Note at the request of the Holder thereof.

(2)     *Global Note Legend*. Each Global Note will bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF SUCH INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(g)     *Cancellation and/or Adjustment of Global Notes*. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note will be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note will be reduced accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note

will be increased accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(h)     *General Provisions Relating to Transfers and Exchanges.*

(1)     To permit registrations of transfers and exchanges, the Company will execute and the Trustee will authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 hereof or at the Registrar's request.

(2)     No service charge will be required to be made by a Holder of a beneficial interest in a Global Note or by a Holder of a Definitive Note for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.07, 2.10, 3.06, 4.16, 4.17 and 9.04 hereof).

(3)     The Registrar and the Trustee may require a Holder to furnish appropriate endorsements and transfer documents in connection with any transfer or exchange of Notes.

(4)     All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes will be the valid Obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(5)     Neither the Registrar nor the Company will be required:

(A)     to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption under Section 3.02 hereof and ending at the close of business on the day of selection; or

(B)     to register the transfer of or to exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(6)     Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Company may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Company shall be affected by notice to the contrary.

(7)     The Trustee will authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.02 hereof.

(8)     All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile.

(i)     he Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer or exchange imposed under this Indenture or any applicable law with respect to any transfer or exchange of any interest in any Note (including any transfers between or among Depositary participants or owners of beneficial interests in any Note) other than to require

delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, this Indenture and to examine the same to determine substantial compliance as to form with the express requirements hereof.

Section 2.07    *Replacement Notes*.

(a)    If any mutilated Note is surrendered to the Trustee or the Company and the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Company will issue and the Trustee, upon receipt of an Authentication Order, will authenticate a replacement Note if the Trustee's requirements are met. If required by the Trustee or the Company, an indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee and the Company to protect the Company, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced. The Company may charge the Holder for any expenses in replacing a Note. Upon the issuance of any replacement Note, the Trustee may also require the payment by the registered Holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any fees and expenses (including those of the Trustee) connected therewith.

(b)    Every replacement Note is an additional Obligation of the Company and will be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

Section 2.08    *Outstanding Notes*.

(a)    The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those subsequently canceled by the Trustee, those delivered to the Trustee for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding. Except as set forth in Section 2.09 hereof, a Note does not cease to be outstanding because the Company or an Affiliate of the Company holds the Note.

(b)    If a Note is replaced pursuant to Section 2.07 hereof, it ceases to be outstanding unless the Trustee receives satisfactory proof that the replaced Note is held by a protected purchaser (as defined in Section 8-303 of the Uniform Commercial Code of the State of New York).

(c)    If the principal amount of any Note is considered paid under Section 4.01 hereof, it ceases to be outstanding and interest on it ceases to accrue.

(d)    If the Paying Agent (other than the Company, a Subsidiary or an Affiliate of any thereof) holds for the benefit of Holders, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes will be deemed to be no longer outstanding and will cease to accrue interest.

Section 2.09    *Treasury Notes*.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, request, demand, authorization, notice, waiver or consent pursuant to this Indenture, Notes owned by the Company or any Guarantor, or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or any Guarantor, will be considered as though not outstanding, except that for the purposes of determining whether the Trustee will be protected in relying on any such direction, waiver or consent, only Notes that the Trustee knows are so owned will be so disregarded.

Section 2.10    *Temporary Notes*.

Until certificates representing Notes are ready for delivery, the Company may prepare and the Trustee, upon receipt of an Authentication Order, will authenticate temporary Notes. Temporary Notes will be substantially in the form of certificated Notes but may have variations that the Company considers appropriate for temporary Notes and as may be reasonably acceptable to the Trustee. Without unreasonable delay, the Company will prepare and the Trustee will authenticate definitive Notes in exchange for temporary Notes.

Holders of temporary Notes will be entitled to all of the benefits of this Indenture.

Section 2.11    *Cancellation*.

The Company at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent will forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee (and no one else) will cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and will destroy canceled Notes (subject to any applicable record retention requirement policy of the Trustee or any of the Exchange Act). Certification of the destruction of all canceled Notes will be delivered to the Company. The Company may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation, except for Additional Notes issued in accordance with this Indenture.

Section 2.12    *Defaulted Interest*.

The Company will pay interest (including post-petition interest in any proceeding under any Insolvency Laws) on overdue principal, premium, if any, and interest (without regard to any applicable grace period) from time to time on demand at the rate equal to 2.0% per annum in excess of the then applicable interest rate on the Notes to the extent lawful to the Persons who are Holders on a subsequent special record date, in each case at the rate provided as set forth in the Notes and consistent with Section 4.01 hereof. The Company will notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment. The Company will fix or cause to be fixed each such special record date and payment date; *provided*, that no such special record date may be less than 10 days prior to the related payment date for such defaulted interest. At least 15 days before the special record date, the Company (or, upon the written request of the Company, the Trustee in the name and at the expense of the Company) will mail or cause to be sent to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

All reference to "interest" in this Indenture and the Notes mean the initial interest rate borne by the Notes and any increases in that rate pursuant to this Section 2.12, unless this Indenture states otherwise.

Section 2.13    *Persons Deemed Owners*.

The Holder of a Note may be treated as its owner for all purposes. Only Holders have rights under this Indenture and the Notes.

Section 2.14    *Interest Payment Date; Record Date*.

Interest on outstanding Notes will accrue at the rate per annum of 13.000% and shall be payable monthly in arrears on the first Business Day of the month following the month in respect of which interest is being paid, commencing on [June 1], 2023 (each, an "*Interest Payment Date*") as follows: (i) in cash at a rate of 9.000% (the "*Cash Interest Rate*") on the outstanding principal amount of the Notes and (ii) in PIK Interest at a rate of 4.000% (the "*PIK Interest Rate*") on the outstanding principal amount of the Notes.

The Company will make each interest payment to the Holders of record on the fifteenth calendar day of the month immediately preceding each Interest Payment Date (each, a "*Record Date*"). Interest on the Notes will accrue from the date of original issuance or, if interest has already been paid, from the date it was most recently paid. Interest for each month or portion thereof will be computed daily on the basis of a 360-day year comprised of twelve 30-day months.

PIK Interest shall be payable (x) with respect to the Notes represented by one or more Global Notes registered in the name of, or held by, The Depository Trust Company or its nominee on the relevant Record Date, by increasing the principal amount of the outstanding Notes represented by such Global Notes by an amount equal to the amount of PIK Interest for the applicable interest period (rounded up to the nearest whole dollar) and (y) with respect to the Notes represented by certificated notes, by issuing Additional Notes in certificated form in an aggregate principal amount equal to the amount of PIK Interest for the applicable interest period (rounded up to the nearest whole dollar) (the "*PIK Notes*"). Following an increase in the principal amount of the outstanding Notes represented by Global Notes as a result of a payment of PIK Interest, such Notes will bear interest on such increased principal amount from and after the date of such payment. Any PIK Notes will bear interest from and after the applicable Interest Payment Date on which they were issued.

Solely for the purposes of disclosure under the Interest Act (Canada) whenever any interest or any fee to be paid hereunder or in connection herewith is to be calculated on the basis of a 360, 365 or 366-day year, the yearly rate of interest to which the rate used in such calculation is equivalent during any particular period is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360, 365 or 366, as applicable.

Each of Company and the Guarantors confirms that the foregoing methodology satisfies the requirements of Section 4 of the *Interest Act* (Canada) to the extent it applies to the expression or statement of any interest payable under the Notes and this Indenture. Each of Company and the Guarantors shall calculate the yearly rate or percentage of interest applicable to the Notes based upon such methodology for calculating per annum rates provided for under the Notes and this Indenture. Each of Company and the Guarantors covenants that it will not plead or assert, whether by way of defence or otherwise, in any proceeding relating to the Notes, that the interest payable thereunder and the calculation thereof has not been adequately disclosed to the Company and the Guarantors, whether pursuant to Section 4 of the Interest Act (Canada) or any other applicable law or legal principle.

Section 2.15    *Tax Treatment*.

The Company agrees, and by acceptance of a beneficial ownership interest in the Notes each Holder and each Beneficial Owner of the Notes will be deemed to have agreed, for U.S. federal income tax purposes, to treat the Notes as indebtedness that is subject to Treasury Regulations section 1.1275-4. A Holder or Beneficial Owner may obtain the issue price, amount of original issue discount, issue date, yield to maturity, comparable yield and projected payment schedule for the Notes by submitting a written request for such information to the Company at the following address: 102 NE 3rd Street, Suite 120, Grand Rapids, MN 55744, Attention: Chief Executive Officer.

ARTICLE 3
REDEMPTION AND PURCHASE

Section 3.01    *[Reserved]*.

Section 3.02    *Selection of Notes to Be Purchased*.

(a)    (i) If less than all of the Notes are to be redeemed, the Trustee will select Notes for redemption by lot (or, in the case of Global Notes, subject to the Applicable Procedures) unless otherwise required by law or applicable stock exchange or Depositary requirements and (ii) if less than all of the Notes tendered pursuant to an Asset Sale Offer or a Change of Control Offer are to be purchased, the Company will purchase Notes (together with any other Indebtedness subject to such offers in accordance with the terms of this Indenture) having principal amount equal to the purchase amount on a pro rata basis (with such adjustments as may be deemed appropriate by the Company so that only Notes in minimum denominations of US\$2,000, or integral multiples of US\$1,000 in excess thereof, shall be purchased).

(b)    In the event of selection by lot for partial redemption, the particular Notes to be redeemed will be selected, unless otherwise provided herein, not less than 30 nor more than 60 days prior to the redemption date by the Trustee from the outstanding Notes not previously called for redemption..

(c)    The Trustee will promptly notify the Company in writing of the Notes selected for redemption or purchase pursuant to this Section 3.02 and, in the case of any Note selected for partial redemption or purchase, the principal amount thereof to be redeemed or purchased. Notes and portions of Notes selected will be in minimum amounts of US\$2,000 or whole multiples of US\$1,000 in excess thereof; except that if all of the Notes of a Holder are to be redeemed or purchased, the entire outstanding amount of Notes held by such Holder, even if not a multiple of US\$2,000, shall be redeemed or purchased. Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption or purchase also apply to portions of Notes called for redemption or purchase..

Section 3.03    *[Reserved]*.

Section 3.04    *[Reserved]*.

Section 3.05    *Deposit of Redemption or Purchase Price*.

(a)    No later than 10:00 a.m. Eastern Time on the redemption or purchase date, the Company will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase price of and accrued interest on all Notes to be redeemed or purchased on that date. The Trustee or the Paying Agent will promptly return to the Company any money deposited with the Trustee or the Paying Agent by the Company in excess of the amounts necessary to pay the redemption or purchase price of, and accrued interest on, all Notes to be redeemed or purchased.

(b)    If the Company complies with the provisions of the preceding paragraph, on and after the redemption or purchase date, interest will cease to accrue on the Notes or the portions of Notes called for redemption or tendered for purchase. If a Note is redeemed or purchased on or after a Record Date but on or prior to the related Interest Payment Date, then any accrued and unpaid interest shall be paid to the Person in whose name such Note was registered at the close of business on such Record Date. If any Note called for redemption or tendered for purchase is not so paid upon surrender for redemption or purchase because of the failure of the Company to comply with Section 3.05(a), interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in this Indenture.

Section 3.06    *Notes Redeemed or Purchased in Part*.

Upon surrender of a Note that is redeemed or purchased in part, the Company will issue and, upon receipt of an Authentication Order, the Trustee will authenticate for the Holder at the expense of the Company a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered.

Section 3.07    *No Optional Redemption*.

The Notes shall not be redeemable at the option of the Company prior to the due date thereof.

Section 3.08    *No Mandatory Redemption*.

The Company is not required to make mandatory redemption, sinking fund or other reserve payments with respect to the Notes.

Section 3.09    *[Reserved]*.

Section 3.10    *Offer to Purchase by Application of Excess Proceeds*.

In the event that, pursuant to Section 4.17 hereof, the Company shall be required to commence an Asset Sale Offer to all Holders of Notes and, if required by the terms of any Senior Priority Obligations or other Obligations secured by a Lien permitted under this Indenture on the Collateral disposed of (which such Lien is senior to or pari passu with the Notes Priority Liens with respect to the Collateral), to all holders of such Senior Priority Obligations or such other Obligations, subject to the ABL Intercreditor Agreement, the Jarvis Hedge Facility Intercreditor Agreement, any Pari Passu Intercreditor Agreement or any Senior Priority Intercreditor Agreement, as provided in Section 4.17(c), it will follow the procedures specified in this Section 3.10 and in Section 4.17:

(a)    The Asset Sale Offer will commence as set forth in Section 4.17(c) and shall remain open for a period of at least 20 Business Days following its commencement and not more than 30 Business Days, except to the extent that a longer period is required by applicable law (the "*Asset Sale Offer Period*").

(b)    Promptly following the expiration of the Asset Sale Offer Period (the "*Asset Sale Purchase Date*"), the Company shall apply the Excess Proceeds to, subject to the Senior Priority Intercreditor Agreement, purchase, prepay or redeem, as applicable, the maximum principal amount of Notes and Senior Priority Obligations or such other Obligations, as appropriate, on a pro rata basis, that is secured by such Collateral (plus the payment of all accrued interest thereon, and all fees and expenses, including premiums, incurred in connection therewith) that may be purchased, prepaid or redeemed out of such Excess Proceeds (on a *pro rata* basis, if applicable) (the "*Asset Sale Purchase Amount*").

(c)    Payment for any Notes purchased in an Asset Sale Offer shall be made in the same manner as interest payments are made.

(d)    If the Asset Sale Purchase Date is on or after a Record Date and on or before the related Interest Payment Date, any accrued interest will be paid to the Person in whose name a Note is registered at the close of business on such Record Date, and no additional interest will be payable to Holders who tender Notes pursuant to the Asset Sale Offer.

(e)    Upon the commencement of an Asset Sale Offer, the Company will send or cause to be sent, by first class mail, a notice to the Holders, with a copy to the Trustee. The notice will contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Asset Sale Offer. The notice, which will govern the terms of the Asset Sale Offer, will state:

(1)    that the Asset Sale Offer is being made pursuant to this Section 3.10 and Section 4.17 hereof and the length of time the Asset Sale Offer will remain open;

(2)     the terms of the Asset Sale Offer, including the amount of Excess Proceeds, the purchase price and the expected Asset Sale Purchase Date;

(3)     that any Note not tendered or accepted for payment will continue to accrue interest;

(4)     that, unless the Company defaults in making such payment, any Note accepted for payment pursuant to the Asset Sale Offer will cease to accrue interest after the Asset Sale Purchase Date;

(5)     that Holders electing to have a Note purchased pursuant to an Asset Sale Offer may elect to have Notes purchased in the principal amount of US$2,000 or an integral multiple of US$1,000 in excess thereof;

(6)     that Holders electing to have any Notes purchased pursuant to any Asset Sale Offer shall be required to surrender the Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of the Note completed, to the Paying Agent or the Depositary, as applicable, at the address specified in the notice prior to the close of business on the third Business Day preceding the Purchase Date, subject to the Applicable Procedures;

(7)     specifying the procedures (including, without limitation, the Applicable Procedures, to the extent applicable) that Holders electing to have Notes purchased pursuant to any Asset Sale Offer will be required to comply with;

(8)     that, if the aggregate principal amount of Notes and applicable Senior Priority Obligations or such other Obligations, as appropriate, on a pro rata basis, secured by such Collateral that are tendered pursuant to the Asset Sale Offer, together with accrued interest thereon and all fees and expenses, including premiums, incurred in connection therewith, exceeds the Excess Proceeds, the purchase will, subject to the Senior Priority Intercreditor Agreement, be made on a pro rata basis based on principal amount; and

(9)     that Holders whose Notes are purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered (or transferred by book-entry transfer).

(f)     On or before the Asset Sale Purchase Date, the Company will, to the extent lawful:

(1)     accept for payment all Notes or portions of Notes properly tendered pursuant to the Asset Sale Offer;

(2)     deposit with the Paying Agent an amount in immediately available funds equal to the Asset Sale Purchase Amount in respect of all Notes or portions of Notes properly tendered and to be accepted pursuant to the Asset Sale Offer; and

(3)     deliver or cause to be delivered to the Trustee the Notes properly accepted, together with an Officers' Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Company.

The Paying Agent shall promptly deliver to each Holder of Notes properly tendered and accepted for purchase the Asset Sale Purchase Amount for such Notes, and the Trustee will promptly authenticate and send (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any.

Other than as specifically provided in this Section 3.10, any purchase pursuant to this Section 3.10 shall be made pursuant to the provisions of Sections 3.01 through 3.06 of this Indenture.

The Company shall comply with Canadian Securities Legislation and the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the Asset Sale Offer provisions of this Section 3.10 or Section 4.17, the Company shall comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under such Asset Sale Offer provisions by virtue of such compliance.

Section 3.11    *Offer to Purchaser by Application of Excess Cash Flow*.

In the event that, pursuant to Section 4.19, the Company will be required to commence an Excess Cash Flow Offer, it shall follow the procedures specified in this Section 3.11.

(a)    The Excess Cash Flow Offer shall remain open for a period of 20 Business Days following its commencement and no longer, except to the extent that a longer period is required by applicable law (the "*Excess Cash Flow Offer Period*").  No later than five Business Days after the termination of the Offer Period (the "*Excess Cash Flow Purchase Date*"), the Company shall purchase properly tendered Notes in an aggregate principal amount equal to the Excess Cash Flow Offer Amount. Payment for any Notes so purchased shall be made in the same manner as interest payments are made.

(b)    If the Excess Cash Flow Purchase Date is on or after a Record Date and on or before the related interest payment date, any accrued and unpaid interest shall be paid to the Person in whose name a Note is registered at the close of business on such record date, and no additional interest shall be payable to Holders who tender Notes pursuant to the Excess Cash Flow Offer.

(c)    Upon the commencement of an Excess Cash Flow Offer, the Company will send, by first class mail, a notice to each of the Holders, with a copy to the Trustee. The notice shall contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Excess Cash Flow Offer. The notice, which shall govern the terms of the Excess Cash Flow Offer, shall state:

(1)    that the Excess Cash Flow Offer is being made pursuant to this Section 3.11 and Section 4.19 and the length of time the Excess Cash Flow Offer shall remain open;

(2)    the Excess Cash Flow Offer Amount, the purchase price and the Excess Cash Flow Purchase Date;

(3)    that any Note not tendered or accepted for payment shall continue to accrue interest;

(4)    that, unless the Company defaults in making such payment, any Note accepted for payment pursuant to the Excess Cash Flow Offer shall cease to accrue interest after the Excess Cash Flow Purchase Date;

(5)    that Holders electing to have a Note purchased pursuant to an Excess Cash Flow Offer may only elect to have Notes in minimum denominations of US$2,000, or integral multiples of US$1,000 in excess thereof (unless such amount represents the entire principal amount of Notes held by such Holder), purchased;

(6)        that Holders electing to have any Notes purchased pursuant to any Excess Cash Flow Offer shall be required to surrender the Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of the Note completed, to the Paying Agent or the Depositary, as applicable, at the address specified in the notice prior to the close of business on the third Business Day preceding the Purchase Date, subject to the Applicable Procedures;

(7)        that Holders shall be entitled to withdraw their election if the Paying Agent or the Depositary, as applicable, receives, not later than the close of business on the third Business Day preceding the Purchase Date, a telegram, telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder delivered for purchase and a statement that such Holder is withdrawing its election to have such Note purchased, subject to the Applicable Procedures;

(8)        that, if the aggregate principal amount of Notes surrendered by Holders exceeds the Excess Cash Flow Offer Amount, the Trustee will select the Notes to be purchased on a pro rata basis (with such adjustments as may be deemed appropriate by the Company so that only Notes in minimum denominations of US$2,000, or integral multiples of US$1,000 in excess thereof, shall be purchased), subject to the Applicable Procedures; and

(9)        that Holders whose Notes were purchased only in part shall be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered (or transferred by book-entry transfer).

If any of the Notes subject to the Excess Cash Flow Offer are in the form of a Global Note, then the Company may modify such notice to the extent necessary to comply with the Applicable Procedures of the Depositary.

On or before the Purchase Date, subject to the Applicable Procedures, the Company shall, to the extent lawful, accept for payment, on a pro rata basis to the extent necessary, the Excess Cash Flow Offer Amount (and not withdrawn), or, if less than the Excess Cash Flow Offer Amount has been validly tendered, all Notes tendered (and not withdrawn), and shall deliver to the Trustee an Officers' Certificate stating that such Notes or portions thereof were accepted for payment by the Company in accordance with the terms of this Section 3.11. The Paying Agent shall promptly (but in any case not later than five Business Days after the Excess Cash Flow Purchase Date) mail or deliver to each tendering Holder an amount received from the Company equal to the purchase price of the Notes validly tendered by such Holder and accepted by the Company for purchase, and the Company will promptly issue a new Note, and the Trustee, upon receipt of an Authentication Order, shall authenticate and mail (or cause to be transferred by book-entry) such new Note to such Holder, in a principal amount equal to any unpurchased portion of the Note surrendered.  Any Note not so accepted shall be promptly mailed (or caused to be transferred by book-entry) by the Company to the Holder thereof.

Other than as specifically provided in this Section 3.11, any purchase pursuant to this Section 3.10 shall be made pursuant to the provisions of Sections 3.01 through 3.06.

Section 3.12    *Certificate and Opinion as to Conditions Precedent*.

In connection with any redemption of Notes by the Company pursuant to Article 3 hereof, on the applicable redemption date, the Company shall furnish to the Trustee an Officers' Certificate pursuant to Section 13.02(1) hereof and an Opinion of Counsel pursuant to Section 13.02(2) hereof.

ARTICLE 4
COVENANTS

Section 4.01    *Payment of Notes*.

The Company will pay or cause to be paid the principal of, premium, if any, and interest on, the Notes on the dates and in the manner provided in this Indenture and the Notes. Principal, premium, if any, and interest will be considered paid on the date due if the Paying Agent, if other than the Company or a Subsidiary thereof, holds as of 10:00 a.m. Eastern Time on the due date money deposited by the Company in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest then due.

Section 4.02    *Maintenance of Office or Agency*.

(a)    The Company will maintain an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee. Such offices shall initially be at:

> Computershare Trust Company, N.A.
> 9062 Old Annapolis Road
> Columbia, Maryland 21045

(b)    The Company may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations. The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

(c)    The Company hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Company in accordance with Section 2.03 hereof.

Section 4.03    *Corporate Existence; Insurance; Maintenance of Properties*.

(a)    Subject to Article 5 hereof, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect:

(1)    its corporate existence, and the corporate, partnership or other existence of each of its Restricted Subsidiaries (other than Immaterial Subsidiaries), in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company or any such Restricted Subsidiary; and

(2)    the rights (charter and statutory), licenses and franchises of the Company and its Restricted Subsidiaries (other than Immaterial Subsidiaries);

*provided*, that the Company shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Restricted Subsidiaries, if the Company shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company

and its Subsidiaries, taken as a whole, and that the loss thereof would not have a material adverse effect on the Company and its Subsidiaries, taken as a whole.

Section 4.04    *Compliance Certificate*.

(a)    The Company shall deliver to the Trustee, within 120 days after the end of each fiscal year of the Company (provided, that, for the fiscal year ended December 31, 2022, such Officers' Certificate shall be delivered within 180 days after the fiscal year end), an Officers' Certificate regarding compliance with all conditions and covenants under this Indenture and the Collateral Documents and, if the Company is not in compliance, the Company must specify any Defaults.

(b)    So long as any of the Notes are outstanding, the Company will deliver to the Trustee, forthwith upon becoming aware of any Default or Event of Default, an Officers' Certificate specifying such Default or Event of Default.  The Trustee shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless a responsible trust officer of the Trustee shall have received written notice from the Company or a Holder describing such Default or Event of Default, and stating that such notice is a notice of default.

Section 4.05    *Taxes.*

The Company will pay or discharge or cause to be paid or discharged, before the same shall become delinquent, (1) all material taxes, assessments and governmental charges levied or imposed upon the Company or any Subsidiary or upon the income, profits or property of the Company or any Subsidiary, and (2) all material lawful claims for labor, materials and supplies which, if unpaid, might by law become a Lien upon any property or assets of the Company or any Subsidiary; *provided*, that the Company shall not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings.

Section 4.06    *Stay, Extension and Usury Laws*.

The Company and each of the Guarantors covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Company and each of the Guarantors (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.07    *Restricted Payments*.

(a)    The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(1)    declare or pay any dividend or make any other payment or distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests (including, without limitation, any payment in connection with any consolidation, arrangement, merger or amalgamation involving the Company or any of its Restricted Subsidiaries) or to the direct or indirect holders of the Company's or any of its Restricted Subsidiaries' Equity Interests in their capacity as such (other than dividends or distributions payable in Equity Interests (other than

Disqualified Stock) of the Company and other than dividends or distributions payable to the Company or a Restricted Subsidiary of the Company);

(2)    purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any consolidation, arrangement, merger or amalgamation involving the Company) any Equity Interests of the Company or any direct or indirect parent of the Company;

(3)    make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Indebtedness of the Company or any Guarantor that is contractually subordinated to the Notes or to any Note Guarantee (excluding any intercompany Indebtedness between or among the Company and any of its Restricted Subsidiaries), except a purchase, repurchase, redemption, defeasance or other acquisition or retirement for value in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case, due within one year of the date of such purchase, repurchase, redemption, defeasance or other acquisition or retirement; or

(4)    make any Restricted Investment,

(all such payments and other actions set forth in these clauses (1) through (4) of Section 4.07(a) being collectively referred to as "*Restricted Payments*")

unless, at the time of and after giving effect to such Restricted Payment:

(1)    no Default or Event of Default has occurred and is continuing or would occur as a consequence of such Restricted Payment;

(2)    the Company would, at the time of such Restricted Payment and after giving pro forma effect thereto as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to incur at least US$1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.08(a) of this Indenture; and

(3)    such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and its Restricted Subsidiaries since the Issue Date (excluding Restricted Payments permitted by clauses (2), (3), (4), (5), (6), (8), (9), (11), (12) and (13) of Section 4.07(b) of this Indenture), is less than the sum, without duplication, of:

(A)    50% of Consolidated Net Income for the period (treated as one accounting period) from the beginning of the fiscal quarter in which the Issue Date occurs to the end of the most recent fiscal quarter ending prior to the date of such Restricted Payment for which financial statements are available (or, in case such Consolidated Net Income is a deficit, minus 100% of such deficit); *plus*

(B)    100% of the aggregate net proceeds, including cash and the Fair Market Value of property other than cash, received by the Company since the Issue Date as a contribution to its common equity share capital or from the issue or sale of Equity Interests of the Company (other than Disqualified Stock of the Company and Excluded Contributions) or from the issue or sale of convertible or exchangeable Disqualified Stock of the Company or convertible or exchangeable debt securities of the Company, in each case, that have been converted into or exchanged for Equity Interests of the Company (other than Equity Interests (or Disqualified Stock or debt securities) sold to a Subsidiary of the Company); *plus*

(C)    to the extent that any Restricted Investment that was made after the Issue Date is (a) sold for cash or marketable securities or otherwise cancelled, liquidated or repaid for cash or marketable securities or (b) made in an entity that subsequently becomes a Restricted Subsidiary of the Company that is a Guarantor, the initial amount of such Restricted Investment (or, if less, the amount of cash or the Fair Market Value of the marketable securities received upon repayment or sale); *plus*

(D)    to the extent that any Unrestricted Subsidiary of the Company designated as such after the Issue Date is redesignated as a Restricted Subsidiary after the Issue Date, the lesser of (i) the Fair Market Value of the Company's Restricted Investment in such Subsidiary as of the date of such redesignation or (ii) such Fair Market Value as of the date on which such Subsidiary was originally designated as an Unrestricted Subsidiary after the Issue Date; *plus*

(E)    50% of any dividends received in cash and the Fair Market Value of property other than cash received by the Company or a Restricted Subsidiary of the Company after the Issue Date from an Unrestricted Subsidiary of the Company, to the extent that such dividends were not otherwise included in the Consolidated Net Income of the Company for such period; *plus*

(F)    US$5.0 million.

(b)    The provisions of Section 4.07(a) of this Indenture will not prohibit:

(1)    the payment of any dividend or the consummation of any irrevocable redemption within 60 days after the date of declaration of the dividend or giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend or redemption payment would have complied with the provisions of this Indenture;

(2)    the making of any Restricted Payment in exchange for, or out of or with the net cash proceeds of the substantially concurrent sale (other than to a Subsidiary of the Company) of, Equity Interests of the Company (other than Disqualified Stock and Excluded Contributions) or from the substantially concurrent contribution of common equity capital to the Company; *provided*, that the amount of any such net cash proceeds that are utilized for any such Restricted Payment will not be considered to be net proceeds of Equity Interests for purposes of Section 4.07(a)(3)(B) of this Indenture;

(3)    the payment of any dividend (or, in the case of any partnership or limited liability company, any similar distribution) by a Restricted Subsidiary of the Company to the holders of such Restricted Subsidiary's Equity Interests on a pro rata basis;

(4)    the repurchase, redemption, defeasance or other acquisition or retirement for value of Indebtedness of the Company or any Guarantor that is contractually subordinated to the Notes or to any Note Guarantee with the net cash proceeds from a substantially concurrent incurrence of Permitted Refinancing Indebtedness;

(5)    so long as no Default or Event of Default has occurred and is continuing, the repurchase, redemption or other acquisition or retirement for value of any Equity Interests of the Company or any Restricted Subsidiary of the Company held by any current or former officer, director or employee of the Company or any of its Restricted Subsidiaries pursuant to any equity subscription agreement, stock option agreement, shareholders' agreement or similar agreement;

*provided*, that the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests may not exceed US$2.5 million in any twelve-month period;

(6)    the repurchase of Equity Interests deemed to occur upon the exercise of stock options to the extent such Equity Interests represent a portion of the exercise price of those stock options (or related withholding taxes);

(7)    so long as no Default or Event of Default has occurred and is continuing, the declaration and payment of regularly scheduled or accrued dividends to holders of any class or series of Disqualified Stock of the Company or any preferred stock of any Restricted Subsidiary of the Company issued on or after the Issue Date in accordance with the Fixed Charge Coverage Ratio test described in Section 4.08(a) of this Indenture;

(8)    payments of cash, dividends, distributions, advances or other Restricted Payments by the Company or any of its Restricted Subsidiaries to allow the payment of cash in lieu of the issuance of fractional shares upon (i) the exercise of options or warrants or (ii) the conversion or exchange of Capital Stock of any such Person;

(9)    payments or distributions to dissenting stockholders pursuant to applicable law, or pursuant to or in connection with a consolidation, amalgamation, merger or transfer of the Capital Stock of any Restricted Subsidiary or of all or substantially all of the assets of the Company, in each case, that complies with the requirements of this Indenture; *provided*, that as a result of such consolidation, amalgamation, merger or transfer of assets, the Company shall have made a Change of Control Offer (if required by this Indenture) and that all Notes validly tendered by Holders in connection with the Change of Control Offer have been repurchased, redeemed or acquired for value;

(10)    payments made in connection with, or constituting any part of any Permitted Tax Reorganization and fees and expenses relating thereto;

(11)    so long as no Default or Event of Default has occurred and is continuing, other Restricted Payments in an aggregate amount not to exceed US$15.0 million since the Issue Date;

(12)    Investments or other Restricted Payments that are made with Excluded Contributions; and

(13)    Restricted Payments, so long as, immediately after giving pro forma effect to the payment of any such Restricted Payment, no Event of Default has occurred and is continuing (or would result therefrom) and the Consolidated Secured Net Leverage Ratio shall be no greater than 0.00 to 1.00.

(c)    The amount of all Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Company or such Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment. The Fair Market Value of any assets or securities that are required to be valued by this Section 4.07 will be determined by the chief executive officer, the chief financial officer, the chief accounting officer or the controller of the Company and set forth in an Officers' Certificate delivered to the Trustee; *provided*, that such determination of Fair Market Value shall be evidenced by a resolution of the Board of Directors of the Company if the value of such Restricted Payment exceeds $10.0 million. The Company, in its sole discretion, may classify any Investment or other Restricted Payment as being made in part under one of the clauses or subclauses of this Section 4.07 (or, in the case of any Investment, the clauses or subclauses of

Permitted Investments) and in part under one or more other such clauses or subclauses (or, as applicable, clauses or subclauses), in each case, in any manner that complies with this Section 4.07.

Section 4.08    *Incurrence of Indebtedness and Issuance of Preferred Stock.*

(a)    The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "*incur*") any Indebtedness (including Acquired Debt), and the Company will not issue any Disqualified Stock and will not permit any of its Restricted Subsidiaries to issue any shares of preferred stock; *provided*, that the Company may incur Indebtedness (including Acquired Debt) or issue Disqualified Stock, and the Guarantors may incur Indebtedness (including Acquired Debt) or issue preferred stock, if the Fixed Charge Coverage Ratio for the Company's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred or such Disqualified Stock or such preferred stock is issued, as the case may be, would have been at least 2.0 to 1.0, determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been incurred or the Disqualified Stock or the preferred stock had been issued, as the case may be, at the beginning of such four-quarter period.

(b)    The provisions of Section 4.08(a) hereof will not prohibit the incurrence of any of the following items of Indebtedness (collectively, "*Permitted Debt*"):

(1)    the incurrence by the Company and any Guarantor of (a) Indebtedness through the issuance of Additional Notes in the February 2022 Notes Offering, (b) additional Indebtedness and letters of credit under a Credit Facility and (c) additional Indebtedness arising pursuant to royalty financing payments, customer deposits or advance payments (including pursuant to any factoring arrangements), which may be incurred under this subclause (c) pursuant to a Senior Secured Hedging Facility, in an aggregate principal amount under this clause (1) (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Company and its Restricted Subsidiaries thereunder) not to exceed, at any time outstanding, the greater of (x) US$75.0 million and (y) 16.75% of Consolidated Tangible Assets;

(2)    Existing Indebtedness (other than the Existing Notes and Existing Note Guarantees);

(3)    the incurrence by the Company and the Guarantors of Indebtedness represented by the Existing Notes and the related Existing Note Guarantees;

(4)    the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness represented by Capital Lease Obligations, mortgage financings or purchase money obligations, in each case, incurred for the purpose of financing all or any part of the purchase price or cost of design, construction, installation or improvement of property, plant or equipment used in the business of the Company or any of its Restricted Subsidiaries, in an aggregate principal amount, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (4), not to exceed, at any time outstanding, the greater of (x) US$75.0 million and (y) 25% of Consolidated Tangible Assets;

(5)    the incurrence by the Company or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge any Indebtedness (other than intercompany Indebtedness)

that was permitted by the Indenture to be incurred under Section 4.08(a) hereof or clauses (2), (3), (4), (5), (10) or (16) of this Section 4.08(b);

(6)    the incurrence by the Company or any of its Restricted Subsidiaries of intercompany Indebtedness between or among the Company and any of its Restricted Subsidiaries; *provided*, that:

(A)    if the Company or any Guarantor is the obligor on such Indebtedness and the payee is not the Company or a Guarantor, such Indebtedness must be unsecured and expressly subordinated to the prior payment in full in cash of all Obligations then due with respect to the Existing Notes and the Notes, in the case of the Company, or the Existing Note Guarantee and Note Guarantee, in the case of a Guarantor; and

(B)    (i) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Company or a Restricted Subsidiary of the Company and (ii) any sale or other transfer of any such Indebtedness to a Person that is not either the Company or a Restricted Subsidiary of the Company,

will be deemed, in each case, to constitute an incurrence of such Indebtedness by the Company or such Restricted Subsidiary, as the case may be, that was not permitted by this clause (6);

(7)    the issuance by any of the Company's Restricted Subsidiaries to the Company or to any of its Restricted Subsidiaries of shares of preferred stock; *provided*, that:

(A)    any subsequent issuance or transfer of Equity Interests that results in any such preferred stock being held by a Person other than the Company or a Restricted Subsidiary of the Company; or

(B)    any sale or other transfer of any such preferred stock to a Person that is neither the Company nor a Restricted Subsidiary of the Company, will be deemed, in each case, to constitute an issuance of such preferred stock by such Restricted Subsidiary that was not permitted by this clause (7);

(8)    the incurrence by the Company or any of its Restricted Subsidiaries of Hedging Obligations, including Hedging Obligations incurred prior to the date of the First Supplemental Indenture under the Advance Payments Facility Agreement, in the ordinary course of business;

(9)    the guarantee by the Company or any of the Guarantors of Indebtedness of the Company or a Restricted Subsidiary of the Company to the extent that the guaranteed Indebtedness was permitted to be incurred by another provision of this Section 4.08; *provided*, that if the Indebtedness being guaranteed is subordinated to or pari passu with the Existing Notes and the Notes, then the Guarantee must be subordinated or pari passu, as applicable, to the same extent as the Indebtedness guaranteed;

(10)    Indebtedness of the Company or any of its Restricted Subsidiaries constituting Acquired Debt; *provided*, that such Acquired Debt is not incurred in contemplation of the related acquisition, amalgamation or merger; *provided*, further, that, after giving effect to such acquisition and the incurrence of Indebtedness, either (i) the Company would be permitted to incur at least US$1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.08(a) or (ii) the Company would have had a Fixed Charge Coverage Ratio not less than

the actual Fixed Charge Coverage Ratio for the Company pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.08(a);

(11)    the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness in respect of (A) workers' compensation claims, health, disability or other employee benefits, self-insurance obligations, bankers' acceptances, performance and surety bonds in the ordinary course of business, (B) performance bonds, bank guarantees or similar obligations for or in connection with pledges, deposits or payments made or given in relation to such performance bonds, bank guarantees or similar instruments in the ordinary course of business in connection with or to secure statutory, regulatory or similar obligations, including obligations under mining, health, safety, affected local community or aboriginal people's benefits, reclamation, mine closure or other environmental obligations or in relation to infrastructure arrangements owned or provided to or applied for by the Company or any of its Restricted Subsidiaries and (C) letters of credit issued or incurred to support the purchase of supplies and equipment, including fuel, in the ordinary course of business of the Company and its Restricted Subsidiaries;

(12)    the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Indebtedness is covered within five business days;

(13)    Indebtedness arising from agreements of the Company or any Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred in connection with any acquisition or disposition of any business, assets or a Subsidiary of the Company in accordance with the terms of this Indenture, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition; *provided*, that the maximum assumable liability in respect of all such Indebtedness shall at no time exceed the gross proceeds actually received by the Company and its Restricted Subsidiaries in connection with such disposition;

(14)    the incurrence by the Company or any of its Restricted Subsidiaries of obligations consisting of take-or-pay obligations contained in supply arrangements incurred in the ordinary course of business (other than in connection with the types of obligations described in Section 4.08(b)(1)(b) hereof);

(15)    Indebtedness of the Company or any of its Restricted Subsidiaries arising pursuant to any Permitted Tax Reorganization;

(16)    the incurrence by the Company or any of its Restricted Subsidiaries of additional Indebtedness in an aggregate principal amount (or accreted value, as applicable) at any time outstanding, including Indebtedness for borrowed money incurred prior to the date of the First Supplemental Indenture under the Advance Payments Facility Agreement and all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (16), not to exceed the greater of (x) US$15.0 million and (y) 5.0% of Consolidated Tangible Assets;

(17)    to the extent that the same may constitute Indebtedness, any reserve or in-trust account arrangement established by the Company and SFPPN pursuant to the SFPPN Agreement, provided that any such arrangement adheres to the terms set out in the SFPPN Agreement; and

(18)    the incurrence by the Company or any of its Restricted Subsidiaries of Senior Priority Notes, including the Notes, in an aggregate principal amount (or accreted value, as applicable) at any time outstanding, including any Indebtedness incurred in the form of Senior Priority Notes pursuant to Section 4.08(b)(1) hereof and any Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Senior Priority Notes incurred pursuant to this clause (18), not to exceed US$77.0 million.

(c)    The Company will not incur, and will not permit any Guarantor to incur, any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Company or such Guarantor unless such Indebtedness is also contractually subordinated in right of payment to the Existing Notes and the Notes and the applicable Existing Note Guarantee and Note Guarantee on substantially identical terms; *provided*, that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of the Company or such Guarantor solely by virtue of being unsecured, by virtue of being secured on a junior priority basis or by virtue of the fact that the holders of any secured Indebtedness have entered into intercreditor agreements giving one or more such holders priority over the other holders in the collateral held by them. The Company will not incur, and will not permit any Restricted Subsidiary of the Company to incur, any Indebtedness arising pursuant to streaming transaction payments.

(d)    For purposes of determining compliance with this Section 4.08, in the event that an item of Indebtedness meets the criteria of more than one of the clauses of Permitted Debt described in clauses (2) through (16) of Section 4.08(b), or is entitled to be incurred pursuant to Section 4.08(a), the Company will be permitted to classify such item of Indebtedness on the date of its incurrence, or later reclassify all or a portion of such item of Indebtedness, in any manner that complies with this Section 4.08. The accrual of interest or preferred stock dividends, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, the reclassification of preferred stock or operating leases as Indebtedness due to a change in accounting principles, and the payment of dividends on preferred stock or Disqualified Stock in the form of additional shares of the same class of preferred stock or Disqualified Stock will not be deemed to be an incurrence of Indebtedness or an issuance of preferred stock or Disqualified Stock for purposes of this Section 4.08; *provided*, in each such case, that the amount thereof is included in Fixed Charges of the Company as accrued. For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be utilized, calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred. Notwithstanding any other provision of this Section 4.08, the maximum amount of Indebtedness that the Company or any Restricted Subsidiary may incur pursuant to this Section 4.08 shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

(e)    The amount of any Indebtedness outstanding as of any date will be:

(1)    the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount;

(2)    the principal amount of the Indebtedness, in the case of any other Indebtedness; and

(3)    in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of:

(A)    the Fair Market Value of such assets at the date of determination; and

(B)    the amount of the Indebtedness of the other Person.

Section 4.09    *Liens.*

(a)    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind (other than Permitted Liens) securing Indebtedness on any asset of the Company or such Restricted Subsidiary now owned or hereafter acquired, unless, solely in the case of assets not constituting Collateral, contemporaneously therewith:

(1)    in the case of any Lien securing any Existing Notes, Pari Passu Indebtedness or Jarvis Secured Hedge Obligations, effective provision is made to secure the Notes or such Note Guarantee, as the case may be, at least equally and ratably with or prior to such obligation with a Lien on the same assets of the Company or such Restricted Subsidiary, as the case may be; and

(2)    in the case of any Lien securing Indebtedness subordinated in right of payment to the Notes or a Note Guarantee, effective provision is made to secure the Notes or such Note Guarantee, as the case may be, with a Lien on the same assets of the Company or such Restricted Subsidiary, as the case may be, prior to the Lien securing such subordinated Indebtedness.

(b)    Any Lien that is granted to secure the Notes pursuant to this Section 4.09 shall be automatically released and discharged at the same time as the release of the Lien that gave rise to the obligation to secure the Notes.

(c)    For purposes of determining compliance with this Section 4.09, (1) a Lien securing an item of Indebtedness need not be permitted solely by reference to one clause of Permitted Liens (or any portion thereof) but may be permitted in part under any combination thereof and (2) in the event that a Lien securing an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the clauses of Permitted Liens (or any portion thereof), the Company may, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such Lien securing such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 4.09.

Section 4.10    *Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries.*

(a)    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(1)    pay dividends or make any other distributions on its Capital Stock to the Company or any of its Restricted Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, or pay any indebtedness owed to the Company or any of its Restricted Subsidiaries;

(2)    make loans or advances to the Company or any of its Restricted Subsidiaries; or

(3)    sell, lease or transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries.

(b)    The restrictions set forth in Section 4.10(a) shall not apply to encumbrances or restrictions existing under or by reason of:

(1)     agreements governing Existing Indebtedness and any related collateral documents as in effect on the Issue Date and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of those agreements; *provided*, that the amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are not materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in those agreements on the Issue Date;

(2)     this Indenture, the Existing Notes, the Notes, the Existing Note Guarantees, the Note Guarantees and any Collateral Documents;

(3)     agreements governing other Indebtedness (including a Credit Facility) permitted to be incurred under Section 4.08 of this Indenture and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of those agreements; *provided*, that the restrictions will not materially adversely impact the ability of the Company to make required principal and interest payments on the Notes;

(4)     applicable law, rule, regulation or order;

(5)     any instrument governing Indebtedness or Capital Stock of a Person acquired by the Company or any of its Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such Indebtedness or Capital Stock was incurred in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired; *provided*, that, in the case of Indebtedness, such Indebtedness was permitted by the terms of this Indenture to be incurred;

(6)     customary non-assignment provisions in contracts and licenses entered into in the ordinary course of business;

(7)     purchase money obligations for property acquired in the ordinary course of business and Capital Lease Obligations that impose restrictions on the property purchased or leased of the nature described in clause (3) of this Section 4.10(a);

(8)     any agreement for the sale or other disposition of a Restricted Subsidiary that restricts distributions by that Restricted Subsidiary pending its sale or other disposition;

(9)     Permitted Refinancing Indebtedness; *provided*, that the restrictions contained in the agreements governing such Permitted Refinancing Indebtedness will not materially adversely impact the ability of the Company to make required principal and interest payments on the Notes;

(10)     Liens permitted to be incurred under Section 4.09 of this Indenture that limit the right of the debtor to dispose of the assets subject to such Liens;

(11)     customary provisions limiting the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements and other similar agreements (including agreements entered into in connection with a Restricted Investment) entered into with the approval of the Company's Board of Directors, which limitation is applicable only to the assets that are the subject of such agreements; and

(12)     restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business.

Section 4.11    *Transactions with Affiliates*.

(a)    The Company will not, and will not permit any of its Restricted Subsidiaries to, make any payment to or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each, an "*Affiliate Transaction*") involving aggregate payments or consideration in excess of US$5.0 million, unless:

(1)    the Affiliate Transaction is on terms that are no less favorable to the Company or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person; and

(2)    the Company delivers to the Trustee, with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of US$10.0 million, a resolution of the Board of Directors of the Company set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with this Section 4.11 and that such Affiliate Transaction has been approved by a majority of the disinterested members of the Board of Directors of the Company.

(b)    The following items will be deemed not to be Affiliate Transactions and, therefore, will not be subject to Section 4.11(a):

(1)    any employment agreement, severance agreement, employee benefit plan, officer or director indemnification agreement or any similar arrangement entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business and payments pursuant thereto;

(2)    transactions between or among the Company and/or its Restricted Subsidiaries;

(3)    transactions with a Person (other than an Unrestricted Subsidiary of the Company) that is an Affiliate of the Company solely because the Company owns, directly or through a Restricted Subsidiary, an Equity Interest in, or controls, such Person;

(4)    payment of reasonable and customary fees and reimbursements of expenses (pursuant to indemnity arrangements or otherwise) of officers, directors, employees or consultants of the Company or any of its Restricted Subsidiaries;

(5)    any issuance of Equity Interests (other than Disqualified Stock) of the Company to Affiliates of the Company;

(6)    any transaction or series of related transactions for which the Company delivers to the Trustee an opinion as to the fairness to the Company or the applicable Restricted Subsidiary of such transaction or series of related transactions from a financial point of view issued by an accounting, appraisal or investment banking firm of national standing;

(7)    Restricted Payments that do not violate the provisions of this Indenture described in Section 4.07;

(8)    loans or advances to employees in the ordinary course of business not to exceed US$2.5 million in the aggregate at any one time outstanding;

(9)    any Permitted Tax Reorganization; and

(10)    any agreement as in effect as of the Issue Date or any amendment thereto (so long as any such agreement together with all amendments thereto, taken as a whole, is not more disadvantageous to the Holders of the Notes in any material respect than the original agreement as in effect on the Issue Date) or any transaction contemplated thereby.

## Section 4.12    *Business Activities*.

The Company shall not, and shall not permit any of its Restricted Subsidiaries to, engage in any business other than Permitted Businesses, except to such extent as would not be material to the Company and its Restricted Subsidiaries taken as a whole.

## Section 4.13    *Additional Guarantees*.

If the Company or any of its Restricted Subsidiaries acquires or creates another Subsidiary (other than an Immaterial Subsidiary or a Subsidiary designated as an Unrestricted Subsidiary in accordance with this Indenture) after the Issue Date, or if any Immaterial Subsidiary ceases to be an Immaterial Subsidiary or an Unrestricted Subsidiary is designated as a Restricted Subsidiary, then that newly acquired or created Subsidiary or former Immaterial Subsidiary or Unrestricted Subsidiary, as applicable, will become a Guarantor and execute a Note Guarantee pursuant to a supplemental indenture, execute an amendment, supplement or other instrument in respect of the Collateral Documents (including a joinder to the ABL Intercreditor Agreement, if any) and deliver an Opinion of Counsel, in each case satisfactory to the Trustee or the Notes Collateral Agent, as applicable, within 30 business days of the date on which it is acquired or created or ceases to be an Immaterial Subsidiary or Unrestricted Subsidiary, as applicable. The form of such supplemental indenture is attached as Exhibit D hereto.

## Section 4.14    *Designation of Restricted and Unrestricted Subsidiaries*.

(a)    The Board of Directors of the Company may designate any Restricted Subsidiary to be an Unrestricted Subsidiary if that designation would not cause a Default; *provided*, that in no event will the Scully Mine Project (or any ownership right therein) be transferred to or held by an Unrestricted Subsidiary. That designation shall only be permitted if the Investment would be permitted at that time and if the Restricted Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

(b)    If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the aggregate Fair Market Value of all outstanding Investments owned by the Company and its Restricted Subsidiaries in the Subsidiary designated as an Unrestricted Subsidiary shall be deemed to be an Investment made as of the time of the designation and will reduce the amount available for Restricted Payments under Section 4.07 hereof or one or more clauses of the definition of Permitted Investments, as determined by the Company.

(c)    Any designation of a Subsidiary of the Company as an Unrestricted Subsidiary will be evidenced to the Trustee by filing with the Trustee a certified copy of a resolution of the Board of Directors giving effect to such designation and an Officers' Certificate certifying that such designation complied with the preceding conditions and was permitted by Section 4.07 of this Indenture.

(d)    If, at any time, any Unrestricted Subsidiary would fail to meet the requirements of clauses (a) through (c) of this Section 4.14 as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of this Indenture and any Indebtedness of such Subsidiary will be deemed to be incurred by a Restricted Subsidiary of the Company as of such date and, if such Indebtedness is not permitted to be incurred as of such date under Section 4.08 of this Indenture, the Company will be in default of such Section 4.08.

(e)        The Board of Directors of the Company may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary of the Company; *provided*, that such designation will be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of the Company of any outstanding Indebtedness of such Unrestricted Subsidiary, and such designation will only be permitted if:

(1)        such Indebtedness is permitted under Section 4.08 of this Indenture, calculated on a pro forma basis as if such designation had occurred at the beginning of the applicable reference period; and

(2)        no Default or Event of Default would be in existence following such designation.

Any designation of an Unrestricted Subsidiary as a Restricted Subsidiary will be evidenced to the Trustee by filing with the Trustee a certified copy of a resolution of the Board of Directors of the Company giving effect to such designation and an Officers' Certificate certifying that such designation complied with the preceding conditions.

Section 4.15    *Reports.*

(a)        So long as any Notes are outstanding, the Company shall furnish and deliver to the Trustee, without cost to the Holders of Notes:

(1)        within 120 days after the end of the Company's fiscal year (provided, that, with respect to the fiscal year ended December 31, 2022, this deadline shall be 180 days), annual consolidated financial statements of the Company audited by the Company's independent public accountants. Such audited annual financial statements will be prepared in accordance with IFRS and be accompanied by a management's discussion and analysis ("*MD&A*") of the results of operations and liquidity and capital resources of the Company and its consolidated subsidiaries for the periods presented in a level of detail comparable to the MD&A of the results of operations and liquidity and capital resources of the Company contained in the Offering Memorandum;

(2)        within 60 days after the end of each of the first three fiscal quarters of each fiscal year (provided, that, with respect to the first and second fiscal quarter in the fiscal year ended December 31, 2022, this deadline shall be 90 days), unaudited consolidated quarterly financial statements of the Company (including a balance sheet, income statement and cash flow statement for the fiscal quarter or quarters then ended and the corresponding fiscal quarter or quarters from the prior year) reviewed pursuant to applicable auditing standards. Such quarterly financial statements will be prepared in accordance with IFRS and be accompanied by an MD&A of the results of operations and liquidity and capital resources of the Company and its consolidated subsidiaries for the periods presented in a level of detail in accordance with Canadian Securities Legislation as a reporting issuer; and

(3)        on or prior to the tenth day following an event that would give rise to a requirement for the Company to file a material change report pursuant to Canadian Securities Legislation as a reporting issuer with securities listed on the Toronto Stock Exchange, such material change report with respect to the Company and the Restricted Subsidiaries, as applicable.

The Company will make available such foregoing financial information, MD&A and reports to any Holder and, upon request, to any Beneficial Owner of the Notes, in each case, by posting such information on its website; *provided*, that so long as the Company is a "reporting issuer" (or its equivalent) in Canada or the United States, the disclosure requirements contemplated in clauses (1), (2) and (1) above will be deemed to have been satisfied once the corresponding documents have been filed

electronically on the Canadian Securities Administrators' SEDAR website or the SEC's EDGAR website (or, in each case, any successor system) in the form and within the time periods required by applicable Canadian Securities Legislation or SEC rules, as interpreted and applied by the Ontario Securities Commission or the SEC, as applicable, and the Company will no longer be required to post such information on its website.

(b)    The Company will also arrange and participate in quarterly conference calls, beginning with the first full fiscal quarter ending after the Issue Date, to discuss its results of operations with Holders of the Notes, Beneficial Owners of the Notes, prospective purchasers of the Notes, securities analysts and market makers no later than 15 business days following the date on which each of the quarterly and annual financial statements for the prior fiscal period are made available as provided above; *provided*, that, the Company shall not be required to have separate conference calls with Holders of the Notes, Beneficial Owners of the Notes, prospective purchasers of the Notes, securities analysts and market makers to the extent that the Company already has regular quarterly conference calls with equity investors. Dial-in conference call information will be included in or provided together with such financial statements.

(c)    If the Company has designated any of its Significant Subsidiaries as Unrestricted Subsidiaries, then the quarterly and annual financial information required by Sections 4.15(a) and 4.15(b) shall include a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, and in the MD&A of the financial condition and results of operations of the Company and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Company.

(d)    In addition, the Company agrees that, for so long as any Notes remain outstanding, it shall furnish to the Holders of the Notes, Beneficial Owners of the Notes, prospective investors in the Notes, securities analysts and market makers in the Notes, upon their request, the information and reports described in this Section 4.15 and any other information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

Delivery of reports or any other information to the Trustee shall be for informational purposes only and shall not constitute actual or constructive knowledge of Trustee or proper notice or any such information contained therein or determined from the information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on officers' certificates). The Trustee shall not be obligated to monitor or confirm, on a continuing basis or otherwise, our compliance with the covenants or with respect to any reports or other documents filed with the SEC or website under the indenture, or participate in any conference calls.

Section 4.16    *Offer to Repurchase Upon Change of Control*.

(a)    If a Change of Control occurs, each Holder of Notes will have the right to require the Company to repurchase all or any part (equal to US$2,000 or an integral multiple of US$1,000 in excess thereof) of such Holder's Notes pursuant to a change of control offer (a "*Change of Control Offer*") at a purchase price in cash equal to 101% of the aggregate principal amount of Notes repurchased, plus accrued and unpaid interest, if any, on the Notes repurchased to, but not including, the date of purchase (the "*Change of Control Payment*"), subject to the rights of Holders of Notes on the relevant Record Date to receive interest due on the relevant Interest Payment Date.

(b)    Within ten (10) days following any Change of Control, the Company will mail a notice to the Trustee and each Holder:

(1)    describing the transaction or transactions that constitute the Change of Control;

71

(2)     stating the purchase price and repurchase date, which date will  be no earlier than 30 days and no later than 60 days from the date such notice is mailed (the "*Change of Control Payment Date*");

(3)     that the Change of Control Offer is being made pursuant to this Section 4.16 and that all Notes properly tendered pursuant to such Change of Control Offer will be accepted for payment;

(4)     that any Note not tendered will continue to accrue interest;

(5)     that, unless the Company defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest after the Change of Control Payment Date;

(6)     that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender the Notes, with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the Paying Agent in accordance with the provisions, and within the timeframe, set forth in the notice;

(7)     that Holders will be entitled to withdraw their election if they properly deliver to the Paying Agent a withdrawal instruction in accordance with the procedures, and within the timeframe, specified in the notice;

(8)     that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered, which unpurchased portion must be equal to $2,000 or an integral multiple of $1,000 in excess of $2,000; and

(9)     stating any conditions to the Company's Change of Control Offer.

The Company shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change of Control. To the extent that the provisions of any securities laws or regulations conflict with the Change of Control provisions of this Section 4.16, the Company shall comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under the Change of Control provisions of this Section 4.16 by virtue of such compliance.

(c)     On or before the Change of Control Payment Date, the Company shall, to the extent lawful:

(1)     accept for payment all Notes or portions of Notes properly tendered pursuant to the Change of Control Offer;

(2)     deposit with the Paying Agent an amount in immediately available funds equal to the Change of Control Payment in respect of all Notes or portions of Notes properly tendered; and

(3)     deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Company.

The Paying Agent shall promptly deliver to each Holder of Notes properly tendered the Change of Control Payment for such Notes, and the Trustee will promptly authenticate and send (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any. The Company shall publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

(d)     Notwithstanding anything to the contrary in this Section 4.16, the Company shall not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture applicable to a Change of Control Offer made by the Company and purchases all Notes properly tendered and not withdrawn under the Change of Control Offer.

(e)     Notwithstanding anything to the contrary contained herein, a Change of Control Offer may be made in advance of a Change of Control, conditioned upon the consummation of such Change of Control, if a definitive agreement is in place for the Change of Control at the time the Change of Control Offer is made.

(f)     In the event that Holders of not less than 90% of the aggregate principal amount of the outstanding Notes accept a Change of Control Offer and the Company (or a third party making the Change of Control Offer as provided above) purchases all of the Notes held by such Holders, the Company will have the right, upon not less than 30 nor more than 60 days' notice, given not more than 30 days following the purchase pursuant to the Change of Control Offer described above, to redeem all of the Notes that remain outstanding following such purchase at a redemption price equal to the Change of Control Payment plus, to the extent not included in the Change of Control Payment, accrued and unpaid interest on the Notes that remain outstanding, to, but not including, the date of redemption (subject to the right of Holders of record on the relevant Record Date to receive interest due on an Interest Payment Date that is on or prior to the date of redemption).

Section 4.17     *Asset Sales*.

(a)     The Company shall not, and shall not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(1)     the Company (or the Restricted Subsidiary, as the case may be) receives consideration at the time of the Asset Sale at least equal to the Fair Market Value (measured as of the date of the definitive agreement with respect to such Asset Sale) of the assets or Equity Interests issued or sold or otherwise disposed of; and

(2)     at least 75% of the aggregate consideration received by the Company and its Restricted Subsidiaries in the Asset Sale is in the form of cash or Cash Equivalents.

For purposes of this provision, each of the following will be deemed to be cash:

(A)     any liabilities, as shown on the Company's most recent consolidated balance sheet, of the Company or any Restricted Subsidiary (other than contingent liabilities and liabilities that are by their terms subordinated to the Notes or any Note Guarantee) that are assumed by the transferee of any such assets pursuant to a customary novation or indemnity agreement that releases the Company or such Restricted Subsidiary from or indemnifies against further liability;

(B)      any securities, notes or other obligations received by the Company or any such Restricted Subsidiary from such transferee that are within 180 days after the Asset Sale, subject to ordinary settlement periods, converted by the Company or such Restricted Subsidiary into cash, to the extent of the cash received in that conversion; and

(C)      any stock or assets of the kind referred to in clauses (2)  or  (4) of Section 4.17(b) of this Indenture.

(b)      Within 365 days after the receipt of any Net Proceeds from an Asset Sale, the Company (or the applicable Restricted Subsidiary, as the case may be) may apply such Net Proceeds:

(1)      to the extent the Net Proceeds are attributable to an Asset Sale of assets that constitute Collateral, (w) to reduce, prepay, repay or purchase any Senior Priority Obligations, subject to any Senior Priority Intercreditor Agreement, (x) subject to any ABL Intercreditor Agreement, Jarvis Hedge Facility Intercreditor Agreement or Pari Passu Intercreditor Agreement, to reduce, prepay, repay or purchase any Notes Priority Obligations (other than the Existing Notes); provided that the Company ratably reduces, prepays, repays or purchases the Existing Notes, (y) subject to any ABL Intercreditor Agreement to reduce, prepay, repay or purchase ABL Priority Obligations or (z) to make an offer (in accordance with the procedures set forth herein for an Asset Sale Offer), purchase Notes through open-market purchases or in privately negotiated transactions (in each case, other than Indebtedness owed to the Company or any Restricted Subsidiary); provided, however, that, in connection with any reduction, prepayment, repayment or purchase of Indebtedness pursuant to this clause (1), the Company or such Restricted Subsidiary will retire such Indebtedness and will cause the related commitment (including Indebtedness under any ABL Facility or any Refinancing Indebtedness in respect thereof), to the extent the assets sold or otherwise disposed of in connection with such Asset Sale constituted "borrowing base assets," to be reduced in an amount equal to the principal amount so reduced, prepaid, repaid or purchased;

(2)      to the extent such Net Proceeds are from an Asset Sale that does not constitute Collateral, (w) to reduce, prepay, repay or purchase any Indebtedness secured by a Lien on such asset, subject to any Senior Priority Intercreditor Agreement, (x) to reduce, prepay, repay or purchase any Senior Priority Obligations, (y) to reduce, prepay, repay or purchase Pari Passu Indebtedness; provided, that the Company ratably reduces, prepays, repays or purchases the Existing Notes or (z) to make an offer (in accordance with the procedures set forth below for an Asset Sale Offer), purchase Notes through open-market purchases or in privately negotiated transactions (in each case, other than Indebtedness owed to the Company or any Restricted Subsidiary); provided, however, that, in connection with any reduction, prepayment, repayment or purchase of Indebtedness pursuant to this clause (2), the Company or such Restricted Subsidiary will retire such Indebtedness and will cause the related commitment (including Indebtedness under the ABL Facility or any Refinancing Indebtedness in respect thereof), to the extent the assets sold or otherwise disposed of in connection with such Asset Sale constituted "borrowing base assets," to be reduced in an amount equal to the principal amount so reduced, prepaid, repaid or purchased;

(3)      to acquire all or substantially all of the assets of, or any Capital Stock of, another Permitted Business, if, after giving effect to any such acquisition of Capital Stock, the Permitted Business is or becomes a Restricted Subsidiary of the Company;

(4)      to make a capital expenditure in respect of a Permitted Business; or

(5)      to acquire other assets that are not classified as current assets under GAAP and that are used or useful in a Permitted Business.

In the case of clause (3) of this Section 4.17(b), a binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment until the earlier of (x) the date on which such acquisition is consummated, and (y) the 180th day following the expiration of the aforementioned 365 day period.

Pending the final application of any Net Proceeds, the Company (or the applicable Restricted Subsidiary) may temporarily reduce revolving credit borrowings or otherwise invest the Net Proceeds in any manner that is not prohibited by this Indenture.

(c)      Any Net Proceeds from Asset Sales that are not applied or invested as provided in clauses (1) through (5) of Section 4.17(b) of this Indenture will constitute "*Excess Proceeds*." When the aggregate amount of Excess Proceeds exceeds US$15.0 million, within thirty days of exceeding such amount, the Company will make an offer (an "*Asset Sale Offer*"), to all holders of Notes and, if required by the terms of any other Senior Priority Obligations or other Obligations secured by a Lien permitted under the Indenture on the Collateral disposed of (which such Lien is senior to or pari passu with the Senior Priority Liens with respect to the Collateral), to all holders of such Senior Priority Obligations or such other Obligations, subject to the ABL Intercreditor Agreement, the Jarvis Hedge Facility Intercreditor Agreement, any Pari Passu Intercreditor Agreement or any Senior Priority Intercreditor Agreement, to purchase, prepay or redeem the maximum principal amount of Notes and such other Senior Priority Obligations or such other Obligations, as appropriate, on a pro rata basis, secured by such Collateral (plus all accrued interest on the Indebtedness and the amount of all fees and expenses, including premiums, incurred in connection therewith) that may be purchased, prepaid or redeemed out of the Excess Proceeds.

(d)      The offer price in any Asset Sale Offer shall be equal to 100% of the principal amount, plus accrued and unpaid interest, if any, to, but not including, the date of purchase, prepayment or redemption, subject to the rights of Holders of Notes on the relevant Record Date to receive interest due on the relevant Interest Payment Date, and will be payable in cash.

(e)      If any Excess Proceeds remain after consummation of an Asset Sale Offer, the Company may use those Excess Proceeds for any purpose not otherwise prohibited by this Indenture.

(f)      If the aggregate principal amount of Notes and Senior Priority Obligations or such other Obligations, as appropriate, secured by Collateral tendered in (or required to be prepaid or redeemed in connection with) such Asset Sale Offer exceeds the amount of Excess Proceeds, the Notes to be purchased, based on the amounts tendered or required to be prepaid or redeemed (with such adjustments as may be deemed appropriate by the Company so that only Notes in denominations of US$2,000, or an integral multiple of US$1,000 in excess thereof, will be purchased).  Upon completion of each Asset Sale Offer, the amount of Excess Proceeds will be reset at zero.

Section 4.18      *Additional Amounts*.

(a)      All payments made under or with respect to the Notes or the Note Guarantees will be made free and clear of and without withholding or deduction for or on account of any present or future Taxes, unless the withholding or deduction is then required by law. If any withholding or deduction for, or on account of, any Taxes imposed or levied by or on behalf of (1) any jurisdiction in which the Company or any Guarantor (including any successor or other surviving entity) is then organized, engaged in business or resident for tax purposes or any political subdivision or taxing authority thereof or therein or (2) any jurisdiction from or through which payment is made by or on behalf of the Company or any Guarantor

(including, without limitation, the jurisdiction of any Paying Agent) (each, a "*Tax Jurisdiction*"). will at any time be required to be made from any payments made under or with respect to the Notes or the Note Guarantees, including, without limitation, payments of principal, redemption price, purchase price, interest or premium, the Company or the relevant Guarantor, as applicable, will pay such additional amounts (the "*Additional Amounts*") as may be necessary in order that the net amounts received in respect of such payments by each Holder (including Additional Amounts) after such withholding or deduction will equal the respective amounts that would have been received in respect of such payments in the absence of such withholding or deduction; *provided*, that no Additional Amounts will be payable with respect to any of the following (referred to herein as "*Excluded Taxes*");

(1)    any Taxes that would not have been imposed but for the Holder or Beneficial Owner (or fiduciary, settlor, beneficiary, partner, member or shareholder of the Holder, as the case may be) of the Notes being a citizen or resident or national of, organized in or carrying on a business, in the relevant Tax Jurisdiction in which such Taxes are imposed or having any other present or former connection with the relevant Tax Jurisdiction other than the mere acquisition, holding, enforcement or receipt of payment in respect of the Notes;

(2)    any Taxes that are imposed or withheld as a result of the failure of the Holder or Beneficial Owner of the Notes to comply with any reasonable written request, made to that Holder or Beneficial Owner in writing at least 30 days before any such withholding or deduction would be made, by the Company, any Guarantor or any Paying Agent to provide timely and accurate information concerning the nationality, residence or identity of such Holder or Beneficial Owner or to make any valid and timely declaration or similar claim or satisfy any certification, information or other reporting requirement, which is required or imposed by a statute, treaty, regulation or administrative practice of the relevant Tax Jurisdiction as a precondition to any exemption from or reduction in all or part of such Taxes;

(3)    any Taxes imposed with respect to any Note presented for payment more than 30 days after the relevant payment is first made available for payment to the Holder (except to the extent that the Holder would have been entitled to Additional Amounts had the Note been presented on any day during such 30-day period);

(4)    any estate, inheritance, gift, sales, transfer, personal property or similar Taxes;

(5)    any Tax required to be withheld or deducted under Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended, or any amended or successor versions of such Sections ("*FATCA*"), any regulations or other guidance thereunder, or any agreement (including any intergovernmental agreement) entered into in connection therewith, or any law, regulation or other official guidance enacted in any jurisdiction implementing FATCA or an intergovernmental agreement in respect of FATCA;

(6)    any Taxes withheld, deducted or imposed because the Holder or Beneficial Owner of the Notes, or any other Person entitled to payments under the Notes, does not deal at arm's length with the Company or a relevant Guarantor or Paying Agent for purposes of the *Income Tax Act* (Canada) or is a Person who is, or who does not deal at arm's length with, a Person who is a "specified shareholder" (as defined in subsection 18(5) of the *Income Tax Act* (Canada)) of the Company or a relevant Guarantor or Paying Agent at a relevant time;

(7)    any Taxes withheld, deducted or imposed on a payment on or with respect to the Notes to a Holder that is a fiduciary, a partnership or a Person other than the sole Beneficial Owner of any such payment, if a beneficiary or settlor with respect to such fiduciary, a member of such

partnership or the Beneficial Owner of such payment would not have been entitled to the payment of Additional Amounts had it been the Holder of the Note; or

(8)     any combination of items (1) through (7) of this Section 4.18(a).

(b)     If the Company or any Guarantor becomes aware that it shall be obligated to pay Additional Amounts with respect to any payment under or with respect to the Notes, the Company will deliver to the Trustee on a date that is at least 30 days prior to the date of that payment (unless the obligation to pay Additional Amounts arises after the 30th day prior to that payment date, in which case the Company shall notify the Trustee promptly thereafter) an Officers' Certificate stating the fact that Additional Amounts will be payable and the amount estimated to be so payable. The Officers' Certificate must also set forth any other information reasonably necessary to enable the Paying Agents to pay Additional Amounts to Holders on the relevant payment date. The Trustee shall be entitled to rely solely on such Officers' Certificate as conclusive proof that such payments are necessary. The Company will provide the Trustee with documentation reasonably satisfactory to the Trustee evidencing the payment of Additional Amounts.

(c)     The Company or the relevant Guarantor shall make all withholdings and deductions required by law and shall remit the full amount deducted or withheld to the relevant taxing authority in accordance with applicable law.  Upon request, the Company shall provide to the Trustee an official receipt or, if official receipts are not obtainable, other documentation reasonably satisfactory to the Trustee evidencing the payment of any Taxes so deducted or withheld. The Company will be responsible for making all calculations called for under the Indenture and the Notes and the Trustee shall be entitled to conclusively rely on any such calculation provided for in an officers' certificate or otherwise.

(d)     Whenever in this Indenture there is mentioned, in any context (i) the payment of principal (and premium, if any), (ii) redemption prices or purchase prices in connection with a redemption or repurchase of Notes, (iii) interest, or (iv) any other amount payable under or with respect to any of the Notes, such mention shall be deemed to include mention of the payment of Additional Amounts to the extent that, in such context, Additional Amounts are, were or would be payable in respect thereof.

(e)     The Company and the Guarantors, jointly and severally, shall indemnify the Trustee and each Holder or Beneficial Owner of the Notes for and hold them harmless against the full amount of (i) any Taxes, other than Excluded Taxes, paid by or on behalf of the Trustee or such Holder or Beneficial Owner in connection with payments made under or with respect to the Notes or the Note Guarantees held by such Holder or Beneficial Owner and (ii) any Taxes, other than Excluded Taxes, levied or imposed with respect to any reimbursement under the foregoing clause (i) or this clause (ii). A certificate as to the amount of such requested indemnification, delivered by the Trustee or such Holder, shall be conclusive absent manifest error. The Company will pay, and indemnify the Trustee and each Holder for, any present or future stamp, issue, registration, transfer, court or documentary taxes or any other excise, property or similar Taxes, charges or levies that arise in any relevant Tax Jurisdiction (and, in the case of enforcement, any jurisdiction) from the execution, issuance, delivery or enforcement of the Notes, the Note Guarantees, this Indenture, the Collateral Documents or any other document or instrument in relation thereto, or the receipt of any payments with respect to the Notes or any Note Guarantees.

(f)     The limitations on the Company or any Guarantor to pay Additional Amounts set forth in this Section 4.18 shall not apply if the provision of information, documentation or other evidence described in clause (2) would be materially more onerous, in form, in procedure or in the substance of information disclosed, to comply with for a holder or beneficial owner of a Note, than comparable information or other reporting requirements imposed under U.S. tax law.

(g)    The obligations described under this Section 4.18 will survive any termination, defeasance or discharge of this Indenture, and transfer by a Holder or Beneficial Owner of the Notes, and will apply mutatis mutandis to any jurisdiction (i) in which any successor Person to the Company or any Guarantor is organized, engaged in business or resident for tax purposes or any political subdivision or taxing authority thereof or therein or (ii) from or through which payment is made by or on behalf of such successor Person.

Section 4.19    *Excess Cash Flow*.

(a)    If the Company and its Restricted Subsidiaries have Excess Cash Flow for any six-month period ending on June 30 or December 31 (*provided*, that the first period shall commence from the Issue Date and end on December 31, 2021), then, within (i) 125 days after the end of any such period ending on December 31 or (ii) 65 days after the end of any such period ending on June 30, as applicable, the Company will be required to make an offer (an "*Excess Cash Flow Offer*") to all Holders of Notes to purchase the maximum principal amount of Notes that may be purchased with 50% of such Excess Cash Flow for such period (the "*Excess Cash Flow Offer Amount*"). The aggregate amount of redemptions pursuant to all Excess Cash Flow Offers over the term of the Notes shall be capped at US$50.0 million, and no Excess Cash Flow Offer shall be required to the extent the aggregate amount of redemptions pursuant to all Excess Cash Flow Offers exceeds US$50.0 million. To the extent the amount of redemptions prior to the date of any Excess Cash Flow Period plus the portion of the Excess Cash Flow Offer Amount accepted by the holders exceed US$50.0 million, the redemption of the Notes pursuant to such Excess Cash Flow Offer shall be subject to the provisions set forth under Section 3.02. The offer price for such Excess Cash Flow Offer shall be an amount in cash equal to 100% of the principal amount thereof, plus accrued and unpaid interest, if any, to the date of repurchase, in accordance with the procedures set forth in this Indenture. To the extent that the aggregate amount of Notes tendered pursuant to an Excess Cash Flow Offer is less than the Excess Cash Flow Offer Amount, the Company and its Restricted Subsidiaries may use any remaining Excess Cash Flow Offer Amount for any purpose not otherwise prohibited by this Indenture. If the aggregate principal amount of the Notes surrendered by Holders thereof exceeds the Excess Cash Flow Offer Amount, the Notes to be purchased based upon principal amount (with such adjustments as may be deemed appropriate by the Company so that only Notes in denominations of US$2,000, or an integral multiple of US$1,000 in excess thereof, will be purchased). The Company shall cancel any Notes tendered pursuant to the Excess Cash Flow Offer and repurchased by the Company.

(b)    With respect to each Excess Cash Flow Offer, the Company shall be entitled to reduce the applicable Excess Cash Flow Offer Amount with respect thereto by an amount equal to the sum of (x) the aggregate repurchase price paid for any Notes theretofore repurchased by the Company in the open market (and cancelled by the Company) and (y) the aggregate redemption price paid for any Notes theretofore redeemed pursuant to one or more optional redemptions, in each case, during the period with respect to which such Excess Cash Flow was being computed. Notwithstanding anything to the contrary in the immediately preceding sentence, the Company shall not be entitled to reduce the applicable Excess Cash Flow Offer Amount by the aggregate repurchase price of any Notes theretofore repurchased by the Company pursuant to any Asset Sale Offers or Change of Control Offers, Excess Cash Flow Offers during such period.

(c)    Notwithstanding the foregoing, the Company shall not be required (but may elect to do so) to make an Excess Cash Flow Offer in accordance with this Section 4.19 unless the Excess Cash Flow Offer Amount with respect to the applicable period in respect of which such Excess Cash Flow Offer is to be made exceeds $5.0 million (with lesser amounts being carried forward for purposes of determining whether the $5.0 million threshold has been met for any future period). Upon completion of each Excess Cash Flow Offer, the Excess Cash Flow Offer Amount will be reset at zero.

(d)      The Company shall comply, to the extent applicable, with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder in connection with the repurchase of the Notes as a result of an Excess Cash Flow Offer. To the extent that the provisions of any securities laws or regulations conflict with Section 3.10 of this Indenture or this Section 4.19, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Indenture by virtue of its compliance with such securities laws or regulations.

Section 4.20    *Grant of Security Interests.*

On or prior to the Security Deadline, the Company and the Guarantors shall cause the Notes Collateral Agent (for the benefit of the Notes Collateral Agent, the Trustee and the holders of the Notes) to have valid and perfected Liens on the Collateral that are first in priority on the Collateral, subject to any ABL Intercreditor Agreement and Permitted Liens. In addition, the Company and the Guarantors shall on or prior to the Security Deadline:

(a)      (i) enter into each of the Collateral Documents, including the Mortgages and all of the documents and instruments listed on Schedule A hereto, necessary in order to cause the Notes Collateral Agent (for the benefit of the Notes Collateral Agent, the Trustee and the Holders of the Notes) to have valid and perfected Liens on the Collateral that are first in priority, subject to Permitted Liens;

(b)      execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register, as applicable, any and all such further acts, deeds, conveyances, security agreements, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as may be required so that, on or prior to the Security Deadline, the Notes Collateral Agent (for the benefit of the Notes Collateral Agent, the Trustee and the Holders of the Notes) shall have valid and perfected Liens on the Collateral that are first in priority, subject to Permitted Liens;

(c)      take such further action and execute and deliver such other documents specified in the Indenture Documents or as otherwise may be reasonably requested by the Trustee or the Notes Collateral Agent to give effect to the foregoing;

(d)      deliver to the Trustee and the Notes Collateral Agent an Opinion of Counsel that (i) such Collateral Documents and any other documents required to be delivered have been duly authorized, executed and delivered by the Company and the Guarantors and constitute legal, valid, binding and enforceable obligations of the Company and the Guarantors, subject to customary qualifications and limitations, (ii) the Collateral Documents and the other documents entered into pursuant to this Section 4.20 create valid and perfected Liens on the Collateral covered thereby, subject to Permitted Liens and customary qualifications and limitations; (iii) the execution of and performance by the Trustee and the Notes Collateral Agent pursuant to such Collateral Document does not require any consent, approval, registration, notice, or other action by any government authority in the applicable jurisdiction; (iv) the Trustee and the Collateral Agent is not required to be licensed, qualified, registered, or otherwise entitled to do business in the applicable jurisdiction in order to enter into the such Collateral Document or to hold such Collateral under the applicable jurisdiction; and

(e)      to the extent any Excluded Account ceases to be an Excluded Account, promptly, but in any event within 90 days thereof, either (i) permanently close such account or (ii) execute and deliver (A) a control agreements or blocked account agreement, as applicable and (B) any other, security agreements or any other necessary or customary Collateral Documents in respect thereof as may be required to grant a perfected a first priority security interest in such account or as is required by applicable law (subject to any ABL Intercreditor Agreement and Permitted Liens) to the Notes Collateral Agent for the benefit of the Holders and the Trustee.

Section 4.21    *Further Assurances; After-Acquired Collateral*.

(a)    The Company and the Guarantors shall execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register, as applicable, any and all such further acts, deeds, conveyances, security agreements, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments, and shall take all further action, as may be required from time to time in order to (i) carry out the terms and provisions of the Collateral Documents, (ii) subject to the Liens created by any of the Collateral Documents any of the properties, rights or interests required to be encumbered thereby, (iii) perfect and maintain the validity, effectiveness and, subject to the Senior Priority Intercreditor Agreement, the priority of any of the Collateral Documents and the Liens intended to be created thereby, and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm to the Notes Collateral Agent any of the rights granted now or hereafter intended by the parties thereto to be granted to the Notes Collateral Agent under the Collateral Documents or under any other instrument executed in connection therewith.

(b)    If at any time the ABL Priority Obligations are secured by Liens on Additional Notes Collateral, the Company and the Guarantors, as applicable, shall as promptly as practicable take all necessary action in furtherance of clauses (i) through (iv) of Section 4.21(a) with respect to such Additional Notes Collateral. Upon the exercise by the Trustee, the Notes Collateral Agent or any Holder of Notes of any power, right, privilege or remedy under this Indenture or any of the Collateral Documents which requires any consent, approval, recording, qualification or authorization of any governmental authority, the Company and the Guarantors shall execute and deliver all applications, certifications, instruments and other documents and papers that may be required from either the Company or any Guarantor for such governmental consent, approval, recording, qualification or authorization.

(c)    From and after the Issue Date, if (a) any Subsidiary becomes a Guarantor, (b) the Issuer or any Guarantor acquires any property or rights which are of a type constituting Collateral under any Collateral Document (excluding, for the avoidance of doubt, any Excluded Assets or assets not required to be Collateral pursuant to this Indenture or the Collateral Documents), or (c) any Excluded Asset ceases to constitute an Excluded Asset pursuant to this Indenture, the Issuer or such Guarantor will be required to execute and deliver such security instruments, financing statements and such certificates as are required under this Indenture or any Collateral Document to vest in the Notes Collateral Agent a security interest (subject to Permitted Liens) in such after-acquired collateral (or all of its assets, except Excluded Assets, in the case of a new Guarantor) and to take such actions to add such after-acquired collateral to the Collateral and satisfy the requirements of Section 4.20 and Article 12 in respect thereof, and thereupon all provisions of this Indenture and the Collateral Documents relating to the Collateral shall be deemed to relate to such after-acquired collateral to the same extent and with the same force and effect.

Notwithstanding anything to the contrary, neither the Trustee nor the Notes Collateral Agent shall have any responsibility for preparing, recording or filing any financing statement, perfection statement, continuation statement or other instrument in any public office or for otherwise ensuring the perfection or maintenance of any security interest granted pursuant to the Indenture or any Collateral Document.

Section 4.22    *Impairment of Security Interest*.

Neither the Company nor any of its Restricted Subsidiaries shall take or omit to take any action which would adversely affect or impair in any material respect the Liens in favor of the Notes Collateral Agent with respect to the Collateral, except as otherwise permitted or required by the Collateral Documents or this Indenture.

Section 4.23    *Additional Notes Collateral*.

If any ABL Priority Obligations are secured by a first priority Lien on the Collateral and by Liens on any additional property or assets of the Company or any of its Restricted Subsidiaries (such additional property or assets, "*Additional Notes Collateral*"), the Notes and Note Guarantees shall be secured by a Lien on such Additional Notes Collateral.

Section 4.24    *Suspension of Certain Covenants on Achievement of Investment Grade Status.*

Beginning on the first day (a) the Notes have achieved Investment Grade Status and (b) no Default or Event of Default has occurred and is continuing under this Indenture, and ending on a Reversion Date (such period a "*Suspension Period*"), the Company and its Restricted Subsidiaries will not be subject to Sections 4.07, 4.08, 4.09, 4.10, 4.11, 4.17 and 5.01(a)(4) (the "*Suspended Covenants*").

If at any time the Notes cease to have such Investment Grade Status, then the Suspended Covenants shall thereafter be reinstated as if such covenants had never been suspended (the "*Reversion Date*") and be applicable pursuant to the terms of this Indenture (including in connection with performing any calculation or assessment to determine compliance with the terms of this Indenture), unless and until the Notes subsequently attain Investment Grade Status and no Default or Event of Default is in existence (in which event the Suspended Covenants shall no longer be in effect for such time that the Notes maintain an Investment Grade Status); provided, however, that no Default, Event of Default or breach of any kind shall be deemed to exist under this Indenture, the Notes or the Note Guarantees with respect to the Suspended Covenants based on, and none of the Company or any of its Restricted Subsidiaries shall bear any liability for, any actions taken or events occurring during the Suspension Period, or any actions taken at any time pursuant to any contractual obligation arising prior to the applicable Reversion Date, regardless of whether such actions or events would have been permitted if the applicable Suspended Covenants remained in effect during such period.

On the Reversion Date, all Indebtedness incurred during the applicable Suspension Period will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under Section 4.08, to the extent such Indebtedness would be permitted to be incurred thereunder as of the Reversion Date and after giving effect to Indebtedness incurred prior to the Suspension Period and outstanding on the Reinstatement Date.

On the Reversion Date, all Indebtedness incurred during the applicable Suspension Period will be classified to have been incurred pursuant to 4.08(a) or one of the clauses set forth in 4.08(b) (to the extent such Indebtedness would be permitted to be incurred thereunder as of the Reversion Date and after giving effect to Indebtedness incurred prior to the Suspension Period and outstanding on the Reversion Date). To the extent such Indebtedness would not be so permitted to be incurred pursuant to 4.08(a), such Indebtedness will be deemed to have been outstanding on the Issue Date, so that it is classified under clause (2) of 4.08(b).

Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under Section 4.7 will be made as though Section 4.07 had been in effect since the Issue Date and throughout the Suspension Period. Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under Section 4.07(a). As described above, however, no Default, Event of Default or breach of any kind shall be deemed to have occurred as a result of the Reversion Date occurring on the basis of any actions taken or the continuance of any circumstances resulting from actions taken or the performance of obligations under agreements entered into by the Company or any of the Restricted Subsidiaries during the Suspension Period (other than agreements to take actions after the Reversion Date that would not be permitted outside of the Suspension Period entered into in contemplation of the Reversion Date).

During any period when the Suspended Covenants are suspended, the Board of Directors of the Company may not designate any of the Company's Subsidiaries as Unrestricted Subsidiaries pursuant to the Indenture.

The Trustee shall have no duty to monitor the ratings of the Notes, shall not be deemed to have any knowledge of the ratings of the Notes and shall have no duty to notify Holders if the Notes achieve Investment Grade Status or of the occurrence of a Reversion Date or to independently determine or verify such events have occurred.

## Section 4.25    *Minimum Liquidity*.

For so long as the Notes remain outstanding, the Company (x) starting on May 19, 2023, shall not permit its Cash Equivalents, on a consolidated basis, to be less than $5,000,000 (the "*Minimum Liquidity Requirement*") as of the last Business Day of any business week thereafter and (y) shall report its consolidated Cash Equivalents as of the last Business Day of each such business week to the Ad Hoc Group Representative no later than the third Business Day of the following week.  In the event the Company fails to meet the Minimum Liquidity Requirement, the Company shall promptly notify the Trustee and the Ad Hoc Group Representative in writing of such failure.

## Section 4.26    *Canadian Defined Benefit Pension Plans*.

No Canadian Defined Benefit Pension Plan has been established by the Company or any of its Restricted Subsidiaries. Neither the Company nor any of its Restricted Subsidiaries shall establish or permit the establishment of any Canadian Defined Benefit Pension Plans.

## ARTICLE 5
## SUCCESSORS

## Section 5.01    *Merger, Amalgamation, Consolidation, or Sale of Assets*.

(a)      The Company shall not, directly or indirectly: (1) merge, amalgamate or consolidate with or into another Person (whether or not the Company is the surviving or continuing corporation), or (2) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company and its Restricted Subsidiaries taken as a whole, in one or more related transactions, to another Person, unless:

(1)      either: (A) the Company is the surviving or continuing corporation; or (B) the Person formed by or surviving or continuing from any such consolidation, merger or amalgamation (if other than the Company) or to which such sale, assignment, transfer, conveyance or other disposition has been made is an entity organized or existing under the laws of Canada, any province or territory of Canada, the United States, any state of the United States or the District of Columbia;

(2)      the Person formed by or surviving or continuing from any such consolidation, merger or amalgamation (if other than the Company) or the Person to which such sale, assignment, transfer, conveyance or other disposition has been made assumes all the obligations of the Company under the Notes, this Indenture and the Collateral Documents pursuant to agreements reasonably satisfactory to the Trustee or the Notes Collateral Agent, as applicable, or is liable for those obligations by operation of law;

(3)      immediately after such transaction, no Default or Event of Default exists;

(4)    the Company or the Person formed by or surviving or continuing from any such consolidation, merger or amalgamation (if other than the Company), or to which such sale, assignment, transfer, conveyance or other disposition has been made would, on the date of such transaction after giving pro forma effect thereto and any related financing transactions as if the same had occurred at the beginning of the applicable four-quarter period, (i) be permitted to incur at least US$1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.08(a); or (ii) have had a Fixed Charge Coverage Ratio not less than the actual Fixed Charge Coverage Ratio for the Company pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.08(a); and

(5)    the Company shall have delivered to the Trustee and the Notes Collateral Agent an Officers' Certificate and an Opinion of Counsel, each stating that such merger, amalgamation, consolidation or transfer and such supplemental indenture (if any) comply with this Indenture or the Collateral Documents, as applicable and all conditions precedent in the Indenture and the Collateral Documents, as applicable, have been complied with.

(b)    In addition, the Company shall not, directly or indirectly, lease all or substantially all of the properties and assets of it and its Restricted Subsidiaries taken as a whole, in one or more related transactions, to any other Person.

(c)    This Section 5.01 will not apply to (i) any sale, assignment, transfer, conveyance, lease or other disposition of assets between or among the Company and any one or more of its Restricted Subsidiaries or between or among any one or more of the Company's Restricted Subsidiaries and (ii) any Permitted Tax Reorganization.

(d)    Section 5.01(a)(4) will not apply to any merger, amalgamation, consolidation or arrangement of the Company with or into one or more of its Restricted Subsidiaries for any purpose.

(e)    For purposes of this Section 5.01, the sale, assignment, transfer, conveyance or other disposition of all or substantially all of the properties and assets of one or more Subsidiaries of the Company, which properties and assets, if held by the Company instead of such Subsidiaries, would constitute all or substantially all of the properties and assets of the Company on a consolidated basis, shall be deemed to be the transfer of all or substantially all of the properties and assets of the Company.

Section 5.02    *Successor Corporation Substituted*.

Upon any consolidation, amalgamation or merger, or any sale, assignment, transfer, conveyance or other disposition of all or substantially all of the properties or assets of the Company and its Restricted Subsidiaries in a transaction that is subject to, and that complies with the provisions of, Section 5.01 hereof, the successor Person formed by such consolidation or amalgamation or into or with which the Company or Restricted Subsidiaries is or are merged or to which such sale, assignment, transfer, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, amalgamation, merger, sale, assignment, transfer, conveyance or other disposition, the provisions of this Indenture referring to the "Company" shall refer instead to the successor Person and not to the Company), and may exercise every right and power of the Company under this Indenture with the same effect as if such successor Person had been named as the Company herein; *provided*, that the predecessor Company shall not be relieved from the obligation to pay the principal of and interest on the Notes except in the case of a disposition of all or substantially all of the Company's and its Restricted Subsidiaries' assets in a transaction that is subject to, and that complies with the provisions of, Section 5.01 hereof.

ARTICLE 6
DEFAULTS AND REMEDIES

Section 6.01    *Events of Default*.

Each of the following is an "*Event of Default*":

(1)    default for 60 days in the payment when due of interest on the Notes;

(2)    default in the payment when due (at maturity, upon redemption or otherwise) of the principal of, or premium, if any, on, the Notes;

(3)    failure by the Company or any of the Guarantors for a period of 30 days to comply with the provisions described in Section 4.16, Section 4.17, Section 4.19, Section 4.20, Section 4.25 or  Section 5.01 hereof;

(4)    failure by the Company or any of the Guarantors to comply with any of the other agreements in this Indenture, continued for 60 days after notice to the Company by the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class of such failure to comply with any of the other agreements in the Indenture Documents;

(5)    default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Company or of its Restricted Subsidiaries (or the payment of which is guaranteed by the Company or any of its Restricted Subsidiaries), whether such Indebtedness or Guarantee now exists, or is created after the Issue Date, if that default:

(A)    is caused by a failure to pay principal of, premium on, if any, or interest, if any, on such Indebtedness prior to the expiration of the grace period provided in such Indebtedness on the date of such default (a "*Payment Default*"); or

(B)    results in the acceleration of such Indebtedness prior to its express maturity,

and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the maturity of which has been so accelerated, aggregates US$10.0 million or more;

(6)    failure by the Company or any of its Restricted Subsidiaries to pay final judgments entered by a court or courts of competent jurisdiction aggregating in excess of US$10.0 million, which judgments are not paid, discharged or stayed, for a period of 60 days;

(7)    failure by the Company or any of its Restricted Subsidiaries to perform any covenant or other agreement or condition under any existing or future offtake, royalty or metal streaming agreement, the effect of which is  to  cause  the  acceleration  of  payments  of US$10.0 million or more under such agreement;

(8)    except as expressly permitted by this Indenture and the Collateral Documents, with respect to any assets having a Fair Market Value in excess of US$10.0 million, individually or in

the aggregate, that constitutes, or under this Indenture or any Collateral Document is required to constitute, Collateral:

(A)      any of the Collateral Documents for any reason ceases to be in full force and effect;

(B)      any security interest created, or purported to be created, by any of the Collateral Documents for any reason ceases to be enforceable and of the same effect and priority purported to be created thereby; or

(C)      the Company or any Restricted Subsidiary asserts that such Collateral is not subject to a valid, perfected security interest;

(9)      except as permitted by this Indenture, any Note Guarantee is held in any judicial proceeding to be unenforceable or invalid or ceases for any reason to be in full force and effect, or any Guarantor, or any Person acting on behalf of any Guarantor, denies or disaffirms its obligations under its Note Guarantee;

(10)      the Company or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of its Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary pursuant to or within the meaning of Insolvency Laws:

(A)      commences a voluntary case;

(B)      consents to the entry of an order for relief against it in an involuntary case;

(C)      consents to the appointment of a custodian of it or for all or substantially all of its property;

(D)      makes a general assignment for the benefit of its creditors;

(E)      generally is not paying its debts as they become due; or

(F)      commences or is subject to another Insolvency Event;

(11)      a court of competent jurisdiction enters an order or decree under any Insolvency Laws that:

(A)      is for relief against the Company or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary in an involuntary case;

(B)      appoints a custodian of the Company or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary or for all or substantially all of the property of the Company or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary; or

(C)        orders the liquidation of the Company or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary;

and the order or decree remains unstayed and in effect for 60 consecutive days; and

(12)        there occurs under the Jarvis Hedge Facility or any other Hedging Obligations an "early termination date" (or similar term of like import, as defined in the definitive documentation for the Jarvis Hedge Facility or such Hedging Obligations, as applicable) resulting from (A) any event of default under the Jarvis Hedge Facility or such Hedging Obligation as to which the Issuer or any of its Restricted Subsidiary is the "defaulting party" (or similar term of like import, as defined in the definitive documentation for the Jarvis Hedge Facility or such Hedging Obligations, as applicable) or (B) any termination event (or similar term of like import, as defined in the definitive documentation for the Jarvis Hedge Facility or such Hedging Obligations, as applicable) under the Jarvis Hedge Facility or any such Hedging Obligations as to which the Issuer or any of its Restricted Subsidiaries is an "affected party" (or similar term of like import, as defined in the definitive documentation for the Jarvis Hedge Facility or such Hedging Obligations, as applicable) and, in either event, other than in the case of the Jarvis Hedge Facility, the Hedge Termination Value owed by the Issuer or such Restricted Subsidiary as a result thereof is greater than US$10.0 million.

Section 6.02    *Acceleration.*

(a)        In the case of an Event of Default specified in clause (10) or (11) of Section 6.01 hereof, with respect to the Company, any Restricted Subsidiary of the Company that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary, all outstanding Notes will become due and payable immediately without further action or notice. If any other Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the then outstanding Notes may declare all the Notes to be due and payable immediately and may instruct the Notes Collateral Agent to enforce the Collateral, subject to the provisions of this Indenture and the Collateral Documents.

Section 6.03    *Other Remedies.*

(a)        If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

(b)        The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

Section 6.04    *Waiver of Past Defaults.*

(a)        The Holders of not less than a majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee or the Notes Collateral Agent, as applicable, (and upon payment of any fees and expenses that may have been incurred by the Trustee and Notes Collateral Agent as a result of such Default or Event of Default) may on behalf of the Holders of all of the Notes (i) rescind

an acceleration or any instruction to enforce the Collateral, except where such rescission would conflict with any judgment or decree or (ii) waive any existing Default or Event of Default and its consequences under this Indenture, except a continuing Default or Event of Default in the payment of the principal of, premium or interest on, if any, the Notes. Upon such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture, *provided*, that no such waiver shall extend to subsequent or other Defaults or impair any right consequent thereon pursuant to this Indenture and the Collateral Documents.

(b)     In the event of any cross-default Event of Default specified in clauses (5) and (7) of Section 6.01, such Event of Default and all consequences thereof (excluding any resulting payment default, other than as a result of the acceleration of the Notes) shall be annulled, waived and rescinded, automatically and without any action by the Trustee or the Holders of the Notes, if within 20 days after such Event of Default arose, the Company delivers an Officers' Certificate to the Trustee stating that:

(1)     the Indebtedness, guarantee or obligation that is the basis for such Event of Default has been discharged,

(2)     the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default, or

(3)     if the default that is the basis for such Event of Default has been cured.

Section 6.05    *Control by Majority.*

Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or to the Notes Collateral Agent or exercising any trust or power conferred on either of them, *provided*, that:

(1)     such direction shall not be in conflict with any rule of law or with this Indenture;

(1)     the Trustee or Notes Collateral Agent may take any other action deemed proper by the Trustee or Notes Collateral Agent which is not inconsistent with such direction, and

(2)     each of the Trustee and Notes Collateral Agent need not take any action which might involve it in personal liability or be unjustly prejudicial to the Holders not consenting.

Prior to taking any action under this Indenture, each of the Trustee and the Notes Collateral Agent shall be entitled to security or indemnity satisfactory to it in its sole discretion against all losses, liability and expenses caused by taking or not taking such action.

Section 6.06    *Limitation on Suits.*

(a)     Except to enforce the right to receive payment of principal, premium, if any, or interest, if any, when due, no Holder of a Note may pursue any remedy with respect to this Indenture, the Collateral Documents or the Notes unless:

(1)     such Holder has previously given the Trustee and the Notes Collateral Agent written notice that an Event of Default is continuing;

(2)     Holders of at least 25% in aggregate principal amount of the then outstanding Notes make a written request to the Trustee to pursue the remedy and, if applicable, instructions to the Notes Collateral Agent to enforce the Collateral;

(3)     such Holder or Holders offer and, if requested, provide to the Trustee and the Notes Collateral Agent security or indemnity satisfactory to the Trustee and the Notes Collateral Agent against any loss, liability or expense;

(4)     the Trustee and the Notes Collateral Agent do not comply with such request within 60 days after receipt of the request and the offer of security or indemnity; and

(5)     during such 60-day period, Holders of a majority in aggregate principal amount of the then outstanding Notes do not give the Trustee and/or the Notes Collateral Agent a direction inconsistent with such request.

(b)     Holders of the Notes may not independently enforce the Collateral, except through the Notes Collateral Agent, as provided in the Collateral Documents and the Indenture.

Section 6.07     *Rights of Holders of Notes to Receive Payment*.

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal, premium, if any, and interest on the Note, on or after the respective due dates expressed in the Note, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder; *provided*, that a Holder shall not have the right to institute any such suit for the enforcement of payment if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver or loss of the Lien of this Indenture upon any property subject to such Lien.

Section 6.08     *Collection Suit by Trustee or Notes Collateral Agent*.

If an Event of Default specified in Sections 6.01(1) or (2) hereof occurs and is continuing, the Trustee may recover judgment, or may direct the Notes Collateral Agent to recover judgment, (a) in its own name and (b)(1) in the case of the Trustee, as trustee of an express trust or (2) in the case of the Notes Collateral Agent, as Notes Collateral Agent on behalf of the Holders, in each case against the Company for the whole amount of principal of, premium, if any, and interest remaining unpaid on, the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, the Notes Collateral Agent and their respective agents and counsel.

Section 6.09     *Trustee and Notes Collateral Agent May File Proofs of Claim*.

Each of the Trustee and the Notes Collateral Agent shall be authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Notes Collateral Agent, as applicable (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, the Notes Collateral Agent and their respective agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Company (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee or the Notes Collateral Agent, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it

for the reasonable compensation, expenses, disbursements and advances of the Trustee, the Notes Collateral Agent or their respective agents and counsel, and any other amounts due the Trustee or the Notes Collateral Agent under the Collateral Documents and Section 7.06 hereof. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.06 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee or the Notes Collateral Agent, as the case may be, to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10    *Priorities.*

If the Trustee collects any money pursuant to this Article 6, it shall pay out the money in the following order:

*First*: to the Trustee, the Notes Collateral Agent, the Paying Agent and the Registrar for amounts due under Section 7.06 hereof, including payment of all compensation, expenses and liabilities incurred, and all advances made, by the Trustee or the Notes Collateral Agent, as the case may be, and the costs and expenses of collection;

*Second*: to holders of Senior Priority Notes and any Senior Secured Hedging Facility for amounts due and unpaid on the Senior Priority Notes and any Senior Secured Hedging Facility for principal, premium, if any, interest and other amounts outstanding or other liabilities incurred thereunder, if any, ratably, without preference or priority of any kind, according to the amounts due and payable on the Senior Priority Notes and any Senior Secured Hedging Facility for principal, premium, if any, interest and any such other amounts outstanding or other liabilities incurred thereunder, respectively;

*Third*: to Holders of Notes and any Pari Passu Indebtedness for amounts due and unpaid on the Notes and any such other Pari Passu Indebtedness for principal, premium, if any, interest and other amounts outstanding or other liabilities incurred thereunder, if any, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes and any Pari Passu Indebtedness for principal, premium, if any, interest, and any such other amounts outstanding or other liabilities incurred thereunder, respectively; and

*Fourth*: to the Company or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders of Notes or Senior Priority Notes pursuant to this Section 6.10.

Section 6.11    *Undertaking for Costs*.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against a Trustee or the Notes Collateral Agent, as the case may be, for any action taken or omitted by it as the Trustee or the Notes Collateral Agent, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply

to a suit by the Trustee or the Notes Collateral Agent, as the case may be, a suit by a Holder of a Note pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in aggregate principal amount of the then outstanding Notes.

## ARTICLE 7
## TRUSTEE

Section 7.01    *Duties of Trustee*.

(a)    If an Event of Default has occurred and is continuing, the Trustee will exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)    Except during the continuance of an Event of Default:

(1)    the duties of the Trustee will be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or Obligations shall be read into this Indenture against the Trustee; and

(2)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. However, the Trustee will examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(c)    The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1)    this paragraph does not limit the effect of clause (b) of this Section 7.01;

(2)    the Trustee will not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3)    the Trustee will not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05 hereof.

(d)    Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to clauses (a), (b) and (c) of this Section 7.01.

(e)    The Trustee will not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(f)    The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in aggregate principal amount of the then outstanding Notes as provided in Section 6.05 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture.

Section 7.02    *Rights of Trustee.*

(a)    The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b)    The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, report, notice, request, direction, consent, order, bond, debenture, coupon or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine, during business hours and upon reasonable notice, the books, records and premises of the Company, personally or by agent or attorney at the sole cost of the Company and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(c)    Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both. The Trustee will not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel. The Trustee may consult with counsel, investment bankers, accountants or other professionals and the written advice of such counsel, investment bankers, accountants or other professionals or any Opinion of Counsel will be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(d)    The Trustee may act through its attorneys and agents and will not be responsible for the misconduct or negligence of any attorney or agent appointed with due care.

(e)    The Trustee will not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(f)    The Trustee may request that the Company deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized and their respective signatures at such time to take specified actions pursuant to this Indenture or the Notes.

(g)    No provision of this Indenture will require the Trustee to expend or risk its own funds or incur any financial liability. The Trustee will not be under any obligation to exercise any of its rights and powers under this Indenture or the Collateral Documents at the request or direction of any Holders, unless such Holder has offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense that might be incurred by it in compliance with such request or direction.

(h)    The permissive rights of the Trustee enumerated herein shall not be construed as duties.

(i)    The Trustee shall not be required to give any bond or surety in respect of the performance of their powers and duties hereunder.

(j)    In no event shall the Trustee be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.  The Trustee shall not be responsible for any loss or damage resulting from any action or non-action based on its good faith reliance upon such opinion or advice or for any errors in judgment made in good faith.

(k)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, the Trustee's right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder; provided (i) that any paying agent, registrar, agent, custodian or other Person shall only be liable to extent of its gross negligence or bad faith; and (ii) in and during an Event of Default, only the Trustee, and not any paying agent, registrar, agent, custodian or other Person shall be subject to the prudent person standard.

(l)     The Trustee shall not have any obligation or duty to monitor, determine or inquire as to compliance, and shall not be responsible or liable for compliance, with restrictions on transfer, exchange, redemption, purchase or repurchase, as applicable, of minimum denominations imposed under this Indenture or under applicable law or regulation with respect of any transfer, exchange, redemption, purchase or repurchase, as applicable, of interest in any security.

(m)     The Trustee shall not be deemed to have or be charged with knowledge of any Default or Event of Default under this Indenture or with respect to the Notes unless written notice of such Default or Event of Default shall have been given to a Responsible Officer of the Trustee by the Company or any other obligor on such Notes or by a Holder of such Notes and such notice refers to the Notes and this Indenture and states that such notice is a notice of Default or Event of Default.

(n)     Delivery of any reports, information and documents to the Trustee (including pursuant to Section 4.15) is for informational purposes only and the Trustee's receipt of the foregoing shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of their covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates or Opinions of Counsel, as applicable).

(o)     Unless otherwise agreed in writing, the Trustee may hold the trust funds uninvested without liability for interest.

(p)     Any recitals contained herein, in the Notes or any offering materials shall not be taken as the statements of the Trustee, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representations as to the validity or sufficiency of this Indenture, the Notes or any offering materials.

(q)     No delay or omission of the Trustee to exercise any right or remedy shall impair any such right or remedy or constitute a waiver or any acquiescence therein.

(r)     If at any time the Trustee is served with any arbitral, judicial or administrative order, judgment, award, decree, writ or other form of arbitral, judicial or administrative process in respect of this Indenture, the Collateral Documents, the Notes, the Collateral or any parts thereof, funds held by it, or the Guarantees (including, but not limited to, orders of attachment or garnishment or other forms of levies or injunctions), it shall (i) forward a copy of such arbitral, judicial or administrative order, judgment, award, decree, writ or other form of arbitral, judicial or administrative process to the Company and (ii) be authorized to comply therewith in any manner as it or its legal counsel of its own choosing deems appropriate; and if the Trustee complies with any such arbitral, judicial or administrative order, judgment, award, decree, writ or other form of arbitral, judicial or administrative process, the Trustee shall not be liable to any of the parties hereto or to any other person or entity even though such order, judgment, award, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

(s)      The Trustee shall not responsible for the content or accuracy of any document provided to the Trustee, and shall not be required to recalculate, certify, or verify any numerical information unless expressly provided for in writing.

Section 7.03    *Individual Rights of Trustee*.

The Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Company or any Affiliate of the Company with the same rights it would have if it were not Trustee. However, if the Trustee acquires any conflicting interest under applicable law, it must eliminate such conflict within 90 days, or resign. In addition, under the Business Corporations Act (Ontario), if the Trustee becomes aware that a material conflict of interest between its role as Trustee and its role in any other capacity, it must, within 90 days after becoming aware that such material conflict of interest exists, eliminate that conflict of interest or resign as Trustee.  Any Agent may do the same with like rights and duties.

Section 7.04    *Trustee's Disclaimer*.

The Trustee will not be responsible for and makes no representation as to the validity or adequacy of this Indenture, the Collateral Documents or the Notes, shall not be accountable for the Company's use of the proceeds from the Notes or any money paid to the Company or upon the Company's direction under any provision of this Indenture, will not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and will not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than a Trustee's certificate of authentication.

Section 7.05    *Notice of Defaults*.

If a Default or Event of Default occurs and is continuing and a Responsible Officer of the Trustee has received written notice of it or has actual knowledge of it, the Trustee will mail to Holders of Notes a notice of the Default or Event of Default within 90 days after such Responsible Officer received written notice of such Default or Event of Default or had actual knowledge thereof. The Trustee may withhold from Holders the notice of any Default if, and so long as, a Trust Officer of the Trustee determines in good faith that withholding the notice is in the interests of the Holders of the Notes, except a Default or Event of Default relating to the payment of principal, premium, if any, and interest, if any.

Section 7.06    *Compensation and Indemnity*.

(a)      The Company will pay to the Trustee, Notes Collateral Agent, Paying Agent and Registrar (each, an "*Indemnified Party*") from time to time reasonable compensation for its acceptance of this Indenture and services hereunder.  The Trustee's compensation will not be limited by any law on compensation of a Trustee of an express trust. The Company will reimburse each Indemnified Party promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services. Such expenses will include the reasonable compensation, disbursements and expenses of the Indemnified Party's agents and counsel.

(b)      The Company and the Guarantors will jointly and severally indemnify each Indemnified Party against any and all losses, liabilities or expenses (including reasonable attorneys' fees and expenses and court costs) incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture or the Collateral Documents, including the costs and expenses of enforcing this Indenture against the Company and the Guarantors (including this Section 7.06) and defending itself against any claim (whether asserted by the Company, the Guarantors, any Holder or any other Person) or liability

in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense may be attributable to its negligence or bad faith. Each Indemnified Party will notify the Company promptly of any claim for which it may seek indemnity. Failure by an Indemnified Party to so notify the Company will not relieve the Company or any of the Guarantors of their Obligations hereunder or under the Collateral Documents. The Company or such Guarantor will defend the claim and the Indemnified Party will cooperate in the defense. Each Indemnified Party may have separate counsel and the Company will pay the reasonable fees and expenses of such counsel. Neither the Company nor any Guarantor needs pay for any settlement made without its consent, which consent will not be unreasonably withheld or delayed. Neither Company nor any Guarantor shall not enter into any settlement with respect to a claim without such Indemnified Party' prior written consent, which such consent shall not be unreasonably withheld or delayed.

(c)     The Obligations of the Company and the Guarantors under this Section 7.06 will survive the satisfaction and discharge of this Indenture and the termination of the Collateral Documents.

(d)     To secure the Company's and the Guarantors' payment Obligations in this Section 7.06, the Trustee will have a first priority Lien, and each other Indemnified Party will have a Lien, prior to the Notes, on all money, Collateral or property held or collected by the Trustee, in its capacity as Trustee, or the Notes Collateral Agent in its capacity as Notes Collateral Agent, except, in the case of the Trustee, that held in trust to pay principal of, premium, if any, and interest on particular Notes pursuant to Article 8 hereof. Such Lien will survive the satisfaction and discharge of this Indenture.

(e)     When an Indemnified Party incurs expenses or renders services after an Event of Default specified in Section 6.01(10) or (11) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Insolvency Laws.

Section 7.07    *Replacement of Trustee and Notes Collateral Agent*.

(a)     The Trustee or the Notes Collateral Agent may resign in writing at any time with thirty (30) days prior written notice and be discharged from the trust hereby created by so notifying the Company. A resignation or removal of the Trustee or the Notes Collateral Agent and appointment of a successor Trustee or Notes Collateral Agent will become effective only upon the successor Trustee's or successor Notes Collateral Agent's, as applicable, acceptance of appointment as provided in this Section 7.07.

(b)     The Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee and/or the Notes Collateral Agent by so notifying the Trustee and/or the Notes Collateral Agent, as applicable, and the Company in writing.  The Company may remove the Trustee and/or the Notes Collateral Agent, as applicable, if:

(1)     the Trustee fails to comply with Section 7.09 hereof;

(2)     the Trustee or the Notes Collateral Agent, as applicable, is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Insolvency Laws;

(3)     a custodian or public officer takes charge of the Trustee or the Notes Collateral Agent, as applicable, or its property; or

(4)     the Trustee or the Notes Collateral Agent, as applicable, becomes incapable of acting.

(c)    If the Trustee and/or the Notes Collateral Agent resigns or is removed or if a vacancy exists in the office of Trustee or the Notes Collateral Agent, as applicable, for any reason, the Company will promptly appoint a successor Trustee or successor Notes Collateral Agent, as applicable. Within one year after the successor Trustee and/or successor Notes Collateral Agent, as applicable, takes office, the Holders of a majority in aggregate principal amount of the then outstanding Notes may appoint a successor Trustee or successor Notes Collateral Agent, as applicable, to replace the successor Trustee or successor Notes Collateral Agent, as applicable, appointed by the Company.

(d)    If a successor Trustee or successor Notes Collateral Agent, as applicable, does not take office within 60 days after the retiring Trustee or Notes Collateral Agent, as applicable, resigns or is removed, at the sole expense of the Company, the retiring Trustee or Notes Collateral Agent, as applicable, the Company, or the Holders of at least 10% in aggregate principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee or successor Notes Collateral Agent, as applicable.

(e)    If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.09 hereof, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)    A successor Trustee or successor Notes Collateral Agent, as applicable, will deliver a written acceptance of its appointment to the retiring Trustee or Notes Collateral Agent, as applicable, and to the Company. Thereupon, the resignation or removal of the retiring Trustee or Notes Collateral Agent, as applicable, will become effective, and the successor Trustee or successor Notes Collateral Agent, as applicable, will have all the rights, powers and duties of the Trustee or the Notes Collateral Agent, as applicable, under this Indenture. The successor Trustee or successor Notes Collateral Agent, as applicable, will mail a notice of its succession to Holders. The retiring Trustee or Notes Collateral Agent, as applicable, will promptly transfer all property held by it as Trustee or Notes Collateral Agent, as applicable, to the successor Trustee or successor Notes Collateral Agent, as applicable; *provided*, that all sums owing to the Trustee or Notes Collateral Agent, as applicable, hereunder have been paid and subject to the Lien provided for in Section 7.06 hereof. Notwithstanding replacement of the Trustee pursuant to this Section 7.07, the Company's Obligations under Section 7.06 hereof will continue for the benefit of the retiring Trustee or Notes Collateral Agent, as applicable.

Section 7.08    *Successor Trustee or Successor Notes Collateral Agent by Merger, etc.*

If the Trustee or Notes Collateral Agent, as applicable, consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act will be the successor Trustee or successor Notes Collateral Agent, as applicable.

Section 7.09    *Eligibility; Disqualification.*

The Trustee shall maintain its status as a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least US$50.0 million as set forth in its most recent published annual report of condition.

Section 7.10    *Additional Rights of Trustee.*

The Trustee shall retain the right not to act and shall not be liable for refusing to act if, due to a lack of information or for any other reason whatsoever, the Trustee, in its sole judgment, determines that such act might cause it to be in non-compliance with any applicable anti-money laundering or anti- terrorist legislation, regulation or guideline.  Further, should the Trustee, in its sole judgment, determine at any time that its acting under this Indenture has resulted in its being in non-compliance with any applicable anti-money laundering or anti-terrorist legislation, regulation or guideline, then it shall have the right to resign on 10 days' written notice to all parties, *provided*, (i) that the Trustee's written notice shall describe the circumstances of such non-compliance; and (ii) that if such circumstances are rectified to the Trustee's satisfaction within such 10 day period, then such resignation shall not be effective.

Notwithstanding anything to the contrary herein, the Company and the Trustee may, without liability, disclose information about the Holders and Beneficial Owners or potential Holders or Beneficial Owners of the Notes pursuant to subpoena or other order issued by a court of competent jurisdiction or when otherwise required by applicable law.

Unless otherwise notified, the Trustee shall be entitled to assume that all payments have been made by the Company as required under this Indenture.

The Trustee may assume for the purposes of this Indenture that any address on the register of the Holders of the Notes is the Holder's actual address and is also determinative as to residency.

The Trustee shall have no obligation to ensure or verify compliance with any applicable laws or regulatory requirements on the issue, exercise or transfer of any Notes provided such issue, exercise or transfer, as the case may be, is effected in accordance with the terms of this Indenture. The Trustee shall be entitled to process all transfers of Notes upon the presumption that such transfers are permissible pursuant to all applicable laws and regulatory requirements.  The Trustee shall have no obligation to ensure that legends appearing on the Notes certificates comply with regulatory requirements or securities laws of any applicable jurisdiction.

Except as provided in this Indenture, the Trustee shall retain the right not to act and shall not be held liable for refusing to act unless it has received clear and reasonable documentation which complies with the terms of this Indenture; such document must not require the exercise of any discretion or independent judgment.

The Trustee hereby accepts the trusts in this Indenture declared and provided for and agrees to perform the same upon the terms and conditions herein set forth and to hold all rights, privileges and benefits conferred hereby and by law in trust for the various persons who shall from time to time be Holders, subject to all the terms and conditions herein set forth.

Section 7.11    *Third Party Interests*.

Each party to this Indenture hereby represents to the Trustee that any account to be opened by, or interest to held by the Trustee in connection with this Indenture, for or to the credit of such party, either (i) is not intended to be used by or on behalf of any third party or (ii) is intended to be used by or on behalf of a third party, in which case such party hereto agrees to complete and execute forthwith a declaration in the Trustee's prescribed form as to the particulars of such third party.

Section 7.12    *Appointment of Additional Co-Trustees*.

It is the purpose of this Indenture that there shall be no violation of any law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as trustee in

such jurisdiction. It is recognized that in case of litigation under this Indenture, and in particular in case of the enforcement thereof on default, or in the case the Trustee deems that by reason of any present or future law of any jurisdiction it may not exercise any of the powers, rights or remedies herein granted to it or hold title to the properties, in trust, as herein granted or take any action which may be desirable or necessary in connection therewith, it may be necessary that the Trustee appoint an individual or institution as a separate or co-trustee. The following provisions of this Section are adopted to these ends.

In the event that the Trustee appoints an additional individual or institution as a separate or co-trustee, each and every remedy, power, right, claim, demand, cause of action, immunity, estate, title, interest and lien expressed or intended by this Indenture to be exercised by or vested in or conveyed to the Trustee with respect thereto shall be exercisable by and vest in such separate or co-trustee but only to the extent necessary to enable such separate or co-trustee to exercise such powers, rights and remedies, and only to the extent that the Trustee by the laws of any jurisdiction is incapable of exercising such powers, rights and remedies and every covenant and obligation necessary to the exercise thereof by such separate or co-trustee shall run to and be enforceable by either of them.

Should any instrument in writing from the Company be required by the additional separate or co-trustee so appointed by the Trustee for more fully and certainly vesting in and confirming to it such properties, rights, powers, trusts, duties and obligations, any and all such instruments in writing shall, on request, be executed, acknowledged and delivered by the Company; *provided,* that if an Event of Default shall have occurred and be continuing, if the Company does not execute any such instrument within 15 days after request therefor, the Trustee shall be empowered as an attorney-in-fact for the Company to execute any such instrument in the Company's name and stead. In case any additional separate or co- trustee or a successor to either shall die, become incapable of acting, resign or be removed, all the estates, properties, rights, powers, trusts, duties and obligations of such separate or co-trustee, so far as permitted by law, shall vest in and be exercised by the Trustee until the appointment of a new trustee or successor to such separate or co-trustee.

Every additional separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

     (1)    all rights and powers, conferred or imposed upon the Trustee shall be conferred or imposed upon and may be exercised or performed by such separate trustee or co-trustee; and

     (2)    no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder.

Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then additional separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any additional separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article.

Any separate trustee or co-trustee may at any time appoint the Trustee as its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, until the appointment of a new trustee or successor to such separate or co-trustee.

Section 7.13    *USA PATRIOT Act Compliance.*

The parties hereto acknowledge that in accordance with Section 326 of the USA PATRIOT Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001), the Trustee is required to obtain, verify and record information that identifies each person or legal entity that establishes a relationship or opens an account. The Company and the Guarantors agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the applicable requirements of the USA PATRIOT Act of 2001.

## ARTICLE 8
## LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01    *Option to Effect Legal Defeasance or Covenant Defeasance*.

The Company may at any time, at the option of its Board of Directors evidenced by a resolution set forth in an Officers' Certificate, elect to have either Section 8.02 or 8.03 hereof be applied to all outstanding Notes and the Note Guarantees upon compliance with the conditions set forth below in this Article 8.

Section 8.02    *Legal Defeasance and Discharge*.

Upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.02, the Company and each of the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be deemed to have been discharged from their obligations with respect to all outstanding Notes (including the Note Guarantees) on the date the conditions set forth below are satisfied (hereinafter, "*Legal Defeasance*"). For this purpose, Legal Defeasance means that the Company and the Guarantors will be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes (including the Note Guarantees), which will thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 hereof and the other Sections of this Indenture referred to in clauses (1) and (2) of this Section 8.02, and to have satisfied all their other obligations under such Notes, the Note Guarantees and this Indenture (and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions which will survive until otherwise terminated or discharged hereunder:

(1)    the rights of Holders of outstanding Notes to receive payments in respect of the principal of, or interest or premium, if any, on, such Notes when such payments are due from the trust referred to in Section 8.05 hereof;

(2)    the Company's obligations with respect to the Notes under Article 2 and Sections 4.01, 4.02 and 4.18 hereof;

(3)    the rights, powers, trusts, duties and immunities of the Trustee, and the Company's and the Guarantors' obligations in connection therewith; and

(4)    this Article 8.

Subject to compliance with this Article 8, the Company may exercise its option under this Section 8.02 notwithstanding the prior exercise of its option under Section 8.03 hereof.

Section 8.03    *Covenant Defeasance*.

Upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, the Company and each of the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from each of their obligations under the covenants contained in

Sections 4.07 through 4.17, Sections 4.19 through 4.23 and Section 5.01 (a)(4) hereof with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.04 hereof are satisfied (hereinafter, "*Covenant Defeasance*"), and the Notes will thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but will continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes may not be deemed outstanding for accounting purposes). For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes and Note Guarantees, the Company and the Guarantors may omit to comply with and will have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply will not constitute a Default or an Event of Default under Section 6.01 hereof, but, except as specified above, the remainder of this Indenture and such Notes and Note Guarantees will be unaffected thereby. In addition, upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, Sections 6.01(3) (other than as such Section 6.01(3) relates to Section 5.01 (other than Section 5.01(a)(4))) through 6.01(9) and Section 6.01(12) hereof will not constitute Events of Default.

Section 8.04     *Conditions to Legal or Covenant Defeasance*.

In order to exercise either Legal Defeasance or Covenant Defeasance under either Section 8.02 or 8.03 hereof:

(1)     the Company shall irrevocably have deposited or caused to be deposited with the Trustee as trust funds in trust for the purpose of making the following payments, specifically pledged as security for, and dedicated solely to, the benefit of the Holders of the Notes, (A) an amount (in U.S. dollars), or (B) Government Securities which through the scheduled payment of principal and interest in respect thereof in accordance with their terms will provide, not later than one day before the due date of any payment of principal of and premium, if any, and interest, if any, for the Notes, money in an amount, or (C) a combination thereof, sufficient, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, to pay and discharge, and which shall be applied by the Trustee (or other qualifying trustee) to pay and discharge, (i) the principal of (and premium, if any) and interest, if any, on the Notes on the Stated Maturity (or Redemption Date, if applicable) of such principal (and premium, if any) or installment of interest, if any, and (ii) all amounts due the Trustee under Section 7.06; *provided*, that the Trustee shall have been irrevocably instructed to apply such money or the proceeds of such Government Securities to said payments with respect to the Notes. Before such a deposit, the Company may give to the Trustee an irrevocable notice of its election to redeem all or any portion of Notes at a future date in accordance with the terms of this Indenture. Such irrevocable redemption notice, if given, shall be given effect in applying the foregoing.

(2)     No Default or Event of Default with respect to the Notes shall have occurred and be continuing on the date of such deposit or, insofar as clauses (10) and (11) of Section 6.01 are concerned, at any time during the period ending on the 91st day after the date of such deposit (it being understood that this condition shall not be deemed satisfied until the expiration of such period).

(3)    Such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under, any material agreement or instrument (other than this Indenture) to which the Company is a party or by which it is bound.

(4)    In the case of Legal Defeasance under Section 8.02, the Company shall have delivered to the Trustee an Opinion of Counsel in the United States stating that (x) the Company has received from, or there has been published by, the Internal Revenue Service a ruling, or(y) since the date of execution of this Indenture, there has been a change in the applicable U.S. federal income tax law, in either case to the effect that, and based thereon such opinion shall confirm that, the Holders of such outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such defeasance had not occurred.

(5)    In the case of Covenant Defeasance under Section 8.03, the Company shall have delivered to the Trustee an Opinion of Counsel in the United States to the effect that the Holders of such outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such covenant defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such covenant defeasance had not occurred.

(6)    The Company shall have delivered to the Trustee an Opinion of Counsel in Canada or a ruling from the Canada Revenue Agency to the effect that the Holders and Beneficial Owners of such outstanding Notes will not recognize income, gain or loss for Canadian federal, provincial or territorial income tax or other tax purposes as a result of such defeasance or covenant defeasance, as applicable, and will be subject to Canadian federal, provincial and territorial income tax and other tax on the same amounts, in the same manner and at the same times as would have been the case had such defeasance or covenant defeasance, as applicable, not occurred (and for the purposes of such opinion, such Canadian counsel shall assume that Holders and Beneficial Owners of the Notes include Holders and Beneficial Owners who are not resident in Canada).

(7)    The Company is not an "insolvent person" within the meaning of the Bankruptcy and Insolvency Act (Canada) on the date of such deposit or at any time during the period ending on the 91st day after the date of such deposit (it being understood that this condition shall not be deemed satisfied until the expiration of such period).

(8)    The Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for in this Section 8.04, relating to either the Legal Defeasance under Section 8.02 or the Covenant Defeasance under Section 8.03 (as the case may be), have been complied with.

Section 8.05    *Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions*.

Subject to Section 8.06 hereof, all money and non-callable Government Securities (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.05, the "*Trustee*") pursuant to Section 8.04 hereof in respect of the outstanding Notes will be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in

respect of principal, premium, if any, and interest, but such money need not be segregated from other funds except to the extent required by law.

The Company will pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or non-callable Government Securities deposited pursuant to Section 8.04 hereof or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Notwithstanding anything in this Article 8 to the contrary, any Trustee will deliver or pay to the Company from time to time upon the request of the Company any money or non-callable Government Securities held by it as provided in Section 8.04 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.04(1) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 8.06    *Repayment to Company*.

Any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of, premium, if any, or interest on, any Note and remaining unclaimed for two years after such principal, premium, if any, or interest has become due and payable shall be paid to the Company on its request or (if then held by the Company) will be discharged from such trust; and the Holder of such Note will thereafter be permitted to look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, will thereupon cease; *provided*, that the Trustee or such Paying Agent, before being required to make any such repayment, may at the expense of the Company cause to be published once, in the New York Times or The Wall Street Journal, notice that such money remains unclaimed and that, after a date specified therein, which will not be less than 30 days from the date of such notification or publication, any unclaimed balance of such money then remaining will be repaid to the Company.

Section 8.07    *Reinstatement*.

If the Trustee or Paying Agent is unable to apply any U.S. dollars or non-callable Government Securities in accordance with Section 8.02 or 8.03 hereof, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Company's and the Guarantors' Obligations under this Indenture and the Notes and the Note Guarantees will be revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or 8.03 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.02 or 8.03 hereof, as the case may be; *provided*, that, if the Company makes any payment of principal of, premium, if any, or interest on, any Note following the reinstatement of its Obligations, the Company will be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

# ARTICLE 9
## AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01    *Without Consent of Holders of Notes*.

Notwithstanding Section 9.02 of this Indenture, the Company, the Guarantors and the Trustee and, if any amendment or supplement relates to any Collateral Document, the Notes Collateral Agent, may amend or supplement this Indenture, the Notes, the Collateral Documents or the Note Guarantees without the consent of any Holder of Note:

(1)     to cure any omission, ambiguity, mistake, defect or inconsistency;

(2)     to provide for uncertificated Notes in addition to or in place of certificated Notes;

(3)     to provide for the assumption of the Company's or a Guarantor's obligations to Holders of Notes and Note Guarantees in the case of a consolidation, arrangement, merger or amalgamation or sale of all or substantially all of the Company's or such Guarantor's assets or to effect a Permitted Tax Reorganization, as applicable;

(4)     to make any change that would provide any additional rights or benefits to the Holders of Notes or that does not materially adversely affect the legal rights under this Indenture of any Holder;

(5)     to conform the text of this Indenture, the Notes, the Note Guarantees or the Collateral Documents to any provision of the "Description of the Notes" section of the Offering Memorandum to the extent that such provision in the Description of the Notes was intended to be a verbatim recitation of a provision of this Indenture, the Notes, the Note Guarantees or the Collateral Documents, which intent may be evidenced by an Officers' Certificate to that effect;

(6)     to provide for the issuance of Additional Notes in accordance with the limitations set forth in this Indenture as of the Issue Date;

(7)     to allow any Guarantor to execute a supplemental indenture and/or a Note Guarantee to add a guarantee with respect to the Notes;

(8)     to evidence and provide for the acceptance and appointment under this Indenture of a successor Trustee or Notes Collateral Agent pursuant to the requirements thereof;

(9)     (i) to enter into additional or supplemental Collateral Documents in accordance with the terms of this Indenture and the Collateral Documents, (ii) to enter into any amended or modified Collateral Documents in accordance with any ABL Intercreditor Agreement or (iii) to release Collateral from the Lien of this Indenture or the Collateral Documents in accordance with the terms of this Indenture and the Collateral Documents.

Upon the request of the Company accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental indenture, and upon receipt by the Trustee of the documents described in Section 7.02(c) hereof, the Trustee will join with the Company and the Guarantors in the execution of any amended or supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee will not be obligated to enter into such amended or supplemental indenture that affects its own rights, duties or immunities under this Indenture or otherwise.

Upon the request of the Company accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental Collateral Documents, and upon receipt by the Notes Collateral Agent of the documents described in Section 7.02(c) hereof, the Notes Collateral Agent will join with the Company and the Guarantors in the execution of any amended or supplemental Collateral Documents authorized or permitted by the terms of this Indenture and the Collateral Documents and to make any further appropriate agreements and stipulations that may be therein contained, but the Notes Collateral Agent will not be obligated to enter into such amended or supplemental Collateral Documents that affects its own rights, duties or immunities under this Indenture, the Collateral Documents or otherwise.

Section 9.02    *With Consent of Holders of Notes.*

(a)    Except as otherwise provided in Section 9.01, the immediately succeeding paragraph of this Section 9.02(a) or Section 9.02(b), this Indenture, the Notes, the Collateral Documents or the Note Guarantees may be amended or supplemented with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, Additional Notes, if any) voting as a single class (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes), and any existing Default or Event of Default or compliance with any provision of this Indenture, the Notes, the Note Guarantees and the Collateral Documents may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, Additional Notes, if any) voting as a single class (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes). Section 2.08 hereof shall determine which Notes are considered to be "outstanding" for purposes of this Section 9.02.

Without the consent of each Holder of Notes affected, an amendment, supplement or waiver may not (with respect to any Notes held by a non-consenting holder):

(1)    reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(2)    reduce the principal of, or change the fixed maturity of, any Note or alter or waive any of the provisions relating to the dates on which the Notes may be redeemed or the redemption price thereof (including the premium payable thereon) with respect to the redemption of the Notes;

(3)    reduce the rate of or change the time for payment of interest, including default interest, on any Note;

(4)    waive a Default or Event of Default in the payment of principal of, premium on, if any, or interest, if any, on, the Notes (except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the then outstanding Notes and a waiver of the payment default that resulted from such acceleration);

(5)    make any Note payable in money other than that stated in the Notes;

(6)    make any change in the provisions of this Indenture relating to waivers of past Defaults or the rights of Holders of Notes to receive payments of principal of, premium on, if any, or interest, if any, on, the Notes;

(7)    waive a redemption payment with respect to any Note (other than a payment required by one of the covenants described in Sections 4.16, 4.17 and 4.19 hereof);

(8)    release any Guarantor from any of its obligations under its Note Guarantee or this Indenture, except in accordance with the terms of this Indenture; or

(9)    make any change in the preceding amendment and waiver provisions.

(b)    In addition, (i) any amendment to or waiver of, the provisions of this Indenture relating to the Collateral or the Collateral Documents that has the effect of releasing all or substantially all of the Collateral from the Liens securing the Notes or (ii) any amendment, change or modification of the obligations of the Company and the Guarantors under Section 4.20 will require the consent of the Holders

of at least 66 2/3% of the aggregate principal amount of the Notes then outstanding; *provided*, that all Collateral shall be released from the Liens securing the Notes upon the discharge of the Company's and the Guarantors' obligations under the Notes and the Note Guarantees through redemption of all of the Notes outstanding or payment in full of the obligations under this Indenture at maturity or otherwise, or upon any defeasance or satisfaction and discharge as described in Article 8 or Article 10, respectively.

Section 9.03    *Revocation and Effect of Consents*.

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. However, any such Holder of a Note or subsequent Holder of a Note may revoke the consent as to its Note if the Trustee receives a properly delivered written notice of revocation before the date the amendment, supplement or waiver becomes effective. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

The Company may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to consent to any amendment, supplement or waiver. If a record date is fixed, then notwithstanding the provisions of the immediately preceding paragraph, those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to consent to such amendment or waiver or to revoke any consent previously given, whether or not such Persons continue to be Holders after such record date.

Section 9.04    *Notation on or Exchange of Notes*.

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Company in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or waiver.

Section 9.05    *Trustee to Sign Amendments, etc*.

The Trustee shall sign any amended or supplemental indenture authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect its rights, duties, liabilities or immunities. In executing any amended or supplemental indenture, the Trustee will be entitled to receive and (subject to Section 7.01 hereof) will be fully protected in relying upon, in addition to the documents required by Section 13.02 hereof, an Officers' Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted by this Indenture.

In connection with any modification, amendment, supplement or waiver in respect of the Indenture, any Collateral Document, or the Notes, the Company shall deliver to the Trustee an officers' certificate and an opinion of counsel, each stating (i) that such modification, amendment, supplement or waiver is authorized or permitted pursuant to the terms of the Indenture, such Collateral Document, or the Notes, as applicable, and (ii) that all related conditions precedent to such modification, amendment, supplement or waiver have been complied with.

ARTICLE 10
SATISFACTION AND DISCHARGE

Section 10.01  *Satisfaction and Discharge*.

Upon request by the Company, this Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, and the Trustee, at the expense of the Company, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when:

(1)    either:

(a)    all Notes theretofore authenticated and delivered and all coupons, if any, appertaining thereto (other than (i) Notes which have been destroyed, lost or stolen and which have been replaced or paid as provided in this Indenture and (ii) Notes for whose payment money has theretofore been deposited in trust with the Trustee or any Paying Agent or segregated and held in trust by the Company and thereafter repaid to the Company, as provided in this Indenture) have been delivered to the Trustee for cancellation; or

(b)    all Notes not theretofore delivered to the Trustee for cancellation (i) have become due and payable or (ii) will become due and payable at their Stated Maturity within one year, or (iii) if redeemable at the option of the Company, are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Company,

and the Company, in the case of the subclauses (i), (ii) or (iii) of this Section 10.01(1)(b), has irrevocably deposited or caused to be deposited with the Trustee (and delivered irrevocable instructions to the Trustee) as trust funds in trust for such purpose an amount in U.S. dollars, sufficient to pay and discharge the entire indebtedness on such Notes not theretofore delivered to the Trustee for cancellation, for principal (and premium, if any), interest, if any, and Additional Amounts, if any, to the date of such deposit (in the case of Notes which have become due and payable) or to the Stated Maturity or date of redemption, as the case may be;

(2)    The Company has paid or caused to be paid all other amounts payable under the Indenture Documents by the Company, including all amounts payable to the Trustee and the Notes Collateral Agent; and

(3)    The Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture as to the Notes have been complied with.

Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to subclause (b) of clause (1) of this Section 10.01, the provisions of Sections 10.02, 8.05 and 8.06 hereof will survive. In addition, nothing in this Section 10.01 will be deemed to discharge those provisions of Section 7.06 hereof, that, by their terms, survive the satisfaction and discharge of this Indenture.

The Collateral will be released from the Lien securing the Notes as provided under Section 12.03 of this Indenture upon the satisfaction and discharge of this Indenture in accordance with the provisions of this Section 10.01.

Section 10.02  *Application of Trust Money*.

Subject to the provisions of Section 8.05 and 8.06 hereof, all money deposited with the Trustee pursuant to Section 10.01 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal (and premium, if any) and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 10.01 hereof by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's and any Guarantor's Obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 10.01 hereof; *provided*, that if the Company has made any payment of principal of, premium, if any, or interest on, any Notes because of the reinstatement of its Obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent.

# ARTICLE 11
# GUARANTEES

## Section 11.01  *Guarantee.*

(a)      Subject to this Article 11, each of the Guarantors hereby, jointly and severally, unconditionally guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and the Notes Collateral Agent and their respective successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes, the Collateral Documents or the Obligations of the Company hereunder or thereunder, that:

(1)      the principal of, premium, if any, and interest on, the Notes will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, if lawful, and all other Obligations of the Company to the Holders or the Trustee and the Notes Collateral Agent hereunder or thereunder or under any Collateral Document will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and

(2)      in case of any extension of time of payment or renewal of any Notes or any of such other Obligations, that same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise.

Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors will be jointly and severally obligated to pay the same immediately. Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

(b)      The Guarantors hereby agree that their Obligations hereunder are unconditional, irrespective of the validity, regularity or enforceability of the Notes, any Collateral Document or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor. Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require a proceeding first against the Company, protest, notice and all demands whatsoever and covenant

that this Note Guarantee will not be discharged except by complete performance of the Obligations contained in the Notes and this Indenture.

(c)    If any Holder, the Notes Collateral Agent or the Trustee is required by any court or otherwise to return to the Company, the Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to either the Company or the Guarantors, any amount paid to either the Trustee, the Notes Collateral Agent or such Holder, the Note Guarantee, to the extent theretofore discharged, will be reinstated in full force and effect.

(d)    Each Guarantor agrees that it will not be entitled to any right of subrogation in relation to the Holders in respect of any Obligations guaranteed hereby until payment in full of all Obligations guaranteed hereby. Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders, the Notes Collateral Agent and the Trustee, on the other hand, (1) the maturity of the Obligations guaranteed hereby may be accelerated as provided in Article 6 hereof for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such Obligations as provided in Article 6 hereof, such Obligations (whether or not due and payable) will forthwith become due and payable by the Guarantors for the purpose of the Note Guarantee. The Guarantors will have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Note Guarantee.

Section 11.02 *Limitation on Guarantor Liability*.

Each Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Note Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of Insolvency Laws, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Note Guarantee. To effectuate the foregoing intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that the Obligations of such Guarantor will be limited to the maximum amount that will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws, and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the Obligations of such other Guarantor under this Article 11, result in the Obligations of such Guarantor under its Note Guarantee not constituting a fraudulent transfer or conveyance.

Section 11.03 *Execution and Delivery of Guarantee*.

Each Guarantor hereby agrees that its execution of this Indenture evidences its Note Guarantee pursuant to this Article 11.

If an Officer whose signature is on this Indenture no longer holds that office at the time the Trustee authenticates the Note, the Note Guarantee will be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, will constitute due delivery of the Note Guarantee set forth in this Indenture or any supplemental indenture on behalf of the Guarantors.

In the event that the Company or any of its Restricted Subsidiaries creates or acquires any Subsidiary after the Issue Date, if required by Section 4.13 hereof, the Company will cause such Subsidiary to comply with the provisions of Section 4.13 hereof and this Article 11, to the extent applicable.

Section 11.04  *Guarantors May Consolidate, etc., on Certain Terms*.

Except as otherwise provided in Section 11.05 hereof, no Guarantor may sell or otherwise dispose of all or substantially all of its assets to, or consolidate with or merge or amalgamate with or into (whether or not such Guarantor is the surviving or continuing Person) another Person, other than the Company or another Guarantor, unless:

(1)      immediately after giving effect to such transaction, no Default or Event of Default exists; and

(2)      either:

(a)      subject to Section 11.05 hereof, the Person acquiring the property in any such sale or disposition or the Person formed by or surviving or continuing from any such consolidation, merger or amalgamation either (i) continues to be a Guarantor or (ii) unconditionally assumes all the obligations of that Guarantor under its Note Guarantee, this Indenture and applicable Collateral Documents pursuant to a supplemental indenture and an amendment, supplement or other instrument in respect of such Collateral Documents, in each case, satisfactory to the Trustee; or

(b)      the Net Proceeds of such sale or other disposition are applied in accordance with the applicable provisions of this Indenture.

*provided*, that the transfer, sale or other disposition of all or substantially all of the assets of, directly or indirectly, the Guarantors as a whole will be governed by Article 5 and may be subject to Section 4.17.

In case of any such consolidation, merger, amalgamation, sale or conveyance and upon the assumption by the successor Person, by supplemental indenture, executed and delivered to the Trustee and satisfactory in form to the Trustee, of the Note Guarantee and the due and punctual performance of all of the covenants and conditions of this Indenture and the Collateral Documents to be performed by the Guarantor, such successor Person will succeed to and be substituted for the Guarantor with the same effect as if it had been named herein as a Guarantor. Such successor Person thereupon may cause to be signed any or all of the Note Guarantees to be endorsed upon all of the Notes issuable hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee. All the Note Guarantees so issued will in all respects have the same legal rank and benefit under this Indenture as the Note Guarantees theretofore and thereafter issued in accordance with the terms of this Indenture as though all of such Note Guarantees had been issued at the date of the execution hereof.

Except as set forth in Articles 4 and 5 hereof, and notwithstanding clauses (2)(a) and (b) of this Section 11.04, nothing contained in this Indenture or in any of the Notes will prevent any consolidation or merger of a Guarantor with or into the Company or another Guarantor, or will prevent any sale or conveyance of the property of a Guarantor as an entirety or substantially as an entirety to the Company or another Guarantor.

Section 11.05  *Releases*.

The Note Guarantee of a Guarantor will be released:

(1)      in connection with any sale or other disposition of all or substantially all of the assets of that Guarantor, by way of consolidation, merger, amalgamation or otherwise, to a Person that is not (either before or after giving effect to such transaction) the Company or a Restricted

Subsidiary of the Company, if the sale or other disposition does not violate Section 4.17 of this Indenture;

(2)    in connection with any sale or other disposition of Capital Stock of that Guarantor to a Person that is not (either before or after giving effect to such transaction) the Company or a Restricted Subsidiary of the Company, if the sale or other disposition does not violate Section 4.17 of this Indenture and the Guarantor ceases to be a Restricted Subsidiary of the Company as a result of the sale or other disposition;

(3)    if the Company designates such Restricted Subsidiary that is a Guarantor to be an Unrestricted Subsidiary in accordance with the applicable provisions of this Indenture; or

(4)    upon legal defeasance, covenant defeasance or satisfaction and discharge of this Indenture as provided in Article 8 and Article 10 of this Indenture.

Upon the release of any Note Guarantee, all obligations of such Guarantor under any Collateral Document and all Liens in connection therewith will be automatically released and discharged.

Any Guarantor not released from its Obligations under its Guarantee as provided in this Section 11.05 will remain liable for the full amount of principal of and interest and premium, if any, on the Notes and for the other Obligations of any Guarantor under this Indenture as provided in this Article 11.

## ARTICLE 12
## SECURITY

Section 12.01  *Grant of Security Interests; ABL Intercreditor Agreement*.

(a)    The Company:

(1)    shall grant a security interest in the Collateral as set forth in the Collateral Documents to the Notes Collateral Agent for the benefit of the Holders and the Trustee, to secure the due and punctual payment of the principal of, premium, if any, and interest on the Notes and amounts due hereunder and under the Note Guarantees when and as the same shall be due and payable, whether at the Stated Maturity thereof, on an Interest Payment Date, by acceleration, purchase, repurchase, redemption or otherwise, and interest on the overdue principal of, premium, if any, and interest (to the extent permitted by law), if any, on the Notes and the performance of all other Obligations of the Company and the Guarantors to the Holders, the Notes Collateral Agent and the Trustee under this Indenture, the Collateral Documents, the Note Guarantees and the Notes, subject to the terms of the Collateral Documents (including any Intercreditor Agreement) and any other Permitted Liens;

(2)    hereby covenant (A) to perform and observe their obligations under the Collateral Documents and (B) to take any and all commercially reasonable actions (including without limitation the covenants set forth in Section 4.20 through 4.23 hereof and in this Article 12) required to cause the Collateral Documents to create and maintain, as security for the Obligations contained in this Indenture, the Notes, the Collateral Documents and the Note Guarantees, valid and enforceable, perfected (except as expressly provided herein or therein) security interests in and on all the Collateral, in favor of the Notes Collateral Agent, superior to and prior to the rights of all third Persons, and subject to no other Liens (other than Permitted Liens), in each case, except as expressly permitted herein, therein or in any of the Collateral Documents (including any Intercreditor Agreement);

(3)        shall warrant and defend the title to the Collateral against the claims of all persons, subject to the Collateral Documents (including any Intercreditor Agreement) and any Permitted Liens; and

(4)        shall do or cause to be done, at their sole cost and expense, all such actions and things as may be necessary, or as may be required by the provisions of the Collateral Documents, to confirm to the Notes Collateral Agent the security interests in the Collateral contemplated hereby and by the Collateral Documents, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes and Note Guarantees secured hereby, according to the intent and purpose herein and therein expressed.

(b)        Each Holder, by its acceptance of a Note:

(1)        appoints the Notes Collateral Agent to act as its agent (and by its signature below, the Notes Collateral Agent accepts such appointment);

(2)        consents and agrees to the terms of this Indenture and each Collateral Document, as the same may be in effect or may be amended, restated, supplemented or otherwise modified from time to time in accordance with their respective terms, and authorizes and directs the Notes Collateral Agent to enter into the Collateral Documents and to perform its obligations and exercise its rights thereunder in accordance therewith; and

(3)        appoints and authorizes each of the Notes Collateral Agent and the Trustee (i) to enter into, deliver, perform and otherwise exercise its rights and obligations under any Intercreditor Agreement and (ii) in connection therewith, to enter into any amendments or modifications to the Collateral Documents that are necessary to evidence that any Lien on the Collateral will thereby and at that time become contractually subordinated to any Lien held by an ABL Administrative Agent pursuant to the terms of an ABL Intercreditor Agreement, *provided*, that, prior to entering into an ABL Intercreditor Agreement, the Company shall deliver to the Trustee an Officers' Certificate to the effect that the ABL Intercreditor Agreement is not materially inconsistent with the ABL ICA Provisions (as defined in the Offering Memorandum under the caption "Description of the Notes—Security—ABL Intercreditor Agreement") and does not conflict with the Indenture Documents in any material respect and an Opinion of Counsel that the execution, delivery and performance by Notes Collateral Agent of the ABL Intercreditor Agreement is permitted by this Indenture. Such Officers' Certificate shall designate such intercreditor agreement as the ABL Intercreditor Agreement. The Trustee and the Notes Collateral Agent, may, but shall not be obligated to, enter into any such ABL Intercreditor Agreement which adversely affects the rights, duties or immunities of the Trustee or the Notes Collateral Agent, as applicable, under this Indenture or otherwise, as determined in the sole discretion of the Trustee or the Notes Collateral Agent, as the case may be.

(c)        This Article 12 and the other Collateral Documents (other than any ABL Intercreditor Agreement) will be subject to the terms, limitations and conditions set forth in such ABL Intercreditor Agreement.

(d)        The Notes Collateral Agent will determine the circumstances and manner in which the Collateral will be disposed of, including, but not limited to, the determination of whether to release all or any portion of the Collateral from the Liens created by the Collateral Documents and whether to foreclose on the Collateral following an Event of Default.

Section 12.02  *Recording and Filings*.

(a)    The Company shall, and shall cause each of the Guarantors to, at their sole cost and expense, take or cause to be taken all commercially reasonable action required to perfect (except as expressly provided in the Collateral Documents), maintain (with the priority required under the Collateral Documents), preserve and protect the security interests in the Collateral granted by the Collateral Documents, including (i) the filing of financing statements, continuation statements, collateral assignments and any instruments of further assurance, in such manner and in such places as may be required by law to preserve and protect fully the rights of the Holders, the Notes Collateral Agent, and the Trustee under this Indenture and the Collateral Documents to all property comprising the Collateral pursuant to the terms of the Collateral Documents, and (ii) the delivery of the certificates, if any, evidencing the certificated securities pledged under the Collateral Documents, duly endorsed in blank or accompanied by undated stock powers or other instruments of transfer executed in blank. The Company shall from time to time promptly pay all financing and continuation statement recording and/or filing fees, charges and recording and similar taxes relating to this Indenture, the Collateral Documents and any amendments hereto or thereto and any other instruments of further assurance required pursuant thereto. Neither the Company nor any Guarantor will be permitted to take any action which action might or would have the result of materially impairing the security interest with respect to the Collateral for the benefit of the Notes Collateral Agent, the Trustee or the Holders except as expressly set forth herein, in the Collateral Documents (including any Intercreditor Agreement).

(b)    If property constituting Additional Notes Collateral is not automatically subject to a Lien or perfected security interest under the Collateral Documents, then the Company will, as soon as practicable, grant Liens on such property constituting Additional Notes Collateral in favor of the Notes Collateral Agent and take all necessary steps to perfect the security interest represented by such Liens.

(c)    Notwithstanding anything contained in this Indenture to the contrary, neither the Notes Collateral Agent nor the Trustee shall have any obligations to take any actions or to cause the Company or any of the Guarantors under this Indenture to take any actions of the Company or the Guarantors pursuant to this Section 12.02.

Section 12.03 *Release of Collateral*.

(a)    Subject to the terms of the Collateral Documents, the Company shall be entitled to release the Collateral from the Liens securing the Obligations under this Indenture and the Notes under any one or more of the following circumstances:

(1)    in accordance with this Indenture and the applicable Collateral Documents if (x) at any time either the Notes Collateral Agent or the First Lien Representative (if applicable) forecloses upon or otherwise exercises remedies against any Collateral resulting in the sale or disposition thereof or (y) a sale or other disposition of any Collateral is consummated which is permitted by the terms of this Indenture and the Collateral Documents (or is made pursuant to a valid waiver and consent to an otherwise prohibited transaction);

(2)    as described under Article 9;

(3)    upon payment in full of the principal of, together with accrued and unpaid interest on, the Notes and all other Obligations that are due and payable at or prior to the time such principal, together with accrued and unpaid interest, is paid; or

(4)    upon a legal defeasance or covenant defeasance or a satisfaction and discharge under Article 8 or 10, respectively.

(b)        Upon receipt of any necessary or proper instruments of termination, satisfaction or release prepared by the Company or the Guarantors, as the case may be, the Notes Collateral Agent shall execute, deliver or acknowledge such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Collateral Documents, including any Intercreditor Agreement.

(c)        The release of any Collateral from the terms of the Collateral Documents shall not be deemed to impair the security under this Indenture in contravention of the provisions hereof if and to the extent the Collateral is released pursuant to this Indenture and the Collateral Documents.

Section 12.04  *Form and Sufficiency of Release.*

In the event that the Company or any Guarantor has sold, exchanged, or otherwise disposed of or proposes to sell, exchange or otherwise dispose of any portion of the Collateral that may be sold, exchanged or otherwise disposed of by the Company or any Guarantor to any Person other than the Company or a Guarantor, and the Company or any Guarantor requests in writing that the Notes Collateral Agent furnish a written disclaimer, release or quit-claim of any interest in such property under this Indenture and the Collateral Documents, the Notes Collateral Agent shall execute, acknowledge and deliver to the Company or such Guarantor (in proper form prepared by the Company or such Guarantor) such an instrument promptly after satisfaction of the conditions set forth herein for delivery of any such release. Notwithstanding the preceding sentence, all purchasers and grantees of any property or rights purporting to be released herefrom shall be entitled to rely upon any release executed by the Notes Collateral Agent hereunder as sufficient for the purpose of this Indenture and as constituting a good and valid release of the property therein described from the Lien of this Indenture or of the Collateral Documents.

Section 12.05 *Actions to be Taken by the Notes Collateral Agent Under the Collateral Documents.*

Subject to the provisions of the applicable Collateral Documents and this Indenture, the Trustee and each Holder, by acceptance of any Notes agrees that (a) the Notes Collateral Agent shall execute and deliver the Collateral Documents, and all agreements, documents and instruments incidental thereto, and act in accordance with the terms thereof, (b) the Notes Collateral Agent may, in its sole discretion and without the consent of the Trustee or the Holders, take all actions it deems necessary or appropriate in order to (i) enforce any of the terms of the Collateral Documents and (ii) collect and receive any and all amounts payable in respect of the Obligations of the Company and the Guarantors hereunder and under the Notes, the Note Guarantees and the Collateral Documents and (c) the Notes Collateral Agent shall have power to institute and to maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any act that may be unlawful or in violation of the Collateral Documents or this Indenture, and suits and proceedings as the Notes Collateral Agent may deem expedient to preserve or protect its interests and the interests of the Trustee and the Holders in the Collateral (including the power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest thereunder or be prejudicial to the interests of the Notes Collateral Agent, the Holders or the Trustee). Notwithstanding the foregoing, the Notes Collateral Agent may, at the expense of the Company, request the direction of the Holders with respect to any such actions and upon receipt of the written consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes, shall take such actions; *provided*, that all actions so taken shall, at all times, be in conformity with the requirements of the Collateral Documents (including any Intercreditor Agreement).

Section 12.06 *Authorization of Receipt of Funds by the Notes Collateral Agent Under the Collateral Documents.*

The Notes Collateral Agent is authorized to receive any funds for the benefit of itself, the Trustee and the Holders distributed under the Collateral Documents and to the extent not prohibited under any Intercreditor Agreement, as applicable, for turnover to the Trustee to make further distributions of such funds to itself, the Trustee and the Holders in accordance with the provisions of Section 6.11 hereto and the other provisions of this Indenture.

# ARTICLE 13
# MISCELLANEOUS

Section 13.01  *Notices.*

Any notice or communication by the Company, any Guarantor, the Notes Collateral Agent or the Trustee to the others is duly given if in writing and delivered in Person or by first class mail (registered or certified, return receipt requested), electronic transmission or overnight air courier guaranteeing next day delivery, to the others' address:

If to the Company and/or any Guarantor:

Tacora Resources, Inc.
102 NE 3rd Street, Suite 120,
Grand Rapids, MN 55744,
Attention: Chief Executive Officer
Email: joe.broking@tacoraresources.com

If to the Trustee and Notes Collateral Agent:

Computershare Trust Company, N.A.
9062 Old Annapolis Road
Columbia, Maryland 21045
Attn: David Diaz

The Company, any Guarantor, the Notes Collateral Agent or the Trustee, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) will be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if transmitted by electronic means; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.

Any notice or communication to a Holder will be mailed by first class mail, certified or registered, return receipt requested, or by overnight air courier guaranteeing next day delivery to its address shown on the register kept by the Registrar. Failure to mail a notice or communication to a Holder or any defect in it will not affect its sufficiency with respect to other Holders.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Company mails a notice or communication to Holders, it will mail a copy to the Trustee and the Notes Collateral Agent at the same time.

Notwithstanding any other provision of this Indenture or any Note, where this Indenture or any Note provides for notice of any event (including any notice of redemption) to a Holder of a Global Note (whether by mail or otherwise), such notice shall be sufficiently given if given to the Depositary for such Note (or its designee), pursuant to the customary procedures of such Depositary.

The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Indenture or any document to be signed in connection with this Indenture (including, without limitation, the Notes or the Collateral Documents, any Guarantee, and any Officer's Certificate) shall be deemed to include electronic signatures, including without limitation, digital signature provided by Docusign (or such other digital signature provider as specified in writing to Trustee by the authorized representative), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature. The Company agrees to assume all risks arising out of the use of using digital signatures and electronic methods to submit communications to Trustee, including without limitation the risk of Trustee acting on unauthorized instructions, and the risk of interception and misuse by third parties.

Section 13.02  *Certificate and Opinion as to Conditions Precedent*.

Upon any request or application by the Company to the Trustee or the Notes Collateral Agent, as the case may be, to take any action under this Indenture or any Collateral Document, the Company shall furnish to the Trustee or the Notes Collateral Agent, as the case may be:

(1)    an Officers' Certificate in form and substance reasonably satisfactory to the Trustee or the Notes Collateral Agent, as the case may be (which must include the statements set forth in Section 13.03 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture or any Collateral Document relating to the proposed action have been satisfied; and

(2)    an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which must include the statements set forth in Section 13.03 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

Section 13.03  *Statements Required in Certificate or Opinion*.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture or any Collateral Document must include:

(1)    a statement that the Person making such certificate or opinion has read such covenant or condition;

(2)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)    a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(4)    a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

Section 13.04  *Rules by Trustee and Agents*.

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 13.05 *No Personal Liability of Directors, Officers, Employees and Stockholders*.

No director, officer, employee, incorporator or stockholder of the Company or any Guarantor, as such, will have any liability for any obligations of the Company or the Guarantors under the Notes, this Indenture, the Note Guarantees or the Collateral Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under the federal securities laws.

Section 13.06 *Governing Law*.

The internal law of the State of New York will govern and be used to construe this Indenture, the Notes and the Guarantees. Each Collateral Document will be governed by, and construed in accordance with, the laws of the State of New York or the laws of one or more Provinces of Canada.

Section 13.07 *Additional Information*.

Any Holder of the Notes or prospective investor may obtain a copy of the Offering Memorandum without charge by writing to Tacora Resources, Inc., 102 NE 3rd Street, Suite 120, Grand Rapids, MN 55744, Attention: Chief Executive Officer.

Section 13.08 *Payment Date Other than a Business Day*.

If any payment with respect to a payment of any principal of, premium, if any, or interest on any Note (including any payment to be made on any date fixed for redemption or purchase of any Note) is due on a day which is not a Business Day, then the payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on such date, and no interest will accrue for the intervening period.

Section 13.09 *Currency Indemnity*.

(a)     The Company, and each Guarantor, shall pay all sums payable under this Indenture, the Notes or such Note Guarantee, as applicable, solely in U.S. dollars. Any amount received or recovered in a currency other than U.S. dollars by any payee, in respect of any sum expressed to be due to it from the Company or any Guarantor, shall only constitute a discharge to the Company or any such Guarantor to the extent of the U.S. dollar amount which such payee is able to purchase with the amount received or recovered in that other currency on the date of the receipt or recovery or, if it is not practicable to make the purchase on that date, on the first date on which such payee is able to do so. If the U.S. dollar amount is less than the U.S. dollar amount expressed to be due to the Trustee under this Indenture or any Holder under this Indenture or any Note, the Company, and any Guarantor, shall indemnify such payee against any loss it sustains as a result. In any event, the Company and the Guarantors shall indemnify each payee, to the extent permitted under applicable law, against the cost of making any purchase of U.S. dollars. For the purposes of this Section 13.09, it shall be sufficient for a payee to certify in a satisfactory manner that it would have suffered a loss had an actual purchase of U.S. dollars been made with the amount received in that other currency on the date of receipt or recovery or, if it was not practicable to make the purchase on that date, on the first date on which it was able to do so. In addition, payees shall also be required to certify in a satisfactory manner the need for a change of the purchase date.

(b)      The indemnities described in Section 13.09(a):

(1)      constitute a separate and independent obligation from the other obligations of the Company and the Guarantors;

(2)      shall give rise to a separate and independent cause of action;

(3)      shall apply irrespective of any indulgence granted by any Holder or the Trustee; and

(4)      shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under this Indenture, any Note or any Note Guarantee.

Section 13.10 *Agent for Service; Submission to Jurisdiction; Waiver of Immunities*.

By the execution and delivery of this Indenture, the Company (i) acknowledges that it has irrevocably designated and appointed Corporation Service Company, 1180 Avenue of the Americas, Suite 210, New York, NY 10036-8401 as its authorized agent upon which process may be served in any suit or proceeding arising out of or relating to the Notes or this Indenture that may be instituted in any U.S. federal or New York State court located in The Borough of Manhattan, The City of New York, or brought by the Trustee (whether in their individual capacity or in their capacity as Trustee hereunder), (i) submits to the non-exclusive jurisdiction of any such court in any such suit or proceeding, and (ii) agrees that service of process upon Corporation Service Company and written notice of said service to the Company (mailed or delivered to the Company, at its principal office as specified in Section 13.01 hereof), shall be deemed in every respect effective service of process upon the Company in any such suit or proceeding. The Company further agrees to take any and all action, including the execution and filing of any and all such documents and instruments, as may be necessary to continue such designation and appointment of Corporation Service Company in full force and effect so long as this Indenture shall be in full force and effect.

To the extent that the Company has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, the Company hereby irrevocably waives such immunity in respect of its obligations under this Indenture and the Notes, to the extent permitted by law.

The Company irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any such action, suit or proceeding arising out of or relating to this Indenture or the Notes in any federal or state court in the State of New York, The Borough of Manhattan. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

Section 13.11 *No Adverse Interpretation of Other Agreements*.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or its Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 13.12 *Force Majeure*.

In no event shall the Trustee be responsible or liable for any failure or delay in the performance of their obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, governmental action, wire, communications or computer (software and hardware) services.

Section 13.13  *Successors.*

All agreements of the Company in this Indenture and the Notes will bind its successors. All agreements of the Trustee and the Notes Collateral Agent in this Indenture will bind its successors. All agreements of each Guarantor in this Indenture will bind its successors, except as otherwise provided in Section 11.05 hereof.

Section 13.14  *Severability*.

In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 13.15  *Waiver of Jury Trial*.

The Company, each Guarantor, each Holder by its acceptance of the Notes and the Trustee hereby irrevocably waive, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Indenture, the Notes, the Collateral Documents or the transactions contemplated hereby.

Section 13.16  *Counterpart Originals*.

The parties may sign any number of copies of this Indenture, including in electronic .pdf format. Each signed copy will be an original, but all of them together represent the same agreement.

Section 13.17  *Table of Contents, Headings, etc*.

The Table of Contents, Cross-Reference Table and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or provisions hereof.

Section 13.18  *Intercreditor Agreements*.

Reference is made to the Jarvis Hedge Facility Intercreditor Agreement, the ABL Intercreditor Agreement, any Pari Passu Intercreditor Agreement and any Senior Priority Intercreditor Agreement. Each Holder, by its acceptance of a Note, (a) agrees that it will be bound by and will take no actions contrary to the provisions of each Intercreditor Agreement and (b) authorizes and instructs the Trustee and the Notes Collateral Agent, as applicable, to enter into each Intercreditor Agreement as Trustee and as Notes Collateral Agent, as the case may be, and on behalf of such Holder, including without limitation, making the representations of the Holders contained therein. The foregoing provisions are intended as an inducement to the Jarvis Hedge Provider under the Jarvis Hedge Facility and the lenders under any ABL Facility to extend credit and such Jarvis Hedge provider or such lenders, as the case may be, are intended third party beneficiaries of such provisions and the provisions of the Jarvis Hedge Facility Intercreditor Agreement or the ABL Intercreditor Agreement, as applicable.

[Signatures on following pages]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**TACORA RESOURCES, INC.**

By: _____

Name:   Joe Broking

Title:   Chief Executive Officer

**COMPUTERSHARE TRUST COMPANY, N.A.,** as
Trustee and Notes Collateral Agent

By: _____

Name:
Title:     Amy Pratt

        Vice President

[Signature Page — Indenture]

EXHIBIT A

[Face of QIB / Regulation S Note]

*[Insert the Global Note Legend, if applicable pursuant to the provisions of this Indenture]*

*[Insert the Canadian Restricted Legend, if applicable pursuant to the provisions of this Indenture]*

*[Insert the Private Placement Legend, if applicable pursuant to the provisions of this Indenture]*

CUSIP/ISIN [87356L AC4 / US87356LAC46][1] / [C86668 AC1 / USC86668AC17][2]

9.00% Cash / 4.00% PIK Senior Secured Priority Notes due 2023

No. ___                                                                                               $_____

## TACORA RESOURCES, INC. (the "Company")

promises to pay to Cede & Co., or its registered assigns, the principal sum of _____DOLLARS ($[ ]), or such other amount as indicated on the Schedule of Exchanges of Interests in the Global Note attached hereto, on the Maturity Date (as defined below).

Interest Rate:  9.000% cash interest and 4.000% PIK Interest per annum.

Interest Payment Dates:  The first Business Day of the month following the month in respect of which interest is being paid, commencing on June 1, 2023.

Record Dates:  The fifteenth calendar day of the month immediately preceding each Interest Payment Date.

Maturity Date: The earlier of: (i) September 8, 2023 (the 120th calendar day following the Issue Date); (ii) the consummation by the Company of a Restructuring or Recapitalization Transaction (as defined in the Indenture); (iii) the occurrence of an Event of Default under the Notes or an "event of default" under, and as defined in, the Base Indenture, The First Supplemental Indenture or the Advance Payments Facility Agreement; (iv) the date that the Company is required to repay in full, as such date may be extended from time to time, its outstanding Indebtedness under the Advance Payments Facility Agreement; (v) the Company's termination or breach resulting from its failure to pay any amount required to be paid by it under any fee letter (or similar agreement) between any professional advisor to the Ad Hoc Group (as defined in the Indenture) and the Company; and (vi) an "event of default" under, and as defined in, any financing, royalty or lease agreement, that results from the Company's failure to make any payment in excess of $1.0 million after the later of (A) the stated due date thereof, as such date may be extended from time to time, and (B) the expiry of any applicable cure period.

Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which will for all purposes have the same effect as if set forth at this place.

Dated: May 11, 2023

---

[1] 144A

[2] Regulation S

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly signed below.

**TACORA RESOURCES, INC.**

By: _____

      Name:

      Title:

This is one of the Notes referred to
in the within-mentioned Indenture:

**COMPUTERSHARE TRUST COMPANY, N.A.**, as
Trustee

By: _____
              Authorized Signatory

[Back of Note]

9.00% Cash / 4.00% PIK Senior Secured Priority Notes due 2023

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

      (1)    *INTEREST*. Tacora Resources, Inc., a company continued under the laws of the Ontario, Canada (the "*Company*"), promises to pay interest on the principal amount of this Note at a rate of 13.000%, comprised of the Cash Interest Rate (as defined in the Indenture) and the PIK Interest Rate (as defined in the Indenture), which shall be payable monthly in arrears on the Interest Payment Dates set forth on the face of this Note to the Holders of record on the immediately preceding Record Date, as set forth on the face of this Note.  Interest on the Notes will accrue from the date of original issuance or, if interest has already been paid, from the date it was most recently paid (or, if no interest has been paid, from May 11, 2023).  Interest for each month or portion thereof will be computed daily on the basis of a 360-day year comprised of twelve 30-day months.

PIK Interest shall be payable (x) with respect to the Notes represented by one or more Global Notes registered in the name of, or held by, The Depository Trust Company or its nominee on the relevant Record Date, by increasing the principal amount of the outstanding Notes represented by such Global Notes by an amount equal to the amount of PIK Interest for the applicable interest period (rounded up to the nearest whole dollar) and (y) with respect to the Notes represented by certificated notes, by issuing PIK Notes (as defined in the Indenture).  Following an increase in the principal amount of the outstanding Notes represented by Global Notes as a result of a payment of PIK Interest, such Notes will bear interest on such increased principal amount from and after the date of such payment. Any PIK Notes will bear interest from and after the applicable Interest Payment Date on which they were issued.

The Company will pay interest in cash (including post-petition interest in any proceeding under any Insolvency Laws) on overdue principal, premium, if any, and interest (without regard to any applicable grace period) from time to time on demand at the rate equal to 2.0% per annum in excess of the Cash Interest Rate to the extent lawful. Interest not paid when due, and any interest on principal, premium or interest not paid when due, will be paid to Persons who are Holders on a special record date to be fixed by the Company, *provided*, that no such special record date may be less than 10 days prior to the related payment date. At least 15 days before the special record date, the Company (or, upon the written request of the Company, the Trustee in the name and at the expense of the Company) will mail or cause to be sent to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

All reference to "interest" in this Note and the Indenture mean the initial interest rate borne by the Notes and any increases in that rate due to defaulted interest (unless the Indenture states otherwise).

      (2)    *METHOD OF PAYMENT*. The Company will pay interest on the Notes to the Persons who are registered Holders of Notes at the close of business on the Record Date next preceding an Interest Payment Date, even if such Notes are canceled after such Record Date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest.

The Company will maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("Registrar") and an office or agency where Notes may be presented for payment ("Paying Agent").

The Company will pay or cause to be paid the principal of, premium, if any, and interest on, the Notes on the dates and in the manner provided in the Indenture and the Notes. Principal, premium, if any, and interest will be considered paid on the date due if the Paying Agent, if other than the Company or a Subsidiary thereof, holds as of 10:00 a.m. Eastern Time on the due date money deposited by the Company in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest then due.

Not later than 10:00 a.m. Eastern Time on the due date of any principal of, or interest on, any Notes, or any redemption or purchase price of the Notes, the Company will deposit with the Trustee (or Paying Agent) money in immediately available funds and designated for and sufficient to pay such amounts.

At any time that Notes are held as Definitive Notes, such Notes will be payable as to principal, premium, if any, and interest at the office or agency of the Company maintained for such purpose, or, at the option of the Company, payment of interest may be made by check mailed to the Holders at their addresses set forth in the register of Holders; *provided*, that such payment by check may only be paid so long as no Event of Default under the Indenture has occurred and is continuing.

All payments shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

(3)     *PAYING AGENT AND REGISTRAR*. Initially, Computershare Trust Company, N.A., the Trustee under the Indenture, will act as Paying Agent and Registrar. The Company may change any Paying Agent or Registrar without notice to any Holder. The Company or any of its Subsidiaries may act in any such capacity; *provided*, that no Event of Default is continuing.

(4)     *INDENTURE; COLLATERAL DOCUMENTS*. The Company issued the Notes under the Base Indenture dated as of May 11, 2023 (the "*Base Indenture*") and the Second Supplemental Indenture dated as of May 11, 2023 (the "*Second Supplemental Indenture*," together with the Base Indenture, the "*Indenture*"), each among the Company, the Guarantors, the Trustee and the Notes Collateral Agent. The terms of the Notes include those stated in the Indenture. The Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling. The Notes are secured by the Collateral under the Collateral Documents.

(5)     *RANKING*. This Note shall constitute a Senior Priority Obligation (as defined in the Indenture) of the Company and the Obligation of the Company under the Indenture and this Note shall be secured pursuant to the Collateral Documents and will be subject to the Senior Priority Intercreditor Agreement.

(6)     *OPTIONAL REDEMPTION*. The Notes are not subject to redemption at the option of the Company.

(7)     *MANDATORY REDEMPTION*. The Company is not required to make mandatory redemptions, mandatory sinking fund or other reserve payments with respect to the Notes.

(8)     *REPURCHASE AT THE OPTION OF HOLDER.*

(a)     If a Change of Control occurs, each Holder of Notes will have the right to require the Company to repurchase all or any part of that Holder's Note pursuant to a Change of Control Offer, as provided in Section 4.16 of the Indenture, at a purchase price in cash equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest thereon, if any, to but not including, the date of purchase. When the aggregate amount of Excess Proceeds of Asset Sales exceeds US$15.0 million, the Company shall be required to make an Asset Sale Offer to all Holders of Notes, as provided in Section 4.17 of the Indenture, with an offer price equal to 100% of the principal amount, plus accrued and unpaid interest, if any, to, but not including, the date of purchase, prepayment or redemption. In addition, if the Company and its Restricted Subsidiaries have Excess Cash Flow for any six-month period ending on June 30 or December 31 (*provided*, that the first period shall commence from the Issue Date and end on December 31, 2021), then the Company will be required to make an Excess Cash Flow Offer to all Holders of Notes, as provided in Section 4.19 of the Indenture, with an offer price equal to 100% of the principal amount thereof, plus accrued and unpaid interest, if any, to but not including, the date of repurchase.

(b)     Holders of Notes that are the subject of an offer to purchase will receive notice of a Change of Control Offer, an Asset Sale Offer or an Excess Cash Flow Offer, as applicable, from the Company prior to any related purchase date and may elect to have such Notes purchased by completing the form entitled "*Option of Holder to Elect Purchase*" attached to the Notes.

(9)     *[Reserved].*

(10)     *DENOMINATIONS, TRANSFER, EXCHANGE.* The Notes are in registered form without coupons in denominations of $2,000 and integral multiples of $1,000. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Company may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to issue, register the transfer of, or exchange, any Note or certain portions of a Note.

(11)     *PERSONS DEEMED OWNERS.* The registered Holder of a Note may be treated as its owner for all purposes. Only Holders have rights under the Indenture and this Note.

(12)     *AMENDMENT, SUPPLEMENT AND WAIVER.* Subject to certain exceptions, the Indenture, the Notes, the Collateral Documents and the Note Guarantees may be amended or supplemented with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes, voting as a single class, and any existing Default or Event or Default or compliance with any provision of the Indenture, the Notes, the Collateral Documents or the Note Guarantees may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes, voting as a single class. Without the consent of any Holder of a Note, the Indenture, the Collateral Documents, the Notes and the Note Guarantees may be amended or supplemented to cure any omission, ambiguity, mistake, defect or inconsistency and to effect certain other changes as set forth in the Indenture.

(13)     *DEFAULTS AND REMEDIES.* If any Event of Default, as defined in the Indenture, occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate

principal amount of the then outstanding Notes may declare all the Notes to be due and payable immediately. Notwithstanding the foregoing, in the case of an Event of Default arising from certain events of bankruptcy or insolvency, all outstanding Notes will become due and payable immediately without further action or notice and the Holders of at least 25% in aggregate principal amount of the then outstanding Notes may instruct the Notes Collateral Agent to enforce the Collateral, subject to the provisions of the Indenture and the Collateral Documents.

Holders may not enforce the Indenture or the Notes except as provided in the Indenture. Subject to certain limitations, Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on the Trustee, subject to the requirements set forth in the Indenture.

The Company shall deliver to the Trustee, within 120 days after the end of each fiscal year of the Company (provided, that, for the fiscal year ended December 31, 2022, such Officers' Certificate shall be delivered within 180 days after the fiscal year end), an Officers' Certificate regarding compliance with all conditions and covenants under the Indenture and Collateral Documents and, if the Company is not in compliance, the Company must specify any Defaults. So long as any of the Notes are outstanding, the Company will deliver to the Trustee, forthwith upon becoming aware of any Default or Event of Default, an Officers' Certificate specifying such Default or Event of Default. The Trustee may withhold from Holders the notice of any Default if, and so long as, the Trustee determines in good faith that withholding the notice is in the interests of the Holders of the Notes, except a Default or Event of Default relating to the payment of principal, premium, if any, and interest, if any.

The Holders of not less than a majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee, or the Notes Collateral Agent, as applicable, may, on behalf of the Holders of all of the Notes, rescind an acceleration or any instruction to enforce the Collateral, except where such rescission would conflict with any judgment or decree, or waive an existing Default or Event of Default and its consequences under the Indenture, except a continuing Default or Event of Default in the payment of interest or premium, if any, on, or the principal of, the Notes.

(14)    *TRUSTEE DEALINGS WITH COMPANY*. The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not a Trustee.

(15)    *NO RECOURSE AGAINST OTHERS*. No director, officer, employee, incorporator or stockholder of the Company or any Guarantor, as such, will have any liability for any obligations of the Company or the Guarantors under the Notes, the Indenture, the Note Guarantees, the Collateral Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under the federal securities laws.

(16)    *AUTHENTICATION*. This Note will not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

(17)    *ABBREVIATIONS*. Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the

entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(18)     *CUSIP NUMBERS*. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes, and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption, and reliance may be placed only on the other identification numbers placed thereon.

(19)     *GOVERNING LAW*. THE INTERNAL LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THE INDENTURE, THIS NOTE AND THE NOTE GUARANTEES.

The Company will furnish to any Holder upon written request and without charge a copy of the Indenture. Requests may be made to:

Tacora Resources, Inc.
102 NE 3rd Street, Suite 120,
Grand Rapids, MN 55744,
Attention: Chief Executive Officer

ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:

_____

(Insert assignee's legal name)

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Note on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your Signature: _____

(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*: _____

*      Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-10

**Option of Holder to Elect Purchase**

If you want to elect to have this Note purchased by the Company pursuant to Section 4.16, Section 4.17 or Section 4.19 of the Indenture, check the appropriate box below:

☐ Section 4.16          ☐ Section 4.17          ☐ Section 4.19

If you want to elect to have only part of the Note purchased by the Company pursuant to Section 4.16, Section 4.17 or Section 4.19 of the Indenture, state the amount you elect to have purchased:

$ _____

Date: _____

Your Signature: _____
(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*: _____

\*      Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-11

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE*

The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Custodian |
| --- | --- | --- | --- | --- |

EXHIBIT B

FORM OF CERTIFICATE OF TRANSFER

Tacora Resources, Inc.
102 NE 3rd Street, Suite 120,
Grand Rapids, MN 55744,
Attention: Chief Executive Officer
Attention: Joe Broking
Email: joe.broking@tacoraresources.com

Computershare Trust Company, N.A.
9062 Old Annapolis Road
Columbia, Maryland 21045
Attn: David Diaz

Re: 8.250% Senior Secured Notes due 2026

Reference is hereby made to the Indenture, dated as of May 11, 2021 (the "*Indenture*"), among Tacora Resources, Inc., as issuer (the "Company "), the Guarantors party thereto, Computershare Trust Company, N.A., as trustee, and as Notes Collateral Agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "*Transferor*") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $_____ in such Note[s] or interests (the "*Transfer*"), to _____ (the "*Transferee*"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

1.      ☐ **Check if Transferee will take delivery of a beneficial interest in the QIB Global Note or a Restricted Definitive Note pursuant to Rule 144A**. The Transfer is being effected pursuant to an in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended (the "*Securities Act*"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Personal and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A, and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transfer [will be subject to the restrictions on Transfer] enumerated in the Private Placement Legend printed on the QIB Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act and the applicable securities laws of other jurisdictions.

2.      ☐ **Check if Transferee will take delivery of a beneficial interest in the Regulation S Global Note or a Restricted Definitive Note pursuant to Regulation S**. The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a Person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf

knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the Restricted Period, the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person. Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on Transfer enumerated in the Private Placement Legend printed on the Regulation S Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act and the applicable securities laws of other jurisdictions.

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

_____

[Insert Name of Transferor]

By: _____

Name:

Title:

Dated: _____

ANNEX A TO CERTIFICATE OF TRANSFER

1.    The Transferor owns and proposes to transfer the following:

[CHECK ONE OF (a) OR (b)]

(a)    ☐ a beneficial interest in the:

    (i)    ☐ QIB Global Note (CUSIP _____), or

    (ii)    ☐ Regulation S Global Note (CUSIP _____).

2.    After the Transfer the Transferee will hold:

[CHECK ONE]

(a)    ☐ a beneficial interest in the:

    (i)    ☐ QIB Global Note (CUSIP _____), or

    (ii)    ☐ Regulation S Global Note (CUSIP _____).

in accordance with the terms of the Indenture.

EXHIBIT C

FORM OF CERTIFICATE OF EXCHANGE

102 NE 3rd Street, Suite 120,
Grand Rapids, MN 55744,
Attention: Chief Executve Officer
Attention: Joe Broking
Email: joe.broking@tacoraresources.com

Computershare Trust Company, N.A.
9062 Old Annapolis Road
Columbia, Maryland 21045
Attn: David Diaz

Re: 8.250% Senior Secured Notes due 2026

(CUSIP _____)

Reference is hereby made to the Indenture, dated as of May 11, 2021 (the "*Indenture*"), among Tacora Resources, Inc., as issuer (the "Company"), the Guarantors party thereto, Computershare Trust Company, N.A., as trustee and as Notes Collateral Agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "*Owner*") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $_____ in such Note[s] or interests (the "*Exchange*"). In connection with the Exchange, the Owner hereby certifies that:

1.    **Exchange of Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes for Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes**

(a)    ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to Restricted Definitive Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act and the applicable securities laws of other jurisdictions.

(b)    ☐ **Check if Exchange is from Restricted Definitive Note to beneficial interest in a Restricted Global Note**. In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE] ☐ QIB Global Note, ☐ Regulation S Global Note with an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act and the applicable securities laws of other jurisdictions.

C-1

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

_____

[Insert Name of Transferor]

By: _____

Name:

Title:

Dated: _____

FORM OF SUPPLEMENTAL INDENTURE
TO BE DELIVERED BY SUBSEQUENT GUARANTORS

SUPPLEMENTAL INDENTURE (this *"Supplemental Indenture'"),* dated as of _____, 20[●], among _____ (the "*Guaranteeing Subsidiary*"), a subsidiary of _____ (or its permitted successor), a _____ corporation (the "*Company*"), the Company, the other Guarantors(as defined in the Indenture referred to herein), Computershare Trust Company, N.A., as trustee (the "*Trustee*"), and as Notes Collateral Agent (the "*Notes Collateral Agent*").

W I T N E S S E T H

WHEREAS, the Company has heretofore executed and delivered to the Trustee an indenture (the "*Indenture*"), dated as of May 22, 2018 providing for the issuance of 8.250% Senior Secured Notes due 2021 (the "*Notes*");

WHEREAS, the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which the Guaranteeing Subsidiary shall unconditionally guarantee all of the Company's Obligations under the Notes and the Indenture on the terms and conditions set forth herein (the " *Guarantee*");

WHEREAS, the Company has furnished the Trustee with (i) an Opinion of Counsel stating that the execution of this Supplemental Indenture is authorized or permitted by the Indenture; (ii) an Officers' Certificate stating that all conditions precedent under the Indenture for the execution of this Supplemental Indenture have been satisfied; and (iii) an Officers' Certificate certifying the resolutions of the Board of Directors of the Company authorizing this Supplemental Indenture; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

1.      CAPITALIZED TERMS. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2.      AGREEMENT TO GUARANTEE. The Guaranteeing Subsidiary hereby agrees to provide an unconditional Guarantee on the terms and subject to the conditions set forth in the Guarantee and in the Indenture including but not limited to Article 11 thereof, and subject to the limitations therein.

3.      NO RECOURSE AGAINST OTHERS. No director, officer, employee, incorporator or stockholder of the Company or any Guarantor, as such, will have any liability for any obligations of the Company or the Guarantors under the Notes, the Indenture or the Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under the federal securities laws.

4.      NEW YORK LAW TO GOVERN. THE INTERNAL LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THIS SUPPLEMENTAL INDENTURE AND THE GUARANTEE.

5.     COUNTERPARTS. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

6.     EFFECT OF HEADINGS. The Section headings herein are for convenience only and shall not affect the construction hereof.

7.     THE TRUSTEE. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Guaranteeing Subsidiary and the Company.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, all as of the date first above written.

Dated: _____, 20__

[GUARANTEEING SUBSIDIARY]

By:     _____
        Name:
        Title:

**TACORA RESOURCES, INC.**

By:     _____
        Name:
        Title:

**COMPUTERSHARE TRUST COMPANY, N.A.**
as Trustee and Notes Collateral Agent


By: _____
     Name:
     Title:

EXHIBIT E

[FORM OF]
ABL INTERCREDITOR AGREEMENT

[See attached]

[FORM OF]

ABL INTERCREDITOR AGREEMENT

dated as of [ ],

among

TACORA RESOURCES INC.,

the other GRANTORS party hereto,

COMPUTERSHARE TRUST COMPANY, N.A.,
in its capacity as
the Notes Collateral Agent, as the Initial Notes Priority Agent for the
Indenture Secured Parties,

and

[                    ],

as the ABL Agent,

## ABL INTERCREDITOR AGREEMENT

THIS ABL INTERCREDITOR AGREEMENT (as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time pursuant to the terms hereof, this "**Agreement**") is entered into as of [_____] between (a) [_____] ("**[_____]**"), in its capacities as administrative agent and collateral agent (together with its successors and assigns in such capacities, the "**ABL Agent**") for (i) the financial institutions, lenders and investors party from time to time to the ABL Credit Agreement referred to below (such financial institutions, lenders and investors together with their respective successors, assigns and transferees, including any letter of credit issuers under the ABL Credit Agreement, the "**ABL Lenders**"), (ii) any ABL Cash Management Affiliates (as defined below) and (iii) any ABL Hedging Affiliates (as defined below) (such ABL Cash Management Affiliates and ABL Hedging Affiliates, together with the ABL Agent and the ABL Lenders and any other secured parties under any ABL Credit Agreement, the "**ABL Secured Parties**"), (b) **Computershare Trust Company, N.A.** ("**Computershare**"), in its capacity as collateral agent under the Indenture and the Notes Collateral Documents (each as defined below) (together with its successors and assigns in such capacities, the "**Initial Notes Priority Agent**") for (i) the Holders (as defined in the Indenture described below) (the "**Holders**") and (ii) the Trustee, the Initial Notes Priority Agent (collectively, together with the Holders [and the holders of any Jarvis Secured Hedge Obligations (defined below), if any], the "**Initial Notes Priority Claimholders**") and (c) each Additional Notes Priority Agent that from time to time becomes a party hereto pursuant to Section 7.4.

## RECITALS

A.    Pursuant to that certain ABL Credit Agreement, dated as of [_____], by and among **TACORA RESOURCES INC.,** a corporation incorporated under the laws of the Province of Ontario, Canada (the "**Borrower**"), [[_____], a [_____] corporation ("**Holdings**"),] the ABL Lenders and the ABL Agent (as such agreement may be amended, supplemented, restated or otherwise modified from time to time, the "**ABL Credit Agreement**"), the ABL Lenders have agreed to make certain loans and other financial accommodations to or for the benefit of the Borrower.

B.    Pursuant to certain guaranties each dated as of [_____] (as the same may be amended, supplemented, restated and/or otherwise modified, collectively, the "**ABL Guaranty**") by each of the ABL Guarantors (as hereinafter defined) in favor of the ABL Secured Parties, the ABL Guarantors have agreed to guarantee, inter alia, the payment and performance of the Borrower's obligations under the ABL Documents (as hereinafter defined).

C.    To secure the obligations of the Borrower and the ABL Guarantors (the Borrower, the ABL Guarantors and each other direct or indirect subsidiary or parent of the Borrower or any of their affiliates that is now or hereafter becomes a party to any ABL Document, collectively, the "**ABL Credit Parties**") under and in connection with the ABL Documents, the ABL Credit Parties have granted to the ABL Agent (for the benefit of the ABL Secured Parties) Liens on the Collateral.

D.    The Borrower, as issuer (in such capacity, "**Issuer**"), the Notes Guarantors (as defined below), as guarantors, Computershare, as trustee (not in its individual capacity, but solely in such trustee capacity (the "**Trustee**"), and the Initial Notes Priority Agent have entered into that certain Indenture dated as of May 11, 2021 (the "**Indenture**") pursuant to which Issuer's [__]% senior secured notes due 2026 (the "**Notes**") were issued

E.    Pursuant to the Indenture each of the Notes Guarantors (as hereinafter defined) have agreed to guarantee, inter alia, the payment and performance of the Issuer's obligations under the Notes Priority Documents (as hereinafter defined).

F.       To secure the obligations of the Issuer and the Notes Guarantors (the Issuer, the Notes Guarantors and each other direct or indirect subsidiary or parent of the Issuer or any of its affiliates that is now or hereafter becomes a party to any Notes Priority Document, collectively, the "**Notes Parties**") under and in connection with the Notes Priority Documents, the Notes Parties have granted to the Initial Notes Priority Agent (for the benefit of the Notes Priority Claimholders) Liens on the Collateral.

G.       Each of the ABL Agent (on behalf of the ABL Secured Parties) and the Notes Priority Agents (on behalf of the Notes Priority Claimholders) and, by their acknowledgement hereof, the ABL Credit Parties and the Notes Parties, desire to agree to the relative priority of Liens on the Collateral and certain other rights, priorities and interests as provided herein.

**NOW THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1       Definitions**. The following terms which are defined in the Uniform Commercial Code, PPSA or STA (notwithstanding that such terms may be defined in lowercase in the Uniform Commercial Code, PPSA or STA, as applicable), as applicable, are used herein as so defined: Account, Chattel Paper, Commercial Tort Claim, Deposit Account, Document, Document of Title, Electronic Chattel Paper, Financial Asset, Fixtures, General Intangible, Intangible, Instrument, Inventory, Investment Property, Letter-of-Credit Right, Money, Payment Intangible, Promissory Note, Records, Securities Account, Security Certificates, Security Entitlements, Commodity Accounts, Commodity Contracts, Futures Accounts, Futures Contracts, Supporting Obligation and Tangible Chattel Paper.

**Section 1.2       Other Definitions**. Subject to Section 1.1 hereof, as used in this Agreement, the following terms shall have the meanings set forth below:

"**ABL Affected Collateral**" shall have the meaning set forth in Section 3.6(a) hereof.

"**ABL Agent**" shall have the meaning assigned to that term in the introduction to this Agreement and shall include any successor thereto as well as any Person designated as the "Agent", "Administrative Agent", "Collateral Agent", "Trustee" or "Collateral Trustee" or similar term under any ABL Credit Agreement.

"**ABL Cash Management Affiliate**" shall mean any ABL Cash Management Bank that is owed ABL Cash Management Obligations by an ABL Credit Party and which ABL Cash Management Obligations are secured by Liens granted under one or more ABL Collateral Documents, together with their respective successors, assigns and transferees.

"**ABL Cash Management Bank**" shall mean, as of any date of determination, any Person that is an ABL Lender or an Affiliate of an ABL Lender on such date, whether or not such Person subsequently ceases to be an ABL Lender or an Affiliate of an ABL Lender.

"**ABL Cash Management Obligations**" shall mean obligations owed by the Borrower or any Restricted Subsidiary to any ABL Cash Management Bank in respect of or in connection with any Cash Management Services and designated under the ABL Credit Agreement by the ABL Cash Management Bank and the Borrower in writing to the ABL Agent as "Cash Management Obligations".

"**ABL Collateral Documents**" shall mean all "Collateral Documents" or similar term as defined in any ABL Credit Agreement, and all other security agreements, mortgages, deeds of trust and other collateral documents executed and delivered in connection with any ABL Credit Agreement, in each case as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**ABL Credit Agreement**" shall have the meaning assigned to such term in the recitals to this Agreement and shall include any one or more other agreements, indentures or facilities extending the maturity of, consolidating, restructuring, refunding, replacing or refinancing all or any portion of the ABL Obligations, whether by the same or any other agent, trustee, lender, group of lenders, creditor or group of creditors and whether or not increasing the amount of any Indebtedness that may be incurred or issued thereunder.

"**ABL Credit Parties**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**ABL Deposit and Securities Accounts**" means all Deposit Accounts, Securities Accounts, collection accounts and lockbox accounts (and all related lockboxes) of the Credit Parties (other than the Notes Priority Accounts).

"**ABL Documents**" shall mean any ABL Credit Agreement, any ABL Guaranty, any ABL Collateral Document, all Cash Management Services between the Borrower or any Restricted Subsidiary and any ABL Cash Management Affiliate, any ABL Hedging Agreement between any ABL Credit Party or any Restricted Subsidiary and any ABL Hedging Affiliate, any other ancillary agreement as to which any ABL Secured Party is a party or a beneficiary and all other agreements, instruments, documents and certificates, now or hereafter executed by or on behalf of any ABL Credit Party or any of its respective Subsidiaries or Affiliates, and delivered to the ABL Agent or any other ABL Secured Party, in connection with any of the foregoing or any ABL Credit Agreement, in each case as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**ABL Guarantors**" shall mean the collective reference to (i) [Holdings] and each wholly owned [Material Subsidiary] (as defined in the ABL Credit Agreement) of the Borrower other than any Excluded Subsidiary (as defined in the ABL Credit Agreement), and (ii) any other Person who becomes a guarantor under any ABL Guaranty. The term "ABL Guarantors" shall include all "Guarantors" under and as defined in the ABL Credit Agreement.

"**ABL Guaranty**" shall have the meaning assigned to that term in the recitals to this Agreement and shall also include any other guaranty made by an ABL Guarantor guaranteeing, inter alia, the payment and performance of any ABL Obligations.

"**ABL Hedge Bank**" shall have the meaning assigned to the term "Hedge Bank" in the ABL Credit Agreement.

"**ABL Hedging Affiliate**" shall mean any ABL Hedge Bank that has entered into an ABL Hedging Agreement with an ABL Credit Party or Restricted Subsidiary, as applicable, with the obligations of such ABL Credit Party or Restricted Subsidiary, as applicable, thereunder being secured by one or more ABL Collateral Documents, together with their respective successors, assigns and transferees.

"**ABL Hedging Agreement**" means any "Secured Hedge Agreement" as defined in the ABL Credit Agreement.

"**ABL Lenders**" shall have the meaning assigned to that term in the introduction to this Agreement, as well as any Person designated as a "Lender" or similar term under any ABL Credit Agreement.

"**ABL Obligations**" shall mean any and all obligations of every nature of each ABL Credit Party from time to time owed to the ABL Secured Parties, or any of them, under, in connection with, or evidenced or secured by any ABL Document, including, without limitation, all "Obligations" or similar term as defined in any ABL Credit Agreement and whether for principal, interest (including interest which, but for the commencement of an Insolvency Proceeding with respect to such ABL Credit Party, would have accrued on any ABL Obligation, whether or not a claim is allowed against such ABL Credit Party for such interest in the related Insolvency Proceeding), reimbursement of amounts drawn under letters of credit, payments for early termination of Swap Contracts, fees, expenses, indemnification or otherwise, and all other amounts owing or due under the terms of any ABL Document.

"**ABL Priority Collateral**" shall mean all Collateral consisting of the following (including for the avoidance of doubt, any such assets that, but for the application of Section 552 of the Bankruptcy Code (or any similar provision or concept under any other Bankruptcy or Insolvency Laws), would be ABL Priority Collateral):

(1)     all Accounts, other than Accounts which constitute identifiable proceeds of Notes Priority Collateral;

(2)     cash, Money and cash equivalents;

(3)     all (x) Deposit Accounts (other than Notes Priority Accounts) and Money and all cash, checks, other negotiable instruments, funds and other evidences of payments properly held therein, including intercompany indebtedness between or among the Credit Parties or their Affiliates, to the extent owing in respect of ABL Priority Collateral, (y) Securities Accounts (other than Notes Priority Accounts), Security Entitlements and Securities credited to such a Securities Account (other than Equity Interests) and (z) Commodity Accounts and Commodity Contracts credited thereto, Futures Accounts (other than Notes Priority Accounts) and Futures Contracts credited thereto, and, in each case, all cash, Money, cash equivalents, checks and other property properly held therein or credited thereto (other than Equity Interests); provided, however, that to the extent that identifiable proceeds of Notes Priority Collateral are deposited in any such Deposit Accounts or Securities Accounts, such identifiable proceeds shall be treated as Notes Priority Collateral;

(4)     all Inventory;

(5)     to the extent relating to, evidencing or governing any of the items referred to in the preceding clauses (1) through (4) constituting ABL Priority Collateral, all Documents, all Documents of Title, General Intangibles (including all rights under contracts), Intangibles (including all rights under contracts), Instruments (including Promissory Notes), Chattel Paper (including Tangible Chattel Paper and Electronic Chattel Paper), Intellectual Property and Commercial Tort Claims; provided that to the extent any of the foregoing also relates to Notes Priority Collateral, only that portion related to the items referred to in the preceding clauses (1) through (4) shall be included in the ABL Priority Collateral;

(6)     to the extent relating to any of the items referred to in the preceding clauses (1) through (5) constituting ABL Priority Collateral, all Supporting Obligations and Letter-of-Credit Rights; provided that to the extent any of the foregoing also relates to Notes Priority Collateral

4

only that portion related to the items referred to in the preceding clauses (1) through (5) shall be included in the ABL Priority Collateral;

(7)    all books and Records relating to the items referred to in the preceding clauses (1) through (6) constituting ABL Priority Collateral (including all books, databases, customer lists, engineer drawings, and Records, whether tangible or electronic, which contain any information relating to any of the items referred to in the preceding clauses (1) through (6) constituting ABL Priority Collateral); and

(8)    all collateral security and guarantees, products or Proceeds of or with respect to any of the foregoing items referred to in the preceding clauses (1) through (7) constituting ABL Priority Collateral and all cash, Money, cash equivalents, insurance proceeds, Instruments, Securities, Securities Accounts, Security Certificates, Security Entitlements, Futures Accounts and Financial Assets received as Proceeds of any of the foregoing items referred to in the preceding clauses (1) through (7) and this clause (8) constituting ABL Priority Collateral ("**ABL Priority Proceeds**").

"**ABL Recovery**" shall have the meaning set forth in Section 5.3(a) hereof.

"**ABL Secured Parties**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Additional Notes Priority Documents**" shall mean each Additional Notes Priority Obligations Agreement and each document or instrument entered into pursuant to any Additional Notes Priority Obligations Agreement, any other ancillary agreement as to which any Additional Notes Priority Claimholder is a party or a beneficiary and all other agreements, instruments, documents and certificates, now or hereafter executed by or on behalf of any Notes Party or any of its respective Subsidiaries or Affiliates, and delivered to the Additional Notes Priority Agent or any other Additional Notes Priority Claimholder with respect to such Additional Notes Priority Obligations, in connection with any of the foregoing, in each case as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Additional Notes Priority Obligations**" means Indebtedness of the Issuer or the Notes Guarantors issued following the date of this Agreement to the extent (a) such Indebtedness is permitted by the terms of the ABL Documents, the Notes Priority Documents and each then extant Additional Notes Priority Obligations Agreement to be secured by Liens on the Collateral ranking pari passu with the Liens securing the Notes, (b) the Notes Guarantors have granted Liens, consistent with clause (a), on the Collateral to secure the obligations in respect of such Indebtedness, (c) such Indebtedness constitutes "Additional Pari Passu Lien Obligations" as defined in the Indenture and (d) the Additional Notes Priority Agent executes a joinder agreement to this Agreement agreeing to be bound thereby on behalf of the holders under such Additional Notes Priority Obligations Agreement and acknowledging that such holders shall be bound by the terms hereof applicable to Additional Notes Priority Claimholders.

"**Additional Notes Priority Agent**" means the Person appointed to act as trustee, agent or representative for the Additional Notes Priority Claimholders with respect to any Additional Notes Priority Obligations pursuant to any Additional Notes Priority Obligations Agreement.

"**Additional Notes Priority Claimholders**" means, with respect to any series, issue or class of Additional Notes Priority Obligations, the holders of such obligations, the Additional Notes Priority Agent with respect thereto and the beneficiaries of any indemnification obligations undertaken by the Issuer or any Guarantor under any related Additional Notes Priority Obligations Agreement.

"**Additional Notes Priority Obligations Agreement**" means the indenture, credit agreement or other agreement under which any Additional Notes Priority Obligations are incurred.

"**Affiliate**" shall mean, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"**Agent(s)**" means individually the ABL Agent or any Notes Priority Agent and collectively means the ABL Agent and the Notes Priority Agents.

"**Agreement**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as now or hereafter in effect or any successor thereto.

"**Bankruptcy or Insolvency Law**" means the Bankruptcy Code, the *Bankruptcy and Insolvency Act* (Canada), the *Companies' Creditors Arrangement Act* (Canada), the *Winding-Up and Restructuring Act* (Canada) and any Canadian corporate statute where such statute is used to propose an arrangement involving the compromise of claims of creditors, each as amended from time to time, and any similar federal, provincial, state or foreign law for the relief of debtors or affecting the rights of creditors generally.

"**Borrower**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Business Day**" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed (or are in fact closed).

"**Capitalized Leases**" means all leases that have been or are required to be, in accordance with GAAP, as in effect on the date hereof, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP, as in effect on the date hereof.

"**Cash Management Services**" means any agreement or arrangement to provide cash management services, including treasury, depository, overdraft, credit card processing, credit or debit card, purchase card, electronic funds transfer and other cash management arrangements.

"**Collateral**" shall mean all Property now owned or hereafter acquired by the Borrower, the Issuer or any Guarantor in or upon which a Lien is granted or purported to be granted to any ABL Agent or any Notes Priority Agent under any of the ABL Collateral Documents, the Notes Collateral Documents or the Additional Notes Priority Documents, together with all rents, issues, profits, products and Proceeds thereof.

"**Computershare**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Control**" shall have the meaning specified in the definition of "Affiliate".

"**Control Collateral**" shall mean any Collateral consisting of any Certificated Security (as defined in (a) Section 8-102 of the Uniform Commercial Code or (b) the PPSA or STA, as applicable), Investment Property, Deposit Account, Securities Accounts, Securities Entitlements, Commodity Accounts, Futures Accounts, Commodity Contracts, Futures Contracts, Letter of Credit Rights, Electronic Chattel Paper, Instruments and any other Collateral as to which a Lien may be perfected through possession or control by the secured party, or any agent therefor.

"**Copyright Licenses**" shall mean any written agreement, now or hereafter in effect, naming any Credit Party as licensor and granting any right to any third party under any Copyright now or hereafter owned by such Credit Party or that such Credit Party otherwise has the right to license, or naming any Credit Party as licensee and granting any right to such Credit Party under any Copyright now or hereafter owned by any third party, and all rights of such Credit Party under any such agreement.

"**Copyrights**" shall mean all of the following now owned or hereafter acquired by or assigned to any Credit Party: (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, whether registered or unregistered and whether published or unpublished, (b) all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office, including those listed on the applicable schedule to the Perfection Certificate (as defined in the Notes Security Agreement) and all: (i) rights and privileges arising under applicable law with respect to such Credit Party's use of such copyrights, (ii) reissues, renewals and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

"**Credit Documents**" shall mean the ABL Documents and the Notes Priority Documents.

"**Credit Parties**" shall mean the ABL Credit Parties and the Notes Parties.

"**Designated Notes Priority Agent**" means (i) if at any time there is only one series of Notes Priority Obligations, the Notes Priority Agent for such series of Notes Priority Obligations, and (ii) at any time when clause (i) does not apply, the Notes Priority Agent designated at such time as the "Designated Notes Priority Agent" under this Agreement pursuant to the Notes Priority Intercreditor Agreement. The Designated Notes Priority Agent as of the date hereof is the Initial Notes Priority Agent.

"**DIP Financing**" shall have the meaning set forth in Section 6.1(a) hereof.

"**Discharge of ABL Obligations**" shall mean the time at which all the ABL Obligations (other than (i) contingent indemnification and reimbursement obligations as to which no claim has been asserted by the Person entitled thereto, (ii) Obligations (as defined in the ABL Credit Agreement) under Secured Hedge Agreements (as defined in the ABL Credit Agreement) and (iii) Cash Management Obligations (as defined in the ABL Credit Agreement)) have been paid in full in cash, all Letters of Credit (as defined in the ABL Credit Agreement) have expired or been terminated (other than Letters of Credit for which other arrangements reasonably satisfactory to the ABL Agent and each applicable Issuer (as defined in the ABL Credit Agreement) have been made) and all Commitments (as defined in the ABL Credit Agreement) have been terminated.

"**Discharge of Notes Priority Obligations**" shall mean the time at which all the Notes Priority Obligations (other than contingent indemnification and reimbursement obligations as to which no claim has been

has been asserted by the Person entitled thereto) have been paid, performed or discharged in full (with all such Notes Priority Obligations consisting of monetary or payment obligations having been paid in full in cash) and the Designated Notes Priority Agent has received cash collateral in order to secure any other contingent Notes Priority Obligations for which a claim or demand for payment has been made on or prior to such time or in respect of matters or circumstances known to such Designated Notes Priority Agent or other Notes Priority Claimholders at such time that are reasonably expected to result in any loss, cost, damage, or expense (including attorneys' fees and legal expenses), such cash collateral to be in such amount as the Designated Priority Agent reasonably determines is appropriate to secure such contingent Notes Priority Obligations.

"**Domain Names**" shall mean all Internet domain names and associated URL addresses in or to which any Credit Party now or hereafter has any right, title or interest.

"**Enforcement Notice**" shall mean a written notice delivered by either the ABL Agent or the Designated Notes Priority Agent to the other announcing that an Enforcement Period has commenced.

"**Enforcement Period**" shall mean the period of time following the receipt by either the ABL Agent or the Designated Notes Priority Agent of an Enforcement Notice from the other and continuing until the earliest of (a) in the case of an Enforcement Period commenced by the Designated Notes Priority Agent, the Discharge of Notes Priority Obligations, (b) in the case of an Enforcement Period commenced by the ABL Agent, the Discharge of ABL Obligations, or (c) the ABL Agent or the Designated Notes Priority Agent (as applicable) terminates, or agrees in writing to terminate, the Enforcement Period.

"**Equipment**" shall mean (x) any "equipment" as such term is defined in Article 9 of the Uniform Commercial Code, or in the applicable PPSA or other similar law, and in any event, shall include, but shall not be limited to, all machinery, equipment, furnishings, appliances, furniture, fixtures, tools, and vehicles now or hereafter owned by any Credit Party in each case, regardless of whether characterized as equipment under the Uniform Commercial Code, PPSA, or other similar law (but excluding any such items which constitute Inventory), and (y) any and all additions, substitutions and replacements of any of the foregoing and all accessions thereto, wherever located, whether or not at any time of determination incorporated or installed therein or attached thereto, and all replacements therefore, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"**Equity Interest**" shall mean, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"**Event of Default**" shall mean an "Event of Default" or similar term under and as defined in any ABL Credit Agreement or any Notes Priority Documents, as applicable.

"**Exercise of Any Secured Creditor Remedies**" or "**Exercise of Secured Creditor Remedies**" shall mean, except as otherwise provided in the final sentence of this definition:

(a)    the taking by any Secured Party of any action to enforce or realize upon any Lien, including the institution of any foreclosure proceedings or the noticing of any public or private sale pursuant to Article 9 of the Uniform Commercial Code or equivalent provision or concept under the PPSA or other applicable law;

(b)      the exercise by any Secured Party of any right or remedy provided to a secured creditor on account of a Lien under any of the Credit Documents, under applicable law, in an Insolvency Proceeding (including seeking to commence such an Insolvency Proceeding) or otherwise, including the election to retain any of the Collateral in satisfaction of a Lien;

(c)      the taking of any action by any Secured Party or the exercise of any right or remedy by any Secured Party in respect of the collection on, set off against, marshaling of, injunction respecting or foreclosure on the Collateral or the Proceeds thereof;

(d)      the appointment on the application of a Secured Party, of a receiver, receiver and manager or interim receiver of all or part of the Collateral;

(e)      the sale, lease, license or other disposition of all or any portion of the Collateral by private or public sale conducted by any Secured Party or any other means at the direction of any Secured Party permissible under applicable law;

(f)      the exercise of any other right of a secured creditor under Part 6 of Article 9 of the Uniform Commercial Code, any equivalent provision of the applicable PPSA or under provisions of similar effect under other applicable law; and

(g)      the exercise by any Secured Party of any voting rights relating to any Equity Interest included in the Collateral.

For the avoidance of doubt, none of the following shall be deemed to constitute an Exercise of Any Secured Creditor Remedies or an Exercise of Secured Creditor Remedies: (i) the filing of a proof of claim in any Insolvency Proceeding or the seeking of adequate protection, where applicable, (ii) the exercise of rights by the ABL Agent upon the occurrence of a Cash Dominion Period (as defined in any ABL Credit Agreement), including, without limitation, the notification of account debtors, depository institutions or any other Person to deliver proceeds of ABL Priority Collateral to the ABL Agent, (iii) the consent by the ABL Agent to a store closing sale, going out of business sale or other disposition by any Credit Party of any of the ABL Priority Collateral, (iv) the reduction of advance rates or sub-limits by the ABL Agent and the ABL Lenders, (v) the change in eligibility criteria for components of the borrowing base under the ABL Credit Agreement by the ABL Agent and the ABL Lenders or (vi) the imposition of Reserves (as defined in the ABL Credit Agreement) by the ABL Agent.

"**GAAP**" shall have the meaning assigned to that term in the ABL Credit Agreement.

"**Governmental Authority**" shall mean the government of the United States, Canada or any other nation, or of any political subdivision thereof, whether provincial, territorial, state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantor**" shall mean any of the ABL Guarantors or Notes Guarantors.

["**Holdings**" shall have the meaning assigned to that term in the introduction to this Agreement.]

"**Indebtedness**" shall have the meaning provided in the ABL Credit Agreement and the Indenture as in effect on the date hereof.

"**Indenture**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**Indenture Documents**" means, collectively, the Indenture, the Notes (including any Additional Notes) issued pursuant hereto, the Note Guarantees and the Notes Collateral Documents, as amended, supplemented, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified, in whole or in part, from time to time.

"**Initial Notes Priority Agent**" shall have the meaning assigned to that term in the introduction to this Agreement and shall include any successor thereto as well as any Person designated as the "Notes Collateral Agent", "Collateral Agent", "Trustee", "Collateral Trustee" or similar term under any Initial Notes Priority Document.

"**Initial Notes Priority Claimholders**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Initial Notes Priority Documents**" shall mean the Indenture, the Notes, the Notes Collateral Documents, [the Jarvis Hedge Facility Intercreditor Agreement, the Jarvis Hedge Agreements, if any], any other ancillary agreement as to which any Initial Notes Priority Claimholder is a party or a beneficiary and all other agreements, instruments, documents and certificates, now or hereafter executed by or on behalf of any Notes Party or any of its respective Subsidiaries or Affiliates, and delivered to the Initial Notes Priority Agent or any other Initial Notes Priority Claimholder, in connection with any of the foregoing, in each case as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Initial Notes Obligations**" shall mean all obligations and all amounts owing, due, or secured under the Initial Notes Priority Documents, whether now existing or arising hereafter, including, without limitation, all "Obligations" or similar term as defined in the Indenture and whether for principal, interest (including interest which, but for the commencement of an Insolvency Proceeding with respect to such Notes Party, would have accrued on any Initial Notes Obligation, whether or not a claim is allowed against such Notes Party for such interest in the related Insolvency Proceeding), fees, expenses, indemnification or otherwise, and all other amounts owing or due under the terms of any Initial Notes Priority Document, as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time.

"**Insolvency Proceeding**" shall mean:

(a)    any dissolution, winding up, total or partial liquidation, adjustment or readjustment of debt, reorganization, recapitalization, judicial reorganization, extrajudicial reorganization, compromise, arrangement with creditors, plan of arrangement, proposal or similar proceedings under any Bankruptcy or Insolvency Laws of or with respect to any Credit Party or their respective property or liabilities, in each case under any Bankruptcy or Insolvency Law;

(b)    any dissolution, winding up, total or partial liquidation, adjustment or readjustment of debt, reorganization, recapitalization, compromise, arrangement with creditors, plan of arrangement or similar proceedings under the arrangement provisions of any applicable corporate law (in any case which involves the alteration, amendment, conversion, compromise, satisfaction or discharge of debts owing to any or all creditors) of or with respect to any Credit Party or their respective property or liabilities;

(c)    any bankruptcy, insolvency, receivership, petition or assignment in bankruptcy, assignment for the benefit of creditors or any similar case or proceeding is commenced under any Bankruptcy or Insolvency Laws or otherwise of or with respect to any Credit Party;

(d)     any marshalling of assets or liabilities of any Credit Party under any Bankruptcy or Insolvency Laws;

(e)     any bulk sale of assets by any Credit Party including any sale of all or substantially all of the assets of any Credit Party, in each case, to the extent not permitted by the terms of this Agreement or any Credit Documents;

(f)     any proceeding seeking the appointment of any trustee, monitor, receiver, receiver and manager, liquidator, custodian or other insolvency official with similar powers with respect to all or substantially all of the assets of any Credit Party, or with respect to any of their respective assets, to the extent not permitted under any Credit Documents;

(g)     any proceedings in relation to any of the foregoing or otherwise involving the compromise of claims of creditors or in which substantially all claims of creditors of a Credit Party are determined and any payment or distribution is or may be made on account of such claims, whether any of the foregoing is voluntary or involuntary, partial or complete, and includes any such proceedings initiated or consented to by such Credit Party, as applicable; or

(h)     any other event which, under the laws of any applicable jurisdiction, has an effect equivalent to any of the events referred to in clauses (a) through (g) above.

"**Intellectual Property**" shall mean all intellectual and similar property of every kind and nature now owned, licensed or hereafter acquired by any Credit Party that is subject to a security interest under any ABL Documents and any Notes Priority Documents, including inventions, designs, Patents, Copyrights, Licenses, Trademarks, Domain Names, trade secrets, confidential or proprietary technical and business information, know how, show how or other data or information, software, databases, all other proprietary information and all embodiments or fixations thereof and related documentation and registrations and all additions, improvements and accessions to, and books and records describing or used in connection with, any of the foregoing.

["**Jarvis Hedge Agreements**" means the definitive agreements governing the Jarvis Hedge Facility.]

["**Jarvis Hedge Facility**" means those certain credit arrangements entered into as of May 11, 2021 in the form of a commodity derivatives facility to support existing commodity derivatives contracts of the Company (as assigned by SAF Jarvis 1 LP to the Jarvis Hedge Provider) which are scheduled to mature from time to time on or before December 31, 2021, and potential new commodity derivatives contracts.]

["**Jarvis Hedge Facility Intercreditor Agreement**" means that certain intercreditor agreement, dated as of May 11, 2021, among [Wells Fargo Bank, National Association], as the Notes Collateral Agent (on behalf of itself, the Trustee, and the Holders of the Notes) and the Jarvis Hedge Provider with respect to the Jarvis Shared Collateral.]

["**Jarvis Hedge Provider**" means SAF Jarvis 2 LP and any of its successors and assigns.]

["**Jarvis Secured Hedge Obligations**" means any Obligations incurred under the Jarvis Hedge Facility that are secured by a Lien on a pari passu basis with the Liens securing the Obligations under the Indenture Documents.]

["**Jarvis Shared Collateral**" means, at any time, Collateral in which the Notes Collateral Agent (on behalf of the holders of the Notes) and the Jarvis Hedge Provider hold a valid and perfected security interest at such time.]

"**Lenders**" means, collectively, all of the ABL Lenders, the Holders [and the Jarvis Hedge Provider, if any].

"**License**" shall mean any Patent License, Trademark License, Copyright License, or other license or sublicense agreement granting rights under Intellectual Property to which any Credit Party is a party.

"**Lien**" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); provided that in no event shall an operating lease in and of itself be deemed a Lien.

"**Lien Priority**" shall mean with respect to any Lien of the ABL Secured Parties or the Notes Priority Claimholders in the Collateral, the order of priority of such Lien as specified in Section 2.1 hereof.

"**Notes**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**Notes Cash Proceeds Notice**" shall mean a written notice delivered by the Designated Notes Priority Agent to the ABL Agent (a) stating that an Event of Default has occurred and is continuing under any Notes Priority Document and specifying the relevant Event of Default and (b) stating that certain cash proceeds which may be deposited in an ABL Deposit and Securities Account constitute Notes Priority Collateral, and reasonably identifying the amount of such proceeds and specifying the origin thereof.

"**Notes Collateral Documents**" shall mean all "Notes Collateral Documents" or similar term as defined in the Indenture, and all other security agreements, mortgages, deeds of trust and other collateral documents executed and delivered by one or more Notes Parties pursuant to which a Lien is granted securing any Initial Notes Obligations or under which rights or remedies with respect to such Liens are governed, in each case as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Notes Guarantors**" shall mean the collective reference to [Holdings,] the Issuer and each Subsidiary of the Issuer who becomes a guarantor under the Indenture. The term "Notes Guarantors" shall include all "Guarantors" under and as defined in the Indenture.

"**Notes Parties**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**Notes Priority Accounts**" means[, subject to the Jarvis Hedge Facility Intercreditor Agreement] any Deposit Accounts or Securities Accounts, in each case that are intended to contain Notes Priority Collateral or identifiable proceeds of Notes Priority Collateral (it being understood that any property in such Deposit Accounts or Securities Accounts which is not Notes Priority Collateral or identifiable proceeds of Notes Priority Collateral shall not be Notes Priority Collateral solely by virtue of being on deposit in any such Deposit Account or Securities Account).

"**Notes Priority Agent**" means (i) in the case of any Initial Notes Obligations and the Notes Priority Claimholders, the Initial Notes Priority Agent and (ii) in the case of any Additional Notes Priority Obligations and Additional Notes Priority Parties thereunder, the Additional Notes Priority Agent with respect to such Additional Notes Priority Obligations.

"**Notes Priority Documents**" means the Initial Notes Priority Documents and the Additional Notes Priority Documents.

"**Notes Priority Collateral**" shall mean all Collateral consisting of the following (including for the avoidance of doubt, any such assets that, but for the application of Section 552 of the Bankruptcy Code (or any similar provision or concept under any other Bankruptcy or Insolvency Laws) would be Notes Priority Collateral):

> (1)     all Equipment, Fixtures, Real Property, intercompany indebtedness between or among the Credit Parties or their Affiliates, except to the extent constituting ABL Priority Collateral, and Investment Property (other than any Investment Property described in clauses 3(y) and 8 of the definition of ABL Priority Collateral);

> (2)     except to the extent constituting ABL Priority Collateral, all Instruments, Intellectual Property, Commercial Tort Claims, Documents, Documents of Title, General Intangibles and Intangibles;

> (3)     Notes Priority Accounts; provided, however, that to the extent that identifiable proceeds of ABL Priority Collateral are deposited in any such Notes Priority Accounts, such identifiable proceeds shall be treated as ABL Priority Collateral;

> (4)     all other Collateral, other than the ABL Priority Collateral (including ABL Priority Proceeds); and

> (5)     all collateral security and guarantees, products or Proceeds of or with respect to any of the foregoing items referred to in the preceding clauses (1) though (4) constituting Notes Priority Collateral and all cash, Money, cash equivalents, insurance proceeds, Instruments, Securities, Securities Accounts, Security Certificates, Security Entitlements, Futures Accounts and Financial Assets received as Proceeds of any of the foregoing items referred to in the preceding clauses (1) through (4) and this clause (5) constituting Notes Priority Collateral, other than the ABL Priority Collateral ("**Notes Priority Proceeds**").

"**Notes Priority Claimholders**" means the Initial Notes Priority Claimholders and the Additional Notes Priority Claimholders.

"**Notes Priority Intercreditor Agreement**" means any intercreditor agreement among the Initial Notes Priority Agent and one or more Additional Notes Priority Agents for holders of Indebtedness permitted by the terms of the ABL Documents, the Notes Priority Documents and each then extant Additional Notes Priority Obligations Agreement to be secured by Liens on the Collateral ranking pari passu with the Liens securing the Notes or ranking junior with the Liens securing the Notes, in the form attached as an exhibit to the Indenture or in such other form satisfactory to the Initial Notes Priority Agent and Issuer.

"**Notes Priority Obligations**" means the Initial Notes Obligations and the Additional Notes Priority Obligations.

"**Notes Recovery**" shall have the meaning set forth in Section 5.3(b) hereof.

"**Notes Security Agreement**" shall mean that certain Notes Security Agreement, dated as of May 11, 2021, among the Issuer, the Initial Notes Priority Agent and the Notes Guarantors from time to time party thereto.

"**Other Liabilities**" means ABL Cash Management Obligations and Obligations (as defined in the ABL Credit Agreement) in respect of any ABL Hedging Agreement.

"**Party**" shall mean the ABL Agent or any Notes Priority Agent, and "**Parties**" shall mean both the ABL Agent and the Notes Priority Agents.

"**Patent License**" means any written agreement, now or hereafter in effect, naming any Credit Party as licensor and granting to any third party any right to develop, commercialize, import, make, have made, offer for sale, use or sell any invention on which a Patent, now or hereafter owned by such Credit Party, or that such Credit Party otherwise has the right to license, is in existence, or naming any Credit Party as licensee and granting to such Credit Party any such right with respect to any invention on which a Patent, now or hereafter owned by any third party, is in existence, and all rights of such Credit Party under any such agreement.

"**Patents**" shall mean all of the following now owned or hereafter acquired by any Credit Party: (a) all letters patent of the United States or the equivalent thereof in any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or the equivalent thereof in any other country, including registrations, recordings and pending applications in the United States Patent and Trademark Office or any similar offices in any other country, including those listed on the applicable schedule to the Perfection Certificate (as defined in the Notes Security Agreement), and (b) all (i) rights and privileges arising under applicable law with respect to such Credit Party's use of any patents, (ii) inventions and improvements described and claimed therein, (iii) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof and amendments thereto, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable respect to any of the foregoing, including damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

"**Permitted Junior Secured Refinancing Debt**" shall mean any (i) "Permitted Junior Secured Refinancing Debt", or other like term of similar import, as defined in the ABL Credit Agreement and (ii) "Permitted Refinancing Indebtedness" as defined in the Indenture in respect of the Notes, which is permitted under the Indenture to be incurred and be secured by a Lien on the Collateral on a junior priority basis to the Liens securing the Notes Priority Obligations and the Liens securing the ABL Obligations.

"**Permitted Pari Passu Secured Refinancing Debt**" shall mean any (i) "Permitted Pari Passu Secured Refinancing Debt", or other like term of similar import, as defined in the ABL Credit Agreement and (ii) "Permitted Refinancing Indebtedness" as defined in the Indenture in respect of the Notes, which is permitted under the Indenture to be incurred and be secured by a Lien on the Collateral on a pari passu basis to the Liens securing the Notes Priority Obligations.

"**Permitted Refinancing**" shall mean any (i) "Permitted Refinancing", or other like term of similar import as defined in the ABL Credit Agreement or (ii) "Permitted Refinancing Indebtedness" as defined in any Notes Priority Documents, as applicable.

"**Person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**PPSA**" means the Personal Property Security Act in effect from time to time in the Province of British Columbia; provided that, at any time, if perfection or the effect of perfection or non-perfection or the priority of the Notes Collateral Agent's security interest in any item or portion of the Collateral is governed by the Personal Property Security Act as in effect in a Canadian jurisdiction other than the Province of British Columbia, including the Civil Code of Quebec, the term "PPSA" shall mean the Personal Property Security Act or the Civil Code of Quebec (as applicable) as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or the effect of perfection or non-perfection or priority and for purposes of definitions relating to such provisions.

"**Priority Collateral**" shall mean the ABL Priority Collateral or the Notes Priority Collateral, as applicable.

"**Proceeds**" shall mean (a) all "proceeds," as defined in Article 9 of the Uniform Commercial Code or equivalent provision of any applicable PPSA or other law, with respect to the Collateral, and (b) whatever is recoverable or recovered when any Collateral is sold, exchanged, collected, or disposed of, whether voluntarily or involuntarily.

"**Property**" shall mean any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"**Purchase Date**" shall have the meaning set forth in Section 3.8(a) hereof.

"**Purchase Notice**" shall have the meaning set forth in Section 3.8(a) hereof.

"**Purchase Option Event**" shall have the meaning set forth in Section 3.8(a) hereof.

"**Purchasing Creditors**" shall have the meaning set forth in Section 3.8(a) hereof.

"**Real Property**" shall mean any right, title or interest in and to real property, including any fee interest, leasehold interest, easement, or license and any other right to use or occupy real property.

"**Replacement Agent**" shall have the meaning set forth in Section 3.8(d) hereof.

"**Restricted Subsidiary**" means any "Restricted Subsidiary" under and as defined in the Indenture or in any ABL Credit Agreement.

"**Secured Parties**" shall mean the ABL Secured Parties and the Notes Priority Claimholders.

"**STA**" means the Securities Transfer Act in effect from time to time in the Province of British Columbia; provided that, at any time, if the rules governing the transfer, holding or control of securities or other financial assets or interests therein which are Collateral is governed by the Securities Transfer Act as in effect in a Canadian jurisdiction other than the Province of British Columbia, including the Civil Code of Quebec, the term "STA" shall mean the Securities Transfer Act or the Civil Code of Quebec (as applicable) as in effect, at such time, in such other jurisdiction for purposes of the transfer, holding and control of such Collateral or interests therein and for purposes of definitions relating to such provisions.

"**Subsidiary**" means any "Subsidiary" under and as defined in the Indenture or in any ABL Credit Agreement.

"**Swap Contract**" has the meaning set forth in the ABL Credit Agreement.

"**Trademark License**" shall mean any written agreement, now or hereafter in effect, granting to any third party any right to use any Trademark now or hereafter owned by any Credit Party or that any Credit Party otherwise has the right to license to a third party, or granting to any Credit Party any right to use any Trademark now or hereafter owned by any third party, and all rights of any Credit Party under any such agreement (not including vendor or distribution agreements that allow incidental use of intellectual property rights in connection with the sale or distribution of such products or services).

"**Trademarks**" shall mean all of the following now owned or hereafter acquired by any Credit Party: (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, other source or business identifiers, designs and general intangibles of like nature, the goodwill of the business symbolized thereby or associated therewith, all registrations and recordings thereof, and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, and all extensions or renewals thereof, including those listed on the applicable schedule to the Perfection Certificate (as defined in the Notes Security Agreement) (b) any and all rights and privileges arising under applicable law with respect to such Credit Party's use of any trademarks, (c) all extensions and renewals thereof and amendments thereto, (d) all income, fees, royalties, damages and payments now and hereafter due and/or payable with respect to any of the foregoing, including damages, claims and payments for past, present or future infringements thereof, (e) all rights corresponding thereto throughout the world and (f) all rights to sue for past, present and future infringements or dilution thereof or other injuries thereto.

"**Uniform Commercial Code**" or "**UCC**" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; provided that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non perfection or the priority of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non perfection or priority or availability of such remedy, as the case may be.

"**Use Period**" means the period commencing on the date that the ABL Agent or an agent acting on its behalf (or an ABL Credit Party acting with the consent of the ABL Agent) commences the liquidation and sale of the ABL Priority Collateral in a manner as provided in Section 3.6 hereof (having theretofore furnished the Designated Notes Priority Agent with an Enforcement Notice) and ending 180 days thereafter. If any stay or other order that prohibits any of the ABL Agent, the other ABL Secured Parties or any ABL Credit Party (with the consent of the ABL Agent) from commencing and continuing to Exercise Any Secured Creditor Remedies or from liquidating and selling the ABL Priority Collateral has been entered by a court of competent jurisdiction, such 180-day period shall be tolled during the pendency of any such stay or other order and the Use Period shall be so extended.

Section 1.3 **Rules of Construction**. Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting and shall be deemed to be followed by the phrase "without limitation," and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Article, section, subsection, clause, schedule and exhibit references herein are to this Agreement unless otherwise

specified. Any reference in this Agreement to any agreement, instrument, or document shall include all alterations, amendments, changes, restatements, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, restatements, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). Any reference herein to any Person shall be construed to include such Person's successors and assigns. Except as otherwise provided herein, any reference herein to the repayment in full of an obligation shall mean the payment in full in cash of such obligation, or in such other manner as may be approved in writing by the requisite holders or representatives in respect of such obligation.

## ARTICLE 2
## LIEN PRIORITY

**Section 2.1      Priority of Liens**.

(a)      Subject to the order of application of proceeds set forth in sub-clauses (b) and (c) of Section 4.1 hereof, notwithstanding (i) the date, time, method, manner, or order of grant, attachment or perfection (including any defect or deficiency or alleged defect or deficiency in any of the foregoing) of any Liens granted to the ABL Secured Parties in respect of all or any portion of the Collateral or of any Liens granted to the Notes Priority Claimholders in respect of all or any portion of the Collateral and regardless of how any such Lien was acquired (whether by grant, statute, operation of law, subrogation or otherwise), (ii) the order or time of filing or recordation of any document or instrument for perfecting the Liens in favor of the ABL Agent or any Notes Priority Agent (or ABL Secured Parties or Notes Priority Claimholders) in any Collateral, (iii) any provision of the Uniform Commercial Code, the applicable PPSA, any Bankruptcy or Insolvency Law or any other applicable law, or of the ABL Documents or the Notes Priority Documents, (iv) whether the ABL Agent or any Notes Priority Agent, in each case, either directly or through agents, holds possession of, or has control over, all or any part of the Collateral, (v) the date on which the ABL Obligations or the Notes Priority Obligations are advanced or made available to the Credit Parties, (vi) the fact that any such Liens in favor of the ABL Agent or the ABL Lenders or any Notes Priority Agent or Notes Priority Claimholders securing any of the ABL Obligations or Notes Priority Obligations, respectively, are (x) subordinated to any Lien securing any obligation of any Credit Party other than the Notes Priority Obligations or the ABL Obligations, respectively, or (y) otherwise subordinated, voided, avoided, invalidated or lapsed, or (vii) any other circumstance of any kind or nature whatsoever, the ABL Agent, on behalf of itself and the ABL Secured Parties, and each Notes Priority Agent, on behalf of itself and the applicable Notes Priority Claimholders, hereby agree that:

(1)      any Lien in respect of all or any portion of the ABL Priority Collateral now or hereafter held by or on behalf of any Notes Priority Agent or any Notes Priority Claimholder that secures all or any portion of the Notes Priority Obligations shall in all respects be junior and subordinate to all Liens granted to the ABL Agent and the ABL Secured Parties in such ABL Priority Collateral to secure all or any portion of the ABL Obligations;

(2)      any Lien in respect of all or any portion of the ABL Priority Collateral now or hereafter held by or on behalf of the ABL Agent or any ABL Secured Party that secures all or any portion of the ABL Obligations shall in all respects be senior and prior to all Liens granted to any Notes Priority Agent or any Notes Priority Claimholder in such ABL Priority Collateral to secure all or any portion of the Notes Priority Obligations;

(3)      any Lien in respect of all or any portion of the Notes Priority Collateral now or hereafter held by or on behalf of the ABL Agent or any ABL Secured Party that secures all or any portion of the ABL Obligations shall in all respects be junior and subordinate to all Liens granted

to any Notes Priority Agent and the Notes Priority Claimholders in such Notes Priority Collateral to secure all or any portion of the Notes Priority Obligations; and

(4)     any Lien in respect of all or any portion of the Notes Priority Collateral now or hereafter held by or on behalf of any Notes Priority Agent or any Notes Priority Claimholder that secures all or any portion of the Notes Priority Obligations shall in all respects be senior and prior to all Liens granted to the ABL Agent or any ABL Secured Party in such Notes Priority Collateral to secure all or any portion of the ABL Obligations.

(b)     Notwithstanding any failure by any ABL Secured Party or Notes Priority Claimholder to perfect its security interests in the Collateral or any avoidance, invalidation, priming or subordination by any third party or court of competent jurisdiction of the security interests in the Collateral granted to the ABL Secured Parties or the Notes Priority Claimholders, the priority and rights as between the ABL Secured Parties and the Notes Priority Claimholders with respect to the Collateral shall be as set forth herein.

(c)     Each Notes Priority Agent, for and on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents, acknowledges and agrees that, concurrently herewith, the ABL Agent, for the benefit of itself and the ABL Secured Parties, has been, or may be, granted Liens upon all of the Collateral in which a Notes Priority Agent has been granted Liens and the Notes Priority Agents hereby consent thereto. The ABL Agent, for and on behalf of itself and the ABL Secured Parties, acknowledges and agrees that, concurrently herewith, the Notes Priority Agents, for the benefit of itself and the applicable Notes Priority Claimholders, have been, or may be, granted Liens upon all of the Collateral in which the ABL Agent has been granted Liens and the ABL Agent hereby consents thereto. The subordination of Liens by each Notes Priority Agent and the ABL Agent in favor of one another as set forth herein shall not be deemed to subordinate any Notes Priority Agent's Liens or the ABL Agent's Liens to the Liens of any other Person, nor shall such subordination be affected by the subordination of such Liens to any Lien of any other Person.

**Section 2.2     Waiver of Right to Contest Liens.**

(a)     Each Notes Priority Agent, for and on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents, agrees that it and they shall not (and hereby waives any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the validity, priority, enforceability, or perfection of the Liens of the ABL Agent and the ABL Secured Parties in respect of the Collateral or the provisions of this Agreement. Each Notes Priority Agent, for itself and on behalf of the applicable Notes Priority Claimholders under its Notes Priority Documents, agrees that none of the Notes Priority Agents or the Notes Priority Claimholders will take any action that would interfere with any Exercise of Secured Creditor Remedies undertaken by the ABL Agent or any ABL Secured Party under the ABL Documents with respect to the ABL Priority Collateral. The Notes Priority Agent, for itself and on behalf of the Notes Priority Claimholders under its Notes Priority Documents, hereby waives any and all rights it or such Notes Priority Claimholders may have as a junior lien creditor or otherwise to contest, protest, object to, or interfere with the manner in which the ABL Agent or any ABL Lender seeks to enforce its Liens in any ABL Priority Collateral. The foregoing shall not be construed to prohibit any Notes Priority Agent from enforcing the provisions of this Agreement.

(b)     The ABL Agent, for and on behalf of itself and the ABL Secured Parties, agrees that it and they shall not (and hereby waives any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the validity, priority, enforceability, or perfection of

the Liens of any Notes Priority Agent or the Notes Priority Claimholders in respect of the Collateral or the provisions of this Agreement. Except to the extent expressly set forth in Section 3.6 of this Agreement, the ABL Agent, for itself and on behalf of the ABL Secured Parties, agrees that none of the ABL Agent or the ABL Secured Parties will take any action that would interfere with any Exercise of Secured Creditor Remedies undertaken by any Notes Priority Agent or any Notes Priority Claimholder under the Notes Priority Documents with respect to the Notes Priority Collateral. The ABL Agent, for itself and on behalf of the ABL Secured Parties, hereby waives any and all rights it or the ABL Secured Parties may have as a junior lien creditor or otherwise to contest, protest, object to, or interfere with the manner in which any Notes Priority Agent or any Notes Priority Claimholder seeks to enforce its Liens in any Notes Priority Collateral. The foregoing shall not be construed to prohibit the ABL Agent from enforcing the provisions of this Agreement.

**Section 2.3    Remedies Standstill.**

(a)    Each Notes Priority Agent, on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents, agrees that, from the date hereof until the date upon which the Discharge of ABL Obligations shall have occurred, neither any Notes Priority Agent nor any Notes Priority Claimholder will Exercise Any Secured Creditor Remedies with respect to any of the ABL Priority Collateral without the written consent of the ABL Agent, and will not take, receive or accept any Proceeds of ABL Priority Collateral, it being understood and agreed that the temporary deposit of Proceeds of ABL Priority Collateral in a Deposit Account controlled by a Notes Priority Agent shall not constitute a breach of this Agreement so long as such Proceeds are promptly (but in no event later than five Business Days after receipt) remitted to the ABL Agent. From and after the date upon which the Discharge of ABL Obligations shall have occurred (or prior thereto upon obtaining the written consent of the ABL Agent), any Notes Priority Agent or any Notes Priority Claimholder may Exercise Any Secured Creditor Remedies under the Notes Priority Documents or applicable law as to any ABL Priority Collateral; provided, however, that any Exercise of Secured Creditor Remedies with respect to any Collateral by the Notes Priority Agents or the Notes Priority Claimholders is at all times subject to the provisions of this Agreement.

(b)    The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that, from the date hereof until the date upon which the Discharge of Notes Priority Obligations shall have occurred, neither the ABL Agent nor any ABL Secured Party will Exercise Any Secured Creditor Remedies with respect to the Notes Priority Collateral without the written consent of the Designated Notes Priority Agent, and will not take, receive or accept any Proceeds of the Notes Priority Collateral, it being understood and agreed that the temporary deposit of Proceeds of Notes Priority Collateral in a Deposit Account controlled by the ABL Agent shall not constitute a breach of this Agreement so long as such Proceeds are promptly (but in no event later than five Business Days after receipt) remitted to the Designated Notes Priority Agent. From and after the date upon which the Discharge of Notes Priority Obligations shall have occurred (or prior thereto upon obtaining the written consent of the Designated Notes Priority Agent), the ABL Agent or any ABL Secured Party may Exercise Any Secured Creditor Remedies under the ABL Documents or applicable law as to any Notes Priority Collateral; provided, however, that any Exercise of Secured Creditor Remedies with respect to any Collateral by the ABL Agent or the ABL Secured Parties is at all times subject to the provisions of this Agreement.

(c)    Notwithstanding the provisions of Sections 2.3(a), 2.3(b) or any other provision of this Agreement, nothing contained herein shall be construed to prevent any Agent or any Secured Party from (i) filing a claim or statement of interest with respect to the ABL Obligations or Notes Priority Obligations owed to it in any Insolvency Proceeding commenced by or against any Credit Party, (ii) taking any action (not adverse to the priority status of the Liens of the other Agent or other Secured Parties on the Collateral in which such other Agent or other Secured Party has a priority Lien or the rights

19

of the other Agent or any of the other Secured Parties to Exercise Any Secured Creditor Remedies in respect thereof) in order to create, perfect, preserve or protect (but not enforce its Lien) on any Collateral, (iii) filing any necessary or responsive pleadings in opposition to any motion, adversary proceeding or other pleading filed by any Person objecting to or otherwise seeking disallowance of the claim or Lien of such Agent or Secured Party or (iv) voting on any plan of reorganization or arrangement or filing any proof of claim in any Insolvency Proceeding of any Credit Party, in each case (i) through (iv) above to the extent not inconsistent with the express terms of this Agreement.

Section 2.4    **Exercise of Rights**.

(a)    No Other Restrictions. Except as expressly set forth in this Agreement, each Notes Priority Claimholder and each ABL Secured Party shall have any and all rights and remedies it may have as a creditor under applicable law, including the right to the Exercise of Secured Creditor Remedies; provided, however, that the Exercise of Secured Creditor Remedies with respect to the Collateral shall be subject to the Lien Priority and to the provisions of this Agreement. The ABL Agent may enforce the provisions of the ABL Documents, each Notes Priority Agent may enforce the provisions of its Notes Priority Documents and each may Exercise Any Secured Creditor Remedies, all in such order and in such manner as each may determine in the exercise of its sole discretion, consistent with the terms of this Agreement and mandatory provisions of applicable law; provided, however, that the ABL Agent agrees to provide to the Notes Priority Agents and each Notes Priority Agent agrees to provide to the ABL Agent (x) an Enforcement Notice prior to the commencement of an Exercise of Any Secured Creditor Remedies and (y) copies of any notices that it is required under applicable law to deliver to any Credit Party; provided further, however, that the ABL Agent's failure to provide the Enforcement Notice (other than in connection with Section 3.6 hereof) or any such copies to the Designated Notes Priority Agent shall not impair any of the ABL Agent's rights hereunder or under any of the ABL Documents and any Notes Priority Agent's failure to provide the Enforcement Notice or any such copies to the ABL Agent shall not impair any of such Notes Priority Agent's rights hereunder or under any of its Notes Priority Documents. Each Notes Priority Agent, each Notes Priority Claimholder, the ABL Agent and each ABL Secured Party agrees that it will not institute any suit or other proceeding or assert in any suit, Insolvency Proceeding or other proceeding any claim, in the case of the Notes Priority Agents and each Notes Priority Claimholder, against either the ABL Agent or any other ABL Secured Party, and in the case of the ABL Agent and each other ABL Secured Party, against either any Notes Priority Agent or any other Notes Priority Claimholder, seeking damages from or other relief by way of specific performance, instructions or otherwise, with respect to any action taken or omitted to be taken by such Person with respect to the Collateral which is consistent with the terms of this Agreement, and none of such Parties shall be liable for any such action taken or omitted to be taken.

(b)    Release of Liens.

(i)    In the event of (A) any private or public sale of all or any portion of the ABL Priority Collateral in connection with any Exercise of Secured Creditor Remedies by or with the consent of the ABL Agent (other than in connection with a refinancing as described in Section 5.2(c) hereof), or (B) any sale, transfer or other disposition of all or any portion of the ABL Priority Collateral (other than in connection with a refinancing as described in Section 5.2(c) hereof), so long as such sale, transfer or other disposition is then permitted by the ABL Documents or consented to by the requisite ABL Lenders, irrespective of whether an Event of Default has occurred, each Notes Priority Agent agrees, on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents that, so long as such Notes Priority Agent, for the benefit of such Notes Priority Claimholders, shall retain a Lien on the proceeds of such sale, transfer or other disposition (to the extent that such proceeds are not applied to the ABL Obligations as provided in Section 4.1(b) hereof), such sale, transfer or other disposition will be

20

free and clear of the Liens on such ABL Priority Collateral (but not the proceeds thereof) securing the Notes Priority Obligations, and the Notes Priority Agents' and the Notes Priority Claimholders' Liens with respect to the ABL Priority Collateral (but not the proceeds thereof) so sold, transferred, or disposed shall terminate and be automatically released without further action concurrently with, and to the same extent as, the release of the ABL Secured Parties' Liens on such ABL Priority Collateral. In furtherance of, and subject to, the foregoing, each Notes Priority Agent agrees that it will promptly execute any and all Lien releases or other documents reasonably requested by the ABL Agent in connection therewith. Each Notes Priority Agent hereby appoints the ABL Agent and any officer or duly authorized person of the ABL Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the Notes Priority Agent and in the name of such Notes Priority Agent or in the ABL Agent's own name, from time to time, in the ABL Agent's sole discretion, for the purposes of carrying out the terms of this paragraph, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this paragraph, including any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

(ii)     In the event of (A) any private or public sale of all or any portion of the Notes Priority Collateral in connection with any Exercise of Secured Creditor Remedies by or with the consent of the Designated Notes Priority Agent (other than in connection with a refinancing as described in Section 5.2(c) hereof), or (B) any sale, transfer or other disposition of all or any portion of the Notes Priority Collateral (other than in connection with a refinancing as described in Section 5.2(c) hereof), so long as such sale, transfer or other disposition is then permitted by the Notes Priority Documents or consented to by the requisite Notes Priority Claimholders, irrespective of whether an Event of Default has occurred, the ABL Agent agrees, on behalf of itself and the ABL Secured Parties that, so long as the ABL Agent, for the benefit of the ABL Secured Parties, shall retain a Lien on the proceeds of such sale, transfer or other disposition (to the extent that such proceeds are not applied to the Notes Priority Obligations as provided in Section 4.1(c) hereof), such sale, transfer or disposition will be free and clear of the Liens on such Notes Priority Collateral (but not the proceeds thereof) securing the ABL Obligations and the ABL Agent's and the ABL Secured Parties' Liens with respect to the Notes Priority Collateral (but not the proceeds thereof) so sold, transferred, or disposed shall terminate and be automatically released without further action concurrently with, and to the same extent as, the release of the Notes Priority Claimholders' Liens on such Notes Priority Collateral. In furtherance of, and subject to, the foregoing, the ABL Agent agrees that it will promptly execute any and all Lien releases or other documents reasonably requested by the Designated Notes Priority Agent in connection therewith. The ABL Agent hereby appoints the Designated Notes Priority Agent and any officer or duly authorized person of the Designated Notes Priority Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the ABL Agent and in the name of the ABL Agent or in the Designated Notes Priority Agent's own name, from time to time, in the Designated Notes Priority Agent's sole discretion, for the purposes of carrying out the terms of this paragraph, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this paragraph, including any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

**Section 2.5      No New Liens**.

(a)        It is the anticipation of the parties, that until the date upon which the Discharge of ABL Obligations shall have occurred, no Notes Priority Claimholder shall acquire or hold any consensual Lien on any assets securing any Notes Priority Obligation which assets are not also subject to the Lien of the ABL Agent under the ABL Documents. If any Notes Priority Claimholder shall (nonetheless and in breach hereof) acquire or hold any Lien on any assets of any Credit Party securing any Notes Priority Obligation which assets are not also subject to the Lien of the ABL Agent under the ABL Documents, then the Designated Notes Priority Agent (or the relevant Notes Priority Claimholder) shall, without the need for any further consent of any other Notes Priority Claimholder, the Issuer or any Notes Guarantor and notwithstanding anything to the contrary in any other Notes Priority Document, be deemed to also hold and have held such Lien as agent or bailee for the benefit of the ABL Agent as security for the ABL Obligations (subject to the Lien Priority and other terms hereof) and shall promptly notify the ABL Agent in writing of the existence of such Lien upon becoming aware thereof.

(b)        It is the anticipation of the parties, that until the date upon which the Discharge of Notes Priority Obligations shall have occurred, no ABL Secured Party shall acquire or hold any consensual Lien on any assets securing any ABL Obligation which assets are not also subject to the Lien of the Notes Priority Agents under the Notes Priority Documents. If any ABL Secured Party shall (nonetheless and in breach hereof) acquire or hold any Lien on any assets of any Credit Party securing any ABL Obligation which assets are not also subject to the Lien of the Notes Priority Agents under the Notes Priority Documents, then the ABL Agent (or the relevant ABL Secured Party) shall, without the need for any further consent of any other ABL Secured Party, the Borrower or any ABL Guarantor and notwithstanding anything to the contrary in any other ABL Document be deemed to also hold and have held such Lien as agent or bailee for the benefit of the Notes Priority Agents as security for the Notes Priority Obligations (subject to the Lien Priority and other terms hereof) and shall promptly notify each Notes Priority Agent in writing of the existence of such Lien upon becoming aware thereof.

**Section 2.6**        **Waiver of Marshalling**.

(a)        Until the Discharge of ABL Obligations, each Notes Priority Agent, on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the ABL Priority Collateral or any other similar rights a junior secured creditor may have under applicable law.

(b)        Until the Discharge of Notes Priority Obligations , the ABL Agent, on behalf of itself and the ABL Secured Parties, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Notes Priority Collateral or any other similar rights a junior secured creditor may have under applicable law.

**ARTICLE 3**
**ACTIONS OF THE PARTIES**

**Section 3.1**        **Certain Actions Permitted**. Each Notes Priority Agent and the ABL Agent may make such demands or file such claims in respect of the Notes Priority Obligations or the ABL Obligations, as applicable, as are necessary to prevent the waiver or bar of such claims under applicable statutes of limitations or other statutes, court orders, or rules of procedure at any time. Nothing in this Agreement shall prohibit the receipt by any Notes Priority Agent or any Notes Priority Claimholder of the required payments of interest, principal and other amounts owed in respect of its Notes Priority

Obligations so long as such receipt is not the direct or indirect result of the exercise by such Notes Priority Agent or such Notes Priority Claimholder of rights or remedies as a secured creditor (including set-off) with respect to ABL Priority Collateral or enforcement in contravention of this Agreement of any Lien held by any of them. Nothing in this Agreement shall prohibit the receipt by the ABL Agent or any ABL Secured Party of the required payments of interest, principal and other amounts owed in respect of the ABL Obligations so long as such receipt is not the direct or indirect result of the exercise by the ABL Agent or any ABL Secured Party of rights or remedies as a secured creditor (including set-off) with respect to Notes Priority Collateral or enforcement in contravention of this Agreement of any Lien held by any of them.

**Section 3.2**    **Agent for Perfection**. The ABL Agent, for and on behalf of itself and each ABL Secured Party, and each Notes Priority Agent, for and on behalf of itself and each Notes Priority Claimholder under its Notes Priority Documents, as applicable, each agree to hold all Collateral in their respective possession, custody, or control (including as defined in (a) Sections 9-104, 9-105, 9-106, 9-107 and 8-106 of the UCC or (b) the STA, as applicable) (or in the possession, custody, or control of agents or bailees for either) as gratuitous bailee for the other solely for the purpose of perfecting or maintaining the perfection of the security interest granted to each in such Collateral, subject to the terms and conditions of this Section 3.2. None of the ABL Agent, the ABL Secured Parties, the Notes Priority Agents, or the Notes Priority Claimholders, as applicable, shall have any obligation whatsoever to the others to assure that the Collateral is genuine or owned by the Borrower, the Issuer, any Guarantor, or any other Person or to preserve rights or benefits of any Person. The duties or responsibilities of the ABL Agent and each Notes Priority Agent under this Section 3.2 are and shall be limited solely to holding or maintaining control of the Control Collateral as gratuitous bailee and/or agent for the other Party for purposes of perfecting the Lien held by such Notes Priority Agent or the ABL Agent, as applicable. The ABL Agent is not and shall not be deemed to be a fiduciary of any kind for the Notes Priority Claimholders or any other Person. Without limiting the generality of the foregoing, the ABL Secured Parties shall not be obligated to see to the application of any Proceeds of the Notes Priority Collateral deposited into any Deposit Account or be answerable in any way for the misapplication thereof. No Notes Priority Agent is or shall be deemed to be a fiduciary of any kind for the ABL Secured Parties, or any other Person. Without limiting the generality of the foregoing, the Notes Priority Claimholders shall not be obligated to see to the application of any Proceeds of the ABL Priority Collateral deposited into any Deposit Account or be answerable in any way for the misapplication thereof. In addition, each Notes Priority Agent, on behalf of the Notes Priority Claimholders under its Notes Priority Documents, hereby agrees and acknowledges that other than with respect to ABL Priority Collateral that may be perfected through the filing of a UCC or PPSA financing statement, the ABL Agent's Liens may be perfected on certain items of ABL Priority Collateral with respect to which such Notes Priority Agent's Liens would not be perfected but for the provisions of this Section 3.2, and each Notes Priority Agent, on behalf of the Notes Priority Claimholders under its Notes Priority Documents, hereby further agrees that the foregoing described in this sentence shall not be deemed a breach of this Agreement.

**Section 3.3**    **Sharing of Information and Access**. In the event that the ABL Agent shall, in the exercise of its rights under the ABL Collateral Documents or otherwise, receive possession or control of any books and records of any Notes Party which contain information identifying or pertaining to the Notes Priority Collateral, the ABL Agent shall, upon request from the Designated Notes Priority Agent and as promptly as practicable thereafter, either make available to the Designated Notes Priority Agent such books and records for inspection and duplication or provide to the Designated Notes Priority Agent copies thereof. In the event that any Notes Priority Agent shall, in the exercise of its rights under the Notes Collateral Documents or otherwise, receive possession or control of any books and records of any ABL Credit Party which contain information identifying or pertaining to any of the ABL Priority Collateral, such Notes Priority Agent shall, upon request from the ABL Agent and as promptly as

practicable thereafter, either make available to the ABL Agent such books and records for inspection and duplication or provide the ABL Agent copies thereof.

Section 3.4    **Insurance**. Proceeds of Collateral include insurance proceeds and, therefore, the Lien Priority shall govern the ultimate disposition of casualty insurance proceeds. The ABL Agent and each Notes Priority Agent shall each be named as additional insured or loss payee, as applicable, with respect to all insurance policies relating to the Collateral as set forth in the Notes Priority Documents or the ABL Credit Agreement, as applicable. The ABL Agent shall have the sole and exclusive right, as against the Notes Priority Agents, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of ABL Priority Collateral. The Designated Notes Priority Agent shall have the sole and exclusive right, as against the ABL Agent, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of Notes Priority Collateral. If any insurance claim includes both ABL Priority Collateral and Notes Priority Collateral, the insurer will not settle such claim separately with respect to ABL Priority Collateral and Notes Priority Collateral, and if the Parties are unable after negotiating in good faith to agree on the settlement for such claim, either Party may apply to a court of competent jurisdiction to make a determination as to the settlement of such claim, and the court's determination shall be binding upon the Parties. All proceeds of such insurance shall be remitted to the ABL Agent or the Designated Notes Priority Agent, as the case may be, and each of the Designated Notes Priority Agent and ABL Agent shall cooperate (if necessary) in a reasonable manner in effecting the payment of insurance proceeds in accordance with Section 4.1 hereof.

Section 3.5    **No Additional Rights For the Credit Parties Hereunder**. Except as provided in Section 3.6 hereof, if any ABL Secured Party or Notes Priority Claimholder shall enforce its rights or remedies in violation of the terms of this Agreement, the Credit Parties shall not be entitled to use such violation as a defense to any action by any ABL Secured Party or Notes Priority Claimholder, nor to assert such violation as a counterclaim or basis for set off or recoupment against any ABL Secured Party or Notes Priority Claimholder.

Section 3.6    **Inspection and Access Rights**. (a) Without limiting any rights the ABL Agent or any other ABL Secured Party may otherwise have under applicable law or by agreement, in the event of any liquidation of the ABL Priority Collateral (or any other Exercise of Any Secured Creditor Remedies by the ABL Agent) and whether or not any Notes Priority Agent or any other Notes Priority Claimholder has commenced and is continuing to Exercise Any Secured Creditor Remedies, the ABL Agent or any other Person (including any ABL Credit Party) acting with the consent, or on behalf, of the ABL Agent, shall have the right (a) during the Use Period during normal business hours on any Business Day, to access ABL Priority Collateral that (i) is stored or located in or on, (ii) has become an accession with respect to (within the meaning of Section 9335 of the Uniform Commercial Code or equivalent provision of any applicable PPSA or equivalent laws of any jurisdiction), or (iii) has been commingled with (within the meaning of Section 9-336 of the Uniform Commercial Code, the equivalent provision of any applicable PPSA or equivalent laws of any jurisdiction) Notes Priority Collateral (collectively, the "**ABL Affected Collateral**"), and (b) during the Use Period, shall have the irrevocable right to use the Notes Priority Collateral (including, without limitation, Equipment, Fixtures, Intellectual Property, General Intangibles and Real Property) on a rent-free, royalty-free basis, each of the foregoing solely for the limited purposes of assembling, inspecting, copying or downloading information stored on, taking actions to perfect its Lien on, completing a production run of Inventory involving, taking possession of, moving, preparing and advertising for sale, selling (by public auction, private sale or a "store closing", "going out of business" or similar sale, whether in bulk, in lots or to customers in the ordinary course of business or otherwise and which sale may include augmented Inventory of the same type sold in any ABL Credit Party's business), storing or otherwise dealing with the ABL Priority Collateral, in each case without notice to, the involvement of or interference by any Notes Priority Claimholder or liability to any Notes Priority Claimholder; provided, however, that the expiration of the Use Period shall be without prejudice

to the sale or other disposition of the ABL Priority Collateral in accordance with this Agreement and applicable law. In the event that any ABL Secured Party has commenced and is continuing the Exercise of Any Secured Creditor Remedies with respect to any ABL Affected Collateral or any other sale or liquidation of the ABL Affected Collateral has been commenced by an ABL Credit Party (with the consent of the ABL Agent), the Notes Priority Agents may not sell, assign or otherwise transfer the related Notes Priority Collateral prior to the expiration of the Use Period, unless the purchaser, assignee or transferee thereof agrees in writing to be bound by the provisions of this <u>Section 3.6</u>.

(b)     During the period of actual occupation, use and/or control by the ABL Secured Parties and/or the ABL Agent (or their respective employees, agents, advisers and representatives) of any Notes Priority Collateral, the ABL Secured Parties and the ABL Agent shall be obligated to repair at their expense any physical damage (but not any diminution in value) to such Notes Priority Collateral resulting from such occupancy, use or control, and to leave such Notes Priority Collateral in substantially the same condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted. Notwithstanding the foregoing, in no event shall the ABL Secured Parties or the ABL Agent have any liability to the Notes Priority Claimholders and/or to any Notes Priority Agent pursuant to this <u>Section 3.6</u> as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Notes Priority Collateral existing prior to the date of the exercise by the ABL Secured Parties (or the ABL Agent, as the case may be) of their rights under this <u>Section 3.6</u> and the ABL Secured Parties shall have no duty or liability to maintain the Notes Priority Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the ABL Secured Parties, or for any diminution in the value of the Notes Priority Collateral that results from ordinary wear and tear resulting from the use of the Notes Priority Collateral by the ABL Secured Parties in the manner and for the time periods specified under this <u>Section 3.6</u>. Without limiting the rights granted in this <u>Section 3.6,</u> the ABL Secured Parties and the ABL Agent shall cooperate with the Designated Notes Priority Agent in connection with any efforts made by the Designated Notes Priority Agent to sell the Notes Priority Collateral.

(c)     The ABL Agent and the ABL Secured Parties shall not be obligated to pay any amounts to the Notes Priority Agents or the Notes Priority Claimholders (or any person claiming by, through or under the Notes Priority Claimholders, including any purchaser of the Notes Priority Collateral) or to the ABL Credit Parties, for or in respect of the use by the ABL Agent and the ABL Secured Parties of the Notes Priority Collateral.

(d)     The ABL Secured Parties shall (i) use the Notes Priority Collateral in accordance with applicable law; (ii) insure for damage to property and liability to persons, including property and liability insurance for the benefit of the Notes Priority Claimholders; and (iii) reimburse the Notes Priority Claimholders for any injury or damage to Persons or property (ordinary wear-and-tear excepted) caused by the acts or omissions of Persons under their control (except for those arising from the gross negligence or willful misconduct of any Notes Priority Claimholder); <u>provided, however,</u> that the ABL Secured Parties will not be liable for any diminution in the value of the Notes Priority Collateral caused by the absence of the ABL Priority Collateral therefrom.

(e)     Each Notes Priority Agent and the other Notes Priority Claimholders shall use commercially reasonable efforts to not hinder or obstruct the ABL Agent and the other ABL Secured Parties from exercising the rights described in <u>Section 3.6(a)</u> hereof.

(f)     Subject to the terms hereof, any Notes Priority Agent may advertise and conduct public auctions or private sales of the Notes Priority Collateral without notice (except as required by applicable law) to any ABL Secured Party, the involvement of or interference by any ABL Secured Party or liability to any ABL Secured Party as long as, in the case of an actual sale, the respective purchaser assumes and

agrees to the obligations of such Notes Priority Agent and the Notes Priority Claimholders under this Section 3.6.

(g)    In furtherance of the foregoing in this Section 3.6, each Notes Priority Agent, in its capacity as a secured party (or as a purchaser, assignee or transferee, as applicable), and to the extent of its interest therein, hereby grants to the ABL Agent a nonexclusive, irrevocable, royalty-free, worldwide license to use, license or sublicense any and all Intellectual Property now owned or hereafter acquired by the Credit Parties (except to the extent such grant is prohibited by any rule of law, statute or regulation), included as part of the Notes Priority Collateral (and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof) as is or may be necessary or advisable in the ABL Agent's reasonable judgment for the ABL Agent to process, ship, produce, store, supply, lease, complete, sell, liquidate or otherwise deal with the ABL Priority Collateral, or to collect or otherwise realize upon any Accounts (as defined in the ABL Credit Agreement) comprising ABL Priority Collateral, in each case solely in connection with any Exercise of Secured Creditor Remedies; provided that (i) any such license shall terminate upon the sale of the applicable ABL Priority Collateral and shall not extend or transfer to the purchaser of such ABL Priority Collateral, (ii) the ABL Agent's use of such Intellectual Property shall be reasonable and lawful, and (iii) any such license is granted on an "AS IS" basis, without any representation or warranty whatsoever. Each Notes Priority Agent (i) acknowledges and consents to the grant to the ABL Agent by the Credit Parties of the license referred to in Section 4.01 of the Security Agreement (as defined in the ABL Credit Agreement) and (ii) agrees that its Liens in the Notes Priority Collateral shall be subject in all respects to such license. Furthermore, each Notes Priority Agent agrees that, in connection with any Exercise of Secured Creditor Remedies conducted by such Notes Priority Agent in respect of Notes Priority Collateral, (x) any notice required to be given by such Notes Priority Agent in connection with such Exercise of Secured Creditor Remedies shall contain an acknowledgement of the existence of such license and (y) such Notes Priority Agent shall provide written notice to any purchaser, assignee or transferee pursuant to an Exercise of Secured Creditor Remedies that the applicable assets are subject to such license.

Section 3.7    **Tracing of and Priorities in Proceeds**. The ABL Agent, for itself and on behalf of the ABL Secured Parties, and each Notes Priority Agent, for itself and on behalf of the Notes Priority Claimholders under its Notes Priority Documents, further agree that prior to an issuance of any notice of Exercise of Any Secured Creditor Remedies by such Secured Party (unless a bankruptcy or insolvency Event of Default then exists), any proceeds of Collateral, whether or not deposited under control agreements, which are used by any Credit Party to acquire other property which is Collateral shall not (solely as between the Agents and the Lenders) be treated as Proceeds of Collateral for purposes of determining the relative priorities in the Collateral which was so acquired.

Section 3.8    **Purchase Right**.

(a)    If (i) the ABL Agent or "Requisite Lenders" (as defined in the ABL Credit Agreement) shall sell, lease, license or dispose of all or substantially all of the ABL Priority Collateral by private or public sale, (ii) an Insolvency Proceeding with respect to the Borrower [or Holdings] shall have occurred or shall have been commenced, or (iii) the ABL Obligations under the ABL Credit Agreement shall have been accelerated (including as a result of any automatic acceleration) or shall remain unpaid following the Scheduled Termination Date or similar term (as defined in any ABL Credit Agreement), (each such event described in clauses (i) through (iii) herein above, a "**Purchase Option Event**"), the Notes Priority Claimholders shall have the opportunity to purchase (at par and without premium) all (but not less than all) of the ABL Obligations pursuant to this Section 3.8; provided, that such option shall expire if the applicable Notes Priority Claimholders fail to deliver a written notice (a "**Purchase Notice**") to the ABL Agent with a copy to the Borrower within ten (10) business days following the first date the Designated

26

Notes Priority Agent obtains actual knowledge of the occurrence of the earliest Purchase Option Event, which Purchase Notice shall (A) be signed by the applicable Notes Priority Claimholders committing to such purchase (the "**Purchasing Creditors**") and indicate the percentage of the ABL Obligations to be purchased by each Purchasing Creditor (which aggregate commitments must add up to 100% of the ABL Obligations) and (B) state that (1) it is a Purchase Notice delivered pursuant to Section 3.8 of this Agreement and (2) the offer contained therein is irrevocable. Upon receipt of such Purchase Notice by the ABL Agent, the Purchasing Creditors shall have from the date of delivery thereof to and including the date that is ten (10) business days after the Purchase Notice was received by the ABL Agent to purchase all (but not less than all) of the ABL Obligations pursuant to this Section 3.8 (the date of such purchase, the "**Purchase Date**").

(b)    On the Purchase Date, the ABL Agent and the other ABL Secured Parties shall, subject to any required approval of any Governmental Authority and any limitation in the ABL Credit Agreement, in each case then in effect, if any, sell to the Purchasing Creditors all (but not less than all) of the ABL Obligations. On such Purchase Date, the Purchasing Creditors shall (i) pay to the ABL Agent, for the benefit of the ABL Secured Parties, as directed by the ABL Agent, in immediately available funds the full amount (at par and without premium) of all ABL Obligations then outstanding together with all accrued and unpaid interest and fees thereon, all in the amounts specified by the ABL Agent and determined in accordance with the applicable ABL Documents, (ii) furnish such amount of cash collateral in immediately available funds as the ABL Agent determines is reasonably necessary to secure ABL Secured Parties in connection with any (x) contingent Other Liabilities or (y) issued and outstanding letters of credit issued under the ABL Credit Agreement but not in any event in an amount greater than 101% of the aggregate undrawn amount of all such outstanding letters of credit (and in the case of clauses (x) and (y) herein above, any excess of such cash collateral for such Other Liabilities or letters of credit remaining at such time when there are no longer any such Other Liabilities or letters of credit outstanding and there are no unreimbursed amounts then owing in respect of such Other Liabilities or drawings under such letters of credit shall be promptly paid over to the Designated Notes Priority Agent) and (iii) agree to reimburse the ABL Secured Parties for any loss, cost, damage or expense resulting from the granting of provisional credit for any checks, wire or ACH transfers that are reversed or not final or other payments provisionally credited to the ABL Obligations under the ABL Credit Agreement and as to which the ABL Agent and ABL Secured Parties have not yet received final payment as of the Purchase Date. Such purchase price shall be remitted by wire transfer in immediately available funds to such bank account of the ABL Agent (for the benefit of the ABL Secured Parties) as the ABL Agent shall have specified in writing to the Purchasing Creditors. Interest and fees shall be calculated to but excluding the Purchase Date if the amounts so paid by the Purchasing Creditors to the bank account designated by the ABL Agent are received in such bank account prior to 1:00 p.m., New York time, and interest shall be calculated to and including such Purchase Date if the amounts so paid by the Purchasing Creditors to the bank account designated by the ABL Agent are received in such bank account after 1:00 p.m., New York time.

(c)    Any purchase pursuant to the purchase option set forth in this Section 3.8 shall, except as provided below, be expressly made without representation or warranty of any kind by the ABL Agent or the other ABL Secured Parties as to the ABL Obligations, the collateral or otherwise, and without recourse to the ABL Agent and the other ABL Secured Parties as to the ABL Obligations, the collateral or otherwise, except that the ABL Agent and each of the ABL Secured Parties, as to itself only, shall represent and warrant only as to the matters set forth in the assignment agreement to be entered into as provided herein in connection with such purchase, which shall include (i) the principal amount of the ABL Obligations being sold by it, (ii) that such Person has not created any Lien on any ABL Obligations being sold by it, and (iii) that such Person has the right to assign the ABL Obligations being assigned by it and its assignment agreement has been duly authorized and delivered.

(d)    Upon notice to the Credit Parties by the Designated Notes Priority Agent that the purchase of ABL Obligations pursuant to this Section 3.8 has been consummated by delivery of the purchase price to the ABL Agent, the Credit Parties shall treat the Purchasing Creditors as holders of the ABL Obligations and the Designated Notes Priority Agent shall be deemed appointed to act in such capacity as the "agent" or "administrative agent" (or analogous capacity) (the "**Replacement Agent**") under the ABL Documents, for all purposes hereunder and under each ABL Document (it being agreed that the Designated Notes Priority Agent shall have no obligation to act as such replacement "agent" or "administrative agent" (or analogous capacity)). In connection with any purchase of ABL Obligations pursuant to this Section 3.8, each ABL Lender and ABL Agent agrees to enter into and deliver to the Purchasing Creditors on the Purchase Date, as a condition to closing, an assignment agreement customarily used by the ABL Agent in connection with the ABL Credit Agreement and the ABL Agent and each other ABL Lender shall deliver all possessory collateral (if any), together with any necessary endorsements and other documents (including any applicable stock powers or bond powers), then in its possession or in the possession of its agent or bailee, or turn over control as to any pledged collateral, deposit accounts or securities accounts of which it or its agent or bailee then has control, as the case may be, to the Replacement Agent, and deliver the loan register and participant register, if applicable and all other records pertaining to the ABL Obligations to the Replacement Agent and otherwise take such actions as may be reasonably appropriate to effect an orderly transition to the Replacement Agent. Upon the consummation of the purchase of the ABL Obligations pursuant to this Section 3.8, the ABL Agent (and all other agents under the ABL Credit Agreement) shall be deemed to have resigned as an "agent" or "administrative agent" for the ABL Secured Parties under the ABL Documents; provided that the ABL Agent (and all other agents under the ABL Credit Agreement) shall be entitled to all of the rights and benefits of a former "agent" or "administrative agent" under the ABL Credit Agreement.

(e)    Notwithstanding the foregoing purchase of the ABL Obligations by the Purchasing Creditors, the ABL Secured Parties shall retain those contingent indemnification obligations and other obligations under the ABL Documents which by their express terms would survive any repayment of the ABL Obligations pursuant to this Section 3.8.

Section 3.9    **Payments Over**.

(a)    So long as the Discharge of Notes Priority Obligations has not occurred, any Notes Priority Collateral or Proceeds thereof not constituting ABL Priority Collateral received by the ABL Agent or any other ABL Secured Party in connection with the exercise of any right or remedy (including set off) relating to the Notes Priority Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to the Designated Notes Priority Agent for the benefit of the Notes Priority Claimholders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The Designated Notes Priority Agent is hereby authorized to make any such endorsements as agent for the ABL Agent or any such other ABL Secured Parties. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

(b)    So long as the Discharge of ABL Obligations has not occurred, any ABL Priority Collateral or Proceeds thereof not constituting Notes Priority Collateral received by any Notes Priority Agent or any Notes Priority Claimholders in connection with the exercise of any right or remedy (including set off) relating to the ABL Priority Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to the ABL Agent for the benefit of the ABL Secured Parties in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The ABL Agent is hereby authorized to make any such endorsements as agent for any such Notes Priority Agent or any such Notes Priority Claimholders. This authorization is

coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

## ARTICLE 4
## APPLICATION OF PROCEEDS

Section 4.1    Application of Proceeds.

(a)    Revolving Nature of ABL Obligations. Each Notes Priority Agent, for and on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents, expressly acknowledges and agrees that (i) the ABL Credit Agreement includes a revolving commitment, that in the ordinary course of business the ABL Agent and the ABL Lenders will apply payments and make advances thereunder, and that no application of any ABL Priority Collateral or the release of any Lien by the ABL Agent upon any portion of the Collateral in connection with a permitted disposition by the ABL Credit Parties under any ABL Credit Agreement shall constitute the Exercise of Secured Creditor Remedies under this Agreement; (ii) the amount of the ABL Obligations that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, and that the terms of the ABL Obligations may be modified, extended or amended from time to time, and that the aggregate amount of the ABL Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the Notes Priority Claimholders and without affecting the provisions hereof; and (iii) all ABL Priority Collateral received by the ABL Agent may be applied, reversed, reapplied, credited, or reborrowed, in whole or in part, to the ABL Obligations at any time; provided, however, that from and after the date on which the ABL Agent (or any ABL Secured Party) or any Notes Priority Agent (or any Notes Priority Claimholder) commences the Exercise of Any Secured Creditor Remedies, all amounts received by the ABL Agent or any ABL Lender shall be applied as specified in this Section 4.1. The Lien Priority shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of either the ABL Obligations or the Notes Priority Obligations, or any portion thereof. Notwithstanding anything to the contrary contained in this Agreement, any Notes Priority Document or any ABL Document, each Credit Party and each Notes Priority Agent, for itself and on behalf of the Notes Priority Claimholders under its Notes Priority Documents, agrees that (i) only Notes Priority Collateral or proceeds of the Notes Priority Collateral shall be deposited in the Notes Priority Accounts and (ii) prior to the receipt of a Notes Cash Proceeds Notice, the ABL Secured Parties are hereby permitted to treat all cash, cash equivalents, Money, collections and payments deposited in any ABL Deposit and Securities Account or otherwise received by any ABL Secured Parties as ABL Priority Collateral, and no such amounts credited to any such ABL Deposit and Securities Account or received by any ABL Secured Parties or applied to the ABL Obligations shall be subject to disgorgement or deemed to be held in trust for the benefit of the Notes Priority Claimholders (and all claims of the Notes Priority Agents or any other Notes Priority Claimholder to such amounts are hereby waived).

(b)    Application of Proceeds of ABL Priority Collateral. The ABL Agent and each Notes Priority Agent hereby agree that all ABL Priority Collateral, ABL Priority Proceeds and all other Proceeds thereof, received by any of them in connection with any Exercise of Secured Creditor Remedies with respect to the ABL Priority Collateral shall be applied,

first, to the payment of costs and expenses of the ABL Agent in connection with such Exercise of Secured Creditor Remedies,

second, to the payment or cash collateralization of the ABL Obligations in accordance with the ABL Documents until the Discharge of ABL Obligations shall have occurred,

29

third, to the payment of the Notes Priority Obligations in accordance with the Notes Priority Documents until the Discharge of Notes Priority Obligations shall have occurred, and

fourth, the balance, if any, to the Credit Parties or as a court of competent jurisdiction may direct.

(c)     Application of Proceeds of Notes Priority Collateral. The ABL Agent and each Notes Priority Agent hereby agree that all Notes Priority Collateral, Notes Priority Proceeds and all other Proceeds thereof, received by either of them in connection with any Exercise of Secured Creditor Remedies with respect to the Notes Priority Collateral shall be applied,

first, to the payment of costs and expenses of the Trustee and the Designated Notes Priority Agent in connection with such Exercise of Secured Creditor Remedies,

second, to the payment of the Notes Priority Obligations in accordance with the Notes Priority Documents until the Discharge of Notes Priority Obligations shall have occurred,

third, to the payment of the ABL Obligations in accordance with the ABL Documents until the Discharge of ABL Obligations shall have occurred; and

fourth, the balance, if any, to the Credit Parties or as a court of competent jurisdiction may direct.

(d)     Limited Obligation or Liability. In exercising remedies, whether as a secured creditor or otherwise, the ABL Agent shall have no obligation or liability to any Notes Priority Agent or to any Notes Priority Claimholder, and the Notes Priority Agents shall have no obligation or liability to the ABL Agent or any ABL Secured Party, regarding the adequacy of any Proceeds or for any action or omission, except solely for an action or omission that breaches the express obligations undertaken by each Party under the terms of this Agreement. Notwithstanding anything to the contrary herein contained, none of the Parties hereto waives any claim that it may have against a Secured Party on the grounds that any sale, transfer or other disposition by the Secured Party was not commercially reasonable in every respect as required by the Uniform Commercial Code, the PPSA or similar laws of any jurisdiction.

(e)     Turnover of Collateral After Discharge. Upon the Discharge of ABL Obligations, the ABL Agent shall deliver to the Designated Notes Priority Agent or shall execute such documents as the Designated Notes Priority Agent may reasonably request to enable the Designated Notes Priority Agent to have control over any Control Collateral still in the ABL Agent's possession, custody, or control in the same form as received with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct. Upon the Discharge of Notes Priority Obligations, each Notes Priority Agent shall deliver to the ABL Agent or shall execute such documents as the ABL Agent may reasonably request to enable the ABL Agent to have control over any Control Collateral still in such Notes Priority Agent's possession, custody or control in the same form as received with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.

**Section 4.2     Specific Performance**. The ABL Agent and each Notes Priority Agent is hereby authorized to demand specific performance of this Agreement, whether or not the Borrower, the Issuer or any Guarantor shall have complied with any of the provisions of any of the Credit Documents, at any time when the other Party shall have failed to comply with any of the provisions of this Agreement applicable to it. Each of the ABL Agent, for and on behalf of itself and the ABL Secured Parties, and each Notes Priority Agent, for and on behalf of itself and the Notes Priority Claimholders under its Notes Priority

Documents, hereby irrevocably waives any defense based on the adequacy of a remedy at law that might be asserted as a bar to such remedy of specific performance.

# ARTICLE 5
## INTERCREDITOR ACKNOWLEDGEMENTS AND WAIVERS

**Section 5.1**    **Notice of Acceptance and Other Waivers**.

(a)    All ABL Obligations at any time made or incurred by the Borrower or any Guarantor shall be deemed to have been made or incurred in reliance upon this Agreement, and each Notes Priority Agent, on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents, hereby waives notice of acceptance, or proof of reliance by the ABL Agent or any ABL Secured Party of this Agreement, and notice of the existence, increase, renewal, extension, accrual, creation, or non-payment of all or any part of the ABL Obligations. All Notes Priority Obligations at any time made or incurred by the Issuer or any Guarantor shall be deemed to have been made or incurred in reliance upon this Agreement, and the ABL Agent, on behalf of itself and the ABL Secured Parties, hereby waives notice of acceptance, or proof of reliance, by any Notes Priority Agent or any Notes Priority Claimholder of this Agreement, and notice of the existence, increase, renewal, extension, accrual, creation, or non-payment of all or any part of the Notes Priority Obligations.

(b)    None of the ABL Agent, any ABL Secured Party, or any of their respective Affiliates, directors, officers, employees, or agents shall be liable for failure to demand, collect, or realize upon any of the Collateral or any Proceeds, or for any delay in doing so, or shall be under any obligation to sell or otherwise dispose of any Collateral or Proceeds thereof or to take any other action whatsoever with regard to the Collateral or any part or Proceeds thereof, except as specifically provided in this Agreement. If the ABL Agent or any ABL Secured Party honors (or fails to honor) a request by the Borrower for an extension of credit pursuant to any ABL Credit Agreement or any of the other ABL Documents, whether the ABL Agent or any ABL Secured Party has knowledge that the honoring of (or failure to honor) any such request would constitute a default under the terms of the Indenture or any other Notes Priority Document or an act, condition, or event that, with the giving of notice or the passage of time, or both, would constitute such a default, or if the ABL Agent or any ABL Secured Party otherwise should exercise any of its contractual rights or remedies under any ABL Documents (subject to the express terms and conditions hereof), neither the ABL Agent nor any ABL Secured Party shall have any liability whatsoever to any Notes Priority Agent or any Notes Priority Claimholder as a result of such action, omission, or exercise (so long as any such exercise does not breach the express terms and provisions of this Agreement). The ABL Agent and the ABL Secured Parties shall be entitled to manage and supervise their loans and extensions of credit under any ABL Credit Agreement and any of the other ABL Documents as they may, in their sole discretion, deem appropriate, and may manage their loans and extensions of credit without regard to any rights or interests that any Notes Priority Agent or any of the Notes Priority Claimholders have in the Collateral, except as otherwise expressly set forth in this Agreement. Each Notes Priority Agent, on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents, agrees that neither the ABL Agent nor any ABL Secured Party shall incur any liability as a result of a sale, lease, license, application, or other disposition of all or any portion of the Collateral or Proceeds thereof, pursuant to the ABL Documents, so long as such disposition is conducted in accordance with mandatory provisions of applicable law and does not breach the provisions of this Agreement.

(c)    None of any Notes Priority Agent, any Notes Priority Claimholder or any of their respective Affiliates, directors, officers, employees, or agents shall be liable for failure to demand, collect, or realize upon any of the Collateral or any Proceeds, or for any delay in doing so, or shall be under any obligation to sell or otherwise dispose of any Collateral or Proceeds thereof or to take any other action whatsoever with regard to the Collateral or any part or Proceeds thereof, except as specifically provided

in this Agreement. If any Notes Priority Agent or any Notes Priority Claimholder honors (or fails to honor) a request by the Issuer for an extension of credit pursuant to the Indenture or any of the other Notes Priority Documents, whether such Notes Priority Agent or any Notes Priority Claimholder has knowledge that the honoring of (or failure to honor) any such request would constitute a default under the terms of any ABL Credit Agreement or any other ABL Document or an act, condition, or event that, with the giving of notice or the passage of time, or both, would constitute such a default, or if such Notes Priority Agent or any Notes Priority Claimholder otherwise should exercise any of its contractual rights or remedies under its Notes Priority Documents (subject to the express terms and conditions hereof), neither such Notes Priority Agent nor any Notes Priority Claimholder shall have any liability whatsoever to the ABL Agent or any ABL Secured Party as a result of such action, omission, or exercise (so long as any such exercise does not breach the express terms and provisions of this Agreement). The Notes Priority Claimholders shall be entitled to manage and supervise their loans and extensions of credit under the Notes Priority Documents as they may, in their sole discretion, deem appropriate, and may manage their loans and extensions of credit without regard to any rights or interests that the ABL Agent or any ABL Secured Party has in the Collateral, except as otherwise expressly set forth in this Agreement. The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that none of the Notes Priority Agents or the Notes Priority Claimholders shall incur any liability as a result of a sale, lease, license, application, or other disposition of the Collateral or any part or Proceeds thereof, pursuant to the Notes Priority Documents, so long as such disposition is conducted in accordance with mandatory provisions of applicable law and does not breach the provisions of this Agreement.

### Section 5.2    Modifications to ABL Documents and Notes Priority Documents.

(a)    Each Notes Priority Agent, on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents, hereby agrees that, without affecting the obligations of such Notes Priority Agent and the Notes Priority Claimholders hereunder, the ABL Agent and the ABL Secured Parties may, at any time and from time to time, in their sole discretion without the consent of or notice to any Notes Priority Agent or any Notes Priority Claimholder (except to the extent such notice or consent is required pursuant to the express provisions of this Agreement), and without incurring any liability to any Notes Priority Agent or any Notes Priority Claimholder or impairing or releasing the subordination provided for herein, amend, restate, supplement, replace, refinance, extend, consolidate, restructure, or otherwise modify any of the ABL Documents in any manner whatsoever (other than in a manner which would contravene the provisions of this Agreement), including, without limitation, to:

(i)    change the manner, place, time, or terms of payment or renew, alter or increase, all or any of the ABL Obligations or otherwise amend, restate, supplement, or otherwise modify in any manner, or grant any waiver or release with respect to, all or any part of the ABL Obligations or any of the ABL Documents;

(ii)    subject to Section 2.5 hereof, retain or obtain a Lien on any Property of any Person to secure any of the ABL Obligations, and in connection therewith to enter into any additional ABL Documents;

(iii)    amend, or grant any waiver, compromise, or release with respect to, or consent to any departure from, any guaranty or other obligations of any Person obligated in any manner under or in respect of the ABL Obligations;

(iv)    release its Lien on any Collateral or other Property;

(v)    exercise or refrain from exercising any rights against the Borrower, any Guarantor, or any other Person;

(vi)     subject to Section 2.5 hereof, retain or obtain the primary or secondary obligation of any other Person with respect to any of the ABL Obligations; and

(vii)     otherwise manage and supervise the ABL Obligations as the ABL Agent shall deem appropriate.

(b)     The ABL Agent, on behalf of itself and the ABL Secured Parties, hereby agrees that, without affecting the obligations of the ABL Agent and the ABL Secured Parties hereunder, the Notes Priority Agents and the Notes Priority Claimholders may, at any time and from time to time, in their sole discretion without the consent of or notice to the ABL Agent or any ABL Secured Party (except to the extent such notice or consent is required pursuant to the express provisions of this Agreement), and without incurring any liability to the ABL Agent or any ABL Secured Party or impairing or releasing the subordination provided for herein, amend, restate, supplement, replace, refinance, extend, consolidate, restructure, or otherwise modify any of the Notes Priority Documents in any manner whatsoever (other than in a manner which would contravene the provisions of this Agreement), including, without limitation, to:

(i)     change the manner, place, time, or terms of payment or renew, alter or increase, all or any of the Notes Priority Obligations or otherwise amend, restate, supplement, or otherwise modify in any manner, or grant any waiver or release with respect to, all or any part of the Notes Priority Obligations or any of the Notes Priority Documents;

(ii)     subject to Section 2.5 hereof, retain or obtain a Lien on any Property of any Person to secure any of the Notes Priority Obligations, and in connection therewith to enter into any additional Notes Priority Documents;

(iii)     amend, or grant any waiver, compromise, or release with respect to, or consent to any departure from, any guaranty or other obligations of any Person obligated in any manner under or in respect of the Notes Priority Obligations;

(iv)     release its Lien on any Collateral or other Property;

(v)     exercise or refrain from exercising any rights against the Issuer, any Guarantor, or any other Person;

(vi)     subject to Section 2.5 hereof, retain or obtain the primary or secondary obligation of any other Person with respect to any of the Notes Priority Obligations; and

(vii)     otherwise manage and supervise the Notes Priority Obligations as the Notes Priority Agents shall deem appropriate.

(c)     The ABL Obligations and the Notes Priority Obligations may be refinanced, in whole or in part, from time to time, in each case, without notice to, or the consent (except to the extent a consent is required to permit such refinancing transaction under any ABL Document or any Notes Priority Document) of the ABL Agent, the ABL Secured Parties, the Notes Priority Agents or the Notes Priority Claimholders, as the case may be, all without affecting the Lien Priorities provided for herein or the other provisions hereof, provided, however, that the holders of any class or series of such refinancing Indebtedness (or an authorized agent or trustee on their behalf) bind themselves in writing to the terms of this Agreement pursuant to such documents or agreements (including amendments or supplements to this Agreement) as the ABL Agent or the Notes Priority Agents, as the case may be, shall reasonably request and in form and substance reasonably acceptable to the ABL Agent or the Notes Priority Agents, as the

case may be, and any such refinancing transaction shall be in accordance with any applicable provisions of both the ABL Documents and the Notes Priority Documents (to the extent such documents survive the refinancing).

**Section 5.3**    **Reinstatement and Continuation of Agreement**.

(a)    If the ABL Agent or any ABL Secured Party is required in any Insolvency Proceeding or otherwise to turn over or otherwise pay to the estate of the Borrower, any Guarantor, or any other Person any payment made in satisfaction of all or any portion of the ABL Obligations (an "**ABL Recovery**"), then the ABL Obligations shall be reinstated to the extent of such ABL Recovery. If this Agreement shall have been terminated prior to such ABL Recovery, this Agreement shall be reinstated in full force and effect in the event of such ABL Recovery, and such prior termination shall not diminish, release, discharge, impair, or otherwise affect the obligations of the Parties from such date of reinstatement. All rights, interests, agreements, and obligations of the ABL Agent, the Notes Priority Agents, the ABL Secured Parties, and the Notes Priority Claimholders under this Agreement shall remain in full force and effect and shall continue irrespective of the commencement of, or any discharge, confirmation, conversion, or dismissal of, any Insolvency Proceeding by or against the Borrower, the Issuer or any Guarantor or any other circumstance which otherwise might constitute a defense available to, or a discharge of the Borrower, the Issuer or any Guarantor in respect of the ABL Obligations or the Notes Priority Obligations. No priority or right of the ABL Agent or any ABL Secured Party shall at any time be prejudiced or impaired in any way by any act or failure to act on the part of the Borrower, the Issuer or any Guarantor or by the noncompliance by any Person with the terms, provisions, or covenants of any of the ABL Documents, regardless of any knowledge thereof which the ABL Agent or any ABL Secured Party may have.

(b)    If any Notes Priority Agent or any Notes Priority Claimholder is required in any Insolvency Proceeding or otherwise to turn over or otherwise pay to the estate of the Issuer, any Guarantor, or any other Person any payment made in satisfaction of all or any portion of the Notes Priority Obligations (a "**Notes Recovery**"), then the Notes Priority Obligations shall be reinstated to the extent of such Notes Recovery. If this Agreement shall have been terminated prior to such Notes Recovery, this Agreement shall be reinstated in full force and effect in the event of such Notes Recovery, and such prior termination shall not diminish, release, discharge, impair, or otherwise affect the obligations of the Parties from such date of reinstatement. All rights, interests, agreements, and obligations of the ABL Agent, the Notes Priority Agents, the ABL Secured Parties, and the Notes Priority Claimholders under this Agreement shall remain in full force and effect and shall continue irrespective of the commencement of, or any discharge, confirmation, conversion, or dismissal of, any Insolvency Proceeding by or against the Borrower, the Issuer or any Guarantor or any other circumstance which otherwise might constitute a defense available to, or a discharge of the Borrower, the Issuer or any Guarantor in respect of the ABL Obligations or the Notes Priority Obligations. No priority or right of any Notes Priority Agent or any Notes Priority Claimholder shall at any time be prejudiced or impaired in any way by any act or failure to act on the part of the Borrower, the Issuer or any Guarantor or by the noncompliance by any Person with the terms, provisions, or covenants of any of the Notes Priority Documents, regardless of any knowledge thereof which any Notes Priority Agent or any Notes Priority Claimholder may have.

## ARTICLE 6
## INSOLVENCY PROCEEDINGS

**Section 6.1**    **DIP Financing**.

(a)    If the Borrower, the Issuer or any Guarantor shall be subject to any Insolvency Proceeding at any time prior to the Discharge of ABL Obligations, and the ABL Agent or the ABL Secured Parties shall seek to provide the Borrower, the Issuer or any Guarantor with, or consent to a third party providing, any financing under Section 364 of the Bankruptcy Code or any similar provision or concept under any other Bankruptcy or Insolvency Laws, or consent to any order for the use of cash collateral constituting ABL Priority Collateral under Section 363 of the Bankruptcy Code (or any similar provision or concept under any other Bankruptcy or Insolvency Laws or under a court order in respect of measures granted with similar effect under any Bankruptcy or Insolvency Laws) (each, a "**DIP Financing**"), with such DIP Financing to be secured by all or any portion of the Collateral (including assets that, but for the application of Section 552 of the Bankruptcy Code (or any similar provision of any other Bankruptcy or Insolvency Laws) would be Collateral) (it being agreed that the ABL Agent and the ABL Secured Parties shall not propose any DIP Financing secured by the Notes Priority Collateral in competition with the Notes Priority Agents and the Notes Priority Claimholders without the consent of each Notes Priority Agent), then each Notes Priority Agent, on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents, agrees that it will not oppose, raise or support any objection to, or act in a manner inconsistent with, any such DIP Financing or use of cash collateral or to the Liens securing the same on the grounds of a failure to provide "adequate protection" for the Liens of any Notes Priority Agent securing the Notes Priority Obligations under its Notes Priority Documents or on any other grounds (and will not request any adequate protection solely as a result of such DIP Financing or use of cash collateral that is ABL Priority Collateral except as permitted by Section 6.3(c)(i)), so long as (i) each Notes Priority Agent retains its Lien on the Collateral to secure the Notes Priority Obligations (in each case, including Proceeds thereof arising after the commencement of the Insolvency Proceeding) and, as to the Notes Priority Collateral only, such Lien has the same priority as existed prior to the commencement of the Insolvency Proceeding and any Lien on the Notes Priority Collateral securing such DIP Financing is junior and subordinate to the Liens of the Notes Priority Agents on the Notes Priority Collateral, (ii) all Liens on ABL Priority Collateral securing any such DIP Financing shall be senior to or on a parity with the Liens of the ABL Agent and the ABL Secured Parties securing the ABL Obligations on ABL Priority Collateral and (iii) the foregoing provisions of this Section 6.1(a) shall not prevent any Notes Priority Agents or Notes Priority Claimholders from objecting to any provision in any DIP Financing relating to any provision or content of a plan of reorganization or other plan of similar effect under any Bankruptcy or Insolvency Laws.

(b)    If the Borrower, the Issuer or any Guarantor shall be subject to any Insolvency Proceeding at any time prior to the Discharge of Notes Priority Obligations , and any Notes Priority Agent or Notes Priority Claimholders shall seek to provide the Borrower, the Issuer or any Guarantor with, or consent to a third party providing, any DIP Financing, with such DIP Financing to be secured by all or any portion of the Collateral (including assets that, but for the application of Section 552 of the Bankruptcy Code (or any similar provision or concept under any other Bankruptcy or Insolvency Laws) would be Collateral) (it being agreed that none of the Notes Priority Agents or the Notes Priority Claimholders shall propose any DIP Financing secured by the ABL Priority Collateral in competition with the ABL Agent and the ABL Secured Parties without the consent of the ABL Agent), then the ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that it will not oppose, raise or support any objection or act in a manner inconsistent with any such DIP Financing or to the Liens securing the same on the grounds of a failure to provide "adequate protection" for the Liens of the ABL Agent securing the ABL Obligations or on any other grounds (and will not request any adequate protection solely as a result of such DIP Financing), so long as (i) the ABL Agent retains its Lien on the Collateral to secure the ABL Obligations (in each case, including Proceeds thereof arising after the commencement of the Insolvency Proceeding) and, as to the ABL Priority Collateral only, such Lien has the same priority as existed prior to the commencement of the Insolvency Proceeding and any Lien on ABL Priority Collateral securing such DIP Financing furnished by the Notes Priority Agents or Notes Priority Claimholders is junior and subordinate to the Lien of the ABL Agent on the ABL Priority Collateral, (ii) all Liens on Notes Priority

35

Collateral securing any such DIP Financing furnished by such Notes Priority Agent or Notes Priority Claimholders shall be senior to or on a parity with the Liens of Notes Priority Agents and the Notes Priority Claimholders securing the Notes Priority Obligations on Notes Priority Collateral and (iii) the foregoing provisions of this <u>Section 6.1(b)</u> hereof shall not prevent the ABL Agent and the ABL Secured Parties from objecting to any provision in any DIP Financing relating to any provision or content of a plan of reorganization or other plan of similar effect under any Bankruptcy or Insolvency Laws.

(c)    All Liens granted to the ABL Agent or any Notes Priority Agent in any Insolvency Proceeding, whether as adequate protection or otherwise, are intended by the Parties to be and shall be deemed to be subject to the Lien Priority and the other terms and conditions of this Agreement.

**Section 6.2    <u>Relief From Stay</u>**. Until the Discharge of ABL Obligations has occurred, each Notes Priority Agent, on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents, agrees not to seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of any portion of the ABL Priority Collateral without the ABL Agent's express written consent. Until the Discharge of Notes Priority Obligations has occurred, the ABL Agent, on behalf of itself and the ABL Secured Parties, agrees not to seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of any portion of the Notes Priority Collateral without the Designated Notes Priority Agent's express written consent. In addition, neither any Notes Priority Agent nor the ABL Agent shall seek any relief from the automatic stay with respect to any Collateral without providing three (3) days' prior written notice to the other, unless such period is agreed by the ABL Agent and the Designated Notes Priority Agent to be modified or unless the ABL Agent or the Designated Notes Priority Agent, as applicable, makes a good faith determination that either (A) the ABL Priority Collateral or the Notes Priority Collateral, as applicable, will decline speedily in value or (B) the failure to take any action will have a reasonable likelihood of endangering the ABL Agent's or such Notes Priority Agent's ability to realize upon its Collateral.

**Section 6.3    <u>No Contest; Adequate Protection</u>**.

(a)    Each Notes Priority Agent, on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents, agrees that, prior to the Discharge of ABL Obligations, none of them shall seek or accept any form of adequate protection under any or all of §361, §362, §363 or §364 of the Bankruptcy Code (or any similar provision or concept under any other Bankruptcy or Insolvency Laws) with respect to the ABL Priority Collateral, except as set forth in <u>Section 6.1</u> hereof and this <u>Section 6.3</u> or as may otherwise be consented to in writing by the ABL Agent in its sole and absolute discretion. Each Notes Priority Agent, on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents, agrees that, prior to the Discharge of ABL Obligations, none of them shall contest (or support any other Person contesting) (i) any request by the ABL Agent or any ABL Secured Party for adequate protection, where applicable, of its interest in the Collateral (unless in contravention of <u>Section 6.1(b)</u> above), (ii) any proposed provision of DIP Financing by the ABL Agent and the ABL Secured Parties (or any other Person proposing to provide DIP Financing with the consent of the ABL Agent) (unless in contravention of <u>Section 6.1(a)</u> above) or (iii) any objection by the ABL Agent or any ABL Secured Party to any motion, relief, action, or proceeding based on a claim by the ABL Agent or any ABL Secured Party that its interests in the Collateral (unless in contravention of <u>Section 6.1(b)</u> above) are not adequately protected (or any other similar request under any law applicable to an Insolvency Proceeding), so long as any Liens granted to the ABL Agent as adequate protection of its interests are subject to this Agreement.

(b)    The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that, prior to the Discharge of Notes Priority Obligations, none of them shall seek or accept any form of adequate protection under any or all of §361, §362, §363 or §364 of the Bankruptcy Code (or any similar provision

or concept under any other Bankruptcy or Insolvency Laws) with respect to the Notes Priority Collateral, except as set forth in <u>Section 6.1</u> hereof and this <u>Section 6.3</u> or as may otherwise be consented to in writing by the Designated Notes Priority Agent in its sole and absolute discretion. The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that, prior to the Discharge of Notes Priority Obligations, none of them shall contest (or support any other Person contesting) (i) any request by any Notes Priority Agent or any Notes Priority Claimholder for adequate protection, where applicable, of its interest in the Collateral (unless in contravention of <u>Section 6.1(a)</u> above), (ii) any proposed provision of DIP Financing by any Notes Priority Agent and the Notes Priority Claimholders (or any other Person proposing to provide DIP Financing with the consent of the Notes Priority Agents) (unless in contravention of <u>Section 6.1(b)</u> above) or (iii) any objection by any Notes Priority Agent or any Notes Priority Claimholder to any motion, relief, action or proceeding based on a claim by any Notes Priority Agent or any Notes Priority Claimholder that its interests in the Collateral (unless in contravention of <u>Section 6.1(a)</u> above) are not adequately protected (or any other similar request under any law applicable to an Insolvency Proceeding), so long as any Liens granted to such Notes Priority Agent as adequate protection of its interests are subject to this Agreement.

       (c)      Notwithstanding the foregoing provisions in this <u>Section 6.3,</u> in any Insolvency Proceeding:

       (i) if the ABL Secured Parties (or any subset thereof) are granted adequate protection with respect to the ABL Priority Collateral in the form of additional collateral (even if such collateral is not of a type which would otherwise have constituted ABL Priority Collateral), then the ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that each Notes Priority Agent, on behalf of itself or any of the Notes Priority Claimholders under its Notes Priority Documents, may seek or request (and the ABL Secured Parties will not oppose such request) adequate protection with respect to its interests in such Collateral in the form of a Lien on the same additional collateral, which Lien will be subordinated to the Liens securing the ABL Obligations on the same basis as the other Liens of such Notes Priority Agent on ABL Priority Collateral; and

       (ii) in the event any Notes Priority Agent, on behalf of itself or any of the Notes Priority Claimholders under its Notes Priority Documents, is granted adequate protection in respect of Notes Priority Collateral in the form of additional collateral (even if such collateral is not of a type which would otherwise have constituted Notes Priority Collateral), then such Notes Priority Agent, on behalf of itself and any of the Notes Priority Claimholders under its Notes Priority Documents, agrees that the ABL Agent on behalf of itself or any of the ABL Secured Parties, may seek or request (and the Notes Priority Claimholders will not oppose such request) adequate protection with respect to its interests in such Collateral in the form of a Lien on the same additional collateral, which Lien will be subordinated to the Liens securing the Notes Priority Obligations on the same basis as the other Liens of the ABL Agent on Notes Priority Collateral.

       (iii) Except as otherwise expressly set forth in <u>Section 6.1</u> hereof or in connection with the exercise of remedies with respect to the ABL Priority Collateral, nothing herein shall limit the rights of any Notes Priority Agent or the Notes Priority Claimholders from seeking adequate protection, where applicable, with respect to their rights in the Notes Priority Collateral in any Insolvency Proceeding (including adequate protection in the form of a cash payment, periodic cash payments or otherwise). Except as otherwise expressly set forth in <u>Section 6.1</u> hereof or in connection with the exercise of remedies with respect to the Notes Priority Collateral, nothing herein shall limit the rights of the ABL Agent or the ABL Secured Parties from seeking adequate protection, where applicable, with respect to their rights in the ABL Priority Collateral

in any Insolvency Proceeding (including adequate protection in the form of a cash payment, periodic cash payments or otherwise).

**Section 6.4      Asset Sales**. Each Notes Priority Agent agrees, on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents, that it will not oppose any sale consented to by the ABL Agent of any ABL Priority Collateral pursuant to Section 363(f) of the Bankruptcy Code (or any similar provision or concept under any other Bankruptcy or Insolvency Law or under the law applicable to any Insolvency Proceeding or under a court order in respect of measures granted with similar effect under any Bankruptcy or Insolvency Law) so long as such Notes Priority Agent, for the benefit of the Notes Priority Claimholders under its Notes Priority Documents, shall retain a Lien on the proceeds of such sale (to the extent such proceeds are not applied to the ABL Obligations in accordance with Section 4.1(b) hereof). The ABL Agent agrees, on behalf of itself and the ABL Secured Parties, that it will not oppose any sale consented to by any Notes Priority Agent of any Notes Priority Collateral pursuant to Section 363(f) of the Bankruptcy Code (or any similar provision or concept under any other Bankruptcy or Insolvency Law or under the law applicable to any Insolvency Proceeding or under a court order in respect of measures granted with similar effect under any Bankruptcy or Insolvency Law) so long as (i) any such sale is made in accordance with Section 3.6 hereof and (ii) the ABL Agent, for the benefit of the ABL Secured Parties, shall retain a Lien on the proceeds of such sale (to the extent such proceeds are not applied to the Notes Priority Obligations in accordance with Section 4.1(c) hereof). If such sale of Collateral includes both ABL Priority Collateral and Notes Priority Collateral and the Parties are unable after negotiating in good faith to agree on the allocation of the purchase price between the ABL Priority Collateral and Notes Priority Collateral, either Party may apply to the court in such Insolvency Proceeding to make a determination of such allocation, and the court's determination shall be binding upon the Parties.

For the avoidance of doubt, each Notes Priority Agent, on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents, acknowledges and agrees that in connection with any of the matters described in the foregoing Sections 6.1, 6.2 or 6.3 hereof or in this Section 6.4, the rights of each Notes Priority Claimholder that is an ABL Secured Party but not an ABL Lender, in such Notes Priority Claimholder's capacity as an ABL Secured Party, are subject to, and limited as set forth in, Section 11.12(b) of the ABL Credit Agreement.

**Section 6.5      Separate Grants of Security and Separate Classification**. Each Notes Priority Claimholder and each ABL Secured Party acknowledges and agrees that (i) the grants of Liens pursuant to the ABL Collateral Documents, the Notes Collateral Documents and the Additional Notes Priority Documents constitute two or more separate and distinct grants of Liens and (ii) because of, among other things, their differing rights in the Collateral, the Notes Priority Obligations are fundamentally different from the ABL Obligations and must be separately classified in any plan of reorganization (or other plan of similar effect under any Bankruptcy or Insolvency Laws) proposed or adopted in an Insolvency Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the ABL Secured Parties and the Notes Priority Claimholders in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the ABL Secured Parties and the Notes Priority Claimholders hereby acknowledge and agree that all distributions shall be made as if there were separate classes of ABL Obligation claims and Notes Priority Obligation claims against the Credit Parties, with the effect being that, to the extent that the aggregate value of the ABL Priority Collateral or Notes Priority Collateral, as applicable, is sufficient (for this purpose ignoring all claims held by the other Secured Parties), the ABL Secured Parties or the Notes Priority Claimholders, respectively, shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all applicable amounts owing in respect of post-petition interest, fees and expenses that is available from each pool of Priority Collateral for each of the ABL Secured Parties and the Notes Priority Claimholders, respectively,

before any distribution is made in respect of the claims held by the other Secured Parties from such Collateral, with the other Secured Parties hereby acknowledging and agreeing to turn over to the respective other Secured Parties amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the aggregate recoveries.

**Section 6.6**      **Enforceability**. The provisions of this Agreement are intended to be and shall be enforceable under Section 510(a) of the Bankruptcy Code or any similar provision or concept under any other Bankruptcy or Insolvency Law.

**Section 6.7**      **ABL Obligations Unconditional**. All rights of the ABL Agent hereunder, and all agreements and obligations of the Notes Priority Agents and the Credit Parties (to the extent applicable) hereunder, shall remain in full force and effect irrespective of:

      A.      any lack of validity or enforceability of any ABL Document;

      B.      any change in the time, place or manner of payment of, or in any other term of, all or any portion of the ABL Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any ABL Document;

      C.      any exchange, release, voiding, avoidance or non perfection of any security interest in any Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding, restatement or increase of all or any portion of the ABL Obligations or any guarantee or guaranty thereof; or

      D.      any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Credit Party in respect of the ABL Obligations, or of any of any Notes Priority Agent or any Credit Party, to the extent applicable, in respect of this Agreement.

**Section 6.8**      **Notes Priority Obligations Unconditional**. All rights of the Notes Priority Agents hereunder, and all agreements and obligations of the ABL Agent and the Credit Parties (to the extent applicable) hereunder, shall remain in full force and effect irrespective of:

      E.      any lack of validity or enforceability of any Notes Priority Document;

      F.      any change in the time, place or manner of payment of, or in any other term of, all or any portion of the Notes Priority Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any Notes Priority Document;

      G.      any exchange, release, voiding, avoidance or non perfection of any security interest in any Collateral, or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding, restatement or increase of all or any portion of the Notes Priority Obligations or any guarantee or guaranty thereof; or

      H.      any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Credit Party in respect of the Notes Priority Obligations, or of any of the ABL Agent or any Credit Party, to the extent applicable, in respect of this Agreement.

## ARTICLE 7
## MISCELLANEOUS

**Section 7.1      Rights of Subrogation**. Each Notes Priority Agent, for and on behalf of itself and the Notes Priority Claimholders under its Notes Priority Documents, agrees that no payment to the ABL Agent or any ABL Secured Party pursuant to the provisions of this Agreement shall entitle such Notes Priority Agent or any Notes Priority Claimholder to exercise any rights of subrogation in respect thereof until the Discharge of ABL Obligations shall have occurred. Following the Discharge of ABL Obligations, the ABL Agent agrees to execute such documents, agreements, and instruments as any Notes Priority Agent or any Notes Priority Claimholder may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the ABL Obligations resulting from payments to the ABL Agent by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by the ABL Agent are paid by such Person upon request for payment thereof. The ABL Agent, for and on behalf of itself and the ABL Secured Parties, agrees that no payment to any Notes Priority Agent or any Notes Priority Claimholder pursuant to the provisions of this Agreement shall entitle the ABL Agent or any ABL Secured Party to exercise any rights of subrogation in respect thereof until the Discharge of Notes Priority Obligations shall have occurred. Following the Discharge of Notes Priority Obligations , each Notes Priority Agent agrees to execute such documents, agreements, and instruments as the ABL Agent or any ABL Secured Party may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the Notes Priority Obligations resulting from payments to such Notes Priority Agent by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by such Notes Priority Agent are paid by such Person upon request for payment thereof.

**Section 7.2      Further Assurances**. The Parties will, at their own expense and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that either Party may reasonably request, in order to protect any right or interest granted or purported to be granted hereby or to enable the ABL Agent or any Notes Priority Agent to exercise and enforce its rights and remedies hereunder; provided, however, that no Party shall be required to pay over any payment or distribution, execute any instruments or documents, or take any other action referred to in this Section 7.2, to the extent that such action would contravene any law, order or other legal requirement or any of the terms or provisions of this Agreement, and in the event of a controversy or dispute, such Party may interplead any payment or distribution in any court of competent jurisdiction, without further responsibility in respect of such payment or distribution under this Section 7.2.

**Section 7.3      Representations**. Each Notes Priority Agent represents and warrants to the ABL Agent that it has the requisite power and authority under its Notes Priority Documents to enter into, execute, deliver, and carry out the terms of this Agreement and that its Notes Priority Documents authorize such Notes Priority Agent to execute, deliver, and carry out the terms of this Agreement on behalf of the Notes Priority Claimholders under its Notes Priority Documents, binding such Notes Priority Claimholders to its terms. The ABL Agent represents and warrants to each Notes Priority Agent that it has the requisite power and authority under the ABL Documents to enter into, execute, deliver, and carry out the terms of this Agreement on behalf of itself and that the ABL Documents authorize the ABL Agent to execute, deliver, and carry out the terms of this Agreement on behalf of the ABL Secured Parties, binding the ABL Secured Parties to its terms.

**Section 7.4      Amendments**. No amendment or waiver of any provision of this Agreement nor consent to any departure by any Party hereto shall be effective unless it is in a written agreement executed by each Notes Priority Agent and the ABL Agent and, in the case of any amendment or waiver that could reasonably be expected to be adverse to the interests of any Credit Party (it being agreed that any such

40

amendment or waiver that conflicts with or is inconsistent with the obligations of any Credit Party under any other ABL Documents or Notes Priority Documents is adverse to the interests of a Credit Party), the Borrower and the Issuer, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. It is understood that the ABL Agent and each Notes Priority Agent, without the consent of any other ABL Secured Party or Notes Priority Claimholder, may in their discretion determine that a supplemental agreement (which may take the form of an amendment and restatement of this Agreement) is necessary or appropriate (i) to facilitate having additional indebtedness or other obligations of any of the Credit Parties become ABL Obligations or Notes Priority Obligations, as the case may be, under this Agreement, (ii) to effectuate the subordination of Liens securing any Permitted Junior Secured Refinancing Debt (or any Permitted Refinancing thereof) to the Liens on the Notes Priority Collateral securing the ABL Obligations and to the Liens on the ABL Priority Collateral securing the Notes Priority Obligations and (iii) to cause Liens securing any Permitted Pari Passu Secured Refinancing Debt (or any Permitted Refinancing thereof) to be secured by ABL Priority Collateral or Notes Priority Collateral on a pari passu basis with ABL Obligations or Notes Priority Obligations, as the case may be (the indebtedness or other obligations described in clauses (i), (ii) and (iii), "**Additional Debt**"), which supplemental agreement shall, except in the case of (ii) and (iii), specify whether such Additional Debt constitutes ABL Obligations or Notes Priority Obligations; provided that such Additional Debt is permitted to be incurred under any ABL Credit Agreement and any Notes Priority Documents then extant in accordance with the terms thereof. Notwithstanding the foregoing, (i) any Additional Notes Priority Agent, on behalf of itself and such holders, may become a party to this Agreement, without any further action by any other party hereto, upon execution and delivery by the Issuer and such Additional Notes Priority Agent of a properly completed joinder agreement (substantially in the form of **Exhibit B**) to each of the other parties hereto and (ii) technical modifications may be made to this Agreement to facilitate the inclusion of Additional Notes Priority Obligations without any further action by any other party hereto to the extent such Additional Notes Priority Obligations are permitted to be incurred under the ABL Documents and the Notes Priority Documents.

**Section 7.5        Addresses for Notices**. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, emailed, or sent by overnight express courier service or United States mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or five (5) days after deposit in the United States mail (certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section) shall be as set forth below or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

ABL Agent:        [____]
                  [____]
                  Attention: [____]
                  Telecopier: [____]

Initial Notes Priority Agent:

                  COMPUTERSHARE TRUST COMPANY, N.A.
                  9062 Old Annapolis Road
                  Columbia, Maryland 21045
                  Attn: David Diaz

**Section 7.6        No Waiver: Remedies**. No failure on the part of any Party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial

exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 7.7    **Continuing Agreement, Transfer of Secured Obligations**. This Agreement is a continuing agreement and shall (a) remain in full force and effect until the Discharge of ABL Obligations and the Discharge of Notes Priority Obligations shall have occurred, (b) be binding upon the Parties and their successors and assigns, and (c) inure to the benefit of and be enforceable by the Parties and their respective successors, transferees and assigns. Except as set forth in Section 7.4 hereof, nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Collateral. All references to any Credit Party shall include any Credit Party as debtor-in-possession and any receiver or trustee for such Credit Party in any Insolvency Proceeding. Without limiting the generality of the foregoing clause (c), the ABL Agent, any ABL Secured Party, any Notes Priority Agent, or any Notes Priority Claimholder may assign or otherwise transfer all or any portion of the ABL Obligations or the Notes Obligations in accordance with the ABL Credit Agreement or the Notes Priority Documents, in each case, as applicable, to any other Person (other than the Borrower, the Issuer any Guarantor or any Affiliate of the Borrower, the Issuer or any Guarantor and any Subsidiary of the Borrower, the Issuer or any Guarantor (except as provided in such ABL Credit Agreement or such Notes Priority Document, as applicable)), and such other Person shall thereupon become vested with all the rights and obligations in respect thereof granted to the ABL Agent, any Notes Priority Agent, any ABL Secured Party, or any Notes Priority Claimholder, as the case may be, herein or otherwise. The ABL Secured Parties and the Notes Priority Claimholders may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide Indebtedness to, or for the benefit of, any Credit Party on the faith hereof.

Section 7.8    **GOVERNING LAW; ENTIRE AGREEMENT**.  (a) THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK. This Agreement constitutes the entire agreement and understanding among the Parties with respect to the subject matter hereof and supersedes any prior agreements, written or oral, with respect thereto.

Section 7.9    **Counterparts**. This Agreement may be executed in any number of counterparts, and it is not necessary that the signatures of all Parties be contained on any one counterpart hereof, each counterpart will be deemed to be an original, and all together shall constitute one and the same document. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission (in .pdf or similar format) shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 7.10    **No Third Party Beneficiaries**. This Agreement is solely for the benefit of the ABL Agent, ABL Secured Parties, Notes Priority Agents and Notes Priority Claimholders. Except as set forth in Section 7.4 hereof, no other Person (including the Borrower, the Issuer, any Guarantor or any Affiliate of the Borrower, the Issuer or any Guarantor, or any Subsidiary of the Borrower, the Issuer or any Guarantor (except as provided in any ABL Credit Agreement or any Notes Priority Document, as applicable)) shall be deemed to be a third party beneficiary of this Agreement.

Section 7.11    **Headings**. The headings of the articles and sections of this Agreement are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof.

Section 7.12    **Severability**. If any of the provisions in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement and shall not invalidate the Lien Priority or the

application of Proceeds and other priorities set forth in this Agreement. The parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 7.13    **Attorneys Fees**. Attorneys' Fees. The Parties agree that if any dispute, arbitration, litigation, or other proceeding is brought with respect to the enforcement of this Agreement or any provision hereof, the prevailing party in such dispute, arbitration, litigation, or other proceeding shall be entitled to recover its reasonable attorneys' fees and all other costs and expenses incurred in the enforcement of this Agreement irrespective of whether suit is brought.

Section 7.14    **VENUE; JURY TRIAL WAIVER**.

(a)    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT ANY ABL SECURED PARTY OR ANY TERM SECURED PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, ANY TERM DOCUMENTS, OR ANY ABL DOCUMENTS AGAINST ANY CREDIT PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(b)    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN PARAGRAPH (a) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c)    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING

WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION. EACH PARTY HERETO REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(d)     EXCEPT FOR THE INITIAL NOTES PRIORITY AGENT, EACH OTHER PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 7.5 HEREOF. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

**Section 7.15     Intercreditor Agreement**. This Agreement is the "Intercreditor Agreement" referred to in the ABL Credit Agreement and this Agreement is the "ABL Intercreditor Agreement" referred to in the Indenture. Nothing in this Agreement shall be deemed to subordinate the obligations due to (i) any ABL Secured Party to the obligations due to any Notes Priority Claimholder or (ii) any Notes Priority Claimholder to the obligations due to any ABL Secured Party (in each case, whether before or after the occurrence of an Insolvency Proceeding), it being the intent of the Parties that this Agreement shall effectuate a subordination of Liens but not a subordination of Indebtedness.

**Section 7.16     No Warranties or Liability**. Each Notes Priority Agent and the ABL Agent acknowledge and agree that neither has made any representation or warranty with respect to the execution, validity, legality, completeness, collectability or enforceability of any other ABL Document or any Notes Priority Document. Except as otherwise provided in this Agreement, the Notes Priority Claimholders and the ABL Agent will be entitled to manage and supervise their respective extensions of credit to any Credit Party in accordance with law and their usual practices, modified from time to time as they deem appropriate.

**Section 7.17     Conflicts**. In the event of any conflict between the provisions of this Agreement and the provisions of any ABL Document or any Notes Priority Document, the provisions of this Agreement shall govern.

**Section 7.18     Costs and Expenses**. All costs and expenses incurred by the Initial Notes Priority Agent and the ABL Agent, including, without limitation pursuant to Section 3.8(d) and Section 4.1(e) hereunder shall be reimbursed by the Borrower, the Issuer and the Credit Parties as provided in Sections 7.7 and 12.7(z) of the Indenture (or any similar provision) and Section 12.3 (or any similar provision) of the ABL Credit Agreement.

**Section 7.19     Information Concerning Financial Condition of the Credit Parties**. Each of the Notes Priority Claimholders and the ABL Agent hereby assumes responsibility for keeping itself informed of the financial condition of the Credit Parties and all other circumstances bearing upon the risk of nonpayment of the ABL Obligations or the Notes Priority Obligations; provided that, nothing in this Agreement shall obligate any Notes Priority Agent to keep itself informed as to the financial condition of the Credit Parties beyond that which may be required by its Notes Priority Documents. The Notes Priority Agents and the ABL Agent hereby agree that no party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances. In the event any Notes Priority Agent or the ABL Agent, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, (a) it shall be under no obligation (i) to provide any such information to such other party or any other party on any subsequent occasion, (ii) to

undertake any investigation not a part of its regular business routine, or (iii) to disclose any other information, (b) it makes no representation as to the accuracy or completeness of any such information and shall not be liable for any information contained therein, and (c) the Party receiving such information hereby agrees to hold the other Party harmless from any action the receiving Party may take or conclusion the receiving Party may reach or draw from any such information, as well as from and against any and all losses, claims, damages, liabilities, and expenses to which such receiving Party may become subject arising out of or in connection with the use of such information. Notwithstanding anything to the contrary, in no event shall the Initial Note Priority Agent be liable or responsible for keeping itself informed of the financial condition of the Credit Parties and all other circumstances bearing upon the risk of nonpayment of the ABL Obligations or the Notes Priority Obligations.

**Section 7.20    Additional Credit Parties**. The Borrower will promptly cause each Person that becomes a Credit Party to execute and deliver to the parties hereto an acknowledgment to this Agreement substantially in the form of **Exhibit A**, whereupon such Person will be bound by the terms hereof to the same extent as if it had executed and delivered this Agreement as of the date hereof. The parties and the Credit Parties hereto further agree that, notwithstanding any failure to take the actions required by the immediately preceding sentence, each Person which becomes a Credit Party at any time (and any security granted by any such Person) shall be subject to the provisions hereof as fully as if the same constituted a Credit Party party hereto and had complied with the requirements of the immediately preceding sentence.

**Section 7.21    Concerning the Initial Notes Priority Agent**. Computershare is entering into this Agreement not in its individual capacity, but solely in its capacity as "Notes Collateral Agent" under the Indenture and the Initial Notes Priority Documents, and in entering into this Agreement and acting (or forbearing from acting) hereunder as the Initial Notes Priority Agent shall be entitled to all of the rights, privileges, immunities and indemnities of the "Notes Collateral Agent" under the Indenture and the Initial Notes Priority Documents. For the avoidance of doubt, Computershare Trust Company, N.A., in its individual capacity, shall not be responsible for any payment obligations of the Initial Notes Priority Agent or the Trustee under this Agreement. The Initial Notes Priority Agent shall not be responsible for the terms or sufficiency of this Agreement for any purpose. The Initial Notes Priority Agent shall not have any duties or obligations under or pursuant to this Agreement other than such duties as may be expressly set forth in this as duties on its part to be performed or observed. The Initial Notes Priority Agent shall not have any liability or responsibility for the actions or omissions of any other claimholder or other Agent's, or for any other claimholder's or other Agent's compliance with (or failure to comply with) the terms of this Agreement. None of the provisions in this Agreement shall require the Initial Notes Priority Agent to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to them against such risk or liability is not assured to them. The Initial Notes Priority Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Initial Notes Priority Documents that the Initial Notes Priority Agent is required to exercise as directed in writing by the required noteholders under the Initial Notes Priority Documents; provided that, the Initial Notes Priority Agent shall be entitled to refrain from any act or the taking of any action hereunder, under the Initial Notes Priority Documents or from the exercise of any power or authority vested in it hereunder or thereunder unless and until the Initial Notes Priority Agent shall have received instructions from the required noteholders, and if the Initial Notes Priority Agent deems necessary, satisfactory indemnity has been provided to it, and Initial Notes Priority Agent shall not be liable for any such delay in acting. Initial Notes Priority Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose either to liability or that is contrary to the Initial Notes Priority Documents or applicable law, including for the avoidance of doubt, any action that may be in violation of the automatic stay under any bankruptcy or insolvency law. For purposes of clarity, phrases such as "satisfactory to", "approved by", "acceptable to", "as determined by", "in the discretion

of", "selected by", "requested by" the Initial Notes Priority Agent and phrases of similar import authorize and permit the Initial Notes Priority Agent to approve, disapprove, determine, act or decline to act in its discretion. Any exercise of discretion on behalf of Initial Notes Priority Agent shall be exercised in accordance with the terms of the Initial Notes Priority Documents. Notwithstanding anything herein to the contrary, Initial Notes Priority Agent shall not have any responsibility for the preparation, filing or recording, re-filing, re-recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest granted pursuant to this Agreement or any Initial Notes Priority Document.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the ABL Agent, for and on behalf of itself and the ABL Secured Parties, and the Initial Notes Priority Agent, for and on behalf of itself and the Initial Notes Priority Claimholders, have caused this Agreement to be duly executed and delivered as of the date first above written.

[_____], in its capacity as the ABL Agent

By: _____
    Name:
    Title:

**COMPUTERSHARE TRUST COMPANY,
N.A.**, in its capacity as the Initial Notes Priority
Agent

By: _____
    Name:
    Title:

[Signature Page to ABL Intercreditor Agreement]

**EXHIBIT A**

## ACKNOWLEDGMENT

The Borrower, the Issuer and each Guarantor hereby acknowledges that it has received a copy of this Agreement as in effect on the date hereof and consents thereto, agrees to recognize all rights granted thereby to the ABL Agent, the ABL Secured Parties, the Notes Priority Agents, and the Notes Priority Claimholders (including pursuant to Section 7.18 hereof) and will not do any act or perform any obligation which is not in accordance with the agreements set forth in this Agreement as in effect on the date hereof. The Borrower, the Issuer and each Guarantor further acknowledges and agrees that (except as set forth in Section 7.4 hereof) it is not an intended beneficiary or third party beneficiary under this Agreement and (i) as between the ABL Secured Parties, the Borrower and Guarantors, the ABL Documents remain in full force and effect as written and are in no way modified hereby, and (ii) as between the Notes Priority Claimholders, the Issuer and Guarantors, the Notes Priority Documents remain in full force and effect as written and are in no way modified hereby.

Without limiting the foregoing or any rights or remedies the Issuer and the other Credit Parties may have, [Holdings,] the Issuer and the other Credit Parties consent to the performance by each Notes Priority Agent of the obligations set forth in Section 3.6 of this Agreement and acknowledge and agree that neither any Notes Priority Agent nor any other Notes Priority Claimholder shall ever be accountable or liable for any action taken or omitted by the ABL Agent or any other ABL Secured Party or its or any of their officers, employees, agents successors or assigns in connection therewith or incidental thereto or in consequence thereof, including any improper use or disclosure of any proprietary information or other Intellectual Property by the ABL Agent or any other ABL Secured Party or its or any of their officers, employees, agents, successors or assigns or any other damage to or misuse or loss of any property of the Credit Parties as a result of any action taken or omitted by the ABL Agent or its officers, employees, agents, successors or assigns pursuant to, and in accordance with, Section 3.6 of this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[Signature Page to Intercreditor Agreement]

**<u>CREDIT PARTIES</u>:**

**TACORA RESOURCES INC.**


By:      _____
Name:    _____
Title:   _____

**<u>GUARANTORS:</u>**

[_____]


By:   _____
Name:  _____
Title:   _____

**EXHIBIT B**

## FORM OF JOINDER AGREEMENT

JOINDER NO. [     ] dated as of [          ], 20[   ] (the "**Joinder Agreement**") to the INTERCREDITOR AGREEMENT dated as of [          ], 20[   ] ("**Intercreditor Agreement**"), and entered into by and between [____] ("[____]"), in its capacities as administrative agent and collateral agent for the ABL Secured Parties (the "**ABL Agent**"), and **COMPUTERSHARE TRUST COMPANY, N.A.** ("**Computershare**"), in its capacity as collateral agent under the Indenture and the Notes Collateral Documents (each as defined below) (together with its successors and assigns in such capacities, the "**Initial Notes Priority Agent**"), acknowledged by Tacora Resources Inc., a corporation incorporated under the laws of the Province of Ontario, Canada, and the other Credit Parties named therein.

A.     Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

B.     As a condition to the ability of the Credit Parties to incur Additional Notes Priority Obligations, and to secure such Additional Notes Priority Obligations with the liens and security interests created by the applicable Additional Notes Priority Obligations Agreement, the collateral agent for such Additional Notes Priority Obligations is required to become an Additional Notes Priority Agent and Additional Notes Priority Obligations and Additional Notes Priority Claimholders in respect thereof are required to become subject to and bound by, the Intercreditor Agreement. Section 7.4 of the Intercreditor Agreement provides that the Additional Notes Priority Agent, and such Additional Notes Priority Claimholders may become subject to and bound by the Intercreditor Agreement, pursuant to the execution and delivery by the New Collateral Agent of an instrument in the form of this Joinder Agreement and the satisfaction of the other conditions set forth in Section 7.4 of the Intercreditor Agreement and in the definition of "Additional Notes Priority Obligations". The undersigned Additional Notes Priority Agent (the "New Collateral Agent") is executing this Joinder Agreement in accordance with the requirements of the Intercreditor Agreement.

Accordingly, the New Collateral Agent agrees as follows:

SECTION 1.     In accordance with the Intercreditor Agreement, (i) the New Collateral Agent by its signature below becomes an Additional Notes Priority Agent under, and the related Notes Priority Claimholders become subject to and bound by, the Intercreditor Agreement with the same force and effect as if the New Collateral Agent had originally been named therein as an Additional Notes Priority Agent, (ii) the New Collateral Agent, on its behalf and on behalf of such Notes Priority Claimholders, hereby agrees to all the terms and provisions of the Intercreditor Agreement applicable to it as an Additional Notes Priority Agent, and to the Additional Notes Priority Claimholders that it represents. Each reference to an Additional Pari Passu Obligations Agent in the Intercreditor Agreement shall be deemed to [include][refer to] the New Collateral Agent. The Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2.     The New Collateral Agent represents and warrants that (i) it has full power and authority to enter into this Joinder Agreement, in its capacity as [agent] [trustee] under [describe new facility], (ii) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability, and (iii) the Additional Notes Priority Obligations Agreement provides that, upon the New Collateral Agent's entry into this Joinder Agreement, the holders of Additional Notes Priority Obligations in respect of such

Additional Notes Priority Obligations Agreement will be subject to and bound by the provisions of the Intercreditor Agreement as Notes Priority Claimholders.

SECTION 3.    This Joinder Agreement may be executed in one or more counterparts, including by means of facsimile or "pdf" file thereof or other electronic means, each of which shall be an original and all of which shall together constitute one and the same document.

SECTION 4.    Except as expressly supplemented hereby, the Intercreditor Agreement shall remain in full force and effect.

SECTION 5.    This Joinder Agreement has been delivered and accepted at and shall be deemed to have been made at New York, New York and shall be interpreted, and the rights and liabilities of the parties bound hereby determined, in accordance with the laws of the State of New York.

SECTION 6.    The terms of this Joinder Agreement shall survive, and shall continue in full force and effect, notwithstanding the commencement of any proceeding under any Bankruptcy or Insolvency Law. Any provision of this Joinder Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 7.    All communications and notices hereunder shall be in writing and given as provided in Section 7.5 of the Intercreditor Agreement. All communications and notices hereunder to the New Collateral Agent shall be given to it at it address set forth below their signatures hereto.

SECTION 8.    Sections 7.8 and 7.14 of the Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 9.    After giving effect to this Joinder Agreement, the Designated Notes Priority Agent as of the date hereof is [_____].

SECTION 10.    It is expressly understood and agreed by the parties hereto that this Joinder Agreement is executed and delivered by Computershare Trust Company, N.A., not individually but solely as Notes Collateral Agent under the Indenture and Initial Notes Priority Documents. The Initial Notes Priority Agent assumes no responsibility for the correctness of the recitals contained herein and shall not be responsible or accountable in any way whatsoever for or with respect to the validity, execution or sufficiency of this Joinder Agreement and makes no representation with respect thereto. In connection with the Initial Notes Priority Agent entering into and in the performance of its duties under any of this Joinder Agreement, to the extent not already provided for herein or therein, the Initial Notes Priority Agent shall be entitled to the benefit of every provision of the Indenture and the Initial Notes Priority Documents limiting the liability of or affording rights, privileges, protections, exculpations, immunities, indemnities or benefits to the Initial Notes Priority Agent as if they were expressly set forth herein, mutatis mutandis.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the party hereto has executed this Joinder Agreement as of the date first written above.

[            ],
as the New Collateral Agent


By: _____
     Name:
     Title:




Address for Notices:

[            ]

EXHIBIT F

FORM OF PARI PASSU INTERCREDITOR AGREEMENT

[Attached]

[FORM OF]

PARI PASSU INTERCREDITOR AGREEMENT

dated as of [      ],

among

TACORA RESOURCES INC.

the other GRANTORS party hereto,

COMPUTERSHARE TRUST COMPANY, N.A.,
in its capacity as
the Notes Collateral Agent, as the Authorized Representative for the Indenture
Secured Parties,

[            ],

as the Initial Additional Authorized Representative,

[SAF Jarvis 2 LP,
as the Jarvis Hedge Provider]

and

each ADDITIONAL AUTHORIZED REPRESENTATIVE from time to time party hereto

PARI PASSU INTERCREDITOR AGREEMENT, dated as of [      ] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), by and among TACORA RESOURCES INC., a corporation incorporated under the laws of the Province of Ontario, Canada (the "Company"), the other GRANTORS (as defined below) party hereto, COMPUTERSHARE TRUST COMPANY, N.A., as notes collateral agent (in such capacity, along with its successors and permitted assigns, the "Notes Collateral Agent"), as Authorized Representative for the Indenture Secured Parties under the Indenture (as defined below), [                  ], as the Authorized Representative for the Initial Additional Secured Parties (in such capacity, along with its successors and permitted assigns, the "Initial Additional Authorized Representative"), [SAF Jarvis 2 LP, and any of its successors and assigns (the "Jarvis Hedge Provider") under the Jarvis Hedge Agreements (defined below),] and each Additional Authorized Representative from time to time party hereto, as the Authorized Representative for any Secured Parties of any other Class.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Authorized Representative, for itself and on behalf of its Related Secured Parties, hereby agrees as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01. Certain Defined Terms. Capitalized terms used but not otherwise defined herein have the meanings assigned to such terms in the Indenture referred to below. As used in this Agreement, the following terms have the meanings specified below:

"ABL/Bond Intercreditor Agreement" means an Intercreditor Agreement by between COMPUTERSHARE TRUST COMPANY, N.A., as the Notes Collateral Agent, and [_____], as the ABL Agent, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, entered into in connection with any ABL Facility.



"ABL Collateral Agent" means [_____] and any successor or assign under the ABL Agreement, and/or the "ABL Collateral Agent" designated pursuant to the terms of the ABL Credit Agreement.

"ABL Credit Agreement" means the asset-based credit agreement entered into in connection with an ABL Facility, collectively with the guarantees thereof, by and among the Company, the other Grantors as borrowers or guarantors, the financial institutions party thereto as lenders and agents, and [_____], as the as administrative agent, as amended, restated, modified, renewed, refunded, replaced, increased, extended or refinanced in whole or in part from time to time under the same or any other agent, lender or group of lenders, including in the form of notes issued under an indenture in a securities offering.

"ABL Facility" means a new asset-based credit facility with the financial institutions party thereto as lenders and the agent of such lenders, as amended, restated, modified, renewed, refunded, replaced (whether upon or after termination or otherwise) or refinanced in whole or in part from time to time.

"Additional Authorized Representative" has the meaning assigned to such term in Article VI.

"Additional Authorized Representative Joinder Agreement" means a supplement to this Agreement substantially in the form of Exhibit I, appropriately completed.

"Additional Pari Passu Lien Documents" means the indentures, loan agreements, note purchase agreements or other agreements under which Additional Pari Passu Obligations of any Class are issued or incurred and all other notes, instruments, agreements and other documents evidencing or governing Additional Pari Passu Lien Obligations of such Class or providing any guarantee, Lien or other right in respect thereof.

"Additional Pari Passu Lien Obligations" means all obligations of the Company and the other Grantors that shall have been designated as such pursuant to Article VI.

"Additional Secured Parties" means the holders of any Additional Pari Passu Lien Obligations.

"Agreement" has the meaning assigned to such term in the preamble hereto.

"Authorized Representatives" means the Notes Collateral Agent, [the Applicable Collateral Holder (as defined in the Jarvis Hedge Facility Intercreditor Agreement,] [the Jarvis Hedge Provider,] the Initial Additional Authorized Representative and each Additional Authorized Representative.

"Bankruptcy Case" has the meaning assigned to such term in Section 2.06.

"Bankruptcy Code" means Title 11 of the United States Code as amended.

"Bankruptcy or Insolvency Law" means the Bankruptcy Code, the *Bankruptcy and Insolvency Act* (Canada), the *Companies' Creditors Arrangement Act* (Canada), the *Winding-Up and Restructuring Act* (Canada) and any Canadian corporate statute where such statute is used to propose an arrangement involving the compromise of claims of creditors, each as amended from time to time, and any similar federal, provincial, state or foreign law for the relief of debtors.

"Business Day" means any day other than a Saturday, Sunday, or day on which commercial banks in the state of New York and the State where the Corporate Trust Office of the Notes Collateral Agent are authorized or required by law to remain closed.

"Class", when used in reference to (a) any Pari Passu Lien Obligations, refers to whether such Pari Passu Lien Obligations are the Initial Pari Passu Claims, the Initial Additional Pari Passu Lien Obligations or the Additional Pari Passu Lien Obligations of any Series, (b) any Authorized Representative, refers to whether such Authorized Representative is the Notes Collateral Agent, [the Applicable Collateral Holder (as defined in the Jarvis Hedge Facility Intercreditor Agreement,] ,] [the Jarvis Hedge Provider,] the Initial Additional Authorized Representative or the Additional Authorized Representative with respect to the Additional Pari Passu Lien Obligations of any Series, (c) any Secured Parties, refers to whether such Secured Parties are the Indenture Secured Parties, [the Jarvis Hedge Provider,] the Initial Additional Secured Parties or the Additional Secured Parties with respect to the Additional Pari Passu Lien Obligations of any Series, and (d) any Pari Passu Lien Documents, refers to whether such Pari Passu Lien Documents are the Noteholder Documents, [the Jarvis Hedge Agreements,] the Initial Additional Pari Passu Lien Documents or the Additional Pari Passu Lien Documents with respect to Additional Pari Passu Lien Obligations of any Series.

"Collateral" means all assets of the Grantors now or hereafter subject to a Lien created pursuant to any Pari Passu Lien Security Document to secure any Pari Passu Lien Obligations.

"Company" has the meaning assigned to such term in the preamble hereto.

"Controlling Collateral Agent" means, (a) until the earlier of (i) Discharge of the Initial Pari Passu Claims and (ii) the occurrence of the Non-Controlling Authorized Representative Enforcement Date, the [Applicable Collateral Holder (as such term is defined in the Jarvis Hedge Facility Intercreditor Agreement)] / [Notes Collateral Agent] and (b) from and after the earlier of (i) the Discharge of the Initial Pari Passu Claims and (ii) the occurrence of the Non-Controlling Authorized Representative Enforcement Date, the Major Non-Controlling Authorized Representative.

"Controlling Secured Parties" means, at any time with respect to any Shared Collateral, the Secured Parties of the same Class as the Authorized Representative that is the Controlling Collateral Agent with respect to such Shared Collateral at such time.

"Corporate Trust Office of the Notes Collateral Agent" mean the designated corporate trust office of Computershare Trust Company, N.A., as indicated in Section 7.01 hereto, or such office designated by any successor Notes Collateral Agent.

"Default" means a "Default" (or a similar event, however denominated) as defined in any Pari Passu Lien Document.

"Designated Notes Priority Agent" means (i) if at any time there is only one series of Pari Passu Lien Obligations, the Authorized Representative for such Pari Passu Lien Obligations and (ii) at any time when clause (i) does not apply, the Controlling Collateral Agent. The Designated Notes Priority Agent as of the date hereof is the Notes Collateral Agent.

"DIP Financing" has the meaning assigned to such term in Section 2.06.

"DIP Financing Liens" has the meaning assigned to such term in Section 2.06.

"DIP Lenders" has the meaning assigned to such term in Section 2.06.

"Discharge" means, with respect to any Shared Collateral and Pari Passu Lien Obligations of any Class, the date on which Pari Passu Lien Obligations of such Class are no longer secured by Liens on such Shared Collateral. The term "Discharged" shall have a corresponding meaning.

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Event of Default" means an "Event of Default" (or a similar event, however denominated) as defined in any Pari Passu Lien Document.

"Grantor Joinder Agreement" means a supplement to this Agreement substantially in the form of Exhibit II, appropriately completed.

"Grantors" means, at any time, the Company and each of its Subsidiaries that, at such time, has granted a security interest in any of its assets pursuant to any Pari Passu Lien Security Document to secure any Pari Passu Lien Obligations of any Class. The Persons that are Grantors on the date hereof are set forth on Schedule I.

"Impairment" has the meaning assigned to such term in Section 2.02.

"<u>Indenture</u>" means the Indenture dated as of May 11, 2021, by and among the Company, as Issuer, the guarantors from time to time party thereto, the Trustee, and the Notes Collateral Agent, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Indenture Secured Parties</u>" means the "Notes Secured Parties" as defined in the Indenture and the Persons holding Noteholder Claims, including the Notes Collateral Agent and the Trustee.

"<u>Initial Additional Authorized Representative</u>" has the meaning assigned to such term in the preamble hereto.

"<u>Initial Additional Pari Passu Lien Documents</u>" means that certain [        ] dated as of [        ], among the Company, [the guarantors identified therein] and [        ], and all other instruments, agreements and other documents evidencing or governing Initial Additional Pari Passu Lien Obligations or providing any guarantee, Lien or other right in respect thereof.

"<u>Initial Additional Pari Passu Lien Obligations</u>" has the meaning assigned to the term [        ] in the Initial Additional Pari Passu Lien Documents.

"<u>Initial Additional Secured Parties</u>" means the holders of any Initial Additional Pari Passu Lien Obligations.

"<u>Initial Pari Passu Claims</u>" means the Noteholder Claims [together with the outstanding, Jarvis Secured Hedge Obligations, if any, with the relative priorities of each of the Noteholder Claims and the Jarvis Secured Hedge Obligations governed by the Jarvis Hedge Facility Intercreditor Agreement.]

"<u>Insolvency or Liquidation Proceeding</u>" means:

(a)    any dissolution, winding up, total or partial liquidation, adjustment or readjustment of debt, reorganization, recapitalization, judicial reorganization, extrajudicial reorganization, compromise, arrangement with creditors, plan of arrangement, proposal or similar proceedings under any Bankruptcy or Insolvency Laws of or with respect to any Grantor or their respective property or liabilities, in each case under any Bankruptcy or Insolvency Law;

(b)    any dissolution, winding up, total or partial liquidation, adjustment or readjustment of debt, reorganization, recapitalization, compromise, arrangement with creditors, plan of arrangement or similar proceedings under the arrangement provisions of any applicable corporate law (in any case which involves the alteration, amendment, conversion, compromise, satisfaction or discharge of debts owing to any or all creditors) of or with respect to any Grantor or their respective property or liabilities;

(c)    any bankruptcy, insolvency, receivership, petition or assignment in bankruptcy, assignment for the benefit of creditors or any similar case or proceeding is commenced under any Bankruptcy or Insolvency Laws or otherwise of or with respect to any Grantor;

(d)    any marshalling of assets or liabilities of any Grantor under any Bankruptcy or Insolvency Laws;

(e)    any bulk sale of assets by any Grantor including any sale of all or substantially all of the assets of any Grantor, in each case, to the extent not permitted by the terms of this Agreement or any Pari Passu Lien Documents;

(f)     any proceeding seeking the appointment of any trustee, monitor, receiver, receiver and manager, liquidator, custodian or other insolvency official with similar powers with respect to all or substantially all of the assets of any Grantor, or with respect to any of their respective assets, to the extent not permitted under any Pari Passu Lien Documents;

(g)     any proceedings in relation to any of the foregoing or otherwise involving the compromise of claims of creditors or in which substantially all claims of creditors of a Grantor are determined and any payment or distribution is or may be made on account of such claims, whether any of the foregoing is voluntary or involuntary, partial or complete, and includes any such proceedings initiated or consented to by such Grantor, as applicable; or

(h)     any other event which, under the laws of any applicable jurisdiction, has an effect equivalent to any of the events referred to in clauses (a) through (g) above.

"Intervening Creditor" has the meaning assigned to such term in Section 2.02.

"Intervening Lien" has the meaning assigned to such term in Section 2.02.

["Jarvis Hedge Agreements" means the definitive agreements governing the Jarvis Hedge Facility.]

["Jarvis Hedge Facility" means those certain credit arrangements entered into as of May 11, 2021 in the form of a commodity derivatives facility to support existing commodity derivatives contracts of the Company (as assigned by SAF Jarvis 1 LP to the Jarvis Hedge Provider) which are scheduled to mature from time to time on or before December 31, 2021, and potential new commodity derivatives contracts.]

["Jarvis Hedge Facility Intercreditor Agreement" means that certain intercreditor agreement, dated as of May 11, 2021, among Wells Fargo Bank, National Association, as the Notes Collateral Agent (on behalf of itself, the Trustee, and the Holders of the Notes) and the Jarvis Hedge Provider with respect to the Jarvis Shared Collateral.]

["Jarvis Hedge Provider" means SAF Jarvis 2 LP and any of its successors and assigns.]

["Jarvis Secured Hedge Obligations" means any Obligations incurred under the Jarvis Hedge Facility that are secured by a Lien on a pari passu basis with the Liens securing the Obligations under the Noteholder Documents.]

["Jarvis Shared Collateral" means, at any time, Collateral in which the Notes Collateral Agent (on behalf of the holders of the Notes) and the Jarvis Hedge Provider hold a valid and perfected security interest at such time.]

"Major Non-Controlling Authorized Representative" means, with respect to any Shared Collateral, the Authorized Representative (other than the [Notes Collateral Agent] / [Applicable Collateral Holder (as such term is defined in the Jarvis Hedge Facility Intercreditor Agreement)]) of the Class of Pari Passu Lien Obligations, if any, that constitutes the largest outstanding principal amount of any then outstanding Class of Pari Passu Lien Obligations (excluding Initial Pari Passu Claims) with respect to such Shared Collateral, but solely to the extent that such Class of Pari Passu Lien Obligations has a larger aggregate principal amount than the Initial Pari Passu Claims then outstanding.

"Mortgaged Property" means any parcel of real property and improvements thereto that constitute Shared Collateral.

"Non-Controlling Authorized Representative" means, at any time with respect to any Shared Collateral, any Authorized Representative that is not the Controlling Collateral Agent at such time with respect to such Shared Collateral.

"Non-Controlling Authorized Representative Enforcement Date" means, with respect to any Non-Controlling Authorized Representative in respect of any Shared Collateral, the date that is ninety (90) days (throughout which ninety (90)-day period such Non-Controlling Authorized Representative was the Major Non-Controlling Authorized Representative with respect to such Shared Collateral) after the occurrence of both (a) an Event of Default (under and as defined in the applicable Pari Passu Lien Document under which such Non-Controlling Authorized Representative is the Authorized Representative) and (b) the Notes Collateral Agent's and each other Authorized Representative's receipt of written notice from such Non-Controlling Authorized Representative certifying that (i) such Non-Controlling Authorized Representative is the Major Non-Controlling Authorized Representative with respect to such Shared Collateral and that an Event of Default (under and as defined in the applicable Pari Passu Lien Document under which such Non-Controlling Authorized Representative is the Authorized Representative) has occurred and is continuing and (ii) the Pari Passu Lien Obligations of the Class with respect to which such Non- Controlling Authorized Representative is the Authorized Representative are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Pari Passu Lien Documents of such Class; provided, however, that the Non- Controlling Authorized Representative Enforcement Date shall be stayed and shall not occur (and shall be deemed not to have occurred for all purposes hereof) with respect to any Shared Collateral (A) at any time the Controlling Collateral Agent has commenced and is pursuing any enforcement action with respect to such Shared Collateral, (B) at any time the Controlling Collateral Agent is stayed under the ABL/Bond Intercreditor Agreement [or the Jarvis Hedge Facility Intercreditor Agreement, as applicable,] from pursuing any enforcement action with respect to such Shared Collateral, or (C) at any time the Grantor that has granted a security interest in such Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

"Non-Controlling Secured Parties" means, at any time with respect to any Shared Collateral, the Secured Parties that are not Controlling Secured Parties at such time with respect to such Shared Collateral.

"Noteholder Claims" shall mean all Obligations in respect of the Notes or arising under the Noteholder Documents or any of them, including all fees and expenses of the Notes Collateral Agent and the Trustee thereunder and all other fees, expenses, indemnification or otherwise, and all other amounts owing or due under the terms of any Noteholder Document, as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time.

"Noteholder Collateral" shall mean all of the assets of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted (or purported to be granted) as security for any Noteholder Claim.

"Noteholder Collateral Agreement" shall mean the "Notes Collateral Agreement" as defined in the Indenture.

"Noteholder Collateral Documents" shall mean the "Notes Collateral Documents" as defined in the Indenture.

"Noteholder Documents" shall mean (a) the Indenture, the Notes and the Noteholder Collateral Documents and (b) any other related document or instrument executed and delivered pursuant to any Noteholder Document described in clause (a) above evidencing or governing any obligations thereunder,

in each case, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified, in whole or in part, from time to time.

"Notes" shall mean any securities issued under the Indenture.

"Notes Collateral Agent" has the meaning assigned to such term in the preamble hereto.

"Pari Passu Lien Documents" means, collectively, (a) all the Noteholder Documents, (b) [the Jarvis Hedge Agreements that govern the Jarvis Secured Hedge Obligations,] (c) all the Initial Additional Pari Passu Lien Documents and (d) all the Additional Pari Passu Lien Documents.

"Pari Passu Lien Obligations" means (a) all the Noteholder Claims, (b) [the Jarvis Secured Hedge Obligations,] (c) all the Initial Additional Pari Passu Lien Obligations and (d) all the Additional Pari Passu Lien Obligations.

"Pari Passu Lien Security Documents" means the Noteholder Collateral Documents, [any security documents entered into in connection with the Jarvis Secured Hedge Obligations with respect to the Jarvis Shared Collateral,] and each other agreement entered into in favor of an Authorized Representative for the purpose of securing Pari Passu Lien Obligations of any Class.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"Possessory Collateral" means any Shared Collateral in the possession of the Controlling Collateral Agent (or its agents or bailees), to the extent that possession thereof perfects a Lien thereon under the Uniform Commercial Code, the PPSA, or equivalent laws of any jurisdiction, as applicable.

"PPSA" means the Personal Property Security Act in effect from time to time in the Province of British Columbia; provided that, at any time, if perfection or the effect of perfection or non-perfection or the priority of the Notes Collateral Agent's security interest in any item or portion of the Collateral is governed by the Personal Property Security Act as in effect in a Canadian jurisdiction other than the Province of British Columbia, including the Civil Code of Quebec, the term "PPSA" shall mean the Personal Property Security Act or the Civil Code of Quebec (as applicable) as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or the effect of perfection or non-perfection or priority and for purposes of definitions relating to such provisions.

"Proceeds" has the meaning assigned to such term in Section 2.01(b).

"Refinance" means, in respect of any Indebtedness, to refinance, extend, renew, refund, repay, prepay, purchase, redeem, defease or retire, or to issue other Indebtedness in exchange or replacement for, such Indebtedness, in whole or in part. "Refinanced" and "Refinancing" shall have correlative meanings.

"Related Secured Parties" means, with respect to the Authorized Representative of any Class, the Secured Parties of such Class.

"Secured Parties" means (a) the Indenture Secured Parties, (b) [the Jarvis Hedge Provider,] (c) the Initial Additional Secured Parties and (d) the Additional Secured Parties.

"Series" means, when used in reference to Additional Pari Passu Lien Obligations, such Additional Pari Passu Lien Obligations as shall have been issued or incurred pursuant to the same

indentures or other agreements and with respect to which the same Person acts as the Authorized Representative.

"Shared Collateral" means, at any time, Collateral (including any Jarvis Shared Collateral) in which the holders of two or more Classes of Pari Passu Lien Obligations (or their respective Authorized Representatives) hold a valid and perfected security interest at such time. If more than two Classes of Pari Passu Lien Obligations are outstanding at any time and the holders of less than all Classes of Pari Passu Lien Obligations hold a valid and perfected security interest in any Collateral at such time, then such Collateral shall constitute Shared Collateral for those Classes of Pari Passu Lien Obligations that hold a valid security interest in such Collateral at such time and shall not constitute Shared Collateral for any Class which does not have a valid and perfected security interest in such Collateral at such time.

"STA" means the Securities Transfer Act in effect from time to time in the Province of British Columbia; provided that, at any time, if the rules governing the transfer, holding or control of securities or other financial assets or interests therein which are Collateral is governed by the Securities Transfer Act as in effect in a Canadian jurisdiction other than the Province of British Columbia, including the Civil Code of Quebec, the term "STA" shall mean the Securities Transfer Act or the Civil Code of Quebec (as applicable) as in effect, at such time, in such other jurisdiction for purposes of the transfer, holding and control of such Collateral or interests therein and for purposes of definitions relating to such provisions.

"Trustee" means Computershare Trust Company, N.A., as trustee under the Indenture, and its successors and permitted assigns in such capacity.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

SECTION 1.02.  Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections and Exhibits shall be construed to refer to Articles and Sections of, and Exhibits to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## ARTICLE II

## PRIORITIES AND AGREEMENTS WITH RESPECT TO SHARED COLLATERAL

SECTION 2.01.  Equal Priority.

(a)     Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Lien on any Shared Collateral securing Pari Passu Lien Obligations of any Class, and

F-9

notwithstanding any provision of the Uniform Commercial Code, the PPSA or similar statute or law of any jurisdiction, as applicable, any other applicable law or any Pari Passu Lien Document, or any other circumstance whatsoever (but, in each case, subject to Section 2.02), each Authorized Representative, for itself and on behalf of its Related Secured Parties, agrees that valid and perfected Liens on any Shared Collateral securing Pari Passu Lien Obligations of any Class shall be of equal priority with valid and perfected Liens on such Shared Collateral securing Pari Passu Lien Obligations of any other Class.

(b)     Each Authorized Representative, for itself and on behalf of its Related Secured Parties, agrees that, notwithstanding any provision of any Pari Passu Lien Document to the contrary (but subject to Section 2.02), if (i) an Event of Default shall have occurred and is continuing and such Authorized Representative or any of its Related Secured Parties is taking action to enforce rights or exercise remedies in respect of any Shared Collateral, (ii) any distribution is made in respect of any Shared Collateral in any Insolvency or Liquidation Proceeding or (iii) such Authorized Representative or any of its Related Secured Parties receives any payment with respect to any Shared Collateral pursuant to any intercreditor agreement (other than this Agreement), then the proceeds of any sale, collection or other liquidation of any Shared Collateral obtained by such Authorized Representative or any of its Related Secured Parties on account of such enforcement of rights or exercise of remedies, and any such distributions or payments received by such Authorized Representative or any of its Related Secured Parties (all such proceeds, distributions and payments being collectively referred to as "Proceeds"), shall, subject to the ABL/Bond Intercreditor Agreement [and the Jarvis Hedge Facility Intercreditor Agreement, as applicable], be applied as follows:

(i)     FIRST, to the payment of all amounts owing to the Authorized Representatives and the Trustee pursuant to the terms of the Pari Passu Lien Documents;

(ii)    SECOND, to the payment of the Pari Passu Lien Obligations of each Class for the principal, premium, if any, and interest on a ratable basis, owing to them on the date of such determination; and

(iii)   THIRD, to the Company and the other Grantors or their successors or permitted assigns, as their interests may appear, or as a court of competent jurisdiction may direct.

(c)     It is acknowledged that the Pari Passu Lien Obligations of any Class may, to the extent permitted in the Pari Passu Lien Documents, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced or otherwise amended or modified from time to time, all without affecting the priorities set forth in Section 2.01(a) or the provisions of this Agreement defining the relative rights of the Secured Parties of any Class.

SECTION 2.02.  Impairments. It is the intention of the parties hereto that the Secured Parties of each Class (and not the Secured Parties of any other Class) bear the risk of (a) any determination by a court of competent jurisdiction that (i) any Pari Passu Lien Obligations of such Class are unenforceable under applicable law or are subordinated to any other obligations (other than to any Pari Passu Lien Obligations of any other Class), (ii) any Pari Passu Lien Obligations of such Class do not have a valid and perfected Lien on any of the Collateral securing any Pari Passu Lien Obligations of any other Class and/or (iii) any Person (other than any Authorized Representative or any Secured Party) has a Lien on any Shared Collateral that is senior in priority to the Lien on such Shared Collateral securing Pari Passu Lien Obligations of such Class, but junior to the Lien on such Shared Collateral securing any Pari Passu Lien Obligations of any other Class (any such Lien being referred to as an "Intervening Lien", and any such Person being referred to as an "Intervening Creditor"), or (b) the existence of any Collateral securing Pari Passu Lien Obligations of any other Class that does not constitute Shared Collateral with respect to Pari Passu Lien Obligations of such Class (any condition referred to in clause (a) or (b) with respect to Pari

Passu Lien Obligations of such Class being referred to as an "<u>Impairment</u>" of such Class); <u>provided</u> that the existence of any limitation on the maximum claim that may be made against any Mortgaged Property that applies to Pari Passu Lien Obligations of all Classes shall not be deemed to be an Impairment of Pari Passu Lien Obligations of any Class. In the event an Impairment exists with respect to Pari Passu Lien Obligations of any Class, the results of such Impairment shall be borne solely by the Secured Parties of such Class, and the rights of the Secured Parties of such Class (including the right to receive distributions in respect of Pari Passu Lien Obligations of such Class pursuant to Section 2.01(b)) set forth herein shall be modified to the extent necessary so that the results of such Impairment are borne solely by the Secured Parties of such Class. In furtherance of the foregoing, in the event Pari Passu Lien Obligations of any Class shall be subject to an Impairment in the form of an Intervening Lien of any Intervening Creditor, the value of any Shared Collateral or Proceeds that are allocated to such Intervening Creditor shall be deducted solely from the Shared Collateral or Proceeds to be distributed in respect of Pari Passu Lien Obligations of such Class. In addition, in the event the Pari Passu Lien Obligations of any Class are modified pursuant to applicable law (including pursuant to Section 1129 of the Bankruptcy Code or any similar provision or concept under any other Bankruptcy or Insolvency Laws), any reference to the Pari Passu Lien Obligations of such Class or the Pari Passu Lien Documents of such Class shall refer to such obligations or such documents as so modified.

SECTION 2.03.  <u>Actions with Respect to Shared Collateral; Prohibition on Certain Contests</u>.

(a)      Notwithstanding anything to the contrary in the Pari Passu Lien Documents (other than this Agreement), (i) only the Controlling Collateral Agent shall, and shall have the right to, exercise, or refrain from exercising, any rights, remedies and powers with respect to the Shared Collateral, including any action to enforce its security interest in or realize upon any Shared Collateral and any right, remedy or power with respect to any Shared Collateral under any intercreditor agreement (other than this Agreement), (ii) the Controlling Collateral Agent shall not be required to follow any instructions or directions with respect to Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral) from any Non-Controlling Authorized Representative (or any other Non-Controlling Secured Party) it being understood and agreed that the Controlling Collateral Agent shall not be required to take any action that could expose the Controlling Collateral Agent to liability or be contrary to any Pari Passu Lien Security Document or applicable law, and (iii) no Non-Controlling Authorized Representative or any other Non-Controlling Secured Party shall, or shall instruct the Controlling Collateral Agent to, commence any judicial or non-judicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, seek to commence any Insolvency or Liquidation Proceeding, attempt any action to take possession of, take any other action to enforce its security interest in or realize upon, or exercise any other right, remedy or power with respect to (including any right, remedy or power under any intercreditor agreement other than this Agreement) any Shared Collateral, whether under any Pari Passu Lien Document, applicable law or otherwise, it being agreed that only the Controlling Collateral Agent, and in accordance with the applicable Pari Passu Lien Security Documents, shall be entitled to take any such actions or exercise any such rights, remedies and powers with respect to Shared Collateral. Notwithstanding the equal priority of the Liens established under Section 2.01(a), the Controlling Collateral Agent may deal with the Shared Collateral as if the Controlling Collateral Agent had a senior Lien on such Collateral. No Non-Controlling Authorized Representative or Non-Controlling Secured Party will contest, protest or object to any enforcement action brought by the Controlling Collateral Agent or any Controlling Secured Party, or any other exercise by the Controlling Collateral Agent or any Controlling Secured Party of any rights, remedies or powers with respect to the Shared Collateral, or seek to cause the Controlling Collateral Agent to do so. Nothing in this paragraph shall be construed to limit the rights and priorities of the Controlling Collateral Agent, any Authorized Representative or any other Secured Party with respect to any Collateral not constituting Shared Collateral.

(b)    Each of the Authorized Representatives agrees, for itself and on behalf of its Related Secured Parties, that they will not accept any Lien on any asset of any Grantor securing Pari Passu Lien Obligations of any Class for the benefit of any Secured Party of such Class other than pursuant to the Pari Passu Lien Security Documents, other than (i) any funds deposited for the discharge or defeasance of Pari Passu Lien Obligations of any Class and (ii) any rights of set-off created under the Pari Passu Lien Documents of any Class.

(c)    Each of the Authorized Representatives agrees, for itself and on behalf of its Related Secured Parties, that neither such Authorized Representative nor its Related Secured Parties will (and each hereby waives any right to) challenge or contest or support any other Person in challenging or contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), (i) the validity, attachment, creation, perfection, priority or enforceability of a Lien held by or on behalf of any other Authorized Representative or any of its Related Secured Parties in all or any part of the Collateral, (ii) the validity, enforceability or effectiveness of any Pari Passu Lien Obligation of any Class or any Pari Passu Lien Security Document of any Class or (iii) the validity, enforceability or effectiveness of the priorities, rights or duties established by, or other provisions of, this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any Authorized Representative or any of its Related Secured Parties to enforce this Agreement.

SECTION 2.04.    No Interference; Payment Over.

(a)    Each of the Authorized Representatives, for itself and on behalf of its Related Secured Parties, agrees that (i) neither such Authorized Representative nor its Related Secured Parties will (and each hereby waives any right to) take or cause to be taken any action the purpose of which is, or could reasonably be expected to be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Shared Collateral by the Controlling Collateral Agent, (ii) except as provided in Section 2.03, neither such Authorized Representative nor its Related Secured Parties shall have any right (A) to direct the Controlling Collateral Agent or any other Secured Party to exercise any right, remedy or power with respect to any Shared Collateral (including pursuant to any intercreditor agreement) or (B) to consent to the exercise by the Controlling Collateral Agent or any other Secured Party of any right, remedy or power with respect to any Shared Collateral, (iii) neither such Authorized Representative nor its Related Secured Parties will (and each hereby waives any right to) institute any suit or proceeding, or assert in any suit or proceeding any claim, against the Controlling Collateral Agent or any other Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Shared Collateral, and none of the Controlling Collateral Agent or any other Secured Party shall be liable for any action taken or omitted to be taken by the Controlling Collateral Agent or such other Secured Party with respect to any Shared Collateral in accordance with the provisions of this Agreement and the ABL/Bond Intercreditor Agreement [or the Jarvis Hedge Facility Intercreditor Agreement, as applicable], and (iv) neither such Authorized Representative nor its Related Secured Parties will (and each hereby waives any right to) seek to have any Shared Collateral or any part thereof marshaled upon any foreclosure, sale or other disposition or enforcement of such Shared Collateral; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any Authorized Representative or any of its Related Secured Parties to enforce this Agreement.

(b)    Each Authorized Representative, on behalf of itself and its Related Secured Parties, agrees that if such Authorized Representative or any of its Related Secured Parties shall at any time obtain possession of any Shared Collateral or receive any Proceeds or payment in respect thereof (other than as a result of any application of Proceeds pursuant to Section 2.01(b)), in each case, pursuant to the applicable Pari Passu Lien Documents or as a result of the enforcement of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of

remedies, at any time prior to the Discharge of Pari Passu Lien Obligations of each other Class, (i) such Authorized Representative or its Related Secured Party, as the case may be, shall promptly inform each Authorized Representative thereof, (ii) such Authorized Representative or its Related Secured Party shall hold such Shared Collateral or Proceeds in trust for the benefit of the Secured Parties of any Class entitled thereto pursuant to Section 2.01(b) and (iii) such Authorized Representative or its Related Secured Party shall promptly transfer such Shared Collateral or Proceeds to the Controlling Collateral Agent, for distribution in accordance with Section 2.01(b).

SECTION 2.05. Automatic Release of Liens; Amendments to Pari Passu Lien Security Documents.

(a)    Subject to the terms of the ABL/Bond Intercreditor Agreement [and the Jarvis Hedge Facility Intercreditor Agreement, as applicable], if, at any time the Controlling Collateral Agent forecloses upon or otherwise exercises remedies against any Shared Collateral resulting in a sale or disposition thereof, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of each Authorized Representative for the benefit of each Class of Secured Parties upon such Shared Collateral will automatically be released and discharged as and when, but only to the extent, such Liens of the Controlling Collateral Agent on such Shared Collateral are released and discharged; provided that any proceeds of any Shared Collateral realized by any Secured Party therefrom shall be applied pursuant to Section 2.01 hereof.

(b)    Each of the Authorized Representatives, for itself and on behalf of its Related Secured Parties, acknowledges and agrees that each Authorized Representative may enter into any amendment to any Pari Passu Lien Security Document so long as such amendment is not prohibited by the terms of each then extant Pari Passu Lien Document, in each case, without the consent of any other Authorized Representative or its related Secured Parties.

(c)    Each Authorized Representative agrees to execute and deliver (at the sole cost and expense of the Grantors) all such consents, confirmations, authorizations and other instruments as necessary or shall reasonably be requested by the Controlling Collateral Agent to evidence and confirm any release of Shared Collateral or amendment or modification to any Pari Passu Lien Security Document or to the ABL/Bond Intercreditor Agreement[, or to the Jarvis Hedge Facility Intercreditor Agreement, as applicable,] provided for in this Section.

SECTION 2.06. Certain Agreements with Respect to Bankruptcy and Insolvency Proceedings.

(a)    The Authorized Representative of each Class, for itself and on behalf of its Related Secured Parties, agrees that, if the Company or any other Grantor shall become subject to a case or proceeding (a "Bankruptcy Case") under any Bankruptcy or Insolvency Law and shall, as debtor-in-possession, move for approval of financing ("DIP Financing") to be provided by one or more lenders (the "DIP Lenders") under Section 364 of the Bankruptcy Code or any similar provision or concept under any other Bankruptcy or Insolvency Law or the use of cash collateral under Section 363 of the Bankruptcy Code or any similar provision or concept under any other Bankruptcy or Insolvency Law, neither such Authorized Representative nor its Related Secured Parties will oppose, raise any objection to, or act in a manner inconsistent with, any such financing or to the grant of any liens securing such financing that are proposed to rank senior to, or pari passu, with the Liens in favour of the Controlling Secured Parties on the Shared Collateral ("DIP Financing Liens") or to any use of cash collateral that constitutes Shared Collateral, in each case unless the Controlling Collateral Agent shall then oppose or object to such DIP Financing or such DIP Financing Liens or such use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Secured Parties, each Non-Controlling Secured Party will subordinate its Liens with respect to such

Shared Collateral on the same terms as the Liens of the Controlling Secured Parties (other than any Liens of any Controlling Secured Parties constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank <u>pari passu wi</u>th the Liens on any such Shared Collateral granted to secure the Pari Passu Lien Obligations of the Controlling Secured Parties, each Non-Controlling Secured Party will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the Secured Parties of such Class retain the benefit of their Liens on all such Shared Collateral subject to the DIP Financing Liens, including proceeds thereof arising after the commencement of the Bankruptcy Case, with such Liens having the same priority with respect to Liens of the Secured Parties of any other Class (other than any Liens of the Secured Parties of such other Class constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) if applicable, the Secured Parties of such Class are granted Liens on any additional collateral provided to the Secured Parties of any other Class as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with such Liens having the same priority with respect to Liens of the Secured Parties of any other Class (other than any Liens of the Secured Parties of such other Class constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (C) if any amount of such DIP Financing or cash collateral is applied to repay any Pari Passu Lien Obligations, such amount is applied in accordance with Section 2.01(b), and (D) if the Secured Parties of any Class are granted adequate protection, including in the form of periodic payments, in connection with such DIP Financing or use of cash collateral, the proceeds of such adequate protection are applied in accordance with Section 2.01(b); <u>provided,</u> that the Secured Parties of each Class shall have a right to object to the grant, as security for the DIP Financing, of a Lien on any Collateral subject to Liens in favor of the Secured Parties of such Class or its Authorized Representative that do not constitute Shared Collateral; <u>provided, further,</u> that any Secured Party receiving adequate protection granted in connection with the DIP Financing or such use of cash collateral shall not object to any other Secured Party receiving adequate protection comparable to any such adequate protection granted to such Secured Party.

(b)        This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under any Bankruptcy or Insolvency Law or any other federal, provincial, state or foreign bankruptcy, insolvency, receivership or similar law by or against any Grantor or any of its subsidiaries. The relative rights as to the Shared Collateral and proceeds thereof shall continue after the commencement of any Insolvency or Liquidation Proceeding on the same basis as prior to the date of the petition or application therefor. All references herein to any Grantor shall include such Grantor as a debtor-in- possession and any receiver or trustee for such Grantor.

SECTION 2.07.  <u>Reinstatement</u>. If, in any Insolvency or Liquidation Proceeding or otherwise, all or part of any payment with respect to the Pari Passu Lien Obligations of any Class previously made shall be rescinded for any reason whatsoever (including an order or judgment for disgorgement of a fraudulent preference or conveyance, transfer at undervalue, or other avoidance action under any Bankruptcy or Insolvency Law, or other similar law, or the settlement of any claim in respect thereof), then the terms and conditions of Article II shall be fully applicable thereto until all the Pari Passu Lien Obligations of such Class shall again have been paid in full in cash.

SECTION 2.08.  <u>Insurance and Condemnation Awards</u>. As between the Secured Parties, the Controlling Collateral Agent (acting pursuant to the applicable Pari Passu Lien Security Documents), shall have the exclusive right, subject to the rights of the Grantors under the Pari Passu Lien Security Documents, to settle and adjust claims in respect of Shared Collateral under policies of insurance covering or constituting Shared Collateral and to approve any award granted in any condemnation or similar proceeding, or any deed in lieu of condemnation, in respect of the Shared Collateral; <u>provided t</u>hat any Proceeds arising therefrom shall be subject to Section 2.01(b).

SECTION 2.09.  Refinancings. The Pari Passu Lien Obligations of any Class may be Refinanced, in whole or in part, in each case, without notice to, or the consent of, any Secured Party of any other Class, all without affecting the priorities provided for herein or the other provisions hereof; provided, that nothing in this Section shall affect any limitation on any such Refinancing that is set forth in the Pari Passu Lien Documents of any such other Class; provided, further, that if any obligations of the Grantors in respect of such Refinancing Indebtedness shall be secured by Liens on any Shared Collateral, then the administrative agent, trustee or similar representative of the holders of such Refinancing Indebtedness shall become a party hereto (to the extent not already a party hereto) and such obligations and the holders thereof shall be subject to and bound by the provisions of this Agreement and the Authorized Representative of the holders of any such Refinancing Indebtedness shall have executed an Additional Authorized Representative Joinder Agreement.

SECTION 2.10.  Controlling Collateral Agent as Gratuitous Bailee for Perfection.

(a)    The Controlling Collateral Agent agrees to hold any Shared Collateral constituting Possessory Collateral that is part of the Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for the benefit of each other Secured Party and any assignee solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable Pari Passu Lien Security Documents, in each case subject to the terms and conditions of this Section. Each Authorized Representative agrees to deliver any Shared Collateral constituting Possessory Collateral promptly to the Controlling Collateral Agent and pending delivery to the Controlling Collateral Agent, each Authorized Representative agrees to hold any Shared Collateral constituting Possessory Collateral, from time to time in its possession, as gratuitous bailee for the benefit of each other Secured Party and any assignee, solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable Pari Passu Lien Security Documents, in each case, subject to the terms and conditions of this Section.

(b)    The duties or responsibilities of the Controlling Collateral Agent and each Authorized Representative under this Section shall be limited solely to holding any Shared Collateral constituting Possessory Collateral as gratuitous bailee for the benefit of each other Secured Party for purposes of perfecting the Lien held by such Secured Parties therein and (in the case of each Authorized Representative) delivering any Shared Collateral constituting Possessory Collateral promptly to the Controlling Collateral Agent.

# ARTICLE III

# DETERMINATIONS WITH RESPECT TO OBLIGATIONS AND LIENS

Whenever, in connection with the exercise of its rights or the performance of its obligations hereunder, the Controlling Collateral Agent or the Authorized Representative of any Class shall be required to determine the existence or amount of any Pari Passu Lien Obligations of any Class, or the Shared Collateral subject to any Lien securing the Pari Passu Lien Obligations of any Class (and whether such Lien constitutes a valid and perfected Lien), it may request that such information be furnished to it in writing by the Authorized Representative of such Class and shall be entitled to make such determination on the basis of the information so furnished; provided that if, notwithstanding such request, the Authorized Representative of the applicable Class shall fail or refuse to promptly provide the requested information, the requesting Controlling Collateral Agent or Authorized Representative shall be entitled to make any such determination by reliance upon an Officer's Certificate. The Controlling Collateral Agent and each Authorized Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise

directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any Secured Party or any other Person as a result of such determination or any action or not taken pursuant thereto.

## ARTICLE IV

## CONCERNING THE CONTROLLING COLLATERAL AGENT

SECTION 4.01. Appointment and Authority.

(a)        Each of the Authorized Representatives, for itself and on behalf of its Related Secured Parties, hereby irrevocably appoints the Controlling Collateral Agent as such hereunder and under each of the Pari Passu Lien Security Documents, and authorizes the Controlling Collateral Agent to take such actions and to exercise such powers as are delegated to the Controlling Collateral Agent by the terms hereof or thereof, including for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any Grantor to secure any of the Pari Passu Lien Obligations, together with such actions and powers as are reasonably incidental thereto. In addition, to the extent required under the laws of any jurisdiction other than the United States, each of the Authorized Representatives, for itself and on behalf of its Related Secured Parties, hereby grants to the Controlling Collateral Agent any required powers of attorney to execute any Pari Passu Lien Security Document governed by the laws of such jurisdiction on such Secured Party's behalf. Without limiting the generality of the foregoing, the Controlling Collateral Agent is hereby expressly authorized to execute (i) any and all documents (including releases) with respect to the Shared Collateral, and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and (ii) (A) the ABL/Bond Intercreditor Agreement as Designated Notes Priority Agent [and (B) the Jarvis Hedge Facility Intercreditor Agreement as Applicable Collateral Holder].

(b)        Each of the Authorized Representatives, for itself and on behalf of its Related Secured Parties, acknowledges and agrees that the Controlling Collateral Agent shall be entitled, for the benefit of the Secured Parties, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the Pari Passu Lien Security Documents, without regard to any rights, remedies or powers to which the Non-Controlling Secured Parties would otherwise be entitled to as a result of their holding Pari Passu Lien Obligations. Without limiting the foregoing, each of the Authorized Representatives, for itself and on behalf of its Related Secured Parties, agrees that none of the Controlling Collateral Agent or any other Secured Party shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the Pari Passu Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any Pari Passu Lien Obligations), in any manner that would maximize the return to the Non-Controlling Secured Parties, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Non-Controlling Secured Parties from such realization, sale, disposition or liquidation. Each of the Authorized Representatives, for itself and on behalf of its Related Secured Parties, waives any claim they may now or hereafter have against the Controlling Collateral Agent or the Authorized Representative or any Secured Party of any other Class arising out of (i) any actions that the Controlling Collateral Agent or any such Authorized Representative or Secured Party takes or omits to take (including actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the enforcement, foreclosure upon, sale or other disposition, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the Pari Passu Lien Obligations from any account debtor, guarantor or any other party) in accordance with the applicable Pari Passu Lien Security Documents or any other agreement related thereto or to the collection of the Pari Passu Lien Obligations or the valuation, use, protection or release of any security for the Pari Passu Lien Obligations, (ii) any election by any Controlling Collateral Agent or Secured Parties, in any

proceeding instituted under any Bankruptcy or Insolvency Laws, of the application of Section 1111(b) of the Bankruptcy Code or any similar provision or concept under any other Bankruptcy or Insolvency Laws or (iii) subject to Section 2.06, any borrowing by, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code or any equivalent provision or concept under any other Bankruptcy or Insolvency Laws by, the Company or any of their respective Subsidiaries, as debtor-in-possession. Notwithstanding any other provision of this Agreement, the Controlling Collateral Agent shall not accept any Shared Collateral in full or partial satisfaction of any Pari Passu Lien Obligations pursuant to Section 9-620 of the Uniform Commercial Code, the PPSA or any equivalent section of any other similar statutes or laws of any jurisdiction, as applicable, without the consent of each Authorized Representative representing Secured Parties for whom such Collateral constitutes Shared Collateral.

SECTION 4.02.  Rights as a Secured Party. (a) The Person serving as the Controlling Collateral Agent hereunder shall have the same rights, protections and powers in its capacity as a Secured Party of any Class as any other Secured Party of such Class under any Pari Passu Lien Documents and may exercise the same as though it were not the Controlling Collateral Agent and the term "Secured Party", "Secured Parties", "Indenture Secured Party", "Indenture Secured Parties", "Initial Additional Secured Party", "Initial Additional Secured Parties", "Additional Secured Party" or "Additional Secured Parties", as applicable, shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Controlling Collateral Agent hereunder in its individual capacity.

SECTION 4.03. Exculpatory Provisions. The Controlling Collateral Agent shall not have any duties or obligations except those expressly set forth herein and in the other Pari Passu Lien Security Documents to which it is a party. Without limiting the generality of the foregoing, the Controlling Collateral Agent:

(i)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except to the extent directed and indemnified to its satisfaction pursuant to the Pari Passu Lien Security Documents to which the Controlling Collateral Agent is a party and is required to exercise, provided that the Controlling Collateral Agent shall not be required to take any action that may expose the Controlling Collateral Agent to liability or that is contrary to this Agreement, the ABL/Bond Intercreditor Agreement, [the Jarvis Hedge Facility Intercreditor Agreement, as applicable], any Pari Passu Lien Security Document or applicable law;

(iii)   shall not, except as expressly set forth in this Agreement and in the Pari Passu Lien Security Documents to which the Controlling Collateral Agent is a party, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Company or any of their respective Subsidiaries or any of their respective Affiliates that is communicated to or obtained by the Person serving as the Controlling Collateral Agent or any of its Affiliates in any capacity;

(iv)   shall not be liable for any action taken or not taken by it (A) in the absence of its own gross negligence or willful misconduct as determined by a final order of a court of competent jurisdiction or (B) in reliance on an Officer's Certificate stating that such action is permitted by the terms of this Agreement;

(v)     shall be deemed not to have knowledge of any Default or Event of Default under any Pari Passu Lien Documents of any Class unless and until written notice describing such Default or Event Default is given to the Controlling Collateral Agent by the

Authorized Representative of such Class or the Company in accordance with the applicable Pari Passu Lien Document;

(vi)    shall not be responsible for or have any duty to ascertain or inquire into (A) any statement, warranty or representation made in or in connection with this Agreement or any Pari Passu Lien Document, (B) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (C) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (D) the validity, enforceability, effectiveness or genuineness of this Agreement, any Pari Passu Lien Document or any other agreement, instrument or document, or the validity, attachment, creation, perfection, priority or enforceability of any Lien purported to be created by the Pari Passu Lien Documents, (E) the value or the sufficiency of any Collateral for Pari Passu Lien Obligations of any Class or (F) the satisfaction of any condition set forth in any Pari Passu Lien Document, other than to confirm receipt of items expressly required to be delivered to the Controlling Collateral Agent under the terms of this Agreement; and

(vii)    need not segregate money held hereunder from other funds except to the extent required by law and shall be under no liability for interest on any money received by it hereunder except as otherwise agreed in writing by the Controlling Collateral Agent.

SECTION 4.04.  Reliance by Controlling Collateral Agent. The Controlling Collateral Agent shall be entitled to conclusively rely, and shall not incur any liability for relying, upon any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) reasonably believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Controlling Collateral Agent also shall be entitled to conclusively rely, and shall not incur any liability for relying, upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person. The Controlling Collateral Agent also shall be entitled to conclusively rely, and shall not incur any liability for relying, upon any Officer's Certificate in making any determination under this Agreement. The Controlling Collateral Agent may consult with legal counsel (who may be counsel of its selection for the Company, any other Grantor or any Authorized Representative), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 4.05.  Delegation of Duties. The Controlling Collateral Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Pari Passu Lien Security Document by or through any one or more sub-agents appointed by the Controlling Collateral Agent. The Controlling Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this Article shall apply to any such sub-agent appointed by the Controlling Collateral Agent with due care and to the Affiliates of the Controlling Collateral Agent and any such sub-agent, and shall apply to their respective activities as the Controlling Collateral Agent. The Controlling Collateral Agent shall not have any liability for any acts or omissions of any sub-agent appointed by it with due care.

SECTION 4.06.  Agent Capacity. Except as expressly provided herein or in the Noteholder Documents, Computershare Trust Company, N.A. is acting in the capacity of Notes Collateral Agent solely for the Indenture Secured Parties. It is understood and agreed that Computershare Trust Company, N.A. is executing, entering into and acting under this Agreement solely in its capacity as Notes Collateral Agent, and the provisions of the Indenture and the Notes Collateral Documents granting or extending any rights, protections, privileges, indemnities and immunities to Computershare Trust Company, N.A. in its

capacity as Notes Collateral Agent thereunder shall also apply to its acting as Notes Collateral Agent and Controlling Collateral Agent hereunder, as if fully set forth herein. Without limiting the foregoing, in acting as Authorized Representative hereunder, the Notes Collateral Agent may seek and be fully protecting in relying on the direction of the Trustee or Holders holding a majority in aggregate principal amount of the Notes. The Notes Collateral Agent shall not be responsible for the terms or sufficiency of this Agreement for any purpose. The Notes Collateral Agent shall not have any duties or obligations under or pursuant to this Agreement other than such duties as may be expressly set forth in this as duties on its part to be performed or observed. The Notes Collateral Agent shall not have any liability or responsibility for the actions or omissions of any other claimholder or other agent's, or for any other claimholder's or other agent's compliance with (or failure to comply with) the terms of this Agreement. None of the provisions in this Agreement shall require the Notes Collateral Agent to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to them against such risk or liability is not assured to them. The Notes Collateral Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Notes Collateral Documents that the Notes Collateral Agent is required to exercise as directed in writing by the required noteholders under the Notes Collateral Documents; provided that, the Notes Collateral Agent shall be entitled to refrain from any act or the taking of any action hereunder, under the Notes Collateral Documents or from the exercise of any power or authority vested in it hereunder or thereunder unless and until the Notes Collateral Agent shall have received instructions from the required noteholders, and if the Notes Collateral Agent deems necessary, satisfactory indemnity has been provided to it, and Notes Collateral Agent shall not be liable for any such delay in acting. Notes Collateral Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose either to liability or that is contrary to the Notes Collateral Documents or applicable law, including for the avoidance of doubt, any action that may be in violation of the automatic stay under any bankruptcy or insolvency law. For purposes of clarity, phrases such as "satisfactory to", "approved by", "acceptable to", "as determined by", "in the discretion of", "selected by", "requested by" the Notes Collateral Agent and phrases of similar import authorize and permit the Notes Collateral Agent to approve, disapprove, determine, act or decline to act in its discretion. Any exercise of discretion on behalf of Notes Collateral Agent shall be exercised in accordance with the terms of the Notes Collateral Documents. Notwithstanding anything herein to the contrary, Notes Collateral Agent shall not have any responsibility for the preparation, filing or recording, re-filing, re-recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest granted pursuant to this Agreement or any Notes Collateral Document.

## ARTICLE V

## NO LIABILITY

SECTION 5.01.  Information. The Controlling Collateral Agent or the Authorized Representative or Secured Parties of any Class shall have no duty to disclose to any Secured Party of any other Class any information relating to the Company or any of their respective Subsidiaries, or any other circumstance bearing upon the risk of nonpayment of any of the Pari Passu Lien Obligations, that is actually known to any of them or any of their Affiliates. If the Notes Collateral Agent or the Authorized Representative or any Secured Party of any Class, in its reasonable judgement, undertakes at any time to provide any such information to, as the case may be, the Authorized Representative or any Secured Party of any other Class, it shall be under no obligation (i) to make, and shall not be deemed to have made, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of the information so provided, (ii) to provide any additional information or to provide any such

information on any subsequent occasion or (iii) to undertake any investigation regarding such information.

SECTION 5.02.  No Warranties or Liability.

(a)     Each Authorized Representative, for itself and on behalf of its Related Secured Parties, acknowledges and agrees that neither the Controlling Collateral Agent nor the Authorized Representative or any Secured Party of any other Class has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the Pari Passu Lien Documents, the ownership or value of any Shared Collateral or the perfection or priority of any Liens thereon. The Authorized Representative and the Secured Parties of any Class will be entitled to manage and supervise their loans and other extensions of credit in the manner determined by them.

(b)     No Authorized Representative or Secured Parties of any Class shall have any express or implied duty to the Authorized Representative or any Secured Party of any other Class to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance of a Default or an Event of Default under any Pari Passu Lien Document (other than, in each case, this Agreement), regardless of any knowledge thereof that they may have or be charged with.

## ARTICLE VI

## ADDITIONAL PARI PASSU LIEN OBLIGATIONS

The Company may, at any time and from time to time, to the extent permitted by and subject to any limitations contained in the Pari Passu Lien Documents in effect at such time, designate additional Indebtedness and related obligations that are, or are to be, secured by Liens on any assets of the Company or any other Grantor that would, if such Liens were granted, constitute Shared Collateral as Additional Pari Passu Lien Obligations by delivering to the Controlling Collateral Agent and each Authorized Representative party hereto at such time an Officer's Certificate:

(a)     describing the Indebtedness and other obligations being designated as Additional Pari Passu Lien Obligations, and including a statement of the maximum aggregate outstanding principal amount of such Indebtedness as of the date of such certificate;

(b)     setting forth the Additional Pari Passu Lien Documents under which such Additional Pari Passu Lien Obligations are issued or incurred or the guarantees of such Additional Pari Passu Lien Obligations are, or are to be, created, and attaching copies of such Additional Pari Passu Lien Documents as each Grantor has executed and delivered to the Person that serves as the administrative agent, trustee or a similar representative for the holders of such Additional Pari Passu Lien Obligations (such Person being referred to, in such capacity, as the "Additional Authorized Representative") with respect to such Additional Pari Passu Lien Obligations on the closing date of such Additional Pari Passu Lien Obligations, certified as being true and complete;

(c)     identifying the Person that serves as the Additional Authorized Representative;

(d)     certifying that the incurrence of such Additional Pari Passu Lien Obligations, the creation of the Liens securing such Additional Pari Passu Lien Obligations and the designation of such Additional Pari Passu Lien Obligations as Additional Pari Passu Lien Obligations hereunder do not violate or result in a default under any provision of any Pari Passu Lien Documents in effect at such time;

(e)    certifying that the Additional Pari Passu Lien Documents authorize the Additional Authorized Representative to become a party hereto by executing and delivering an Additional Authorized Representative Joinder Agreement and provide that upon such execution and delivery, such Additional Pari Passu Lien Obligations and the holders thereof shall become subject to and bound by the provisions of this Agreement; and

(f)    attaching a fully completed Additional Authorized Representative Joinder Agreement executed and delivered by the Additional Authorized Representative.

Upon the delivery of such certificate, the related attachments as provided above, and an Opinion of Counsel delivered in accordance with the Indenture with respect to the satisfaction of all conditions precedent to the incurrence of the Additional Pari Passu Lien Obligations, the obligations designated in such notice as Additional Pari Passu Lien Obligations shall become Additional Pari Passu Lien Obligations for all purposes of this Agreement.

## ARTICLE VII

## MISCELLANEOUS

SECTION 7.01. Notices. All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)    if to any Grantor, to

c/o Tacora Resources Inc.
102 NE 3rd Street, Suite 120,
Grand Rapids, MN 55744,
Attention: Chief Executive Officer
Attention: Joe Broking

Email: joe.broking@tacoraresources.com

(b)    if to the Notes Collateral Agent, to

Computershare Trust Company, N.A.
9062 Old Annapolis Road
Columbia, Maryland 21045
Attn: David Diaz

(c)    if to the Initial Additional Authorized Representative, to

[        ]

(d)    if to any other Additional Authorized Representative, to the address set forth in the applicable Additional Authorized Representative Joinder Agreement.

Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto. All notices and communications shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; five (5) calendar days after being deposited in the mail, postage prepaid, if mailed by certified or registered; when receipt

is acknowledged, if faxed; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery; provided that any notice or communication delivered to the Notes Collateral Agent shall be deemed effective upon actual receipt thereof.

SECTION 7.02.   Waivers; Amendment; Joinder Agreements.

(a)      No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)      Neither this Agreement nor any provision hereof may be waived, amended or otherwise modified except pursuant to an agreement or agreements in writing entered into by the Company, the Notes Collateral Agent and each Authorized Representative then party hereto; provided that no such agreement shall by its terms amend, modify or otherwise affect the rights or obligations of any Grantor without the Company's prior written consent; provided further that (i) without the consent of any party hereto, (A) this Agreement may be supplemented by an Additional Authorized Representative Joinder Agreement, and an Additional Authorized Representative may become a party hereto, in accordance with Article VI and (B) this Agreement may be supplemented by a Grantor Joinder Agreement, and a Subsidiary may become a party hereto, in accordance with Section 7.13, and (ii) in connection with any Refinancing of Pari Passu Lien Obligations of any Class, or the incurrence of Additional Pari Passu Lien Obligations of any Class, the Notes Collateral Agent and the Authorized Representatives then party hereto shall enter (and are hereby authorized to enter without the consent of any other Secured Party), at the request of any Authorized Representative or the Company, and upon receipt of an Officer's Certificate and Opinion of Counsel required under the Indenture, into such amendments or modifications of this Agreement as are reasonably necessary to reflect such Refinancing or such incurrence and are in form and substance reasonably satisfactory to the Notes Collateral Agent and each such Authorized Representative.

SECTION 7.03.   Parties in Interest. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, as well as the other Secured Parties, all of whom are intended to be bound by, and to be third-party beneficiaries of, this Agreement.

SECTION 7.04.   Effectiveness; Survival. This Agreement shall become effective when executed and delivered by the parties hereto. All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement. This Agreement shall continue in full force and effect notwithstanding the commencement of any Insolvency or Liquidation Proceeding against the Company or any other Grantor.

SECTION 7.05.   Counterparts; Electronic Signatures.

(a)      This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed

signature page to this Agreement by facsimile or other electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

(b)    Delivery of an executed counterpart of a signature page of this Agreement by fax, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures in a manner acceptable by all parties hereto, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that, Notes Collateral Agent is not under any obligation to agree to accept Electronic Signatures unless expressly agreed to by the Notes Collateral Agent pursuant to reasonable procedures approved by the Notes Collateral Agent.

SECTION 7.06.  <u>Severability</u>. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.07.  <u>Governing Law</u>. THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 7.08.  <u>Submission to Jurisdiction Waivers; Consent to Service of Process</u>.

(a)    Each party hereto hereby irrevocably and unconditionally:

(i)    submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(ii)    consents that any such action or proceeding shall be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(iii)    (excluding the Notes Collateral Agent) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address referred to in Section 7.01 or at such other address of which the Notes Collateral Agent shall have been notified pursuant thereto;

(iv)    (excluding the Notes Collateral Agent) agrees that nothing herein shall affect the right of the Notes Collateral Agent or any other Secured Party to effect service of process in any other manner permitted by applicable law or shall limit the right of the Notes Collateral Agent or any other Secured Party to sue in any other jurisdiction; and

(v)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 7.08 any special, exemplary, punitive or consequential damages.

SECTION 7.09.  <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.

SECTION 7.10.  <u>Headings</u>. Article and Section headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 7.11.  <u>Conflicts</u>. In the event of any conflict or inconsistency between the provisions of this Agreement (including Section 2.05 hereof) and the provisions of any of the Pari Passu Lien Documents, the provisions of this Agreement shall control.

SECTION 7.12.  <u>Provisions Solely to Define Relative Rights</u>. The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the Secured Parties in relation to one another. Except as expressly provided in this Agreement, none of the Company, any other Grantor, any other Subsidiary or any other creditor of any of the foregoing shall have any rights or obligations hereunder, and none of the Company, any other Grantor or any other Subsidiary or any other creditor of any of the foregoing may rely on the terms hereof. Nothing in this Agreement is intended to or shall impair the obligations of the Company or any other Grantor, which are absolute and unconditional, to pay the Pari Passu Lien Obligations as and when the same shall become due and payable in accordance with their terms.

SECTION 7.13. <u>Additional Grantors</u>. In the event any Subsidiary of the Company shall have granted a Lien on any of its assets to secure any Pari Passu Lien Obligations, the Company shall cause such Subsidiary, if not already a party hereto, to become a party hereto as a "Grantor". Upon the execution and delivery by any such Subsidiary of a Grantor Joinder Agreement, any such Subsidiary shall become a party hereto and a Grantor hereunder with the same force and effect as if originally named as such herein. The execution and delivery of any such instrument shall not require the consent of any other party hereto. The rights and obligations of each party hereto shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

SECTION 7.14. <u>Integration</u>. This Agreement, together with the other Pari Passu Lien Documents, the ABL/Bond Intercreditor Agreement [and the Jarvis Hedge Facility Intercreditor Agreement, as applicable], represents the agreement of each of the Grantors and the Secured Parties with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by any Grantor or any Secured Party relative to the subject matter hereof not expressly set forth or referred to herein, in the ABL/Bond Intercreditor Agreement, [the Jarvis Hedge Facility Intercreditor Agreement, as applicable,] or in the other Pari Passu Lien Documents. References herein to the ABL/Bond Intercreditor Agreement [and the Jarvis Hedge Facility Intercreditor Agreement, as applicable,] refer to such agreement to the extent the same is then in effect. Each Authorized Representative, by its execution and delivery of this Agreement (or the applicable joinder to this Agreement) for itself and its Related Secured

Parties, (a) consents to the terms and conditions in the ABL/Bond Intercreditor Agreement [and the Jarvis Hedge Facility Intercreditor Agreement, as applicable], (b) agrees that it will be bound by the ABL/Bond Intercreditor Agreement [and the Jarvis Hedge Facility Intercreditor Agreement, as applicable,] and (c) authorizes and agrees that (i) the Notes Collateral Agent has entered into the ABL/Bond Intercreditor Agreement as the "Initial Notes Priority Agent" and is the "Designated Notes Priority Agent" thereunder on behalf of such Authorized Representative and its Related Secured Parties, (ii) in its capacity as "Designated Notes Priority Agent" under the ABL/Bond Intercreditor Agreement, the Notes Collateral Agent may take any and all such action under the ABL/Bond Intercreditor Agreement on behalf of each Authorized Representative and its Related Secured Parties as provided in the ABL/Bond Intercreditor Agreement and Section 2.05 hereof, [(iii) the Notes Collateral Agent has entered into the Jarvis Hedge Facility Intercreditor Agreement as the "First Lien Representative and the Indenture Collateral Agent" and is the "Applicable Collateral Holder" thereunder on behalf of such Authorized Representative and its Related Secured Parties and (iv) in its capacity as "Applicable Collateral Holder" under the Jarvis Hedge Facility Intercreditor Agreement, the Notes Collateral Agent may take any and all such action under the Jarvis Hedge Facility Intercreditor Agreement on behalf of each Authorized Representative and its Related Secured Parties as provided in the Jarvis Hedge Facility Intercreditor Agreement and Section 2.05 hereof.]

SECTION 7.15. <u>Further Assurances</u>. Each Secured Party and each Grantor agrees that it will execute, or will cause to be executed, any and all further documents, agreements and instruments, and take all such further actions, as may be required under any applicable law, or which any Secured Party may reasonably request, to effectuate the terms of this Agreement, including the relative Lien priorities provided for herein.

[remainder of page intentionally blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

COMPUTERSHARE TRUST COMPANY, N.A.,
as Notes Collateral Agent


by:  _____
    Name:
    Title:


[_____],
  as Jarvis Hedge Provider


by:  _____
    Name:
    Title:


as Initial Additional Authorized Representative,


by:  _____
    Name:
    Title:


by:  _____
    Name:
    Title:

THE GRANTORS LISTED ON SCHEDULE I
HERETO,


by: _____
       Name:
       Title:

SCHEDULE I to
PARI PASSU INTERCREDITOR AGREEMENT

Grantors

EXHIBIT I to
PARI PASSU INTERCREDITOR AGREEMENT

[FORM OF] ADDITIONAL AUTHORIZED REPRESENTATIVE JOINDER AGREEMENT, dated as of [          ], [          ] (this "Joinder Agreement"), to the PARI PASSU INTERCREDITOR AGREEMENT, dated as of [          ], [          ] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among TACORA RESOURCES INC., a corporation incorporated under the laws of the Province of Ontario, Canada (the "Company"), the other Grantors from time to time party thereto, COMPUTERSHARE TRUST COMPANY, N.A., as notes collateral agent (in such capacity, the " Notes Collateral Agent") for the Indenture Secured Parties, [          ], as the Authorized Representative for the Initial Additional Secured Parties (in such capacity, the "Initial Additional Authorized Representative"), and each Additional Authorized Representative from time to time party thereto, as the Authorized Representative for any Secured Parties of any other applicable Class.

Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

The Company and the other Grantors propose to issue or incur Additional Pari Passu Lien Obligations designated by the Company as such in accordance with Article VI of the Intercreditor Agreement in an Officer's Certificate delivered concurrently herewith to the Notes Collateral Agent and the Authorized Representatives (the "Additional Pari Passu Lien Obligations"). The Person identified in the signature pages hereto as the "Additional Authorized Representative" (the "Additional Authorized Representative") will serve as the administrative agent, trustee or a similar representative for the holders of the Additional Pari Passu Lien Obligations (the "Additional Secured Parties").

The Additional Authorized Representative wishes, in accordance with the provisions of the Intercreditor Agreement, to become a party to the Intercreditor Agreement and to acquire and undertake, for itself and on behalf of the Additional Secured Parties, the rights and obligations of an Additional Authorized Representative and Secured Parties thereunder.

Accordingly, the Additional Authorized Representative, for itself and on behalf of its Related Secured Parties, and the Company agree as follows, for the benefit of the existing Authorized Representatives and the existing Secured Parties:

SECTION 1.01.  Accession to the Intercreditor Agreement. The Additional Authorized Representative hereby (a) accedes and becomes a party to the Intercreditor Agreement as an "Additional Authorized Representative", (b) agrees, for itself and on behalf of the Additional Secured Parties, to all the terms and provisions of the Intercreditor Agreement and (c) acknowledges and agrees that (i) the Additional Pari Passu Lien Obligations and Liens on any Collateral securing the same shall be subject to the provisions of the Intercreditor Agreement and (ii) the Additional Authorized Representative and the Additional Secured Parties shall have the rights and obligations specified under the Intercreditor Agreement with respect to an Authorized Representative or a Secured Party, and shall be subject to and bound by the provisions of the Intercreditor Agreement. The Intercreditor Agreement is hereby incorporated by reference.

SECTION 1.02.  Representations and Warranties of the Additional Authorized Representative. The Additional Authorized Representative represents and warrants to the existing Authorized Representatives and the existing Secured Parties that (a) it has full power and authority to enter into this Joinder Agreement, in its capacity as the Additional Authorized Representative, (b) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and

binding obligation, enforceable against it in accordance with its terms, and (c) the Additional Pari Passu Lien Documents relating to the Additional Pari Passu Lien Obligations provide that, upon the Additional Authorized Representative's execution and delivery of this Joinder Agreement, (i) the Additional Pari Passu Lien Obligations and Liens on any Collateral securing the same shall be subject to the provisions of the Intercreditor Agreement and (ii) the Additional Authorized Representative and the Additional Secured Parties shall have the rights and obligations specified therefor under, and shall be subject to and bound by the provisions of, the Intercreditor Agreement.

SECTION 1.03.  <u>Parties in Interest</u>. This Joinder Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, as well as the other Secured Parties, all of whom are intended to be bound by, and to be third-party beneficiaries of, this Agreement.

SECTION 1.04.  <u>Counterparts; Electronic Signatures</u>.

(a)  This Joinder Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be as effective as delivery of a manually signed counterpart of this Joinder Agreement.

(b)  Delivery of an executed counterpart of a signature page of this Joinder Agreement by fax, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Joinder Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Joinder Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 1.05.  <u>Governing Law</u>. THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 1.06.  <u>Notices</u>. All communications and notices hereunder shall be in writing and given as provided in Section 7.01 of the Intercreditor Agreement. All communications and notices hereunder to the Additional Authorized Representative shall be given to it at the address set forth under its signature hereto, which information supplements Section 7.01 to the Intercreditor Agreement.

SECTION 1.07.  <u>Expenses</u>. The Company agrees to reimburse the Authorized Representatives for their reasonable and documented out-of-pocket expenses in connection with this Joinder Agreement, including the reasonable fees, other charges and disbursements of counsel for the Authorized Representatives.

SECTION 1.08.  <u>Incorporation by Reference</u>. The provisions of Sections 7.04, 7.06, 7.08, 7.09, 7.10, 7.11 and 7.12 of the Intercreditor Agreement are hereby incorporated by reference, <u>mutatis mutandis</u>, as if set forth in full herein.

SECTION 1.08.  It is expressly understood and agreed by the parties hereto that this Joinder Agreement is executed and delivered by Computershare Trust Company, N.A., not individually but solely as Notes Collateral Agent under the Indenture and Notes Collateral Documents. The Notes Collateral Agent assumes no responsibility for the correctness of the recitals contained herein and shall not be responsible or accountable in any way whatsoever for or with respect to the validity, execution or sufficiency of this Joinder Agreement and makes no representation with respect thereto. In connection with the Notes Collateral Agent entering into and in the performance of its duties under any of this Joinder Agreement, to the extent not already provided for herein or therein, the Notes Collateral Agent shall be entitled to the benefit of every provision of the Indenture and the Notes Collateral Documents limiting the liability of or affording rights, privileges, protections, exculpations, immunities, indemnities or benefits to the Notes Collateral Agent as if they were expressly set forth herein, mutatis mutandis.

[remainder of page intentionally blank]

IN WITNESS WHEREOF, the Additional Authorized Representative and the Company have duly executed this Joinder Agreement to the Intercreditor Agreement as of the date first above written.

[      ], AS ADDITIONAL AUTHORIZED REPRESENTATIVE,

by: _____
     Name:
     Title:

Address for notices:

_____

_____

attention of: _____

Facsimile: _____

by: _____
     Name:
     Title:

Acknowledged by:

by: _____
Name:
Title:

by: _____
Name:
Title:

[          ], AS THE [INITIAL] ADDITIONAL
AUTHORIZED REPRESENTATIVE,

by: _____
Name:
Title:

by:

Name:

Title:

EXHIBIT II to
PARI PASSU INTERCREDITOR AGREEMENT

[FORM OF] GRANTOR JOINDER AGREEMENT, dated as of [      ] (this "Joinder Agreement"), to the PARI PASSU INTERCREDITOR AGREEMENT, dated as of [      ] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among TACORA RESOURCES INC., a corporation incorporated under the laws of the Province of Ontario, Canada (the "Company"), the other Grantors from time to time party thereto, COMPUTERSHARE TRUST COMPANY, N.A., as notes collateral agent (in such capacity, along with its successors and permitted assigns, the "Notes Collateral Agent") for the Indenture Secured Parties, [      ], as the Authorized Representative for the Initial Additional Secured Parties (in such capacity, the "Initial Additional Authorized Representative"), and each Additional Authorized Representative from time to time party thereto, as the Authorized Representative for any Secured Parties of any other applicable Class.

Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

[      ], a [      ] [corporation] and a Subsidiary of the Company (the "Additional Grantor"), has granted a Lien on all or a portion of its assets to secure Pari Passu Lien Obligations and such Additional Grantor is not a party to the Intercreditor Agreement.

The Additional Grantor wishes to become a party to the Intercreditor Agreement and to acquire and undertake the rights and obligations of a Grantor thereunder. The Additional Grantor is entering into this Joinder Agreement in accordance with the provisions of the Intercreditor Agreement in order to become a Grantor thereunder.

Accordingly, the Additional Grantor agrees as follows, for the benefit of the Authorized Representatives and the Secured Parties:

SECTION 1.01.  Accession to the Intercreditor Agreement. The Additional Grantor (a) hereby accedes and becomes a party to the Intercreditor Agreement as a "Grantor", (b) agrees to all the terms and provisions of the Intercreditor Agreement and (c) acknowledges and agrees that the Additional Grantor shall have the rights and obligations specified under the Intercreditor Agreement with respect to a Grantor, and shall be subject to and bound by the provisions of the Intercreditor Agreement.

SECTION 1.02.  Representations and Warranties of the Additional Grantor. The Additional Grantor represents and warrants to the Authorized Representatives and the Secured Parties that this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms.

SECTION 1.03.  Parties in Interest. This Joinder Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, as well as the other Secured Parties, all of whom are intended to be third-party beneficiaries of this Agreement.

SECTION 1.04.  Counterparts; Electronic Signatures.

(a)     This Joinder Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be as effective as delivery of a manually signed counterpart of this Joinder Agreement.

(b)    Delivery of an executed counterpart of a signature page of this Joinder Agreement by fax, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Joinder Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Joinder Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 1.05.  Governing Law. THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 1.06.  Notices. All communications and notices hereunder shall be in writing and given as provided in Section 7.01 of the Intercreditor Agreement.

SECTION 1.07.  Expenses. The Grantor agrees to reimburse the Additional Authorized Representatives for their reasonable and documented out-of-pocket expenses in connection with this Joinder Agreement, including the reasonable fees, other charges and disbursements of counsel for the Notes Collateral Agent and any of the Authorized Representatives.

SECTION 1.08.  Incorporation by Reference. The provisions of Sections 7.04, 7.06, 7.08, 7.09, 7.10, 7.11 and 7.12 of the Intercreditor Agreement are hereby incorporated by reference, mutatis mutandis, as if set forth in full herein.

SECTION 1.09.  It is expressly understood and agreed by the parties hereto that this Joinder Agreement is executed and delivered by Computershare Trust Company, N.A., not individually but solely as Notes Collateral Agent under the Indenture and Notes Collateral Documents. The Notes Collateral Agent assumes no responsibility for the correctness of the recitals contained herein and shall not be responsible or accountable in any way whatsoever for or with respect to the validity, execution or sufficiency of this Joinder Agreement and makes no representation with respect thereto. In connection with the Notes Collateral Agent entering into and in the performance of its duties under any of this Joinder Agreement, to the extent not already provided for herein or therein, the Notes Collateral Agent shall be entitled to the benefit of every provision of the Indenture and the Notes Collateral Documents limiting the liability of or affording rights, privileges, protections, exculpations, immunities, indemnities or benefits to the Notes Collateral Agent as if they were expressly set forth herein, mutatis mutandis.

[remainder of page intentionally blank]

IN WITNESS WHEREOF, the Additional Grantor has duly executed this Joinder Agreement to the Intercreditor Agreement as of the date first above written.

[NAME OF SUBSIDIARY],

by: _____
      Name:
      Title:

SCHEDULE A

**POST-CLOSING COLLATERAL REQUIREMENTS**

**A. Quebec Security**

Not later than ninety (90) days after the Issue Date (or such later date as the Notes Collateral Agent may reasonably agree), the Notes Collateral Agent shall have received the documents or evidence of completion of the following, each in a form reasonably satisfactory to the Notes Collateral Agent:

1.  **Deed of Hypothec**. A deed of hypothec granted by the Company in favor of the Notes Collateral Agent for its benefit and the benefit of the Trustee and the holders of the Notes governed by the laws of the province of Quebec (the "**Deed of Hypothec**").

2.  **Company Counsel Opinion**. A Quebec and B.C. law opinion addressed to the holders of the Initial Notes and the Notes Collateral Agent for its benefit and for the benefit of the Trustee and holders of the Notes with respect to the due execution, authorization and enforceability of the Deed of Hypothec and other matters customarily included in such opinions.

3.  **RPMRR Registration**. An application for registration (Form RH) in respect of the deed of hypothec granted by the Company and registered at the RPMRR in Quebec.

4.  All such further certificates and documents as the Notes Collateral Agent may reasonably request in connection with the Deed of Hypothec.

**B. Real Property**

Not later than ninety (90) days after the Issue Date (or such later date as the Notes Collateral Agent may reasonably agree), the Notes Collateral Agent shall have received the documents or evidence of completion of the following, each in a form reasonably satisfactory to the Notes Collateral Agent:

1.  **Debenture**. A debenture governed by the laws of the province of Newfoundland and Labrador and granted by the Company in favor of the Notes Collateral Agent for its benefit and the benefit of the Trustee and the holders of the Notes, in proper form for recording in the applicable land and mineral registries in the Province of Newfoundland and Labrador, in form and substance satisfactory to the holders of the Initial Notes and the Notes Collateral Agent (each acting reasonably) and sufficient to create a valid and enforceable mortgage lien on the Material Real Property Assets in favor of the Notes Collateral Agent for its benefit and the benefit of the Trustee and the holders of the Notes, securing the obligations of the Company and the Guarantors under the Indenture, the Notes and the Collateral Documents, subject only to Permitted Liens.

2.  **Title Insurance**. A lender's policy of title insurance (or commitment to issue such a policy having the effect of a policy of title insurance) issued by a nationally recognized title insurance company reasonably acceptable to the holders of the Notes and the Notes Collateral Agent (the "**Title Company**") insuring (or committing to insure) the lien of the Debenture as valid and enforceable mortgage lien on the Material Real Property Assets described therein (each, a "**Title Policy**") which insures the Notes Collateral Agent that the Debenture creates a valid and enforceable mortgage lien on such Material Real

Property Assets free and clear of all defects and encumbrances except Permitted Liens and other customary permitted exceptions.

3. **Consents and acknowledgements**. All necessary consents and acknowledgements necessary to grant the Debenture on the Material Real Property Assets, including but not limited to the following, each in form and substance substantially the same as the similar documents obtained in connection with the existing lenders' debenture and in proper form for recording in the applicable land and mineral registries in the Province of Newfoundland and Labrador, (collectively, the "**Consents**"):

  **a.**    Acknowledgement Agreement Re: Knoll Lake Lots 2, 3, and 4 Head Lease dated May 15, 1962 and Wabush Mountain Area Mining Head Lease dated May 15, 1962, between Knoll Lake Minerals Ltd., the Notes Collateral Agent and Her Majesty the Queen in Right of the Province of Newfoundland and Labrador;

  **b.**    Acknowledgement Agreement Re: Lot 1 Head Lease dated May 26, 1956, between Knoll Lake Minerals Ltd., the Notes Collateral Agent and Her Majesty the Queen in Right of the Province of Newfoundland and Labrador;

  **c.**    Consent and Acknowledgement Agreement Re: Pumping Facilities Crown Lease dated April 12, 1965, between Knoll Lake Minerals Ltd., the Notes Collateral Agent, Her Majesty the Queen in Right of the Province of Newfoundland and Labrador and the Company;

  **d.**    Acknowledgement Agreement Re: Flora Lake License dated May 15, 1962, between Knoll Lake Minerals Ltd., the Notes Collateral Agent, Her Majesty the Queen in Right of the Province of Newfoundland and Labrador and the Company;

  **e.**    Acknowledgement Agreement Re: Lot 1 Sublease dated May 26, 1956, between Knoll Lake Minerals Ltd, the Notes Collateral Agent and 1128349 B.C. Ltd.;

  **f.**    Consent and Acknowledgement Agreement Re: Lot 1 Sub-Sublease dated November 17, 2017, between the Company, the Notes Collateral Agent and 1128349 B.C. Ltd.;

  **g.**    Acknowledgement Agreement Re: Knoll Lake Lots 2, 3, and 4 and Wabush Mountain Area Mining Sublease dated May 16, 1962, between Knoll Lake Minerals Ltd., the Notes Collateral Agent and 1128349 B.C. Ltd.; and

  **h.**    Consent and Acknowledgement Agreement Re: Knoll Lake Lots 2, 3, and 4 and Wabush Mountain Area Mining Sub-Sublease dated May 17, 1962, between the Company, the Notes Collateral Agent, and 1128349 B.C. Ltd.

4. **Other Real Property Documents**. Evidence satisfactory to the holders of the Notes and the Notes Collateral Agent that the Company and the Guarantors have delivered to the Title Company such customary affidavits, certificates, information (including financial data), instruments of indemnification (including a so-called "gap" indemnification) and other documents as may be reasonably necessary to cause the Title Company to issue the Title Policies and endorsements contemplated by paragraph 2 above.

5.      **Survey**. If and to the extent required by the Title Company to issue the Title Policies and endorsements contemplated by paragraph 2 above, a new survey (or an existing survey together with a no-change affidavit and any additional documentation reasonably required by the Title Company) of each Material Real Property Asset in such form as shall be reasonably required by the Title Company to issue such Title Policies and endorsements.

6.      **Newfoundland & Labrador Counsel Opinions**. A Newfoundland & Labrador law opinion addressed to the holders of the Notes and the Notes Collateral Agent for its benefit and for the benefit of the Trustee and holders of the Notes with respect to the holder of the Material Real Property Assets, the enforceability of the Debenture and the Consents against the Company and other matters customarily included in such opinions.

7.      **British Columbia Counsel Opinions.** A British Columbia law opinion addressed to the holders of the Notes and the Notes Collateral Agent for its benefit and for the benefit of the Trustee and holders of the Notes with respect to the due authorization and execution by the Company of the Debenture and the Consents and other matters customarily included in such opinions.

8.      **Real Property Collateral Fees and Expenses**. Evidence reasonably satisfactory to the holders of the Notes and the Notes Collateral Agent of payment by the Company of all Title Policy premiums, search and examination charges, escrow charges and related charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of the Debenture and other documents and issuance of the Title Policies and endorsements contemplated by paragraph 2 above.

9.      **Newfoundland and Labrador Registry of Deeds Discharges**. Evidence reasonably satisfactory to the holders of the Notes and the Notes Collateral Agent that the following have been discharged from the Newfoundland and Labrador Registry of Deeds:

a.      Acknowledgement Agreement (re: Sublease) dated June 21, 2018 among Knoll Lake Minerals Ltd., as lessor, SAF Jarvis LP, as term lender, SAF Jarvis Infrastructure LP, as infrastructure lender, and 1128349 B.C. Ltd., as sublessee, registered in the Newfoundland Registry of Deeds under registration number 882184.

b.      Acknowledgement Agreement (re: Knoll Lake Lots 2, 3 and 4 and Wabush Mountain Area Mining Sublease) dated June 21, 2018 among Knoll Lake Minerals Ltd., as lessor, SAF Jarvis LP, as term lender, SAF Jarvis Infrastructure LP, as infrastructure lender, and 1128349 B.C. Ltd., as sublessee, registered in the Newfoundland Registry of Deeds under registration number 882216.

c.      Consent and Acknowledgement Agreement (re: Sub-Sublease) dated June 21, 2018 among Tacora Resources Inc., as lessee, SAF Jarvis LP, as term lender, SAF Jarvis Infrastructure LP, as infrastructure lender, and 1128349 B.C. Ltd., as lessor, registered in the Newfoundland Registry of Deeds under registration number 882217.

d.      Consent and Acknowledgement Agreement (re: Knoll Lake Lots 2, 3 and 4 and Wabush Mountain Area Mining Sub-Sublease) dated June 21, 2018 among Tacora Resources Inc., as lessee, SAF Jarvis LP, as term lender, SAF Jarvis

Infrastructure LP, as infrastructure lender, and 1128349 B.C. Ltd., as lessor, registered in the Newfoundland Registry of Deeds under registration number 882219.

e.  Acknowledgement Agreement (re: Head Lease) dated November 13, 2018 among Knoll Lake Minerals Ltd., as lessee, SAF Jarvis LP, as term lender, SAF Jarvis Infrastructure LP, as infrastructure lender, SAF Jarvis 1 LP, as hedging party, and Her Majesty the Queen in Right of the Province of Newfoundland and Labrador, as lessor, registered in the Newfoundland Registry of Deeds under registration number 882237.

f.  Acknowledgement Agreement (re: Knoll Lake Lots 2, 3 and 4 and Wabush Mountain Area Mining Head Leases) dated November 13, 2018 among Knoll Lake Minerals Ltd., as lessee, SAF Jarvis LP, as term lender, SAF Jarvis Infrastructure LP, as infrastructure lender, SAF Jarvis 1 LP, as hedging party, and Her Majesty the Queen in Right of the Province of Newfoundland and Labrador, as lessor, registered in the Newfoundland Registry of Deeds under registration number 882240.

g.  Acknowledgement Agreement (re: Flora Lake License) dated November 13, 2018 among Knoll Lake Minerals Ltd., as licensee, SAF Jarvis LP, as term lender, SAF Jarvis Infrastructure LP, as infrastructure lender, SAF Jarvis 1 LP, as hedging party, Her Majesty the Queen in Right of the Province of Newfoundland and Labrador, as licensor, and Tacora Resources Inc. registered in the Newfoundland Registry of Deeds under registration number 882242.

h.  Consent and Acknowledgement Agreement (re: Pumping Facilities Crown Lease) dated November 13, 2018 among Knoll Lake Minerals Ltd., as lessee, SAF Jarvis LP, as term lender, SAF Jarvis Infrastructure LP, as infrastructure lender, SAF Jarvis 1 LP, as hedging party, Her Majesty the Queen in Right of the Province of Newfoundland and Labrador, as lessor, and Tacora Resources Inc. registered in the Newfoundland Registry of Deeds under registration number 882244.

i.  Debenture (Infrastructure Loan) granted by Tacora Resources Inc. in favour of SAF Jarvis Infrastructure LP, made as of November 13, 2018, registered in the Newfoundland Registry of Deeds under registration number 882245.

j.  Debenture (Term Loan) granted by Tacora Resources Inc. in favour of SAF Jarvis LP, made as of November 13, 2018, registered in the Newfoundland Registry of Deeds under registration number 882246.

10.  **Newfoundland and Labrador Mineral Registry (Transfer & Lien Registry) Discharges**. Evidence reasonably satisfactory to the holders of the Notes and the Notes Collateral Agent that the following have been discharged from the Newfoundland and Labrador Mineral Registry (Transfer & Lien Registry):

a.  Acknowledgement Agreement (re: Sublease) dated June 21, 2018 among Knoll Lake Minerals Ltd., as lessor, SAF Jarvis LP, as term lender, SAF Jarvis Infrastructure LP, as infrastructure lender, and 1128349 B.C. Ltd., as sublessee, registered in the Newfoundland Mineral Registry (Transfer & Lien Registry) under Volume 26 Folio 146.

b.      Acknowledgement Agreement (re: Knoll Lake Lots 2, 3 and 4 and Wabush Mountain Area Mining Sublease) dated June 21, 2018 among Knoll Lake Minerals Ltd., as lessor, SAF Jarvis LP, as term lender, SAF Jarvis Infrastructure LP, as infrastructure lender, and 1128349 B.C. Ltd., as sublessee, registered in the Newfoundland Mineral Registry (Transfer & Lien Registry) under Volume 26 Folio 148.

c.      Consent and Acknowledgement Agreement (re: Sub-Sublease) dated June 21, 2018 among Tacora Resources Inc., as lessee, SAF Jarvis LP, as term lender, SAF Jarvis Infrastructure LP, as infrastructure lender, and 1128349 B.C. Ltd., as lessor, registered in the Newfoundland Mineral Registry (Transfer & Lien Registry) under Volume 26 Folio 147.

d.      Consent and Acknowledgement Agreement (re: Knoll Lake Lots 2, 3 and 4 and Wabush Mountain Area Mining Sub-Sublease) dated June 21, 2018 among Tacora Resources Inc., as lessee, SAF Jarvis LP, as term lender, SAF Jarvis Infrastructure LP, as infrastructure lender, and 1128349 B.C. Ltd., as lessor, registered in the Newfoundland Mineral Registry (Transfer & Lien Registry) under Volume 26 Folio 149.

e.      Acknowledgement Agreement (re: Head Lease) dated November 13, 2018 among Knoll Lake Minerals Ltd., as lessee, SAF Jarvis LP, as term lender, SAF Jarvis Infrastructure LP, as infrastructure lender, SAF Jarvis 1 LP, as hedging party, and Her Majesty the Queen in Right of the Province of Newfoundland and Labrador, as lessor, registered in the Newfoundland Mineral Registry (Transfer & Lien Registry) under Volume 26 Folio 142.

f.      Acknowledgement Agreement (re: Knoll Lake Lots 2, 3 and 4 and Wabush Mountain Area Mining Head Leases) dated November 13, 2018 among Knoll Lake Minerals Ltd., as lessee, SAF Jarvis LP, as term lender, SAF Jarvis Infrastructure LP, as infrastructure lender, SAF Jarvis 1 LP, as hedging party, and Her Majesty the Queen in Right of the Province of Newfoundland and Labrador, as lessor, registered in the Newfoundland Mineral Registry (Transfer & Lien Registry) under Volume 26 Folio 143.

g.      Acknowledgement Agreement (re: Flora Lake License) dated November 13, 2018 among Knoll Lake Minerals Ltd., as licensee, SAF Jarvis LP, as term lender, SAF Jarvis Infrastructure LP, as infrastructure lender, SAF Jarvis 1 LP, as hedging party, Her Majesty the Queen in Right of the Province of Newfoundland and Labrador, as licensor, and Tacora Resources Inc. registered in the Newfoundland Mineral Registry (Transfer & Lien Registry) under Volume 26 Folio 145.

h.      Consent and Acknowledgement Agreement (re: Pumping Facilities Crown Lease) dated November 13, 2018 among Knoll Lake Minerals Ltd., as lessee, SAF Jarvis LP, as term lender, SAF Jarvis Infrastructure LP, as infrastructure lender, SAF Jarvis 1 LP, as hedging party, Her Majesty the Queen in Right of the Province of Newfoundland and Labrador, as lessor, and Tacora Resources Inc. registered in the Newfoundland Mineral Registry (Transfer & Lien Registry) under Volume 26 Folio 144.

**i.**     Debenture (Infrastructure Loan) granted by Tacora Resources Inc. in favour of SAF Jarvis Infrastructure LP, made as of November 13, 2018, registered in the Newfoundland Mineral Registry (Transfer & Lien Registry) under Volume 26 Folio 150.

**j.**     Debenture (Term Loan) granted by Tacora Resources Inc. in favour of SAF Jarvis LP, made as of November 13, 2018, registered in the Newfoundland Mineral Registry (Transfer & Lien Registry) under Volume 26 Folio 152.

**k.**     General Security Agreement (Infrastructure Loan) granted by Tacora Resources Inc. in favour of SAF Jarvis Infrastructure LP, made as of November 13, 2018, registered in the Newfoundland Mineral Registry (Transfer & Lien Registry) under Volume 26 Folio 151.

**l.**     General Security Agreement (Term Loan) granted by Tacora Resources Inc. in favour of SAF Jarvis LP, made as of November 13, 2018, registered in the Newfoundland Mineral Registry (Transfer & Lien Registry) under Volume 26 Folio 153.

11.     **Newfoundland and Labrador Mineral Registry (Transfer & Lien Registry) Registration of General Security Agreement.** Evidence reasonably satisfactory to the holders of the Notes and the Notes Collateral Agent that the general security agreement dated on or around the date hereof entered into by and among the Company, the Notes Collateral Agent and the other Grantors party thereto has been registered in the Newfoundland and Labrador Mineral Registry (Transfer & Lien Registry).

12.     All such further certificates and documents as the Notes Collateral Agent may reasonably request in connection with the Debenture and the Title Policy.

## C. Material Contract Consents

1.     **Material Contract Consents.** Not later than ninety (90) days after the Issue Date (or such later date as the Notes Collateral Agent may reasonably agree), the Company shall have received a consent to assignment (by way of security) from the counterparty to the following material contracts, (i) in the case of items a to e below, in form and substance substantially the same as the similar documents obtained in connection with the existing lenders' security, and (ii) in the case of item f below, in form and substance reasonably satisfactory to the Notes Collateral Agent:

a.     Confidential Transportation Contract dated November 3, 2017 between Quebec North Shore and Labrador Railway Company Inc. and the Company, as amended by the Agreement to Amend the Confidential Transportation Contract dated as of February 13, 2019;

b.     Locomotive Rental Agreement dated November 8, 2018 between Quebec North Shore and Labrador Railway Company Inc. and the Company;

c.     Service Agreement dated May 16, 2018 between Newfoundland and Labrador Hydro and the Company;

     d.      Contract (for users of the Port's multi-user berth) between Sept-Iles Port Authority and the Company;

     e.      Iron Ore Sale and Purchase Contract (Offtake Agreement) dated April 5, 2017 between Cargill International Trading Pte Ltd and the Company, as amended by the Amendment and Clarification dated as of March 2, 2020; and

     f.      Agreement in Principle dated June 1, 2018 between Societe ferroviaire et portuaire de Pointe-Noire s.e.c. and the Company, as amended by the Amending Agreement dated August 15, 2018.

## D. Norwegian Pledge Documents

**1.**     **Share Pledge Agreement:** Not later than ninety (90) days after the Issue Date (or such later date as the Notes Collateral Agent may reasonably agree), the Notes Collateral Agent shall have received, each in a form reasonably satisfactory the Notes Collateral Agent:

     a.      a duly executed Norwegian law share pledge agreement (the "**Norwegian law Share Pledge Agreement**") between the Company as pledgor and the Notes Collateral Agent as pledgee for its benefit and the benefit of the Trustee and the holders of the Notes, under which the Company grants a first priority (subject to the provisions of the SAF Hedge Facility Intercreditor Agreement) pledge (the "**Norwegian law Share Pledge**") over all the shares in and the entire share capital of Tacora Norway AS (Norwegian business enterprise no. 926 009 435);

     b.      a copy of a duly executed notice of the Norwegian Law Share Pledge sent by the Company to Tacora Norway AS and a copy of a duly executed acknowledgement thereof;

     c.      a copy of the signed and dated shareholders' register of Tacora Norway AS showing that (i) the Norwegian Law Share Pledge has been duly noted therein, (ii) the recording of the Share Pledge Agreement granted by Tacora Resources Inc. in favour of SAF Jarvis LP, by its general partner, SAF Jarvis Inc., made as of December 18, 2020 has been removed, and (iii) the recording of the Share Pledge Agreement granted by Tacora Resources Inc. in favour of SAF Jarvis Infrastructure LP, by its general partner, SAF Jarvis Infrastructure Inc., made as of December 18, 2020 has been removed;

     d.      a copy of the articles of association of Tacora Norway AS and which shall include provisions to the effect that its shares are freely transferable and that no transfer of shares require any consent from Tacora Norway AS or will trigger any preemption rights; and

     e.      a Norwegian law legal opinion addressed to the holders of the Notes and the Notes Collateral Agent with respect to the enforceability of the Norwegian Law Share Pledge Agreement and other matters customarily included in such opinions.

**E. Blocked Account Agreement**

1.    **Canadian Blocked Account Agreement.** Not later than ninety (90) days after the Issue Date (or such later date as the Notes Collateral Agent may reasonably agree), the Notes Collateral Agent shall have received a blocked account agreement among the Company, its deposit account bank and the Notes Collateral Agent for its benefit and the benefit of the Trustee in respect of all Canadian deposit accounts to the extent required by the terms of the Indenture in a form reasonably satisfactory to the Notes Collateral Agent.

2.    All such further certificates, documents, UCC statements and PPSA financing statements as the Notes Collateral Agent may reasonably request in connection with the Canadian Blocked Account Agreement.