**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CROSSINGBRIDGE ADVISORS LLC,

          Plaintiff,

   v.

CARGILL INTERNATIONAL TRADING
PTE LTD.,

          Defendant.

**ORAL ARGUMENT REQUESTED**

**Case No. 24-cv-9138 (RA)**

<u>**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT'S**</u>
<u>**MOTION TO DISMISS**</u>

Tracey Salmon-Smith
Christian J. Clark
**FAEGRE DRINKER BIDDLE & REATH LLP**
1177 Avenue of the Americas, 41st Floor
New York, New York 10036
(212) 248-3140 (Telephone)
(212) 248-3141 (Fax)
tracey.salmonsmith@faegredrinker.com
christian.clark@faegredrinker.com

*Attorneys for Defendant Cargill International Trading
Pte Ltd.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 1

I.     Plaintiff Ignores the Economic Structure of the Reverse Vesting Transaction and Instead Attempts to Manufacture Factual Questions and Mischaracterizes Defendant's Arguments. ...................................................................................... 1

     A.    Any Consideration Received Was for Cargill Entering New Contracts, Not Repayment on Old, Pre-Petition Secured Debt Contracts. ...................................... 2

     B.    Plaintiff's $12.5 Million Setoff Theory Does Not Involve Any Net Exchange of Value and Could Never Have Resulted in Recovery to Plaintiff. .......................... 4

     C.    Plaintiff's Attempts to Create Factual Issues and Its Mischaracterizations of Defendant's Arguments Are Baseless and Improper. ............................................ 5

II.    Plaintiff's Opposition Fails to Salvage Its Claim that the Cargill Consideration Payment and the $12.5 Million Setoff Were Payments or Distributions With Respect to Shared Collateral. ............................................................................. 8

CONCLUSION ....................................................................................................... 11

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
   671 F.3d 140 (2d Cir. 2011)............................................................................................2

*In re Energy Future Holdings Corp.*,
   773 F. App'x 89 (3d Cir. 2019) ...................................................................................4

*In re MPM Silicones, LLC*,
   518 B.R. 740 (Bankr. S.D.N.Y. 2014) ....................................................................3, 4

*Smolen v. Fischer*,
   2012 WL 3609089 (S.D.N.Y. Aug. 23, 2012)...........................................................7

*Universal Trading & Inv. Co. v. Tymoshenko*,
   2012 WL 6186471 (S.D.N.Y. Dec. 12, 2012) ...........................................................9

*Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*,
   2023 WL 4493542 (S.D.N.Y. July 12, 2023) ...........................................................6

**Statutes, Rules & Regulations**

Fed. R. Civ. P. 11 ..............................................................................................................7

Fed. R. Civ. P. 12(b)(6).....................................................................................................1

Fed. R. Civ. P. 12(c) .........................................................................................................1

Defendant Cargill International Trading Pte Ltd. ("CITPL") respectfully submits this reply memorandum of law in further support of its motion pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c) to dismiss the First Amended Complaint ("FAC") filed by Plaintiff CrossingBridge Advisors LLC ("CrossingBridge"). Dkt. No. 9.

## PRELIMINARY STATEMENT

Plaintiff's Opposition attempts to manufacture factual issues and mischaracterizes Defendant's arguments in order to distract from its inability to address the economic structure of the transaction upon which its suit is based: only parties that provided new consideration received any value in exchange under the Reverse Vesting Transaction. The face of the contracts at issue and the documents from the Canadian insolvency proceeding resolve the question. The FAC's conclusory allegations and outright speculation in the face of these documents need not be taken as true and support dismissal here. Plaintiff's efforts to reframe its own pleading inadequacies as "fact issue[s]" requiring further discovery is a transparent attempt to generate doubt and confusion. Yet, Plaintiff never articulates how anything not already available to the parties and the Court could possibly move the needle here. The reality is that Plaintiff and the Defendant were equally given the opportunity to put new consideration forward as part of Tacora's restructuring and the Defendant and other investors acted on that opportunity, while Plaintiff chose not to. Plaintiff's inaction does not entitle them to share in the consideration Defendant received for its investment.

