UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CROSSINGBRIDGE ADVISORS LLC,

Plaintiff,

v.

CARGILL INTERNATIONAL TRADING PTE
LTD.,

Defendant.

24-CV-9138 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff CrossingBridge Advisors LLC ("CrossingBridge") brings this action against

Defendant Cargill International Trading Pte Ltd. ("CIPTL"), asserting a single claim for breach of

contract. CIPTL moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss

CrossingBridge's claim. For the reasons that follow, the motion is granted.

## BACKGROUND

The following facts are drawn from the allegations set forth in the First Amended

Complaint ("FAC"), *see* ECF No. 9, which are taken as true for the purposes of this motion to

dismiss, as well as (1) documents incorporated by reference into the FAC and upon which it relies;[1]

and (2) documents filed in connection with legal proceedings relevant to this action.[2]

Tacora Resources, Inc. ("Tacora") owns and operates an iron ore mine located in Canada.

---

[1] "A complaint is considered to include a document incorporated in it by reference, or where the complaint relies heavily upon its terms and effect." *Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022). Unless otherwise indicated, this opinion and order omits all internal quotation marks, citations, footnotes, omissions, emphases, and alterations in quoted text.

[2] "The Court may also consider matters of which judicial notice may be taken, which includes documents filed in other courts." *Deylii v. Novartis Pharms. Corp.*, No. 13-CV-06669, 2014 WL 2757470, at *4 (S.D.N.Y. June 16, 2014); *see also Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 369 (7th Cir. 1983) ("[F]ederal courts may also take notice of proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to matters at issue.").

FAC ¶¶ 5–6.  Since 2017, pursuant to an "Offtake Agreement" between Tacora and CIPTL, Tacora is required to sell to CIPTL—and CIPTL is required to buy from Tacora—all iron ore concentrate produced at the mine.  *Id.* ¶ 7.  In January 2023, Tacora and CIPTL entered an advance payment facility agreement ("APF Agreement"), pursuant to which CIPTL advanced a total of $30 million to Tacora under the Offtake Agreement.  *Id.* ¶ 12.  In May 2023, the APF agreement was amended such that CIPTL would provide Tacora margin advances of up to $25 million to finance payments due under the Offtake Agreement (the "Margin Facility").  *Id.* ¶ 14.

From 2021 through 2023, Tacora also engaged in several debt offerings.  First, in 2021 and 2022, it issued $225 million in Senior Secured Notes, for which Computershare Trust Company, N.A. ("Computershare") was the trustee and collateral agent.  *Id.* ¶¶ 9–11.  In May 2023, Tacora issued approximately $28 million in Senior Priority Notes, 45% of which were held by CrossingBridge, and for which Computershare was again the trustee and collateral agent.  *Id.* ¶¶ 16–18.  Tacora, CIPTL, and Computershare (as authorized representative of the noteholders), then executed an intercreditor agreement (the "ICA") that, among other things, set forth the priority of the creditors' claims against Tacora.  *Id.* ¶ 20–21.  As relevant here, the ICA provided, in sum and substance, that if any of the parties received a distribution of or proceeds from their "Shared Collateral," in Tacora, the funds would be applied: first, on a pari passu basis—i.e., equally— between the Senior Priority Notes and the Margin Facility; and, second, on a pari passu basis between the Senior Secured Notes and the $30 million initially advanced under the APF Agreement.  *Id.* ¶¶ 21–26.

On October 10, 2023, Tacora commenced a Canadian insolvency proceeding under the Companies' Creditors Arrangements Act (the "CCAA Proceeding").  *Id.* ¶ 28.  The result of that proceeding was a so-called "reverse vesting transaction."  *Id.* ¶ 29.  As one commentator has

explained:

> In a reverse vesting transaction, the purchaser acquires the shares of the debtor company, rather than its assets. The debtor company retains all of the assets that the purchaser wishes to acquire as part of the restructured business. The assets, obligations and encumbrances that the purchaser is not prepared to retain are transferred to and vested in a newly formed entity that becomes the remaining CCAA applicant and is subsequently wound-down.