## ARGUMENT

I.  **Plaintiff Ignores the Economic Structure of the Reverse Vesting Transaction and Instead Attempts to Manufacture Factual Questions and Mischaracterizes Defendant's Arguments.**

Plaintiff does not engage with the crux of Defendant's argument: that any value received by CITPL as part of the Reverse Vesting Transaction does not trigger the Intercreditor Agreement

1

(ICA) because it was provided as contractual consideration for the Investors' new capital contributions as part of the Reverse Vesting Transaction rather than as repayment on old, pre-petition secured debt contracts. The face of the relevant contracts and court orders underlying the Reverse Vesting Transaction demonstrate that, other than repayment of the super-priority Court-approved DIP financing, that held priority over the pre-petition secured debt, only parties who provided new value as part of the Reverse Vesting Transaction received consideration. In its Opposition, Plaintiff simply does not engage with Defendant's key points in this regard. Rather, Plaintiff attempts to dismiss these points as involving "irrelevant fact question[s]" about the subjective motivation behind the contracts when Defendant's arguments have always been focused on the text of the relevant contracts and the Ontario Court's orders approving them. Opp'n at 14.

Plaintiff simply side-steps Defendant's argument that the Cargill Consideration Payment and the $12.5 million Setoff were provided as consideration for Cargill, Incorporated's injection of new capital and CITPL's agreement to enter into a new offtake agreement with reorganized Tacora. *See id.* The reason for this evasion is self-evident: Plaintiff cannot avoid the language of the agreements at issue, specifically the Subscription Agreement as amended, and the holdings of the Ontario Court that dispose of its theory of the case. Plaintiff instead resorts to mischaracterizations of Defendant's arguments and tries to invent factual issues where none exist.

### A. Any Consideration Received Was for Cargill Entering New Contracts, Not Repayment on Old, Pre-Petition Secured Debt Contracts.

The nature of the consideration CITPL received is not "an irrelevant fact question[,]" *see id.*, and can be determined from the contracts at issue and the judicially noticed decisions of the Ontario Court. Plaintiff's conclusory allegations are plainly contradicted by these documents, and thus cannot survive a motion to dismiss. *See*, *e.g.*, *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146–47 (2d Cir. 2011) ("where a conclusory allegation in the complaint is contradicted

by a document attached to the complaint, the document controls and the allegation is not accepted as true"); *In re MPM Silicones, LLC*, 518 B.R. 740, 744 (Bankr. S.D.N.Y. 2014).

*First*, the Subscription Agreement as amended explicitly states that the Cargill Consideration Payment was provided as consideration for CITPL and its corporate parent's role in the Reverse Vesting Transaction *and not* for its pre-petition secured interest—the Existing Cargill Margin Facility. *See* Moving Br. at 19 ("The Subscription Agreement, approved by the Ontario Court, expressly provided that the Cargill Consideration Payment was being made '**in consideration for Cargill entering into [the Subscription Agreement] and its agreements, compromises and obligations hereunder**[.]'") (quoting Dkt. No. 21-2, Subscription Agmt. § 2.3(a) (emphasis added)); *id.* ("The Subscription Agreement Amendment . . . provid[ed] expressly that . . . 'the Cargill Consideration Payment shall be made to Cargill pursuant to a discount provided under the Cargill Offtake Agreement in connection with the Transactions and this Agreement, and, **for certainty, is not being made in repayment of the Existing Cargill Margin Facility**.'") (quoting Dkt. No. 21-3, Subscription Agmt. Amend. § 1.4 (emphasis added)). To be clear, Plaintiff does not contest that this is what the Subscription Agreement as amended provides, but responds only with innuendo that the Subscription Agreement may not have been valid due to lack of Monitor approval, which innuendo is factually inaccurate as discussed and refuted more fully below.

*Second*, Justice Kimmel's August Endorsement makes the finding, which this Court can take judicial notice of, *see id.* at 3 n.5, that "'**significant compromises were made by the secured creditors (whose pre-filing debt and annual debt service was eliminated** in exchange for equity and future funding commitments by some)[.]'" *Id.* at 17 (quoting Dkt. No. 21-10, August Endorsement ¶ 12b) (emphasis added)). Thus, Justice Kimmel's Endorsement confirms that the

Cargill Consideration Payment and Setoff were not made in connection with CITPL's pre-petition secured interest because such interests were "eliminated."