Bradley Wiffen, *Reverse Vesting Transactions: An Innovative Approach to Restructuring*, 18 Ann. Rev. Insolvency L. 146 (2020). In Tacora's case, its shares were acquired by a group of investors that included Cargill, Inc.—CIPTL's parent company—and its obligations and encumbrances, including the Senior Priority and Senior Secured Notes, were transferred to a newly created entity named "ResidualCo." FAC ¶ 29. The transaction was carried out pursuant to a "Subscription Agreement" between the investor group and Tacora. *Id.*; *see* Salmon-Smith Decl., Ex. B, ECF No. 21-2.

The Subscription Agreement provided for a new offtake agreement to replace the prior one between Tacora and CIPTL. FAC ¶¶ 33–34; Subscription Agreement § 1.1. Because CIPTL owed Tacora $12.5 million under the prior offtake agreement, *see id.*, Cargill agreed to "set off" the money Tacora owed to CIPTL under the APF Agreement by the same amount, *see id.* § 7.2(c).

The Subscription Agreement further provided that, once the Notes and other liabilities were transferred to ResidualCo, Tacora would pay Cargill all amounts owed under the Margin Facility. FAC ¶ 30; Subscription Agreement § 7.2. This payment was "in consideration for Cargill entering into th[e] [Subscription] Agreement and its agreements, compromises and obligations [t]hereunder." *Id.* § 2.3; FAC ¶ 31. Prior to the transaction's closing, the Subscription Agreement was amended to provide that the payment—termed the "Cargill Consideration Payment"—would take the form of a discount provided to Cargill under the new offtake agreement. FAC ¶ 32.

The Canadian court approved the Subscription Agreement and reverse vesting transaction

on July 26, 2024.  FAC ¶ 29.  On October 7, 2024, the court terminated the CCAA proceeding, and Tacora emerged free of obligations under the Senior Priority and Senior Secured Notes.  *Id.* ¶ 37.

CrossingBridge commenced this action in New York state court on October 23, 2024, asserting that CIPTL's failure to distribute the value it received from Tacora pursuant to the Subscription Agreement violated the ICA.  *See* ECF No. 1.  CIPTL then removed to this Court, *see id.*, after which CrossingBridge filed an amended complaint containing substantially the same allegations, *see* ECF No. 9.  On February 3, 2025, CIPTL filed the instant motion to dismiss, *see* ECF No. 19, which CIPTL has opposed, *see* ECF No. 26.  The Court heard oral argument on Defendant's motion on August 5, 2025.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.*  On a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but "whether his complaint [is] sufficient to cross the federal court's threshold."  *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011).  In answering this question, the Court must "accept as true all factual allegations . . . but [is] not required to credit conclusory allegations or legal conclusions couched as factual allegations."

*Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020).[3]

## DISCUSSION

To recover on a claim for breach of contract under New York law, which governs the ICA, "a plaintiff must prove (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245–46 (2d Cir. 2000). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002).

Pursuant to the ICA, as a Senior Priority Noteholder, CrossingBridge is entitled to a portion of "any distribution [] made" or "proceeds or payment" "realize[d]" "in respect of any Shared Collateral." ICA §§ 2.01, 2.03(b). CrossingBridge asserts that CIPTL breached the ICA by failing to share the proceeds from (1) the Cargill Consideration Payment; and (2) the $12.5 million setoff against the APF Agreement (the "Setoff"). CIPTL argues that these transactions were not distributions or payments within the meaning of the ICA and, in the alternative, that they were not made "in respect of" the "Shared Collateral." The Court considers each transaction in turn.

## I.    The Cargill Consideration Payment

CrossingBridge first contends that it is entitled to a share of the Cargill Consideration Payment, which took the form of a discount to CIPTL under its new offtake agreement with Tacora. The Court concludes that CrossingBridge has failed to state a claim with respect to the Cargill Consideration Payment because the terms of the ICA and Subscription Agreement make clear that it was not drawn from the Shared Collateral.

---

[3] CIPTL also moves for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). That motion is premature, however, as CIPTL has not yet filed an answer. *See* Fed. R. Civ. P. 12(c) (motions for judgment on the pleadings allowed only "[a]fter the pleadings are closed"). Accordingly, the Court considers only the Rule 12(b)(6) motion. *See Alba v. City of New York*, No. 23-CV-8619, 2025 WL 26771, at *1 n.2 (S.D.N.Y. Jan. 3, 2025).