*Third*, Plaintiff does not dispute that the two other Investors to the Subscription Agreement—Millstreet Capital and OSP—who were also pre-petition secured creditors, received consideration only in connection with their contribution of new equity and debt. *See id.* at 20. Plaintiff likewise does not dispute Defendant's assertion that "no secured claims ranking junior to the DIP Facility in the capital structure received a recovery on account of those claims." *Id.* at 17. Plaintiff has no response to the Ontario Court's comments that the Reverse Vesting Transaction was "'the best and only actionable transaction available to Tacora'" and that "'[n]o alternative transactions emerged from these processes that would provide full repayment to the Senior Notes or Senior Priority Notes[,]'" such that no proceeds were or could have been available for any secured creditors ranking behind the DIP Facility. *Id.* at 10 (quoting Dkt. No. 21-9, July Endorsement ¶ 4 and August Endorsement ¶ 12b). Finally, Plaintiff also makes no attempt to acknowledge, let alone refute, Defendant's cited cases in which courts found that, like here, intercreditor agreements were not violated where parties accepted payments in connection with separate assets or obligations not governed by the applicable intercreditor agreements. *See id.* at 20–21 (citing *In re Energy Future Holdings Corp.*, 773 F. App'x 89, 93 (3d Cir. 2019) and *In re MPM Silicones*, 518 B.R. at 753).

### B. Plaintiff's $12.5 Million Setoff Theory Does Not Involve Any Net Exchange of Value and Could Never Have Resulted in Recovery to Plaintiff.

After CITPL provided Plaintiff's counsel with a copy of the Subscription Agreement Amendment (which demonstrably refuted the original complaint's allegations regarding alleged repayments of the "Existing Cargill Margin Facility"), Plaintiff responded by amending its complaint in the FAC. *Compare* Compl. ¶ 35, *with* FAC ¶ 40. No doubt realizing that its original

4

theory was on shaky ground, Plaintiff supplemented the FAC with an academic theory that a "$12.5 Million Setoff" exchanged between reorganized Tacora and CITPL involving a zero net exchange of dollars should have somehow been "shared" with CrossingBridge. In addition to failing for the reason discussed in the preceding section (that it is among the consideration in exchange for which the Reverse Vesting Transaction was negotiated), this theory is without merit.

Despite devoting a significant amount of the Opposition to arguing that the Setoff is in fact a distribution or payment, Plaintiff fails to provide any explanation in the Opposition as to how a zero-dollar "distribution" or "payment" could have been shared with CrossingBridge. Specifically, in its definition of "Transactions," Section 1.1 of the Subscription Agreement (whether pre- or post-amendment) provides for "repayment of the DIP Obligations . . . and amounts owing under the APF (subject to set-off in accordance with the Closing Sequence)[.]" § 1.1 This language in turn references the Closing Sequence at § 7.2(c), which reads, "Cargill shall set-off a portion of the amount owing by the Company under the APF (equal to the amount of the Cargill Pre-filing Payable) against the Cargill Pre-filing Payable." *Id.* § 7.2. The contract contemplates a fully offsetting transaction that did not result in a single net dollar in Cargill's pocket that could have been distributed under the ICA. The Opposition provides no response to CITPL's argument in its Moving Brief that "under no circumstances would [the CITPL receivable of $12.5 million] be available for recovery to any pre-petition secured creditors." Moving Br. at 28.

### C. Plaintiff's Attempts to Create Factual Issues and Its Mischaracterizations of Defendant's Arguments Are Baseless and Improper.