The ICA defines "Shared Collateral" to mean "Collateral in which the holders of any Series of Senior Priority Obligations . . . hold a valid and perfected security interest at such time."  ICA § 1.01.  "Collateral," in turn, is defined as "all assets and properties of [Tacora] now or hereafter subject to Liens created pursuant to," among other things, "Senior Priority [Notes]."  *Id.*  Putting those definitions together, "Shared Collateral" means, as relevant here, "assets and properties of Tacora subject to the Senior Priority Notes."

Accordingly, the question is whether, at the time of the Cargill Consideration Payment, Tacora's assets were encumbered by the Senior Priority Notes.  That question turns on the effect of the Subscription Agreement, which is governed by Canadian law.  Under Canadian law, "a decision-maker must read the contract as a whole, giving the words used their ordinary and grammatical meaning, consistent with the surrounding circumstances known to the parties at the time of formation of the contract."  *Warner v. Nutrien, Ltd.*, No. 18-CV-01615, 2018 WL 6528137, at *3 (D. Colo. Dec. 12, 2018) (quoting *Sattva Capital Corp. v. Creston Moly Corp.*, [2014] S.C.C. 53, ¶ 47 (Can.)).  Pursuant to the Subscription Agreement, which the Canadian court approved:

> On the Closing Date and in accordance with the Closing Sequence and pursuant to the Approval and Reverse Vesting Order, any Claims in respect of any Senior Priority Notes . . . shall be transferred and assumed by ResidualCo, for no consideration, and the same shall be vested in ResidualCo pursuant to the Approval and Reverse Vesting Order, which transfer shall constitute a novation of the Senior Priority Notes . . . to ResidualCo.

Subscription Agreement § 3.1(b).  It further provided that:

> Notwithstanding any other provision of this Agreement, . . . the Company shall [not] assume or have any Liability for any of the Senior Priority Notes, . . . and the Company and its assets, undertaking, business and properties shall be fully and finally Discharged from all Senior Priority Notes, . . . as at and from and after the [closing], pursuant to the Approval and Reverse Vesting Order.

*Id.* § 3.1(c).  Finally, pursuant to the "Closing Sequence" referenced above, which detailed the

order of the steps in the reverse vesting transaction, Tacora's obligations under the Senior Priority Notes were transferred to ResidualCo before the Cargill Consideration Payment was made. *See id.* § 7.2.

Under well-established Second Circuit law, "American courts will normally accord considerable deference to foreign adjudications as a matter of comity." *See, e.g.*, *Diorinou v. Mezitis*, 237 F.3d 133, 142 (2d Cir. 2001). In light of the Canadian court's approval of the Subscription Agreement, the Court assumes that its unambiguous terms—in particular, the order of operations set forth in the Closing Sequence—"should be given their literal meaning." *1337523 Ontario, Inc. v. Golden State Bancorp, Inc.*, 163 F. Supp. 2d 1111, 1116 (N.D. Cal. 2001) (citing *Gadbois v. Bonte Foods, Ltd.*, [1988] 94 N.B.R. (2d) 21 at ¶ 34 (Can.)). The Closing Sequence makes clear that, at the time the Cargill Consideration Payment took effect, CrossingBridge's Senior Priority Notes were vested in ResidualCo—not in Tacora—and thus Tacora's assets were neither "Collateral" nor "Shared Collateral" within the meaning of the ICA. CrossingBridge is therefore not entitled to share in the proceeds of the Cargill Consideration Payment.

Accordingly, CrossingBridge has failed to state a breach of contract claim with respect to the Cargill Consideration Payment.

## II.    The Setoff

CrossingBridge next alleges that it is entitled to a share of the Setoff, pursuant to which $12.5 million that Tacora owed to CIPTL under the APF Agreement was set off against CIPTL's pre-filing debt to Tacora under the Offtake Agreement. CIPTL principally contends that the Setoff was not a distribution or payment within the meaning of the ICA. The Court agrees.