Given the obstacles the Subscription Agreement as amended and Justice Kimmel's August Endorsement pose to Plaintiff's case, Plaintiff attempts to sow doubt as to the validity of the Subscription Agreement as amended. Plaintiff underpins its argument here by suggesting that the Monitor was required to sign the Amendment itself, when no such requirement existed. *Compare*

Opp'n at 2, *with* Subscription Agreement § 10.12 (noting only that "prior consent" of Monitor required). Plaintiff is careful not to affirmatively state that the Amendment was invalid, or that the parties either mistakenly or knowingly misrepresented that they received such approval. *See*, *e.g.*, Opp'n at 2 ("there are in any event unresolved fact questions about whether the Amendment was even validly adopted, as it was never approved by the Ontario Court and is not signed by the Monitor"); *see also id.* at 7 ("there is a fact dispute that cannot be resolved in this motion whether the Amendment is of any force and effect"). In addition to reading like an opposition to summary judgment rather than to a motion to dismiss, these assertions are a baldly improper attempt to foster speculation about the validity of the Amendment when, in reality, Plaintiff does not have an adequate factual basis for this. With respect to the Ontario Court's approval, Plaintiff ignores that the Court pre-approved any amendment of the Subscription Agreement in its Approval and Reverse Vesting Order. *See* Dkt. No. 27-5, Order at ¶ 3 ("THIS COURT ORDERS . . . the execution of the Subscription Agreement by the Applicant is hereby authorized and approved, **with such amendments as the Applicant and the Investors may deem necessary or otherwise agree to, with the approval of the Monitor**.") (emphasis added).

As for the Monitor's approval, after acknowledging that "[t]he recitals to the [Subscription Agreement] amendment **state monitor prior approval was obtained**," Plaintiff alleges in the FAC that "CrossingBridge lacks knowledge as to whether the monitor actually approved the same." FAC ¶ 32 n.1 (emphasis added).[1] To be clear, this statement does not rise to the level of

---

[1] Plaintiff further describes the second recital in the Subscription Agreement as amended as being "inadmissible hearsay." Opp'n at 7. First, again, at this procedural stage, Plaintiff must plead a plausible claim for relief rather than object to the admissibility of documents as if this were summary judgment. Second, it is well established that fully executed contracts by the relevant parties involve verbal acts with "independent legal significance," and are not hearsay. *See Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*, 2023 WL 4493542, at *17 (S.D.N.Y. July 12, 2023).

alleging that the Amendment was invalid, but merely says that Plaintiff does not know one way or the other. Plaintiff's tactic here is not only improper, but borders on the scurrilous as it tacitly impugns the parties to the Subscription Agreement without foundation as potentially misleading the Ontario Court or the Monitor or both. CrossingBridge appears to want the upside of sowing doubt about the Amendment without either doing the work of reasonable inquiry to figure out the truth of the matter or having the Rule 11 accountability that comes with affirmatively stating that the Amendment is invalid. *See Smolen v. Fischer*, 2012 WL 3609089, at *9 (S.D.N.Y. Aug. 23, 2012) (noting plaintiff could face Fed. R. Civ. P. 11 sanctions "if he has no basis for his factual allegations"). Finally, although it is not Defendant's burden to show that the Monitor did approve the Amendment, but rather Plaintiff's burden to allege a plausible theory that it was not so approved, a reasonable investigation by counsel pursuant to his Rule 11 duties would have demonstrated both Court and Monitor approval beyond any reasonable doubt.[2]

---

[2] In addition to the Ontario Court's explicit prior approval of amendments later adopted by the parties and approved by the Monitor in the July 26 Approval Order, *see* Order at ¶ 3, and the parties' recital in the Subscription Agreement as amended that prior Monitor approval had been obtained, the executed Monitor's certificate dated September 19, 2024 is totally inconsistent with Plaintiff's suggestions that the requisite approval may have been lacking. *See* Dkt. No. 21-11, Monitor's Certificate § C.3 (certifying that "[t]he Monitor has received written confirmation from each of the Investors and the Applicant, in form and substance satisfactory to the Monitor, that all conditions to closing under the Subscription Agreement have been satisfied or waived by the Investors or the Applicant[.]") The mental gymnastics required for this Certificate not to encompass the Subscription Agreement as amended are, frankly, laughable. The Subscription Agreement was amended only a single time, on September 17, 2024. If the written confirmation relied on by the Monitor somehow pre-dated the September 17 Amendment, this means that the parties gave earlier written confirmation and then inexplicably failed to update that confirmation after they amended the governing Subscription Agreement. If the Monitor relied on post-September 17 written confirmation, this necessarily encompasses the September 17 Subscription Agreement as amended. Moreover, if Plaintiff had a sincere doubt—rather than a mere litigation posture—as to whether the Monitor had provided prior approval of the Subscription Agreement as amended, Plaintiff could have consulted the final Monitor's Twelfth Report filed to the CCAA docket, which contains billing entries for Monitor's counsel explicitly referring to the amendment to the Subscription Agreement. *See* Monitor's Twelfth Report, Twelfth Report - FTI Consulting Canada Inc - Monitor - 01-OCT-2024.pdf, at 179 (September 12, 2024 entry from R. Jacobs for