As noted above, the ICA is governed by New York law. "In New York, setoff exists as a common law right, as well as a statutory right under New York Debtor & Creditor Law section

151," and is "jealously protected and enjoys a cherished status." *O'Quinn v. City of New York*, No. 1:19-CV-09663, 2025 WL 966015, at *2 (S.D.N.Y. Mar. 31, 2025). The doctrine "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." *DeFlora Lake Dev. Assocs., Inc. v. Hyde Park*, 689 F. App'x 99, 100 (2d Cir. 2017). Thus, "[a]lthough setoff can have the effect of paying one creditor more than another . . . setoffs are accepted and approved because they are based on long-recognized rights of mutuality." *In re Arcapita Bank B.S.C.(C)*, 640 B.R. 604, 628 (S.D.N.Y. 2022). Indeed, New York courts have long held that the "right of set-off of mutual demands is superior to the rights of creditors of an insolvent estate." *Munger v. Albany City Nat'l Bank*, 85 N.Y. 580, 583 (1881). Additionally, courts to consider the question have held that a setoff is not a payment. *See, e.g.*, *In re PS On Tap, LLC*, 669 B.R. 56, 76 (Bankr. C.D. Cal. 2025) ("[S]etoff does not involve the payment of money but rather the netting of mutual obligations."); *Arcapita*, 2014 WL 2109931, at *4 ("A setoff agreement only creates a right to pay less or nothing, not a right to receive a payment."); *In re SemCrude, L.P.*, 399 B.R. 388, 398 (Bankr. D. Del. 2009), *aff'd,* 428 B.R. 590 (D. Del. 2010) ("[A] right to effect a setoff can never impose a 'right to payment,' it only can yield a right to pay less than one would otherwise have to pay."); *In re Hancock*, 137 B.R. 835, 845 (Bankr. N.D. Okla. 1992) ("Where there is payment, by definition there is no setoff."); *Blount v. Windley*, 95 U.S. 173, 179 (1877) ("The idea of set-off is not the same as payment."); *see also Cammarota v. Drake*, 285 A.D.2d 919, 920 (N.Y. App. Div. 2001) (recognizing that the "affirmative defenses of payment and offset are distinguishable"). Nor is a setoff generally considered a distribution. *See In re SVB Fin. Grp.*, 662 B.R. 53, 67 (Bankr. S.D.N.Y. 2024) ("Setoff must be distinguished from a claim requesting a distribution from the liquidation of an estate."); *In re Trace Int'l Holdings, Inc.*, 284 B.R. 32, 39 (Bankr. S.D.N.Y. 2002)

(distinguishing distribution from setoff); *re PS On Tap*, 669 B.R. at 76 (rejecting argument that a setoff violated a predetermined "distribution waterfall").

In general, "unless a contract provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein." *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 118 (S.D.N.Y. 2010). "[S]etoff, as it exists under New York common law or statutory law, operates as a background principle, and a contract must expressly opt out of setoff to preclude invocation of the device." *O'Quinn*, 2025 WL 966015, at *4. Because the ICA does not provide otherwise, the Court concludes that the parties entered the ICA with the understanding that (1) in the event of an insolvency, Tacora may engage in a setoff with any of its creditors; and (2) as the law makes clear, such a setoff would neither violate the priority of claims set forth in the ICA nor constitute a payment or distribution within the meaning thereof.

Accordingly, CrossingBridge has failed to state a breach of contract claim with respect to the Setoff.

### III.    Leave to Amend

"The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "it is well established that leave to amend a complaint need not be granted when amendment would be futile." *Ruderman v. Liberty Mut. Grp., Inc.*, 2022 WL 244086, at *2 (2d Cir. Jan. 27, 2022). "[W]here an unambiguous document requires dismissal in a contract case, further amendment will often be futile." *Arag-A Ltd. v. Republic of Argentina*, 178 F. Supp. 3d 192, 203 (S.D.N.Y. 2016), *aff'd sub nom. Attestor Value Master Fund v. Republic of Argentina*, 940 F.3d 825 (2d Cir. 2019). Here, "[g]iven the terms of the parties' contract[s], any amendment" to CrossingBridge's claims for breach of contract would be futile. *Banco Santander (Brasil), S.A.*

*v. Am. Airlines, Inc.*, 2021 WL 4820646, at *6 (E.D.N.Y. Oct. 15, 2021).    Accordingly, the complaint is dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is granted.    The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 19 and to close this case.

SO ORDERED.

Dated:    August 12, 2025
New York, New York

_____
Ronnie Abrams
United States District Judge