7

Plaintiff also mischaracterizes Defendant's discussion of the Ontario Court's decision. Contrary to Plaintiff's assertions, *see* Opp'n at 3–4, Defendant did not claim in its Moving Brief, and does not claim now, that the Ontario Court analyzed or decided the ICA issue or that Plaintiff is estopped from bringing this suit. (On the other hand, neither did the Ontario Court endorse Plaintiff's claims here.) Reserving a right to sue on an ancillary contract is different than objecting to the Reverse Vesting Transaction itself, something Plaintiff knew to be futile. While Plaintiff reserved its rights to sue later on the ICA, that does not mean the analysis and findings by the Ontario Court in the CCAA Proceeding are irrelevant. Far from it, the CCAA proceeding is the undeniable context for Plaintiff's entire theory of the case. *See* Moving Br. at 17 (citing August Endorsement); *id.* at 22–23 (citing July Endorsement and August Endorsement). In sum, Defendant was not, and is not, claiming that the Ontario Court adjudicated whether there was a breach of the ICA, but rather that the transaction the Ontario Court and Monitor ultimately approved—consideration to parties who contributed new value (rather than to any pre-petition creditor on account of their secured claims, which were "eliminated" according to the Court)—did not trigger the ICA.

## II.    Plaintiff's Opposition Fails to Salvage Its Claim that the Cargill Consideration Payment and the $12.5 Million Setoff Were Payments or Distributions With Respect to Shared Collateral.

As a threshold matter, the Court should reject Plaintiff's arguments concerning the indenture documents. Plaintiff now cites and attaches to its Opposition two 250-page indenture documents in an attempt to save the conclusory allegations of the Complaint from dismissal. The Court should reject this attempt to add particulars that were lacking in the FAC by reference to the

---

"[r]eview amendment to Subscription Agreement. Emails regarding closing maters [*sic*] and next steps."); *id.* at 180 (September 15, 2024 entry from M. Sassi for "[c]orrespondence regarding amendment to subscription agreement").

indenture documents, which the FAC mentioned only in passing and did not explain in any depth. *See Universal Trading & Inv. Co. v. Tymoshenko*, 2012 WL 6186471, at *1 (S.D.N.Y. Dec. 12, 2012) ("The Court declines to take these assertions into account because '[n]ew facts and allegations, first raised in a Plaintiff's opposition papers, may not be considered' in deciding a motion to dismiss.") (internal citation omitted).

But even if this material is not rejected, it fails to demonstrate how the Cargill Consideration Payment and Setoff were issued as proceeds of Shared Collateral. Plaintiff spends several paragraphs quoting the use of "Shared Collateral" in Sections 2.01(a) and 2.03(b) of the ICA and the definition of "Shared Collateral" and "Collateral" in both the ICA and the indenture documents. *See* Opp'n at 12. From there, Plaintiff cites paragraph 17 of the FAC—"[t]he Senior Priority Notes are secured by a lien on substantially all the real and personal property of Tacora and its subsidiaries"—and ultimately concludes that the Cargill Consideration Payment and Setoff trigger application of the ICA. *See* Opp'n at 12. Plaintiff's unstated and otherwise flawed premise is either that the Cargill Consideration Payment and Setoff are somehow connected to Plaintiff's liens on restructured Tacora's property or that any payment or distribution tangentially connected to Tacora's property triggers the ICA.

Plaintiff does not allege this first premise—that the Cargill Consideration Payment and Setoff are somehow connected to Plaintiff's liens on Tacora's property—because it cannot. The Cargill Consideration Payment was issued in the form of a discount on a completely new contractual obligation, the Cargill Offtake Agreement, and therefore cannot constitute proceeds of pre-petition Shared Collateral under the ICA. *See* Moving Br. at 28. Further, with respect to both the Cargill Consideration Payment and the Setoff, Plaintiff cannot evade the outcome of the Reverse Vesting Transaction: at the time of the Transaction's closing, the liens on Tacora's

9

property were "Discharged" from the Senior Priority Notes, Senior Secured Notes, and the Advanced Payment Facility (APF) because those liabilities, and any claims connected to them, were transferred to ResidualCo pursuant to Sections 7.2(b) and 7.2(d) of the Subscription Agreement's Closing Sequence. *See* Moving Br. at 27–28 (citing Subscription Agmt. §§ 3.1(c), 7.2(d)).

Plaintiff's counterpoint that the definition of "Discharge" in the Subscription Agreement differs from that of the ICA is unavailing. *See* Opp'n at 13. Defendant is not claiming that the Reverse Vesting Transaction caused the liens to be satisfied or perfected as the Indenture agreements and, in turn the ICA, use the term "Discharge." *See id.* Rather, at the time of the Reverse Vesting Transaction's closing, Plaintiff's Shared Collateral was converted from a lien on Tacora's property *to a lien on ResidualCo's property*; as such, Plaintiff's lien on ResidualCo's property does not, and cannot, have any connection to a discount on a new agreement between CITPL and reorganized Tacora or the Setoff of an outstanding debt under the APF between CITPL and reorganized Tacora. *See* Moving Br. at 28. Had Plaintiff's lien on Tacora's property not been transferred to ResidualCo, as Plaintiff appears to suggest, this would defeat the entire purpose of the Reverse Vesting Transaction: to allow Tacora to emerge as a going concern, free and clear of liabilities. *See id.* at 16–17.

The second premise—that any payment or distribution tangentially connected to Tacora's property triggers the ICA—is even more implausible. For instance, from the time that the parties entered into the ICA to the closing of the Reverse Vesting Transaction, CITPL was consistently receiving iron ore from the Tacora mine under the "Offtake Agreement" contract. At no point has Plaintiff claimed that it was entitled to a portion of that iron ore under the ICA. Indeed, such a claim would be absurd: CITPL had a contractual right to the iron ore in exchange for the value it

paid. The same logic applies to any consideration Defendant received as part of the Subscription Agreement in exchange for the value it provided—the investment from its corporate parent and the new Offtake Agreement. Plaintiff, who provided no value, is not entitled to now share via the ICA in those separately bargained-for benefits.

## CONCLUSION

For the foregoing reasons, Plaintiff's FAC should be dismissed with prejudice.

Respectfully submitted,

Dated:  March 21, 2025

*/s/ Tracey Salmon-Smith*

Tracey Salmon-Smith
Christian J. Clark
Faegre Drinker Biddle & Reath LLP
1177 Avenue of the Americas, 41st Floor
New York, New York
(212) 248-3140 (Telephone)
(212) 248-3141 (Fax)
tracey.salmonsmith@faegredrinker.com
christian.clark@faegredrinker.com

*Attorneys for Defendant Cargill International Trading Pte. Ltd.*

11

## **<u>WORD COUNT CERTIFICATION</u>**

I, TRACEY SALMON-SMITH, in accordance with Rule 7.1(c) of the Joint Local Rules for S.D.N.Y. and E.D.N.Y. and Rule 4.A of the Honorable Ronnie Abrams's Individual Rules certify that the foregoing Reply Memorandum of Law contains 3,473 words, as counted by Microsoft Word's word-processing system, excluding the caption, tables of contents and authorities, and signature block, and is in compliance with the aforementioned Rules.


Dated: March 21, 2025                          /s/ *Tracey Salmon-Smith*
                                               TRACEY SALMON-SMITH

## **CERTIFICATE OF SERVICE**

I certify that, on the date set forth below, I caused a true and correct copy of the foregoing Reply Memorandum of Law in Further Support of Defendant's Motion to Dismiss to be served via the Court's electronic filing system on counsel for Plaintiff CrossingBridge Advisors LLC. Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: March 21, 2025                     /s/ *Tracey Salmon-Smith*
                                          TRACEY SALMON-SMITH

13